UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ODED GREENBERG, M.D., | 15-cv-2343 (PKC/VMS) |
| Plaintiff, | **DEFENDANTS'** |
| - against - | **LOCAL CIVIL RULE 56.1 STATEMENT IN SUPPORT** |
| SUNY DOWNSTATE ET AL., | **OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | |

Pursuant to Local Civil Rule 56.1 of the United States District Court for the Southern and Eastern Districts of New York, Defendants Dr. Deborah Reede, Dr. Steven Pulitzer (the "Individual Defendants"), and The State University of New York ("SUNY") (together the "SUNY Defendants"), by their attorney ERIC SCHNEIDERMAN, the Attorney General of the State of New York, contend that there are no genuine issues as to the following material facts and that they are entitled to summary judgment based thereupon:

**I.     The Parties**

1.     Plaintiff, who self-identifies as White (Caucasian) and of the Jewish faith, was at least 54 years of age at the time of his termination.  Second Amended Complaint ("Compl."), ¶ 1.   He began his employment at SUNY Downstate in or about April 2001, and he was assigned to the Kings County Hospital Center ("KCHC") emergency room ("ER") pursuant to an affiliation agreement. Id., ¶¶ 4, 13.  Besides a hiatus from 2008 to

1

2010, Plaintiff remained employed by SUNY Downstate until his termination in October 2014. Compl., ¶ 1; Greenberg Dep., p. 13:7-10.[1]

2. Defendant Dr. Deborah Reede self-identifies as African-American, not Jewish, and is 67 years old. Reede Decl., ¶ 2. She was appointed Chair of Radiology at SUNY Downstate Medical Center in 2013, a position she holds to this day. Id., ¶ 3.

3. Defendant Dr. Stephen Pulitzer self identifies as White and Jewish and is 51 years old. Pulitzer Decl., ¶ 2. Dr. Pulitzer was a SUNY employee working at KCHC as part of an affiliation agreement at the time of the events described herein. Id. In July 2014, he became the Interim Chair of Radiology at KCHC, and eventually the full Chair in January 2015. Id. In November 2016, he was named the Chief Medical Officer at KCHC. Id.

4. Defendant SUNY is a legal entity constituted under N.Y. Educ. Law § 351 et seq. As subdivisions of SUNY, the Downstate Medical Center is not a legally-cognizable entity separate from SUNY. See N.Y. Educ. Law §§ 351 and 352.

## II. Facts Regarding ACGME Accreditation

5. The Accreditation Council for Graduate Medical Education (the "ACGME") is the body responsible for accrediting the majority of graduate medical training programs for physicians in the United States. Reede Decl., ¶ 6. The ACGME visited SUNY Downstate in 2013. Reede Dep., p. 96:2-11; Reede Decl., ¶ 6.

6. Following its visit in 2013, the ACGME conferred the adverse designation of "Probationary Accreditation" on SUNY's Radiology Department. Ex. A. The ACGME noted in its findings that "'some faculty' do not 'show up' for their scheduled

---

[1] For ease of reference, citations to exhibits and deposition transcripts herein are to the documents attached to the Declaration of Christopher Coulston, dated March 26, 2018.

2

supervision assignments and the program has not enforced adherence to the schedule." Id., SUNY000683. The Department was also criticized for not demonstrating that "an appropriate level of supervision is in place for all residents," and it was noted that "faculty do not demonstrate a strong interest in the education of the residents." Id., SUNY000684.

7. The SUNY Radiology Department was the only department in the country on probation in 2014 out of 201 radiology departments. Reede Decl., ¶ 7; Ex. B.

8. Dr. Reede, along with Dr. Ross Clinchy, from the Dean's Office at SUNY, met with the KCHC Chief Medical Officer, Dr. Jamaleddine, on April 9, 2014 to discuss the ACGME review. Reede Decl., ¶ 9.

9. During the meeting, Dr. Reede discussed changes that she believed were required to fix the issues in the department. Id. As part of the changes, Dr. Reede proposed replacing a number of faculty members, primarily based on teaching evaluations, and providing short term extensions for several others. Reede Dep., p. 67: 15-69:8; Jamaleddine Dep., p. 101:11-17. She also emphasized the need for monitoring of faculty member performance, increased work performance for physicians, productivity monitoring, and monitoring of teaching and scholarly activity. Ex. B.

