UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ODED GREENBERG, M.D.,                    15-cv-2343 (PKC/VMS)

                    Plaintiff,

        - against -

SUNY DOWNSTATE ET AL.,

                    Defendants.


## MEMORANDUM OF LAW IN SUPPORT OF
## SUNY DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT


ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
Attorney for SUNY Defendants
120 Broadway, 24th Floor
New York, New York 10271
(212) 416-8556
email: christopher.coulston@ag.ny.gov


CHRISTOPHER COULSTON
Assistant Attorney General
    of Counsel


Dated:  March 26, 2018

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... iii

Preliminary Statement........................................................................................................... 1

Statement of Facts.................................................................................................................. 3

Probationary Accreditation by the ACGME and Termination of Five Radiologists...................... 4
Dr. Scott is Appointed as New Section Chief of ER Radiology.................................................... 6
Plaintiff's Problems with Time and Attendance......................................................................... 6
Plaintiff's Time and Attendance Problems Worsen.................................................................... 7
The September 4 and 5 Absences ............................................................................................ 9
Plaintiff's First Interrogation ................................................................................................ 11
Plaintiff's Use of Unapproved Attestations. ........................................................................... 13
Plaintiff Takes Additional Unauthorized Leave ....................................................................... 16
Plaintiff's Second Labor Relations Visit ................................................................................ 16
ACGME Reassesment ........................................................................................................... 18

Summary Judgment Standard ................................................................................................ 19

Argument .............................................................................................................................. 19

I.     THE ELEVENTH AMENDMENT BARS PLAINTIFF'S CLAIMS UNDER THE
       FMLA, § 1983, SHRL AND CHRL AGAINST CUNY AND THE INDIVIDUAL
       DEFENDANTS IN THEIR OFFICIAL CAPACITIES ...................................................... 19

II.    PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE DISCRIMINATION
       CLAIM UNDER TITLE VII OR THE SHRL............................................................... 21

       A.  Plaintiff Cannot Show Facts Giving Rise to an Inference of Discrimination.................. 22

       B.  Because There Were Legitimate Non-Discriminatory Reasons to Terminate
           Plaintiff and not to Promote him, Plaintiff's Claim Fails .................................. 26

       C.  There is No Evidence of Pretext ................................................................... 27

III.   PLAINTIFF CANNOT ESTABLISH A RETALIATION CLAIM UNDER
       TITLE VII, THE SHRL AND THE CHRL................................................................. 27

IV.    PLAINTIFF'S AIDING AND ABETTING CLAIMS UNDER THE
       SHRL AND CHRL FAIL ......................................................................................... 29

i

V.    PLAINTIFF'S FMLA CLAIM FAILS ................................................................ 30

    A.  Plaintiff Cannot State a <u>Prima Facie</u> Case ...................................................... 31

    B.  Plaintff was Terminated for Legitimate Reasons and There is No Evidence
       of Pretext ............................................................................................................. 33

    C.  Defendants Reede and Pulitzer Cannot be Held Liable as Individuals ............ 34

VI.   PLAINTIFF CANNOT ESTABLISH AN EQUAL PROTECTION CLAIM ................... 34

CONCLUSION ..................................................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

Anderson v. Liberty Lobby, Inc.,
     477 U.S. 242 (1986)....................................................................................................19

Ashcroft v. Iqbal,
     556 U.S. 662 (2009)....................................................................................................35

Benedith v. Malverne Union Free Sch. Dist.,
     38 F. Supp. 3d 286 (E.D.N.Y. 2014) .........................................................................25

Bishop v. New Process Gear, Inc.,
     No. 5:06-CV-0821 GTS/GHL, 2009 WL 3928679 (N.D.N.Y. Nov. 18, 2009) ......................26

Blanc v. Sagem Morpho, Inc.,
     No. 07-cv-3085, 2009 WL 181236 (E.D.N.Y. June 25, 2009), aff'd, 394 F.
     App'x 808 (2d Cir. 2010)..............................................................................................26

Bogle-Assegai v. Connecticut,
     470 F.3d 498 (2d Cir. 2006)........................................................................................35

Bowen-Hooks v. City of New York,
     13 F. Supp. 3d 179 (E.D.N.Y. 2014) ..........................................................................28

Brown v. City of New York,
     No. 11 CIV. 2915 PAE, 2013 WL 3789091 (S.D.N.Y., July 19, 2013).....................29

Brown v. The Pension Boards,
     488 F. Supp. 2d 395 (S.D.N.Y. 2007).........................................................................32

Bussey v. Phillips,
     419 F. Supp. 2d 569 (S.D.N.Y. 2006).........................................................................24

Cajuste v. Lechworth Developmental Disabilities Serv.,
     No. 03 Civ. 0161 (RCC), 2005 WL 22863 (S.D.N.Y. Jan. 5, 2005) .........................20

Celotex Corp. v. Catrett,
     477 U.S. 317 (1986)....................................................................................................19

Chuang v. T.W. Wang Inc.,
     647 F. Supp. 2d 221 (E.D.N.Y. 2009) ........................................................................25

Clissuras v. City Univ. of N.Y.,
     359 F.3d 79 (2d Cir. 2004)..........................................................................................19

Coleman v. Court of Appeals of Maryland,
     566 U.S. 30 (2012)......................................................................................................20

DeWitt v. Lieberman,
    48 F.Supp. 2d 280 (S.D.N.Y.1999) ........................................................30

Dillon v. Ned Mgmt., Inc.,
    13–CV–2622, 85 F.Supp. 3d 639, 2015 WL 427921 (E.D.N.Y. Feb. 2, 2015) ....................30

Eka v. Brookdale Hosp. Med. Ctr.,
    247 F. Supp. 3d 250 (E.D.N.Y. 2017) ...................................................22

Feingold v. New York,
    366 F.3d 138 (2d Cir. 2004) ...............................................................20

Forrester v. Prison Health Servs.,
    No. 12 CV 363 NGG LB, 2015 WL 1469521 (E.D.N.Y. Jan. 5, 2015), report
    and recommendation adopted as modified, No. 12-CV-363 NGG, 2015 WL
    1469737 (E.D.N.Y. Mar. 30, 2015), aff'd sub nom. Forrester v. Prison Health
    Servs., Inc., 651 F. App'x 27 (2d Cir. 2016) ...............................................26

Graham v. Long Island R.R.,
    230 F.3d 34 (2d Cir. 2000) .................................................................24

Graziadio v. Culinary Inst. of Am.,
    817 F.3d 415 (2d Cir. 2016) ...........................................................31, 34

Holcomb v. Iona College,
    521 F.3d 130 (2d Cir. 2008) .................................................................1

Jett v. Dallas Indep. Sch. Dist.,
    491 U.S. 701 (1989) ........................................................................35

Johnson v. New York State Dep't of Corr. Servs. & Cmty. Supervision,
    No. 11-CV-079S, 2012 WL 4033485 (W.D.N.Y. Sept. 12, 2012) .........................20

Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.,
    716 F.3d 10 (2d Cir.2013) (per curiam) .................................................28

LeBoeuf v. New York Univ. Med. Ctr.,
    No. 98 CIV. 0973 (JSM), 2000 WL 1863762 (S.D.N.Y. Dec. 20, 2000) ...............33

Lore v. City of Syracuse,
    670 F.3d 127 (2d Cir.2012) ...............................................................28

Melman v. Montefiore Med. Ctr.,
    98 A.D.3d 107 (1st Dep't, 2012) .........................................................29

Noia v. Orthopedic Assocs. of Long Island,
    93 F. Supp. 3d 13 (E.D.N.Y. 2015) .......................................................34

O'Kane v. Lew,
    No. 10-CV-5325 PKC, 2013 WL 6096775 (E.D.N.Y. Nov. 20, 2013)....................................22

Okin v. Village of Cornwall-On-Hudson Police Dep't,
    577 F.3d 415 (2d Cir. 2009).............................................................................................35

Papasan v. Allain,
    478 U.S. 265 (1986)........................................................................................................19

Patterson v. County of Oneida,
    375 F.3d 206 (2d Cir. 2004)......................................................................................23, 35

Pennhurst State Sch. & Hosp. v. Halderman,
    465 U.S. 89 (1984)..........................................................................................................19

Perry v. State of New York Dep't of Labor,
    No. 08 CIV. 4610(PKC), 2009 WL 2575713 (S.D.N.Y. Aug. 20, 2009), aff'd
    sub nom., 398 F. App'x 628 (2d Cir. 2010)....................................................................35

Pilgrim v. McGraw-Hill Companies, Inc.,
    599 F. Supp. 2d 462 (S.D.N.Y. 2009)............................................................................28

Potenza v. City of New York,
    365 F.3d 165 (2d Cir. 2004).............................................................................................31

Quern v. Jordan,
    440 U.S. 332 (1979).........................................................................................................20

Redd v. N.Y. State Div. of Parole,
    923 F. Supp. 2d 371 (E.D.N.Y. 2012) ...........................................................................29

Ren Yuan Deng v. N.Y. State Office of Mental Health,
    13–CV–6801, 2015 WL 221046 (S.D.N.Y. Jan. 15, 2015)............................................30

Rinaldi v. Quality King Distributors, Inc.,
    29 F. Supp. 3d 218 (E.D.N.Y. 2014) .............................................................................31

Ross v. State of New York,
    No. 15-CV-3286 (JPO) 2016 WL 626561 (S.D.N.Y. Feb. 16, 2016) ...........................30

Rozenfeld v. Dep't of Design & Const. of City of New York,
    875 F. Supp. 2d 189 (E.D.N.Y. 2012), aff'd, 522 F. App'x 46 (2d Cir. 2013) ......................21

Santiago v. N.Y. State Dep't of Corr. Servs.,
    945 F.2d 25 (2d Cir. 1991)..............................................................................................20

Serby v. New York City Dep't of Educ.,
    526 F. App'x 132 (2d Cir. 2013) ...............................................................................31, 33

*Sethi v. Narod*,
    12 F. Supp. 3d 505 (E.D.N.Y. 2014) ...............................................................23

*Simpson v. Metro-N. Commuter R.R.*,
    No. 04 CIV. 2565 (PAC), 2006 WL 2056366 (S.D.N.Y. July 20, 2006) ...............35

*Slattery v. Swiss Reinsurance Am. Corp.*,
    248 F.3d 87 (2d Cir. 2001) ...................................................................28, 29

*Soloviev v. Goldstein*,
    104 F. Supp. 3d 232 (E.D.N.Y 2015) ..................................................................30

*Terry v. Ashcroft*,
    336 F. 3d 128 (2d Cir. 2003) ...............................................................................22

