UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
ODED GREENBERG, M.D.,

                           Plaintiff,

   -against-                                15-CV-2343 (PKC/VMS)

SUNY DOWNSTATE ET AL.,                   **DECLARATION OF**
                                                         **STEVEN PULITZER, M.D.**
                           Defendants.
---------------------------------------------------------X

      STEVEN PULITZER, M.D. affirms under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

      1.     I am currently the Chief Medical Officer for Kings County Hospital Center ("KCHC"), a major affiliate of Defendant State University of New York Downstate Medical Center ("SUNY DMC" or "Downstate"). I submit this declaration in support of Defendants' motion for summary judgment. In my former position of Chairman of Radiology at Kings County Hospital Center, I became and was fully familiar with Plaintiff's termination in 2014 and the reasons therefor.

      2.     I self-identify as White and am Jewish. I am 51 years old. I earned my MD degree from Drexel University College of Medicine and completed my residency in Diagnostic Radiology at the Icahn School of Medicine at Mount Sinai. I served as a Neuroradiology Fellow at NYU Langone Medical Center and later became Clinical Director of Radiology at KCHC in July 2013. In July 2014, I became the Interim Chair of Radiology at KCHC, and eventually the full Chair in January 2015. In November 2016, I was named the Chief Medical Officer at KCHC. Throughout my employment at KCHC, I have served as an affiliate employed by SUNY Downstate under the affiliation agreement between SUNY Downstate and KCHC.

1

3. In my role as Chair of Radiology at KCHC, I was responsible for the day-to-day operations of the Radiology Department. I supervised approximately 22 radiologists who were employed by SUNY Downstate and completed their clinical work at KCHC under the Downstate-KCHC affiliation. Before his termination, Plaintiff was one such radiologist. In my role, I did not hire or fire radiologists, determine the rate of their pay, or maintain employment records.

4. Prior to July 2014, in my role as Clinical Director of Radiology, I reported to Dr. Alan Kantor, then the Chair of Radiology. When Dr. Kantor left KCHC and I assumed the position as Interim Chair of Radiology in July 2014, the Radiology department was in disarray. As Chair, I would be responsible for improving the performance of the department, especially with respect to time and attendance abuse by radiologists, and rectifying the backlogs that resulted from inefficient review of patients' films. One of my first duties as Chair was to institute a "zero backlog" policy to ensure that patients' films were read in a timely fashion.

5. As Interim Chair of the department, I also assumed a supervisory role with respect to managing radiologists' schedules and ensuring adequate coverage for the department. Before my chairmanship, supervision of radiologists' schedules could be lax, and along with Dr. Deborah Reede (then the Academic Chair of the Radiology Department at Downstate), I took on responsibility for ensuring coverage of the department during several daily shifts.

6. The general expectation at KCHC is that radiologists spend most of their workday reading films. Time spent reading film is reflected, if only approximately, in "Talk Station" data. Talk Station data comprises information about a particular film,

including which radiologist read the film, and when the film was opened and signed for by a radiologist. By reviewing the data for one day, an approximation of when a radiologist started reading films and when he or she stopped can be discerned. As Chair, I monitored Talk Station data for all of the radiologists in the department to ensure that the physicians were working their scheduled shifts.

7. In my role as Chair, I also reviewed requests for time off. In order for a radiologist to request time off, he or she would first complete a form and submit it for my initial review. Radiologists were encouraged to submit their request forms with as much advance notice as possible, given that adequate coverage would necessarily need to be arranged.

8. August is a very challenging month to schedule given the number of vacation days taken by the department. The Department was usually short-staffed and so adherence to the schedule was critical to provide adequate care throughout the radiology department.

9. On September 2, 2014, Plaintiff approached me to inform me that he would be unavailable to work for the rest of the week. I advised Plaintiff that I could not approve his proposed absence that same week, due to the fact that the department would not have adequate coverage. On the following day, September 3, Plaintiff approached me to notify me that, notwithstanding the fact that I had not approved his request, he would be taking the next two days off anyway. Plaintiff indeed did not report to work on either September 4 or September 5. Plaintiff never submitted the appropriate forms to request leave. Although I understand that he contests this, Plaintiff did not inform me why he wanted to take leave on those days.

3

10. In light of Plaintiff's insistence that he would not report to work on September 4 and September 5, despite not receiving approval for such absence, I contacted Dr. Reede. Dr. Reede advised me to draft a letter to Plaintiff outlining my position. I did so and handed Plaintiff the letter on September 3. Ex. Y. When Plaintiff did not report to work on September 4 and September 5, Dr. Reede and I referred the issue to SUNY Downstate's Labor Relations Department. My hope was that Plaintiff would be counseled, agree to a particular schedule and then abide by it. My intention was not to terminate Plaintiff.

11. It is my understanding that Plaintiff signed a Settlement Agreement on September 8 following an interrogation by Michael Arabian of Labor Relations. I had no role in preparing that agreement and was not consulted by Mr. Arabian regarding the agreement.

12. An attestation is a written statement made by an attending physician to certify that he or she had reviewed a patient's report and that the report was now final. Attestations are legal documents that are vital to hospital billing and they also help to verify and ensure good patient care, and non-conforming ones could trigger a full investigation by the Centers for Medicare & Medicaid Services ("CMS"), as well as potential financial liability. For this reason, I had been part of the Radiology Department's recent efforts to standardize our attestations. All Radiology Department staff were instructed on which standard attestations to append to patient reports, and I personally instructed Plaintiff to use the agreed-upon standard attestations during a staff meeting on September 22, 2014.

13. In or around late September 2014 after the September 22 staff meeting, Dr. John Amodio (then the Chief of Pediatric Radiology) notified me of a completely inappropriate attestation that had been affixed by Plaintiff to a patient report. In the radiology context, attestations are a notation added by an attending radiologist that essentially confirms that such attending radiologist has reviewed a patient's images that to that point had only been reviewed by a resident. Whether that reviewing attending radiologist concurs or finds something to change in the resident's interpretation of the images will be reflected in the attending's attestation.

14. Within hours of hearing from Dr. Amodio about the inappropriate attestation, I was able to review the attestation myself on the patient's chart. I promptly contacted a colleague in KCHC's Information Technology department, Jayan Kurian, in an effort to learn the full extent of the non-standard attestations. I eventually learned that Plaintiff had placed non-standard attestation on approximately 180 patient studies. I considered Plaintiff's use of the unapproved attestation to be insubordinate.

15. Upon learning the extent of Plaintiff's use of the non-standard attestations, I brought the issue to the attention of Dr. Ghassan Jameladdine, then the Chief Medical Officer of KCHC. Dr. Jamelraddine, in turn, advised me to contact KCHC's Risk Management Department in an effort to determine KCHC's potential legal exposure.

16. I met with Michelle Welcome in KCHC's Office of Risk Management, who agreed that the conduct was at least insubordinate and that I should consider a Medical Board Hearing. The Medical Board is a committee, comprised of approximately eight member physicians, which can be convened to approve, or to revoke, the medical credentials of a provider physician. A Hearing of the Medical Board can determine

5

whether a physician's conduct is inappropriate such that his or her credentials should be revoked. Shortly after meeting with Risk Management, I notified Dr. Reede of the situation, and Dr. Reede and I agreed to refer the issue to SUNY Downstate's Department of Labor Relations. Following the investigation by Labor Relations, I conferred with Labor Relations and Dr. Reede, and we ultimately concluded that Plaintiff should be terminated.

17. None of my dealings with Plaintiff had anything to do with Plaintiff's age, race, or religion.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
March 26, 2018

*Steven Pulitzer, MD*
STEVEN PULITZER