10. Dr. Jamaleddine recommended that Dr. Kantor should also be non-renewed, due to the unfavorable accreditation decision. Reede Dep., p. 31:18-25; Jamaleddine Dep., p. 109:6-110:17. Dr. Pulitzer replaced Dr. Kantor as Interim Chief in July 2014. Pulitzer Decl., ¶ 4.

### III. Facts Regarding Appointment of Dr. Jinell Scott-Moore

11. Dr. Jinel Scott-Moore was a radiologist at LICH, and therefore a SUNY Downstate employee as of 2014, following SUNY Downstate's merger with LICH, who had worked with Dr. Reede. Scott Dep., p. 73:23-74:8. She is also Black, younger than Plaintiff, and not Jewish. Compl., ¶ 25.

12. Dr. Scott's resume showed more academic accomplishments than Plaintiff's. Ex. YY, ZZ. Plaintiff's resume listed two publications without a date. Ex. YY. During his deposition, he admitted that one of them was never published, and the other was published in 1993 or 1994. Greenberg Dep., 10:23-12:4. Plaintiff had also let his membership lapse in the radiological professional societies. Id., 6:23-5. Dr. Scott on the other hand was a member of three professional societies in 2014, she had a number of recent scientific posters and education exhibits, and was actively engaged in research for publication. Ex. ZZ. Plaintiff had also submitted a summary of his scholarly activity in 2013-2104 to provide an update to the ACGME that showed zero hours spent engaging in "Research/scholarly activity with residents" and no scholarly activity in the prior year. Ex. BBB.

13. There is no evidence that Dr. Scott had any time and attendance issues.

### IV. Plaintiff's Problems with Time and Attendance

14. On May 5, 2014, following the ACGME report, Dr. Reede met with Plaintiff to discuss an incorrect time entry from April 21, 2014. Ex. I. Dr. Reede reminded Plaintiff that "his job responsibilities require him to be present for consultations as well as resident supervision and education." Id. He was told to report his time correctly going forward. Id.

4

15. On May 8, 2014, Dr. Reede reminded all of the attending radiologists in the department that "everyone documents accurate information on their timesheets." Ex. L. This was repeated during the KCHC Department Meeting on June 26, 2014 led by Dr. Pulitzer, who noted that time and attendance will be monitored and that time sheets should reflect the actual time a physician was in the hospital. Ex. M, SUNY002458.

16. Dr. Pulitzer, who oversaw the schedule at KCHC, testified that, beginning in late July or August 2014, Plaintiff was "coming in late, he was on occasion leaving early. I…often didn't know what time he was going to be in that day…. I couldn't reliably plan the schedule." Pulitzer Dep., p. 305:23-306:9. Dr. Reede testified that she received reports that Plaintiff was sometimes not in the emergency room when "residents would be looking for him." Reede Dep., p. 142:22-143:9. Plaintiff's Talk Station data from the time showed that he was often not reading his first case until 10:30 or later. Ex. R.

17. The general expectation at KCHC is that radiologists spent most of their workday reading films. Pulitzer Decl., ¶ 6. Time spent reading film gets reflected, if only approximately, in "talk station" data. Id. Talk Station data comprises information about a particular film, including which radiologist read the film, and when the film was opened and signed for by a radiologist. Id. By reviewing the data for one day, an approximation of when a radiologist started reading film and when he or she stopped can be discerned. Id.

18. Dr. Scott, who worked in the same room as Plaintiff, testified that "[Plaintiff] was sometimes very erratic about his hours." Scott Dep., p. 137:19-25. She

5

noted that Plaintiff "would often come late to work. It could vary from like half an hour late to an hour to an hour and a half, to two." Id., p. 153:21-25.

19. In August 2014, Plaintiff originally requested vacation for August 11-August 22. Ex. O. On August 13, 2014, Plaintiff emailed Dr. Pulitzer while on vacation, and asked if he could return the following week, and then instead take off the week of August 25th. Ex. P.

20. On August 22, 2014, Dr. Pulitzer counseled Plaintiff in person on issues of time and attendance. Ex. R. Dr. Pulitzer addressed specific time entries with Plaintiff during this meeting that appeared to be inaccurate based on his Talk Station dictation system entries. Id. Dr. Pulitzer reminded him of the need to be at the hospital for set hours of 9:30-5:30. Id.

21. Despite his scheduled vacation the week of August 25th, Plaintiff returned to work on August 26. Ex. S; Pulitzer Dep., p. 334:8-21. Dr. Pulitzer received reports that Plaintiff was working "erratic" hours. Pulitzer Dep., p. 334:8-21. Plaintiff's time sheet indicates that, instead of 9:30 am to 5:30 pm, he claimed to have worked from 11 am to 7 pm on three days that week and 10 am to 6 pm on the other day he was in the office. Ex. T.