*Univ. of Texas Southwestern Med. Ctr. v. Nassar*,
    570 U.S. 338 (2013) .......................................................................................28, 29

*Van Zant v. KLM Royal Dutch Airlines*,
    80 F.3d 708 (2d Cir. 1996) ..................................................................................22

*Weinstock v. Columbia Univ.*,
    224 F.3d 33 (2d Cir. 2000) ..................................................................................22

*Will v. Mich. Dep't of State Police*,
    491 U.S. 58 (1989) ..............................................................................................20

*Williams v. N.Y.C. Hous. Auth.*,
    61 A.D.3d 62 (1st Dep't 2009) ............................................................................30

*Woods v. START Treatment & Recovery Centers, Inc.*,
    864 F.3d 158 (2d Cir. 2017) ..........................................................................31, 33

*Wright v. Smith*,
    21 F.3d 496 (2d Cir.1994) ...................................................................................35

**CONSTITUTIONS**

Eleventh Amendment ............................................................................................ passim

Fourteenth Amendment ................................................................................................21

**FEDERAL STATUTES**

42 U.S.C.
    § 1981 .............................................................................................................34, 35
    § 1983 ......................................................................................................... passim

Civil Rights Act of 1964 Title VII, 42 U.S.C.
    § 2000e et seq. ........................................................................................ passim

Family Medical Leave Act, 29 U.S.C.
    § 2600 et seq. ........................................................................................ passim

FMLA ...................................................................................................... passim

Title VII ................................................................................................... passim

**FEDERAL RULES**

Federal Rules of Civil Procedure
    Rule 56 .............................................................................................................1

Local Civil Rule 56.1 .............................................................................................1

**FEDERAL REGULATIONS**

29 C.F.R.
    § 825.303(c) .................................................................................................32, 33

**STATE STATUTES**

New York Executive Law
    § 290 et seq. ........................................................................................... passim

**MISCELLANEOUS AUTHORITIES**

N.Y.C. Admin.Code § 8-107 et seq. ........................................................... passim

Defendants Dr. Deborah Reede, Dr. Steven Pulitzer (the "Individual Defendants"), and

The State University of New York ("SUNY") (together the "SUNY Defendants") submit this

memorandum of law in support of their motion for summary judgment dismissing the claims in

this action pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Also submitted in

support of this motion are the SUNY Defendants' Statement Pursuant to Local Civil Rule 56.1;

the declaration of Christopher Coulston ("Coulston Decl."); the declaration of Dr. Stephen

Pulitzer ("Pulitzer Decl."); and the declaration of Dr. Deborah Reede ("Reede Decl.").

## Preliminary Statement

SUNY Downstate Medical Center is a teaching hospital.  In April 2014, the Radiology

Department's residency program at SUNY Downstate was put on academic probation by the

Accreditation Council for Graduate Medical Education (the "ACGME").[1]  The probationary

status was imposed following a site visit in 2013, before the new Radiology Department

Chairperson, Dr. Deborah Reede, was hired.  The probationary status put the very survival of the

residency program at stake.  Following the ACGME's report, Dr. Reede increased her efforts to

encourage academic engagement by her physicians, and institute measures to ensure that

radiologists worked regular shifts to handle patient care needs and educate residents, while

terminating a number of underperforming physicians in the department.  Plaintiff Dr. Oded

Greenberg, who was retained following the ACGME report, responded poorly to the new

leadership and the new attention paid to performance metrics and time and attendance in the

department, labeling them the "corporatization of medicine."  Following a litany of angry emails,

insubordinate acts and time and attendance abuse, Plaintiff was terminated on October 22, 2014.

Plaintiff now claims that his termination, as well as the appointment of Dr. Jinel Scott-

---

[1] The ACGME is the body responsible for accrediting the majority of graduate medical training programs for physicians in the United States.  Reede Decl., ¶ 5.

Moore as Section Chief of ER Radiology, was the result of discrimination based on his age, race or religion in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"); the New York State Human Rights Law ("SHRL"), New York Executive Law § 290 et seq.; the New York City Human Rights Law ("CHRL"), N.Y.C. Admin.Code § 8-107 et seq.; and, pursuant to 42 U.S.C. § 1983, for violation of his right to equal protection.  In the alternative, Plaintiff alleges he was terminated in retaliation for taking leave under Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2600 et seq.  These claims are without merit. Specifically, there is no evidence of discrimination by anyone at SUNY, and Plaintiff did not request, nor was he qualified for, FMLA leave during his unexcused absences.  Further, the uncontroverted evidence shows that Plaintiff was terminated due to his own actions. The record here shows a department in shambles, a director intent on fixing the issues that plagued it, and an insubordinate employee who refused to adapt to what Dr. Ghassan Jamaleddine, the Chief Medical Officer of Kings County Hospital Center, described as "sort of like a crisis."  As set forth below, all of Plaintiffs' claims are subject to dismissal.

*First*, Plaintiff's claims against SUNY under §1983, SHRL, CHRL and FMLA are barred pursuant to the 11th Amendment (see Sec. I, infra.).  *Second*, Plaintiff cannot set forth a prima face case of discrimination under Title VII or the SHRL, let alone establish a genuine issue of material facts with respect to the legitimate reasons for Plaintiff's termination (see Sec. II, infra.). *Third*, Plaintiff cannot establish a retaliation claim under Title VII or the SHRL (see Sec. III, infra.).  *Fourth*, Plaintiff's aiding and abetting claims under the SHRL and CHRL against the Individual Defendants fail because SUNY cannot be held liable under those statutes (see Sec. IV, infra.).  *Fifth*, in addition to being barred by sovereign immunity, Plaintiff's FMLA claim fails because Plaintiff took leave for an ineligible condition, and, in the alternative, Plaintiff was

terminated for a legitimate reason (see Sec. V, infra.).  *Sixth*, Plaintiff cannot establish an equal

protection claim (see Sec. VI, infra.).

## Statement of Facts

SUNY Downstate Medical Center is one of the nation's leading urban medical centers.

Founded in 1860, it is comprised of a College of Medicine, College of Health Related Professions,

College of Nursing, School of Graduate Studies, School of Public Health, and University Hospital

of Brooklyn.  SUNY Downstate employs a number of radiologists who work at Kings County

Hospital Center ("KCHC"), which is a hospital operated by New York City and is across the street

from SUNY Downstate, through an affiliate agreement.

Plaintiff self identifies as White and Jewish and is 58 years old.  Plaintiff was originally

hired by SUNY in April 2001 as a board-certified radiologist and attending physician, and he

was assigned to the KCHC emergency room ("ER") through the affiliation agreement.  Compl. ¶

13.  Besides a hiatus from 2008 to 2010, Plaintiff remained employed by SUNY Downstate until

his termination in October 2014.  Id., ¶ 1; Greenberg Dep., p. 13:7-10.[2]

Defendant Dr. Deborah Reede self-identifies as African-American, not Jewish, and is 67

years old. Reede Decl., ¶ 2.  Following an executive search in 2013, Dr. Reede was appointed

Chair of Radiology at SUNY Downstate Medical Center, a position she still holds.  Id., ¶ 3. In her

role as Chair of Radiology at Downstate, she oversees the daily activities of the Radiology

Department, and is responsible for its faculty and residents (particularly with respect to resident

education), as well as its staff.  Id.  Dr. Reede's office is located at SUNY Downstate.  Id.

Defendant Dr. Stephen Pulitzer self identifies as White and Jewish and is 51 years old.

Pulitzer Decl., ¶ 2. In July 2014, he became the Interim Chair of Radiology at KCHC, and

---

[2]For ease of reference, citations to exhibits and deposition transcripts herein are to the exhibits attached to the Declaration of Christopher Coulston, dated March 26, 2018.

eventually the full Chair in January 2015.  Id.  In his role as Chair of Radiology at KCHC, Dr. Pulitzer was the site director and responsible for the day-to-day operations of the Radiology Department, including the supervision of Plaintiff before his termination.  Id.  During the relevant events, Dr. Pulitzer was a SUNY employee through the affiliation agreement with KCHC.  Id., ¶ 2.  In November 2016, he was named the Chief Medical Officer at KCHC.  Id.

### *Probationary Accreditation by the ACGME and Termination of Five Radiologists.*

Shortly before Dr. Reede's hiring in 2013, the Accreditation Council for Graduate Medical Education visited SUNY Downstate to assess the Radiology Department.  Reede Dep., p. 96:2-11; Reede Decl., ¶ 6.  The ACGME is the body responsible for accrediting the majority of graduate medical training programs in the United States.  Id.  On April 15, 2014, the ACGME conferred the adverse designation of "Probationary Accreditation" on SUNY's Radiology Department.  Ex. A.  The ACGME noted in its findings that "'some faculty' do not 'show up' for their scheduled supervision assignments and the program has not enforced adherence to the schedule."  Id., SUNY000683. The Department was also criticized for not demonstrating that "an appropriate level of supervision is in place for all residents," and it was noted that "faculty do not demonstrate a strong interest in the education of the residents."  Id., SUNY000684.  In light of the ACGME's findings, it became crucial that, going forward, radiologists be present during their regular shifts for consultations and formal teaching sessions.  Reede Decl., ¶ 11.  The Radiology Department had the unfortunate distinction of being the only department in the country on probation out of 201 radiology departments.  Reede Decl., ¶ 7; Ex. B.  Without significant changes, the Residency Program risked closure altogether.  Id.

Dr. Reede, along with Dr. Ross Clinchy, from the Dean's Office at SUNY, met with the KCHC Chief Medical Officer, Dr. Jamaleddine, on April 9, 2014 to discuss the ACGME review.

Reede Decl., ¶ 9.  Dr. Jamaleddine referred to the situation as "sort of like a crisis."  Jamaleddine Dep., p. 99:8-20.  During the meeting, Dr. Reede discussed changes that she believed were required to fix the issues in the department.  Id.  As part of the changes, Dr. Reede proposed replacing a number of faculty members, primarily based on teaching evaluations, and providing short term extensions for several others.  Reede Dep., p. 67: 15-69:8; Jamaleddine Dep., p. 101:11-17.  She also emphasized the need for monitoring of faculty member performance, increased work performance for physicians, productivity monitoring, and monitoring of teaching and scholarly activity.  Ex. B.  As part of the changes, Dr. Jamaleddine recommended that Dr. Alan Kantor, the Chief of Radiology at KCHC, should also be non-renewed.[3]  Reede Dep., p. 31:18-25; Jamaleddine Dep., 109:6-110:17.  Dr. Pulitzer replaced Dr. Kantor as Interim Chief in July 2014.  Pulitzer Decl., ¶ 4.  The ACGME would return for a site visit within the year.  Ex. B.