V. **Facts Regarding the September 4th and 5th Absences**

22. On August 29, 2014, the Friday before Labor Day weekend, Plaintiff e-mailed Linda McMurren asking how he could get approval for days off the following week "on an emergent basis." Ex. U, SUNYESI000994. Ms. McMurren was not authorized to approve vacation requests; the site director – Dr. Pulitzer – was the appropriate person to contact. Reede Dep., p. 290:9-15.

6

23. Plaintiff requested this "emergent" leave five days before he intended to take it, and he did not submit the approved form, which he had received on a number of occasions, to Dr. Pulitzer indicating who would provide coverage, the reason for the leave, and how much time he intended to take off. Ex. V, SUNYESI000805-6; Pulitzer Decl. ¶ 9.

24. The following Tuesday, September 2, 2014, Plaintiff asked Dr. Pulitzer to take the remainder of the week off. Ex. W, SUNY 827. This was the first time Dr. Pulitzer had heard of this request. Pulitzer Dep., 349:23-350:3.

25. Dr. Pulitzer denied his request, due to the operational needs of the department, since Dr. Patrick Hammil, the only other body imager, was scheduled to be off that same week. Ex. S; Ex. X, SUNY001289-1290; Reede Dep., p. 303:25-304:12.

26. Dr. Pulitzer testified that he does not recall Plaintiff specifying the reason he wanted to take the leave. Pulitzer Dep., 344:5-9; 345:16-346:12; 359:16-22. Dr. Pulitzer did not tell Dr. Reede that there was a specific reason for the request, and Plaintiff did not speak to her at all regarding his request. Reede Dep., 282:13-23. There is no written evidence of Plaintiff specifying the reason for his request prior to taking leave.

27. On September 3, Plaintiff returned to Dr. Pulitzer and informed him that he would be absent on September 4 and September 5. Pulitzer Dep., p. 351:9-24. After consulting with Dr. Reede, Dr. Pulitzer drafted a letter to Plaintiff that specifically denied his request for time off on September 4th and 5th, and Plaintiff was directed to report for duty or the matter would be referred to the Labor Relations Department. Ex. Y; Pulitzer Dep. 355:18-356:7.

28. On September 4, 2014, Plaintiff e-mailed Linda McMurren to confirm that he was not coming in "due to important family issues," the nature of which he did not specify. Ex. Z. Short on staff, Dr. Pulitzer arranged for multiple radiologists to cover Plaintiff's shifts those days. Pulitzer Dep., p. 354:3-23.

29. On September 5, 2014, however, Plaintiff e-mailed Ms. McMurren again and cc'd Dr. Pulitzer, writing that he "was going to come in regardless of my last email Thursday, the family issues having been resolved Thursday morning, I then managed to throw my back out." Ex. U. Plaintiff was absent from work on Thursday, September 4 and Friday, September 5. Ex. FF, SUNYESI001401.

30. Plaintiff called Ms. McMurren the following Monday, September 8, at 10:40 am (nearly two hours after his shift began) to inform her that he would be in late because he had to go to Urgent Care for his back. Ex. AA. Plaintiff arrived for work at about 12:30 pm and provided documentation from Premier Care of Park Slope, indicating that he received treatment for back pain that morning. Exs. BB; X, SUNY001291.

## VI. Facts Regarding Plaintiff's First Interrogation

31. Upon his arrival on September 8, Plaintiff was directed to Labor Relations, where he met with Michael Arabian. Ex. X. After reading the Statement of Rights Letter regarding his rights to representation by a union attorney or counsel of his choice during the hearing, Plaintiff elected to represent himself. Id., SUNY001280. Plaintiff was also advised by Mr. Arabian that he must respond truthfully to the questions asked during the interrogation or he could be subject to further discipline. Id.,

SUNY001281. The investigation was into Plaintiff's absences and failure to follow supervisors' directives regarding time and attendance. Id.