On June 23, 2014, it was announced that five radiologists – Catherine Mason, Alan Kantor, David Areman, Gautam Mirchandani and Daphne Roitberg – would be non-renewed. Reede Decl., ¶ 9.  Plaintiff did not agree with the decision to non-renew these individuals and was angry with Dr. Reede.  Greenberg Dep., p. 519:8-10.  In an email to Dr. Kantor on June 23, 2014, Plaintiff wrote that "[t]here is a special place in Hell for the administration and the powers that be for what has happened here….[and] [h]opefully I will remain employed at least long enough to make a certain someones (sic) life miserable."  Ex. C.  Plaintiff wrote in another email that "I always felt that Downstate was a pretty horrible hospital, now with this experience, the LICH fiasco, bringing in Stalin as our new chairperson [referring to Dr. Reede] and numerous agregious (sic) firings later, I am convinced that this is the new face of medicine playing out at

---

[3] Non-renewal has a specific meaning under the applicable collective bargaining agreement between the State of New York and United University Professions.  The physicians in the department were operating under one year contracts at the time due to economic uncertainty.  The contracts were either renewed or non-renewed each year. Reede Decl., ¶ 9, fn 2.

its worst here in Brooklyn." Ex. D, SUNYESI000733; Greenberg Dep., p. 315:10-13.

### *Dr. Scott is Appointed as New Section Chief of ER Radiology.*

Following the non-renewals, the Department needed a new Section Chief of ER

Radiology. When making this determination, Dr. Reede focused on the "academic profile" of

the potential candidates, in light of the ACGME review. Reede Dep., p. 121:17-122:16. Dr.

Reede considered Plaintiff and Dr. Qi Chen, another radiologist in the department, but ultimately

decided on Dr. Jinel Scott-Moore "because she had expressed a strong interest in academics…

and she had very good reports from the residents regarding her teaching." Id., p. 124:10-22. Dr.

Jinel Scott-Moore was a SUNY employee at Long Island College Hospital ("LICH") (which had

merged with SUNY), who had worked with Dr. Reede in the past. Scott Dep., p. 73:23-74:8.

She is also Black, younger than Plaintiff, and not Jewish. Compl., ¶ 25. Dr. Reede believed that

Dr. Scott had more interest in scholarly activity than Dr. Greenberg at the time she decided on a

new Chief of ER Radiology. Reede Dep., p. 131:15-132:25. Concerns over Plaintiff's and Dr.

Chen's time and attendance and availability was also a factor in Dr. Reede's decision. Id., p.

137:18-25. Dr. Reede met with Plaintiff on July 23, 2014 to discuss the position, and discussed

the possibility of sharing the role with Dr. Scott in the future. Ex. AAA.

### *Plaintiff's Problems with Time and Attendance.*

There had "been time and attendance issues with Dr. Greenberg for many years." [4]

Pulitzer Dep., 111:24-25. These issues intensified with the hiring of Dr. Reede, who placed a

---

[4] Plaintiff record of time and attendance and behavioral issues in the past was well known by Dr. Pulitzer, and he
collected emails from Dr. Kantor related to this conduct for Labor Relations following Plaintiff's termination. Ex.
E. In August 2013, Dr. Kantor noted that Plaintiff failed to work until 8:00 pm as scheduled, and "unilaterally
decided to leave early every day." Ex. F. Dr. Kantor also could not locate Plaintiff to discuss this issue. Id. On
September 25, 2013, Plaintiff emailed Dr. Kantor again, and complained that "it pisses me off that there is so much
attention being paid to data analysis as to when I read my first and last cases (an inaccurate measure of the time I
arrive and leave)." Ex. G. On October 9, 2013, Plaintiff again emailed Dr. Kantor, complaining about an allegation
made during a department meeting by Dr. Hammil about lack of ER coverage from 4 and 5 pm." Ex. H. Plaintiff
stated that he thought this was "bullshit," and ended the email by saying that he "no longer give[s] a fuck." Id.

new emphasis on attendance and physicians working their assigned shifts, particularly following the ACGME report.  Reede Decl., ¶ 11.  Plaintiff objected to the new attention, claiming he was no longer treated as a "professional" after the hiring of Dr. Reede.  Greenberg Dep., p. 63:4-64:18.  On May 5, 2014, following the ACGME report, Dr. Reede met with Plaintiff to discuss an incorrect time entry from April 21, 2014.  Ex. I.[5]  Dr. Reede reminded Plaintiff that "his job responsibilities require him to be present for consultations as well as resident supervision and education."  Id.  He was told to report his time correctly going forward.  Id.   During this period, Dr. Reede received reports that Plaintiff was sometimes not in the emergency room when "residents would be looking for him."  Reede Dep., p. 142:22-143:9.

On May 8, 2014, Dr. Reede reminded all of the attending radiologists in the department that "everyone documents accurate information on their timesheets."  Ex. L, p. 4. At the KCHC Department Meeting on June 26, 2014 Dr. Pulitzer noted that time and attendance will be monitored and time sheets must be accurate. Ex. M, SUNY2458.

### Plaintiff's Time and Attendance Problems Worsen.

Following the non-renewals and the appointment of Dr. Scott, Plaintiff continued to have attendance issues in July 2014, scheduling a day off on July 9, only to appear for work that day, state that he had to leave by 2:15 pm and that he would take July 10 off instead.  Ex. N.  This pattern persisted into August 2014. Dr. Pulitzer, who oversaw the schedule at KCHC, testified that, beginning in late July or August, Plaintiff was "coming in late, he was on occasion leaving early.  I…often didn't know what time he was going to be in that day…. I couldn't reliably plan the schedule."  Pulitzer Dep., p. 305:23-306:9. Dr. Scott, who worked in the same room as

---

[5] During Plaintiff's deposition, he admitted that he also incorrectly entered his time for April 8, listing his hours as 9 am – 5 pm, when in fact he took a half day off that day.  Greenberg Dep., p. 157:11-159:9.  Plaintiff called it a "clerical error."  Id.  Plaintiff's April 3 and 4 entries were wrong as well. Exs. J, K.

Plaintiff, saw firsthand that "[Plaintiff] was sometimes very erratic about his hours."  Scott Dep., p. 137:19-25. She noted that Plaintiff "would often come late to work.  It could vary from like half an hour late to an hour to an hour and a half, to two."  Id., p. 153:21-25.  Talk Station data from the time showed that Plaintiff was often not reading his first case until after 10:30. Ex. R.[6]

August is a challenging month to schedule given the number of vacation days taken by physicians in the department.  Pulitzer Decl., ¶ 8.  The department was usually short-staffed and so adherence to the schedule was critical to provide adequate care throughout the radiology department.  Id.  In August 2014, Plaintiff originally requested vacation for August 11-August 22. Ex. O.  On August 13, 2014, Plaintiff emailed Dr. Pulitzer while on vacation, and asked if he could return the following week, and instead take off the week of August 25th.  Ex. P.

During the week of August 18, Plaintiff maintained erratic hours, only working from 10 am to 1:30 pm on Thursday, August 21.  Ex. Q.  On August 22, 2014, Dr. Pulitzer counseled Plaintiff in person on issues of time and attendance.  Ex. R.  Dr. Pulitzer addressed specific time entries with Plaintiff during this meeting that appeared to be inaccurate based on Plaintiff's Talk Station dictation system.  Id.  Dr. Pulitzer reminded him of the need to be at the hospital for set hours of 9:30-5:30.  Id.  These hours were decided upon after Dr. Pulitzer asked Plaintiff what hours would be most convenient for him, and made it clear that he would try to accommodate his schedule.  Pulitzer Dep., p. 310:21-311:14.

---

[6] The general expectation at KCHC is that radiologists spent most of their workday reading films.  Pulitzer Decl., ¶ 6.  Time spent reading film gets reflected, if only approximately, in "talk station" data.  Id. Talk Station data comprises information about a particular film, including which radiologist read the film, and when the film was opened and signed for by a radiologist.  Id.  By reviewing the data for one day, an approximation of when a radiologist started and stopped reading film can be discerned. Id. Dr. Pulitzer monitored this data for *all* of the radiologists in the department, as the department was in disarray at the time he was appointed Director of Radiology in part due to time and attendance abuse by physicians.  Id. ¶¶ 4, 6; Pulitzer Dep. II, p. 160:17-161:3.  Besides Plaintiff, Dr. Jaya Nath was placed on time and attendance watch, and Dr. Qui Chen was ultimately terminated due to time and attendance issues.  Reede Dep. p. 101:21-25; Reede Decl., ¶ 13.  Dr. Reede stated that reviewing this data is "a standard procedure in most radiology departments."  Reede Dep., p. 260:21-262:23.

Despite his scheduled vacation the week of August 25th, Plaintiff returned to work on August 26, again working erratic hours "at his choosing." Ex. S; Pulitzer Dep., p. 334:8-21. Plaintiff also told Dr. Scott that he might not come in during some of the days that week, leading to a "mess." Scott Dep. p. 142:3-20. This was less than a week after Plaintiff and Dr. Pulitzer had met regarding his hours. The schedule switch was not authorized by Dr. Pulitzer or Dr. Reede, and none of the required documentation was submitted to request the change. Plaintiff's time sheet indicates that, instead of 9:30 am to 5:30 pm, he claimed to have worked from 11 am to 7 pm on three days that week and 10 am to 6 pm on the other day he was in the office. Ex. T.

### *The September 4 and 5 Absences.*

On August 29, 2014, the Friday before Labor Day weekend, Plaintiff e-mailed Linda McMurren asking how he could get approval for days off the following week "on an emergent basis." Ex. U, SUNYESI000994. Ms. McMurren was not authorized to approve vacation requests; the site director – Dr. Pulitzer – was the appropriate person to contact. Reede Dep., p. 290:9-15. Plaintiff requested this "emergent" leave five days before he intended to take it, and he did not submit the approved form, which he had received on a number of occasions, to Dr. Pulitzer indicating who would provide coverage, the reason for the leave, and how much time he intended to take off. Ex. V, SUNYESI000805-6; Pulitzer Decl. ¶ 9.

The following Tuesday, September 2, 2014, Plaintiff asked Dr. Pulitzer directly to take the remainder of the week off. Ex. W. This was the first time Dr. Pulitzer had heard of this request. Pulitzer Dep., 349:23-350:3. Dr. Pulitzer denied his request, due to the operational needs of the department, since Dr. Patrick Hammil, the only other body imager, was scheduled to be off that same week. Ex. S; Ex. X, SUNY001289-1290; Reede Dep., p. 303:25-304:12. Dr. Greenberg has alleged that he requested leave to provide care for his autistic son, but Dr.