32. During the interrogation, Plaintiff stated that he was "on the [department's] schedule as 9 to 5," but he would occasionally "come in later and stayed later," sometimes arriving at 10-10:30 or even "a little bit later." Id., SUNY001283. Plaintiff further stated that "if I come in late it doesn't make any difference. I stay a little bit later. I've been keep—adhering to a schedule between, say, 10 and 11 and 6 and 7 in the evening." Id., SUNY001284. When Plaintiff was asked whether he had the authority to make his own schedule, he replied that he felt that he had the "moral authority to do so if I feel the department is failing to – to take care of their patients." Id., SUNY001284. Plaintiff admitted that he had recently been told by Dr. Pulitzer to adhere to set hours, which he assumed were "9 to 5 as written on the schedule." Id., SUNY001284.

33. When discussing the September 4 and 5 absences, Plaintiff stated that "I have a child with special needs and he was kicked out of his school and he was to attend a new school and I had to spend time with him," but he said that was not the reason he did not appear for work on September 4 and 5. Id., SUNY001290-1291. Plaintiff's mother-in-law came from out of town to help with his son, and while Plaintiff "had initially planned to take the day off, but I-I-I was gonna come in, I rolled out of bed and I – and I stretched my back out and I've been in pain and not able to be mobile since then." Id., SUNY001291. Plaintiff stated that he knew "that [his] son would have appropriate support" after his mother-in-law arrived. Id., SUNY001292.

34. Following the interrogation, Mr. Arabian consulted with Leonzo Cuiman, the Assistant Vice President for Labor Relations, and prepared a Settlement Agreement, which Plaintiff signed. Cuiman Dep., p. 237:22-238:6; Ex. CC. Dr. Reede and Dr. Pulitzer had no role in preparing the agreement, nor were they informed that Mr. Arabian was preparing such a document. Reede Dep., 314:12-25; Pulitzer Decl., ¶ 11.

35. The Settlement Agreement, covered Plaintiff's September 4 and 5 absences as well as his time and attendance issues in July and August. Ex. CC. The Settlement Agreement stated that in lieu of a Notice of Discipline for: "(1) unscheduled absences, (2) tardiness, (3) interfering with the operations of the department, (4) insubordination and (5) misrepresenting hours worked on time sheets, as a result of absences and tardiness, [and] switching schedule without authorization of his supervisor" a penalty ranging from a letter of reprimand to termination would be held in abeyance for one year provided Plaintiff could abide by its terms. Id.

36. The language included was standard for a settlement agreement from Labor Relations department. Ex. CC; Arabian Dep., p. 209:7-21. It called for Plaintiff to work his scheduled shift of 9:00 a.m. to 5:00 p.m., accurately list the hours he works, seek approval for any leave, and adhere to all Departmental policies and procedures. Id. The Agreement provided that if Plaintiff failed to abide by its terms, he could be punished with discipline ranging from a letter of reprimand to termination. Id. This language was subject to negotiation when it was presented to Plaintiff, who, having turned down assistance of counsel from his union, did not request for any of the terms to be changed; subsequently stating that he did not even read the agreement. Cuiman Dep., p. 255-257:4; Ex. DD, SUNY001353; Greenberg Dep., 274:12-275:18. The

agreement also waived any claims Plaintiff had related to any incidents occurring up to and including September 8, 2014. Ex. CC.

### VII. Plaintiff's Use of Unapproved Attestations

37. An attestation is a written statement made by an attending physician to certify that he or she had reviewed a patient's report and that the report is now final. Pulitzer Decl., ¶ 12. Attestations are legal documents that are vital to hospital billing, and non-conforming ones could trigger an investigation by the Centers for Medicare & Medicaid Services ("CMS"), as well as potential financial liability. Id. Risk Management approved the use of three attestations and, beginning in July 2014, staff were informed at numerous meetings on how to use them. GG, SUNY001270.

38. Phycare, which handles the billing for the department, gave a presentation on September 15, 2014 on the attestations. Id.

39. All Radiology Department staff, including Plaintiff, were personally instructed by Dr. Pulitzer to use the approved attestations during a staff meeting on September 22, 2014. Pulitzer Decl., ¶ 1; Ex. HH. The approved language was as follows:

> "I, _____, MD, have personally reviewed the images and concur with the preliminary report and the interpretation as stated and signed by the resident. This report now represents the FINAL REPORT for this patient." Ex. GG.

40. Shortly after the meeting, Plaintiff attached to patients' records approximately 180 unapproved attestations that were filled with sarcastic language, stating the following:

> "I, Oded Greenberg M.D., Board Certified Diagnostic attending Radiologist and Board Certified Pathologist, have personally, painstakingly reviewed each and every one of the provided images and reviewed the available clinical information. The above report, based on my own extensive knowledge and skill as well as meticulous observation and careful interpretation now represents the final report."