9

Pulitzer, who has his own child with special needs, does not recall any discussion of Plaintiff's son, and testified the reason for the request "wasn't specified to [him]."  Pulitzer Dep., 344:5-9; 345:16-346:12; 359:16-22.[7]  Dr. Pulitzer did not tell Dr. Reede that there was a specific reason for the request, and Plaintiff did not speak to her.  Reede Dep., 282:13-23.  Dr. Pulitzer had been very flexible throughout the month of August with Plaintiff's ever-changing vacation schedule, but he simply did not have the staff to cover for Plaintiff's absence the week of September 2. Pulitzer Dep., p. 337:10-338:4.

On September 3, Plaintiff returned to Dr. Pulitzer and informed him that he would be absent on September 4 and September 5.  Pulitzer Dep., p. 351:9-24.  After consulting with Dr. Reede, Dr. Pulitzer drafted a letter to Plaintiff that specifically denied his request for time off on September 4th and 5th, and Plaintiff was directed to report for duty or the matter would be referred to the Labor Relations Department.  Ex. Y; Pulitzer Dep. 355:18-356:7.  On September 4, 2014, Plaintiff e-mailed Linda McMurren to confirm that he was not coming in "due to important family issues," the nature of which he did not specify.  Ex. Z.  Short on staff, Dr. Pulitzer arranged for multiple radiologists to cover Plaintiff's shifts.  Pulitzer Dep., p. 354:3-23.

On September 5, 2014, however, Plaintiff e-mailed Ms. McMurren again and copied Dr. Pulitzer, writing that he "was going to come in regardless of my last email Thursday, the family issues having been resolved Thursday morning, I then managed to throw my back out." Ex. U. Again, Plaintiff did not specify the "family issues."  Plaintiff called Ms. McMurren the following Monday, September 8, at 10:40 am (well after his shift began) to inform her that he would be in late because he had to go to Urgent Care for his back.  Ex. AA.  Plaintiff arrived for work at

---

[7] While Defendants respectfully submit that documentary evidence and Plaintiff's own admissions indicate he did not tell Dr. Pulitzer that he needed the time off to care for his son, it is irrelevant here.  Even assuming that he did express that to Dr. Pulitzer on September 2 or September 3, as set forth below, this does not save his claims.

about 12:30 pm and provided documentation from Premier Care of Park Slope, indicating that he

received treatment for back pain that morning.  Exs. BB; X, SUNY001291.

> ### *Plaintiff's First Interrogation.*

Upon his arrival on September 8, Plaintiff was directed to Labor Relations, where he met

with Michael Arabian.  Ex. X.  After reading the Statement of Rights Letter regarding his rights

to representation by a union attorney or counsel of his choice during the hearing, Plaintiff elected

to represent himself.  Id., SUNY001280.  Plaintiff was also advised by Mr. Arabian that he must

respond truthfully to the questions asked during the interrogation or he could be subject to

further discipline.  Id., SUNY001281.  The investigation concernedPlaintiff's absences and

failure to follow supervisors' directives regarding time and attendance.  Id.

During the interrogation, Plaintiff admitted that he was "on the [department's] schedule

as 9 to 5," but he would occasionally "come in later and stayed later," sometimes arriving at 10-

10:30 or even "a little bit later."  Id., SUNY001283.  Plaintiff further stated that "if I come in late

it doesn't make any difference.  I stay a little bit later.  I've been keep—adhering to a schedule

between, say, 10 and 11 and 6 and 7 in the evening."  Id., SUNY001284.  When Plaintiff was

asked whether he had the authority to make his own schedule, he replied that he felt that he had

the "moral authority to do so."  Id., SUNY001284.  Plaintiff admitted that he had recently been

told by Dr. Pulitzer to adhere to set hours, which he assumed were "9 to 5 as written on the

schedule."  Id., SUNY001284.  Plaintiff promised during the interrogation that he would abide

by "the cookie cutter hours that they require….from now on."  Id., SUNY001306.

When discussing the September 4 and 5 absences, Plaintiff stated that "I have a child

with special needs and he was kicked out of his school and he was to attend a new school and I

had to spend time with him," but he said that was not the reason he did not appear for work on

September 4 and 5.  Id., SUNY001290-1291.  Plaintiff's mother-in-law came from out of town to help with his son, and while Plaintiff "had initially planned to take the day off, but I-I-I was gonna come in, I rolled out of bed and I – and I stretched my back out and I've been in pain and not able to be mobile since then."  Id., SUNY001291.  Plaintiff stated that he knew "that [his] son would have appropriate support" after his mother-in-law arrived.  Id., SUNY001292.  He acknowledged that "[he] didn't do the best job [he] could with communications this time around."  Id., SUNY001311.  The 45 minute interrogation concluded with Plaintiff stating that he would "do a better job of communicating," and that he would adhere "to the schedule that they want me to."  Id., SUNY001314; Arabian Dep., p. 187:11-19.

After the interrogation, Mr. Arabian consulted with Leonzo Cuiman, the Assistant Vice President for Labor Relations, and prepared a Settlement Agreement, which Plaintiff signed that day.  Cuiman Dep., p. 237:22-238:6; Ex. CC.  The Settlement Agreement, covered Plaintiff's September 4 and 5 absences as well as his time and attendance issues in July and August.  Ex. CC.  It stated that in lieu of a Notice of Discipline for: "(1) unscheduled absences, (2) tardiness, (3) interfering with the operations of the department, (4) insubordination and (5) misrepresenting hours worked on time sheets, as a result of absences and tardiness, [and] switching schedule without authorization of his supervisor" a penalty ranging from a letter of reprimand to termination would be held in abeyance for one year provided Plaintiff could abide by its terms.  Ex. CC.  The agreement also called for Plaintiff to work his scheduled shift of 9:00 a.m. to 5:00 p.m., accurately list the hours he works, seek approval for any leave, and adhere to all Departmental policies and procedures.  Ex. CC.  If Plaintiff failed to abide by its terms, he could be punished with discipline ranging from a letter of reprimand to termination.  Id.  The language included was standard for a settlement agreement from Labor Relations department, but it was

12

also subject to negotiation when it was presented to Plaintiff, who, having turned down the assistance of counsel from his union, did not request for any of the terms to be changed; subsequently stating that he did not even read the agreement.  Ex. CC; Arabian Dep., p. 209:7-21; Cuiman Dep., p. 255-257:4; Ex. DD, SUNY01353. The agreement also waived any claims Plaintiff had related to any incidents occurring up to and including September 8, 2014. Ex. CC.

Dr. Reede and Dr. Pulitzer had no role in preparing the agreement, nor were they informed that Mr. Arabian was preparing such a document.  Reede Dep., 314:12-25; Pulitzer Decl., ¶ 11.  Following the settlement, Labor Relationdepartment urged Defendant Pulitzer to "monitor" Dr. Greenberg's behavior "to ensure that he fulfills his obligations" regarding the settlement.  Ex. EE.  Plaintiff eventually submitted time sheets claiming September 4 and 5 as sick days, his sick accruals were charged, and he was compensated for those days.  Ex. FF, SUNYESI001401.

### *Plaintiff's Use of Unapproved Attestations.*

An attestation is a written statement made by an attending physician to certify that he or she had reviewed a patient's report and that the report is now final.  Pulitzer Decl., ¶ 13. Attestations are legal documents that are vital to hospital billing, and non-conforming ones could trigger an investigation by the Centers for Medicare & Medicaid Services ("CMS"), as well as potential financial liability.  Id., ¶ 12.  CMS requires attestations in a standard format on all reports initially read by a resident.  Reede Decl., ¶ 14. The Risk Management department approved the use of three attestations for the Radiology Department and, beginning in July 2014, Radiology staff were informed at numerous meetings on how to use them.  Ex. GG, SUNY001270.  Phycare, which handles the billing for the department, gave a presentation on September 15, 2014 on the attestations.  Id.  Finally, all Radiology Department staff, including

Plaintiff, were personally instructed by Dr. Pulitzer to use the approved attestations during a staff meeting on September 22, 2014. Pulitzer Decl., ¶ 12; Ex. HH. Plaintiff complained during that meeting about the use of attestations, telling Dr. Scott that "this is the beginning of the end of medicine, this is the corporatization of medicine." Ex. HH. After the meeting, Plaintiff said to Dr. James Walsh that "I can't believe I have to write an attestation." Ex. II.

Plaintiff explained what he derisively called the "corporatization of medicine," as when "[m]edicine is being run like a business, and professionals are being treated like factory workers." Greenberg Dep., p. 41:4-13; 43:24-44:2. In Plaintiff's view, this "corporatization" led to attention "being paid to metrics and productivity and things of that matter." Id., p. 41:16-18. Plaintiff made similar complaints shortly after authoring the unapproved attestations. On October 1, Plaintiff sent an email to Dr. Pulitzer, cc'ing Dr. Reede, complaining that "[t]he hyper-vigilance and micromanagement is often insulting and I no longer look forward to coming to work as a result of the corporatization of medicine." Ex. JJ. Plaintiff repeated this concern following his termination, writing that "the new administrations polices have negatively affected morale and patient care in the name of corporatization." Ex. KK, SUNYESI001450. Plaintiff believed this "corporatization of medicine" began at SUNY Downstate when Dr. Reede became chairwoman. Greenberg Dep., p. 42:9-13.

Shortly after the September 22 meeting, Plaintiff attached to patients' records approximately 180 unapproved attestations that were filled with sarcastic language:

> "I, Oded Greenberg M.D., Board Certified Diagnostic attending Radiologist and Board Certified Pathologist, have personally, painstakingly reviewed each and every one of the provided images and reviewed the available clinical information. The above report, based on my own extensive knowledge and skill as well as meticulous observation and careful interpretation now represents the final report."[8]

---

[8] The approved language, without Plaintiff's sarcastic additional language, was: "I, _____, MD, have personally reviewed the images and concur with the preliminary report and the interpretation as stated and signed by

14

Ex. LL, SUNY00506-659.  Once added, the attestation cannot be deleted from the medical record, and it becomes part of the permanent record.  Pulitzer Dep., 265:23-266:2.

Dr. Pulitzer was informed by Dr. Amodio, the Chief of Pediatric Radiology, of the unauthorized attestations.  Pulitzer Dep., p. 138:21-139:25.  Not only was this language viewed as sarcastic and unprofessional, it was used in direct contravention of SUNY policy, which had repeatedly been given to Plaintiff.  His conduct was thus also insubordinate.  Pulitzer Dep., ¶ 14, 16; Reede ¶ 15.  Alarmingly, Dr. Pulitzer was informed that Plaintiff had asked Jayan Kurian, an employee in the IT Department, to "take off" or "erase" the incorrect attestations, which would have constituted tampering with patients' legal medical file.  Pulitzer Dep., 143:13-144:11.  Dr. Pulitzer was extremely concerned by the number of reports, which he believed indicated a more severe "malicious" act, as well as posing problems for managing the data for all of the cases with the unauthorized language, which would need to be tracked.  Id., p. 147:7-148:4.