Ex. LL, SUNY00506-659.

41. Dr. Pulitzer was informed that Plaintiff subsequently had asked Jayan Kurian, an employee in the IT Department, to "take off" or "erase" the incorrect attestations, which would have been tampering with a legal medical file. Pulitzer Dep., p. 143:13-144:11. Dr. Pulitzer was extremely concerned by the number of reports, which he believed indicated a more severe "malicious" act, as well as posing problems for managing the data for all of the cases with the unauthorized language, which would need to be tracked. Id., p. 147:7-148:4.

42. After collecting and reviewing the attestations, Dr. Pulitzer then escalated the issue to Dr. Jamaleddine at KCHC, and scheduled a meeting with Risk Management at KCHC at his recommendation. Pulitzer Dep., p. 155:3-156:11. Risk Management believed the conduct was at least insubordinate, and told Dr. Pulitzer to consider a Medical Board Hearing. Ex. MM, HHC_ESI_001344; Pulitzer Decl., ¶ 16. Risk Management also told Dr. Pulitzer to have a "second reader" add a new, proper attestation to each file, and they were concerned that "if any of these cases became a medical legal case that there could be potential exposure to the hospital." Pulitzer Dep., p. 287:8-20; Pulitzer Dep. II, p. 108:23-109:3.

43. Dr. Pulitzer again conferred with Dr. Jamaleddine and they agreed that Plaintiff should be referred to Labor Relations. Dr. Pulitzer again conferred with Dr. Jamaleddine and they agreed that Plaintiff should be referred to Labor Relations, as well

as a possible referral to the Office of Professional Medical Conduct, which investigates complaints against physicians. Pulitzer Dep., p. 289:8-23; 290:20-291:17. Dr. Reede was consulted and agreed with referring the matter to Labor Relations at SUNY Downstate. Pulitzer Decl., ¶ 16; Reede Decl., ¶ 15.

### VIII. Facts Regarding Plaintiff's September 23 Absence

44. After taking off part of the morning of September 23, 2014, Plaintiff asked for two hours of additional leave that afternoon. Pultizer Dep., p. 389:22-390:6; Ex. GG. Defendant Pulitzer denied this request, because there was no one available to adequately cover for Plaintiff. Id.

45. That afternoon, Dr. Pulitzer learned that, in spite of the denied request for leave, Plaintiff "had left the building," and Dr. Pulitzer was unable to locate him for a number of hours. Pulitzer Dep., p. 402:20-403:6; 413:15-20. According to Talk Station data there was a gap of approximately two hours from 2:50 to 4:52. Ex. QQ, SUNY001326. Dr. Pulitzer learned that Dr. Greenberg had asked Dr. Amiram Samin to cover for him during that period, but Dr. Samin was not able to read neuroradiology cases, leaving the ER inadequately covered. Id. p. 401:24-403:6; 413:15-20. This issue was referred to Labor Relations as well. Ex. GG.

### IX. Facts Regarding Plaintff's Second Visit to Labor Relation

46. On October 3, 2014, Plaintiff was notified that he was to report to Labor Relations "to discuss allegations of insubordination, leaving the worksite without authorization and related matters." Ex. RR. This new case was handled by Stephanie Bernadel. Bernadel Dep., 11:22-12:6. After a delay so Plaintiff could attempt to locate

an outside attorney, an interrogation was held on October 10, 2014. Ex. QQ. Plaintiff was accompanied by his wife who is an attorney, and again waived his right to union representation. Ex. SS.

47. During the interrogation, Plaintiff was asked about the two hour gap in his Talk Station data on September 23. Ex. QQ, SUNY001323-1328. Plaintiff admitted that he left his desk during this period, and claimed it was only to talk to colleagues, his wife and eat lunch across the street at SUNY Downstate. Id., SUNY001326.

48. During the interrogation, Plaintiff described the attestations as "a Medicare and insurance hoop to jump through." Id., SUNY001329. He admitted the purpose of the attestations was explained to him, and that it was important to the hospital. Id. But he also admitted that he "thought it was ridiculous." Id., SUNY001329-30. He admitted that he complained about the forms during the meeting, and he continued to complain about the attestations during the interrogation, stating "I don't see why signing the document isn't attesting to me checking his work." Id., SUNY001330, 1340, 1337-8. Plaintiff admitted that he wrote the unapproved attestations, and he admitted that he thought the language was "playful." Id., SUNY001339.