After collecting and reviewing the attestations, Dr. Pulitzer then escalated the issue to Dr. Jamaleddine at KCHC, and scheduled a meeting with Risk Management at KCHC at his recommendation.  Pulitzer Dep., p. 155:3-156:11. Risk Management believed the conduct was at least insubordinate, and told Dr. Pulitzer to consider a Medical Board Hearing, which could have led to the revocation of Plaintiff's medical credentials.  Ex. MM, HHC_ESI_001344; Pulitzer Decl., ¶ 16.  Risk Management also told Dr. Pulitzer to have a "second reader" add a new, proper attestation to each file, and they were concerned that "if any of these cases became a medical legal case that there could be potential exposure to the hospital."  Pulitzer Dep., p. 287:8-20; Pulitzer Dep. II, p. 108:23-109:3.  Dr. Pulitzer again conferred with Dr. Jamaleddine and they agreed that Plaintiff should be referred to Labor Relations, as well as a possible referral to the

---

the resident.  This report now represents the FINAL REPORT for this patient."  Ex. GG, SUNY001270.

Office of Professional Medical Conduct, which investigates complaints against physicians. Pulitzer Dep., p. 289:8-23; 290:20-291:17.  Dr. Reede was consulted and agreed with referring the matter to Labor Relations at SUNY Downstate.  Pulitzer Decl., ¶ 16; Reede Decl., ¶ 15.

### *Plaintiff Takes Additional Unauthorized Leave.*

That same morning of September 22, Plaintiff requested to take time a few hours off from his usual schedule on September 23 and 24 "to attend to some family matters."  Ex. NN.  Dr. Pulitzer approved this leave.  Ex. OO.  On September 23, Plaintiff also asked for September 25 off for Rosh Hashanah.  Ex. PP.  After leaving the hospital for "five or five and a half hours" during the morning of September 23, Plaintiff requested an additional two hours off that afternoon.  Pulitzer Dep., p. 389:22-390:6; Ex. GG.  Defendant Pulitzer denied this request, because there was no one available to adequately cover for Plaintiff.  Id.

That afternoon, Dr. Pulitzer learned that, in spite of the denied request for leave, Plaintiff "had left the building," and Dr. Pulitzer was unable to locate him for a number of hours.  Pulitzer Dep., p. 402:20-403:6; 413:15-20.   According to Talk Station data there was a gap of approximately two hours from 2:50 to 4:52.  Ex. QQ, SUNY001326.  Dr. Pulitzer learned that Dr. Greenberg had asked Dr. Amiram Samin during that period, but Dr. Samin was not able to read neuroradiology cases, leaving the ER inadequately covered.  Id. p. 401:24-403:6; 413:15-20.  This issue was referred to Labor Relations as well.  Ex. GG.

### *Plaintiff's Second Labor Relations Visit.*

On October 3, 2014, Plaintiff was notified that he was to report to Labor Relations "to discuss allegations of insubordination, leaving the worksite without authorization and related matters."  Ex. RR.  This new case was handled by Stephanie Bernadel.  Bernadel Dep., 11:22-12:6.  After a delay so Plaintiff could attempt to locate an outside attorney, an interrogation was

16

held on October 10, 2014.  Ex. QQ.  Plaintiff was accompanied by his wife, who is an attorney, and again waived his right to union representation.  Ex. SS.

During the interrogation, Plaintiff was asked about the two hour gap in his Talk Station data on September 23. Ex. QQ, SUNY001323-1328.  Plaintiff admitted that he left his desk during this period, and claimed it was only to talk to colleagues and his wife, and eat lunch across the street at SUNY Downstate.  Id., SUNY001326.

Ms. Bernadel then moved on to the issue of the improper attestations.  Plaintiff admitted that he understood the forms were required as, what he called, "a Medicare and insurance hoop to jump through." Ex. QQ, SUNY001329.  He admitted this purpose was explained to him, and it was important to the hospital.  Id.  He also "thought it was ridiculous."  Id., SUNY001329-30.  He admitted that he complained about the forms during the meeting, and he continued to complain about the attestations during the interrogation, stating "I don't see why signing the document isn't attesting to me checking his work."  Id., SUNY001330, 1340, 1337-8.  Plaintiff admitted that he wrote the attestations, and he admitted that he thought the language was "playful."  Id., SUNY001339.  Leonzo Cuiman felt Plaintiff "made a conscious decision not to cooperate" with Dr. Pulitzer's directive.  Cuiman Dep., p. 294:14-295:5.

At the interrogation, Plaintiff mentioned possible allegations of discrimination for the first time.  Ex. QQ, SUNY001335.  In response, Ms. Bernadel sent Dr. Greenberg a letter directing him to contact the Office of Diversity & Inclusion regarding any complaints of discrimination.  Ex. TT.  Plaintiff never made a complaint to that office.

Shortly after the interrogation, it was reported to Labor Relations that Plaintiff "harassed" employees outside of KCHC.  Ex. UU, SUNYESI00101.  As a result, Plaintiff was not allowed on the hospital premises without permission pending the outcome of the disciplinary action.  Id.

On October 20, 2014, Ms. Bernadel and Mr. Cuiman met with Plaintiff, who this time was accompanied by counsel from the New York State United Teachers, as well as his wife. Ex. DD, SUNY001345.  Plaintiff continued to complain about the use of the required attestations during this meeting, repeating his view that the "purpose of the attestation" was "so that insurance companies make you jump through another hoop before they pay you," or "so that you can get sued better….there's no real good reason for it."  Id., SUNY001364.  He went on to say that "[i]t just adds more work to my day."  Id., SUNY001365.  Despite admitting he did not use the approved attestations, Plaintiff blamed Dr. Reede for his situation, and stated that her character was "really piss-poor."  Id., SUNY001393.  Plaintiff concluded the meeting by stating that "I expect to get my job back.  I expect an apology from [Dr. Reede] and I expect a raise."  Id., SUNY001394.  Far from indicating a willingness to comply with directives from his superiors in the future, Plaintiff was as recalcitrant as ever.

On October 22, 2014, Plaintiff was terminated for violations of the September 8 disciplinary settlement by the Labor Relations Department, in consultation with Drs. Pulitzer and Reede, following allegations of "insubordination, leaving the worksite without authorization and related matters."  Ex. VV; Bernadel Dep., p. 5:12-18; Pulitzer Dep., p. 420:23-421:2; Reede Decl. ¶ 16.  Dr. Pulitzer also conferred with Dr. Jamaleddine prior to Plaintiff's termination, and he agreed with the decision.  Pulitzer Dep., p. 439:12-24.  Dr. Pulitzer himself ultimately had to correct the approximately 180 attestations by re-reading each study, confirming that he agreed or disagreed, and affixing a new counter-attestation.  Ex. WW; Pulitzer Dep., 207:19-208:15.

### *ACGME Reassesment*

Following the changes in personnel and the new standards put in place for all physicians in the department, the ACGME restored the Radiology Department's "Continued Accreditation"

in August 2015.  Ex. XX.  The department was taken off probation at that time, and it remains

accredited today.  Reede Decl., ¶ 17.  The ACGME report in 2015 commended the department

"for a quick turnaround and implementing significant changes that have greatly improved the

educational program."  Ex. XX, SUNY00697.

### Summary Judgment Standard

Summary judgment in the defendants' favor is required if the plaintiff "has failed to make

a sufficient showing on an essential element of her case with respect to which she has the burden

of proof."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A plaintiff cannot defeat summary

judgment by merely showing the "existence of some alleged factual dispute between the parties,"

but must establish through the evidentiary record a "genuine issue of material fact."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); see also Fed. R. Civ. P. 56(a).

### Argument

### I.    THE ELEVENTH AMENDMENT BARS PLAINTIFF'S CLAIMS UNDER THE FMLA, § 1983, SHRL AND CHRL AGAINST CUNY AND THE INDIVIDUAL DEFENDANTS IN THEIR OFFICIAL CAPACITIES.

It is well-established that the Eleventh Amendment bars federal courts from entertaining

suits brought against the states and state agencies under federal or state law, regardless of

whether the relief sought is monetary or injunctive, unless the state consents to be sued, or

Congress enacts legislation validly overriding the states' Eleventh Amendment immunity.  See

Papasan v. Allain, 478 U.S. 265, 276 (1986); Pennhurst State Sch. & Hosp. v. Halderman, 465

U.S. 89, 99 (1984).  This immunity extends to entities considered "arms of the state," such as

SUNY, Clissuras v. City Univ. of N.Y., 359 F.3d 79, 82 (2d Cir. 2004) (citation and quotation

marks omitted), as well as the state officials working at those entities on behalf of the State (i.e.,

in their official capacities). Pennhurst, 465 U.S. at 121.

19

It is well-settled that the State of New York has not consented to be subject to the SHRL or CHRL in federal court as Plaintiff asserts here.    See, e.g., Cajuste v. Lechworth Developmental Disabilities Serv., No. 03 Civ. 0161 (RCC), 2005 WL 22863, at *3 (S.D.N.Y. Jan. 5, 2005) (SHRL); Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004) (CHRL). Similarly, New York State's sovereign immunity bars any federal constitutional claims against it, whether brought directly or pursuant to § 1983 as Plaintiff seeks to do here.[9]  See Quern v. Jordan, 440 U.S. 332, 341-45 (1979) (holding that Congress did not abrogate state sovereign immunity by enacting § 1983); Santiago v. N.Y. State Dep't of Corr. Servs., 945 F.2d 25 (2d Cir. 1991) (holding that the Eleventh Amendment bars suits brought directly pursuant to the Fourteenth Amendment).