49. At the interrogation, Plaintiff mentioned possible allegations of discrimination for the first time. Ex. QQ, SUNY001335. In response, Ms. Bernadel sent Plaintiff a letter directing him to contact The Office of Diversity & Inclusion regarding any complaints of discrimination. Ex. TT.

50. Shortly after the interrogation, it was reported to Labor Relations that Plaintiff "harassed" employees outside of KCHC. Ex. UU, SUNYESI000101. As a

result, Plaintiff was informed that he was not allowed to be on the hospital premises pending the outcome of the disciplinary action. Id.

51. On October 20, 2014, Ms. Bernadel and Mr. Cuiman met with Plaintiff again, who this time was accompanied by counsel from the New York State United Teachers, as well as his wife. Ex. DD, SUNY001345. Plaintiff continued to complain about the use of the required attestations during this meeting, repeating his view that the "purpose of the attestation" was "so that insurance companies make you jump through another hoop before they pay you" or, he added, "so that you can get sued better….there's no real good reason for it." Id., SUNY001364. He went on to say that "[i]t just adds more work to my day." Id., SUNY001365. Despite admitting he did not use the approved attestations, Plaintiff blamed Dr. Reede for his situation, and stated that her character was "really piss-poor." Id., SUNY001393. Plaintiff concluded the meeting by stating that "I expect to get my job back. I expect an apology from [Dr. Reede] and I expect a raise." Id., SUNY001394.

52. As part of her investigation, Stephanie Bernadel interviewed a number of employees regarding Plaintiff's use of the unapproved attestations. Dr. Scott told Ms. Bernadel that Plaintiff complained during that meeting about the use of attestations, telling her that "this is the beginning of the end of medicine, this is the corporatization of medicine." Ex. HH.

53. Dr. James Walsh told Ms. Bernaded that Plaintiff told him after the meeting that "I can't believe I have to write an attestation." Ex. II.

### X. Facts Regarding Other Statements Made by Plaintiff

54. On September 30, Plaintiff sent a letter to Dr. Pulitzer complaining that

"[t]he hyper-vigilance and micromanagement is often insulting and I no longer look forward to coming to works as a result of the corporatization of medicine." Ex. JJ. Plaintiff repeated this concern about the "corporatization" of medicine in an email following his termination, saying that "the new administrations [sic] polices have negatively affected morale and patient care in the name of corporatization." Ex. KK. Plaintiff believed this "corporatization of medicine" began at SUNY Downstate when Dr. Reede became chairwoman. Greenberg Dep., p. 42:9-13.

### XI. Facts Regarding Plaintiff's Termination

55. On October 22, 2014, Plaintiff was terminated for violations of the September 8 disciplinary settlement by the Labor Relations Department, in consultation with Drs. Pulitzer and Reede, following "allegations of insubordination, leaving the worksite without authorization and related matters." Ex. VV; Bernadel Dep., p. 5:12-18; Pulitzer Dep., p. 420:23-421:2. Dr. Pulitzer also conferred with Dr. Jamaleddine prior to Plaintiff's termination, and he agreed with the decision. Pulitzer Dep., p. 439:12-24.

56. Dr. Pulitzer himself ultimately had to correct the approximately 180 attestations by re-reading each study, confirming that he agreed or disagreed, and affixing a new counter-attestation. Ex. WW; Pulitzer Dep., 207:19-208:15.

### XII. Facts Regarding the ACGME Reassessment

57. Following the changes in personnel and the new standards put in place for all physicians in the department, the ACGME restored the Radiology Department's "Continued Accreditation" in August 2015. Ex. XX. The department was taken off probation at that time, and it remains accredited today. Reede Decl., ¶ 17. The ACGME

report in 2015 commended the department "for a quick turnaround and implementing significant changes that have greatly improved the educational program." Ex. XX, SUNY00697.

Dated: New York, New York
March 26, 2018

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
*Attorney for SUNY Defendants*

BY: **/s/ Christopher Coulston**
CHRISTOPHER COULSTON
Assistant Attorney General
120 Broadway, 24th Floor
New York, New York 10271
(212) 416-8556
email: christopher.coulston@ag.ny.gov

TO: *(via First Class Mail)*

Chad L. Edgar
Cardi & Edgar LLP
99 Madison Avenue, 8th Floor
New York, NY 10016
212.481.7770 (tel.)

Ryan Shaffer
Senior Counsel
New York City Law Department
100 Church St.
New York, New York 10007
(212) 356-5037