The State of New York's sovereign immunity has not been abrogated, nor has it otherwise consented to FMLA claims involving self-care, such as are alleged here.  See Coleman v. Court of Appeals of Maryland, 566 U.S. 30, 43 (2012)(FMLA); Johnson v. New York State Dep't of Corr. Servs. & Cmty. Supervision, No. 11-CV-079S, 2012 WL 4033485, at *3 (W.D.N.Y. Sept. 12, 2012)(FMLA).  Plaintiff may argue that his FMLA claims are for care of his son, but the record in this case plainly indicates otherwise.  On September 5, 2014, Plaintiff e-mailed Linda McMurren and cc'd Dr. Pulitzer to explain his absence: "the family issues having been resolved Thursday morning, I then managed to throw my back out." Ex. U. Plaintiff brought in a doctor's note related to his injured back on September 8, and told Mr. Arabian during his interrogation on September 8 that he missed work on September 4 and 5 because he "rolled out of bed and [he] stretched [his] back out and [he'd] been in pain and not able to be mobile since then."  Id., SUNY001291.  Plaintiff's FMLA claims are therefore premised on a

---

[9] State entities and state officials sued in their official capacities are not considered "persons" for purposes of § 1983. Will v. Mich. Dep't of State Police, 491 U.S. 58 (1989).

request for leave due to an injured back, which is self-care.

Accordingly, Plaintiff's CHRL (25th-28th) claims against the Individual Defendants in their official capacities, and FMLA (1st-3rd), §1983 (11th-12th), and SHRL (13th-20th) claims against SUNY and the Individual Defendants in their official capacities should be dismissed for lack of subject matter jurisdiction.

## II.   PLAINTIFF CANNOT ESTABLISH A *PRIMA FACIE* DISCRIMINATION CLAIM UNDER TITLE VII OR THE SHRL.

Plaintiff brings claims of discrimination against SUNY pursuant to Title VII and the SHRL.[10]  To state a prima facie case for discriminatory discharge under Title VII or the SHRL for age, race and religious discrimination, a plaintiff must allege sufficient facts from which it can be plausibly inferred that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination.  See Holcomb v. Iona College, 521 F.3d 130, 138 (2d Cir. 2008) (setting forth elements of a Title VII discrimination claim);  Rozenfeld v. Dep't of Design & Const. of City of New York, 875 F. Supp. 2d 189, 206, 207-208 (E.D.N.Y. 2012), aff'd, 522 F. App'x 46 (2d Cir. 2013)(SHRL discrimination standard same as Title VII).  Here, Plaintiff cannot raise a triable issue of fact as to his claims that Defendants discriminated against him in his termination or in the decision not to appoint him as ER Radiology Section Chief him, because Plaintiff has critically failed to show any circumstances giving rise to an inference of discrimination.

Under the McDonnell Douglas burden-shifting framework, if a Title VII plaintiff makes the prima facie showing, the burden shifts to the defendant to articulate legitimate, non-

---

[10] Plaintiff has only alleged aiding and abetting discrimination claims under the SHRL and CHRL against the Individual Defendants, and has not alleged a violation of the CHRL by SUNY. (17th-19th; 25th-27th causes of action).

discriminatory reasons for its actions.  Terry v. Ashcroft, 336 F. 3d 128, 140 (2d Cir. 2003).  If Defendants makes such a showing, the final and ultimate burden is on the plaintiff to offer evidence that the defendant's reason is a mere pretext for intentional discrimination. Eka v. Brookdale Hosp. Med. Ctr., 247 F. Supp. 3d 250, 263 (E.D.N.Y. 2017).  At this last stage, the "plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false[.]" Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (citing Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996) (internal quotations omitted).

### A. **Plaintiff Cannot Show Facts Giving Rise to an Inference of Discrimination.**

To make a prima facie showing of discrimination, "[p]laintiff may offer direct evidence of such discrimination, such as expressly discriminatory comments or conduct…or by presenting evidence permitting an inference of discrimination, such as disparate treatment of Plaintiff." O'Kane v. Lew, No. 10-CV-5325 PKC, 2013 WL 6096775, at *8 (E.D.N.Y. Nov. 20, 2013)(internal citations omitted).  Plaintiff acknowledged during the pre-motion conference that there is no evidence of direct discrimination in the record, so Plaintiff will likely posit two theories for his discrimination claim.  *First*, Plaintiff, Dr. Kantor, Dr. Mason, and Dr. Roitberg, all of whom are white, Jewish, and older physicians, were terminated, and replaced in part by Dr. Rhonda Osborne and Dr. Jinel Scott-Moore, who are younger, Black and not Jewish. Plaintiff's theory seems to be that Dr. Reede, who is Black and not Jewish, terminated those physicians for discriminatory reasons.[11]  *Second*, Dr. Reede selected Dr. Scott to be the Section Chief for ER

---

[11] Plaintiff also identifies Dr. Schwarzberg as a white, Jewish older physician who was discriminated against by Dr. Reede (Compl., 19), but Pitts Management, a consulting firm hired to reduce costs at SUNY Downstate, decided to non-renew Dr. Schwarzberg, and Dr. Reede actually fought to keep him on staff and succeeded.  Reede Dep., p. 60:10-61:15; 62:14-21.

Radiology, even though she trained under Dr. Greenberg at SUNY Downstate.[12]  Here, Plaintiff's discrimination claims fail because "there plainly [is] a dearth of evidence to show that [any adverse action] occurred under circumstances giving rise to an inference of discrimination." Patterson v. County of Oneida, 375 F.3d 206, 223 (2d Cir. 2004).

As for the termination of white, Jewish doctors, Plaintiff admitted that he did not know anything about the circumstances leading to the termination of Drs. Areman, Mason, or Roitberg. Greenberg Dep., p. 476:25-477:20.  And it was Dr. Jamaleddine, about whom there are no allegations of discrimination, who advised Dr. Reede to non-renew Dr. Kantor.  Reede Dep., p. 31:18-25; Jamaleddine Dep., p. 109:6-110:17.  Further, the terminations followed the ACGME probation report, which was extremely critical of the faculty in the radiology department.  Ex. A, SUNY000683-4; Reede Dep., p. 78:20-79:6.

Plaintiff cannot create an inference of discrimination because of Dr. Reede hiring black physicians to replace white, Jewish physicians.  While SUNY Downstate does not maintain records concerning its employees' religions, Plaintiff could only point to two black physicians hired by Dr. Reede to join a department of more than 25 physicians, who along with Dr. Stephen Waite made three black physicians, which Plaintiff admitted was not "a high number" in such a large department.  Id., p. 184:12-17; 186:10-24.   Further, both Dr. Scott and Dr. Osborne were already SUNY employees in July 2014 and were transferred to SUNY Downstate during the closing of LICH, a SUNY affiliate.  Reede Decl., ¶ 9.   Plaintiff also ignores the other, non-black physicians who were hired or transferred to the department, including Dr. Alicia Goracy, Dr.

---

[12] Plaintiff may also rely on certain alleged remarks by Defendant Reede cited in the Complaint.  Compl., ¶¶ 22-3. The SUNY Defendants deny these undated statements were made, and no admissible evidence of these alleged statements was developed during discovery.  Further, none of the statements are directed at Plaintiff or connected to the decisions at issue here, and, even if made, they would therefore be "stray remarks" that would not give rise to an inference of discrimination.  See Sethi v. Narod, 12 F. Supp. 3d 505, 539 (E.D.N.Y. 2014).

Robert Leonardo, and Dr. Samir Jethwa, among others.  Id., ¶ 10.  In fact, at the same time Dr. Osborne and Dr. Scott transferred to SUNY Downstate, Dr. Craig Linden was transferred as well.  Id.  Since Plaintiff's termination, only one black radiologist has been added to the department.  Reede Decl., ¶ 10.  Further, even if there were more black, younger and non-Jewish physicians hired, statistics alone would not suffice to establish discriminatory intent.  Bussey v. Phillips, 419 F. Supp. 2d 569, 583 (S.D.N.Y. 2006).

To the extent Plaintiff attempts to demonstrate an inference of discrimination through the new position for Dr. Scott, she is not a proper comparator for Plaintiff.  See Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000) (a plaintiff must show that he was "similarly situated in all material respects" to the individuals with whom he seeks to compare himself).  First, unlike Plaintiff, Dr. Scott had no issues with time and attendance, which were recognized as an issue by Dr. Reede in May 2014, before the Section Chief for ER Radiology was appointed.  Ex. I. Plaintiff also had virtually no academic accomplishments during his more than 25 years of work as a physician as compared to Dr. Scott.  Exs. YY, ZZ.[13]  Plaintiff had also submitted a summary of his scholarly activity to provide an update to the ACGME that showed zero hours spent engaging in "Research/scholarly activity with residents" and no scholarly activity in the prior year.  Ex. BBB.  Dr. Reede wanted someone with an interest in academics to head the ER Radiology section, especially following the ACGME probation.  Reede Dep., p. 121:17-122:16. Dr. Scott also had experience as a section chief, having recently served as the Musculoskeletal Radiology section chief at LICH before her transfer.  Reede Dep. II, p. 122:18-24.  In fact,

---

[13] Plaintiff's resume lists two publications without a date.  Ex. YY.  During his deposition, he admitted that one of them was never published, and the other was published in 1993 or 1994.  Greenberg Dep., p. 10:23-12:4. Plaintiff had also let his membership lapse in the radiological professional societies.  Id., 6:23-5.  Dr. Scott on the other hand was a member of three professional societies in 2014, she had a number of recent scientific posters and education exhibits, and was actively engaged in research for publication.  Ex. ZZ.

Plaintiff himself testified that he did not have an opinion as to whether Dr. Scott was qualified to be the director of ER radiology.  Greenberg Dep., p.131:5-11.  Finally, Dr. Linden is white, Jewish and 57 years old; the same race, religion, and only one year younger than Plaintiff.  Id..  Dr. Linden was elevated to the position of Chief of Neuroradiology, a section chief position comparable to Chief of ER Radiology, by Dr. Reede, and was later promoted to be the Vice President of Academic Affairs by her, demonstrating that age, race and religion were not considered by Dr. Reede.  Reede Dep., p. 117:15-20; Reede Decl., ¶ 9.

Critically, Dr. Reede was not the only individual who participated in the process that culminated in his termination.  Dr. Pulitzer, who was White, Jewish, and 51 years old, was involved at every step of the events leading to Plaintiff's termination.  Courts are rightly skeptical of claims of discrimination alleging facts against individuals of the same protected characteristics as Plaintiff.  Benedith v. Malverne Union Free Sch. Dist., 38 F. Supp. 3d 286, 319 (E.D.N.Y. 2014)(collecting cases).[14]  There were others as well.  Plaintiff admits that Dr. Jamaleddine at KCHC, as well as Leonzo Cuiman, Michael Arabian, Stephanie Bernadel, and Adrian Conde-Billy all participated in the process that culminated in his termination.  Greenberg Dep., p. 463:10-13; 464:4-11.  There is no evidence in the record or even allegations in the Complaint to infer discrimination on behalf of any of these individuals.

Dr. Reede also renewed Plaintiff's employment in July 2014 just months before the events leading to his termination, when five other physicians were let go.  Reede Decl., ¶ 9.  See Chuang v. T.W. Wang Inc., 647 F. Supp. 2d 221, 239 (E.D.N.Y. 2009)(holding it is difficult to impute bias when decisionmaker made a recent favorable decision regarding plaintiff).[15]

---

[14] It is worth noting that Dr. Reede is 67 years old, which undermines any claim of discrimination based on age.
[15] Remarkably, Plaintiff barely knew Dr. Reede.  Plaintiff admitted that besides a meeting in May 2014 regarding his timesheets and a meeting in July 2014 to discuss the Director of ER Radiology, Plaintiff had no other interactions with Dr. Reede, except for seeing "her at some faculty meetings."  Greenberg Dep., p. 181:23-182:16.

Further, to the extent Plaintiff argues that he had worked at SUNY Downstate for years without issue, Dr. Reede was entitled to set different standards and enforce different policies than her predecessor.  See Blanc v. Sagem Morpho, Inc., No. 07-cv-3085, 2009 WL 181236, *17 (E.D.N.Y. June 25, 2009) aff'd, 394 F. App'x 808 (2d Cir. 2010)("the fact that Plaintiff previously received satisfactory evaluations from his supervisors prior to [his new supervisor] cannot in itself raise an inference of pretext").  These new standards were even more important due to the threat to the Residency Program in light of the ACGME report.  Reede Decl., ¶ 8.  Indeed, Plaintiff does not allege any steps taken by Dr. Reede to orchestrate his termination until May 2014 – *after* the ACGME report and probationary status.  Greenberg Dep., p. 326:14-23.

## B.  Because There Were Legitimate Non-Discriminatory Reasons to Terminate Plaintiff and not to Appoint him Section Chief, Plaintiff's Claim Fails.

Even if Plaintiff had made a prima facie showing of discrimination, his claim fails because the SUNY Defendants can demonstrate a legitimate reason for Plaintiff's termination, namely, his use of unapproved attestations and his unexcused absence after the denial of his leave. Forrester v. Prison Health Servs., No. 12 CV 363 NGG LB, 2015 WL 1469521, at *15 (E.D.N.Y. Jan. 5, 2015), rep't and rec. adopted as modified, No. 12-CV-363 NGG, 2015 WL 1469737 (E.D.N.Y. Mar. 30, 2015), aff'd, 651 F. App'x 27 (2d Cir. 2016)("Misconduct, excessive lateness, and poor performance are legitimate, non-discriminatory reasons for defendants' adverse actions.") (gathering cases); Bishop v. New Process Gear, Inc., No. 5:06-CV-0821 GTS/GHL, 2009 WL 3928679, at *7 (N.D.N.Y. Nov. 18, 2009) (termination following violation of a last chance agreement is a legitimate, non-discriminatory reason for termination).

It is uncontested that on September 22, 2014, Plaintiff attached approximately 180 attestations to patient's records that included unapproved language.  See p.14-5, supra.  Plaintiff's actions showed poor judgment, defied a direct instruction given in a meeting earlier

26

that day, and he refused to accept responsibility for his behavior.  As Dr. Pulitzer explained,  the

use of the attestations "signaled (sic) to me at that time that the egregiousness of placing

something like that in a patient's record, and putting not only himself but colleagues in medical-

legal jeopardy and the reputation of the hospital in jeopardy, that something had changed in

him." Pulitzer Dep., 115:3-21.  Plaintiff also had repeated time and attendance problems after

being counseled, including disappearing on September 23 after Dr. Pulitzer denied his leave.  It

is undisputed that Plaintiff signed the Settlement Agreement and that these actions violated that

agreement.  Fundamentally, Dr. Greenberg had become unmanageable, a detriment to the

department, and a risk to the ACGME reaccreditation process.

### C.  There is No Evidence of Pretext.

There was no conspiracy here.  Dr. Reede, Dr. Pulitzer, Dr. Jamaleddine and Labor

Relations were simply addressing the urgent problems in the Residency Program following the

ACGME report.  Plaintiff would not adapt to these changes, which he repeatedly characterized as

the "corporatization of medicine."  The ACGME approved of Dr. Reede's changes by reinstating

its accreditation in 2015, and commended the department "for a quick turnaround and

implementing significant changes that have greatly improved the educational program."  Ex. XX,

SUNY00697.  Plaintiff can point to no evidence that discrimination, rather than legitimate

business interests, played a role in any employment decision.

Accordingly, Plaintiff's Title VII (4th-7th) and SHRL (13th-16th) discrimination claims

against SUNY should be dismissed.

### III.    PLAINTIFF CANNOT ESTABLISH A RETALIATION CLAIM UNDER TITLE VII, THE SHRL AND THE CHRL.

Plaintiff brings claims of retaliation against SUNY pursuant to Title VII and the SHRL.[16]

---

[16] Plaintiff has only alleged aiding and abetting retaliation claims under the SHRL and CHRL as against the

In order to establish a prima facie case of retaliation, a plaintiff must establish "(1) [he] engaged in protected activity; (2) the employer was aware of this activity; (3) the employee suffered a materially adverse employment action; and (4) there was a causal connection between the alleged adverse action and the protected activity." Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C., 716 F.3d 10, 14 (2d Cir.2013) (per curiam) (quoting Lore v. City of Syracuse, 670 F.3d 127, 157 (2d Cir.2012)).  Furthermore, the protected activity must be the "but-for" cause of the alleged retaliation.  Univ. of Texas Southwestern Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013); Bowen-Hooks v. City of New York, 13 F. Supp. 3d 179, 221 (E.D.N.Y. 2014)(SHRL).[17]  Here, Plaintiff has not established a causal connection, and, even if he could, the alleged protected activity was not the but-for cause of Plaintiff's termination.

Plaintiff's alleged protected activity is his statement in his October 10, 2014 Interrogation that his situation was "related to [his] Jewish heritage" and that five of his Jewish colleagues were fired, but "[n]o Jews were brought back in, only African-Americans." Ex. QQ.  Plaintiff then said that "[their] chairperson is African-American," referring to Dr. Reede.  Id.  In response, Ms. Beranadel directed Plaintiff to the Office of Diversity.  Id.; Ex. TT.

There is no evidence in the record of retaliatory intent, so the only basis for Plaintiff to establish a causal connection is temporal proximity.  Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001).  Here, there can be no inference of retaliation, since gradual adverse job actions began well before Plaintiff's October 2014 statement to Ms. Bernadel.  Id. Plaintiff was counseled in May 2014 by Defendant Reede regarding his time; again in August 2014 by Defendant Pulitzer; signed a Settlement Agreement, which warned him he could be

---

Individual Defendants.  (20th and 28th causes of action).
[17] The CHRL prima facie case differs with respect to the third prong, but is otherwise the same.  Pilgrim v. McGraw-Hill Companies, Inc., 599 F. Supp. 2d 462, 469 (S.D.N.Y. 2009)

terminated for future violations in September 2014 following an interrogation; and was sitting in an interrogation for breaching that agreement before he made any complaint of discrimination. Exs. I, R, CC, QQ.   No retaliatory inference can fairly be drawn from the bare fact that he was terminated shortly after making his complaint, given this escalating discipline.  See Redd v. N.Y. State Div. of Parole, 923 F. Supp. 2d 371, 390 (E.D.N.Y. 2012); also see Slattery v. Swiss Reinsurance America Corp., 248 F. 3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."); Brown v. City of New York, No. 11 CIV. 2915 PAE, 2013 WL 3789091, at *19 (S.D.N.Y., July 19, 2013) (SHRL); Melman v. Montefiore Med. Ctr., 98 A.D.3d 107, 129 (1st Dep't, 2012) (CHRL). Plaintiff was terminated following his violation of the Settlement Agreement, and there are no facts to suggest that his complaint to Ms. Bernadel contributed to his termination.

Even if Plaintiff could establish a genuine issue of material fact regarding causation, which he cannot, his claim still fails because, as discussed in Sec. II.B. supra, the SUNY Defendants had a legitimate non-retaliatory reason to terminate him.  Once a legitimate reason is demonstrated, the burden shifts to Plaintiff who must show that the "protected activity was a but-for cause of the alleged adverse action by the employer." Nassar, 133 S. Ct. at 2534.  There is simply no evidence in the record to support such a conclusion.

Accordingly, Plaintiff's Title VII (8th) and SHRL (16th) retaliation claims against SUNY should be dismissed.

## IV.    PLAINTIFF'S AIDING AND ABETTING CLAIMS UNDER THE SHRL AND CHRL FAIL.

Plaintiff's has brought aiding and abetting claims against Defendants Reede and Pulitzer under the SHRL and CHRL.  However, under both statutes, there is "a requirement that liability

must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor." DeWitt v. Lieberman, 48 F.Supp. 2d 280, 293 (S.D.N.Y.1999) (citation omitted); see also Dillon v. Ned Mgmt., Inc., 13–CV–2622, 85 F.Supp. 3d 639, 658–59, 2015 WL 427921, at *12 (E.D.N.Y. Feb. 2, 2015); Ren Yuan Deng v. N.Y. State Office of Mental Health, 13–CV–6801, 2015 WL 221046, at *5 (S.D.N.Y. Jan. 15, 2015). Here, Plaintiff cannot state a claim against SUNY under the SHRL and CHRL (nor does he even allege a CHRL claim), because the claims are barred by the Eleventh Amendment. Plaintiff therefore cannot state a claim against Defendants Reede and Pulitzer as aiders and abettors, and the claims against them individually should be dismissed. See Soloviev v. Goldstein, 104 F. Supp. 3d 232, 253 (E.D.N.Y 2015) (SHRL and CHRL aider and abettor claims against CUNY dismissed since 11th Amendment barred suit against CUNY); Ross v. State of New York, No. 15-CV-3286 (JPO) 2016 WL 626561 at *9 (S.D.N.Y. Feb. 16, 2016) (same).

Accordingly, Plaintiff's 17th-20[th] and 25th-28[th] causes of action should be dismissed because Plaintiff's cannot establish liability on behalf of SUNY. To the extent this Court disagrees, Plaintiff's claims fail for the reasons stated in sections II-III, supra.[18]

## V.    PLAINTIFF'S FMLA CLAIM FAILS.

Even if they were not barred by the Eleventh Amendment, Plaintiffs FMLA claims fail. Plaintiff brings three causes of action under the FMLA against the SUNY Defendants. Compl., ¶¶59-68. While Plaintiff asserts retaliation and interference claims, his allegations are for retaliation, as they "involve an employee actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action

---

[18] With respect to discrimination, the City Human Rights Law, in some respects, prohibits a broader range of conduct than that covered by federal and state anti-discrimination laws. See Williams v. N.Y.C. Hous. Auth., 61 A.D.3d 62, 68 (1st Dep't 2009). But Plaintiff has not developed any evidence sufficient to support a claim even under the CHRL against Defendant Reede or Pulitzer.

30

by the employer." Woods v. START Treatment & Recovery Centers, Inc., 864 F.3d 158, 166 (2d

Cir. 2017).[19]  In the Second Circuit, FMLA retaliation claims are reviewed under the McDonnell

Douglas burden-shifting framework.  Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir.

2004).  Plaintiff must establish that 1) he exercised rights protected under the FMLA; 2) he was

qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse

employment action occurred under circumstances giving rise to an inference of retaliatory intent.

Serby v. New York City Dep't of Educ., 526 F. App'x 132, 134 (2d Cir. 2013).  If Plaintiff states

a prima facie case, then the SUNY Defendants must articulate a legitimate, non-discriminatory

reason for their actions, and then the burden returns to Plaintiff to show that the reason is

pretextual.  Id.  The Plaintiff must demonstrate that the FMLA leave was a motivating factor in

the decision to terminate Plaintiff in this final step.  Woods, 864 F.3d at169.

### A.  **Plaintiff Cannot State a Prima Facie Case.**

Plaintiff has failed to establish the first and fourth prongs of a prima facie FMLA

retaliation claim. With respect to both prongs, Plaintiff did not exercise rights protected by the

FMLA, because he informed SUNY that he missed work due to an injured back.  Plaintiff's

injured back is not a qualifying condition under the FMLA, because it was not a "serious medical

condition" that required "(A) inpatient care in a hospital ... or (B) continuing treatment by a

health care provider." 29 U.S.C. § 2611(11); See Rinaldi v. Quality King Distributors, Inc., 29 F.

Supp. 3d 218, 232 (E.D.N.Y. 2014)(finding no serious medical condition for two days of

absences due to a "pain in one's side").  For the same reason, there can be no inference of

retaliatory intent since Mr. Arabian proposed the Settlement Agreement based on the

---

[19] To the extent Plaintiff believes he has also asserted an interference claim, it is undisputed that Plaintiff did take sick leave on September 4 and 5, and that he used his sick day accruals for this unapproved leave.  He was therefore not denied any benefits under the FMLA. Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 424 (2d Cir. 2016).

representations made by Plaintiff during his Interrogation, in which he stated "I-I-I was gonna come in, I rolled out of bed and I – and I stretched my back out and I've been in pain and not able to be mobile since then."  Ex. X, SUNY001291.  The documentary evidence stated that Plaintiff knew "that [his] son would have appropriate support" after his mother-in-law arrived. Id., SUNY001292.  Dr. Pulitzer received the same message, although with less specificity, on September 5 in an email from Plaintiff stating that "the family issues having been resolved Thursday morning, I then managed to throw my back out." Ex. U.

In this litigation, Plaintiff has recanted his back injury as the sole reason for his leave (see Greenberg Dep., p. 242:4-23), but an employer "is not required to be clairvoyant" and the SUNY Defendants were entitled to rely on Plaintiff's statements as the actual reasons for his absence. See Brown v. The Pension Boards, 488 F. Supp. 2d 395, 409 (S.D.N.Y. 2007).  Indeed, Plaintiff was explicitly told that he was required to provide truthful answers during the interrogation on September 8.  Ex. X, SUNY001281.

Even if Plaintiff had made a request which triggered the SUNY Defendants' obligations under the FMLA, Plaintiff failed to follow the proper procedure for requesting September 4 and 5 leave.  "When the need for leave is not foreseeable, an employee must comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances." 29 C.F.R. § 825.303(c).  "If an employee does not comply with the employer's usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA–protected leave may be delayed or denied. " Id.  Plaintiff first requested the leave on August 29, 2014 by emailing Ms. McMurren, who was not the appropriate person to contact. Ex. U; Reede Dep., p. 290:9-15.  By his own admission, he did not first ask Defendant Pulitzer until September 2, at which point Dr. Pulitzer denied his leave due to the

operational needs of the department.  Ex. S; Ex. X, SUNY001289-1290; Reede Dep., p. 303:25-304:12.  Plaintiff failed to notify Dr. Pulitzer as soon as it was practicable, waiting four days before alerting him of his requested leave during the week of Labor Day.  For this reason, the SUNY Defendants were entitled to deny Plaintiff's request for leave.  29 C.F.R. § 825.303(c).

### B. **Plaintff was Terminated for Legitimate Reasons and There is No Evidence of Pretext.**

Even if Plaintiff could establish a prima facie case, the unapproved attestations are a compelling legitimate reason for Plaintiff's termination, and the burden shifts back to Plaintiff to show some evidence of pretext, and that Plaintiff's protected activity was a motivating factor in his termination.  Serby, 526 F. App'x at 134; Woods, 864 F.3d at169.  But the evidence is quite clear that Plaintiff was in fact terminated for the use of unapproved attestations, as well as ongoing attendance issues.  See Sec. II.B supra.  There is also no evidence to suggest that Dr. Pulitzer, Dr. Reede, or any member of Labor Relations even considered pursuing termination in retaliation for Plaintiff taking leave on September 4 or 5.  Pulitzer Decl., ¶ 10.  Further, that leave would not be protected under the FMLA, as Plaintiff told them he was out of work for a back injury, which is not a qualifying condition.  Ex. X, SUNY001291.

Finally, the Settlement Agreement was not just for the September 4 and 5 absences, but for Plaintiff's failure to abide by the schedule in August, when he admittedly worked irregular hours on days he was supposed to be on vacation. Not only does this further attenuate any connection between the purported FMLA leave and his termination, but the SUNY Defendants are entitled to an "honest belief" defense given Plaintiff's erratic hours. LeBoeuf v. NY Univ. Med. Ctr., No. 98 CIV. 0973 (JSM), 2000 WL 1863762, at *3 (S.D.N.Y. Dec. 20, 2000)("Where an employee is terminated because the employer honestly believed that the employee was not using the leave period for its 'intended purpose,' an FMLA claim will not lie.")

### C. **Defendants Reede and Pulitzer Cannot be Held Liable as Individuals.**

With respect to individual liability, a Plaintiff must show direct involvement by the individual defendant in the alleged FMLA violation. Noia v. Orthopedic Assocs. of Long Island, 93 F. Supp. 3d 13, 17 (E.D.N.Y. 2015). There is no evidence, disputed or otherwise, that Dr. Reede was informed of the alleged FMLA qualifying reason for Plaintiff's leave request prior to the signing of the Settlement Agreement, and Dr. Pulitzer was not consulted prior to the signing of the agreement and therefore was not responsible for its terms. Reede Decl., ¶ 12; Pulitzer Decl., ¶ 11. It was Labor Relations that negotiated the Settlement Agreement with Plaintiff.

Defendants Reede and Pulitzer are also not "employers" under the FMLA. See Graziadio, 817 F.3d at 422. To qualify as an employer, an "economic reality" test is applied based on four factors: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." Id. (internal quotes and citations omitted). Defendants Pulitzer and Reede could not by themselves hire or fire, determine the rate of Plaintiff's pay, and they did not maintain employment records. Pulitzer Decl., ¶ 3; Reede Decl., ¶ 3. Pulitzer did oversee the schedule for the Plaintiff, but this factor standing alone is insufficient to create an employer relationship.

For these reasons, Plaintiff's 1st-3rd causes of action should be dismissed.

### VI.    PLAINTIFF CANNOT ESTABLISH AN EQUAL PROTECTION CLAIM

"Any equal protection claim is grounded on a comparison between the treatment the state gives similarly situated individuals." Okin v. Village of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 439 (2d Cir. 2009).[20] Among other things, "[t]o be 'similarly situated,' employees

---

[20] To the extent Plaintiff attempts to bring any separate claims under § 1981 (9th and 10th Causes of Action), it is well established that § 1983 constitutes the exclusive federal remedy for an alleged violation of the rights guaranteed in §

must be substantially similar as to specific work duties, education, seniority, and performance history[.]" Simpson v. Metro-N. Commuter R.R., No. 04 CIV. 2565 (PAC), 2006 WL 2056366, at *7 (S.D.N.Y. July 20, 2006). Here, Plaintiff has failed to adduce any evidence that similarly situated employees of other races, genders and national origins were given preferential treatment as compared to him. See Perry v. State of New York Dep't of Labor, No. 08 CIV. 4610(PKC), 2009 WL 2575713, at *2 (S.D.N.Y. Aug. 20, 2009), aff'd sub nom., 398 F. App'x 628 (2d Cir. 2010).[21] Plaintiff may argue that Dr. Scott, who was appointed Section Chief of ER Radiology was treated more favorably than he, but the undisputed evidence demonstrates that they were not similarly situated: Dr. Scott was not plagued by time and attendance problems; she was not disciplined for insubordinate behavior like the attestations; and she also had a better track record of interest in academic work leading to her appointment as Section Chief. Ex. YY, ZZ.

For these reasons, Plaintiff's 11th and 12th causes of action should be dismissed.

## CONCLUSION

Defendants respectfully request that this Court grant their motion for summary judgment dismissing this action in its entirety, along with such other and further relief as this Court deems just, proper and appropriate.

---

1981 by state actors. See Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 731-33 (1989) ("Congress intended that the explicit remedial provisions of §1983 be controlling in the context of damages actions brought against state actors alleging violation of the rights declared in §1981."). Further, § 1981 claims do not lie against the State and are barred by the Eleventh Amendment. See Bogle-Assegai v. Connecticut, 470 F.3d 498, 509 (2d Cir. 2006).

[21] Of course, in order for her § 1983 claim to survive, Plaintiff must also demonstrate the personal and intentional involvement of each of the Defendants in the alleged constitutional violation. Patterson, 375 F.3d at 225; Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994). See also Ashcroft v. Iqbal, 556 U.S. 662 (2009). Plaintiff's equal protection claim here additionally fails because he cannot meet this burden, as set forth in Sections II-III supra.

Dated: New York, New York
        March 26, 2018

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
*Attorney for SUNY Defendants*

BY: */s/ Christopher Coulston*_____
CHRISTOPHER COULSTON
Assistant Attorney General
120 Broadway, 24th Floor
New York, New York 10271
(212) 416-8556
email: christopher.coulston@ag.ny.gov

TO:     *(via First Class Mail)*

Chad L. Edgar
Cardi & Edgar LLP
99 Madison Avenue, 8th Floor
New York, NY 10016
212.481.7770 (tel.)

Ryan Shaffer
Senior Counsel
New York City Law Department
100 Church St.
New York, New York 10007
(212) 356-5037