Contract Number: X800141
Agency Code: 3320218



# THE NEW YORK CITY HEALTH AND HOSPITALS CORPORATION

## SUNY HEALTH SCIENCE CENTER AT BROOKLYN

### Affiliation Agreement

### for the provision of services at

### KINGS COUNTY HOSPITAL CENTER

### FYs 14-16

84614790_5

**SUNY 001006**

# TABLE OF CONTENTS

Page

1. OBLIGATIONS OF THE CORPORATION .................................................. 7
   1.1    Services and Support............................................................... 7
   1.2    Chief Executive...................................................................... 7
   1.3    Medical Director .................................................................... 8

2. BASIC OBLIGATIONS OF THE AFFILIATE.............................................. 9
   2.1    Services ................................................................................. 9
   2.2    Hiring of Physician Providers ............................................... 11
   2.3    Staffing -- Supervision ......................................................... 12
   2.4    Chiefs of Service................................................................... 13
   2.5    Assignment of Physician Providers and Post-Graduate Trainees.... 14
   2.6    Provider Qualifications.......................................................... 15
   2.7    Physician Provider Qualifications........................................... 18
   2.8    Student Programs .................................................................. 19
   2.9    Language Proficiency and Cultural Competence ..................... 22
   2.10   Business Information and System Security ............................. 23
   2.11   HIPAA Compliance ............................................................... 24
   2.12   Bioterrorism Preparedness .................................................... 25
   2.13   Medicare Advantage Compliance ........................................... 25
   2.14   Performance Indicators ......................................................... 27

3. RESPONSIBILITIES OF PHYSICIAN PROVIDERS.................................... 27
   3.2    Medical Staff -- Organization ................................................ 28
   3.3    Medical Staff -- Responsibilities ........................................... 28
   3.4    Third Party Reimbursement and Reimbursement from Patients -- Provision of
          Information ........................................................................... 29
   3.5    Third Party Payer Denials of Reimbursement ......................... 30
   3.6    Documentation of Patient Care Services ................................. 30
   3.7    Compliance Training ............................................................. 31
   3.8    Other Responsibilities of Physician Providers......................... 32
   3.9    Risk Reduction Training ........................................................ 33

4. POST-GRADUATE TRAINING PROGRAMS ............................................ 33
   4.1    General.................................................................................. 33
   4.2    Professional Appointments and Supervision of Residents ....... 36
   4.3    The Programs ........................................................................ 36
   4.4    Joint Coordinating Committee................................................ 39

5. TRANSFER AND REFERRAL OF PATIENTS .......................................... 41
   5.1    Permitted Transfers and Referrals .......................................... 41
   5.2    Approval by the Chief Executive............................................. 41

**SUNY 001007**

|  | 5.3 | Failure to Comply | 41 |
|  | 5.4 | Reimbursement for Physician Services | 41 |
| 6. | | MODIFICATION OF CONTRACT SERVICES | 42 |
| 7. | | MEDICAL RECORDS | 42 |
|  | 7.1 | Duties of the Parties | 42 |
|  | 7.2 | Unit Record System | 42 |
|  | 7.3 | Completion of Medical Records | 42 |
| 8. | | COMPLIANCE WITH REGULATIONS AND STANDARDS | 43 |
|  | 8.1 | Required Compliance | 43 |
|  | 8.2 | Failure to Comply | 44 |
|  | 8.3 | Obligation to Cure | 44 |
|  | 8.4 | Consequence of Failure to Cure | 44 |
| 9. | | COMPENSATION FOR CONTRACT SERVICES | 44 |
| 10. | | BILLING -- THE FEE STATEMENT | 44 |
|  | 10.1 | Format and Semi-Monthly Payment Calculation | 44 |
|  | 10.2 | Erroneous or Incomplete Fee Statements | 45 |
|  | 10.3 | Interest on Late Payments | 45 |
|  | 10.4 | Payments for Clinical Services | 45 |
| 11. | | DISPUTE RESOLUTION PROCEDURE | 45 |
| 12. | | PERSONNEL, TIME-KEEPING, EQUAL EMPLOYMENT OPPORTUNITY AND AFFIRMATIVE ACTION | 46 |
|  | 12.1 | Termination of Physician Providers, Post-Graduate Trainee and Students | 46 |
|  | 12.2 | Physician Provider and Post-Graduate Trainee Time Records | 47 |
|  | 12.3 | Time-keeping, Records and Notices | 47 |
|  | 12.4 | Prohibition Against Fees: Assignment of Fees | 48 |
|  | 12.5 | Non-Discrimination: Equal Employment | 48 |
|  | 12.6 | Affirmative Action | 50 |
| 13. | | REIMBURSEMENT FOR CERTAIN EXPENSES | 50 |
|  | 13.1 | Severance Costs | 50 |
|  | 13.2 | Notices of Termination | 51 |
|  | 13.3 | Accrued Vacation Costs | 51 |
|  | 13.4 | Cost of Living Adjustments | 52 |
|  | 13.5 | Collective Bargaining Agreements | 52 |
| 14. | | BOOKS AND RECORDS | 52 |
|  | 14.1 | Generally | 52 |
|  | 14.2 | Method of Accounting | 53 |
| 15. | | ANNUAL AUDITS | 53 |
|  | 15.1 | Scope of the Audit | 53 |

**SUNY 001008**

| | 15.2 | Due Date of the Audit | 53 |
| | 15.3 | Affiliate's Failure to Submit Annual Audit Report | 54 |
| | 15.4 | Corporation's Final Audit | 54 |

| 16. | INSPECTION OF BOOKS AND RECORDS | | 54 |

| 17. | REPORTING REQUIREMENTS AND RESPONSIBILITIES | | 54 |

| 18. | INDEMNIFICATION | | 55 |
| | 18.1 | Scope of Defense and Indemnification | 55 |
| | 18.2 | Limitations on Defense and Indemnification | 56 |
| | 18.3 | Conditions to Defense and Indemnification | 57 |
| | 18.4 | Procedure in Connection with Defense and Indemnification | 58 |
| | 18.5 | Indemnification of the Corporation | 58 |
| | 18.6 | Continuing Obligation to Indemnify | 59 |
| | 18.7 | Corporation/City of New York Operating Agreement | 59 |

| 19. | TERM AND TERMINATION | | 59 |
| | 19.1 | Term of Agreement | 59 |
| | 19.2 | Notice of Termination | 60 |
| | 19.3 | Consequences of Termination | 60 |
| | 19.4 | Effect of Termination on Training Programs | 61 |
| | 19.5 | Good Faith of Parties | 62 |

| 20. | GIFTS AND GRANTS | | 62 |
| | 20.1 | Gifts and Grants to the Affiliate | 62 |
| | 20.2 | Gifts and Grants to the Corporation | 63 |

| 21. | RESEARCH | | 63 |
| | 21.1 | Corporation Approval of Research Projects | 63 |
| | 21.2 | Reimbursement of the Corporation | 63 |
| | 21.3 | Contract Services not to be Compromised | 63 |
| | 21.4 | Acknowledgment of Corporation Support | 64 |
| | 21.5 | Indemnification for Research | 64 |
| | 21.6 | Other Corporation Research | 64 |
| | 21.7 | Limitations; Precedence; Master Premises Agreement | 64 |

| 22. | INTELLECTUAL PROPERTY | | 65 |
| | 22.1 | Definitions | 65 |
| | 22.2 | Disclosures | 66 |
| | 22.3 | Rights of Employees | 66 |
| | 22.4 | Authority With Respect to Commercialization | 66 |
| | 22.5 | Distribution of Net IP Revenues | 67 |
| | 22.6 | Pre-Publication Review | 67 |

| 23. | REPRESENTATIONS AND WARRANTIES | | 68 |
| | 23.1 | Representations and Warranties of the Affiliate | 68 |
| | 23.2 | Representations and Warranties of the Corporation | 69 |

**SUNY 001009**

23.3   Termination for Breach of Representations and Warranties ................................. 69
23.4   Termination for Failure to Obtain Required Authorizations ................................. 69

24.   COVENANTS OF THE AFFILIATE AND THE CORPORATION ............................. 69
      24.1   Physician Providers ................................................................................. 69
      24.2   Worker's Compensation, Disability Benefits, Minimum Wage and
             Unemployment Benefits ........................................................................... 70
      24.3   Employment Status ................................................................................. 70
      24.4   Rights and Remedies ............................................................................... 70
      24.5   Compliance with Law .............................................................................. 70
      24.6   Federal Employment Practices ................................................................. 70
      24.7   Non-Discrimination Against the Disabled .................................................. 70
      24.8   Investigations ........................................................................................ 71
      24.9   Assignment ........................................................................................... 73
      24.10  Subcontracting ....................................................................................... 73
      24.11  Publicity and Publication ......................................................................... 74
      24.12  Participation in an International Boycott ..................................................... 74
      24.13  Northern Ireland Certification .................................................................. 75
      24.14  Antitrust ............................................................................................... 76

25.   MISCELLANEOUS ................................................................................................ 76
      25.1   General Release ...................................................................................... 76
      25.2   Claims and Actions Thereon ..................................................................... 77
      25.3   No Claim against Officers, Agents or Employees ......................................... 77
      25.4   Waiver ................................................................................................... 77
      25.5   Notices .................................................................................................. 78
      25.6   All Legal Provisions Deemed Included ....................................................... 78
      25.7   Severability ............................................................................................ 78
      25.8   Political Activity ..................................................................................... 79
      25.9   Modification ........................................................................................... 79
      25.10  Paragraph Headings ................................................................................ 79
      25.11  Merger ................................................................................................... 79
      25.12  No Removal of Records From Premises ...................................................... 79
      25.13  Inspection of Site .................................................................................... 79
      25.14  Access to Records by the Federal Government ............................................ 80
      25.15  Clean Air Act ......................................................................................... 80
      25.16  Survival ................................................................................................. 80
      25.17  Exclusion of Third Party Rights ................................................................ 81
      25.18  Execution ............................................................................................... 81

**SUNY 001010**

AGREEMENT dated as of July 1, 2013, between **THE NEW YORK CITY HEALTH AND HOSPITALS CORPORATION**, a public benefit corporation created under the law of the State (hereinafter referred to as the "Corporation"), having its principal place of business at 125 Worth Street, New York, New York 10013, and **SUNY HEALTH SCIENCE CENTER AT BROOKLYN** (hereinafter referred to as the "Affiliate"), relating to services to be provided at **KINGS COUNTY HOSPITAL CENTER** and related facilities and clinics (hereinafter referred to as the "Facility").

## W I T N E S S E T H

WHEREAS, the Corporation, pursuant to the New York City Health and Hospitals Corporation Act, as amended, is charged with the responsibility of operating and administering the municipal health facilities formerly operated by the City; and

WHEREAS, the purposes of the Corporation, as set forth in Article II of its By-Laws, include the provision and delivery of dignified and comprehensive care and treatment for the ill and infirm, both physical and mental, particularly to those who can least afford such services; and

WHEREAS, the Affiliate operates a College of Medicine, accredited by the Liaison Committee on Medical Education and through its Academic Departments, operates and sponsors resident training programs accredited by the Accreditation Council for Graduate Medical Education; and

WHEREAS, the Affiliate desires to have students who are enrolled in its College of Medicine ("Students") obtain necessary clinical observation and experience at the Facility, and the Corporation desires to provide such Students with the facilities and amenities necessary to facilitate such clinical observation and experience; and

WHEREAS, the Affiliate desires to have Post-Graduate Trainees who participate in its residency programs obtain necessary clinical training at the Facility, and the Corporation desires to provide such Post-Graduate Trainees with access to its facilities and to obtain the benefit of their services at the Facility;

WHEREAS, the Corporation desires to ensure that health care is provided to all Patients served by the Facility in a manner that complies with accepted community standards;

84614790_5

**SUNY 001011**

**WHEREAS,** the Corporation and the Affiliate have historically entered into affiliation agreements which have provided for certain faculty teaching, Patient care services, research, professional advice and consultation by the Affiliate in the Facility; and

**WHEREAS,** the Corporation, in the exercise of its powers and the fulfillment of its corporate purposes, has requested the professional services of the Affiliate in carrying out its purposes, and the Affiliate desires to continue an affiliation with the Corporation in order to fulfill its medical teaching and research mission and is willing to provide professional services and Post-Graduate Trainees to the extent and on the terms and conditions hereinafter specified.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements hereinafter contained, the Corporation and the Affiliate hereby agree as follows:

**DEFINED TERMS.** As used in this Agreement, each of the following terms shall have the respective meanings set forth below:

**ACGME** - Accreditation Council for Graduate Medical Education.

**ADA** - Commission on Dental Accreditation of the American Dental Association.

**Assignment Schedule** - Time-keeping records, including the "on-call" schedules, reflecting the daily Contract Services activities of all Physician Providers, Post-Graduate Trainees and clinical Department/Service Heads assigned to the Facility, prepared and submitted in accordance with the terms of and conditions of Section 2.5 of this Agreement.

**Chief Executive** - Person duly appointed by the President of the Corporation responsible for the administration and operation of the Facility according to the provisions of this Agreement including, but not limited to, those set out in Section 1.2 of this Agreement.

**Chair** – Physician appointed by the Affiliate responsible for the overall administration and operation of the Affiliate's Clinical Department and Post-Graduate Training Program.

**Chief of Service** – Physician approved by the Chief Executive and appointed by the Corporation pursuant to Section 2.4 of this Agreement, who has responsibility for administration and operation of one of the Facility's clinical Departments.

**SUNY 001012**

**City** - The City of New York.

**Contract Services** - Services rendered pursuant to the terms of this Agreement by the Affiliate which shall consist of: (i) Direct Patient Care Services; (ii) the supervision of the provision of services by Physician Providers, Post-Graduate Trainees, and Students; (iii) administrative services that concern the clinical operation and delivery of Direct Patient Care Services, the business administration of this Agreement and the Affiliate relationship; (iv) the administration and management of personnel, to the extent provided herein, relating to Physician Providers; (v) the instruction of Post-Graduate Trainees, Students and other personnel in a classroom, lecture hall, on rounds or otherwise in the course of the provision of Direct Patient Care Services, including the provision of instruction required by ACGME for a particular Training Program; and (vi) the technical services that support the provision of Direct Patient Care Services; all to the extent expressly set forth in this Agreement.

**Corporation By-Laws** - By-Laws of the Corporation as duly adopted by the Governing Body, as the same may be amended from time to time in accordance with applicable law.

**Corporation Physicians** - Attending Physicians employed by the Corporation providing professional services at the Facility.

**Department/Service** - Duly constituted clinical and support departments provided at the Facility.

**Direct Patient Care Services** - All of those general medical, dental and mental health/chemical dependency services rendered directly to Patients by Physician Providers and by Post-Graduate Trainees.

**Dispute Resolution Procedure** - Procedure set forth in Section 11 of this Agreement pursuant to which disputes between the Corporation and the Affiliate with respect to certain matters arising under this Agreement, except as otherwise provided herein, are to be resolved.

**Faculty** – Physicians and other health-related professionals who hold current faculty appointments at the Affiliate and who (on a part-time, full-time, sessional or voluntary basis) provide Contract Services or engage in Research at the Facility.

**Fee Statement** - A statement prepared by the Affiliate and delivered to the Corporation describing the Contract Services rendered by the Affiliate during a preceding period and setting forth the amount of compensation due for such Contract Services, calculated in accordance with the provisions of this Agreement and Attachment B hereto.

**SUNY 001013**

**Fiscal Year** - Twelve (12) month period commencing July 1 and ending June 30.

**Governing Body** - Board of Directors of the Corporation.

**HIPAA** - Health Insurance Portability and Accountability Act of 1996.

**HIPAA Regulations** - The Regulations promulgated under HIPAA.

**Joint Commission** - Joint Commission on Accreditation of Healthcare Organizations.

**LCME** - Liaison Committee on Medical Education.

**Medical Director** - Chief medical advisor and medical operations officer of the Facility responsible for the discharge of duties and responsibilities by the Medical Staff as required by Section 405 of the New York State Health Code and according to the provisions of Section 1.3 of this Agreement.

**Medical Record** - Account (paper or electronic) compiled by physicians and other health care professionals, in accordance with the State Hospital Code, which includes, but is not limited to, a Patient's medical history, present illnesses, findings on examination, details of treatment and notes on progress.

**Medical Staff** - Facility body which is comprised of licensed physicians and other licensed persons specified in the Medical Staff By-Laws who are permitted by law and by the Corporation to provide clinical care to Patients, that is organized pursuant to, and has responsibilities as are set forth in, the applicable Regulations, and that has the overall responsibility for (i) the quality of the professional services provided by persons with clinical privileges who provide patient care services in the Facility and (ii) the accounting therefor to the Governing Body.

**Medical Staff By-Laws** - By-Laws that prescribe the organization, roles and responsibilities of the Medical Staff of the Facility, adopted and periodically reviewed by the Medical Staff and approved by the Governing Body.

**Patients** - Persons to whom clinical services are rendered on an inpatient, outpatient or emergency room basis at the Facility, or on a home care basis, or otherwise in accordance with the provisions of this Agreement.

**SUNY 001014**

**Physician Providers** - Attending physicians (and such non-physician personnel identified on Attachment A hereto), employed by the Affiliate, providing Contract Services under the provisions of this Agreement.

**Post-Graduate Trainees** - Interns, residents and clinical fellows who, in conjunction with their training, provide Contract Services at the Facility

**President** - President of the New York City Health and Hospitals Corporation.

**Program Director** - An Affiliate employed Faculty member (who may or may not be a Chair) who has primary responsibility for a Training Program.

**Regulations** - All laws, rules, regulations and standards of the United States, the City, the State, and all other applicable governing and regulatory bodies, as the same may be amended and supplemented from time to time including, without limitation, the New York Public Health Law and the rules and regulations promulgated thereunder (including the New York State Health Code), the New York Iran Divestment Act of 2012, the policies of the State Department of Health and the State Department of Education with respect to medical and dental students, Joint Commission and ACGME standards, Level I Trauma Center standards, 911 Receiving Hospital standards, the policies of the Liaison Committee on Medical Education Standards for Accreditation of Medical Education, Medical Staff By-Laws, and Medical Staff Rules and Regulations established pursuant to those By-Laws, Federal and other regulations regarding the protection of the rights and welfare of human research subjects, HIPAA and any regulations promulgated thereunder, Federal and State laws proscribing fraud and abuse in the Medicaid and Medicare Programs (including the Anti-Kickback Civil Monetary Penalty, Physician Self-Referral ("Stark") and False Claims Acts and any regulations promulgated thereunder which are applicable to a party's performance hereunder, and with respect to the Corporation only, the Corporation By-Laws and the established code of ethics, policies and procedures of the Facility, and with respect to the Affiliate only, the established policies and procedures of the Affiliate, which relate or are in any way connected with the education of persons to provide, and the provision of, medically related services.

**Reports** - Information and reports which a party is obligated to provide to the other party pursuant to this Agreement including, but not limited to, reports required by the Annexes specified in the list attached hereto as Exhibit 1.

**Research** - The systematic investigation or study including, but not limited to, research development, testing and evaluation, designed to develop or contribute to general knowledge relating to physical or mental health.

**SUNY 001015**

**Residents** - Interns and residents enrolled in ACGME-approved Training Programs, sponsored by a Sponsoring Institution, within the Facility.

**Semi-Monthly Payments** - Advance payments made on the first and sixteenth day of each calendar month by the Corporation to the Affiliate as compensation for Contract Services pursuant to the provisions of this Agreement.

**Sponsoring Institution** - The Affiliate.

**State** - The State of New York.

**Student Program** - A program of undergraduate medical education that is conducted under the auspices of a Sponsoring Institution within the Facility.

**Students** - Students, who have not yet earned an M.D., D.D.S., D.M.D., D.P.M. or D.O. degree, who are registered with the Affiliate and assigned to engage in certain activities related to their medical education at the Facility.

**Supervisory Services** - Those services that are rendered by Faculty in supervising the Patient care and related services of Post-Graduate Trainees and Students as provided by this Agreement.

**Teaching Services** - Instruction provided by Faculty members to Post-Graduate Trainees, Students and other personnel in a classroom, lecture hall, on rounds or otherwise in the course of the provision of Patient care, including the provision of instruction required by ACGME for a particular Training Program.

**Third Party Reimbursement** - Reimbursement by third party agencies responsible for administering Medicaid and Medicare or other public benefit programs, or private health insurance plans or programs.

**Time Records** - Accurate and complete records of time spent by Physician Providers in the performance of Contract Services required by Section 12 of this Agreement. Such records will consist of certifications of compliance.

**Training Programs** - Post-Graduate Training Programs including, but not limited to, fellowships conducted in whole or in part at the Facility which are organized, supervised and directed by the Affiliate or other Sponsoring Institution.

**SUNY 001016**

# 1. OBLIGATIONS OF THE CORPORATION

## 1.1 Services and Support

(a)    The Corporation shall be responsible for the administration and operation of the Facility, and shall exercise its responsibilities through its representatives as set forth in Sections 1.2 and 1.3 hereof. The Corporation hereby acknowledges and agrees that the Affiliate's ability to perform fully its obligations hereunder is dependent in part on the Corporation's provision of an environment at the Facility that is reasonably conducive to the performance of such obligations, and to the training of Post-Graduate Trainees and Students. In this regard, the Corporation agrees, subject to the terms and conditions of this Agreement, to provide such services, facilities, materials, supplies and equipment as shall be reasonably necessary to support the Contract Services, and to the extent of available financial resources, maintain the Facility in accordance with Joint Commission, ACGME, LCME and other accreditation and legal standards. The adequacy of such level of support shall be reviewed pursuant to Section 4.4 hereof and any disputes with respect thereto shall be subject to the Dispute Resolution process specified in Section 11 hereof.

(b)    Subject to the terms and conditions of this Agreement, the Corporation shall plan, coordinate and ensure the quality and safety of all Direct Patient Care Services provided hereunder. The President, on behalf of the Governing Body, shall ensure the maintenance at the Facility of health care that complies with accepted community standards, and shall (upon receipt and consideration of the recommendations of the Facility's Chief Executive and in accordance with the Medical Staff By-Laws) act to approve Medical Staff appointments, reappointments, termination of appointments, and the granting or revision of clinical privileges. Notwithstanding any other provision in this Agreement, the Corporation remains responsible for ensuring that any service provided pursuant to this Agreement complies with all pertinent provisions of law. Such responsibility shall not serve to diminish the Affiliate's obligations to the Corporation under this Agreement.

## 1.2 Chief Executive

(a)    The President of the Corporation, or his or her designee, shall appoint the Chief Executive of the Facility and shall consider recommendations of the Affiliate concerning the potential candidates being considered to fill, or who could be considered to fill, any vacancy. A representative of the Affiliate shall be included on the Search Committee. The Chief Executive, acting on behalf of the Corporation, shall be responsible for the administration and operation of the Facility and adherence by the Facility to all pertinent performance improvement standards; and shall carry out that

**SUNY 001017**

responsibility in accordance with the Regulations consistent with the terms and conditions of this Agreement.

(b)     The Chief Executive shall oversee, and provide resources to support, performance improvement and patient safety activities of the Medical Staff and Physician Providers as those activities are outlined in the Regulations. The Chief Executive shall determine the level of such resources upon consultation with the Medical Director, the Medical Staff and, to the extent provided herein, the Affiliate.

(c)     The Chief Executive, acting on behalf of the President and the Governing Body, shall chair the Facility Quality of Care Executive Review Committee, which shall exercise the responsibilities set out in State laws and regulations.

(d)     The Chief Executive, upon receipt and consideration of the recommendations of the Medical Director, the Medical Staff and the Affiliate, shall regularly provide recommendations to the President, acting on behalf of the Governing Body, for Medical Staff appointments, reappointments, or terminations of appointments.

(e)     All actions taken or required to be taken by the Chief Executive hereunder shall be deemed to be actions taken or required to be taken, as the case may be, for and on behalf of the Corporation.

1.3     Medical Director

(a)     The Medical Director shall be a member of the Medical Staff appointed and employed by the Corporation, who, at all times, holds a current Faculty appointment with the Affiliate, and who shall act as full-time chief medical advisor and chief medical operations officer of the Facility and provide direction for the Medical Staff in carrying out its functions as required by the Regulations. The duties of the Medical Director shall include, but not be limited to, the following:

(i)     clinical administrative direction with regard to delivery of medical services within the Facility including, but not limited to, supervision of Chiefs of Service;

(ii)     direction for Facility-wide performance improvement, patient safety, risk management and utilization review programs;

(iii)     oversight of the development and implementation of appropriate and effective mechanisms for evaluating clinical appointments, reappointments and privileges, and for maintaining Corporation clinical standards; and for

SUNY 001018

advising the Chief Executive and the President on behalf of the Governing Body on appropriate decisions and actions in those areas;

(iv)    coordination of medical education programs and activities with the Affiliate in collaboration with the appropriate Affiliate employees including the pertinent academic Chairs; and

(v)    oversight of the implementation of Corporation medical policies.

(b)    The Medical Director shall report to and be accountable to the Chief Executive, and through the Chief Executive to the President on behalf of the Governing Body, with regard to medical services, compliance with the Regulations, and compliance with Corporation policies.

(c)    A vacancy in the position of Medical Director shall be filled by the Chief Executive after consultation with Affiliate through the Joint Coordinating Committee pursuant to Section 4 of this Agreement. The Chief Executive shall recommend the candidate to the President of the Corporation for appointment. The President, or his or her designee, shall have sole authority to appoint the Medical Director, who must maintain a current Affiliate Faculty appointment at all times. An Affiliate Faculty appointment shall be granted pursuant to the standards specified in Section 4 hereof and shall not be unreasonably withheld, non-renewed or withdrawn.

## 2.  BASIC OBLIGATIONS OF THE AFFILIATE

### 2.1  Services

(a)    Under the general supervision of the Corporation (but without limiting the Affiliate's rights granted hereunder), the Affiliate shall provide to the Corporation the teaching, supervisory, clinical and ancillary services of all Physician Providers identified on Attachment A hereto or provided pursuant to Section 2.5(d) hereof in such manner as to assist the Corporation in achieving coverage for, and the provision of, such services as are sufficient to meet promptly the needs of all Patients seeking inpatient and outpatient services at the Facility consistent with all applicable Regulations and the terms and conditions of this Agreement. The operation of any Facility Cardiac Catheterization Program shall not be governed by the terms of this Agreement except as separately agreed to by the parties.

(b)    Except as limited by the Corporation's exercises of its powers and obligations hereunder and by the Regulations, the Affiliate shall be responsible for performance of all duties of Physician Providers required by this Agreement. The Affiliate shall not be responsible for (i) the acts or omissions of physicians not in its

**SUNY 001019**

employ; or (ii) the patient care related acts or omissions at the Facility of dually-employed physicians (or other dually employed personnel) who are paid by the Affiliate only for their activities at the Affiliate. The initial number of full-time equivalent Physician Providers in each Department or Service identified on Attachment A hereto may not be reduced or increased by either party in any Department or Service, except in accordance with the provisions of this Agreement and except that (i) either party may, on fourteen months' written notice, eliminate the entire complement of Physician Providers in one or more Department or Service; and (ii) the Corporation may reduce such number to correspond to a decrease in workload subject to reimbursement for severance costs pursuant to Section 13.1 hereof. To the extent the Corporation requests additional Physician Provider services above the level of effort set forth in Attachment A, the Corporation will reimburse the Affiliate's costs in meeting that request.

(c)     If the Corporation reasonably determines that a Physician Provider has not provided services that comply with acceptable community patient care standards and complies fully with the terms of the Agreement, then the Corporation shall give to the Affiliate written notice of such determination and the reasons therefor. Such Provider shall not, at the Corporation's election and following a reasonable opportunity to cure if the issue does not involve a threat to Patient health or safety, thereafter provide Contract Services and the Affiliate shall, upon the Corporation's request, use its best efforts promptly to replace such Provider with another physician with comparable experience and expertise, who shall be added to Attachment A.

(d)     If, following review by the Joint Coordinating Committee pursuant to Section 4 hereof, the Corporation reasonably determines that the Affiliate has failed to provide the services required by this Agreement in any Department of the Facility in a manner that ensures Patient care that complies with acceptable community standards and complies fully with the material terms of this Agreement, then the Corporation shall give to the Affiliate written notice of such determination and the reasons therefor. If the Affiliate fails to cure the failure to the Corporation's reasonable satisfaction within thirty (30) days of receipt of such notice, (or if not curable within such time, if the Affiliate fails to immediately commence and diligently continue its best efforts to effect such cure as promptly as possible) then the matter shall be subject to the Dispute Resolution Procedure pursuant to Section 11 hereof and, if thereby unresolved, the Corporation shall have the unilateral right to terminate the Agreement (and adjust compensation) with respect to the provision of services and procedures in that Department only, and to seek the provision of such services and procedures from a third party.

(e)     Attachment A lists, by Department, all Physician Providers as of July 1, 2013, and for each such Physician Provider, Attachment A also lists their required level of effort at the Facility (expressed as a Full Time Equivalent percentage) and the maximum salary for that level of effort (exclusive of fringe benefits) for which

SUNY 001020

the Corporation will reimburse the Affiliate. The maximum salaries listed on Attachment A for each Physician Provider may not be increased without the express written approval of the Chief Executive, or his or her designee, and such maximums may not be decreased without the express written approval of the Affiliate's President, or his or her designee. Any written approvals obtained in accordance with this Section 2.1(e) shall be deemed to modify Attachment A with respect to the salary line that is the subject of such written approval.

(f)     The Department of Radiology shall provide Initial Reports of Emergency Room and Emergency CT and MRI images within 60 minutes; Initial Reports of Inpatient Procedures within 24 hours; Outpatient Final Reports within 72 hours; and Critical Findings pursuant to guidelines established by the Facility. The foregoing timeframes are based upon (X) all approved roster lines for Radiology being filled; and (Y) an annual volume of 190,000 CT, CTA, X-ray, Ultrasound, MRA, MRI and Abdominal Imaging procedures. For the purpose of determining compliance with the foregoing, turnaround time shall be measured from: (i) the date and time of completion of technician documentation; (ii) availability of relevant current images and prior studies in "PACS Worklists;" and (iii) functionality of voice recognition program. Should such annual volume vary significantly in any year, the timeframes shall be adjusted accordingly. Should the Affiliate, in any quarter during the term of this Agreement, fail to achieve at least 95% compliance with the specified timeframe for any particular category of Reports, subject to the Corporation's delivery of prior notice (and subject to dispute resolution, where applicable), the Affiliate shall reimburse the Corporation for the reasonable costs incurred in arranging for alternative readings and Reports in that category within that quarter. Notwithstanding the forgoing, the provisions of this Section 2.1(f) shall not apply during any period in which the Chief of Service for the Department of Radiology at the Facility is a Corporation employee.

## 2.2    Hiring of Physician Providers

(a)     The Affiliate shall promptly notify the Medical Director of any vacancy or anticipated vacancy in any Physician Provider Line identified on Attachment A. Vacancies shall be deemed to include positions otherwise filled by physicians who are on an approved leave or subject to administrative suspension. Any vacancy in a Chief of Service line, other than in the Department of Radiology, shall, at the Corporation's election, be filled by a physician employed by the Corporation. With respect to all other vacancies, the Corporation may elect to (i) leave the line vacant in whole or in part, (ii) fill the line with a non-Affiliate employee, or (iii) request that the Affiliate fill such line or fill such line with a non-Affiliate employee. Neither the Affiliate nor any Physician Provider shall be responsible for any consequences resulting from the Corporation's election to leave a line vacant. Notwithstanding anything to the contrary, vacancies, other than in a Chief of Service line, in the Departments of

**SUNY 001021**

Radiology and Radiation Oncology shall not be filled by non-Affiliate employees except upon the Affiliate's consent or as provided in Section 2.2(b).

(b)     Upon the Corporation's request, the Affiliate shall use its best efforts to (i) fill promptly any vacancy in a Physician Provider line with a physician qualified to provide Contract Services at an equivalent level of skill, training and salary as the provider whose departure created the vacancy and (ii) hire additional Physician Providers in the Department of Radiology at salaries comparable, based on seniority, to the existing salaries specified in Attachment A. Should the Affiliate be unable to do so, the Corporation may either approve a higher salary level or fill the vacancy with a non-Affiliate employee.

(c)     The Affiliate may follow its own internal personnel policies and procedures with respect to hiring Physician Providers. The Affiliate shall forward to the Medical Director (or his or her designee), in writing, the names, credentials, résumés, proposed job title and proposed salary cost to the Corporation of all individuals proposed to be hired by the Affiliate as Physician Providers. Such proposed salary cost shall not exceed, absent the Medical Director's written approval, the average salary cost for that position identified on Attachment A hereto. The Affiliate shall also submit such information to the Medical Staff to permit the Medical Staff to grant privileges to such individuals in accordance with the Medical Staff By-Laws and Section 3. Medical Staff membership and/or clinical privileges shall not be unreasonably withheld, limited, delayed or withdrawn from any current or proposed Physician Provider during the term of this Agreement.

(d)     Upon receipt of the Affiliate's recommendation of a Physician Provider, the Corporation may accept or reject such recommendation, provided any such rejection is provided in writing and is not unreasonable. The Medical Director (or his or her designee) shall approve or disapprove each such recommendation as soon as reasonably practicable, but in no event in more than ten (10) days from receipt thereof. Any unreasonable objection shall relieve the Affiliate of any further obligation to fill the vacancy.

(e)     The Corporation shall reimburse the Affiliate for a proportion of the Affiliate's reasonable recruitment costs that is the same as the ratio of each recruited physician's effort on behalf of the Corporation to his/her total FTE work effort, subject to a maximum reimbursement of costs incurred in each Fiscal Year equal to $50,500.

2.3     Staffing -- Supervision

(a)     Subject to the provisions of this Agreement, Physician Providers shall be under the general supervision of the President of the Corporation, the Chief

SUNY 001022

Executive, and the Medical Director, and under the direct supervision of the Chiefs of Service.

(b)     Contract Services performed by Post-Graduate Trainees, as well as the services rendered by Students, shall be supervised only by physicians who hold current Affiliate Faculty appointments, who shall be responsible for the care provided. Such supervision shall be conducted in a manner consistent with the Regulations, as applicable, and in accordance with Section 4 of this Agreement.

(c)     All Physician Providers shall receive annual performance evaluations from Facility officials, which shall be in addition to any Affiliate evaluations. Facility evaluations shall be completed (including reviews by Chiefs of Service/the Facility's Medical Director and/or Chief Executive, as appropriate) and submitted to the Facility's Human Resources Department not later than the last day of the month immediately following the month designated for completion of the annual evaluations. The annual residency review of Post-Graduate Trainees may be substituted for the standard Facility performance evaluation forms at the discretion of the Directors of Residency Programs. In addition to the above, each annual performance evaluation must be accompanied by a current, signed, functional job description.

(d)     The Affiliate's Senior or Deputy Affiliation Officer shall attend the quarterly meetings of the Quality Assurance Committee of the Corporation's Board of Directors.

2.4     Chiefs of Service

(a)     If a vacancy arises in the position of Chief of Service, the Chief Executive will appoint a new Chief of Service after consultation with a search committee, the Medical Director and the Program Director of the relevant Affiliate Training Program. At least one member of any such search committee shall be designated by the Affiliate. The Joint Coordinating Committee (as described in Section 4.4) shall recommend to the Chief Executive additional individuals to comprise each such search committee. Such recommendations shall be considered by the Chief Executive. The appointee shall satisfy the requirements for Chief of Service established by the Joint Commission, the Medical Staff By-Laws, and the Job Description annexed hereto as Attachment C, and qualify for and attain appointment to the Affiliate's Faculty as Associate Professor, pursuant to Section 4.2(b). Except for the Department of Radiology, the appointee shall, at the election of the Chief Executive, become an employee of the Corporation.

(b)     Notwithstanding the provisions of Section 2.4(a), the Chief Executive shall inform the Affiliate, in advance, of any proposed Chief of Service

SUNY 001023

appointment. In the event that the Affiliate has questions or concerns regarding the educational background or teaching qualifications of a proposed Chief of Service appointee, the Chief Executive shall meet with the Affiliate's Dean to discuss the issue, prior to implementing the appointment.

(c)     Except as otherwise agreed to by the parties, and as set forth on Attachment D (which is subject to amendment from time to time by mutual consent of the parties), no Chief of Service shall be permitted to engage in clinical or administrative activities outside of the Facility.

(d)     Chiefs of Service may be removed by, and only by, the Chief Executive at any time but only following consultation with the Dean of the Affiliate for the purpose of resolving any problem that may exist. The Affiliate may request removal of a Chief of Service in the event of recurrent and significant performance problems that adversely affect the training or supervision of Post-Graduate Trainees or Students and the Corporation shall give due consideration to such requests. Faculty appointments for Chiefs of Service may be withdrawn pursuant to the standards specified in Section 4 hereof.

2.5     Assignment of Physician Providers and Post-Graduate Trainees

(a)     Each Physician Provider and Post-Graduate Trainee shall provide services and coverage in accordance with provisions of this Agreement, the Regulations and in compliance with the applicable requirements of any grants received by the Corporation. The Corporation shall notify the Affiliate of all such grant requirements.

(b)     Each Physician Provider and Post-Graduate Trainee shall provide services as required by monthly Assignment Schedules, established by the Chiefs of Services after consultation from time to time with the Chairs, Program Directors and Site Directors. Such Assignment Schedules shall specify the hours, location, function of the assignment and such other information as the Corporation may reasonably determine and shall be furnished by the Affiliate at least ten days in advance of each month. With respect to Physician Providers whose level of effort, as set forth on Attachment A, is less than full-time at the Facility, the Chief of Service and the Chair shall work cooperatively on Assignment Schedules so as to avoid, to the extent reasonably feasible, any assignment conflicts.

(c)     In the event that (i) the number of Physician Providers or Post-Graduate Trainees performing Contract Services in any Department or Service on any day during the term of this Agreement is fewer than the number listed on the Assignment Schedule for that Department or Service on that day, and (ii) the duties and workload of the absent Physician Providers and Post-Graduate Trainees are not absorbed

SUNY 001024

or covered by other Physician Providers, then the Affiliate will reimburse the Corporation in an amount equal to the greater of (i) the amount of salary payable that day to each such missing Post-Graduate Trainee or (ii) any costs it incurs in replacing a missing Physician Provider or Post-Graduate Trainee with a sessional employee. Conversely, if, at the request of the Medical Director, Physician Providers and Post-Graduate Trainees expend materially more hours on-site in providing Contract Services than the level of effort set forth on Attachment A, the Corporation shall pay commensurate additional compensation. If the Affiliate anticipates or learns that any Physician Provider on Attachment A will not be present to fulfill his/her scheduled duties for more than one day, it shall promptly notify the Medical Director.

(d)     Except with the written approval of the Medical Director, each Physician Provider line shall be filled with one Physician Provider. Temporary deviations from the levels of effort set forth on Attachment A may be approved on a physician-by-physician basis, as necessary to facilitate appropriate physician "cross-coverage" between the Affiliate's Hospital and the Facility. To the extent any downward deviations in such level of effort are the result of Corporation Physicians furnishing coverage at the Affiliate's Hospital, the Facility shall be "compensated" by receiving corresponding coverage from Physician Providers. Similarly, to the extent that Physician Providers provide coverage at the Facility without direct payment to them or to the Affiliate for such services, the Affiliate shall be "compensated" by receiving corresponding coverage from Corporation Physicians. Any such informal "trading of effort" must be jointly approved by the appropriate Affiliate Department Chair(s) and Facility Chief(s) of Service and the Chief Executive, and if either party so requests, any such arrangements, and the plan for physician coverage in the corresponding Departments at both institutions, shall be memorialized in writing. If at any time prospectively, upon written notice to the other, either party believes that the trade of services has become inequitable, they may either (a) impose a reasonable monetary charge for physician coverage; or (b) if the other party does not agree to such a charge, cancel the existing trade of service arrangement(s). Any proposed or actual modifications or cancellations shall require sixty (60) days advance written notice to the other party.

2.6     Provider Qualifications

(a)     The Affiliate shall ensure that:

(i)     except as otherwise provided in this Agreement or by written authorization of the Corporation, each Physician Provider meets the qualification standards set out in Section 2.7 hereof, as appropriate;

SUNY 001025

(ii)    each Physician Provider shall have a complete medical evaluation prior to assignment to the Facility, pursuant to the requirements of Part 405 of the New York State Hospital Code. The Affiliate shall furnish to the Facility all reports concerning a Physician Provider's medical evaluation that may be required by the Regulations, and such reports shall be treated as confidential medical records in accordance with local, state and federal laws, rules and regulations; and

(iii)    each Physician Provider is duly licensed and/or certified in medicine or his or her discipline, as required by State law and this Agreement, and currently registered by the State, if required.

(b)    To the extent provided herein, the Affiliate shall assume responsibility for the process of credentialing at the Facility, in accordance with the Corporation's credentialing policies, each Physician and Post-Graduate Trainee whom the Affiliate intends to assign to the Facility, by:

(i)    promptly, upon the determination to assign any such Provider to the Facility, giving to such Provider a letter from the Facility's Medical Board Office listing the items the Provider must furnish in order to be credentialed and containing the forms that must be completed by the Provider therefor; and

(ii)    collecting from such Provider the items described in that letter and the completed forms, and then forwarding a complete package for each Provider to the Medical Board Office.

(c)    In order to ensure that each Physician Provider becomes eligible to participate in each Managed Care Plan in which the Facility participates, the Affiliate shall:

(i)    promptly after hiring such Provider, or promptly after the Facility commences participation in such Plan, whichever is later, give to such Physician Provider a letter from the Corporation or the Facility's Medical Board Office listing the items the Physician Provider must furnish in order to become a participating Physician Provider under such Plan and containing the forms that must be completed by the Provider therefor; and

(ii)    collect from such Physician Provider the items described therein and the completed forms, and then forward a complete package for such Plan to the Medical Board Office.

SUNY 001026

(d) In order to ensure that each Physician Provider has in effect all licenses, certifications and registrations required by State law and by this Agreement, and is qualified for membership and privileges to practice at the Facility according to its Medical Staff By-Laws, and will be eligible and remain eligible to participate in all Federal, State and those other Third-Party Reimbursement programs in which the Facility participates identified on Attachment E, the Affiliate shall:

(i) Promptly, upon written notification by the Facility's Medical Board Office listing each such item that is subject to renewal, or required to be obtained in the first instance during the course of a Physician Provider's assignment at the Facility, notify the Physician Provider, in writing, of such requirement and prerequisites within sufficient time so as to reasonably enable such Provider to meet the requirements therefor, and to obtain the required documentation thereof, on or before any applicable deadline;

(ii) In the event that a new license, certificate, registration, or documentation of program participation is required as evidence of such renewal, (A) if such document is not transmitted directly to the Affiliate by the issuing entity, notify the Physician Provider, in writing, within a reasonable time prior to the date by which such documentation is required, that such Physician Provider must deliver the original of such document, in person, to the Affiliate for copying and submission of such copy to the Medical Board Office, and (B) copy the original of such document upon receipt thereof, make written certification that such copy is a true and accurate copy of the original, return such original to such Physician Provider, and submit such copy with such written certification to the Medical Board Office reasonably promptly thereafter; and

(iii) promptly provide to the Medical Board Office copies of all annual evaluations of Physician Providers.

(e) For purposes of this Section 2.6, the Affiliate shall have no responsibility for verifying the validity of items provided, or the accuracy of entries on the required forms completed, by any Provider, except insofar as to attest that copies of original documents made by the Affiliate are true and accurate copies thereof. The Facility's Medical Board Office will review and verify all items and entries on forms received, perform all required checks, and complete all remaining steps required by the Corporation's credentialing policies, and the rules and regulations of managed care plans in which the Facility participates, respectively. All items and forms submitted by the Affiliate to the Medical Board Office will become and remain the sole property of the Corporation and will be retained by the Corporation at the Facility's Medical Board Office or at any other place chosen by the Corporation.

SUNY 001027

(f) Upon termination of any Physician Provider or change in his/her Faculty status, the Affiliate shall promptly notify the Medical Board Office.

(g) Should the Corporation reasonably determine that (i) the Affiliate has failed to meet the requirements of this Section 2.6 with respect to a Physician Provider or (ii) a Physician Provider has failed to fully and timely provide such information and documentation as is necessary to enable the Affiliate to meet such requirements, such Provider shall no longer provide Contract Services from the date specified in a written notice from the Corporation to the Affiliate until such failure is cured.

(h) No person shall provide Contract Services who (i) has been found guilty of a state or federal crime and it is determined that excluding such person from employment is appropriate in accordance with Title VII of the Civil Rights Act of 1964 and related guidance issued by the United States Equal Employment Opportunity Commission or Article 23-A of the New York State Corrections Law, as amended from time to time; or (ii) is ineligible to participate in the Medicaid or Medicare Programs.

(i) The Affiliate shall make inquiry to the New York State Office of Court Administration for a criminal history record search for all Physician Providers and perform a similar type of criminal record search in any location that a prospective Physician Provider has resided during the last seven (7) years from the date of hire. Additionally, the Affiliate shall make reasonable efforts to determine whether any Physician Provider is under criminal investigation, or whether the qualifications of any such Physician Provider to participate in Medicaid or Medicare are under administrative review. The Affiliate shall immediately notify the Chief Executive of any such investigation or review that it discovers.

2.7 Physician Provider Qualifications

(a) Except for those incumbent Physician Providers listed on Attachment F, (i) the Affiliate shall ensure that each Physician Provider performing Contract Services on or after July 1, 2013, shall either be board-certified or exam-admissible and less than five (5) years removed from the completion of his or her Post-Graduate training; (ii) any such Physician who is not yet board-certified shall become board-certified no later than five (5) years after completion of his or her Post-Graduate training; and (iii) all contracts between the Affiliate and non-board-certified Physician Providers will specify that such Physician Providers not taking and passing the board-certification examinations within five (5) years of the completion of Post-Graduate Training will no longer provide Contract Services. Notwithstanding the foregoing, the Corporation may, from time to time, in its sole discretion and in the interest of meeting

SUNY 001028

the special needs of the Facility, defer or waive the termination of any non-board-certified Physician Provider. Such deferral or waiver shall require the written approval of the Chief Executive and the Corporation's Senior Vice President for Medical and Professional Affairs.

(b)     Corporation Physicians (other than the Physician Providers listed on Attachment F) shall not supervise or train Students or Post-Graduate Trainees unless they are (i) board-certified or (ii) exam-admissible and less than five (5) years removed from completion of Post-Graduate training. Corporation Physicians listed on Attachment F who have Affiliate Faculty appointments but who do not meet such requirements may continue such supervision and training and shall not have their appointments withdrawn or non-renewed for failure to meet such requirements.

(c)     No Physician Provider at the Facilities holding a limited license may provide Contract Services except upon the written approval of the Chief Executive and the Corporation's Senior Vice President for Medical and Professional Affairs.

(d)     All Physician Providers will be qualified for membership and privileges to practice at the Facility according to its Medical Staff By-Laws and will be eligible and remain eligible to participate in all Federal, State and those other Third-Party Reimbursement programs in which the Facility participates identified on Attachment E to the extent that such eligibility consists of time and availability commitments. Such membership and privileges shall not be unreasonably withheld, limited, delayed, or withdrawn from any current or proposed Physician Provider.

2.8     Student Programs

(a) The Corporation hereby agrees to make the Facility available, upon the terms and conditions hereinafter set forth, in order to assist the Affiliate in carrying out its medical college academic programs. Subject to Section 18.5(b) hereof, the Affiliate shall be responsible for assigning Students enrolled in an Affiliate medical program to the Facility under this Agreement for clinical education and experience in accordance with clinical course objectives, curriculum objectives and degree requirements of the Affiliate. The number of full time equivalent ("FTE") Students rotating through the Facility for clerkships in any academic year, by Department, shall be as set forth on Attachment G, unless the Affiliate in its sole discretion, but upon written notice to the Corporation at least 90 days before the commencement of any academic year, opts to reduce the number of FTE Students. Any substantial change in the size, scope and organization of the Student schedules at the Facility shall be reviewed in advance with the Chief Executive or his/her designee.

(b) The Affiliate shall assign Students to the Facility under this Agreement for clinical education and experience in accordance with clinical course

**SUNY 001029**

objectives, curriculum objectives and degree requirements of the Affiliate. Students shall be rotated to the Facility in accordance with the Facility's Medical Staff by-laws and policies, the rules and policies of the Affiliate and as required by the Regulations. Such rules and policies shall include standards pertaining to the scope of services each Student can perform and the supervision and teaching of such Students. Students may be removed by the Corporation pursuant to the provisions of Section 12.1 of the Agreement.

(c) (i) The Affiliate shall retain the sole responsibility for the administration of the Students' academic program, recruitment and selection of Students, curriculum content, the requirements of matriculation, grading, and graduation and shall plan Student assignments and schedules in consultation with the appropriate Clinical Coordinators, Chiefs of Service, Administrative Officer(s) and/or Medical Director(s) of the Facility.

(ii) Notwithstanding the foregoing, the parties acknowledge that they share responsibility for ensuring that all Students receive the appropriate clinical and professional training. Each entity is mutually obligated to create and encourage an environment that includes positive attitudes and values associated with professionalism including, but not limited to respect, standards of excellence, honor and integrity, accountability, compassion, altruism and duty. The Corporation represents that the Facility has suitable mechanisms to identify and promptly correct violations of professional standards. The Affiliate represents that it maintains such standards and that copies of its policies on professionalism and Student mistreatment are available upon request.

(iii) The Affiliate and Facility officials shall establish and maintain on-going communication to ensure smooth and effective implementation of this Agreement and to ascertain that the clinical experience of Students meets the Affiliate's academic program requirements.

(d) Students who are assigned to the Facility under this Agreement shall in no event become or be considered employees or agents of the Corporation. Except as otherwise provided herein, the Affiliate shall assume all obligations imposed against either party under the Workers Compensation Law of the State of New York for injuries or disabilities sustained by Students in the course of, or arising out of, their activities at the Facility conducted pursuant to this Agreement.

(e) Students shall be supervised and reviewed only by designated physicians who hold current Affiliate Faculty appointments. Such Faculty shall be responsible for all Student training and clinical field work experience, unless other arrangements are agreed to by the parties. Such other arrangements, which may include rights and privileges granted to the Facility staff, are subject to the approval of the Affiliate's Dean of the College of Medicine and the Medical Director for the Facility,

SUNY 001030

which approval shall not be unreasonably withheld. Any reciprocal academic or clinical appointments shall automatically terminate upon termination of this Agreement.

(f)  The Corporation shall provide an orientation to the Affiliate Faculty furnishing services at the Facility pursuant to this Agreement and advise such Faculty of the rules and regulations with which Faculty and Students shall be expected to comply.

(g)  The Corporation shall provide security to Faculty and Students in all Facility locations including but not limited to parking facilities, on-call quarters, hospitals and institutional grounds, and department offices.

(h)  The parties each shall instruct Students that they are subject to, and are expected to comply with, all the rules, regulations, procedures and policies of the Facility, and are expected to fully adhere to and comply with applicable rules, regulations and laws of the City and State of New York and of the Federal Government. The Facility shall provide students with access to its written rules and regulations.

(i)  The Affiliate shall provide orientation on privacy and confidentiality, as more fully described in this Agreement. The Affiliate also shall provide in-service education to all Students enrolled in medical programs regarding the restrictions of the AIDS confidentiality law prior to such Students' rotation at the Facility.

(j)  The Affiliate shall provide Students with training in accordance with current and applicable requirements of the U.S. Department of Labor, Occupational Safety and Health Administration prior to rotation at the Facility and provide documentation of such training to the Facility. The Affiliate shall provide Students with training on the transmission of blood borne pathogens.

(k)(i)  Except as specifically set forth herein, or unless both parties agree in writing to another arrangement, the Corporation shall not pay any compensation to Students or to the Affiliate in connection with their rotation through the Facility, nor shall the Corporation be responsible for funding any meals, travel or other Student expenses.

(ii)  The Corporation shall, however, provide at its own expense and at no cost to the Affiliate, emergency care for Students who may become ill or injured while participating in the clinical education program at the Facility. The emergency care shall include but not necessarily be limited to, immediate treatment at the Facility of exposures to blood and other potentially infectious materials, with post-exposure prophylaxis if deemed appropriate. The Corporation may bill the Student's insurer for such emergency treatment.

(l)  During the term of this Agreement, the Corporation shall not increase the number of FTE non-Affiliate students receiving medical training at the Facility so that it exceeds thirty-five (35) plus the number of Affiliate Student reductions made

SUNY 001031

pursuant to Section 2.8(a) (but the Corporation may increase the number of non-Affiliate Students only if such reductions exceeds ten (10)). Non-Affiliate students at the Facility will not be cohorted with the Affiliate's Students or Post-Graduate Trainees on any inpatient unit or in any operating room unless the number of Affiliate Students reduced pursuant to Section 2.8(a) exceeds twenty (20) percent of the students in that Department.

(m)(i)  Each Student prior to beginning his or her program at the Facility shall receive a pre-enrollment health assessment. Such assessment shall include without limitation, physical examination, documentation of immunization against measles, mumps and rubella or antibodies to these diseases, a 5 TU Mantoux test and chest x-ray if indicated. In addition, an annual health assessment which includes a 5 TU Mantoux for negative reactors shall be conducted by the Affiliate's Student Employee Health Service. This assessment shall be of sufficient scope to ensure that the Student does not have a communicable disease or health impairment which may interfere with the performance of his/her duties. Documentation of the enrollment physical and annual assessment shall be made available to the Facility.

(ii)  The Affiliate shall make the Hepatitis B Vaccine and vaccination services available to all Students with potential occupational exposure to blood borne pathogens. The Affiliate shall submit to the Facility documentation of vaccination or copy of declination form if a Student chooses not to be vaccinated.

(iii)  To the extent permitted by law, all Facility reports and records relating to the health of Students, exclusive of x-ray films and hospital inpatient and outpatient records, shall be transferred with the appropriate authorization to the Affiliate, at its request, upon termination of the Agreement.

(n)  Each Student, or the Affiliate on behalf of each of its Students, shall provide proof of adequate professional liability coverage for each Student's professional activities at the Facility in accordance with Section 18.5 of the Agreement.

2.9  Language Proficiency and Cultural Competence

(a)  The Affiliate will make all reasonable efforts to ensure that the cohort of Physician Providers are culturally and linguistically sensitive to the Facility's Patient population. Such efforts shall include, where reasonably feasible, the assignment of Physician Providers who speak the languages appropriate to the community being served at the facility including, but not limited to French or Spanish or Creole, and the participation of the Physician Providers in language classes designed to improve competence in one or more of the languages spoken by the Facility's Patients. It will also include attendance at courses and lectures that may be offered by the Corporation or the Affiliate from time to time that are directed at increasing the sensitivity of Physician Providers to the varying cultural backgrounds of the Facility's Patient population.

SUNY 001032

(b)     The Affiliate agrees that all Physician Providers shall attend at least one Grand Rounds per year, developed, paid for, and presented by the Corporation that is specifically designated to increase sensitivity to and awareness of medical care appropriate to the communities being served. This Grand Rounds requirement may also be met by proof of attendance at a course covering similar material. A Physician Provider who fails to comply with this Section 2.9(b) shall not be permitted to provide Contract Services at the Facility.

2.10   Business Information and System Security

(a)     For purposes of this Section 2.10, "Data" shall mean all information relating to the business of the Corporation or the Affiliate, as appropriate, including but not limited to information concerning operations, employees, contractual arrangements, business plans, revenues, assets, costs, liabilities, suppliers, employment practices and plans for future development. The term "Data" does not include information that has become generally available to the public by the act of one who has the right to disclose such information without violating any right of the entity to which it belongs, or as otherwise required to be disclosed by law. Nor does it include information that constitutes Protected Health Information as defined in the HIPAA Regulations. A party required by law to make disclosure shall provide reasonable advance notice to the other party except as required by law.

(b)     The Parties recognize and agree that, within the context of this Agreement, each may come into contact with Data of the other. The Parties agree to ensure that the Data is maintained in the strictest confidence and not to disclose each other's Data to any unauthorized person or entity other than as permitted herein without the prior approval of the other. The Parties agree to protect Data existing in any form. Where the Data is transmitted or maintained electronically, each Party agrees to ensure that its employees comply with appropriate security policies, practices and standards to prevent unauthorized access to any equipment, facility and/or system in which the Data is maintained and through which it is transmitted, regardless of location. The Parties agree that only those employees who legitimately require access to the Data for the provision of services within the context of the Agreement will have access to the Data, and that the Data shall be used only for the purpose of providing such services, or as required by the Regulations.

(c)     Should a third party be used to transmit, maintain, process, utilize or otherwise access the Data, then the Party employing or contracting with such third party shall enter into a security and confidentiality agreement to ensure the same protection for the Data as that provided by the Parties. Such third party shall be considered an agent of the applicable Party, and shall be responsible for any acts, failures or omissions in the provision of services.

**SUNY 001033**

(d)    The confidentiality and security obligations under this Section 2.10 shall survive for five (5) years after the termination of this Agreement. Additionally, upon termination of this Agreement, or upon request of either Party, and to the extent practicable and permitted by law, the Data shall be returned to the Party and no copies shall be retained by the other Party.

2.11    HIPAA Compliance

(a)    The parties acknowledge that each is a "Covered Entity" within the meaning of the Regulations promulgated and/or proposed to be promulgated under HIPAA and consequently agree that

(i)    they will comply with all requirements of the HIPAA Regulations and amendments thereto including, without limitation, those pertaining to transactions and code sets, privacy and security; and

(ii)    they each are independently subject to the enforcement provisions of the HIPAA Regulations separate and apart from this Agreement.

(b)    The parties will negotiate in good faith and execute all agreements, if any, required by the HIPAA Regulations.

(c)    The Corporation shall make available to Affiliate employees, without cost to the Affiliate, training programs and materials for purposes of meeting all HIPAA Regulations to the same extent as made available to the Corporation's employees. Any deficiencies in such training programs and materials shall not relieve the Affiliate of its independent obligation to meet the HIPAA Regulations or constitute a basis for any claim against the Corporation.

(d)    Affiliate shall notify the Corporation orally and in writing within twenty-four hours of its discovery of any protected health information (as defined under HIPAA Regulations) in its possession which has been improperly used or disclosed by anyone except, after de-identification, to an authorized representative of Affiliate. The Affiliate shall cooperate with the Corporation in taking such steps as the Corporation deems appropriate to enjoin misuse, regain possession of, and, if necessary, to notify affected individuals of the breach of their protected heath information.

(e)    The obligations of the parties under this Section 2.11 shall survive termination of this Agreement.

(f)    If any of the training required under Sections 2.9 or 2.11 is, in the Corporation's reasonable judgment, equivalent to training that Physician Providers, Post-Graduate Trainees or Students have completed at another facility, they need not participate in the duplicative course of training.

SUNY 001034

2.12  Bioterrorism Preparedness

As a condition of employment, each Physician Provider in the Department of Emergency Medicine shall participate in Grand Rounds, developed by and paid for by the Corporation, on the clinical aspects of biochemical terrorism and medical preparedness. Each Provider shall provide proof of such participation/attendance. Where the Physician Provider fails to meet the requirement in this Section 2.12, the Physician Provider may provide proof of attendance at a course on biochemical terrorism providing instruction similar to the Grand Rounds offered through the Facility.

2.13  Medicare Advantage Compliance

(a)  The following provisions shall apply with respect to the Corporation's contracts ("Medicare Advantage Contracts") with Managed Care Organizations ("MCOs") for the provision of services covered by such Medicare Advantage Contracts ("Covered Services") to Medicare Advantage beneficiaries ("Members").

(b)  Patient Confidentiality; Accuracy of Records. Affiliate shall be bound by any lawful patient confidentiality provisions set forth in MCOs' policies and procedures (provided that such policies and procedures are furnished to Affiliate in advance), as well as federal and state laws and regulations and the provisions of the Medicare Advantage Contract regarding confidentiality and disclosure of medical records or other health or enrollment information pertaining to Members. Without limiting the generality of the foregoing, Affiliate agrees to: (i) safeguard the privacy of all Member medical records and ensure that copies of or information from such records are released only to authorized individuals; (ii) release such records only in accordance with applicable federal or state laws or pursuant to court orders or court-issued subpoenas; (iii) maintain all such records in an accurate and timely manner; and (iv) ensure timely access by Members to records and information that pertain to them upon appropriate Member request.

(c)  Hold Harmless. Affiliate acknowledges and agrees that in no event, including but not limited to the insolvency of MCOs, breach of the Agreement and/or non-payment for services by MCOs, shall Affiliate bill or seek compensation from or assert any legal action against Members or persons acting on behalf of Members for payment of any fees that are the legal obligation of MCOs. The foregoing sentence shall not affect the Corporation's obligation to pay Affiliate for all Contract Services furnished hereunder.

(d)  Prompt Payment. Where the Corporation has a Medicare Advantage Contract and, pursuant thereto, the Corporation collects amounts which includes payment for both hospital and physician services, the Corporation shall pay the Affiliate for physician services to Members in accordance with this Agreement.

SUNY 001035

(e)     Compliance.  Affiliate shall comply with all applicable Medicare laws and regulations and applicable CMS instructions, and with MCOs' policies and procedures (provided that such policies and procedures are furnished to Affiliate in advance).

(f)     Audits/Access.  Affiliate shall permit audits and inspection by the United States Department of Health and Human Services, the Comptroller General of the United States, CMS and/or their designees regarding any pertinent contracts, books, documents, papers and records (collectively, "Books and Records") involving or relating to Affiliate's provision of services to Members.  All such Books and Records shall be made available by Affiliate for a period of ten (10) years from the termination of the applicable Medicare Contract or ten (10) years from the date of completion of any audit or in certain instances described in applicable Medicare Advantage regulations, for periods in excess of ten (10) years, if appropriate.

(g)     Accountability.  Affiliate acknowledges that MCOs oversee and are accountable to CMS for any functions and responsibilities set forth in the regulations governing the Medicare Advantage Program.  Affiliate further acknowledges and agrees that pursuant to the Medicare Advantage regulations, MCOs or its designees will monitor Affiliate's performance hereunder with respect to Covered Services and that MCOs and/or CMS shall have the right, subject to applicable laws and regulations, if any, relating to Affiliate's appeal rights, to terminate Affiliate's participation in the Medicare Advantage Contract if Affiliate does not meet its obligations hereunder.

(h)     Delegation.  Any delegation of functions hereunder shall be in accordance with applicable delegation requirements set forth in the Medicare Advantage regulations.

(i)     Reporting Requirements; Policies and Procedures.  Affiliate acknowledges that MCOs are subject to reporting requirements specified in the Medicare Advantage regulations.  In furtherance of any such applicable reporting requirements, Affiliate shall cooperate reasonably in order to facilitate all data and reporting requirements of MCOs.  Affiliate shall also comply with all other policies and procedures of MCOs.

(j)     Continued Care.  For the duration of the Agreement, Affiliate agrees that: (i) Covered Services provided to Members hereunder shall continue for all Members for the duration of the Medicare Contract period for which CMS payments have been made to MCOs; and (ii) in the event of MCOs' insolvency or termination of the Medicare Advantage Contract for any reason, Covered Services shall continue until the date of discharge for any Member confined in an inpatient facility on the effective date of insolvency or termination.  The foregoing sentence shall not affect the Corporation's obligation to pay Affiliate for all Contract Services furnished hereunder.

SUNY 001036

2.14 Performance Indicators

The Affiliate agrees to meet threshold levels of performance of certain obligations under this Agreement, herein referred to as "Performance Indicators." They are designed to measure the quality of Contract Services rendered and to ensure that the quality is sufficient to satisfy the expectations of the parties.

(a)    The Performance Indicators are set out in Attachment R hereto. These Performance Indicators are a subset of the indicators measured and reported to the Quality Assurance Committee of the Board of Directors of the Corporation. The Affiliate will submit an annual report on such compliance as Annex F. If the Affiliate fails to meet the threshold level of performance of any obligation required by the Performance Indicators, it will develop a plan, acceptable to the Corporation, to correct the failure promptly. Such plan will be submitted as an addendum to Annex F and will be discussed through the Joint Oversight process until the failure to meet such threshold is cured. Unless contraindicated with regard to a particular Patient, the Affiliate's failure to satisfy the Performance Indicators will result in the specified Withhold identified in Attachment R, which shall be effected in connection with the reconciliations as specified in Attachment B. The Corporation shall monitor the implementation of the Performance Indicators to protect against inappropriate reductions or limitations in patient care services.

## 3.  RESPONSIBILITIES OF PHYSICIAN PROVIDERS

(a)    The Affiliate shall provide and recommend to the Medical Staff and Chief Executive for appointment or reappointment such Physician Providers as are necessary to provide Contract Services. Such appointments and reappointments shall be subject to approval by the Chief Executive of the Facility and the Medical Staff, and final approval by the President on behalf of the Governing Body, in accordance with the Medical Staff By-Laws. Physician Providers identified in Attachment A shall be deemed so approved.

(b)    Such Physician Providers shall be responsible for providing Patient Care in accordance with accepted community standards and for fulfilling the responsibilities set forth in the Regulations, and specifically the Medical Staff By-Laws, and as otherwise provided in this Section 3. Academic functions and requirements shall not, however, be permitted to interfere with the delivery of patient care services or the clinical needs of the Facility.

(c)    Each Physician Provider, Post-Graduate Trainee and such other licensed person permitted by law and by the Facility to provide Contract Services must be credentialed and privileged at the Facility. The Affiliate will provide to each such Physician Provider it intends to assign to the Facility a letter from the Facility's Medical Board Office listing the items the Physician Provider must furnish, including the forms

SUNY 001037

that must be completed in order to be credentialed and privileged. The Affiliate will cooperate in the collection from each such Physician Provider the items described in that letter and the completed forms, and then forwarding a complete package for each Physician Provider to the Medical Board Office. The Affiliate will also ensure that the Chair of the appropriate Department has approved the Physician Provider's requested privileges.

(d)     The Medical Board Office will then review and verify all items and form entries, perform all required checks, and complete all remaining steps required by the Corporation's credentialing and privileging policies, in accordance with Section 2.2. All items and forms submitted by the Affiliate to the Medical Board Office will become and remain the sole property of the Corporation and will be retained by the Corporation at the Facility's Medical Board Office or at any other place chosen by the Corporation. The Affiliate shall have access to such forms and the right to make copies thereof to the extent necessary to carry out its obligations under this Agreement.

3.2    Medical Staff -- Organization

The Physician Providers, together with such other medical and dental appointees and such other licensed persons permitted by law and by the Medical Staff By-Laws, and in accordance with the Regulations, to provide services at the Facility as the Chief Executive, the Medical Director staff and the President on behalf of the Governing Body shall have approved, shall constitute a Medical Staff which is organized in accordance with the Regulations, as applicable. The Corporation shall direct the Medical Staff to establish and implement procedures necessary to assist the Medical Director in carrying out his or her functions as set forth in Section 1.3 of this Agreement and support the organization and delivery of Direct Patient Care Services within the Facility.

3.3    Medical Staff -- Responsibilities

Physician Providers, as members of the Medical Staff under the Medical Staff By-Laws, shall be responsible (i) for satisfying the terms and conditions set forth in subsections (a) through (e), below, as a condition of their continued assignment by the Affiliate to the Facility; and (ii) for performing their duties in accordance with the Regulations. In the event that the Chief Executive determines that there has been a failure by any appointee to perform such responsibilities, removal procedures may be commenced in accordance with Section 12.1(a) hereof and the applicable Medical Staff By-Laws.

(a)     Privileges

SUNY 001038

The Corporation shall direct the Medical Staff to establish and implement a process through the Medical Staff By-Laws, and with the approval of the President on behalf of the Governing Body, whereby clinical privileges for all Physician Providers and Post-Graduate Trainees are delineated on a regular basis.

(b)    Performance Improvement and Risk Management

The Corporation shall direct the Medical Staff to establish and implement such effective mechanisms as are necessary to ensure (i) the quality and appropriateness of Patient care and (ii) the monitoring and evaluation of clinical performance of all individuals with delineated clinical privileges. Those persons appointed by the Medical Staff to carry out these obligations shall review and report on a timely basis all incidents of unsatisfactory or inappropriate Patient care. All such reports shall be subject to the confidentiality requirements of Section 2805-m of the New York State Public Health Law and Section 6527 of the New York State Education Law. The Medical Staff will perform timely follow-up on such incidents, with the goal of ensuring that such incidents will not recur. As required by Section 2.3(d) above, the Affiliate shall attend the quarterly meetings of the Quality Assurance Committee of the Corporation's Board of Directors.

(c)    Patients' Rights

The Affiliate and its Physician Providers shall act in accordance with the Regulations, as then applicable, and amendments thereto which, from time to time, may be established by the Corporation concerning Patients' rights (i) to be treated with dignity; (ii) to non-discrimination; (iii) to confidentiality; and (iv) to know their diagnoses, prognoses and available modalities of care (as long as any amendments established by the Corporation other than those required by applicable State and Federal laws, rules and regulations are consistent with the terms of this Agreement).

3.4    Third Party Reimbursement and Reimbursement from Patients -- Provision of Information

(a)    The Affiliate and the Physician Providers shall provide reasonable cooperation, consistent with the terms of this Agreement, to assist the Corporation to recover all reimbursable costs, including related overhead and direct and indirect graduate medical education reimbursement, available from all Third Party Reimbursement sources, or reimbursement obtained directly from Patients. The Affiliate shall provide to the Facility in a timely manner all pertinent and lawful reimbursement information, if any, available to the Affiliate from Patients relating to Contract Services.

SUNY 001039

(b)     In the event that the allowability of any costs incurred by the Corporation, or the reimbursement of such costs, shall be challenged by one or more of the Third Party Reimbursement sources, the Affiliate agrees to use its best efforts to assist the Corporation to defend against any such disallowances, but shall not be obligated to incur any substantial costs to do so.

(c)     The Affiliate shall provide all Physician Provider data requested by the Corporation that are lawful and reasonably necessary to assist the Corporation to meet all cost-reporting requirements under the Regulations. The Corporation shall notify the Affiliate annually of the specific information needed. The Affiliate shall provide such information on a timely basis following the Corporation's reasonable request therefor. This information shall be subject to revision, from time to time, based upon Regulations then currently in effect.

### 3.5    Third Party Payer Denials of Reimbursement

(a)     Each Physician Provider is responsible for cooperating with the Corporation and Affiliate in responding promptly to notices from all Third Party Reimbursement payers of any intent to deny reimbursement to the Corporation.

(b)     If any final material denial of reimbursement is received by the Corporation, and such denial is (i) due solely to the failure of a Physician Provider to respond to a notice of intent to deny reimbursement or (ii) due solely to an inappropriate admission to, or inappropriate treatment in, the Facility, or a failure to provide necessary documentation by such Provider, or (iii) resulting from a determination by the Medicaid or Medicare Programs that a "never event" (i.e., an avoidable hospital complication or medical error that is identifiable, preventable, and serious in its consequences to a patient) due solely to the acts or omissions of a Physician Provider has occurred, then reasonably promptly after receiving notice of the Corporation's request, the Affiliate shall ensure that such Provider shall no longer provide Contract Services.

(c)     The Corporation shall use reasonable efforts to fully contest, when there is a reasonable basis to do so, through administrative appeals, all Third Party Reimbursement denials.

### 3.6    Documentation of Patient Care Services

(a)     Each Physician Provider shall enter, legibly, accurately and completely, all information as to Patient Care Services furnished or supervised by such Provider as is, and in a time and manner, reasonably prescribed by the Regulations or by the Corporation.

**SUNY 001040**

(b)     Such information shall be (i) entered into the patient's Medical Record, consistent with the requirements of Section 7 of this Agreement, and (ii) to the extent required by the Corporation, entered directly or by way of electronic media, onto Encounter Forms designated by, and submitted to, in the time and manner prescribed by, the Corporation.

(c)     Such information shall include, but not be limited to, one of the following, as specified by the Corporation for the particular context:  (i) those CPT-4 codes which fully and accurately describe the services furnished by such Provider, or (ii) such full and accurate description of those services as is sufficient to enable the Corporation to fully and accurately assign CPT-4 codes thereto.

(d)     If a Physician Provider fails to meet the requirements of this Section 3.5 in more than five percent of a reasonable random sample of the Physician Provider's cases in any quarter during the term of this Agreement and such failure is not due to acts or omissions of the Corporation or its employees, and, after Notice of such failure, again fails to meet such requirements in any succeeding quarter during the term of this Agreement, then upon the Corporation's request, the Affiliate shall promptly ensure that such Physician Provider shall no longer provide Contract Services.

3.7     Compliance Training

(a)     During the term of this Agreement, all Physician Providers designated by the Facility shall, at times specified by the Facility, participate in and successfully complete a course of training which is designed to ensure such Providers' compliance with the requirements of the Regulations, including, without limitation, adherence to proper coding and billing procedures and operation of any Electronic Medical Records System installed by the Corporation.  Such training course shall be offered by the Corporation at times and venues reasonably specified by the Corporation and at its expense.

(b)     Successful completion of the training course requires such Physician Provider to take and pass a written examination that measures understanding of and proficiency in the subject matter of the course.  Physician Providers who fail the test must promptly repeat the training course and examination.

(c)     Physician Providers who fail to participate in the training course (after notice and an opportunity to cure) or who twice fail to pass the examination shall, upon written request of the Corporation to the Affiliate, no longer provide Contract Services.

**SUNY 001041**

(d)  Participation in such training course shall be in addition to the Physician Provider's responsibility to provide Contract Services and shall not diminish the Physician Provider's time devoted to such Services.  No additional compensation shall be due the Affiliate for such participation.

3.8  Other Responsibilities of Physician Providers

(a)  All Physician Providers shall have the responsibility for maintaining licensure and, as required, providing the Medical Board office at the Facility with proof of current registration, and pertinent information concerning their present and past licensing, credentials, billing registration numbers and medical or other clinical practice.  The Affiliate shall reasonably assist the Medical Board office to ensure that such responsibilities are met.

(b)  Each Physician Provider shall be responsible for (i) the efficient delivery of such Direct Patient Care Services and performance of such Teaching Services and Supervisory Services as are assigned in accordance with this Agreement by the Chief of Service, Chair and/or Program Director; (ii) compliance with the applicable Regulations; and (iii) the professional conduct of such Research as has been approved in accordance with the provisions of this Agreement.  Each Physician Provider shall be responsible for exercising such Facility-wide and Department/Service-specific Medical Staff responsibilities as are assigned by the Chief of Service and are generally required of members of the Medical Staff.  Such responsibilities shall include, but not be limited to, participation in in-service education and continuing education; attendance at committee and Departmental meetings, as required; timely completion of Medical Records; timely completion of responses to preliminary denials of reimbursement from Third Party Payer Reimbursement sources; participation in performance improvement activities; participation in the processes pursuant to which privileges are granted and appointments and reappointments of staff are made; and participation in, and cooperation with, the performance improvement and risk management mechanisms established by the Medical Staff pursuant to Section 3.2(b) hereof.  Each Physician Provider (i) shall report to the Chief of Service with respect to Patient Care Services at the Facility, who shall review the performance of his or her responsibilities as set forth hereinabove and report to the Medical Director with respect to his or her compliance with the provisions of this Section 3.7; and (ii) report to the Chair or Site Director with respect to all academic duties that are not Patient Care Services at the Facility.

(c)  Each Physician Provider will see each Patient scheduled to be seen by him or her in a timely manner, i.e., as closely as possible to the Patient's appointment time (subject to the Physician Provider's responsibilities to other Patients) or, in the case of unscheduled patients, as soon as practicable.  If a Physician Provider fails to meet this requirement three or more times in any six-month period, and such failures are not

SUNY 001042

attributable to the actions or failures to act by the Corporation or the patient or to circumstances not reasonably within the Physician Provider's control, then the Corporation may request that such Physician Provider no longer be assigned to perform Contract Services.

### 3.9 Risk Reduction Training

All Physician Providers shall take a medical malpractice claims and risk reduction course (either the Clinicolegal Correlations Course or similar course approved by the New York State Department of Insurance for purposes of qualifying for New York State Excess Liability coverage) annually, which must be completed by the later of (i) June 30 of each calendar year or (ii) thirty days after the commencement of the Physician Provider's employment by the Affiliate. Proof of satisfactory completion shall be placed in the Physician Provider's credential file and shall be a mandatory part of the annual credentialing and reappointment process. A Physician Provider's failure to complete such course by June 30 of each calendar year may also result in a suspension of privileges at the Facility or other appropriate sanctions.

## 4. POST-GRADUATE TRAINING PROGRAMS

### 4.1 General

(a) The Facility shall participate as a primary training site for Post-Graduate Training Programs in various specialties sponsored by, and accredited through, the Affiliate (the "Programs"). The Affiliate and the Corporation shall take such steps as are reasonably necessary to assure that the Programs will continue to provide high quality education and meet all Regulatory requirements. Academic functions and requirements shall not, however, be permitted to interfere with the delivery of Patient Care Services or the clinical needs of the Facility.

(b) The Affiliate acknowledges that, as of the date of its execution of this Agreement, the Programs provide high quality education and meet all Regulatory requirements.

(c) Subject to the general supervision of Corporation (but without limiting the Affiliate's rights granted hereunder), the Chair of the corresponding Affiliate Department and/or its designated Program Director, shall have the authority and responsibility to (i) organize, supervise and direct the Programs; (ii) recruit and select Residents (in accordance with the non-discrimination provisions of Section 12.5 of the Agreement); (iii) oversee the supervision, assignment, reassignment and evaluations of Residents; and (iv) oversee Resident research.

(d) At the request of the Affiliate, the Facility shall designate, in consultation with and upon the approval of the Affiliate, a Site Director for each Program

SUNY 001043

(who may also be the Program Director). Each Site Director shall (i) work cooperatively with the corresponding Affiliate Chair or Program Director to ensure that Residents receive quality education and first-rate clinical training at the Facility; (ii) shall (if not also the Program Director) be a full time Corporation employee, whose entire salary and benefits shall be paid directly by the Corporation; (iii) shall at all times maintain a Faculty appointment at the Affiliate and (iv) shall devote sufficient time each week to Program administration as is necessary to fulfill his or her Program-related duties. While on rotation at the Facility, Residents shall be accountable to the Site Director for all clinical and academic matters. Requests by the Site Directors or the Program Directors to the corresponding Chiefs of Service with respect to matters involving the supervision and training of Residents shall be accommodated to the extent reasonably feasible. Requests by the Chiefs of Service to the corresponding Site Director or Program Director with respect to matters involving the clinical operation of the Facility shall be accommodated to the extent reasonably feasible. With respect to matters concerning the educational experience of Residents, the Site Director shall report to the Affiliate's Chair or Program Director.

(e) The Facility may replace any Site Director at any time, after reasonable consultation with the Affiliate. The Affiliate may require that the Facility replace any Site Director at any time; provided that the Affiliate must first (i) inform the Facility of any major deficiencies in the Site Director's performance; (ii) bring the matter to the attention of the Joint Coordinating Committee (as described in Section 4.4, below); and (iii) give the Facility and the Site Director a reasonable opportunity to cure such deficiencies (the duration of which may vary, depending on the nature of the deficiency, but shall not exceed thirty (30) days unless the Affiliate, in its discretion, consents to a longer period). Such opportunity to cure will not be required in the event that the Affiliate determines, in its reasonable discretion, that the acts or omissions of the Site Director (i) are not by their nature curable, or (ii) are placing a Program in immediate jeopardy of losing its status as fully accredited by the ACGME/RRC. The replacement for any Site Director removed at the Affiliate's instance shall be selected from the staff of qualified existing Physicians in that Department employed by the Corporation.

(f) Notwithstanding subsection (e) hereof, the parties acknowledge that they share responsibility for ensuring that all Residents receive the appropriate clinical and professional training. Each entity is mutually obligated to create and encourage an environment that includes positive attitudes and values associated with professionalism including, but not limited to respect, standards of excellence, honor and integrity, accountability, compassion, altruism and duty. The Corporation represents that the Facility has suitable mechanisms to identify and promptly correct violations of professional standards. The Affiliate represents that it maintains such standards and that copies of its policies on professionalism and Resident mistreatment are available upon request.

SUNY 001044

(g)  At all times during this Agreement, the Facility shall maintain accreditation by the Joint Commission, and shall maintain its participation in Medicare and Medicaid.  Loss of the Joint Commission accreditation, or exclusion from participation in Medicare or Medicaid, shall be grounds for immediate termination of this Agreement.

(h)  The Facility shall ensure full compliance with current ACGME institutional and program requirements for Resident education at affiliated institutions. The Facility shall provide the Affiliate with utilization statistics and other relevant documents required by the ACGME Residency Review Committee for each residency program for the continuation of accreditation and maintenance of the rotation.  The data shall be complete and accurate, and shall be made available to such program in a timely fashion.

(i)  The Affiliate shall deliver to the Corporation within a reasonable time after a request therefor by the Corporation all reasonably available information and reports not otherwise previously provided or available to it with respect to Residents. The reports shall include, but not be limited to:

(i)  an annual report delivered to the Corporation containing a profile by race, sex and medical school graduation status in a format determined by the Corporation of each Resident entering the first year of training and each Resident in all successive years of training.

(ii)  all reports reasonably obtainable from the Affiliate's data systems deemed necessary, in the reasonable opinion of the Corporation, to fulfill reimbursement requirements.  At the Corporation's request, the Affiliate shall conduct an annual survey of all Residents at the Facility in a reasonable format determined by the Corporation.  This survey shall include, but not be limited to, identification of the number of Residents in each program area who do not meet current Federal and State reimbursement regulations.  Based upon the results of this survey, the Affiliate shall, when appropriate in the reasonable opinion of the Corporation, and in conjunction with the Chief Executive, Medical Director and other appropriate Corporate officers, develop a plan that will not adversely affect the quality of Patient care but will reduce the number of Residents whose cost of providing Contract Services is not reimbursable under either Federal or State reimbursement policy.

(iii)  reports summarizing the clinical competencies of all Residents assigned to the Facility that have arisen through supervised clinical activities at other hospitals through which the Residents have rotated.

SUNY 001045

(j)    The Affiliate agrees that at all times Students, Residents and Faculty members are subject to the supervision of the Facility's administration and are considered part of the Facility's workforce for purposes of HIPAA.

4.2    Professional Appointments and Supervision of Residents

(a) All Physician Providers shall hold a current Affiliate Faculty appointment and must meet the qualifications for appointment to the Facility's Medical Staff.

(b) Criteria for receiving or holding a Faculty appointment for the Medical Director, Chiefs of Service and Corporation Physicians are those established (and modified from time to time) by the Affiliate's University Committee for Academic and Professional Qualification. A copy of such criteria is included as Attachment H, as applied in practice to the current Faculty. Faculty appointment, reappointment and removal criteria shall be applied uniformly to Corporation Physicians and non-Corporation Physicians.

(c) Vacancies in the positions of Medical Director and Chiefs of Service shall be filled in accordance with such criteria and the provisions of Sections 1.3 and 2.4 respectively and Faculty appointments for candidates for such positions shall be made in accordance with such criteria and shall not be unreasonably withheld.

(d) The Affiliate agrees that as of the date of this Agreement the Physicians identified as "Faculty" in Attachment I meet the criteria for a Faculty appointment and hold their current appointments in good standing.

(e) Physicians to be employed by the Corporation after the date of this Agreement who are involved in supervising Residents shall have obtained a Faculty appointment.

(f) No Affiliate or Corporation Physician shall engage in the training or supervision of Residents without a current Faculty appointment by the Affiliate, which shall not be unreasonably withheld or withdrawn.

4.3    The Programs

(a) The Affiliate's Program Directors shall assign Residents to the Facility in accordance with the Assignment Schedules established pursuant to Section 2.5 hereof and the Resident rotation schedules maintained by the Affiliate. In determining the allocation of individual Resident assignments between the Facility, consistent with Attachment J hereto, and hospitals or health care facilities other than the Facility or its clinical satellites, the Affiliate shall use its best efforts to ensure that an equitable share of the Residents assigned to the Facility are assigned (i) within a Department/ Service identified to the Training Program in which they are enrolled; and (ii) taking into account

SUNY 001046

visa status and past personnel issues. Assignment of individual Residents is subject to the Chief Executive's approval, which shall not be unreasonably withheld or delayed. In cases where the Affiliate or the Facility has identified performance or other personnel issues involving Residents, the Facility and the Affiliate shall work cooperatively to resolve such issues. Residents assigned to the Facility shall remain at the Facility for the duration of their assigned rotations, except for vacation and leave for illness or appropriate academic purposes. Appropriateness of academic purpose shall be at the sole discretion of the Affiliate.

(b) The number of full time equivalent ("FTE") Affiliate Residents assigned to each Department for each academic year during the term of this Agreement is set forth on Attachment J (as may be modified by mutual agreement of the parties from time to time). Attachment J also comprises the Residents in each Program for whom the Facility is responsible for the payment of salary and benefits (hereinafter "KCHC Residents") (which shall cumulate to an FTE number equal to those actually assigned to the Facility). To the extent that KCHC Residents spend part of their year rotating at hospitals or health care facilities other than the Facility or its clinical satellites, the Facility will be "compensated" by receiving an equivalent number of months of service time from Residents in Affiliate Programs for whom the Facility is not responsible for salary and benefits ("non-KCHC Residents"). Thus, at the end of any academic year, the aggregate number of Resident months funded by the Facility in any Department shall be equal to the aggregate number of months spent at that Department by KCHC Residents and non-KCHC Residents (less allowances for time spent away from the Facility due to vacation, illness, and for appropriate academic purposes).

(c) The Affiliate shall not have the right to reduce, below the levels specified on Attachment J, the number of Residents in any Training Program assigned to the Facility in any year, unless: (i) the parties mutually agree to such reduction; or (ii) the ACGME/RRC mandates a reduction in the number of Residents rotating through the Facility in any Program; or (iii) the ACGME/RRC mandates a reduction in the number of total Residents in any Affiliate Program, in which event the Affiliate may reduce the corresponding rotations at the Facility proportionally; or (iv) the Affiliate discontinues any Program.

(d) The Affiliate shall also have the right to reduce, below the levels specified on Attachment J, the number of Residents in any Training Program assigned to the Facility in any year if the Corporation materially breaches its obligations under this Section 4 and such breach is not remedied within ninety (90) days of written notice of such breach. Such reduction (i) shall be on three months' written notice by the Affiliate and (ii) shall be only to the extent commensurate with the nature and extent of the Corporation's breach.

(e) The individuals designated as "KCHC Residents" shall be paid directly by the Corporation at an appropriate post-graduate salary level, generally competitive

**SUNY 001047**

with salaries paid to residents by other academic medical centers in the New York City metropolitan area. The Corporation shall pay all salaries and furnish all fringe benefits associated with KCHC Residents.

(f) During the term of this Agreement, the Corporation shall continue to pay Program Costs reflecting a portion of the salary costs (including fringe benefits and overhead) of the Program Directors (limited to $175,000.00 for the Program Director for Medicine) and for ACGME-related expenses (excluding the costs of Site Directors who are not also Program Directors) in the same amount as paid in Fiscal Year 2009, which amount shall not be increased without the Medical Director's written approval.

(g) Residents furnishing care at the Facility will act in accordance with the Regulations and all applicable provisions of this Agreement. and shall have all appropriate credentials.

(h) The Corporation may dismiss a Resident from the premises of the Facility pursuant to the provisions of Section 12.1 of the Agreement.

(i) Each Resident assigned to the Facility shall have a complete medical evaluation prior to assignment to the Facility (substantially similar to the health evaluation of Students set forth in Section 2.8(m) hereof) of sufficient scope to ensure that the Resident does not have a communicable disease or health impairment that would interfere with the performance of his/her duties. The Affiliate shall conduct or arrange for such evaluations for SUNY Residents and the Facility for KCHC Residents. Upon request and reasonable notice, the Affiliate shall furnish such reports that relate to the health of the Residents as are required by the applicable Regulations.

(j) The Corporation shall provide at its own expense and at no cost to the Affiliate, emergency care for Residents who may become ill or injured while participating in the clinical education program at the Facility. The emergency care shall include but not necessarily be limited to, immediate treatment at the Facility of exposures to blood and other potentially infectious materials, with post-exposure prophylaxis if deemed appropriate. The Corporation may bill the Resident's insurer for such emergency treatment.

(k) Each Resident shall be responsible for (i) the delivery of such Contract Services as are reasonably assigned by the Chief of his or her designated Department/Service after consultation with the Site Director and/or the Program Director; (ii) compliance with the applicable Regulations and policies of the Medical Staff; and (iii) the professional conduct of such Research as has been approved in accordance with the provisions of this Agreement. Such responsibilities shall include, but are not limited to, participation in-service and continuing education; attendance at Departmental meetings, as required; timely completion of Medical Records; and participation in other Medical Board and teaching-related activities.

**SUNY 001048**

(l) The Facility shall provide services and develop systems to minimize the work of Residents that is extraneous to their educational programs, ensuring that the Facility shall (i) provide Residents on duty in the Facility's hospital with adequate sleeping quarters, access to food services, access to parking, and lockers; (ii) provide patient support services, such as intravenous services, phlebotomy services, and laboratory services, as well as messenger and transporter services, in a manner appropriate to and consistent with educational objectives, patient care, and cost effectiveness; (iii) have in place, at all times hereunder, an effective laboratory, medical records, and radiology information retrieval system to provide for high-quality patient care in a timely manner; and (iv) provide security to Residents in all locations including but not limited to parking facilities, on-call quarters, hospitals and institutional grounds, and departments.

### 4.4 Joint Coordinating Committee

(a) In recognition of the importance of each party to the mission of the other, and the importance of their effective collaboration on matters affecting their affiliation, the parties shall form a Joint Coordinating Committee (the "Committee"). The Committee shall be consulted on those matters specified in Section 4.4(c) below that affect the operation of Student or Residency Training Programs or the Affiliate's other academic functions under this Agreement. The Committee shall meet no less frequently than monthly, and promptly at the request of either party to consider any matter requiring timely disposition.

(b) The Committee shall consist of an equal number (not less than three) of senior officials from each party. The term of each Committee member shall be one (1) year, beginning on July 1, but Committee members may serve an unlimited number of successive terms. Each party may appoint its own Committee representatives each year, but the Committee should consist of individuals who have a range of expertise and are in a position to reflect the views of each party's physicians and administration. The Committee will attempt to make recommendations by consensus, but where this is not possible, will make recommendations based on majority vote. In academic years beginning with an odd number (e.g., the 2011-2012 academic year), the Chair of the Committee will be appointed by the Affiliate, and in academic years beginning with an even number (e.g., the 2012-2013 academic year), the Chair of the Committee will be appointed by the Facility. The Committee's rules may be amended from time to time (by a two-thirds vote); but the parties intend the Committee to function collegially and informally, with minimal procedural requirements.

(c) Either party may consult the Committee to address any significant problems or disputes that may arise in connection with the impact of Facility's clinical operations on the Programs or the impact of the Affiliate's academic operations on the

SUNY 001049

Facility's clinical operations. The parties shall consult the Committee in advance with respect to:

> (i) The filling of any vacancy or reappointment of the Medical Director, pursuant to Section 1.3 of the Agreement;

> (ii) The filling of any vacancy or reappointment of a Chief of Service, pursuant to Section 2.4 of the Agreement;

> (iii) Replacement of the Site Director, pursuant to Section 4.1(e) of the Agreement;

> (iv) Any significant changes proposed by the Corporation in the operations of the Facility (including, without limitation, reductions in staffing levels, expenditures, facilities, equipment and support staff and changes in assignments) that reasonably may lead to a Program being subject to adverse action by the LCME or ACGME or may materially diminish the quality of medical education provided to Students or Residents; and

> (v) Any significant changes proposed by the Affiliate or mandated by the ACGME in the operations of the Training Programs at the Facility that reasonably may have an adverse effect on the Facility's costs or diminish the quality of Patient care provided at the Facility.

(d) Recommendations of the Committee shall be reported to the Chief Executive, the Dean of the Affiliate, and other appropriate Facility and Affiliate personnel. The parties shall use their reasonable best efforts to implement the recommendations of the Committee. In light of the composition of the Committee, it is the parties' expectation that Committee recommendations will be followed by both parties, except in unusual circumstances (such as where revenue constraints, clinical needs or legal developments preclude a recommended action). Notwithstanding the foregoing, the Committee shall not have any authority to override the Corporation with respect to matters involving the operation of the Facility or its clinical programs, nor shall the Committee have any authority to override the Affiliate with respect to matters involving its Student and Training Programs, Faculty appointments, or other academic matters. The parties expressly do not anticipate or intend that every minor dispute or issue will need to be brought to the Committee's attention. The existence of the Committee shall not preclude the parties from attempting to resolve issues informally as they arise, without the Committee's involvement.

SUNY 001050

## 5. TRANSFER AND REFERRAL OF PATIENTS

### 5.1 Permitted Transfers and Referrals

Patients will be transferred and referred to other facilities only when (i) the required services are not available at the Facility; (ii) a third party reimbursement plan does not authorize the provision of a necessary service at the Facility; or (iii) the Patient independently (i.e., without the suggestion or urging of a Physician Provider or other Affiliate employee) requests a transfer or referral. Such transfers and referrals, where required services are unavailable, will be to other facilities operated by the Corporation, except where the Patient, or the Patient's family, requests a transfer or referral elsewhere. The foregoing shall not be construed as prohibiting a Physician Provider from discussing treatment options with a Patient or Patient's family consistent with legal and ethical obligations. The parties agree that such obligations do not require the Physician Provider to initiate any discussion that suggests to the Patient that a transfer or referral to another facility is preferable.

### 5.2 Approval by the Chief Executive

Transfers and referrals due to the unavailability of required services to a facility that is not operated by or affiliated with the Corporation will be permitted only upon the prior approval of the Chief Executive, or his or her designee, or upon the independent request of the Patient or the Patient's family and only to a facility that has a transfer agreement with the Corporation.

### 5.3 Failure to Comply

Any violation of this Section 5 by a Physician Provider will be deemed a material breach of the Agreement and, in the event thereof, the Affiliate will owe to the Corporation fifty percent (50%) of the amount the Corporation would have received in reimbursement for the provision of medical care to the transferred Patient for such episode of care from any third party payer or other source. The Corporation may then obtain reimbursement for such amount by a reduction in the next succeeding Semi-Monthly Payment if the issue is not disputed, or following the Dispute Resolution Procedure set out in Section 11. In addition, upon demand from the Corporation, any Physician Provider whose actions are not in compliance with this provision shall no longer provide Contract Services.

### 5.4 Reimbursement for Physician Services

Should the Patient independently (i.e., without the suggestion or urging of a Physician Provider or other Affiliate employee) elect to have surgery performed at the Facility by a physician employed by the Affiliate who is not a Physician Provider, the

**SUNY 001051**

Corporation shall reimburse such physician for the professional services provided to the same extent that the responsible third party payer would do so.

## 6. MODIFICATION OF CONTRACT SERVICES

The Corporation has the unilateral right to terminate or decrease the scope of any Contract Service upon thirty (30) days written notice to the Affiliate. The Corporation has the unilateral right to require a reconfiguration of services. A reconfiguration will include, but not be limited to, the provision of the same level of services on an outpatient rather than an inpatient basis or the provision of outpatient services at a reasonably proximate offsite location rather than at the Facility. In the event additional services are needed to meet urgent needs in any Department, the Medical Director may temporarily and reasonably reassign the necessary Physician Providers to provide such services, consistent with such Physician Providers' medical staff credentials after consultation with the appropriate Chair. However, no such reassignment will affect the Physician Provider effort requirements set forth in Attachment A or violate the collective bargaining agreement applicable to such Physician Providers.

## 7. MEDICAL RECORDS

### 7.1    Duties of the Parties

Each party has certain general obligations with respect to the completion, maintenance and retrieval of Medical Records. In addition to these general obligations, the parties agree that Medical Records will be completed and maintained in accordance with the provisions of Sections 7.2 and 7.3 hereof.

### 7.2    Unit Record System

All Medical Records (including those for inpatient care, emergency room care, outpatient clinics, and home health care) shall be maintained by the Facility on a unit record system, which shall require a single record containing all data gathered on a given Patient, regardless of the number or types of services provided. There shall be a master Patient index maintained by the Facility on a current and up-to-date basis identifying all Patients who have previously been admitted to, or treated by, the Facility.

### 7.3    Completion of Medical Records

(a)    Physician Providers shall provide clear, accurate and timely documentation within the Medical Record of the care rendered to Patients treated at the Facility. Such documentation shall be in compliance with the Regulations, and specifically, with the Facility's Medical Records policy and procedures. Physician

SUNY 001052

Providers shall make every effort to provide this documentation within thirty (30) days of the time of the Patient's discharge, or thirty-six (36) hours from the time of the Patient's outpatient, emergency room, or home health visit. The Affiliate shall, on a regular and on-going basis, notify all Physician Providers and Post-Graduate Trainees of their responsibilities to complete the appropriate portions of the Medical Record within the time frame indicated in the Regulations.

(b)   In the event that the Corporation shall notify the Affiliate of any failure by a Physician Provider to complete Medical Records in a timely way and in accordance with this Section 7.3, the Affiliate, to the extent it is authorized and empowered, shall

(i)   cooperate with the Facility and the Medical Director by a timely notification of such Physician Provider of the list of Medical Records that are not completed within the established time frame following inpatient discharge, outpatient visit, emergency room visit, or home health visit; and

(ii)   support those Medical Staff actions to remedy the situation which are consistent with the Medical Staff By-Laws, the Rules and Regulations pursuant to those By-Laws, and, if applicable, any Regulations and procedures governing Post-Graduate Trainees, as well as (where pertinent) collective bargaining or similar agreements, and which are supportive of the Facility and the Medical Director. Such actions may include, but are not limited to, termination, suspension without pay or suspension of privileges.

(c)   Specifically, the Affiliate shall promptly issue a warning notice to any Physician Provider who has failed to complete Medical Records in a timely way and in accordance with this Section 7.3. Unless the Medical Records at issue shall have been completed within three (3) working days following such notice (during which period the applicable Medical Records were available to the Physician Provider), such Physician Provider shall not provide Contract Services until all delinquent Medical Records for which the Physician Provider is responsible have been completed. The Affiliate shall advise its Post-Graduate Trainees that all such failures will be the subject of discussion and censure at the time of Post-Graduate Trainee evaluations.

## 8.   COMPLIANCE WITH REGULATIONS AND STANDARDS

### 8.1   Required Compliance

The Affiliate will meet the requirements of all applicable Regulations in the performance of its obligations hereunder.

**SUNY 001053**

### 8.2 Failure to Comply

The Affiliate will immediately reimburse the Corporation for any failure to meet Regulations, wholly attributable to the Affiliate's actions or failures to act that results in a financial penalty to the Corporation. At its option, the Corporation may reduce the next succeeding Semi-Monthly Payment to the Affiliate by the amount of any such penalty.

### 8.3 Obligation to Cure

Regardless of whether a penalty is imposed by a regulatory body, the Affiliate must cure any material failure to meet applicable Regulations, wholly attributable to the Affiliate's actions or failures to act, within thirty (30) days of notice from the Corporation, or must commence efforts to cure such failure within thirty (30) days in the event that it is not possible to cure within such period.

### 8.4 Consequence of Failure to Cure

If the Affiliate fails to cure any material failure in any Department, then the Corporation may withhold ten percent (10%) of each succeeding Semi-Monthly Payment attributable to that Department for the period beginning thirty (30) days after notice to the Affiliate by the Corporation and ending when such material failure is cured. Any such retention of funds will be subject to the Dispute Resolution Procedure set out in Section 11 hereof.

## 9. COMPENSATION FOR CONTRACT SERVICES

The Corporation shall make Semi-Monthly Payments to the Affiliate on the first and sixteenth day of each month (or the following day after either if it is not a business day) during the term of the Agreement, as advance payments for the Contract Services rendered. The compensation amount for Contract Services and reconciliation with Semi-Monthly Payments shall be calculated in accordance with Attachment B hereto.

## 10. BILLING -- THE FEE STATEMENT

### 10.1 Format and Semi-Monthly Payment Calculation

The format and contents of the Fee Statement and the method of calculating each Semi-Monthly Payment will be as set forth on Attachment B hereto.

**SUNY 001054**

10.2 <u>Erroneous or Incomplete Fee Statements</u>

If the Corporation reasonably determines that any Fee Statement contains erroneous or insufficient information, due to the fault of the Affiliate, the Corporation will notify the Affiliate of such determination within thirty (30) days of receipt of the erroneous or incomplete Fee Statement. The Affiliate will then have thirty (30) days to correct or supplement the information in the Fee Statement in a manner reasonably acceptable to the Corporation. Disputes shall be resolved pursuant to the procedures set forth in Section 11.

10.3 <u>Interest on Late Payments</u>

The Corporation shall pay to the Affiliate interest on the undisputed portion of any Semi-Monthly Payment not made on or before the first or sixteenth day of the month, as applicable, or the following business day if either is a Saturday, Sunday or holiday. Interest shall be payable with such Semi-Monthly Payment for each day such Payment was late at the average Prime Rate published in <u>The Wall Street Journal</u> during the period in which such Payment was due. The average Prime Rate shall be determined by calculating the sum of the Prime Rates for all days during the relevant period and dividing the sum by the number of days in such period.

10.4 <u>Payments for Clinical Services</u>

If undisputed, each party shall pay the other party within ninety days of receipt of an appropriately documented invoice for diagnostic or treatment services or items for which separate third-party reimbursement is not available, furnished (a) by the Corporation at the Facility to inpatients of the Affiliate's hospital and (b) by the Affiliate at its hospital to inpatients of the Facility. Payments for such services or items shall be at the greater of (a) the Medicaid fee schedule or (b) the fee schedule of the applicable payor. This provision shall apply to services provided prior to the Term hereof but shall not apply to cases that are uncompensated -- i.e., where neither the Corporation nor the Affiliate or the Affiliate's hospital receives any payment for the Patient stay or encounter (other than nominal self-pay amounts).

11. **DISPUTE RESOLUTION PROCEDURE**

(a) The Affiliate's President, or designee, and the Corporation's President, or designee, shall be afforded the opportunity to resolve any material dispute or controversy arising under, out of or in connection with this Agreement. If the Affiliate's President and the President of the Corporation (or their designees) cannot agree on a resolution within thirty (30) days, such dispute may be resolved through any mechanism mutually agreeable to the parties including, but not limited to, mediation or

**SUNY 001055**

an independent committee, provided the parties agree on such process within an additional thirty (30) days.

(b)     The parties shall pay their own costs and expenses payable in connection with any dispute resolved under this Section 11, except as shall be otherwise determined by a mediator, committee or court of competent jurisdiction. The time limitation specified above may be extended upon mutual written agreement.

(c)     In the event that the dispute is not resolved to the mutual satisfaction of the parties through the process set forth above or the parties cannot agree on such process, then such dispute may be judicially adjudicated.

(d)     Pending final determination of any dispute hereunder pursuant to Subsection (a), the parties shall continue diligently to carry out the provisions of this Agreement, including the performance of Contract Services that may be in dispute. If either party willfully fails to fulfill its obligations pending dispute resolution, and it is determined pursuant to the provisions of this Section 11 that such failure constituted a breach of such party's obligations hereunder, that party shall be responsible for any unavoidable additional reasonable costs incurred by the other party as a result of such failure.

(e)     The provisions of this Section 11 shall not apply to disputes concerning (i) the termination and/or removal of individual Physician Providers (as distinct from termination of a Department pursuant to Section 2.1(d) hereof); (ii) indemnification in accordance with Section 18 of this Agreement; or (iii) Training Program changes mandated by ACGME or ADA, or otherwise required to maintain Training Program accreditation.

## 12.     PERSONNEL, TIME-KEEPING, EQUAL EMPLOYMENT OPPORTUNITY AND AFFIRMATIVE ACTION

### 12.1   Termination of Physician Providers, Post-Graduate Trainee and Students

(a)     The Affiliate shall comply, and shall direct all Physician Providers, Post-Graduate Trainees and Students to comply, with all applicable Regulations in the rendering of Contract Services hereunder. In addition to whatever other rights the Corporation may have under this Agreement, if any such person willfully and materially fails to abide by any applicable Regulation, or if his or her continued assignment at the Facility shall be considered by the President of the Corporation, in his or her reasonable discretion, not to be in the best interest of the Corporation, the President of the Corporation may request in writing that the Affiliate no longer assign such person to the Facility; provided, however, the Corporation shall provide a written justification for such

SUNY 001056

a request to the Affiliate at the time of the request and a reasonable opportunity to cure if the issue does not involve a threat to Patient health or safety. The Affiliate, as soon as practicable following its receipt of such request, and any reasonable cure period, shall forthwith remove such person from providing Contract Services. In the event of the removal of a Physician Provider made at the request of the President of the Corporation pursuant to this Section 12.1(a) where the request for removal is determined to be made without cause under any applicable collective bargaining agreement, the Corporation shall, to the extent provided in Section 13 hereof, reimburse the Affiliate for any severance costs it may pay to the Physician Provider so removed and, pursuant to the provisions of Section 18 hereof, defend and indemnify the Affiliate for its actions taken in connection therewith. The Corporation's right to request the removal of any Physician Provider pursuant to this Section 12.1(a), and the Affiliate's obligation to comply with any such request, are not subject to the Dispute Resolution Procedure set forth in Section 11 hereof.

(b) The Corporation shall distribute sufficient copies of its Code of Ethics (the "Code"), set forth on Attachment L, to the Affiliate which shall then distribute such copies to all Physician Providers and Post-Graduate Trainees performing services pursuant to this Agreement. The Affiliate shall inform such Physician Providers and Post-Graduate Trainees of the obligation on their part to comply with the provisions of the Code throughout the term of this Agreement. Any willful and material breach of the Code by a Physician Provider or Post-Graduate Trainees may result in action taken by the Corporation pursuant to Section 12.1(a) of this Agreement.

12.2   Physician Provider and Post-Graduate Trainee Time Records

The Affiliate shall provide to the Corporation on a quarterly basis, (a) the total number of Physician Provider payroll hours by Department, and any other information that reasonably may be required for the Corporation to obtain Medicare and Medicaid physician reimbursement; (b) the total Post-Graduate Trainee hours by Department, and any other information, including, but not limited to, reconciled Resident rotation schedules, that reasonably may be required for the Corporation to obtain federal and State graduate medical education reimbursement and indirect medical education reimbursement; and (c) an identification of the specific times spent each day on Facility premises by each Physician Provider and Post-Graduate Trainee.

12.3   Time-keeping, Records and Notices

The parties recognize that the maintenance of accurate Time Records is essential to ensure accountability and, therefore, the Affiliate shall direct all Physician Providers and Post-Graduate Trainees to keep accurate and complete records of their time spent in the performance of Contract Services in accordance with this Section 12.3. The

SUNY 001057

Affiliate shall maintain internal procedures to establish the reliability of such Time Records, including, but not limited to, periodic reports verifying the accuracy of the information provided through the Time Records.

### 12.4 Prohibition Against Fees: Assignment of Fees

No Physician Provider shall charge any fee for Contract Services rendered to a Patient at the Facility, except as provided by Corporation rules. As a condition precedent of employment, the Affiliate shall require that each Physician Provider complete an assignment of fee form designated by the Corporation for services rendered to Patients in the Facility, payment of which may be obtained as a reimbursable cost or from liability claims and all other fees. Failure to execute any such assignments shall be grounds for the Corporation to offset any amounts collected by a Physician Provider who has not made an assignment against any payments due to the Affiliate under this Agreement. In no event shall any Physician Provider solicit payments for purposes of personal gain.

### 12.5 Non-Discrimination: Equal Employment

This Agreement is subject to the requirements of the Mayor's Executive Order No. 50 (April 25, 1980) ("E.O. 50"), as amended, and the rules and Regulations promulgated thereunder. No contract shall be awarded unless and until these requirements have been complied with in their entirety. By signing this Agreement, the Affiliate agrees that with respect to Physician Providers, it:

(a) shall not unlawfully discriminate against any Physician Provider or applicant for employment because of race, creed, color, national origin, sex, age, handicap, marital status, sexual orientation or affectional preference with respect to all employment decisions, including, but not limited to, recruitment, hiring, upgrading, demotion, downgrading, transfer, training, rates of pay or other forms of compensation, layoff, termination, and all other terms and conditions of employment;

(b) shall not discriminate in the selection of subcontractors on the basis of the owner's, partners' or shareholders' race, color, creed, national origin, sex, age, handicap, marital status, sexual orientation or affectional preference;

(c) shall state in all solicitations or advertisements for Physician Providers placed by or on behalf of the Affiliate that all qualified applicants will receive consideration for employment without regard to race, creed, color, national origin, sex, age, handicap, marital status, sexual orientation or affectional preference or that it is an equal employment opportunity employer;

**SUNY 001058**

(d)     shall send to each labor organization or representative or workers with which it has a collective-bargaining agreement or other contract or memorandum of understanding, written notification of its equal employment opportunity commitments under E.O. 50 and the rules and Regulations promulgated thereunder;

(e)     shall furnish all information and reports, including an Employment Report, which are required by E.O. 50, the rules and Regulations promulgated thereunder and the Regulations, as applicable, concerning equal employment opportunity; and

(f)     shall permit the Corporation reasonable access to all relevant books, records and accounts for the purposes of investigation to ascertain compliance with such rules, Regulations and orders.

(g)     The Affiliate understands that in the event of its substantial noncompliance with the nondiscrimination clauses of this Agreement or with any of the rules, Regulations or orders of the Corporation which refer to equal employment opportunity or nondiscrimination, or of E.O. 50, such noncompliance shall constitute a material breach of this Agreement and noncompliance with E.O. 50 and the rules and regulations promulgated thereunder. Any provision of this Section 12.5 which becomes a matter of dispute between the parties shall be resolved in a manner consistent with the relevant procedures of E.O. 50.

(h)     The Corporation may convene a board of responsibility for purposes of declaring a contractor who has repeatedly failed to comply with E.O. 50 and the rules and regulations promulgated thereunder (or those promulgated by the Corporation) to be nonresponsible.

(i)     The Affiliate agrees to include the provisions of the foregoing paragraphs in every subcontract or purchase order in excess of $50,000 relating to Contract Services hereunder to which it becomes a party unless exempted by E.O. 50 and the rules and Regulations promulgated thereunder, so that such provisions shall be binding upon each subcontractor or vendor. The Affiliate shall take such action with respect to any subcontractor or vendor as may be directed by the Corporation as a means of enforcing such provisions including sanctions for noncompliance. This provision shall not apply to sessional physicians hired by the Affiliate to provide Contract Services.

(j)     The Affiliate further agrees that it shall refrain from entering into any contract or contract modification relating to Contract Services hereunder subject to E.O. 50, and the rules and Regulations promulgated thereunder, with a subcontractor who is not in compliance with the requirements of E.O. 50 and the rules and regulations

**SUNY 001059**

promulgated thereunder. This provision shall not apply to sessional physicians hired by the Affiliate to provide Contract Services.

### 12.6 Affirmative Action

The Corporation and the Affiliate agree to cooperate in efforts to achieve the New York State Council on Graduate Medical Education's goal that the percentage of underrepresented minorities in Post-Graduate Training Programs be at least equal to the percentage of underrepresented minorities in the available pool of applicants. In order to develop plans and allocate resources to achieve this goal, the Affiliate shall, on October 1st of each year during the term of this Agreement, submit an Affirmative Action Plan which details specific activities and events for the recruitment of underrepresented minority Post-Graduate Trainees, Physician Providers and Chiefs of Service employed by the Affiliate. This plan should include (but not be limited to) the following: (i) a comprehensive description of all minority recruitment activities planned for the year; (ii) a description of initiatives and rationale for programs to enhance minority recruitment; (iii) a description of resources utilized to implement recruitment programs, highlighting organizations, individuals and institutions contacted; and (iv) a description of the problems or concerns encountered in achieving program goals.

## 13. REIMBURSEMENT FOR CERTAIN EXPENSES

Except as set forth in this Agreement and any applicable Attachments, the Corporation shall have no obligation to the Affiliate with respect to reimbursement for the Affiliate's costs of severance, accrued vacation or cost of living increases during the term of this Agreement. The Corporation shall have no obligation to the Affiliate for unemployment compensation costs during the term of this Agreement.

### 13.1 Severance Costs

(a) The Corporation shall reimburse the Affiliate for any severance costs only due to (i) Physician Providers whose employment is terminated (and whom the Affiliate is unable to reassign) as a direct result of a decrease in workload pursuant to Section 2.1(b) hereof or the termination of a Department or a Service by the Corporation, or of a reconfiguration or reduction of a Service by the Corporation, pursuant to Section 6 hereof in cases where the Affiliate, through its best efforts, is unable to reassign a Physician Provider to a comparable position; and (ii) Physician Providers removed by the Affiliate at the Corporation's request, if without cause, pursuant to Section 12.1(a) hereof.

(b) In no event shall the Corporation have any liability for any severance costs pursuant to this Section 13.1 (or otherwise) if it has provided to the Affiliate

**SUNY 001060**

fourteen (14) months' written notice of its request for termination of a Physician Provider (including terminations pursuant to Sections 2.1(b) or 12.1(a) hereof) or of the reconfiguration, reduction or termination of a service pursuant to Section 6 hereof.

(c) In the event the Corporation has not provided fourteen (14) months' notice of such termination or modification, then its liability pursuant to Section 13.1 (a) shall be cash severance in an amount equal to one (1) days salary and fringe benefits for each day less than the fourteen (14) months' notice period up to a maximum of one year.

(d) The Corporation shall have no obligation with respect to severance costs for any Physician Provider:

(i) whose employment is terminated by the Affiliate as a result of the termination of this Agreement pursuant to Section 19 hereof;

(ii) whose employment is terminated in the sole discretion of the Affiliate; and

(iii) whose termination occurs at or after the expiration of this Agreement as a result of the failure of the Corporation and the Affiliate to enter into a new Affiliation Agreement.

The Affiliate shall be liable for all costs and expenses of any termination of a Physician Provider described in this Section 13.1(d).

13.2  Notices of Termination

All notices of termination to Physician Providers during the term of this Agreement shall be provided by the Affiliate and the Corporation shall have no rights or obligations to notify Physician Providers directly.

13.3  Accrued Vacation Costs

(a) The Corporation shall reimburse the Affiliate for accrued vacation costs paid by the Affiliate for those Physician Providers whose employment is terminated during the term or upon termination or expiration of this Agreement, to the extent that such costs are allocable to the provision of Contract Services by such Physician Providers, and only to the extent set forth in Attachment B.

(b) All payments required by this Section 13.3 shall not exceed the Affiliate's liability for accrued vacation benefits (not to exceed thirty days per individual)

**SUNY 001061**

pursuant to collective bargaining agreements or the Affiliate's policies on accrued vaca-tion leave, as the case may be, in effect as of January 1, 2010. Payments by the Corpora-tion shall be made on a lump sum basis if so required by such agreements or policies.

(c)     Except to the extent provided for in the preceding paragraphs of this Section 13.3, any liability of the Corporation to reimburse the Affiliate for vacation benefits accrued under any prior Affiliation Agreement is hereby extinguished.

### 13.4   Cost of Living Adjustments

Except as otherwise expressly agreed by the parties, the Corporation will reimburse the Affiliate for cost of living increases for Physician Providers, only to the extent (i) the Governor's Office of Employee Relations has negotiated such increases with the union to which such Providers belong; (ii) the COLA rate applied is comparable to that received by the other similarly-titled employees within the associated collective bargaining unit; and (iii) set forth in Attachment B.

### 13.5   Collective Bargaining Agreements

The Affiliate party shall provide to the Corporation a copy of any collective-bargaining agreement, stipulation or modification which covers Physician Providers that is entered into during the term of this Agreement and a list of Physician Provider job titles covered by such collective-bargaining agreements, grouped by bargaining representatives and indicating the term of each such collective bargaining agreement, if such information is not otherwise specifically stated therein.

## 14. BOOKS AND RECORDS

### 14.1   Generally

The Affiliate shall maintain separate and accurate books and records (or a subaccount on its General Ledger) relating to this Agreement in an orderly and accessible manner for audit and review during normal business hours at the Affiliate's business office. All such books and records shall be maintained by the Affiliate in accordance with applicable Regulations, including, but not limited to, Titles XVIII ("18") and XIX ("19") of the Social Security Act, and in accordance with the accounting procedures and practices that sufficiently and properly reflect (i) all direct and indirect costs of any nature expended in the performance of this Agreement and (ii) any payments received as described in Sections 9 and 13 hereof. In addition, all such books, records and supporting records shall be retained by the Affiliate for a period of seven (7) years from the creation thereof, the termination of this Agreement, or the Corporation's Final Audit, whichever comes latest, or for any longer period that may be required by law.

**SUNY 001062**

14.2 <u>Method of Accounting</u>

Such books and records shall be complete and maintained on the basis of account classifications generally conforming to the format of the Chart of Accounts of the Corporation, except that the Affiliate may utilize its own account classifications so long as it develops and coordinates with the Corporation appropriate crosswalks to the Corporation's account classifications. The Corporation may make reasonable requests for additional classifications to be reflected in the books and records for each of the forthcoming Fiscal Years during the term of the Agreement and shall set forth its requirements thirty (30) days before the beginning of each such Fiscal Year. Expenses shall be allocated to such accounts in accordance with the recommendations of the American Hospital Association.

## 15. <u>ANNUAL AUDITS</u>

15.1 <u>Scope of the Audit</u>

The Affiliate will engage the services of a certified public accounting firm at the Affiliate's sole expense to perform an annual audit in accordance with generally accepted auditing standards for each Fiscal Year during the term of the Agreement, or in the event the term of this Agreement commences after the beginning of a Fiscal Year or terminates before the end of a Fiscal Year, for any portion of a Fiscal Year during which this Agreement is in effect.

The certified public accounting firm shall conduct an audit based on generally accepted auditing standards of the books of account and other records of the Affiliate that detail the financial operation of the Affiliate pursuant to the terms of this Agreement during the Fiscal Year (or any portion of a Fiscal Year). The Annual Audit Report, which shall include an opinion by the certified public accounting firm, rendered in accordance with generally accepted accounting principles, shall include an examination of the reports with respect to compensation earned by the Affiliate pursuant to the terms of Section 9 and reimbursement paid to the Affiliate pursuant to the provisions of Section 13 hereof. The audit will also include separate audit testing and an Attestation Statement that the Fee Statements presented by the Affiliate for payment during each audit period are presented fairly, accurately, and free of material misstatement. Furthermore, the Annual Audit Report shall cover any other accounting matters as the Corporation shall reasonably request within the original scope of audit. Any such request shall be made in writing to the Affiliate not less than sixty (60) days prior to the end of either the Fiscal Year or the date of termination of this Agreement.

15.2 <u>Due Date of the Audit</u>

**SUNY 001063**

The Affiliate's Annual Audit Report must be submitted within the later of (i) 180 days of the end of each Fiscal Year during the term of the Agreement, or the termination of this Agreement if that date is earlier or (ii) 30 days from the date the Corporation provides to the Affiliate any information necessary to complete such Annual Audit Report. The Affiliate shall be responsible for all costs incurred in connection with the Annual Audit Report, including the fees of the certified public accounting firm of the Affiliate. In the event that the Corporation grants to the Affiliate any extension of time in which to furnish the Annual Audit Report, such extension shall not exceed thirty (30) days from the date the Annual Audit Report is due.

15.3   Affiliate's Failure to Submit Annual Audit Report

In the event that the Affiliate fails to furnish the Annual Audit Report in a timely manner as required by Section 15.2 hereof, then the Corporation shall have the right immediately to conduct its own audit of the books of account and the records of the Affiliate in order to prepare the Annual Audit Report. The Affiliate shall immediately make all its books of account and records available to the Corporation or to its representatives and shall bear all the expenses of the audit incurred by the Corporation.

15.4   Corporation's Final Audit

The Corporation shall use its best efforts to conduct its Final Audit within one year and three months from the date of its receipt of the Affiliate's Annual Audit Report. After the Corporation's auditors complete their review, an exit conference with said auditors will be held at the Facility to allow the Affiliate the opportunity to discuss any questioned amounts and/or internal control issues, and to provide any additional supporting documentation. All questions of fact are to be resolved at this conference, or by the submission of the additional documentation.

16. **INSPECTION OF BOOKS AND RECORDS**

Representatives of the Corporation, accounting firms retained by the Corporation, and the City and State shall have reasonable access to all books and records, including supporting documents, of the Affiliate relating to its performance under this Agreement for purposes of inspection and audit. Representatives of the United States, City and State governments shall have such reasonable access to any information relating to payments for reimbursable costs.

17. **REPORTING REQUIREMENTS AND RESPONSIBILITIES**

The Affiliate shall deliver all Reports required by the Corporation pursuant to this Agreement in a timely fashion in accordance with the terms and conditions for

**SUNY 001064**

such Reports set forth in this Agreement. Reports, where applicable, are to be provided in formats prescribed in this Agreement or as mutually agreed upon by the Chief Executive and the Affiliate.

The Corporation reserves the right, from time to time, reasonably to require additional information after adequate advance notice to the Affiliate. The Affiliate shall make a good faith effort to support and cooperate fully in achieving the timely computerization, where applicable and feasible, of the Reports.

The Corporation shall provide such information reasonably requested by the Affiliate necessary to carry out its obligations (including maintaining Training Program accreditation) under this Agreement.

## 18. INDEMNIFICATION

### 18.1 Scope of Defense and Indemnification

(a) Subject to the limitations and conditions set forth in Sections 18.2 and 18.3 of this Agreement, the Corporation shall defend, indemnify and hold harmless the Affiliate, the Physician Providers, and the Post-Graduate Trainees, including, but not limited to, Post-Graduate Trainees on rotation through Corporation facilities other than the Facility, and all other Affiliate trustees, directors, officers, employees and agents from any and all claims, suits, actions, proceedings, expenses, costs, liability, losses or damages for (a) acts of malpractice of the Affiliate, Physician Providers or Post-Graduate Trainees arising from the obligatory or voluntary provision of patient care services or the diagnosis of Patients while performing Contract Services and (b) acts of malpractice or other acts or omissions arising out of the operation or supervision of services at the Facility that are committed or alleged to have been committed by the Affiliate, Physician Providers or Post-Graduate Trainees or any other Affiliate employees while they are performing functions pertaining to this Agreement either on an obligatory or volunteer basis. Notwithstanding the foregoing, if the Affiliate determines there is an issue involving a significant public interest, it reserves the right to be represented by its own counsel at its sole expense in any such action in which the Affiliate is or becomes a party. Should the Affiliate elect to do so, the Affiliate shall be liable for any judgment of a court of competent jurisdiction to the extent attributable to the negligence of the Affiliate or of its Officers and employees when acting within the course and scope of their employment.

In addition, the Corporation shall defend and indemnify the Affiliate as required pursuant to Sections 21.5 hereof, and, if applicable, in accordance with the provisions of Section 12.1(a) hereof.

SUNY 001065

(b)    In lieu of the indemnification for acts of medical malpractice by Physician Providers practicing in the areas of Obstetrics/Gynecology or Neurosurgery, the Corporation shall provide equivalent professional insurance coverage (i) through its captive insurer ("HHCIC") in the primary amount of $1.3 million/$3.9 million aggregate; and (ii) except as provided in Subsection (c), through the New York State Excess Liability Pool in the excess amount of $1 million/$3 million aggregate (the "Excess Coverage"). In the event of, and to the extent that, a judgment is in excess of the limits of, or is not fully covered by, the primary and excess policies, indemnification for such amounts shall continue as provided in this Section 18.

(c)    Should such Physician Providers have, on the date the alleged act(s) of malpractice occurred, Excess Coverage through the Affiliate or otherwise, the Corporation shall neither indemnify nor insure for the amount of such Excess Coverage. Notwithstanding the foregoing, if the Affiliate determines there is an issue involving a significant public interest, it reserves the right to be represented by its own counsel at its sole expense in any such action in which the Affiliate is or becomes a party. Should the Affiliate elect to do so, the State shall be liable to the Corporation in a separate action duly brought in the New York Court of Claims for any damages awarded in the first action attributable to the acts of the Affiliate or its Physician Providers and Post-Graduate Trainees.

18.2    Limitations on Defense and Indemnification

The defense, indemnification and hold harmless provisions of Section 18.1 shall not apply to the following:

(a)    Physician Providers who shall charge a fee for Contract Services rendered pursuant to this Agreement, whether or not such payment is either directly or indirectly made or received by such Physician Providers. However, any Physician Provider who shall have executed an assignment of fees for the benefit of the Corporation shall not be considered to have charged a fee for purposes of this Section 18.2(a);

(b)    Acts or omissions to act by the Affiliate or Physician Providers (except with respect to consultations concerning Patients at the Facility or its satellite facilities) occurring anywhere other than (i) at the Facility; (ii) at the Facility's satellite facilities (i.e., those facilities outside of the Facility where health care is provided as part of a program conducted with the approval of or requested by the Corporation) or at other sites where the Corporation has approved the provision of Contract Services; (iii) during transfer of a Patient in a Corporation vehicle; or (iv) during transfer of a Patient in a non-Corporation vehicle accompanied by a Physician Provider;

SUNY 001066

(c)     Acts or omissions to act by the Affiliate's Students, except where such acts or omissions to act are at the direction of the Corporation; and

(d)     Acts by Physician Providers while providing Contract Services hereunder when (i) the privileges conferred upon them by the President on behalf of the Governing Body previously have been suspended or revoked, or privileges previously have been formally modified specifically to exclude the performance of the particular activity giving rise to the request for indemnification and the Physician Provider has been so informed in writing; or (ii) the Physician Provider's eligibility to participate in the Medicaid or Medicare programs previously has been terminated. Nothing contained in this Section 18.2(d) shall relieve the Corporation of its obligation to defend, indemnify and hold harmless the Affiliate and all parties to which indemnification extends under Section 18.1 of this Agreement (other than the Physician Providers whose privileges have been so suspended, revoked or modified or whose eligibility to participate in the Medicaid or Medicare programs has been terminated) from any and all claims, suits, acts, proceedings, expenses, cost, liability, losses or damage arising out of such acts or omissions. Notwithstanding the foregoing, the Corporation shall have no such obligation to defend, indemnify and hold harmless the Affiliate in cases where the Affiliate knew, or should have known, of the previous termination of the Physician Provider's eligibility to participate in the Medicaid or Medicare programs and did not so inform the Corporation pursuant to its obligation under Section 2.7(e) hereof; and

(e)     Costs of any compensation that may be paid to the Corporation by the Affiliate for failure by the Affiliate to meet the provisions of Sections 5 and 8 hereof.

18.3    Conditions to Defense and Indemnification

The defense and indemnification as set forth in Section 18.1 hereof shall in each case be conditioned upon the following:

(a)     (i) Each Physician Provider practicing in the areas of Obstetrics/Gynecology or Neurosurgery who is to be insured through the Corporation as specified in Section 18.1(b) shall have completed the risk reduction course specified in Section 3.8 and shall have promptly executed an application, as prepared and furnished by the Corporation, for coverage under the HHCIC policy and New York State Excess Liability Pool and shall have authorized the Corporation to submit such application to its primary and excess insurance carriers on his/her behalf.

(ii) Each Physician Provider practicing in the areas of Obstetrics/Gynecology or Neurosurgery who is insured through the Affiliate or otherwise as specified in Section 18.1(b) shall have promptly executed an application, as prepared and furnished by the Corporation, for

SUNY 001067

coverage under the HHCIC policy and shall have authorized the Corporation to submit such application to its primary insurance carrier on his/her behalf.

(b)     The Affiliate or person seeking such defense and indemnification shall promptly forward to the Corporation any summons or notice of any nature pertaining to claims received or served upon it or such person.

(c)     The Affiliate or the person seeking such defense and indemnification shall provide all information and cooperation requested by the Corporation and the City to investigate, adjust, settle or defend such claim, action or proceeding and shall not, directly or through an attorney or agent, take any action constituting a waiver of any legal defenses available in response to such claim, action or proceeding. Notwithstanding the foregoing, if the Affiliate determines there is an issue involving a significant public interest, it reserves the right to be represented by its own counsel at its sole expense in any such action in which the Affiliate is or becomes a party. Should the Affiliate elect to do so, the Affiliate shall be liable for any judgment of a court of competent jurisdiction to the extent attributable to the negligence of the Affiliate or of its Officers and employees when acting within the course and scope of their employment.

18.4   Procedure in Connection with Defense and Indemnification

The Corporation Counsel of the City or a law firm designated by the Corporation Counsel and the Corporation shall act as attorney in connection with all claims, actions or proceedings within the purview of this Section 18. No settlement of any such claim or action or dismissal of any such proceeding shall be made otherwise than in accordance with the procedures established by the City, including the Comptroller of the City, for the settlement of claims. Notwithstanding the foregoing, if the Affiliate determines there is an issue involving a significant public interest, it reserves the right to be represented by its own counsel at its sole expense in any such action in which the Affiliate is or becomes a party. Should the Affiliate elect to do so, the Affiliate shall be liable for any judgment of a court of competent jurisdiction to the extent attributable to the negligence of the Affiliate or of its Officers and employees when acting within the course and scope of their employment.

18.5   Indemnification of the Corporation

(a) Subject to the availability of lawful appropriations and  consistent with Section 8 of the State  Court of Claims Act, Affiliate shall hold the Corporation harmless from and indemnify it for any final judgment of a court of competent jurisdiction to the extent attributable to the negligence of Affiliate's Post-Graduate Trainees when acting within the course and scope of their employment.

SUNY 001068

(b) In lieu of the indemnification for the acts or omissions of the Affiliate's Students, the Affiliate shall carry comprehensive general liability/excess umbrella liability insurance with limits of not less than one million dollars ($1,000,000) per occurrence and three million dollars ($3,000,000) in the aggregate covering bodily injury arising out of the professional service, error or mistake in the rendering or failure to render services by Students under the direction of the Facility hereunder. Such policy or policies of insurance shall be obtained from a company or companies that is/are duly licensed to do business in the State of New York; shall name the Facility as an additional insured thereunder; and shall be endorsed to state that, in the event of cancellation, the issuing insurer will endeavor to provide thirty (30) days' written notice thereof to the Corporation. Upon either the Corporation's or the Facility's written request, the Affiliate will provide a copy of such insurance policy prior to the effective date hereof.

18.6   Continuing Obligation to Indemnify

The obligation of the Corporation to defend and indemnify for any claims, suits, proceedings, costs, liability, losses or damage arising during the term of this Agreement, pursuant to the provisions of this Section 18, shall survive any termination or expiration of this Agreement.

18.7   Corporation/City of New York Operating Agreement

Notwithstanding any other provision of this Agreement, the agreement of the Corporation pursuant to Sections 18.1 through 18.6 hereof shall be equal to the undertaking of the City in effect at the time of execution of this Agreement as set forth on Attachment M, subject to the agreements and understandings set forth in that certain letters (i) dated June 11, 1993 from Lawrence S. Kahn, Assistant Corporation Counsel of the City, to Edna Wells Handy, Esq., Vice President and General Counsel of the Corporation, and (ii) dated May 25, 1983 from Jeffrey E. Glen, Assistant Corporation Counsel of the City, to Dan Cohen, Esq., acting General Counsel of the Corporation, copies of which is attached hereto on Attachment N.

19. TERM AND TERMINATION

19.1   Term of Agreement

The term of this Agreement shall commence on July 1, 2013 and continue in effect until June 30, 2016; provided, that the parties may mutually agree to extend the term of this Agreement for one (1) additional year (the "Optional Extension Period"), so long as (a) each party has notified the other, no later than February 28, 2016, of its desire to so extend; and (b) the parties agree, in writing, no later than April 30, 2016, to a budget for the Optional Extension Period (i.e., an update to Attachment A that will

SUNY 001069

apply during the Optional Extension Period); and (c) the parties obtain any governmental and other approvals necessary to extend this Agreement for the Optional Extension Period.

19.2   Notice of Termination

(a)    Either party may terminate this Agreement for material breach of the Agreement by the other party of an obligation for which no more limited remedy is specified, which is uncured or unresolved through the Dispute Resolution procedure specified in Section 11 hereof, upon 30 days' written notice, except and unless the breaching party has promptly undertaken curative actions during such period, in which event the parties shall agree upon a reasonable extension of the curative period.

(b)    In the event that either party hereto elects to terminate this Agreement or it is not renewed, the parties shall negotiate an orderly process of disaffiliation culminating in a written plan for disaffiliation which ensures the continued provision at the Facility of health care that complies with accepted community standards. The negotiated plan shall recognize the limits of available resources, existing policies of the Affiliate, the deployment and scheduling of Physician Providers pursuant to Section 19.4(c) of this Agreement, and the need to ensure continued training of Students and Post-Graduate Trainees in a manner that is non-disruptive and compliant with applicable accreditation standards and requirements. The parties' obligations under this Section 19.2(b) shall survive the termination or expiration of this Agreement.

19.3   Consequences of Termination

(a)    On the effective date of any termination of this Agreement, the obligations of each party hereto shall cease to accrue, with the exception of the obligations set forth in Section 19.2(b) hereof, in accordance with the plan for disaffiliation. As soon as reasonable thereafter, the Affiliate shall turn over to the Corporation all records with respect to Facility Patients in its possession or under its control as of the date of termination and all books and records that the Affiliate is required to maintain pursuant to the terms of this Agreement. The Affiliate shall continue to have reasonable access to all those books and records, and the right to make copies thereof, for all good-faith purposes, including determination as to the liability of the Corporation to the Affiliate hereunder.

(b)    In addition, upon termination of this Agreement, the following requirements shall apply:

(i)    The Affiliate shall receive compensation in accordance with this Agreement for Contract Services that have been performed up to the date of

**SUNY 001070**

such termination, subject to all audit and reporting provisions of this Agreement.

(ii)    The liability of the Corporation to pay for, and liability of the Affiliate to provide, further Contract Services hereunder shall cease, except as otherwise provided in the plan for disaffiliation.

(iii)   The Affiliate shall refund to the Corporation, simultaneously with the submission of its Annual Audit Report, all fixed payment amounts that the Affiliate has received for Contract Services and that remain unexpended, uncommitted and unencumbered as of the date of termination and any interest earned thereon remaining unexpended, uncommitted and unencumbered as of said date.

(iv)   If, as a consequence of such termination, (1) the Affiliate terminates the employment of any Physician Providers or such Physician Providers resign: and (2) any accrued benefits potentially payable to such Physician Providers pursuant to the Affiliate's pension plan are forfeited as a result of such termination of employment, then the Affiliate shall, simultaneously with the submission of its final Annual Audit Report, pay to the Corporation an amount equal to the pension plan contributions made or required to be made by the Affiliate on behalf of such Physician Providers, to the extent that any portion of the Compensation Due for Contract Services (as calculated pursuant to Attachment B hereto) that was paid by the Corporation to the Affiliate was intended to reimburse the Affiliate, as part of its fringe benefit costs, for such pension plan contributions.

(c)     The Affiliate shall account for and turn over to the Corporation all equipment, appurtenances and property owned by the Corporation and in the possession and control of the Affiliate, including any inventory records in the possession of the Affiliate as of the date of termination. The Affiliate shall fully comply with this paragraph within sixty (60) days after the effective date of termination, except as otherwise provided in the plan for disaffiliation.

19.4    Effect of Termination on Training Programs

(a)     In the event of termination or a modification of Contract Services pursuant to Section 6, the plan of disaffiliation and parties shall address the reassignment of and salary obligations for Post-Graduate Trainees. In the absence of an agreement, the Affiliate will have the sole authority and obligation for such reassignment. Nothing herein shall preclude the Corporation from seeking or obtaining a change in sponsorship of any Training Program.

SUNY 001071

(b)     Unless otherwise provided in the plan of disaffiliation, the Affiliate shall accept assignment of the employment contracts of KCHC Residents who are reassigned or, if such contracts are not assignable, reimburse the Corporation for their salaries and fringe benefits.

(c)     To the extent the parties mutually agree to the continuation of a specific Training Program at the Facility, the Post-Graduate Trainees shall continue to provide Contract Services at the Facility, consistent with the Affiliate's commitment to the affected Post-Graduate Trainees, during which time the Affiliate shall be paid for said Contract Services by the Corporation. The Affiliate shall provide such Corporation Physicians with Faculty appointments as are necessary to supervise such Post-Graduate Trainees and maintain accreditation of any such Training Program consistent with the Affiliate's commitment to the affected Post-Graduate Trainees. In those affiliation relationships in which a full complement of Post-Graduate Trainees or a substantial percentage of Post-Graduate Trainees shall be continuing at the Facility, a transitional arrangement or a multi-year phase-in disaffiliation plan developed by the parties may, upon mutual agreement, extend until the process of disaffiliation is complete.

19.5     Good Faith of Parties

The Affiliate and the Corporation each recognize that a principal purpose of this Agreement is to provide a basis for the provision of health care services at the Facility that comply with accepted community standards. Accordingly, the Affiliate and the Corporation, without prejudice to their respective legal rights under this Agreement, agree to negotiate in good faith all changes in this Agreement as they shall deem necessary for implementing the purposes of this Agreement, including the provision of training and supervision of Students and Post-Graduate Trainees necessary to maintain accreditation of the Training Programs.

## 20. GIFTS AND GRANTS

20.1     Gifts and Grants to the Affiliate

With the consent of the Corporation and subject to the Corporation's policies and procedures, which shall be furnished to the Affiliate in advance (including without limitation, those policies and procedures with respect to any reimbursement of the Corporation for payments it may make and services it may render to the Affiliate), the Affiliate may apply for, receive and accept funds from any source for the support of Research, educational, service and scientific activities to be carried out at the Facility (such funds being hereinafter referred to as "Sponsored Funds"). The Affiliate shall furnish to the Corporation, at the time of acceptance of Sponsored Funds, information regarding the source of such Sponsored Funds, the amount and terms thereof and other

**SUNY 001072**

information that the Corporation shall reasonably request relating to the activities being performed by or under the direction of the Affiliate at the Facility with such Sponsored Funds. In all cases the rights and intentions of any donor, sponsor or grantor, as such are known to and agreed to by the Corporation, shall prevail, and nothing in this Section 20 shall impinge upon any legal agreement that the Corporation has approved.

### 20.2 Gifts and Grants to the Corporation

The Affiliate shall use reasonable efforts to meet all applicable requirements of gifts and grants received by the Corporation which are used by the Corporation to fund the provision of Contract Services, including, but not limited to, requirements as to the number and availability of Contract Services Providers and the number of Patients served. The Affiliate shall have no obligation hereunder unless the Corporation shall first advise the Affiliate of all such requirements. If the gift or grant requirements increase expenses to be incurred by the Affiliate, the Corporation shall reimburse the Affiliate's actual costs to the extent such costs are not already compensated through the existing compensation provisions set forth in Attachment B hereto.

## 21. RESEARCH

### 21.1 Corporation Approval of Research Projects

The Affiliate is encouraged to undertake Research to improve Patient care and to increase the responsiveness of the Facility's services to the needs of the population served. The Corporation also endorses Research that seeks new biomedical knowledge leading to the control of disease and enhanced well-being. Any such Research involving either Corporation Patients or Corporation facilities may not begin without the prior written approval of the Corporation in accordance with the Corporation's policies and procedures (including without limitation, those policies and procedures with respect to any reimbursement of the Corporation for payments it may make and services it may render to the Affiliate) as they may amended from time to time, which policies and procedures shall be furnished to the Affiliate in advance. All approved Research must be conducted in accordance with such policies and procedures and all applicable legal and regulatory requirements.

### 21.2 Reimbursement of the Corporation

Reimbursement to the Corporation for its costs incurred in the conduct of Research pursuant to grants awarded to the Affiliate shall be governed by the Corporation's policies and procedures and the provisions of Attachment B hereto.

### 21.3 Contract Services not to be Compromised

**SUNY 001073**

The Affiliate shall ensure that Contract Services are not compromised by Research activities. When substantial personnel changes occur in the context of Research activities, the Affiliate shall notify the Facility in advance of such changes and shall arrange for appropriate alternative coverage.

21.4  Acknowledgment of Corporation Support

The Affiliate shall inform investigators of their obligation to acknowledge, in all Research reports, the cooperation and support provided by the Corporation and Facility when such has occurred. The Affiliate will also use commercially reasonable efforts to ensure that such cooperation and support is acknowledged, as applicable, in all correspondence, books, magazines and public affairs materials with regard to Research and other initiatives conducted at either Facility. In those cases where the identification of the Facility, the type of Patients and the data collection period involved would adversely affect the Facility or the Patients, such identification shall not be made.

21.5  Indemnification for Research

For Research that has been approved pursuant to this Section 21, the provisions of Section 18 hereof shall apply.

21.6  Other Corporation Research

If research (not conducted pursuant hereto) is to be conducted by Corporation employees who do not hold Affiliate Faculty appointments, Students or Post-Graduate Trainees may not assist with or be involved in the research, unless specifically consented to in writing in advance by the Affiliate's Dean.

21.7  Limitations; Precedence; Master Premises Agreement

The conduct of Research, and the acceptance and/or use of gifts, grants and/or Sponsored Funds (collectively, "Research and Grant Activities"), directly or indirectly, by the Affiliate, Physician Providers, Post-Graduate Trainees and/or Students, must also comply with all applicable Affiliate policies and procedures, as amended from time to time, which polices and procedures shall be furnished to the Corporation in advance, and with that certain Master Premises Agreement (including all exhibits and attachments thereto and documents incorporated by reference therein), dated on or about January 20, 2010 between the Corporation and the Affiliate (attached hereto as Attachment O), while such Master Premises Agreement remains in effect. In the event of any conflict among the Corporation's policies and procedures, the Affiliate's policies and procedures and the Master Premises Agreement (or any succeeding agreement) with respect to the Research and Grant Activities, the more restrictive requirement shall

SUNY 001074

govern. For example, if the Corporation's policies require a research subject's consent, but the Affiliate's policies do not (or vice versa), such consent shall be required.

## 22. INTELLECTUAL PROPERTY

### 22.1 Definitions

(a) "SUNY IP" is Covered IP (as defined below) that is created, conceived of or reduced to practice or writing or first fixed in a tangible medium of expression in the course of or as a result of research conducted under the sole direction of a Principal Investigator employed by the Affiliate, and that is not Joint IP (as defined below).

(b) "KCHC IP" is Covered IP that is created, conceived of or reduced to practice or writing or first fixed in a tangible medium of expression in the course of or as a result of research conducted under the sole direction of a Principal Investigator employed by the Corporation.

(c) "Joint IP" is Covered IP that is created, conceived or reduced to practice or writing or first fixed in a tangible medium of expression in the course of or as a result of research conducted under the direction of (a) a sole Principal Investigator employed by the Affiliate using facilities, resources or Patients of the Facility, or (b) one or more Principal Investigators employed by both the Affiliate and the Corporation.

(d) For purposes of this Section 22, an Affiliate Faculty appointment shall not constitute employment.

(e) "Covered IP" means all intellectual property rights, including all patent, trademark, copyright and trade secret rights (as defined in the Uniform Trade Secrets Act) in all subject matters created, conceived of or reduced to practice or writing or first fixed in a tangible medium of expression in the course of or as a direct result of research hereunder, including but not limited to such rights in inventions or innovations (whether or not patentable), in all copyright and copyrightable material (unless published in academic or scholarly media or otherwise in the public domain), and all such intellectual property rights inhering in tangible research property such as cell lines, vectors, other biological and agricultural materials, therapeutic agents or pharmaceuticals, medical devices, biological and agricultural materials, therapeutic agents or integrated circuit chips, computer databases and prototype devices, improvements, modifications thereon domestic and foreign, including all continuations, provisionals and divisionals thereof and all applications, registrations and renewals of the foregoing. For the avoidance of doubt, and without limitation, "Covered IP" excludes (a) pre-existing intellectual property; and (b) tangible property of a party to the

SUNY 001075

extent that such tangible property involves only the realization of pre-existing intellectual property and involves de minimus inventive or original effort.

22.2   Disclosures

Each party shall require its employees promptly to disclose all intellectual property invented, authored or developed by such individuals. Such disclosures shall be in accordance with law and each party's policies, irrespective of ultimate patentability. As to any intellectual property that qualifies or reasonably may qualify as Joint IP hereunder, the party receiving such disclosure shall then promptly notify the other party hereto (subject to appropriate confidentiality protections). Each party involved in Research hereunder shall inform the other party of any ownership or use rights of any governmental entity or research sponsor at the time it notifies the other party of an intellectual property disclosure.

22.3   Rights of Employees

Each party hereto shall maintain intellectual property policies that provide clear standards or processes for determining the financial and other rights, if any, of its employees in intellectual property that is subject to this Agreement.

22.4   Authority With Respect to Commercialization

(a)   The Affiliate shall have sole authority over (a) the filing, prosecution and maintenance of copyright applications and registrations, patent applications and patents, registrations and other protective measures; (b) the licensing, assignment, joint-venturing, spin-off of a company, or other commercial opportunities; and (c) all agreements and all measures to commercialize or realize the value or benefit (collectively "Commercialization") of SUNY IP.

(b)   The Corporation shall have sole authority over the Commercialization of KCHC IP.

(c)   At the outset of research that may give rise to Joint IP, the parties shall confer and  designate a Lead Institution. The Lead Institution shall have authority to manage the process of Commercialization, subject to (a) the obligation to consult periodically with the other institution (but not obtain is approval) as to major Commercialization decisions; and (b) the obligation to share Net IP Revenues as provided in Section 22.5. The Lead Institution shall use its reasonable best efforts to engage in successful Commercialization. The Lead Institution shall maintain appropriate records concerning Commercialization, which are subject to reasonable examination at any time by the other party hereto.

**SUNY 001076**

22.5   Distribution of Net IP Revenues

(a)    "Gross IP Revenues" means all revenues, including sales revenues, royalties, current or future equity or other interests, options, licensing fees, milestone payments, or other remuneration of things of value received from third parties as consideration for the grant of rights in Joint IP, and all infringement damages awards received attributable to Joint IP.

(b)    "Costs" means all customary costs reasonable incurred in connection with obtaining, maintaining, licensing or conveying, defending in litigation or otherwise, Joint IP, substantially for the benefit of the owners thereof, and any actions specifically undertaken in connection with the Commercialization of such Joint IP.

(c)    "Net IP Revenues" means Gross IP Revenues less (a) Costs, and (b) a Licensing Fee of 15% of the difference between Gross IP Revenues and Costs, which the Lead Institution shall be entitled to be paid for its efforts and expenses in Commercialization.

(d)    With respect to Joint IP, the Corporation and the Affiliate shall share equally in all Net IP Revenues. The Lead Institution shall be responsible for providing the other party with an accounting of Gross IP Revenues, Costs, and Net IP Revenues relating to any Joint IP, and for distributing to the other party the other party's share of any Net IP Revenues, no less often than annually. The Lead Institution shall provide the other party access to its books and records to the extent reasonably necessary to support its accountings and distributions. The parties shall attempt to resolve informally any disputes arising from such accountings or distributions, but if such disputes cannot be resolved informally they shall be subject to the Dispute Resolution process described in Section 11.

22.6   Pre-Publication Review

Disclosures to third parties of all intellectual property subject to this Agreement shall comply with all applicable Affiliate and Corporation policies on pre-publication review, among other reasons, to avoid improper disclosure of confidential information or loss of patent or other intellectual property protection that might thereby be compromised.

SUNY 001077

## 23. <u>REPRESENTATIONS AND WARRANTIES</u>

23.1 <u>Representations and Warranties of the Affiliate</u>

The Affiliate hereby represents and warrants as follows:

(a)    Procurement of Agreement

The Affiliate represents and warrants that no person, entity or selling agency has been employed or retained to solicit or secure this Agreement upon an agreement or understanding for a commission, percentage, brokerage fee, contingency fee or any other compensation.  The Affiliate further represents and warrants that no payment, gift or thing of value has been made, given or promised to obtain this or any other agreement between the parties.  The Affiliate makes such representations and warranties to induce the Corporation to enter into this Agreement and the Corporation relies upon such representations and warranties in the execution hereof.

(b)    Conflict of Interest

The Affiliate represents and warrants that neither it nor any of its directors, officers, members, partners or Physician Providers has any interest and the Affiliate will not (and will use reasonable efforts to ensure that its directors, officers, members, partners and Physician Providers will not) acquire any interest, directly or indirectly, which would or is likely to conflict in any material manner or degree with the performance or rendering of the Contract Services herein provided.  The Affiliate further represents and warrants that in the performance of or the rendering of Contract Services under this Agreement no person having such interest or possible interest shall be employed by it.  Notwithstanding the foregoing, the Parties acknowledge that the Physician Providers may receive compensation from the Facility or other health care facilities including those maintained by the Affiliate, which shall not constitute a conflict of interest for purposes of this Section 23.1(b).

(c)    No Defaults

The Affiliate represents and warrants that it (i) is not in arrears to the City upon debt or contract and is not a defaulter, as surety or otherwise, upon any obligation to the City, and has not been declared not responsible or disqualified, by any agency of the City or State, nor is there any proceeding pending relating to the responsibility or qualification of the Affiliate to enter into any public contract and (ii) has paid all

**SUNY 001078**

applicable City income, excise and other taxes due from all years it has conducted business activities in the City.

(d)    The Affiliate represents and warrants that upon execution following approval by the State Comptroller and the State Attorney General, this Agreement will constitute a valid and binding agreement of the Affiliate, enforceable in accordance with its terms.

### 23.2    Representations and Warranties of the Corporation

The Corporation hereby represents and warrants that this Agreement constitutes a valid and binding agreement of the Corporation, enforceable in accordance with its terms. Neither the execution, delivery or performance of this Agreement, nor the consummation of the affiliation relationship hereby contemplated (i) conflicts with, will conflict with, or constitutes a default under, or will constitute a default under, any contract or other agreement to which the Corporation is a party or (ii) violates, or will violate, any Regulation by which the Corporation is bound.

### 23.3    Termination for Breach of Representations and Warranties

Any material breach or violation of the representations or warranties set forth in Sections 23.1 and 23.2 hereof shall be a material breach of this Agreement, and each of the Corporation and the Affiliate, respectively, shall have available to it all remedies at law or equity for a material breach.

### 23.4    Termination for Failure to Obtain Required Authorizations

The parties agree that in the event the Affiliate fails to obtain the authorization of the State Comptroller or the State Attorney General as required by Regulation or State of New York policy, and if the requirement for such authorization is not waived by the applicable State of New York Department or Agency, then this Agreement will be void and of no effect.

## 24. COVENANTS OF THE AFFILIATE AND THE CORPORATION

### 24.1    Physician Providers

In the performance of Contract Services under this Agreement, the Physician Providers shall be employees of the Affiliate.

**SUNY 001079**

24.2   Worker's Compensation, Disability Benefits, Minimum Wage and Unemployment Benefits

The Affiliate shall comply with all relevant sections of the Worker's Compensation laws and Minimum Wage laws, disability benefit and unemployment benefit laws of the State, and all relevant State labor laws for all covered Physician Providers.

24.3   Employment Status

Each party agrees that except as otherwise expressly provided in this Agreement, it will not itself, and will use reasonable efforts to ensure the Physicians it employs, and the Students and the Post-Graduate Trainees will not, hold itself or themselves out as, nor claim to be, officers or employees of the other party and that they will not, by reason hereof, make any claim, demand or application to or for any right or privilege applicable to an officer or employee of the other party including, but not limited to, Worker's Compensation coverage, Unemployment Insurance Benefits, Social Security coverage or employee retirement membership or credit.

24.4   Rights and Remedies

The rights and remedies of the Corporation and the Affiliate provided in this Agreement shall not be exclusive and are in addition to any other rights and remedies provided by law.

24.5   Compliance with Law

The Affiliate and the Corporation shall obtain all required approvals and licenses from appropriate Federal, State and City authorities and shall render all services and take all actions under this Agreement in accordance with the Regulations.

24.6   Federal Employment Practices

The Affiliate and its subcontractors, if any, shall comply with the Civil Rights Act of 1964 and any amendments thereto, and the rules and regulations thereunder.

24.7   Non-Discrimination Against the Disabled

The Affiliate shall comply with the provisions of Section 504 of the Rehabilitation Act of 1973, as amended, and all regulations, guidelines and interpretations issued pursuant thereto.

**SUNY 001080**

24.8  <u>Investigations</u>

(a)    The parties agree to cooperate fully and faithfully with any investigation, audit or inquiry in connection with matters arising out of this Agreement conducted by a State or City governmental agency or authority that is empowered directly or by designation to compel the attendance of witnesses and to examine witnesses under oath, or (in the case of the Affiliate) conducted by the Inspector General of the Corporation, or conducted by a governmental agency that is party in interest to the transaction, submitted bid, submitted proposal, contract, lease, permit or license that is the subject of the investigation, audit or inquiry.

(b)    (i)    If any person who has been advised that his or her statement, and any information from such statement, will not be used against him or her in any subsequent criminal proceeding, refuses to testify before a grand jury or other governmental agency or authority empowered directly or by designation to compel the attendance of witnesses and to examine witnesses under oath concerning the award of or performance under any transaction, agreement, lease, permit, contract or license entered into with the Corporation, City, State, or any political subdivision or public authority thereof, or the Port Authority of New York and New Jersey, or any local development corporation within the City, or any public benefit corporation organized under the laws of the State; or

(ii)    If any person refuses to testify for a reason other than the assertion of his or her privilege against self- incrimination or other lawful basis in an investigation, audit or inquiry in connection with matters arising out of this Agreement conducted by the Corporation, City or State governmental agency or authority empowered directly or by designation to compel the attendance of witnesses and to take testimony under oath, or by the Inspector General of the governmental agency that is a party in interest in, and is seeking testimony concerning the award of, or performance under, any transaction, agreement, lease, permit, contract or license entered into with the Corporation, City, the State, or any political subdivision thereof or any local development corporation within the City, THEN:

(c)    (i)    The president of the Corporation or commission or agency head whose agency is a party in interest to the transaction, submitted bid, submitted proposal, contract, lease, permit or license shall convene a hearing, upon not less than five (5) days' written notice to the parties involved to determine if penalties should attach for the failure of a person to testify.

(ii)    In the event that any non-governmental party to the hearing requests an adjournment, the commission or agency head who convened the hearing may, upon granting the adjournment, suspend any contract, lease, permit or

**SUNY 001081**

license of the party granted the extension pending the final determination, without the Corporation or City incurring any penalty or damages for delay or otherwise.

(d)    The penalties which may attach after a final determination by the President or by the commissioner or agency head may include but shall not exceed:

(i)    The disqualification for a period not to exceed five (5) years from the date of an adverse determination for any person, or any entity of which such person was a member at the time the testimony was sought, from submitting bids for, or transacting business with, or entering into or obtaining any contract, lease, permit or license with or from the Corporation or City; and/or

(ii)    The cancellation or termination of the rights or interests of the person or entity it represents in any and all existing Corporation or City contracts, leases, permits or licenses that the refusal to testify concerns and that have not been assigned as permitted under this Agreement, nor the proceeds of which pledged, to an unaffiliated and unrelated institutional lender for fair value prior to the issuance of the notice scheduling the hearing, without the Corporation or City incurring any penalty or damages on account of such cancellation or termination; money lawfully due for goods delivered, work done, rentals, or fees accrued prior to the cancellation or termination shall be paid by the City.

(e)    The President, commissioner or agency head shall consider and address in reaching his or her determination, and in assessing an appropriate penalty, the factors in paragraphs (i) and (ii), below. He or she may also consider, if relevant and appropriate, the criteria established in paragraphs (iii) and (iv), below, in addition to any other information which may be relevant and appropriate:

(i)    The parties' good-faith endeavors or lack thereof to cooperate fully and faithfully with any governmental investigation or audit, including, but not limited to, the discipline, discharge, or disassociation of any person failing to testify, the production of accurate and complete books and records, and the forthcoming testimony of all other members, agents, assignees or fiduciaries whose testimony is sought. In any case, if the President concludes that the Affiliate in good faith has done everything in its power to compel a person employed or controlled by the Affiliate to testify, the President shall not terminate this Agreement for that reason alone, but may invoke any other lesser remedy available to the Corporation.

SUNY 001082

(ii)     The relationship of the person who refuses to testify to any entity that is a party to the hearing, including, but not limited to, whether the person whose testimony is sought has an ownership interest in the entity and the degree of authority and responsibility the person has within the entity.

(iii)    The nexus of the testimony sought to the subject entity and its contracts, permits or licenses with the Corporation or City.

(iv)    The effect a penalty may have on an unaffiliated and unrelated party or entity that has a significant interest in an entity subject to penalties under (d), above, provided the party or entity has given actual notice to the commissioner or agency head upon the acquisition of the interest, or at the hearing called for in (c), above, gives notice and proves that such interest was previously acquired. Under either circumstance, the party or entity must present evidence at the hearing demonstrating the potential adverse impact a penalty will have on such person or entity.

(f)     (i)     The term "license" or "permit" as used herein shall be defined as a license, permit, franchise or concession not granted as a matter of right.

(ii)    The term "person" as used herein shall be defined as any natural person doing business alone or associated with another person or entity as a partner, director, officer, principal or Physician Provider.

(iii)   The term "entity" as used herein shall be defined as any firm, partnership, corporation, association or person that receives money, benefits, licenses, leases or permits from or through the Corporation, City, or otherwise transacts business with the City.

(iv)    The term "member" as used herein shall be defined as any person associated with another person or entity as a partner, director, officer, principal or employee.

24.9  Assignment

Neither party shall assign, transfer, convey, sublet or otherwise dispose of this Agreement, or any of its rights, title, interest, obligations or duties herein, in whole or in part, unless the prior written consent of the other party, and of the Office of the State Comptroller, where applicable, shall be obtained.

24.10 Subcontracting

SUNY 001083

The Affiliate agrees not to enter into any subcontracts for the performance of its obligations, in whole or in part, under this Agreement without the prior written approval of the Corporation. Notwithstanding the foregoing, the Affiliate shall have the right to delegate any of its administrative or management responsibilities hereunder to an entity wholly owned or controlled by the Affiliate upon written approval by the Corporation, which shall not be unreasonably withheld.

24.11 Publicity and Publication

If the Affiliate or the Corporation, or any of their respective employees, or any of the Physician Providers, Post-Graduate Trainees, Students, agents, or independent contractors at any time (either during the period when this Agreement is in effect, or after termination or cessation of this Agreement), publishes or otherwise publicly communicates material based on the work performed or data collected under this Agreement, then:

(a) The party so publishing or publicly communicating such material shall provide the other party with a copy of such material within a period of time prior to public communication such that the other party shall have sufficient time to provide comments to the authors.

(b) The Corporation and the Affiliate shall have a royalty-free, non-exclusive and irrevocable license to reproduce the material; provided that the parties shall relinquish such right if reasonably necessary to enable publication of a scholarly work.

24.12 Participation in an International Boycott

(a) The Affiliate agrees that neither the Affiliate nor any substantially owned affiliated company is participating or shall participate in an international boycott in violation of the provisions of the Export Administration Act of 1979, as amended, and the regulations of the United States Department of Commerce promulgated thereunder.

(b) Upon the final determination by the Commerce Department or any other agency of the United States as to, or conviction of, the Affiliate or substantially owned affiliated company thereof, or participation in an international boycott in violation of the provisions of the Export Administration Act of 1979, as amended, or the regulations promulgated thereunder, the Corporation may at its option terminate and render forfeit and void this Agreement.

SUNY 001084

(c)     The Affiliate shall comply, in all respects, with the provisions of Section 343-10.0 of the Administrative Code of the City and the rules and regulations issued by the Comptroller of the City thereunder.

### 24.13 Northern Ireland Certification

(a)     The Affiliate and any individual or legal entity in which the Affiliate holds a ten percent (10%) or greater ownership interest, and any individual or legal entity that holds a ten percent (10%) or greater ownership interest in the Affiliate either (i) has no business operations in Northern Ireland or (ii) shall take lawful steps in good faith to conduct any business operations in Northern Ireland in accordance with the MacBride Principles, and shall permit independent monitoring of their compliance with such principles.

(b)     For purposes of this Certification, "MacBride Principles" shall mean those principles relating to nondiscrimination in employment and freedom of workplace opportunity which require employers doing business in Northern Ireland to:

(i)     increase the representation of individuals from underrepresented religious groups in the work force, including managerial, supervisory, administrative, clerical and technical jobs;

(ii)     take steps to promote adequate security for the protection of employees from underrepresented religious groups both at the workplace and while traveling to and from work;

(iii)     ban provocative religious or political emblems from the workplace;

(iv)     publicly advertise all job openings and make special recruitment efforts to attract applicants from underrepresented groups;

(v)     establish layoff, recall and termination procedures which do not in practice favor a particular religious group;

(vi)     abolish all job reservations, apprenticeship restrictions and different employment criteria which discriminate on the basis of religion;

(vii)     develop training programs that will prepare substantial numbers of current employees from underrepresented groups for skilled jobs, including the expansion of existing programs and the creation of new programs to

**SUNY 001085**

train, upgrade and improve the skills of workers from underrepresented religious groups;

(viii) establish procedures to assess, identify and actively recruit employees from underrepresented religious groups with potential for further advancement; and

(ix) appoint a senior management staff member to oversee affirmative action efforts and develop a timetable to ensure their full implementation.

(c) The Affiliate agrees that the warranties and representations in Section 24.13(a) are material conditions of this Agreement. If the Corporation receives information that the Affiliate is in violation of Section 24.13(a), the Corporation shall review such information and give the Affiliate and any other relevant party opportunity to respond. If the Corporation finds that such a violation has occurred, the Corporation may declare the Affiliate in default and/or terminate this Agreement upon 30 days' prior notice. In the event of any such termination, the Corporation may procure the supplies, services or work from another source in any manner the Corporation deems proper. The Affiliate shall pay to the Corporation, or the Corporation, in its sole discretion, may withhold from any amounts otherwise payable to the Affiliate, the difference between the contract price for the uncompleted portion of this Agreement and the cost to the Corporation of completing performance of this Agreement either by itself or by engaging another contractor. In addition, the Affiliate may be declared not to be a responsible bidder or proposer for up to three (3) years, following written notice to the Affiliate, giving the Affiliate the opportunity for a hearing at which the Affiliate may be represented by counsel. The rights and remedies of the Corporation hereunder shall be in addition to, and not in lieu of, any rights and remedies the Corporation has pursuant to this Agreement or by operation of law or in equity.

24.14 Antitrust

The Affiliate hereby assigns, sells and transfers to the Corporation and the City all right, title and interest in and to any claims and causes of action arising under the antitrust laws of the State or of the United States relating to the particular goods or services purchased or procured by the Corporation under this Agreement.

## 25. MISCELLANEOUS

25.1 General Release

The acceptance by the Affiliate or its assignees of the final payment for each Fiscal Year under this Agreement shall constitute and operate as a general release to

SUNY 001086

the Corporation and the City from any liability to the Affiliate based on a contractual claim for Semi-Monthly Payments except (i) for any claims then in dispute and (ii) as set out on Attachment B. Notwithstanding the foregoing, each such release shall remain subject to (i) the right of the Affiliate to audit Semi-Monthly Payments made by the Corporation to the Affiliate during each Fiscal Year for the twelve (12) month period following the end of such Fiscal Year; and (ii) the right of the State Comptroller to conduct any audit, with respect to such Semi-Monthly Payments, that may be authorized or required by law.

### 25.2   Claims and Actions Thereon

(a)   No action at law or proceeding in equity against the Corporation or the Affiliate shall lie or be maintained upon any claim based upon this Agreement or arising out of this Agreement or in any way connected with this Agreement unless the Affiliate or the Corporation, as the case may be, shall have complied with all requirements relating to the giving of notice and of information with respect to such claims, all as herein provided and as required by applicable law.

(b)   In the event that a claim is made or an action is brought by a third party relating to this Agreement, each of the Affiliate and the Corporation shall render to the other (and to the City) such reasonable assistance as they may require.

(c)   Each of the Affiliate and the Corporation shall report to the other in writing within ten (10) working days, or reasonably promptly thereafter, of the initiation by or against the Affiliate or the Corporation of any legal action or proceeding by a third party in connection with or relating to this Agreement.

### 25.3   No Claim against Officers, Agents or Employees

(a)   No claim shall be made by the Affiliate for personal liability against any individual officer, agent or employee of the Corporation or City for, or on account of, anything done or omitted in connection with this Agreement, provided such acts done or omitted were within the scope of that person's employment or authority.

(b)   No claim shall be made by the Corporation or the City for personal liability against any individual officer, agent or employee of the Affiliate for, or on account of, anything done or omitted in connection with this Agreement, provided such acts done or omitted were within the scope of that person's employment or authority.

### 25.4   Waiver

SUNY 001087

Waiver by the Corporation or the Affiliate of a breach of any provision of this Agreement shall not be deemed to be a waiver of any other or subsequent breach and shall not be construed to be a modification of the terms of the Agreement unless and until the same shall be agreed to in writing by the Corporation or the Affiliate, and shall be attached to the original Agreement.

### 25.5 Notices

The Affiliate and the Corporation hereby designate the business addresses specified on Attachment P as the places where all notices, direction or communications from one such party to the other party shall be delivered, or to which they shall be mailed.

Correspondence from the Corporation or the Chief Executive concerning services provided under or issues pertaining to this Agreement shall be sent or copied to the designated administrative representative of the Affiliate. Actual delivery of any such notice, direction or communication to a party at the aforesaid place, or delivery by certified mail, return receipt requested, shall be conclusive and deemed to be sufficient service thereof upon such party as of the date such notice, direction or communication is received by the party. Such address may be changed at any time by an instrument in writing executed and acknowledged by the party making such change and delivered to the other party in the manner as specified above. Nothing in this Section 25.5 shall be deemed to serve as a waiver of any requirements for the service of notice or service of process in the institution of an action or proceeding as provided by law.

### 25.6 All Legal Provisions Deemed Included

It is the intent and understanding of the parties to this Agreement that each and every provision of law required to be inserted in this Agreement shall be and is inserted herein, including but not limited to the standard provisions required by the State in all its contracts, which provisions are attached hereto as Attachment Q. Furthermore, it is hereby stipulated that every such provision is to be deemed to be inserted herein, and if, through mistake or otherwise, any such provision is not inserted, or is not inserted in correct form, then this Agreement shall forthwith upon the application of either party be amended by such insertion so as to comply strictly with the law and without prejudice from such omission to the rights of either party hereunder.

### 25.7 Severability

If this Agreement contains any unlawful provision that is not an essential part of the Agreement and that shall not appear to have been a controlling or material inducement to the making thereof, the same shall be deemed of no effect and shall, upon

SUNY 001088

notice by either party, be deemed stricken from this Agreement without affecting the binding force of the remainder of the Agreement.

### 25.8 Political Activity

There shall be no partisan political activity or any activity to further the election or defeat of any candidate for public, political or party office as part of or in connection with this Agreement, nor shall any of the Semi-Monthly Payments provided under this Agreement be used for such purposes.

(a) No Semi-Monthly Payment provided under this Agreement shall be used to pay the salary or expenses of any person to engage in any activity designed to influence legislation or appropriations pending before the Congress of the United States.

### 25.9 Modification

This Agreement may be modified by the parties to this Agreement only in writing. It may not be altered or modified orally.

### 25.10 Paragraph Headings

Paragraph headings are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of intent of this Agreement and in no way affect this Agreement.

### 25.11 Merger

This written Agreement, together with all of the Attachments, Annexes, side letters and other documents attached hereto and made a part hereof, contains all the terms and conditions agreed upon by the parties hereto, and no other agreement, oral or otherwise, regarding the subject matter of this Agreement shall be deemed to exist or to bind any of the parties hereto, or to vary any of the terms contained herein.

### 25.12 No Removal of Records From Premises

Where performance of this Agreement involves use by either party of the other party's papers, files, data or records at the other party's facilities or offices, neither party shall remove any such papers, files, data or records therefrom without the prior approval of the other party, which shall not unreasonably be withheld.

### 25.13 Inspection of Site

**SUNY 001089**

The Corporation shall have the right to have representatives of the Corporation, City, State or United States Government present at the site of the engagement to inspect the work being performed by the Affiliate. Whenever practicable, reasonable prior notice shall be provided to the Affiliate as to the date and nature of such an inspection.

## 25.14 Access to Records by the Federal Government

(a) The parties agree that until the expiration of four (4) years after the furnishing of Contract Services pursuant to this Agreement, the Affiliate shall make available, upon written request of the Secretary of Health and Human Services or the Comptroller General of the United States or any of their duly authorized representatives, copies of this Agreement and any books, documents, records and other data of the Affiliate that are necessary to certify the nature and extent of costs incurred by the Corporation for such Contract Services; and

(b) In the event that the Affiliate performs any of its duties under this Agreement through a subcontract with a related organization involving a value or cost of $20,000 or more over a twelve (12) month period, the Affiliate shall cause such subcontract to contain a clause to the effect that, until the expiration of four (4) years after the furnishing of any services pursuant to said subcontract, the related organization shall make available, upon written request of the Secretary of Health and Human Services or the Comptroller General of the United States or any of their duly authorized representatives, copies of said subcontract and any books, documents, records and other data of such related organization that are necessary to certify the nature and extent of costs incurred by Affiliate for such services.

## 25.15 Clean Air Act

If the amount of this Agreement is in excess of $100,000, the Affiliate shall comply with all applicable standards, orders or regulations issued pursuant to the Clean Air Act of 1970, as amended (42 U.S.C. §185b, et seq.), and the Federal Water Pollution Act (33 U.S.C. §1251 et seq.)

## 25.16 Survival

The obligations with respect to disaffiliation set forth in Section 19, the covenants set forth in Section 24.11, the indemnification obligations set forth in Section 18 hereof (subject to Section 18.7 hereof), the obligations of the parties to share revenues from the commercialization of Joint IP as set forth in Section 22.5 and any other term which by its nature must survive in order to fulfill a party's obligations incurred while this Agreement was in effect, shall survive the expiration or earlier termination of

**SUNY 001090**

this Agreement.  In addition, all other provisions shall survive which, by their express terms, survive the expiration or earlier termination of this Agreement.

### 25.17 Exclusion of Third Party Rights

Except as may be specifically set out herein, the parties do not intend that anything contained in this Agreement shall extend rights to any person or entity who is not a party hereto.

### 25.18 Execution

(a)    The signatories below hereby represent and warrant that (i) they are authorized to execute this Agreement on behalf of the Corporation, the Affiliate, the New York State Attorney General, and the New York State Comptroller, respectively; and (ii) the Agreement, as approved by the New York State Attorney General and the New York State Comptroller, which approvals are evidenced by the signatures of their respective representatives below, shall be a binding and enforceable contract between the parties effective as of July 1, 2013.

(b)    This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.  The exchange of copies of this Agreement and of signature pages by facsimile or other electronic transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by duly authorized officers as of the day and year first written above.

**SUNY 001091**

Contract Number: X800141
Agency Code: 3320218

**THE NEW YORK CITY HEALTH AND HOSPITALS CORPORATION**

By: _____

Name: _____

Date: _____

**SUNY HEALTH SCIENCE CENTER AT BROOKLYN**

By: _____

Name: _____

Date: _____

AGREED AND APPROVED

**NEW YORK STATE ATTORNEY GENERAL**

By: _____

Name: _____

Date: _____

**NEW YORK STATE COMPTROLLER**

By: _____

Name: _____

Date: _____

84614790_5

EXHIBIT 1

**ATTACHMENTS TO AFFILIATION AGREEMENT WITH
SUNY HEALTH SCIENCE CENTER AT BROOKLYN
FOR SERVICES AT
KINGS COUNTY HOSPITAL CENTER**

**ANNEXES AND RELATED REQUIRED REPORTS**

## ATTACHMENTS

Attachments are documents that identify specific terms within the Affiliation contract.
The Attachments required by the Affiliation Contract follow:

| | |
|---|---|
| **Attachment A:** | Roster of Physician Providers. |
| **Attachment B:** | Compensation. |
| **Attachment C:** | Job Descriptions - Chiefs of Service. |
| **Attachment D:** | Chiefs of Service - Outside Activities. |
| **Attachment E:** | Third Party Reimbursement Programs. |
| **Attachment F:** | Physician Providers - Board Certification. |
| **Attachment G:** | Student FTEs. |
| **Attachment H:** | Affiliate's Guidelines for Academic and Professional Qualification |
| **Attachment I:** | Facility Physicians - SUNY. |
| **Attachment J:** | Resident FTEs. |
| **Attachment K:** | [Intentionally Omitted] |
| **Attachment L:** | Corporation's Code of Ethics. |
| **Attachment M:** | Corporation Operating Agreement. |
| **Attachment N:** | Letters dated May 25, 1983 and June 11, 1993 between the City of New York and the Corporation Regarding Indemnification. |

**SUNY 001093**

| Attachment O: | Master Premises Agreement. |
| Attachment P: | Notification of Parties. |
| Attachment Q: | New York State standard contract provisions. |
| Attachment R: | Performance Indicators. |

## ANNEXES

Annexes are reports required under the affiliation contract to monitor activity and ensure compliance. A comprehensive document is submitted annually and quarterly updates identify only those components that have been modified, added or deleted from a previous annex or quarterly report.

Annexes are submitted first to the Facility or Network for review and sign-off. The facility then submits the annual annexes or quarterly updates to the Office of Professional Services and Affiliations. The annual annexes are due in July of each year with the quarterly updates due approximately forty-five (45) days after the end of the preceding quarter as identified below:

First Quarter: November 15
Second Quarter: February 15
Third Quarter: May 15
Fourth Quarter: August 15

The annexes and related reports required by the affiliation contract are as follows:

**Annex A Part 1: Management of Clinical Services:** This annex, submitted annually, provides information on the Affiliate clinical leadership at the Facility. It identifies the chief of service, medical director, department heads and supervisors of sub-specialty services and the supervisor of medical education by department of service. The report includes New York State license number, mailing addresses, telephone, fax numbers and e-mail addresses.

**Annex A, Part 2: Roster of Contract Service Providers – Annual and Quarterly Report:** This annex is submitted annually and updated quarterly. It lists the providers, establishes the budgeted compensation and segregates data into workload based, non-workload based and service grant related categories. Further, it summarizes all provider costs and Full Time Equivalents (FTE). The annual roster provides information regarding each contract service provider including provider type, natural expense classification (NEC), department, applicable section or division, name, title, New York State license number, union membership, compensation (including fringe benefit cost)

2

**SUNY 001094**

and FTE effort as specified in each agreement. Quarterly updates identify additions, deletions and modifications to staffing and compensation during the reporting quarter. Cost and FTE information are summarized by department and NEC on the **Summary of Workload Based Contract Service Provider Costs & FTEs**, the **Summary of Non-Workload Based Contract Service Provider Costs & FTEs** or the **Summary of Service Grant Based Provider Costs & FTEs**.

**Annex A, Part 5: Contract Service Providers – FTE Quarterly Report:** This annex, submitted quarterly, reports FTE information by NEC classification.

**Annex B: Affiliation Contract Projected Payments:** Annex B, submitted at the inception of a new or renewed agreement, establishes the initial annual dollars budgeted for the fiscal year. This annex summarizes the amounts reported from the Annex A Part 2 summary reports. It calculates the first semi-monthly payment of a new contract and identifies the part of each payment attributable to workload, non-workload and service grants activities.

**Annex C, Part I: Postgraduate Training Programs:** This annex, submitted annually, is comprised of three (3) data sheets that summarize information regarding all graduate medical education programs occurring at the Facility. The first data sheet, **Summary of Postgraduate Training Programs,** reports program name, program director, program director New York State license number, telephone number, program type, American College of Graduate Medical Education (ACGME) status, program ID number, length of program (in years), last review date, next review date, total number of FTE Postgraduate Year (PGYs) students at the facility and the designated provider program. The second data sheet, **Summary of Postgraduate Trainees at the Program Level,** summarizes information regarding postgraduate program training. It identifies the total number of PGYs in each program, the number of Foreign Medical Graduates (FMGs), U.S. Foreign Medical Graduates (USFMGs) and U.S. Medical Graduates (USMGs) by number and percentage, and information about the match for level-one PGYs. The third data sheet, **Summary of Postgraduate Trainees at the Facility Level,** details information by PGY level at the Facility. For example, a report identifies how many residents are in the medicine department by PGY level.

**Annex C, Part 3: Master Roster of All Postgraduate Trainees Rotating Through Facility:** This annex, submitted annually, is the list of residents rotating through HHC facilities used by facilities to ensure compliance with resident working hours (Bell 405 and ACGME regulations). The annex identifies residents by name, payroll location, social security number, program name and PGY level.

**Annex D, Part 1: Fee Statements:** The Fee Statement is used to report expenses in a format that facilitates entry into the Corporation's General Ledger (G/L) as per the agreement.

3

**SUNY 001095**

**Annex D, Part 2: Recalculation of Affiliate Payment:** Using information from the Fee Statements, this document reconciles the amount due, revises the budget, and calculates the first revised semimonthly payment (which includes any lump sum due). The payment components are calculated by workload, non-workload, service grant and contractual adjustment and are identified by service, department, grant program or type of adjustment.

**Annex E: Affiliate Sponsored Research and Grant Activities at Corporate Facility:** Annex E is submitted annually with quarterly updates from the effective date of the contract. The annex provides a comprehensive summary of research and research grant activities (funded and unfunded) conducted by Principal Investigators both on and not on the affiliate contract at the Facility.

Active protocols as of July 1 of the reported fiscal year are reported on the annual submission. Protocols for which there has been a change in status are reported on a quarterly Annex E submission. The quarterly reports identifies protocols that are new, renewed, concluded, discontinued, withdrawn, or have become inactive.

**Annex F: Performance Indicators Report:** This annex, submitted quarterly, reports on contractually agreed indicators to monitor affiliate performance.

100155626_1

**SUNY 001096**

| Department/ Division | Annualized Salaries | | Fringe Benefit Rate Applied to Salaries | | Total Annualized Salaries increased by Fringe Benefit Rate | | FTEs |
|---|---|---|---|---|---|---|---|
| **Psychiatry** | | | | | | | |
| Adult | $ | 664,586 | $ | 153,785 | $ | 818,371 | 3.70 |
| Child | $ | 707,845 | $ | 163,795 | $ | 871,640 | 4.00 |
| Emergency Room | $ | 15,000 | $ | 3,471 | $ | 18,471 | 0.20 |
| Chemical Dependency | $ | 158,052 | $ | 36,573 | $ | 194,625 | 1.00 |
| Radiology | $ | 7,909,694 | $ | 1,830,303 | $ | 9,739,997 | 20.15 |
| Radiation Oncology | $ | 372,727 | $ | 86,249 | $ | 458,976 | 1.29 |
| Emergency Medicine | $ | 1,655,543 | $ | 383,093 | $ | 2,038,635 | 8.00 |
| Ophthalmology | $ | 705,548 | $ | 163,264 | $ | 868,812 | 2.56 |
| Pediatrics | $ | 222,073 | $ | 51,388 | $ | 273,461 | 0.85 |
| Other Services | $ | 268,626 | $ | 62,160 | $ | 330,786 | 1.01 |
| **TOTAL** | $ | **12,679,694** | $ | **2,934,081** | $ | **15,613,775** | **42.76** |

*NOTES:*

*1. The "Annualized Salaries" for individual Physician Providers on this Attachment A include amounts, such as those designated, per the policies of the Affiliate, as for "Extra Service" or "Also Receives," which do not constitute components of "basic annual salary" as defined in the collective bargaining agreement covering such Providers (the "UUP CBA"), and thus are not to be included in the calculation of reimbursable COLA per § II.C.3c of Att. B to the Agreement. Notwithstanding anything to the contrary, in determining Compensation Due for Provider Services per Attachment B, that portion of the Annualized Salary on this Attachment A, and/or the Affiliate's actual salary costs, for a given Physician Provider, that may be identified to "basic annual salary," as opposed to "Extra Service" or "Also Receives," shall be no greater than the percentage of total compensation paid by the Affiliate to such individual that is properly characterized as "basic annual salary."*

*2. For purposes of this Attachment A, one FTE shall mean 2,080 Contract Services Hours per year, as defined in § IV.A.1 of Attachment B to the Agreement, except as modified per § IV.A.2 thereof. Contract Services Hours, per Attachment B, refers to hours for which a Physician Provider is compensated by the Affiliate, that are: (i) actually spent by that Physician Provider furnishing Contract Services on-site at the Facility (inclusive of any lunch break taken of at most one half-hour per eight-hour shift), or (ii) for Physician Providers paid on an other-than-hourly basis, constitute reasonably authorized time off actually taken for illness, vacation, holidays and/or continuing medical education that is proportionately allocated to the Contract Services portion of the total services for which such Physician Provider is compensated by the Affiliate.*

*3. For purposes of § II.C.2a of Attachment B, the "Affiliate's actual salary costs to the extent properly apportioned to their time spent in the furnishing of Contract Services on-site at the Facility," for a given Payment Period & Attachment A line, shall mean proportionately allocated to the associated Contract Services time, relative to the total time spent by the associated Physician Provider during such period in the furnishing of all services, regardless of location or beneficiary, for which such Physician Provider is compensated by the Affiliate.*

**SUNY 001097**

| Name | Title | Annualized Salary | FTE |
|---|---|---|---|
| **ADULT PSYCHIATRY** | | | |
| Berkowitz, Ellen (MD)* | Program Director | $ 58,608 | 0.40 |
| Estes, David (MD) | Internist | $ 203,752 | 1.00 |
| Myers, Michael F. (MD)* | Program Director | $ 58,432 | 0.30 |
| Narasimhan, Narasimhan L. (MD) | Psychiatrist | $ 177,762 | 1.00 |
| Rubel, Steven (MD) | Psychiatrist | $ 166,032 | 1.00 |
| *Total Adult Psychiatry* | | *$ 664,586* | *3.70* |
| | | | |
| **CHILD PSYCHIATRY** | | | |
| Engel, Lenore (MD) | Psychiatrist | $ 208,360 | 1.00 |
| Jacques, Jean-Robert (MD) | Psychiatrist | $ 158,053 | 1.00 |
| Pedron-Santiago J. (MD) | Psychiatrist | $ 170,498 | 1.00 |
| Plantin, Moise (MD) | Psychiatrist | $ 170,934 | 1.00 |
| *Total Child Psychiatry* | | *$ 707,845* | *4.00* |
| | | | |
| **PSYCHIATRY EMERGENCY ROOM** | | | |
| Viswanathan, Ramaswany (MD) | Psychiatrist | $ 15,000 | 0.20 |
| *Total Psychiatry Emergency Room* | | *$ 15,000* | *0.20* |
| | | | |
| **CHEMICAL DEPENDENCY -- INPATIENT DETOXIFICATION** | | | |
| Singh, Chadra B. (MD) | Internist | $ 158,052 | 1.00 |
| *Total Chemical Dependency* | | *$ 158,052* | *1.00* |
| | | | |
| **Total Psychiatry** | | $ 1,545,483 | 8.90 |

\* *Providers designated as Program Directors in the Department of Psychiatry furnish Contract Services only as administrators for the Post-Graduate Training Program; they are not credentialed to perform clinical services at the Facility. Notwithstanding anything to the contrary, this Attachment A shall incorporate a total of exactly 0.70 FTEs for Program Director lines in the Department of Psychiatry, with the Annualized Salary for each associated Attachment A line determined by applying the Attachment A FTE for that particular Program Director line to the total compensation paid by the Affiliate to such individual.*

**SUNY 001098**

## RADIOLOGY

| Name | Title | Annualized Salary | FTE |
|---|---|---|---|
| Amodio, John B. (MD) | Physician | $ 200,000 | 0.40 |
| Areman, Russell D. (MD) | Physician | $ 366,261 | 1.00 |
| Chaudury, Riffat R. (MD) | Physician | $ 445,985 | 1.00 |
| Chen, Qi Xin | Physician | $ 351,469 | 1.00 |
| Goldfisher, Rachel (MD) | Physician | $ 345,500 | 1.00 |
| Greenberg, Obed (MD) | Physician | $ 351,469 | 1.00 |
| Hammill, Patrick (MD) | Physician | $ 411,054 | 1.00 |
| Hanley, Claire E. (MD) | Physician | $ 319,610 | 0.80 |
| Herskowitz, Michael (MD) | Physician | $ 169,827 | 0.40 |
| Kantor, Alan M. (MD) | Chief of Service | $ 427,299 | 1.00 |
| Kolla, Srinivas R. (MD) | Physician | $ 213,649 | 0.50 |
| Lehto, Scott A. (MD) | Physician | $ 185,062 | 0.50 |
| Mangla, Sundeep (MD) | Physician | $ 75,900 | 0.20 |
| Mason, Catherine (MD) | Physician | $ 335,867 | 1.00 |
| Pulitzer, Steven (MD) | Physician | $ 389,612 | 1.00 |
| Roitberg, Daphne (MD) | Physician | $ 282,507 | 0.60 |
| Reede, Deborah L. (MD) | Chair | $ 27,000 | 0.05 |
| Samin, Amiram (MD) | Physician | $ 341,862 | 1.00 |
| Strashun, Arnold (MD) | Physician | $ 287,840 | 0.70 |
| Velayudhan, Vinodkumar (MD) | Physician | $ 344,000 | 1.00 |
| Waite, Stephen A. (MD) | Physician | $ 201,173 | 0.50 |
| Walsh, James (MD) | Physician | $ 380,304 | 1.00 |
| Zinn, Daniel (MD) | Physician | $ 408,018 | 1.00 |
| Vacant | Physician | $ 351,470 | 1.00 |
| Vacant | Physician | $ 60,754 | 0.20 |
| Vacant | Physician | $ 61,003 | 0.20 |
| *Total Non-Sessional FTEs* | | *$ 7,334,495* | *19.05* |
| *Interventional Radiology On-Call Coverage Pool* | | *$ 156,000* | *0.30* |
| *Supplemental Emergency Room Coverage Pool* | | *$ 419,199* | *0.80* |
| **Total Radiology** | | **$ 7,909,694** | **20.15** |

NOTES:

*1. At a minimum, the Affiliate shall provide, consistent with the terms of this Agreement: (i) on-site Physician coverage of the Emergency Medicine Department at the Facility from seven o'clock in the morning to eleven o'clock in the evening on all regular weekdays, and from eight o'clock in the morning to six o'clock in the evening on all weekends and holidays; and (ii) all necessary general and subspecialty Radiologist services offered at the Facility, where such subspecialties shall include, at a minimum, interventional radiology, interventional neuroradiology, gastro-intestinal/genito-urinary radiology, pediatric radiology, neuroradiology, ultrasound, nuclear medicine, CT scanning, chest imaging, body imaging (CT & MRI), mammography (screening and diagnostic) and interventional angiography.*

*2. During the following shifts, a Physician who is furnishing, throughout a particular shift, services at/for both the Facility and the Affiliate's Hospital, and is actually on-site at the Facility as needed to provide all required clinical/ancillary/coverage and teaching/administration/supervision services for the Radiology Department during that shift, will be deemed to be providing Contract Services on-site at the Facility for that entire shift, albeit that some of that time may be spent providing services at/to the Affiliate's Hospital: (i) weekend and holiday shifts; (ii) up to two eight-hour shifts per week each for gastro-intestinal/genito-urinary radiology services and interventional neuroradiology services; (iii) up to five eight-hour shifts per week for chest imaging services; and (iv) an average of one additional eight-hour shift per week by a Physician furnishing time-off coverage for the attending physician regularly assigned to the Facility or the Affiliate's Hospital for that shift.*

*3. During any shift in which a Physician Provider is furnishing Contract Services at/for the Affiliate's Hospital, and also providing services at/for the Affiliate's Hospital, priority shall be given to services needed at/for the Facility, including, but not limited to, the reading of radiological examinations performed on the Facility's patients, unless otherwise dictated by clinical exigencies.*

**SUNY 001099**

## RADIATION ONCOLOGY

| Name | Title | Annualized Salary | | FTE |
|------|-------|-------------------|--|-----|
| Choi, Kwang (MD) | Physician | $ | 37,722 | 0.18 |
| Rotman, Marvin (MD) | Chief of Service | $ | 8,430 | 0.11 |
| Schwartz, Michael S. (MD) | Physician | $ | 326,575 | 1.00 |
| Total | | $ | 372,727 | 1.29 |

**SUNY 001100**

## EMERGENCY MEDICINE

| Name | Title | Annualized Salary | FTE |
|------|-------|------------------:|----:|
| Baron, Bonny (MD) | Physician | $ 221,277 | 1.00 |
| Butler, Mincalene (MD) | Physician | $ 52,000 | 0.25 |
| Lucchesi, Michael (MD) | Chair | $ 84,176 | 0.25 |
| Rinnert, Stephan (MD) | Program Director | $ 215,880 | 1.00 |
| Rooney, Marie-Laure (MD) | Physician | $ 204,000 | 1.00 |
| Wiener, Sage (MD) | Physician | $ 102,250 | 0.50 |
| Wolfram, Sigrid H. (MD) | Physician | $ 102,250 | 0.50 |
| Vacant | Physician | $ 91,152 | 0.50 |
| Vacant | Physician | $ 100,857 | 0.50 |
| Vacant | Physician | $ 189,695 | 1.00 |
| Vacant | Physician | $ 92,006 | 0.50 |
| *Total Non-Sessional FTEs* | | *$ 1,455,543* | *7.00* |
| *Supplemental Emergency Medicine Coverage Pool* | | $ 200,000 | 1.00 |
| Total | | $ 1,655,543 | 8.00 |

**SUNY 001101**

## OPHTHALMOLOGY

| Name | Title | Annualized Salary | FTE |
|---|---|---|---|
| Lazzaro, Emanuel C. (MD) | Physician | $ 69,920 | 0.30 |
| McNally, Lois (MD) | Physician | $ 50,875 | 0.27 |
| Michael, Anika (MD) | Physician | $ 71,934 | 0.32 |
| Olumba, Kenneth (MD) | Physician -- Retinal | $ 181,470 | 0.60 |
| Shrier, Eric (MD) | Physician -- Retinal | $ 72,634 | 0.20 |
| Shrier, Eric (MD)* | Consult Physician at WMMHC | $ 36,317 | 0.10 |
| Dimiceli, Camille (MD) | Physician | $ 67,094 | 0.23 |
| Kaufman, S. (MD) | Physician | $ 80,014 | 0.24 |
| Irak, D. (MD) | Physician | $ 75,290 | 0.30 |
| **Total** | | $ 705,548 | **2.56** |

*Contract Services shall include neonatal retinopathy consult services furnished at Woodhull Medical and Mental Health Center, at 0.1 FTE of Physician Provider effort, as reflected herein via Dr. Eric Shrier's 0.1 FTE line.*

**SUNY 001102**

**PEDIATRICS**

| Department | Name | Title | Annualized Salary | | FTE |
|---|---|---|---|---|---|
| Pediatrics | Fisher, Stanley (MD) | Chair | $ | 60,000 | 0.25 |
| Pediatrics | Nathan, Radha (MD) | Gastroenterologist | $ | 55,136 | 0.20 |
| Pediatrics | Rabinowitz, Simon (MD) | Gastroenterologist | $ | 29,382 | 0.11 |
| Pediatrics | Schwartz, Steven (MD) | Gastroenterologist | $ | 48,173 | 0.18 |
| Pediatrics | Xu, Jiliu (MD) | Gastroenterologist | $ | 29,382 | 0.11 |
| | | *Total Pediatrics* | *$* | *222,073* | *0.85* |

**SUNY 001103**

Attachment A

OTHER SERVICES

| Department | Name | Title | Annualized Salary | FTE |
|---|---|---|---|---|
| Anesthesiology | Lipps, Peter (MD)* | Physician | $ 151,833 | 0.81 |
| | | *Total Anesthesiology* | $ 151,833 | 0.81 |
| IMSAL | Papanagnou, Dimitros (MD) | Physician | $ 36,350 | 0.20 |
| | | *Total IMSAL* | $ 36,350 | 0.20 |
| Neurosurgery | Supplementary Coverage Pool** | Physician | $ 80,443 | N/A |
| | | *Total Neurosurgery* | $ 80,443 | N/A |
| **Total All "Other Services"** | | | $ 268,626 | 1.01 |

*Notwithstanding any provisions of the Agreement to the contrary, the Corporation may, at its sole discretion, roll over Dr. Lipps to the Facility's payroll.*

**The Affiliate shall furnish on site coverage on an as needed basis for the minimum "Annualized Salary" amount set forth in the above table.*

SUNY 001104

## ATTACHMENT B

## Compensation

## I. Payments for Contract Services

### A. Scope of Payments

Except as otherwise specified in the Agreement, all payments to the Affiliate for Contract Services shall: (i) be made in the form of Semi-Monthly Payments, in accordance with this Attachment and Sections 9 and 10 of the Agreement; (ii) constitute compensation only, and in full for, such Contract Services; and (iii) be reconciled to compensation due to the Affiliate on a "Payment Period" basis (per subsection B below), pursuant to this Attachment. Notwithstanding the foregoing, the Parties agree that the payment amounts and processes set forth in this Attachment B are exclusive of any amounts that either Party may owe to the other pursuant to Section 10.4 of the Agreement.

### B. Payment Periods

"Payment Periods" shall mean the consecutive six-month periods beginning on July 1, 2013 and ending on June 30, 2015; provided, however, that the parties may mutually agree, in writing, in the interest of administrative ease, to deem any given Fiscal Year to be a single Payment Period (making corresponding adjustments to any payments or amounts due, as set forth herein or otherwise in the Agreement, as may be required to reflect such single Payment Period for the entire Fiscal Year).

### C. Payment Amounts

1. All Semi-Monthly Payment amounts determined pursuant to this section I.C shall be subject to adjustment to reflect reductions or increases provided for in the Agreement.

2. For the Payment Period beginning July 1, 2013, an opening "Prospective Payment Amount" shall be established, subject to reconciliation to "Total Compensation Due" and adjustment per the succeeding sections hereof, in the amount of $8,067,596 for Contract Services furnished during such Payment Period. Such amount shall be: (i) exclusive of any amounts that otherwise may be due between the Parties for services furnished prior to July 1, 2013 pursuant to any predecessor agreement; and (ii) paid in the form of Semi-Monthly Payments made in the amount of $672,300 during such Payment Period.

100102824_4

3.     Subject to the other provisions of this section I.C, the amount of each Semi-Monthly Payment due during any Payment Period shall be equal to: (i) for Semi-Monthly Payments due prior to a "Reconciliation Date" (per section I.D.2), the amount of the preceding Semi-Monthly Payment, determined without respect to any "Reconciliation Amount" (per section I.D.3) or portion thereof, or any adjustments per subsection 1 above, that may be reflected therein; and (ii) for Semi-Monthly Payments due on or after such a "Reconciliation Date," the "Revised Semi-Monthly Payment Amount" for the current Payment Period as of such Date, per section I.D.1, and except as otherwise specified therein, plus any "Reconciliation Amount" or portion thereof per the succeeding paragraph hereto.

4.     The first Semi-Monthly Payment due on or after a given Reconciliation Date, shall be adjusted by the "Reconciliation Amount" (per section I.D.3) for the associated Payment Period or Payment Periods. In the event that such adjustment is negative and would result in a negative Semi-Monthly Payment amount, succeeding Semi-Monthly Payments shall be reduced until the entire adjustment amount has been recouped by the Corporation.

5.     Semi-Monthly Payment amounts may also be adjusted as follows: (i) in the event that there is a modification per, or amendment to, the Agreement with effective date during or preceding the current Payment Period that has not otherwise been reflected in the current Semi-Monthly Payment amount, and a Recalculation Document (per section III.E below) is not otherwise due, the Corporation may choose, upon written agreement of the Affiliate and submission by the Affiliate of the Corporation's Interim Payment Document and any documentation and back-up thereto as is reasonably required by the Corporation, to effect an associated interim change in the amount of one or more Semi-Monthly Payments to be made, and (ii) in the event that the Affiliate has failed, following reasonable notice from the Corporation, to timely submit a materially complete and accurate Recalculation Document for any Payment Period, and the Corporation reasonably expects that such Document would result in a reduction in Semi-Monthly Payments to the Affiliate, the Corporation may choose to implement a reasonably projected reduction thereto pending submission of the Recalculation Document, and will so notify the Affiliate in writing.

D.     Definitions

1.     The "Revised Semi-Monthly Payment Amount" for a given Payment Period as of a particular Reconciliation Date shall be equal to one-twelfth of the Prospective Payment Amount (per subsection 4 below), except that the first Semi-Monthly Payment due on or after the Reconciliation Date shall also include a lump sum adjustment equal to the difference between (i) the aggregate amount paid prior to such Reconciliation Date and (ii) one-twelfth of such Prospective Payment Amount multiplied by the number of payments made prior to such Reconciliation Date.

**SUNY 001106**

2.    A "Reconciliation Date" shall be a date designated by the Corporation, which shall be within a reasonable time after the Corporation has received a materially complete and accurate Recalculation Document from the Affiliate (per section III.E of this Attachment B, or of Attachment B to the predecessor Agreement between the parties). No Recalculation Document shall be deemed materially complete and accurate for any Payment Period unless the Corporation has previously or simultaneously received a materially complete and accurate Recalculation Document for all preceding Payment Periods.

3.    The "Reconciliation Amount" for a given Payment Period, shall be equal to (i) the Total Compensation Due for that Payment Period (per section II.B), minus (ii) the total amount paid, prior to the Reconciliation Date therefor, for Contract Services furnished during such Payment Period. The Parties acknowledge and agree that the Reconciliation Amount for any Payment Period may be positive, negative or zero, depending upon whether such Total Compensation Due is greater than, less than or equal to such amount paid, respectively.

4.    Except as set forth in section I.C.2 above, the "Prospective Payment Amount" for a given Payment Period as of a given Reconciliation Date shall be equal to the sum of: (i) the maximum amount that would be calculated for the Compensation Due for Provider Services for that Period (per section II.C.1 below) should the actual salary costs referenced in section II.C.2.a below be equal to the "Annualized Salary" amounts set forth in Attachment A (as modified per section IV.B), prorated for the number of days in the Period, and reduced to reflect the Corporation's reasonable estimate of underspending against that amount that the Affiliate is reasonably likely to experience over that Payment Period; (ii) the maximum amount that could be calculated for the Compensation Due for Overhead/OTPS for the given Payment Period (per section II.D below), should the Compensation Due for Provider Services for that Period be equal to the maximum amount described in (i); and (iii) any additional amounts that, as of the given Reconciliation Date, the Corporation reasonably has determined to be due between the Parties pursuant to the Agreement, for Contract Services furnished during such Payment Period, except that, to the extent that the Affiliate disagrees with the Corporation's determination as to any negative adjustment per this section I.D.4(iii), the amount of the negative adjustment to be effected, if any, shall be limited to those amounts with respect to which the Agreement otherwise authorizes a reduction to, or withhold from, Semi-Monthly Payments.

E.    Payments Due after Termination of Agreement

1.    General

After termination of this Agreement, a "Final Reconciliation Amount" shall be paid by the appropriate Party to the other Party hereof, so that the aggregate

**SUNY 001107**

compensation to the Affiliate for Contract Services furnished during the term of the Agreement will equal the aggregate Total Compensation Due over such term.

    2.    <u>Final Reconciliation Amount</u>

Such Final Reconciliation Amount shall be identified pursuant to, and paid within sixty days of the Corporation's reasonable determination that it has received, materially complete and accurate Recalculation Documents for all Payment Periods for which no Reconciliation Date existed during the term of the Agreement, except that, in the event that the Affiliate fails, following reasonable notice from the Corporation, to timely submit materially complete and accurate Recalculation Documents for any such Payment Period, the Corporation may choose, upon written notice to the Affiliate, to finalize such Final Reconciliation Amount by incorporating therein its best estimate of the impact that such documents would have had on such Final Reconciliation Amount had they been submitted. The resolution of such Final Reconciliation Amount shall be without prejudice to the parties' retention of any and all rights and remedies afforded under the law with respect to the enforcement of compliance, and/or the seeking of redress for any alleged failure to comply, with terms of this Agreement, whether with respect to the furnishing of Contract Services, the compensation paid thereunder, or otherwise.

## II.   **Compensation for Contract Services**

A.    <u>General</u>

The "Total Compensation Due" for each Payment Period, aggregated across all Payment Periods, shall constitute compensation in full to the Affiliate for Contract Services furnished during the term of the Agreement. This amount is exclusive of any payments that either Party may owe the other pursuant to Section 10.4 of the Agreement.

B.    <u>Calculation of Total Compensation Due</u>

1.    Except as described in subsection 2 of this section II.B, the Total Compensation Due for any Payment Period shall be equal to the sum of:

    a.    The "Compensation Due" for such Payment Period for Provider Services and Overhead/OTPS (per sections II.C and D, respectively); and

    b.    Any penalties, positive or negative adjustments, or add-ons required or permitted pursuant to the Agreement, which the Corporation determines to be due as of the associated Reconciliation Date, for the current, or any prior, Payment Period, to the extent not otherwise recognized in the Total Compensation Due for the current, or any prior, Payment Period.

**SUNY 001108**

2. For purposes of calculating the Total Compensation Due for the final Payment Period during the term of the Agreement, the clause "which the Corporation determines to be due as of the associated Reconciliation Date, for the current, or any prior, Payment Period," shall be deemed to be deleted from subsection 1b of this section II.B.

3. Add-ons per subsection 1.b above shall include, but not be limited to, amounts due to the Affiliate as reimbursement for:

a. Salary paid by the Affiliate as severance to Physician Providers upon termination in accordance with Section 13.1 of the Agreement.

b. "Accrued vacation costs paid by the Affiliate" in accordance with Section 13.3 of the Agreement, which, subject to the conditions set forth in Section 13.3, shall mean salary paid upon termination of a Physician Provider for unused vacation days accrued prior thereto (unless such Physician Provider transfers to another New York State agency that allows such Provider to retain his or her accrued vacation days), to the extent (i) such Physician Provider's line on Attachment A to this Agreement (as modified per section IV.B below) is, at the time of termination, for at least a 0.5 full-time equivalent ("FTE") Provider, and (ii) properly apportioned to the Provider's time spent in the furnishing of Contract Services at the time such vacation days accrued.

c. Location stipends paid by the Affiliate to Physician Providers during a given Payment Period pursuant to provisions, if any, that may parallel section 20.19 of the collective bargaining agreement effective as of July 2, 2007 covering such Providers (the "Prior UUP CBA"), in any successor agreement thereto (the "UUP CBA"), to the extent properly apportioned to the Provider's time spent in the furnishing of Contract Services during such Period, as properly reflected in Attachment A.

C. Provider Services

1. General:

The Compensation Due for Provider Services for any Payment Period shall be equal to the "Affiliate's Allowable Costs" for the associated Payment Period (per subsection 2 below).

2. Affiliate's Allowable Costs:

Subject to subsections 3 through 5 below, the "Affiliate's Allowable Costs" for a given Payment Period shall be equal to, for each line on Attachment A associated therewith, the sum of:

**SUNY 001109**

a.    The lesser of Affiliate's actual salary costs to the extent properly apportioned to their time spent in the furnishing of Contract Services on-site at the Facility, and the "Annualized Salary" set forth on Attachment A for that line for that Payment Period, prorated to reflect (i) the number of days in that Period; and (ii) any shortfall between the actual average full-time equivalents ("FTEs"), per section IV.A, on that line over that Period and the FTE(s) specified for that line for that Period on Attachment A; and

b.    An amount for fringe benefits, calculated by applying a Fringe Benefit Rate of 23.14 percent to the salary costs identified in (a).

3.    Exclusions:

For purposes of subsection 2.a above, the Affiliate's actual salary costs shall exclude costs for any Payment Period that are:

a.    not supported by documentation required per section III.A below;

b.    allocable to hours of effort that the Corporation has reason to believe, and reasonably determines (subject to the Affiliate's review of such determination and consent, which shall not be unreasonably withheld), are not supported by Assignment Schedules and Time Records as described in Sections 2.5(b) and 12.3 of the Agreement and section III.B below;

c.    associated with cost of living increases (i) for any particular job title(s) ("COLAs"), except insofar as they are reimbursable by the Corporation pursuant to Section 13.4 of the Agreement and implemented pursuant to the UUP CBA; or (ii) to the extent applied to amounts not included in "basic annual salary" as defined in the Prior UUP CBA, including, but not limited to, "Extra Service" or "Also Receives" amounts distributed per SUNY policy and/or "location stipend" amounts (as described in section II.B.3.c above and section II.C.3.f below);

d.    associated with any distribution to a Physician Provider per any provision in the UUP CBA that may parallel section 20.10 of the Prior UUP CBA (hereinafter, distributions from the "Discretionary Pool") except insofar as such amounts are reimbursable per section II.C.5 below;

e.    associated with any payments for severance or accrued vacation days, which, to the extent reimbursable by the Corporation pursuant to Section 13.1 or 13.3, respectively, of the Agreement, instead shall be included in Total Compensation Due for the Payment Period in which such amounts are paid by the Affiliate, as an add-on pursuant to section II.B.3.a or b above; and

**SUNY 001110**

f. associated with any payments of location stipends in accordance with the UUP CBA, which instead shall be included in Total Compensation Due for the Payment Period in which such amounts are paid by the Affiliate, as an add-on pursuant to section II.B.3.c above; and

g. associated with any line not included on Attachment A or with any increases in salary (including, but not limited to, increases distributed pursuant to SUNY's policy for "Extra Service" or as "Also Receives," or any such similar policy) on any line included on Attachment A for that Payment Period unless otherwise agreed to by the Parties in writing or expressly permitted under the Agreement.

4. Effort Deemed to be On-Site:

For purposes of this Attachment, time spent by Physician Providers "in the furnishing of Contract Services on-site at the Facility" (per section II.C.2.a above) shall be deemed to include: (i) for Physician Providers in Program Director or Assistant Program Director lines identified as such on Attachment A, time spent off-site in administering the Training Programs operating at the Facility; (ii) for Physician Providers employed by both the Corporation and the Affiliate, only that portion of such Physician Provider's time spent in the furnishing of Contract Services on-site at the Facility as is incremental to the hours of service identified to that Physician Provider on the Facility's payroll; (iii) a reasonable amount of time spent at the Affiliate's Hospital in the perform-ance of Grand Rounds, to the extent that actual on-site coverage needs at the Facility are not compromised; (iv) a reasonable amount of time spent by Radiologist Physician Providers in the reading of radiology films through the PACS system from outside the Facility, to the extent that actual on-site coverage needs at the Facility (including, at a minimum, those described in the footnotes to the Radiology schedule in Attachment A), and the standards set forth in Section 2.1(f) of the Agreement, are not compromised; and (v) for Radiologist Physician Providers, time spent at the Affiliate's Hospital, to the extent described in the footnotes to the Radiology schedule in Attachment A.

5. "Discretionary Pool" Distributions:

a. For a given Fiscal Year, distributions by the Affiliate to Physician Providers from the "Discretionary Pool," if any, established by the UUP CBA for that Fiscal Year (per section II.C.3.d above), shall be reimbursed by the Corporation to the extent that the Affiliate submits documentation demonstrating that such distributions were actually disbursed to such Providers, and have been made (i) solely in the discretion of the State University Trustees or delegate(s) thereof (to the extent that the Affiliate is not among the delegates given authority to determine such distributions); and (ii) not in response to a request by the Affiliate for such disbursements.

**SUNY 001111**

b. In the event that the Affiliate requests, or is delegated by the State University Trustees to determine, distributions to be made to the Physician Providers from the Discretionary Pool for a given Fiscal Year, the associated distributions that the Affiliate documents as having been actually disbursed to such Providers for that Fiscal Year shall be reimbursed to the Affiliate only to the extent that there has been prior written approval from the Chief Executive for the amounts to be requested by the Affiliate for, and/or distributed to, each Provider from such Pool. In the event that the Affiliate is mandated by the State University Trustees to distribute a specified aggregate amount, without prior request by the Affiliate, the Affiliate may, to the extent otherwise permitted by the Trustees, and upon prior written approval of such allocation by the Corporation (which shall not be unreasonably withheld), allocate such amount among the Physician Providers according to its discretion; however, in the event that no other allocation is so approved, the Affiliate shall distribute such aggregate amount in a manner that is consistent across-the-board according to the salaries and/or FTEs of the Physician Providers.

c. Notwithstanding any provisions to the contrary, the total reimbursement allowable for a given Payment Period for distributions to Physician Providers from the Discretionary Pool for the associated Fiscal Year shall not exceed the Physician Providers' proportionate share of such Pool (prorated for number of days in such Period), determined on the basis of the annual salaries of Physician Providers covered by the UUP CBA relative to the annual salaries of all members of the associated bargaining unit.

d. Any carry-forward to subsequent Fiscal Years of, and/or application of subsequent COLAs to, distributions for a given Fiscal Year from the Discretionary Pool for that Fiscal Year, shall be reimbursed by the Corporation only to the extent that the underlying distributions for that given Fiscal Year were reimbursable by the Corporation, and only to the extent otherwise reimbursable per this Agreement or an applicable successor Agreement.

D. Overhead/OTPS

Compensation Due for Overhead/OTPS for each Payment Period shall be equal to the sum of: (i) $143,222; (ii) $18,566 for Ethics Consultation services provided by the Affiliate at the Facility, the compensation for which is contingent upon the Affiliate's timely submission of the minutes of the Ethics Committee Meeting(s), conduct of annual ground rounds and provision of periodic education in Ethics at the Facility; (iii) the amount due from the Corporation to the Affiliate pursuant to Section 2.2(e) of the Agreement as reimbursement for the Affiliate's reasonable recruitment costs incurred on behalf of the Corporation during such Payment Period; and (iv) Overhead and OTPS Rates of two percent and 3.93 percent, respectively, applied to the sum of the Compensation Due for Provider Services for such Payment Period to reimburse the

**SUNY 001112**

Affiliate for reasonable costs of affiliation administration and a reasonable allocation to the Corporation of the other-than-personal-services costs incurred by the Affiliate.

### III. Documents to be Submitted by the Affiliate

Documents to be submitted by the Affiliate include, but are not limited to, the following:

#### A. Payroll Expenses Reports

For each Month, the Affiliate shall submit to the Corporation, as soon as practicable after they become available to the Affiliate:

1. Actual, primary source data from the Affiliate's payroll system for the preceding month, in electronic format, showing actual payroll hours and expenditures for each Physician Provider;

2. Reports, in electronic format, which apportion such actual payroll data according to the associated time spent by each Provider in the furnishing of (i) Contract Services and (ii) services that do not constitute Contract Services hereunder.

#### B. Time Records and Time Studies:

The Affiliate shall (i) provide the Corporation with reasonable access upon request to all Time Records described in Section 12.3 of the Agreement, until any and all claims, or potential claims, by the Affiliate for payment, or by the Corporation for refund, under this Agreement have been finally resolved, including any claims that may arise as a result of any audits or investigations conducted, or to be conducted, pursuant to this Agreement or the Regulations; and (ii) ensure that each Physician Provider completes and submits quarterly time studies of the type described by the Medicare program, in the time and manner reasonably designated by the Corporation.

#### C. Budget and Staffing:

As soon as practicable after the effective date of this Agreement, the Affiliate shall complete and submit the Corporation's Annex B document, which shall be the opening budget for the Agreement, reflecting the maximum amount that could be calculated for the Compensation Due for Provider Services and Overhead/OTPS for Fiscal Year 2013 on the basis of this Attachment and the annual salary costs in Attachment A as executed with the Agreement.

After the beginning of each Fiscal Year during the term of the Agreement, the Affiliate shall complete and submit the Corporation's Annual Annex A2 document, which shall be a roster of all Physician Providers actually on board, and all approved vacant lines, with the associated salaries and FTEs, as of the beginning of such Fiscal

**SUNY 001113**

Year. The Affiliate shall thereafter update Annex A2 on a quarterly basis, reflecting any changes to such roster effected during the preceding calendar quarter, and shall summarize (in Quarterly Annex A5 documents) the total number of FTE Physician Providers actually furnishing Services at/for the Facility as of the end of that quarter (per section IV.A below), according to the Corporation's Natural Expense Class ("NEC") categories.

Each such document shall be submitted in the time and manner reasonably specified, and shall meet such requirements as to content and format as is reasonably prescribed, by the Corporation.

D.    Fee Statements (Annex D, Part I):

For each calendar month, the Affiliate shall complete and submit a Fee Statement to the Corporation, separately identifying (i) the Affiliate's Allowable Costs for that month for "Provider Services" (per section II.C.2 above); (ii) "Overhead/OTPS" (per section II.D above); and (ii) any adjustments, per section II.B.1b above, that it reasonably expects to be reflected in the Total Compensation Due for the associated month. Such Fee Statement shall:

1.    Detail for each of the Corporation's General Ledger codes and NEC categories: (i) the associated FTEs (per section IV.A); and (ii) the portion of such Allowable Costs that is associated therewith;

2.    Be accompanied by back-up that details for each Physician Provider, for such month, or for each relevant portion thereof per section IV.B.4 below: (i) the FTE (per section IV.A); and (ii) the Affiliate's actual salary costs per section II.C.2.a for such Physician Provider for such month, separately identifying any exclusions applied per section II.C.3 thereof; and

3.    Be submitted in the time, manner, and electronic format, reasonably specified by the Corporation, by the later of (i) forty-five days from the end of such month, and (ii) fifteen business days from receipt of information within the Corporation's possession necessary for the preparation of such Fee Statement. The Corporation shall provide assistance to the Affiliate, as reasonably requested by the Affiliate, to ensure that the Fee Statements are submitted in the manner and format specified by the Corporation.

E.    Recalculation Documents (Annex D, Part II):

The Affiliate shall complete and submit the Corporation's "Recalculation Document" electronically, for each Payment Period, within a reasonable time after all data is available necessary to calculate the Total Compensation Due for such Payment

SUNY 001114

Period, and any associated Revised Semi-Monthly Payment Amount (per section I.D.1 above). Such Document shall (i) determine the Reconciliation Amount for such Payment Period and the impact associated therewith on Semi-Monthly Payments to be made (per sections I.C.3 and 4 above), (ii) separately detail the consequences of any Modifications of Services or other approved adjustments to, or contemplated by, the compensation terms of the Agreement that are reflected therein, (iii) meet such requirements as to content and format as is reasonably prescribed by the Corporation, and (iv) be supported by reasonable and sufficient back-up.

In no event shall a Recalculation Document be determined by the Corporation to be materially complete and accurate for any Payment Period, unless and until: (i) such Recalculation Document is signed by the Affiliate as prescribed by the Corporation, (ii) the Affiliate has submitted to the Corporation Fee Statements for all calendar quarters during that Payment Period, and (iii) the Corporation has received from the Affiliate materially complete and accurate Recalculation Documents for all prior Payment Periods during the term of the Agreement, and of any predecessor Agreement thereto, as applicable.

F.    Vacancy and Accruals Report

For each calendar quarter during the term of the Agreement, the Affiliate shall complete and submit to the Corporation a report of vacancies in, and accruals against salaries on, Attachment A lines for such quarter, where the term "vacancies" shall include, but not be limited to, partial vacancies due to reductions in the FTEs for particular lines, as well as temporary vacancies due to leaves of absence, separately identifying the pay status associated with each such leave.

G.    Document Retention

The Affiliate shall, at a minimum, retain copies of all Time Records described in Section 12.3 of the Agreement and subsection B above, all documentation required per subsection A above, and all approval documents obtained and/or submitted that are associated with staffing, salary or FTEs adjustments made to Attachment A, including, but not limited to, those pursuant to Sections 2.1(e), 2.2(d) and 2.5(d) of the Agreement and section IV.B.3 below, until any and all claims by the Affiliate for payment, or by the Corporation for refund, under the Agreement have finally been resolved, including any claims that may arise as a result of any audits or investigations conducted, pursuant to the Agreement or the Regulations.

H.    Electronic Health Records Stimulus Funding

1.    General

In accordance with the Health Information Technology for Economic and

**SUNY 001115**

Clinical Health Act of 2009 ("HITECH"), the Corporation is upgrading its Electronic Health Record ("EHR") technology for meaningful use by Contract Services Providers. The parties intend that implementation of this EHR technology will enable eligible Contract Services Providers furnishing ambulatory care services to qualify for funding available under HITECH from the Medicaid and/or Medicare Programs ("Meaningful Use Funds"), to the extent that such Providers (i) use this technology to achieve objectives specified under HITECH; and (ii) complete and submit all necessary "meaningful use documentation" required by New York State and the Centers for Medicare & Medicaid Services. The Corporation shall provide all supporting documentation necessary for Providers to establish "meaningful use" for purposes of receiving funding available under HITECH.

2.    Eligible Provider List

As soon as is reasonably practicable on or after execution of this Agreement, the Corporation shall furnish the Affiliate with a list of Contract Services Providers that the Corporation has determined meet the eligibility requirements for payments under HITECH ("Eligible Providers"), and the amount that each Eligible Provider is expected to be paid thereunder by the Medicaid Program ("HITECH Eligible Provider List"). Contract Services Providers who do not meet the eligibility requirements for the Medicaid Program but do meet the eligibility requirements for the Medicare Program will be included on the HITECH Eligible Provider List with the associated amount expected to be paid under the Medicare Program. Such List shall be amended from time to time, as necessary, by the Corporation, to reflect any change in the composition of Eligible Providers and/or the funding expected to be paid to such Providers.

Any request by the Affiliate to correct the eligibility status of a given Provider for funding under the Medicare and/or Medicaid Programs on the HITECH Eligible Provider List shall be accompanied by documentation demonstrating such Provider's eligibility or ineligibility. Upon reasonable confirmation of the Affiliate's assertion, the Corporation shall amend the HITECH Eligible Provider List to reflect the Affiliate's substantiated corrections. Notwithstanding anything to the contrary, Eligible Providers who fail to meet meaningful use requirements due to improper or inadequate use of the available Certified Electronic Medical Record, along with the expected payment amount associated therewith, shall remain on the HITECH Eligible Provider List.

3.    Affiliate Responsibilities

a.    General:

The Affiliate shall be responsible for the completion, by such Eligible Providers, of the registration process, including any necessary attestations and

**SUNY 001116**

any other meaningful use documentation that must be completed directly by such Providers. The Affiliate shall work with the Corporation to make certain that all required documentation by the Provider that needs to be submitted to the Medicare and Medicaid Programs, is completed in such time and manner as is necessary to meet any and all conditions of such funding. The Affiliate shall also require that copies of any communications or documentation received by any Eligible Provider as to his/her eligibility for, or receipt or non-receipt of, Meaningful Use Funds, shall be submitted by such Eligible Provider to the Affiliate reasonably promptly upon receipt thereof. Any such communications or documentation received by the Affiliate, whether directly or from an Eligible Provider, shall be forwarded reasonably promptly thereafter to the Corporation.

      b.    <u>Assignment of Funds</u>:

      The Affiliate shall require each Eligible Provider to assign to the Corporation any Meaningful Use Funds that he or she receives, or is otherwise entitled to receive. Such assignment shall (i) provide that it supersedes any other assignment made or to be made by such Eligible Provider in relation to any Meaningful Use Funds, and (ii) apply to any Meaningful Use Funds with respect to which the associated meaningful use has been established on the basis of services performed during the term of this Agreement. In the event that any Eligible Provider furnishes services at Corporation facilities at less than the half-time (0.5 FTE) level, in the aggregate, and also would qualify for receipt of Meaningful Use Funds on the basis of services furnished at any non-Corporation site(s), the Affiliate may, with written consent from such Eligible Provider, request, in writing, that the Corporation remit a portion of such funds to the Affiliate for distribution and/or retention in accordance with an agreement between the Affiliate and that Eligible Provider. Upon receipt of such request, the Corporation shall review all documentation reasonably required by the Corporation and supplied within a reasonable time by the Affiliate, as to the Eligible Provider's would-be-qualifying activities across all sites. The Corporation shall thereupon remit to the Affiliate all but such amount as the Corporation reasonably determines, based upon the proportion of such activities that take place at Corporation sites, constitutes the Corporation's reasonable pro-rata share of the Meaningful Use Funds received under assignment from that Eligible Provider.

      c.    <u>Reporting</u>:

      The Affiliate shall, in such time, manner and frequency as may be reasonably required by the Corporation, submit reports to the Corporation regarding the status of its efforts per this section III.H with respect to each individual Eligible Provider. Such reports shall include, but not be limited to, to the extent specified by the Corporation, the status, with respect to each Eligible Provider, as to the (i) assignment of funds, (ii) completion of the registration process, and of any attestations, documentation and other required paperwork, (iii) submissions that have been, or are required to be,

**SUNY 001117**

made to the Medicare and Medicaid Programs, and (iv) receipt of any written consents to seek, and making of any requests for, apportionment of Meaningful Use Funds by the Corporation.

      4.    Dispute Resolution

        The Affiliate may challenge any determination made by the Corporation pursuant to this section III.H through the Dispute Resolution process described in Section 11 of this Agreement.

## IV.   Miscellaneous

A.    Full-Time-Equivalents (FTEs)

      1.    For purposes of this Agreement, the FTE for a Physician Provider for a given period shall be equal to the result of dividing 2,080 hours per year, prorated for the number of days in the period, into such Physician Provider's "Contract Services Hours" for such period, which shall mean hours during such period for which such Physician Provider is compensated by the Affiliate, taken from the documents to be submitted by the Affiliate per section III.A above, that are (i) actually spent by that Physician Provider furnishing Contract Services on-site at the Facility (inclusive of any lunch period taken of at most one half-hour per eight-hour shift), or (ii) for Physician Providers paid on an other-than-hourly basis, constitute reasonably authorized time off actually taken for illness, vacation, holidays and/or continuing medical education that is appropriately allocated to the Contract Services portion of the total services for which such Physician Provider is compensated by the Affiliate during such period. To the extent that documentation containing such information has not been submitted for any portion of such Fiscal Year prior to the Reconciliation Date therefor (per section I.D.2 above), the Corporation shall determine such FTE by estimating on the basis of the best information reasonably available as of such Date, the FTE that would likely obtain from such calculation if such documentation had been submitted.

      2.    In the event that the annualized salaries on Attachment A reflect any COLAs reimbursable by the Corporation pursuant to Section 13.4 of the Agreement, any increased hours of effort that may be required as a condition of such reimbursement pursuant thereto shall be reflected in an appropriate adjustment to the 2,080 figure in, and/or maximum lunch-time or authorized time off included in Contract Services Hours per, the preceding paragraph, as of the effective date of the inclusion of such COLAs in Attachment A.

B.    Modifications to Attachment A

      1.    In the event of a vacancy in any line on Attachment A, or partial vacancy created by any decrease in the FTE for any Physician Provider thereon, Attachment A

**SUNY 001118**

shall be deemed modified to reflect the disposition of such line pursuant to Sections 2.2(a) through (d) of the Agreement, by: (i) removing such line, or decreasing the FTE therefor, in the event that it is to remain vacant in whole or in part, or to be filled with a non-Affiliate employee, pursuant to Section 2.2, effective as of the date on which such line or portion thereof becomes vacant; or (ii) inserting a replacement Physician Provider, and the associated FTE and annual salary, into such line, to the extent authorized pursuant to Section 2.2, effective as of the date of hire of such replacement.

      2.     Attachment A shall be deemed modified to reflect any COLAs effective during the term of this Agreement, to the extent that they are reimbursable by the Corporation pursuant to Section 13.4 of the Agreement (and, accordingly, are applied only to amounts included in "basic annual salary" per the UUP CBA), as of the effective dates of such increases. Notwithstanding anything to the contrary, the Annualized Salaries in Attachment A shall not reflect any amounts payable as "location stipends" to any Physician Provider pursuant to the UUP CBA.

      3.     In the event that the Parties mutually agree, in writing, to any other addition or elimination of, or increase or decrease in the FTE or annualized salary associated with, any line on Attachment A, Attachment A shall be deemed modified to reflect such agreement, as of the effective date thereof.

      4.     In the event that there has been an adjustment to, or addition or deletion of, any line on Attachment A during a given Payment Period pursuant to this section IV.B, the Compensation Due for Provider Services and Overhead/OTPS for that Period (per sections II.C and D, respectively), and any change in the maximum amount that could be calculated therefor for purposes of section I.D.4 above, shall be determined by aggregating the results of separately calculating such Compensation Due or maximum amount for each portion of that Period during the course of which no further adjustment to, or addition or deletion of, such line occurred.

C.     "Pool" Lines on Attachment A

      For purposes of this Agreement: (i) references to the Attachment A line for a Physician Provider furnishing services in the Departments/Services of Emergency Medicine or Radiology through a "Coverage Pool" as expressly identified, and consistent with any applicable footnote, in Attachment A, shall be to the associated "Pool" line on Attachment A; and (ii) the Affiliate's actual salary costs and FTEs for Physician Providers furnishing such Emergency Medicine or Radiology Coverage Pool services, respectively, shall be aggregated for purposes of applying any provisions pursuant to which such costs or FTEs are compared to the annualized salary or FTE for the associated Coverage Pool lines on Attachment A.

**SUNY 001119**

## DEPARTMENT CHIEF OF SERVICE

## FUNCTIONAL JOB DESCRIPTION

**TITLE:** Chief of Service

**PURPOSE OF POSITION:** Clinical and administrative chief of department.

**QUALIFICATIONS:**

1. Board certification in respective field.
2. Minimum of 3 years (preferably, 5 years) post residency experience.
3. Minimum of 3 years (preferably, 5 years) administrative and supervisory experience.
4. Knowledge of research methodology as evidenced by peer-reviewed publications.

**DUTIES/RESPONSIBILITIES:**

Under general supervision of the Medical Director, responsible for the following activities within the department and institution:

1. Overall supervision of the clinical, academic and administrative activities, to include:

   - participation in regularly scheduled meetings;
   - ensuring that appropriate policies and procedures are developed to guide the department in its activities;
   - participation in KCHC strategic planning;
   - interacting with KCHC administration.

2. Identification and accomplishment of departmental goals and objectives in consonance with the KCHC Strategic Plan, to include:

   - development of departmental goals and objectives;
   - working with attending physicians and KCHC personnel to increase productivity;
   - assisting with the preparation for JCAHO surveys with the goal of achieving successful accreditation;
   - working with staff to achieve/maintain ACGME accreditation;
   - assisting with GME activities.

3. Monitoring and evaluation of the quality and appropriateness of patient care provided within the department, to include:

   - monitoring and reviewing the professional performance of all individuals with delineated clinical privileges;

100155701_1

- reporting to the Credentials Committee concerning the appointment, reappointment, and delineation of clinical privileges for all applicants seeking privileges in the department;
- making recommendations to the Credentials Committee regarding the qualifications and competence of department personnel who are not licensed independent practitioners and who provide patient care services;
- recommending criteria for clinical privileges in the department.

4. Integrating the department into the primary functions of KCHC, coordinating inter-, and intradepartmental services, and maintaining liaison with other Chairmen/Chiefs of Service, and the College of Medicine, to include:

- developing a full schedule for attending physician supervision, and coverage of ward services and subspecialties;
- organizing and presiding over periodic meetings of departmental leadership;
- overseeing teaching of residents and students;
- coordinating educational activities with the College of Medicine, and with academic administration.

5. Continual assessment and improvement of the quality of care and safety and services provided (Performance Improvement and Patient Safety), to include:

- ensuring departmental participation in the development of the Performance Improvement plan of the appropriate Clinical Council;
- monitoring and trending of indicators developed by the Clinical Council to detect deviations from expected norms;
- reporting of results of the monitoring to the Clinical Council;
- ensuring departmental participation in the Clinical Council's analysis of identified problems and development of corrective actions;
- implementation of corrective actions developed by the Clinical Council;
- ensuring adherence to policies and procedures to ensure patient safety;
- fostering a culture of safety within the Department.

100155701_1

## Attachment D

### Chiefs of Service Permitted to Engage in Outside Clinical and/or Administrative Activities

| Chief of Service | KCHC Department |
| --- | --- |
| Julius R. Berger, M.D. | Dentistry |
| Alan R. Shalita, M.D. | Dermatology |
| Helen Valsamis, M.D. | Neurology |
| Douglas Lazzarro, M.D. | Ophthalmology |
| Claude Scott, M.D. Ph.D. | Orthopedic Surgery |
| Matthew Hanson, M.D. | Otolaryngology |
| Marvin Rotman, M.D. | Radiation Oncology |
| Alan Kantor, M.D. | Radiology |
| Cesar Delrosario, M.D. | Pathology |

Note: The holding, by a Chief of Service not specified above, of the title of Vice-Chairperson of an Affiliate Department, if approved by the Medical Director (which approval shall not unreasonably be withheld), and the performance of those activities for the Affiliate that are ordinarily associated therewith, shall not be deemed to be an engagement in administrative activities outside of the Facility, for purposes of Section 2.4(c) of the Agreement.

100047251.1

### Third-Party Reimbursement Programs in which the Facility Participates

The Facility participates in Medicaid, Child Health Plus (CHP), Family Health Plus (FHP), No Fault, Workers Compensation, Medicare, Blue Cross and all other applicable State, Federal and other Third-Party Reimbursement programs. References to eligibility of Providers to participate in such Third-Party Reimbursement programs, for purposes of Section 2.6 of the Agreement, shall incorporate reference to eligibility to participate in all Managed Care Plans operating thereunder with which the Corporation has a contract covering services at the Facility for the associated Lines of Business (LOBs). Below is a listing of all such Plans/LOBs for which the Corporation has a contract in effect for services furnished at the Facility as of July 1, 2013. For the Medicaid, CHP, FHP and HIV Special Needs Program (SNP) LOBs, Corporation contracts are indicated by an "X" in the appropriate column(s). For the Commercial/Other LOBs listed below, the products addressed in the Corporation's contracts are indicated in the appropriate columns. All of the Plans listed below operate as direct insurers for the indicated LOBs, except where identified below as brokers.

*Kings County Hospital Center -- Managed Care Contracts Effective as of July 1, 2013*

| Plan (Scope; Broker Status)^ | Lines of Business | | | | | | Behavioral Health Subcontractor^^^ |
|---|---|---|---|---|---|---|---|
| | Medicaid | CHP | FHP | HIV SNP | Medicare | Commercial/Other^^ | |
| Aetna | | | | | All | HMO; EPO; PPO; Indemnity; NYC Community Health Plan | |
| DentaQuest (Dental) | X | X | X | | HMO | All | |
| EBCBS | | X | | | All | HMO; EPO; PPO; Indemnity | Various |
| Fidelis* | X | X | X | | All | | |
| Fidelis Behavioral Health | X | X | X | | | | |
| GHI** | | | | | PPO Demonstration | PPO | ValueOptions |
| GHI** dba Brooklyn Healthworks | | | | | | Small Business (PPO) | ValueOptions |
| HealthFirst | X | X | X | | All | | |
| HealthPlex (Dental) | X | X | X | | HMO | | |
| HIP & HIP Delegates*** | X | X | X | | HMO | HMO; PPO; NYCARE (PPO for City Employees) | ValueOptions -- as of 12/1/12 only |
| MagnaCare dba MagnaCare | | | | | | PPO | |
| MagnaCare dba MagnaPreferred | | | | | | Direct Plus (POS) | |
| Magellan Behavioral Health Solutions | X | X | X | | HMO | | |
| MetroPlus | X | X | X | X | All | MetroPlus Gold (HMO for HHC Employees) | |
| Multiplan (Direct/Broker) | | | | | | HMO; PPO; Indemnity | |
| Oxford**** | | | | | All | HMO; POS; EPO; PPO; Indemnity | United Behavioral Health (OptumHealth) |
| United Behavioral Health (OptumHealth)**** | X | X | X | | All | HMO; POS; EPO; PPO; Indemnity | |
| UHC of NY Community Health Plan (Americhoice)**** | X | X | X | | All | | United Behavioral Health (OptumHealth) |
| United HealthCare**** | | | | | All | HMO; POS; EPO; PPO; Indemnity | United Behavioral Health (OptumHealth) |
| Value Options (Behavioral Health) | X | X | X | | All | All | |
| VidaCare***** | | | | X | | | Beacon -- services are not covered |
| 1199 | | | | | | PPO | |

*NOTES -- General*

^ For any Plan with which the Corporation has a contract for a given LOB, dental services are covered only where that Plan has subcontracted with DentaQuest or HealthPlex to cover dental services for that LOB.

^^ Contracts for new "other commercial" products that will be participating in the health insurance exchange created under the Affordable Care Act will go into effect as of January 1, 2014 for the following Plans identified above: Fidelis, HealthFirst, MetroPlus and United HealthCare. In addition, as of January 1, 2014, the Corporation will have a contract in effect with the "Health Republic Insurance" Plan for its "other commercial" product that will be offered through the Exchange.

^^^ Where the Behavioral Health Subcontractor column is blank, behavioral health claims are covered by the Plan in-house for that LOB.

*NOTES -- Specific Plans/LOBs*

\* Does not include primary care services.

\*\* GHI and HIP operate independently under the umbrella of EmblemHealth.

\*\*\* "HIP Delegates" are (subject to change): Health Care Partners (formerly Heritage N.Y. Medical Group); Continuum Health Partners; Doctors Care Network; Montefiore CMO; and St. Barnabas Partners in Health (aka St. Barnabas Community Health Plan). GHI and HIP operate independently under the umbrella of EmblemHealth.

\*\*\*\* UHC of NY Community Health Plan (Americhoice), United Behavioral Health (OptumHealth) and United HealthCare are operating businesses under UnitedHealth Group. United HealthCare includes Oxford Health as a brand.

\*\*\*\*\* Does not cover behavioral health services because the Corporation does not have a contract with Beacon, the behavioral health subcontractor.

**SUNY 001123**

## ATTACHMENT F

**Physicians Exempted from the Board Certification Requirements in Section 2.7(a) of the Agreement***

| Department/Service | Name |
|---|---|
| Psychiatry -- including Emergency Room, excluding Chemical Dependency | Jacques, Jean-Robert (MD) Narasimhan, N. (MD) Plantin, Moise (MD) Rubel, Steven (MD) |
| Psychiatry -- Chemical Dependency Services | Singh Chadra (MD) |

* Also exempted are any Physician Providers on Attachment A to this Agreement, who are licensed physicians not credentialed to provide clinical services at the Facility, but who provide GME, or hospital/departmental, administrative services at the Facility as of July 1, 2013.

100049732v1

**Number of Full-Time Equivalent ("FTE") Affiliate Students Engaged in Clerkships at the Facility in Any Academic Year\***

| Department or Subject Area | Type of Course | Affiliate Student FTEs at the Facility |
|---|---|---|
| Anesthesiology | Third-Year Clerkship | 1 |
| Emergency Medicine** | Third-Year Clerkship | 18 |
| Medicine | Third-Year Clerkship | 12 |
| Medicine | Fourth-Year Subinternship | 15 |
| Neurology** | Third-Year Clerkship | 12 |
| Pediatrics** | Third-Year Clerkship | 16 |
| Pediatrics | Fourth-Year Subinternship | 4 |
| Primary Care I | Third-Year Clerkship | 3 |
| Primary Care II** | Third-Year Clerkship | 2 |
| Psychiatry | Third-Year Clerkship | 14 |
| Surgery | Third-Year Clerkship | 8 |
| Women's Health** | Third-Year Clerkship | 14 |

\* For purposes of this Exhibit, and Section 2.8 of this Agreement:
(1) "Clerkship," unless otherwise specified, shall encompass both Clerkships for third-year students andSubinternships for fourth-year students; and
(2) Notwithstanding the definition of FTE in Attachment B to this Agreement, a Student clerkship slot that is filled by Affiliate Students throughout the entire academic year shall count as one FTE Affiliate Student at the Facility.

\*\* These courses involve time at both the Facility and the Affiliate's Hospital. In determining the number of FTE Affiliate Students engaged in these clerkships at the Facility in any given year, time at both facilities shall be counted.

SUNY 001125

## COMMITTEE ON ACADEMIC AND PROFESSIONAL QUALIFICATIONS GUIDELINES

## RESEARCH/SCHOLARSHIP

**LEVEL:**

❶ Participates in investigation/ research leading to publications in peer-reviewed journals.

❷ Conducts focused investigation/research program with steady or improving rate of publication in referred journals; evidence of independence

❸ Supervises independent, productive investigative/ research programs; addresses major and significant problems; solid record of original and important publications in peer-reviewed journals of the discipline; attracts students and fellows; evidence of respect by independent experts (e.g. letters of recommendation, invited lectures, reviewed articles, authorship of standard textbooks, etc., competitively awarded grant support sufficient to support work, and citation of published work)

❹ In addition to **Level 3**, achieved national or international reputation for contributions or comparable distinction as a scholar; recognized as having had a major influence on his/ her field.

## TEACHING

**LEVEL:**

❶ Participates in departmental teaching program. Teaches competently, effectively and with commitment. Relates well to students and other teachers.

❷ Exceptional instructor, substantial teaching responsibility, uses innovative and creative methods, assumes significant responsibility for course planning and administration.

❸ In addition to **Level 2**, substantial primary responsibility for organization and administration of major departmental teaching obligations.

❹ In addition to **Level 3**, individual has achieved a national or international reputation in health science education by publication and presentation of educational innovations.

100155686_1

**SUNY 001126**

## COMMITTEE ON ACADEMIC AND PROFESSIONAL QUALIFICATIONS GUIDELINES

## PROFESSIONAL SERVICE

**LEVEL:**

❶ Accepts and performs administrative and governance duties; interacts in a positive way with faculty and students.

❷ Is a significant contributor to administration, governance, and/or clinical service at HSCB and/or its affiliates, e.g. holds direct managerial responsibility for a major clinical service in a department.

❸ In addition to Level 2, shows substantial evidence of leadership in and/or outside the institution. This may be significant professional service on editorial boards, NIH study sections and professional society planning boards.

❹ In addition to Level 3, individual represents "magnet" for their expertise to attract graduate students, house staff, and/ or patient referrals.

### ** POINT DISTRIBUTION REQUIREMENTS **

❑ **TENURED ACADEMIC TRACK**

Associate Professor: 2 Research/ Scholarship, 1 Teaching, 1 Service **(min=5)**

Professor:      3 Research/ Scholarship, 1 Teaching, 1 Service **(min=6)**

❑ **TENURED CLINICAL TRACK**

Associate Professor of Clinical: 1 Research/ Scholarship, 2 Teaching, 2 Service **(min=5)**

Professor of Clinical: 1 Research/ Scholarship, 2 Teaching, 2 Service **(min=6)**

❑ **QUALIFIED RESEARCH TRACK**

Research Associate Professor: 2 Research/ Scholarship, 1 Teaching, 0 Service **(min=3)**

Research Professor: 3 Research/ Scholarship, 1 Teaching, 0 Service **(min=5)**

❑ **QUALIFIED CLINICAL TRACK**

Clinical Associate Professor: 0 Research/ Scholarship, 1 Teaching, 1 Service **(min=3)**

Clinical Professor: 1 Research/ Scholarship, 1 Teaching, 2 Service **(min=5)**

❑ **QUALIFIED TEACHING TRACK**

Teaching Associate Professor: 0 Research/ Scholarship, 2 Teaching, 1 Service **(min=3)**

Teaching Professor: 1 Research/ Scholarship, 3 Teaching, 1 Service **(min=5)**

100155686_1

upd 8/13/04 & 5/30/06

**SUNY 001127**

<u>**Attachment I**</u>

<u>**List of Faculty Status of Physicians Furnishing Services at KCHC**</u>

The attached printout includes a list of all physicians who furnish clinical services at KCHC and either (a) are employed by the Corporation, in whole or in part; or (b) are employed by the Affiliate and furnish services at KCHC pursuant to the Agreement. For each such individual, the attached printout lists their SUNY faculty title or staff title. Each individual listed on the attached printout under any of the "Faculty" sub-headings is a SUNY faculty member, in good standing with respect to his or her faculty position (which position also is set forth on the printout) as of December 30, 2013. None of the individuals listed on the attached printout under any of the "Staff" sub-headings are SUNY faculty members as of December 30, 2013.

100156155_1

*STATE UNIVERSITY OF NEW YORK*
*HEALTH SCIENCE CENTER AT BROOKLYN*
*ALL FUNDS PERSONNEL BUDGET--DEPARTMENT/DIVISION LISTING FY 2013/2014*
*AS REPORTED BY THE DEPARTMENTS*
*M.D. FACULTY/STAFF WITH A KINGS COUNTY SALARY COMPONENT*

DEPARTMENT=DERMATOLOGY DIVISION=DERMATOPATHOLOG GROUP=FACULTY

| NAME | TITLE |
|---|---|
| HEILMAN, EDWARD | CLINICAL ASSOC PROFESSOR (HS) |

DEPARTMENT=DERMATOLOGY DIVISION=GENERAL DERMATO GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 21149 TAYLOR, GINA A. | CLINICAL ASSISTANT PROF (GFT) |
| 28695 SHALITA, ALAN R. | DISTINGUISHED TEACHING PROF TCL |

DEPARTMENT=DERMATOLOGY DIVISION=PEDIATRIC DERMA GROUP=FACULTY

| NAME | TITLE |
|---|---|
| GLICK, SHARON A. (2) | ASSOCIATE PROFESSOR (GFT) |

DEPARTMENT=DERMATOLOGY DIVISION=SURGICAL DERMAT GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 22092 KRANT, JESSICA J. | CLINICAL ASSISTANT PROF (GFT) |

DEPARTMENT=DERMATOLOGY DIVISION=WOODHULL DERM GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 42512 GILBERT, ERIN | ASSISTANT PROFESSOR (GFT) |
| 44885 RUPANI, REENA N. | ASSISTANT PROFESSOR (TCL) |

DEPARTMENT=EMERGENCY MEDICINE DIVISION=CTC GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 51535 DE SOUZA, IAN S. | ASSISTANT PROFESSOR (GFT) |

DEPARTMENT=EMERGENCY MEDICINE DIVISION=DBR-HRLY GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 50853 DENNIHY, DAVID T. | CLINICAL ASST PROFESSOR (HS) |

DEPARTMENT=EMERGENCY MEDICINE DIVISION=EMER MED RESEAR GROUP=FACULTY

| NAME | TITLE |
|---|---|
| SINERT, RICHARD | ASSOCIATE PROFESSOR (HS) |
| 51516 ZEHTABCHI, SHAHRIAR | PROFESSOR (GFT) |
| 51752 PALADINO, LORENZO | ASSOCIATE PROFESSOR (GFT) |

DEPARTMENT=EMERGENCY MEDICINE DIVISION=EMERGENCY MEDIC GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 44715 LUCCHESI, MICHAEL P. | ASSOCIATE PROFESSOR (TCL) |
| 44886 RINNERT, STEPHAN | ASSOCIATE PROFESSOR (TCL) |

DEPARTMENT=EMERGENCY MEDICINE DIVISION=GENERAL EMER ME GROUP=FACULTY

| NAME | TITLE |
|---|---|
| HOLCOMB, KAREEN | ASSISTANT PROFESSOR |
| JOHNSON, NICOLE | CLINICAL ASSISTANT PROF |
| 44907 DACOSTA, SIGRID H. | ASSOCIATE PROFESSOR (TCL) |
| 50910 BRANDLER, ETHAN S. (2) | CLINICAL ASST PROFESSOR TCL |
| 51545 LEVINE, JEFFREY H. | ASSISTANT PROFESSOR (GFT) |
| 51551 STETZ, JESSICA E. | ASSOCIATE PROFESSOR (GFT) |
| 51670 JOHNSON, ELMA J. | ASSISTANT PROFESSOR (TCL) |

**STATE UNIVERSITY OF NEW YORK**
**HEALTH SCIENCE CENTER AT BROOKLYN**
**ALL FUNDS PERSONNEL BUDGET–DEPARTMENT/DIVISION LISTING FY 2013/2014**
**AS REPORTED BY THE DEPARTMENTS**
**M.D. FACULTY/STAFF WITH A KINGS COUNTY SALARY COMPONENT**

DEPARTMENT=EMERGENCY MEDICINE DIVISION=INTERNATIONAL E GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 51668 BLOEM, CHRISTINA M. | CLINICAL ASST PROFESSOR TCL |

DEPARTMENT=EMERGENCY MEDICINE DIVISION=KCH GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| BARRETT, CHAMEE | CLINICAL ASST PROFESSOR (HS) |
| GLEYZER, ALEKSAN | ASSISTANT PROFESSOR (GFT) |
| JACKSON, KAEDRE | CLINICAL ASSISTANT PROF |
| KEROLLE, HAROLD | CLINICAL ASSISTANT PROF |
| KHADPE, JAY | CLINICAL ASST PROFESSOR (HS) |
| LEGOME, ERIC | VISITING ASSOC. PROFESSOR (HS) |
| LITTLE, MARKUS | CLINICAL ASST PROFESSOR (HS) |
| MARTINDALE, JENNIFER L | CLINICAL ASSISTANT PROF |
| MAURELUS, KELLY | CLINICAL ASSISTANT PROF |
| PEACOCK, PETER R. | ASSISTANT PROFESSOR (HS) |
| SCHECHTER, JOSH | CLINICAL ASSISTANT PROF. |
| SCHWARZBARD, GOLDIE C. | CLINICAL ASSISTANT PROF |
| SHETTY, PRAKASH | ASSISTANT PROFESSOR (HS) |
| SMITH, TERESA Y | CLINICAL ASSISTANT PROF |
| TAYLOR, MATTHEW | CLINICAL ASSISTANT PROF |
| 21022 STAVILE, KAREN L. | ASSISTANT PROFESSOR (GFT) |
| 44708 BARON, BONNY J. | ASSOCIATE PROFESSOR (TCL) |
| 45044 ROMNEY, MARIE-LAURE | CLINICAL ASST PROFESSOR (HS) |

DEPARTMENT=EMERGENCY MEDICINE DIVISION=KCH GROUP=STAFF

| NAME | TITLE |
|------|-------|
| CASEY, GERARD A. | PHYSICIAN SPECIALIST(HRLY) |
| KOZHIMALA, JOSE | PHYSICIAN SPECIALIST |
| REBELLO, EMILIA | PHYSICIAN SPECIALIST |
| SCHNEID, SHARONA | PHYSICIAN SPECIALIST |

DEPARTMENT=EMERGENCY MEDICINE DIVISION=KCH PEDS ED GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| AGORITSAS, KONSTANTINOS | ASSISTANT PROFESSOR (GFT) |
| HASSOUN, AMEER A | CLINICAL ASSISTANT PROF |
| KIM, JANE | ASSISTANT PROFESSOR (HS) |
| ROCHLIN, JONATH | CLINICAL ASSISTANT PROF |
| 41260 MARNENI, SHASHIDHAR | CLINICAL ASST PROFESSOR (HS) |
| 56728 GEORGE, RACHEL (2) | CLINICAL ASSISTANT PROF |

DEPARTMENT=EMERGENCY MEDICINE DIVISION=PEDS EM GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| CHAO, JENNIFER | CLINICAL ASSISTANT PROF |
| LEE, JUNE | CLINICAL ASST PROFESSOR (HS) |
| 56483 KHAN, AMBREEN S. | ASSISTANT PROFESSOR (GFT) |

DEPARTMENT=EMERGENCY MEDICINE DIVISION=RESIDENCY GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| WILLIS, JAMES | CLINICAL ASSISTANT PROF |
| 50868 GORE, ROBERT J. | CLINICAL ASST PROFESSOR (HS) |
| 51532 SILVERBERG, MARK A. | ASSISTANT PROFESSOR (GFT) |
| 56485 QUINN, ANTONIA C. | ASSISTANT PROFESSOR (GFT) |

**HEALTH SCIENCE CENTER AT BROOKLYN**
**ALL FUNDS PERSONNEL BUDGET--DEPARTMENT/DIVISION LISTING FY 2013/2014**
**AS REPORTED BY THE DEPARTMENTS**
**M.D. FACULTY/STAFF WITH A KINGS COUNTY SALARY COMPONENT**

DEPARTMENT=EMERGENCY MEDICINE DIVISION=STUDENT EDUCATI GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 45311 WIENER, SAGE W. | ASSISTANT PROFESSOR (GFT) |
| 51534 EROGUL, MERT H. (2) | ASSISTANT PROFESSOR (GFT) |

DEPARTMENT=EMERGENCY MEDICINE DIVISION=ULTRASOUND GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 45049 PAPANAGNOU, DIMITRIOS | CLINICAL ASST PROFESSOR (HS) |
| 56097 SECKO, MICHAEL | CLINICAL ASST PROFESSOR TCL |

DEPARTMENT=PATHOLOGY DIVISION=AUTOPSY KCH GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 20857 AXIOTIS, CONSTANTINE A. | PROFESSOR (HS) |

DEPARTMENT=PATHOLOGY DIVISION=BLOOD BANK GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 20971 KANG, STEVEN H. | CLINICAL ASST PROFESSOR (HS) |

DEPARTMENT=PATHOLOGY DIVISION=BLOOD BANK - KC GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| WHITSETT,CAROLYN | CLINICAL ASST PROFESSOR (HS) |

DEPARTMENT=PATHOLOGY DIVISION=NEUROPATHOLOGY GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 20387 RAO, CHANDRAKANT | CLINICAL PROFESSOR (GFT) |

DEPARTMENT=PATHOLOGY DIVISION=SURGICAL PATHOL GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| LIU,JINLI | CLINICAL ASSISTANT PROF |
| 20762 SCHNELLER, JANET | CLINICAL PROFESSOR (GFT) |

DEPARTMENT=ANESTHESIOLOGY DIVISION=ANESTHESIOLOGY GROUP=STAFF

| NAME | TITLE |
|------|-------|
| BERRIOS-DIAZ, Y | PHYSICIAN SPECIALIST |
| FELDMAN, DAVID | PHYSICIAN SPECIALIST |
| SABZPOSH, SYED | DIRECTOR OF SERV OB ANESTH |

DEPARTMENT=ANESTHESIOLOGY DIVISION=GENERAL GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| SANTOS, WILFRED | CLINICAL ASSISTANT PROF |
| 44703 LIPPS, PETER | CLINICAL ASSISTANT PROF (GFT) |
| 50936 MENDESZOON, MICHAEL | CLINICAL ASSOC PROFESSOR (HS) |

DEPARTMENT=ANESTHESIOLOGY DIVISION=KCHC GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| DAWODU, OMOTOLA | CLINICAL ASSISTANT PROF |
| ESSUMAN, ADWOA | CLINICAL ASSISTANT PROF |
| SHARMA, NARESH | CLINICAL ASSISTANT PROF |

**HEALTH SCIENCE CENTER AT BROOKLYN**
**ALL FUNDS PERSONNEL BUDGET–DEPARTMENT/DIVISION LISTING FY 2013/2014**
**AS REPORTED BY THE DEPARTMENTS**
**M.D. FACULTY/STAFF WITH A KINGS COUNTY SALARY COMPONENT**

DEPARTMENT=ANESTHESIOLOGY DIVISION=NEURO GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 51514 BENDO, AUDREE A. | PROFESSOR (GFT) |

DEPARTMENT=ANESTHESIOLOGY DIVISION=OBSTETRICS GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| AMIN, AZAD | CLINICAL ASSISTANT PROF |
| BOWEN, PAMELA | CLINICAL ASSISTANT PROF |

DEPARTMENT=ANESTHESIOLOGY DIVISION=PAIN GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| ALEXIS, GEORGETTE | CLINICAL ASSISTANT PROF |
| GANESAN, SHANTH | CLINICAL ASSOC PROFESSOR (HS) |

DEPARTMENT=MEDICINE DIVISION=ALLERGY IMMUNOL GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 22819 JOKS, RAUNO O. | ASSOCIATE PROFESSOR (GFT) |

DEPARTMENT=MEDICINE DIVISION=CARDIOLOGY GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 50869 JOHN, SABU | CLINICAL ASST PROFESSOR (HS) |

DEPARTMENT=MEDICINE DIVISION=CARDIOLOGY - KC GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| GRAHAM-HILL, SUZETTE | CLINICAL ASSISTANT PROF |
| KOKOLIS, SPYROS | CLINICAL ASSISTANT PROF |
| PEDALINO, RONAL | ASSISTANT PROFESSOR |

DEPARTMENT=MEDICINE DIVISION=CARDIOLOGY - VA GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| EL SHERIF, NABIL | PROFESSOR |

DEPARTMENT=MEDICINE DIVISION=CARDIOLOGY-CATH GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 50764 HEGDE, SUDHANVA S. | CLINICAL ASSISTANT PROF (GFT) |

DEPARTMENT=MEDICINE DIVISION=ENDOCRIN - KCH GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| LONEY-HUTCHINSO | ASSISTANT PROFESSOR |
| WINER, NATHANIEL | PROFESSOR |

DEPARTMENT=MEDICINE DIVISION=ENDOCRINOLOGY GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 20536 MCFARLANE, SAMY I. | PROFESSOR (GFT) |

DEPARTMENT=MEDICINE DIVISION=GERIATRICS - KC GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| REID-DURANT, MARIE | CLINICAL ASSISTANT PROF |

HEALTH SCIENCE CENTER AT BROOKLYN
ALL FUNDS PERSONNEL BUDGET–DEPARTMENT/DIVISION LISTING FY 2013/2014
AS REPORTED BY THE DEPARTMENTS
M.D. FACULTY/STAFF WITH A KINGS COUNTY SALARY COMPONENT

**DEPARTMENT=MEDICINE DIVISION=GI & HEP GROUP=FACULTY**

| NAME | TITLE |
|---|---|
| 51536 GROSSMAN, EVAN B. | ASSISTANT PROFESSOR (GFT) |
| 51556 LEE, DAVID S. | ASSISTANT PROFESSOR (GFT) |

**DEPARTMENT=MEDICINE DIVISION=GI & HEP - KCH GROUP=FACULTY**

| NAME | TITLE |
|---|---|
| ATLURI, PURNA C | CLINICAL ASSISTANT PROF |
| BASU, PATRICK | CLINICAL ASSISTANT PROFESSOR |
| DUBROSKAYA, VER | ASSISTANT PROFESSOR |
| EL YOUNIS, CHERIF M | CLINICAL ASSOC PROFESSOR (HS) |
| LI LIN, CUI | CLINICAL ASSISTANT PROFESSOR |

**DEPARTMENT=MEDICINE DIVISION=HEM/ONC GROUP=FACULTY**

| NAME | TITLE |
|---|---|
| 20557 SIDHU, GURINDER S. | ASSISTANT PROFESSOR (GFT) |

**DEPARTMENT=MEDICINE DIVISION=HEM/ONC - KCH GROUP=FACULTY**

| NAME | TITLE |
|---|---|
| GONSKY, JASON | ASSISTANT PROFESSOR |
| LEWIS, ROBERT | ASSISTANT PROFESSOR |
| TAIWO, EVELYN O | ASSISTANT PROFESSOR (HS) |

**DEPARTMENT=MEDICINE DIVISION=INFECTIOUS DISE GROUP=FACULTY**

| NAME | TITLE |
|---|---|
| BRATU, SIMONA | ASSISTANT PROFESSOR |
| DELURY, JOHN | ASSISTANT PROFESSOR OF CLINICAL |
| 20378 LANDMAN, DAVID | PROFESSOR (GFT) |
| 20527 QUALE, JOHN M. | PROFESSOR (GFT) |
| 20811 WEISS, STEVEN M. | ASSOCIATE PROFESSOR (GFT) |
| 22858 AUGENBRAUN, MICHAEL | PROFESSOR (GFT) |

**DEPARTMENT=MEDICINE DIVISION=INFECTIOUS DISE GROUP=STAFF**

| NAME | TITLE |
|---|---|
| GINZBURG, VLADI | PHYSICIAN SPECIALIST |

**DEPARTMENT=MEDICINE DIVISION=KCH - ALLERGY GROUP=FACULTY**

| NAME | TITLE |
|---|---|
| RAND, STEPHEN | CLINICAL ASSISTANT PROF |

**DEPARTMENT=MEDICINE DIVISION=KCH - CARDIO GROUP=FACULTY**

| NAME | TITLE |
|---|---|
| BADERO, OLUYEMI | CLINICAL ASST PROFESSOR (HS) |

**DEPARTMENT=MEDICINE DIVISION=KCH - GERIATRIC GROUP=FACULTY**

| NAME | TITLE |
|---|---|
| CHO, LWIN | CLINICAL ASSISTANT PROF |

ALL FUNDS PERSONNEL BUDGET--DEPARTMENT/DIVISION LISTING FY 2013/2014
AS REPORTED BY THE DEPARTMENTS
M.D. FACULTY/STAFF WITH A KINGS COUNTY SALARY COMPONENT

DEPARTMENT=MEDICINE DIVISION=KCH - HOSPITALI GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| BUKHAROVICH, YA | CLINICAL ASSISTANT PROF |
| JEBRAEILI, FATEMAH | CLINICAL ASSISTANT PROF |
| KAO, KATHERINE | CLINICAL ASSISTANT PROF |
| VALEMBRUN, LAVO | CLINICAL ASSISTANT PROF |

DEPARTMENT=MEDICINE DIVISION=KCH - INFECT DI GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| EXILHOMME, JOSE | CLINICAL INSTRUCTOR |

DEPARTMENT=MEDICINE DIVISION=KCH - INT MED GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| BANKOLE, OLUSEG | CLINICAL ASSISTANT PROF |
| BHUTANI, SATISH | INSTRUCTOR |
| KOHLI, RATTANJI | CLINICAL ASSISTANT PROF |
| KONERU, PRABASH | CLINICAL ASSISTANT PROF |
| MAHONEY, MELVIN | CLINICAL ASSISTANT PROF |
| RAHMAN, MOHAMME | CLINICAL INSTRUCTOR (HS) |
| UMBOZOR, AUGUST | CLINICAL ASSISTANT PROF |
| WILLIAMS, JOSEP | CLINICAL INSTRUCTOR |

DEPARTMENT=MEDICINE DIVISION=KCH - MAS GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| PRESCOTT, IAN D | CLINICAL ASSISTANT PROF |
| VALERY, EMMANUEL | INSTRUCTOR |
| VERTUS, AUDANIS | CLINICAL INSTRUCTOR |

DEPARTMENT=MEDICINE DIVISION=KCH - NON DIVIS GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| BEST, ASQUITH C | CLINICAL ASSISTANT PROF |
| BLUM, EDMUND | CLINICAL INSTRUCTOR |
| GORDON, PATRICK | CLINICAL ASSISTANT PROF (GFT) |
| MELLISH, DAWN | ASSISTANT PROFESSOR (GFT) |

DEPARTMENT=MEDICINE DIVISION=KCH - NON DIVIS GROUP=STAFF

| NAME | TITLE |
|------|-------|
| ADIATU, ISMAILA | PRIME CARE PHYS(COM/MANAG |
| BEJARANO NARBONA,RAFAEL | DIRECTOR OF SERVICE |
| BODAFATI,LEENA | PHYSICIAN SPECIALIST |
| CASTRO,PATRICIA | PHYSICIAN SPECIALIST |
| CREVECOEUR, HARRY | PHYSICIAN SPECIALIST |
| FALCONE, FRANCO | PHYSICIAN SPECIALIST |
| GIBBONS, JOHN F. | PHYSICIAN SPECIALIST |
| HEGDE, HRADAYA K | PHYSICIAN SPECIALIST |
| KHAN, MUHAMMAD | PHYSICIAN SPECIALIST |
| KOLLA,MADMAVI | PCP |
| LILEVMAN,GENADY | PHYSICIAN SPECIALIST |
| PAUL, MICHEL | PHYSICIAN SPECIALIST |
| PEREZ, AMARILIS | PHYSICIAN SPECIALIST |
| RAMIREZ, OSCAR | PHYSICIAN SPECIALIST |
| SINGH,AMANDEEP | PHYSICIAN SPECIALIST |
| TKACHENKO,VIKTORIYA | PHYSICIAN SPECIALIST |
| WILSON, CLAUDIA | PHYSICIAN SPECIALIST |

SUNY 001134

STATE UNIVERSITY OF NEW YORK
10:24 Monday, December 30, 2013   7
HEALTH SCIENCE CENTER AT BROOKLYN
ALL FUNDS PERSONNEL BUDGET–DEPARTMENT/DIVISION LISTING FY 2013/2014
AS REPORTED BY THE DEPARTMENTS
M.D. FACULTY/STAFF WITH A KINGS COUNTY SALARY COMPONENT

### DEPARTMENT=MEDICINE DIVISION=KCH - PALLIATIV GROUP=FACULTY

| NAME | TITLE |
| --- | --- |
| SHULMAN, PAVEL | CLINICAL ASSISTANT PROF |

### DEPARTMENT=MEDICINE DIVISION=KCH - PULMONARY GROUP=FACULTY

| NAME | TITLE |
| --- | --- |
| JOHARI,DAVOOD | CLINICAL ASSISTANT PROFESSOR |

### DEPARTMENT=MEDICINE DIVISION=KCH - WALK IN GROUP=FACULTY

| NAME | TITLE |
| --- | --- |
| ROHEN, ANDREW B | ASSISTANT PROFESSOR |

### DEPARTMENT=MEDICINE DIVISION=KCH - WALK IN GROUP=STAFF

| NAME | TITLE |
| --- | --- |
| HEGDE, HRADAYA | PHYSICIAN SPECIALIST |
| RAMANATHAN,HENRY | ATT PHYS II (KCHC) |

### DEPARTMENT=MEDICINE DIVISION=PULMONARY GROUP=FACULTY

| NAME | TITLE |
| --- | --- |
| FAHMY, SAMIR | ASSISTANT PROFESSOR |
| MAHONEY,JAMES A | CLINICAL ASSISTANT PROF |
| 20928 HILL, ALLISON R. | ASSOCIATE PROFESSOR (GFT) |

### DEPARTMENT=MEDICINE DIVISION=PULMONARY - KCH GROUP=FACULTY

| NAME | TITLE |
| --- | --- |
| AKERMAN,MICHAEL | ASSOCIATE PROFESSOR (HS) |
| DUBEY, GANGACHA | CLINICAL ASSISTANT PROF |
| HANSARD, PAUL | ASSISTANT PROFESSOR (HS) |
| 20392 JAMALEDDINE, GHASSAN W. | ASSOCIATE PROFESSOR (HS) |

### DEPARTMENT=MEDICINE DIVISION=RENAL GROUP=FACULTY

| NAME | TITLE |
| --- | --- |
| 28932 DELANO, BARBARA G. | PROFESSOR (HS) |
| 51570 JOSEPH, ANTHONY J. | ASSISTANT PROFESSOR (HS) |

### DEPARTMENT=MEDICINE DIVISION=RENAL-KCH GROUP=FACULTY

| NAME | TITLE |
| --- | --- |
| BRIEFEL, GARY | ASSOCIATE PROF OF CLINICAL |
| MALLAPPALLIL, M | ASSISTANT PROFESSOR (HS) |

### DEPARTMENT=MEDICINE DIVISION=RENAL-KCH GROUP=STAFF

| NAME | TITLE |
| --- | --- |
| GUIRAND, CARLIN | PHYSICIAN SPECIALIST HRLY |

### DEPARTMENT=MEDICINE DIVISION=RHEUMATOLOGY GROUP=FACULTY

| NAME | TITLE |
| --- | --- |
| SOLOMAN, NANCY | CLINICAL ASSISTANT PROF |
| 20922 GINZLER, ELLEN M. | PROFESSOR (HS) |

**SUNY 001135**

HEALTH SCIENCE CENTER AT BROOKLYN
ALL FUNDS PERSONNEL BUDGET--DEPARTMENT/DIVISION LISTING FY 2013/2014
AS REPORTED BY THE DEPARTMENTS
M.D. FACULTY/STAFF WITH A KINGS COUNTY SALARY COMPONENT

DEPARTMENT=NEUROLOGY DIVISION=ADULT NEUROLOGY GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 20646 ANZISKA, BRIAN J. | ASSOCIATE PROFESSOR (GFT) |
| 25827 SOMASUNDARAM, MAHENDRA | DTSG TEACHING PROFESSOR (GFT) |
| 29183 EGGERS, ARNOLD E. | ASSOCIATE PROFESSOR (GFT) |

DEPARTMENT=NEUROLOGY DIVISION=GENERAL NEUROLO GROUP=FACULTY

| NAME | TITLE |
|---|---|
| MEMON, ZAITOON | ASSISTANT PROFESSOR |
| 20553 MERLIN, LISA R. (2) | DTSG TEACHING PROFESSOR (GFT) |
| 33902 VAS, GEORGE A. | PROFESSOR (GFT) |

DEPARTMENT=NEUROLOGY DIVISION=KCHC GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 58149 VALSAMIS, HELEN A. | PROFESSOR (HS) |

DEPARTMENT=NEUROLOGY DIVISION=MOVEMENT DISORD GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 20699 WOLLNER, IVAN B. | PROFESSOR (GFT) |

DEPARTMENT=NEUROLOGY DIVISION=NEUROMUSCULAR GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 21026 MACCABEE, PAUL J. | PROFESSOR (GFT) |

DEPARTMENT=NEUROLOGY DIVISION=NEUROSURGERY GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 50934 SADR, ALI | CLINICAL ASSOC PROFESSOR (HS) |

DEPARTMENT=NEUROLOGY DIVISION=PED NEURO/EPIL GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 51562 MCSWEEN, TRESA D. | ASSISTANT PROFESSOR (GFT) |

DEPARTMENT=NEUROLOGY DIVISION=PEDIATRIC NEURO GROUP=FACULTY

| NAME | TITLE |
|---|---|
| CRACCO, JOAN B. (2) | PROFESSOR (GFT) |
| GIRIDHARAN, RADHA (2) | CLINICAL ASSOCIATE PROF (GFT) |
| 23011 REZNIKOV, ALEXANDRA | ASSISTANT PROFESSOR (GFT) |
| 50738 CHARI, GEETHA | ASSISTANT PROFESSOR (GFT) |

DEPARTMENT=OBS AND GYN DIVISION=GYN ONCOLOGY GROUP=FACULTY

| NAME | TITLE |
|---|---|
| CUTLER, JED | CLINICAL ASSISTANT PROF |
| SEDLIS, ALEXAND | PROFESSOR EMERITUS |
| 24422 LEE, YICHUN | CLINICAL ASSOCIATE PROF (TCL) |
| 28640 ABULAFIA, OVADIA | PROFESSOR AND CHAIRMAN (TCL) |
| 56705 SALAME, GHADIR M. | CLINICAL ASST PROFESSOR TCL |

**SUNY 001136**

**STATE UNIVERSITY OF NEW YORK**
**HEALTH SCIENCE CENTER AT BROOKLYN**
**ALL FUNDS PERSONNEL BUDGET--DEPARTMENT/DIVISION LISTING FY 2013/2014**
**AS REPORTED BY THE DEPARTMENTS**
**M.D. FACULTY/STAFF WITH A KINGS COUNTY SALARY COMPONENT**

DEPARTMENT=OBS AND GYN DIVISION=GYNECOLOGY GROUP=FACULTY

| NAME | TITLE |
|---|---|
| GENTILE, GWEN | ASSOCIATE PROFESSOR |
| PATEL, RAJANLKA | CLINICAL ASSISTANT PROF |
| RICKETTS-HOLCOM | CLINICAL ASSISTANT PROF |

DEPARTMENT=OBS AND GYN DIVISION=MATERN/FETAL ME GROUP=FACULTY

| NAME | TITLE |
|---|---|
| BARTLEY, LORIE | CLINICAL ASSISTANT PROF |
| CLAXTON, CHERYL | CLINICAL ASSISTANT PROF |
| DOUGLAS,ALBERT, | CLINICAL ASSISTANT PROF |
| ETIENNE,GUY | CLINICAL ASSISTANT PROF |
| HAYNES, DIANNE | CLINICAL ASSISTANT PROF |
| JACQUES, RONALD | CLINICAL ASSISTANT PROF |
| JOSEPH, JEAN | CLINICAL ASSISTANT PROF |
| LEE-MCBRIEN, CA | CLINICAL ASSISTANT PROF |
| MURRAY, CYRUS | CLINICAL ASSISTANT PROF |
| NAVARRO, LOLITA | CLINICAL ASSISTANT PROF |
| PETTERKIN, CARL | CLINICAL ASSISTANT PROF |
| PLANINIC, PETAR | CLINICAL ASSISTANT PROF |
| WILLIAMS,DEBORA | CLINICAL ASSISTANT PROF |

DEPARTMENT=OBS AND GYN DIVISION=MATERN/FETAL ME GROUP=STAFF

| NAME | TITLE |
|---|---|
| AJAYI, OLUSEGUN A. | PHYSICIAN SPECIALIST |
| GRUESO, DAISY | ATT PHYS I (KCHC) |
| HAYNES, DIANNE | ATT PHYS I (KCHC) |
| MUNRO, KIMBERLY | CLINICAL ASSISTANT PROF |
| NADER, IYAD | PHYSICIAN SPECIALIST |
| SHORT, ROBBY | PHYSICIAN SPECIALIST |

DEPARTMENT=OBS AND GYN DIVISION=OBS GROUP=FACULTY

| NAME | TITLE |
|---|---|
| FAUSTIN,DANIEL | CLINICAL ASSOC PROFESSOR (HS) |

DEPARTMENT=OBS AND GYN DIVISION=REPRO ENDO GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 24242 DELALE, OZGUL M. | ASSOCIATE PROFESSOR (GFT) |

DEPARTMENT=OBS AND GYN DIVISION=WMNS HLT SERV GROUP=FACULTY

| NAME | TITLE |
|---|---|
| PHILADELPHIA-ANTILUS,MELISSA | CLINICAL ASSISTANT PROF |

DEPARTMENT=OPHTHALMOLOGY DIVISION=CORNEA GROUP=FACULTY

| NAME | TITLE |
|---|---|
| ASOMA, KICHIEMO | CLINICAL ASSISTANT PROF |
| LIU, HOWARD | CLINICAL ASSISTANT PROF |
| 20440 MICHAEL, ANIKA | CLINICAL ASST PROFESSOR (HS) |
| 21016 LAZZARO, DOUGLAS R. | PROFESSOR AND CHAIRMAN (TCL) |

**HEALTH SCIENCE CENTER AT BROOKLYN**
**ALL FUNDS PERSONNEL BUDGET--DEPARTMENT/DIVISION LISTING FY 2013/2014**
**AS REPORTED BY THE DEPARTMENTS**
**M.D. FACULTY/STAFF WITH A KINGS COUNTY SALARY COMPONENT**

DEPARTMENT=OPHTHALMOLOGY DIVISION=GLAUCOMA GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 45124 DERSU, INCI IRAK | VIS CLINICAL ASSOCIATE PROFESSOR |

DEPARTMENT=OPHTHALMOLOGY DIVISION=NEUR-OPH OCULO- GROUP=STAFF

| NAME | TITLE |
|---|---|
| ELMALEM, VALERIE | PHYSICIAN |

DEPARTMENT=OPHTHALMOLOGY DIVISION=NEURO OPHTHALMO GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 58357 GOPAL, LEKHA R. | CLINICAL ASST PROFESSOR (HS) |

DEPARTMENT=OPHTHALMOLOGY DIVISION=OCULAR PATHOLOG GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 29180 MCNALLY, LOIS M. | CLINICAL ASSOC PROFESSOR (HS) |

DEPARTMENT=OPHTHALMOLOGY DIVISION=OCULAR PLASTICS GROUP=FACULTY

| NAME | TITLE |
|---|---|
| SHINDER, ROMAN | ASSISTANT PROFESSOR (HS) |

DEPARTMENT=OPHTHALMOLOGY DIVISION=OPHTHALMOLOGY GROUP=FACULTY

| NAME | TITLE |
|---|---|
| SCOTT, WAYNE | CLINICAL ASSISTANT PROF |
| 45122 LAZZARO, EMANUEL C. | ASSOCIATE PROFESSOR (HS) |

DEPARTMENT=OPHTHALMOLOGY DIVISION=OPHTHALMOLOGY GROUP=STAFF

| NAME | TITLE |
|---|---|
| WEITZNER, ARI L. | PHYSICIAN SPECIALIST |

DEPARTMENT=OPHTHALMOLOGY DIVISION=PEDIATRICS GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 58318 DEUTSCH, JAMES A. | CLINICAL ASST PROFESSOR TCL |

DEPARTMENT=OPHTHALMOLOGY DIVISION=RETINA GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 22854 SHRIER, ERIC M. | ASSISTANT PROFESSOR (TCL) |
| 44827 OLUMBA, KENNETH C. | CLINICAL ASSISTANT PROF (GFT) |

DEPARTMENT=OPHTHALMOLOGY DIVISION=RETINA GROUP=STAFF

| NAME | TITLE |
|---|---|
| GLATMAN, JOSH | ATT PHYS III (KCHC) |
| TSENG, JOSEPH | ATTENDING PHYSICIAN (KCHC) |

DEPARTMENT=PEDIATRICS DIVISION=ADOLESCENT MEDI GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 50927 SUSS, AMY L. | CLINICAL ASSOCIATE PROF (GFT) |

STATE UNIVERSITY OF NEW YORK
HEALTH SCIENCE CENTER AT BROOKLYN
ALL FUNDS PERSONNEL BUDGET--DEPARTMENT/DIVISION LISTING FY 2013/2014
AS REPORTED BY THE DEPARTMENTS
M.D. FACULTY/STAFF WITH A KINGS COUNTY SALARY COMPONENT

10:24 Monday, December 30, 2013   11

DEPARTMENT=PEDIATRICS DIVISION=ALLERGY/IMMUN GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 20399 MOALLEM, HAMID I. (2) | ASSOCIATE PROFESSOR (HS) |

DEPARTMENT=PEDIATRICS DIVISION=AMBULATORY GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| ACOSTA, LETICIA | ASSISTANT PROFESSOR |
| BANSAL, USHA | CLINICAL ASSISTANT PROF |
| BRAVO, LETICIA | ASSISTANT PROFESSOR (HS) |
| CAMBRIDGE, RHON | ASSISTANT PROFESSOR (HS) |
| CHORNY, VALERIY | ASSISTANT PROFESSOR (HS) |
| DAPUL, ELVIRA F. | ASSISTANT PROFESSOR |
| DIPASQUALE, RICH | ASSISTANT PROFESSOR |
| JAIN, ASHA | CLINICAL ASSISTANT PROF |
| MEHTA, SWATI A. | CLINICAL ASSISTANT PROF |
| REDDY, JAMUNA | CLINICAL INSTRUCTOR |
| TORGERSON, KRIS | ASSISTANT PROFESSOR |

DEPARTMENT=PEDIATRICS DIVISION=AMBULATORY GROUP=STAFF

| NAME | TITLE |
|------|-------|
| BAILEY, SHELLEY | PHYSICIAN SPECIALIST |
| BOYKE, CATHY-AN | PHYSICIAN SPECIALIST |
| CASTELLS, SALVA | PHYSICIAN |
| LAPORTE, MARIE | PHYSICIAN SPECIALIST |
| MATAYEVA, GULYA | PHYSICIAN SPECIALIST |
| SHAH, GOPI R. | ATT PHYS III (KCHC) |
| TEJANI, CENA | ATT PHYS III (KCHC) |

DEPARTMENT=PEDIATRICS DIVISION=CRITICAL CARE GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| ABDELMONEIM, TALAAT | ASSISTANT PROFESSOR (HS) |
| KUMAR, SMITA | ASSISTANT PROFESSOR |
| SKARICIC, DAVOR | ASSISTANT PROFESSOR (HS) |

DEPARTMENT=PEDIATRICS DIVISION=CRITICAL CARE GROUP=STAFF

| NAME | TITLE |
|------|-------|
| PHOKELA, SARABJ | PHYSICIAN SPECIALIST HRLY |

DEPARTMENT=PEDIATRICS DIVISION=EMERGENCY GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| JULE, JOSE E | ASSISTANT PROFESSOR (GFT) |

DEPARTMENT=PEDIATRICS DIVISION=GENETICS GROUP=STAFF

| NAME | TITLE |
|------|-------|
| OUNDJIAN, NELLY | PHYSICIAN SPECIALIST HRLY |

DEPARTMENT=PEDIATRICS DIVISION=HEMATOLOGY/ONCO GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 21049 MILLER, SCOTT T. | PROFESSOR (GFT) |
| 25755 RAO, SREEDHAR | PROFESSOR (GFT) |
| 58362 ZHANG, YAOPING | ASSISTANT PROFESSOR (GFT) |

STATE UNIVERSITY OF NEW YORK
HEALTH SCIENCE CENTER AT BROOKLYN
ALL FUNDS PERSONNEL BUDGET–DEPARTMENT/DIVISION LISTING FY 2013/2014
AS REPORTED BY THE DEPARTMENTS
M.D. FACULTY/STAFF WITH A KINGS COUNTY SALARY COMPONENT

10:24 Monday, December 30, 2013    12

DEPARTMENT=PEDIATRICS DIVISION=INFECTIOUS DISE GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| GESNER, MATTHEW | ASSISTANT PROFESSOR |
| 20546 HAMMERSCHLAG, MARGARET R. | PROFESSOR (HS) |

DEPARTMENT=PEDIATRICS DIVISION=KCHC GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| BROWNE, PATRICE | ASSISTANT PROFESSOR (HS) |

DEPARTMENT=PEDIATRICS DIVISION=KCHC CRITICAL C GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| SHAH, VIKAS S. | ASSISTANT PROFESSOR (HS) |

DEPARTMENT=PEDIATRICS DIVISION=KCHC-DIR OF SER GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| DESAI, NINAD | ASSOCIATE PROFESSOR |

DEPARTMENT=PEDIATRICS DIVISION=NEONATOLOGY GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| AHMAD, ASMA | ASSISTANT PROFESSOR |
| HAND, IVAN | ASSOCIATE PROFESSOR (HS) |
| MUNDAKEL, GRATI | ASSISTANT PROFESSOR |
| RANU, SUKHVINDE | ASSISTANT PROFESSOR (HS) |
| 51062 GHALY, EMAD A. | CLINICAL INSTRUCTOR (HS) |
| 51294 JEAN-BAPTISTE, DOMINIQUE | CLINICAL INSTRUCTOR (HS) |
| 56473 D'SOUZA, ANTONI | ASSISTANT PROFESSOR (GFT) |

DEPARTMENT=PEDIATRICS DIVISION=NEONATOLOGY GROUP=STAFF

| NAME | TITLE |
|------|-------|
| ALI,SALMA | PHYSICIAN SPECIALIST HRLY |
| LAHAGE,NADINE | ASSISTANT PROFESSOR (GFT) |

DEPARTMENT=PEDIATRICS DIVISION=PEDIATRIC ADMIN GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 20800 FISHER, STANLEY E. (2) | PROFESSOR AND CHAIRMAN (TCL) |

DEPARTMENT=PEDIATRICS DIVISION=PEDIATRIC CARDI GROUP=STAFF

| NAME | TITLE |
|------|-------|
| RAO, SUDHA M | DIR OF SERVICE-APPR SPE |

DEPARTMENT=PEDIATRICS DIVISION=PEDIATRIC GASTR GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 21029 NATHAN, RADHA | CLINICAL ASST PROFESSOR (HS) |
| 24230 SCHWARZ, STEVEN M. | PROFESSOR (GFT) |
| 24244 RABINOWITZ, SIMON | VISITING PROFESSOR (GFT) |
| 28968 XU, JILIU | ASSISTANT PROFESSOR (GFT) |

### DEPARTMENT=PEDIATRICS DIVISION=PEDIATRIC NEPHR GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 21407 MONGIA, ANIL K. | ASSISTANT PROFESSOR (GFT) |
| 22314 TAWADROUS, HANAN K. | ASSISTANT PROFESSOR (GFT) |

### DEPARTMENT=PEDIATRICS DIVISION=PEDIATRIC VC ED GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 21168 WADOWSKI, STEPHEN (2) | CLINICAL ASSOCIATE PROF (GFT) |

### DEPARTMENT=PEDIATRICS DIVISION=PRC GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| GEORGE, LALU | CLINICAL ASSISTANT PROF |
| WALDMAN, LEE | ASSISTANT PROFESSOR |

### DEPARTMENT=PEDIATRICS DIVISION=PULMONOLOGY GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| WEAVER, DIANA | ASSISTANT PROFESSOR (GFT) |

### DEPARTMENT=PSYCHIATRY DIVISION=C/L & ER SERVI GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 22865 VISWANATHAN, RAMASWAMY (2) | ASSOCIATE PROFESSOR (TCL) |

### DEPARTMENT=PSYCHIATRY DIVISION=EDUCATION PSYCH GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 47049 BERKOWITZ, ELLEN | CLINICAL ASSISTANT PROF (GFT) |

### DEPARTMENT=PSYCHIATRY DIVISION=KCHC GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| ADEBISI, AKINOLA | CLINICAL ASSISTANT PROF |
| AMIN, SHWETA | CLINICAL ASSISTANT PROF |
| ANANTHAMOORTHY,RENUKA | CLINICAL ASST PROFESSOR TCL |
| BENABE, MORGANA | CLINICAL ASSISTANT PROF |
| BRASLAVSKAYA, TATYANA | CLINICAL ASSISTANT PROF |
| BRODERICK, MONICA | CLINICAL ASSISTANT PROF |
| BRUNY-OLAWAIYE, | CLINICAL ASSISTANT PROF |
| COMBS, MICHAEL | CLINICAL ASSISTANT PROF |
| DICKERSON, WESL | CLINICAL ASSISTANT PROF |
| EYIUCHE,CHUDI C | CLINICAL ASSISTANT PROF |
| FULLAR, MICHAEL | CLINICAL ASSISTANT PROF |
| GAMER,SEVIL | CLINICAL ASSISTANT PROF |
| GARUBA, MARIAM | CLINICAL ASSISTANT PROF |
| GIL, ROBERTO | CLINICAL ASST PROFESSOR (HS) |
| GILMORE, DONNA | CLINICAL ASSISTANT PROF |
| GONZALEZ, ERNESTO | CLINICAL ASSISTANT PROF. |
| GREEN, NORMA | CLINICAL ASSISTANT PROF |
| HERBERT,FARAH R. | CLINICAL ASST PROFESSOR (HS) |
| HUANGTHAISONG, | CLINICAL ASSISTANT PROF |
| KINYAMU, RICHARD | CLINICAL ASSISTANT PROF |
| KOPP, MELANIE | CLINICAL ASSISTANT PROF |
| MADDOX,JILL H | CLINICAL ASSISTANT PROF |
| MERLINO,JOSEPH | PROFESSOR (TCL) |
| MOHIT, ABDUL | CLINICAL ASSISTANT PROF |
| OCCHIOGROSSO,GLENN A | CLINICAL ASSISTANT PROF |

*STATE UNIVERSITY OF NEW YORK*
*HEALTH SCIENCE CENTER AT BROOKLYN*
*ALL FUNDS PERSONNEL BUDGET–DEPARTMENT/DIVISION LISTING FY 2013/2014*
*AS REPORTED BY THE DEPARTMENTS*
*M.D. FACULTY/STAFF WITH A KINGS COUNTY SALARY COMPONENT*

DEPARTMENT=PSYCHIATRY DIVISION=KCHC GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| RAHMAN, HABIBUR | CLINICAL ASSISTANT PROF |
| RAHMAN, QUAZI | CLINICAL ASSISTANT PROF |
| RUETH, ERIC | CLINICAL ASSISTANT PROF |
| SALIMI,KAYVON | CLINICAL ASSISTANT PROF |
| SIAVASHI,ALI | CLINICAL ASSISTANT PROF |
| SINGH,SABINA | CLINICAL ASSISTANT PROF |
| STORCH, RICHARD | CLINICAL ASSISTANT PROF |
| TANSIL, SUSAN | CLINICAL ASSISTANT PROF |
| UMADAT,KHEMDAT | CLINICAL ASSISTANT PROF |
| VERETILO, PAVEL | CLINICAL ASSISTANT PROF |
| WHITLEY, SUSAN | CLINICAL ASSISTANT PROF |
| ZAVERI, DEVAL | CLINICAL ASSISTANT PROF |

DEPARTMENT=PSYCHIATRY DIVISION=KCHC GROUP=STAFF

| NAME | TITLE |
|------|-------|
| FATAKHOV, BORIS | PHYSICIAN SPECIALIST |
| MUSTAFA,TANZIA | CLINICAL ASSISTANT PROF |
| O'KEEFE, PAUL | PHYSICIAN SPECIALIST |

DEPARTMENT=PSYCHIATRY DIVISION=KCHC ADDICTIVE GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 44684 NARASIMHAN, NARASIMHAN L. | CLINICAL ASST PROFESSOR TCL |
| 47039 SINGH, CHANDRA B. | CLINICAL ASST PROFESSOR TCL |

DEPARTMENT=PSYCHIATRY DIVISION=KCHC ADOLESCENT GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| NIKOLOV, ROUMEN | CLINICAL ASSISTANT PROF |

DEPARTMENT=PSYCHIATRY DIVISION=KCHC ADULT INPA GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| RAO,VILAYANNUR | CLINICAL ASSISTANT PROF |
| SHAPIRO, ALLA | CLINICAL ASSISTANT PROF |

DEPARTMENT=PSYCHIATRY DIVISION=KCHC ADULT PSYC GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| BLANCHARD, PIER | CLINICAL ASSISTANT PROF |
| 47053 RUBEL, STEVEN | CLINICAL ASST PROFESSOR TCL |

DEPARTMENT=PSYCHIATRY DIVISION=KCHC C/L SERVIC GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| OSTROVSKAYA, AL | CLINICAL ASSISTANT PROF |
| TUSHER,ALAN L | CLINICAL ASSISTANT PROF |

DEPARTMENT=PSYCHIATRY DIVISION=KCHC CHILD PSYC GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| ABDEL-WAHAB, NANCY | CLINICAL ASSISTANT PROF |
| GALANTER,CATHRYN | CLINICAL ASST PROFESSOR (HS) |
| HAMBLIN, JEFFRE | CLINICAL ASST PROFESSOR (HS) |
| 44914 PEDRON-SANTIAGO, JOSEPHINE E | CLINICAL ASST PROFESSOR (HS) |
| 47041 ENGEL, LENORE | CLINICAL ASSISTANT PROF (GFT) |

**STATE UNIVERSITY OF NEW YORK**
**HEALTH SCIENCE CENTER AT BROOKLYN**
**ALL FUNDS PERSONNEL BUDGET–DEPARTMENT/DIVISION LISTING FY 2013/2014**
**AS REPORTED BY THE DEPARTMENTS**
**M.D. FACULTY/STAFF WITH A KINGS COUNTY SALARY COMPONENT**

DEPARTMENT=PSYCHIATRY DIVISION=KCHC CHILD PSYC GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 47063 PLANTIN, MOISE L. | CLINICAL ASSISTANT PROF (GFT) |
| 47086 JACQUES, JEANROBERT H. | CLINICAL ASSISTANT PROF (GFT) |
| 47805 ESTES, DAVID S. | CLINICAL ASSISTANT PROF (GFT) |

DEPARTMENT=PSYCHIATRY DIVISION=KCHC ER GROUP=FACULTY

| NAME | TITLE |
|---|---|
| BERGER, SCOTT A | CLINICAL ASST PROFESSOR (HS) |
| SIDDIQUE, MIAN | CLINICAL ASST PROFESSOR (HS) |

DEPARTMENT=PSYCHIATRY DIVISION=KCHC ER GROUP=STAFF

| NAME | TITLE |
|---|---|
| GULRAJANI, CHIN | ATT PHYS I (KCHC) |

DEPARTMENT=PSYCHIATRY DIVISION=KCHC NON-DIVISI GROUP=STAFF

| NAME | TITLE |
|---|---|
| HOSSAIN, ZAKIA | ATT PHYS III (KCHC) |

DEPARTMENT=PSYCHIATRY DIVISION=KCHC OUTPATIENT GROUP=FACULTY

| NAME | TITLE |
|---|---|
| SCHWARTZ, SCOTT | CLINICAL ASSISTANT PROF |

DEPARTMENT=PSYCHIATRY DIVISION=KCHC-ALCOHOL GROUP=FACULTY

| NAME | TITLE |
|---|---|
| MANGAL, RAKESH | CLINICAL ASSISTANT PROF |

DEPARTMENT=PSYCHIATRY DIVISION=KCHC-PSYCHIATRY GROUP=FACULTY

| NAME | TITLE |
|---|---|
| ASFAR, TOM RICHA | CLINICAL ASSISTANT PROF |
| MAGARDICIAN, KA | CLINICAL INSTRUCTOR (HS) |
| WEINER, RICHARD | CLINICAL ASSISTANT PROF |

DEPARTMENT=PSYCHIATRY DIVISION=UHB BELL GROUP=FACULTY

| NAME | TITLE |
|---|---|
| ALEXSENKO, LADA | CLINICAL INSTRUCTOR (HS) |
| JANARDHANAN, THULASIRAM | CLINICAL INSTRUCTOR (HS) |

DEPARTMENT=RADIOLOGY DIVISION=ABDOMINAL GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 44826 MASON, CATHERINE | CLINICAL ASST PROFESSOR (HS) |
| 44883 KANTOR, ALAN | CLINICAL ASST PROFESSOR (HS) |

DEPARTMENT=RADIOLOGY DIVISION=ABDOMINAL/KCHC GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 44854 HAMMILL, PATRICK J. | CLINICAL ASST PROFESSOR TCL |

HEALTH SCIENCE CENTER AT BROOKLYN
ALL FUNDS PERSONNEL BUDGET--DEPARTMENT/DIVISION LISTING FY 2013/2014
AS REPORTED BY THE DEPARTMENTS
M.D. FACULTY/STAFF WITH A KINGS COUNTY SALARY COMPONENT

DEPARTMENT=RADIOLOGY DIVISION=BREAST /KCHC GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 48040 ROITBERG, DAPHNE | CLINICAL ASST PROFESSOR TCL |

DEPARTMENT=RADIOLOGY DIVISION=BREAST IMAGING GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 24376 HANLEY, CLAIRE E. | CLINICAL ASST PROFESSOR TCL |
| 44828 CHAUDARY, RIFFAT R. | CLINICAL ASST PROFESSOR TCL |

DEPARTMENT=RADIOLOGY DIVISION=CARDIOTHORACIC GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 21041 WAITE, STEPHEN A. | ASSISTANT PROFESSOR (HS) |

DEPARTMENT=RADIOLOGY DIVISION=DIAGNOSTIC GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 42650 MAGEE, BRIAN J. | CLINICAL ASST PROFESSOR (HS) |
| 44893 CHEN, QIXIN | ASSISTANT PROFESSOR (TCL) |
| 44904 MIRCHANDANI, GAUTAM R. | ASSISTANT PROFESSOR (TCL) |

DEPARTMENT=RADIOLOGY DIVISION=EMERGENCY GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 44511 AREMAN, RUSSELL D. | CLINICAL ASST PROFESSOR (HS) |
| 44849 GREENBERG, ODED | CLINICAL ASST PROFESSOR TCL |

DEPARTMENT=RADIOLOGY DIVISION=GI/KCHC GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 22852 SAMIN, AMIRAM | ASSISTANT PROFESSOR (TCL) |

DEPARTMENT=RADIOLOGY DIVISION=INTERVENTIONAL GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 41232 KWON, WILLIAM | CLINICAL ASSISTANT PROF |
| 44543 HERSKOWITZ, MICHAEL | CLINICAL ASSOC PROFESSOR (HS) |
| 51035 LEVIN, DANIEL Q. | CLINICAL ASST PROFESSOR TCL |

DEPARTMENT=RADIOLOGY DIVISION=IR/ KCHC GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 44900 WALSH, JAMES P. | CLINICAL ASST PROFESSOR TCL |

DEPARTMENT=RADIOLOGY DIVISION=KCHC GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 44902 VELAYUDHAN, VINODKUMAR | CLINICAL ASST PROFESSOR TCL |

DEPARTMENT=RADIOLOGY DIVISION=MUSCULOSKELETAL GROUP=FACULTY

| NAME | TITLE |
|---|---|
| 24370 KOLLA, SRINIVAS R. | CLINICAL ASST PROFESSOR (HS) |
| 44859 LEHTO, SCOTT A. | CLINICAL ASST PROFESSOR TCL |

*STATE UNIVERSITY OF NEW YORK*
*HEALTH SCIENCE CENTER AT BROOKLYN*
*ALL FUNDS PERSONNEL BUDGET--DEPARTMENT/DIVISION LISTING FY 2013/2014*
*AS REPORTED BY THE DEPARTMENTS*
*M.D. FACULTY/STAFF WITH A KINGS COUNTY SALARY COMPONENT*

DEPARTMENT=RADIOLOGY DIVISION=NEURO/KCHC GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 44895 PULITZER, STEVEN | ASSISTANT PROFESSOR (TCL) |

DEPARTMENT=RADIOLOGY DIVISION=NEUROINTERVENTI GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 56708 MANOLA, SUNDEEP (2) | ASSOCIATE PROFESSOR (TCL) |

DEPARTMENT=RADIOLOGY DIVISION=NUCLEAR GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 29216 STRASHUN, ARNOLD M. | PROFESSOR (TCL) |

DEPARTMENT=RADIOLOGY DIVISION=RAD ONC GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 20691 ROTMAN, MARVIN (2) | DTSG SVC PROF CHMN (MEDICINE) |

DEPARTMENT=RADIOLOGY DIVISION=RADIOLOGY PEDIA GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 24290 AMODIO, JOHN B. | PROFESSOR (TCL) |
| 44892 GOLDFISHER, RACHELLE | ASSISTANT PROFESSOR (TCL) |

DEPARTMENT=RADIOLOGY DIVISION=SONO/KCHC GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 45056 ZINN, DANIEL L. | ASSISTANT PROFESSOR (TCL) |

DEPARTMENT=RAD ONCOLOGY DIVISION=CLINICAL RADIAT GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| NWOKEDI, EMMANU | CLINICAL ASST PROFESSOR (HS) |
| 20691 ROTMAN, MARVIN (2) | DTSG SVC PROF CHMN (MEDICINE) |
| 44903 SCHWARTZ, MICHAEL S. | CLINICAL ASST PROFESSOR TCL |
| 50929 CHOI, KWANG N. | CLINICAL PROFESSOR TCL |

DEPARTMENT=ORTHO SURG/REHAB MEDICINE DIVISION=KCHC-ORTHO GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| FREEMAN, BARBAR | CLINICAL ASSISTANT PROF |
| JOSEPH, DAVID | CLINICAL ASSISTANT PROF |
| MANNING, REGINA | CLINICAL ASSISTANT PROF |
| MONSANTO,ENRIQU | ASSOCIATE PROFESSOR |
| WADHWA, RAM | CLINICAL ASSISTANT PROF |

DEPARTMENT=ORTHO SURG/REHAB MEDICINE DIVISION=KCHC-ORTHO GROUP=STAFF

| NAME | TITLE |
|------|-------|
| TROVATE, DANTE | ATT PHYS III (KCHC) |

DEPARTMENT=ORTHO SURG/REHAB MEDICINE DIVISION=KCHC-REHAB GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| BAYOL,MARCEL G | CLINICAL ASSISTANT PROF |
| KIFLE, GETAHUN | CLINICAL ASSISTANT PROF |
| NASSER, IBRAHIM | CLINICAL ASSISTANT PROF |

HEALTH SCIENCE CENTER AT BROOKLYN
ALL FUNDS PERSONNEL BUDGET--DEPARTMENT/DIVISION LISTING FY 2013/2014
AS REPORTED BY THE DEPARTMENTS
M.D. FACULTY/STAFF WITH A KINGS COUNTY SALARY COMPONENT

DEPARTMENT=ORTHO SURG/REHAB MEDICINE DIVISION=LICH-ORTHO GROUP=FACULTY

| NAME | TITLE |
| --- | --- |
| 58689 CALIGIURI, DANIEL A. | CLINICAL ASST PROFESSOR (HS) |

DEPARTMENT=ORTHO SURG/REHAB MEDICINE DIVISION=ORTHO SURG GROUP=FACULTY

| NAME | TITLE |
| --- | --- |
| SCOTT, CLAUDE B. | ASSISTANT PROFESSOR (GFT) |
| 21437 PAULINO, CARL B. | ASSISTANT PROFESSOR (GFT) |
| 22301 MAHESHWARI, ADITYA V. | ASSISTANT PROFESSOR (GFT) |

DEPARTMENT=ORTHO SURG/REHAB MEDICINE DIVISION=SPORTS MED GROUP=FACULTY

| NAME | TITLE |
| --- | --- |
| 22062 URBAN, WILLIAM P. | ASSOCIATE PROFESSOR (GFT) |

DEPARTMENT=OTOLARYNGOLOGY DIVISION=FAC PLAST & REC GROUP=FACULTY

| NAME | TITLE |
| --- | --- |
| 21048 BUTTS, SYDNEY C. | ASSISTANT PROFESSOR (GFT) |

DEPARTMENT=OTOLARYNGOLOGY DIVISION=GENERAL OTOLARY GROUP=FACULTY

| NAME | TITLE |
| --- | --- |
| HAR-EL, GADY | PROFESSOR |
| SHULMAN, ABRAHA | PROFESSOR EMERITUS |
| 23009 BORUK, MARINA | ASSISTANT PROFESSOR (GFT) |
| 23959 LIM, JESSICA W. | ASSISTANT PROFESSOR (HS) |
| 58247 RUFFY, MAURO | CLINICAL ASST PROFESSOR TCL |

DEPARTMENT=OTOLARYNGOLOGY DIVISION=HEAD & NECK SUR GROUP=FACULTY

| NAME | TITLE |
| --- | --- |
| 20890 CHERNICHENKO, NATALYA E. | ASSISTANT PROFESSOR (GFT) |
| 58240 SUNDARAM, KRISHNAMURTHI | CLINICAL PROFESSOR TCL |

DEPARTMENT=OTOLARYNGOLOGY DIVISION=MICROVASCULAR & GROUP=FACULTY

| NAME | TITLE |
| --- | --- |
| 20702 LIN, ALICE | ASSISTANT PROFESSOR |

DEPARTMENT=OTOLARYNGOLOGY DIVISION=OTOLOGY/NEUROTO GROUP=FACULTY

| NAME | TITLE |
| --- | --- |
| 21043 HANSON, MATTHEW B. | ASSISTANT PROFESSOR (GFT) |

DEPARTMENT=OTOLARYNGOLOGY DIVISION=PEDIATRIC OTOLA GROUP=FACULTY

| NAME | TITLE |
| --- | --- |
| 21337 SILVERMAN, JOSHUA B. | ASSISTANT PROFESSOR (GFT) |

DEPARTMENT=SURGERY DIVISION=CARDIOTHORACIC GROUP=FACULTY

| NAME | TITLE |
| --- | --- |
| 21150 BURACK, JOSHUA | CLINICAL ASSOCIATE PROF (GFT) |

DEPARTMENT=SURGERY DIVISION=COLORECTAL-KCH GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| TALUS, HENRY | ASSISTANT PROFESSOR (HS) |

DEPARTMENT=SURGERY DIVISION=CRITICAL CARE T GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| ANGUS, LAMBROS | ASSISTANT PROFESSOR |
| BIGGS, CARINA | ASSISTANT PROFESSOR |
| HIRSHBERG,ASHER | PROFESSOR OF CLINICAL SURGERY |
| KURTZ, ROBERT | VISITING ASSOC. PROFESSOR (GFT) |
| 21021 ONEILL, PATRICIA A. | ASSOCIATE PROFESSOR (GFT) |

DEPARTMENT=SURGERY DIVISION=DENTAL & ORAL M GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| BERGER, JULIUS R (2) | PROFESSOR (HS) |
| BLANK,DAVID | CLINICAL ASSISTANT PROF |
| CHASIN, ARTHUR M | CLINICAL ASSISTANT PROF |
| IZZO, STEVEN | CLINICAL ASSISTANT PROF |
| JOSEPH, ALFRED (2) | CLINICAL ASSISTANT PROF |
| LAZOW, STEWART | PROFESSOR OF CLINICAL SURGERY |
| LEVINSKY, DAVID | CLINICAL ASSISTANT PROF |

DEPARTMENT=SURGERY DIVISION=DENTAL & ORAL M GROUP=STAFF

| NAME | TITLE |
|------|-------|
| CHAZBANI, DIKLA | DIR OF SERVICE-APPR SPE |
| GUAGLIANO, PETE | PHYSICIAN SPECIALIST |
| PETERSON, BARBA | ATTENDING DENTIST L3 HRLY |
| SHAPIRO, SLAVA | ATTENDING DENTIST L2 HRLY |

DEPARTMENT=SURGERY DIVISION=GENERAL SURGERY GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| ROUDNITSKY,VALERY | ASSISTANT PROFESSOR (HS) |
| 21156 LEWIS, THEOPHILUS | CLINICAL ASSOCIATE PROF (GFT) |

DEPARTMENT=SURGERY DIVISION=KCHC CT SURGERY GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| CANE, JEFFREY S | CLINICAL ASSISTANT PROF |

DEPARTMENT=SURGERY DIVISION=LAPAROSCOPY KCH GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 33724 MCINTYRE, THOMAS P. | ASSISTANT PROFESSOR (HS) |

DEPARTMENT=SURGERY DIVISION=ONCOLOGY GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 23768 SERAFINI, FRANCESCO | ASSISTANT PROFESSOR (HS) |

DEPARTMENT=SURGERY DIVISION=PEDIATRIC SURGE GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| JONGCO,BIENVENIDO R | CLINICAL ASSISTANT PROF |
| 56362 SHORTER, NICHOLAS A. | PROFESSOR (HS) |

STATE UNIVERSITY OF NEW YORK
HEALTH SCIENCE CENTER AT BROOKLYN
ALL FUNDS PERSONNEL BUDGET--DEPARTMENT/DIVISION LISTING FY 2013/2014
AS REPORTED BY THE DEPARTMENTS
M.D. FACULTY/STAFF WITH A KINGS COUNTY SALARY COMPONENT

10:24 Monday, December 30, 2013   20

DEPARTMENT=SURGERY DIVISION=PLASTIC SURGERY GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 50745 PARHISCAR, AFSHIN | CLINICAL ASST PROFESSOR TCL |

DEPARTMENT=SURGERY DIVISION=SURGERY ADMINIS GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| MUTHUKUMAR,MUTH | ASSISTANT PROFESSOR (HS) |

DEPARTMENT=SURGERY DIVISION=TRAUMA-KCHC GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 58268 DUNCAN, ALBERT | CLINICAL ASST PROFESSOR TCL |

DEPARTMENT=SURGERY DIVISION=VASCULAR GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 51553 HENDRZAK, ANDREA | ASSISTANT PROFESSOR (QFT) |

DEPARTMENT=SURGERY DIVISION=VASCULAR KCHC GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 56480 KIRWIN, JON D. | ASSISTANT PROFESSOR (HS) |

DEPARTMENT=UROLOGY DIVISION=ADULT UROLOGY GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| LEE,COURTNEY L | ASSISTANT PROFESSOR |
| 51663 MCNEIL, BRIAN K. | ASSISTANT PROFESSOR (TCL) |

DEPARTMENT=UROLOGY DIVISION=GENERAL UROLOGY GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| 58160 HYACINTHE, LLEWELLYN M. | CLINICAL ASST PROFESSOR (HS) |

DEPARTMENT=UROLOGY DIVISION=KCHC GROUP=FACULTY

| NAME | TITLE |
|------|-------|
| LIPYANSKY, ALEXANDER | CLINICAL ASST PROFESSOR (HS) |

## FULL-TIME EQUIVALENT AFFILIATE RESIDENTS ASSIGNED TO THE FACILITY

| DEPARTMENT | PROGRAM | NUMBER OF FTEs BY POST-GRADUATE YEAR AS OF JULY 1, 2013 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | PGY-1 | PGY-2 | PGY-3 | PGY-4 | PGY-5 | PGY-6 | PGY-7 | PGY-8 | ALL PGYs |
| Dermatology | Dermatology | | | 1 | 2 | 2 | | | | 5 |
| | Dermatopathology | | | | | 1 | | | | 1 |
| | **Total Dermatology** | **0** | **0** | **1** | **2** | **3** | **0** | **0** | **0** | **6** |
| Emergency Medicine | Emergency Medicine | 11 | 5 | 14 | 14 | | | | | 44 |
| | Emergency Medicine - IM | 3 | 3 | | 3 | | | | | 9 |
| | Emergency Medicine - Pediatric Emergency Medicine | | | | 3 | 1 | | | | 4 |
| | **Total Emergency Medicine** | **14** | **8** | **14** | **20** | **1** | **0** | **0** | **0** | **57** |
| Medicine | Internal Medicine | 12 | 22 | 23 | 4 | | | | | 61 |
| | Internal Medicine - Allergy | | | | | | | | | 1 |
| | Internal Medicine - Emergency Medicine | | 4 | 2 | | | | | 1 | 9 |
| | Medicine - Cardiology | | | | | 3 | 1 | 1 | | 5 |
| | Medicine - ECRIP | | | | | | | | | 0 |
| | Medicine - Endocrinology | | | | | 1 | | | | 1 |
| | Medicine - Gastroenterology | | | | 1 | 1 | 1 | | | 3 |
| | Medicine - Hematology/Oncology (Including Sickle Cell) | 1 | | | 1 | 2 | | | | 4 |
| | Medicine - Nephrology | | | | 1 | 2 | | | | 3 |
| | Medicine - Pulmonary/Critical Care | | | | 1 | 1 | 3 | 1 | | 6 |
| | Medicine - Rheumatology | | | | 1 | 1 | | | | 2 |
| | Medicine - Infectious Diseases | | | | 3 | 1 | | | | 4 |
| | **Total Medicine** | **13** | **26** | **25** | **12** | **15** | **5** | **2** | **1** | **99** |
| Neurology | Neurology | 1 | 3 | 3 | 5 | 1 | | | | 13 |
| | Neurophysiology | | | | | | | | | 0 |
| | Neurology - Pediatric Neurology | | | | | 2 | | | | 2 |
| | **Total Neurology** | **1** | **3** | **3** | **5** | **3** | **0** | **0** | **0** | **15** |
| Pathology | Pathology | 5 | 1 | 5 | 2 | | | | | 13 |
| | Pathology - Neuropathology | | | | | | | | | 0 |
| | **Total Pathology** | **6** | **1** | **5** | **2** | **0** | **0** | **0** | **0** | **13** |
| Pediatrics | Pediatrics | 23 | 13 | 17 | 2 | | | | | 55 |
| | Pediatric Endocrinology | | | | 1 | | | | | 1 |
| | Pediatric Gastroenterology | | | | | 1 | | | | 1 |
| | Pediatric Infectious Disease | | | | | | 1 | | | 1 |
| | Pediatric Nephrology | | | | 1 | | 1 | | | 2 |
| | Pediatric Pulmonology | | | | | | | | | 0 |
| | **Total Pediatrics** | **23** | **13** | **17** | **4** | **1** | **2** | **0** | **0** | **60** |
| Psychiatry | Psychiatry | 5 | 6 | 8 | 10 | | 1 | | | 30 |
| | Psychiatry - Child & Adolescence | | | | 2 | | 1 | | | 3 |
| | **Total Psychiatry** | **5** | **6** | **8** | **12** | **0** | **2** | **0** | **0** | **33** |
| All Other | Anesthesiology | 2 | 4 | 3 | 4 | | | | | 13 |
| | Family Practice | 2 | 2 | 4 | 1 | | | | | 9 |
| | Obstetrics/Gynecology | 1 | 3 | 4 | 4 | | | | | 12 |
| | Ophthalmology | | 4 | 3 | 4 | | | | | 11 |
| | Orthopedic Surgery | | 1 | 3 | 5 | | | | | 9 |
| | Otolaryngology | 1 | 1 | 1 | 1 | | | | | 4 |
| | Physical Medicine/Rehabilitation Medicine | | 1 | | 4 | | | | | 5 |
| | Radiology Diagnostic | | 5 | 4 | 5 | 5 | 1 | | | 20 |
| | Radiation Oncology | | 1 | 1 | 1 | | | | | 3 |
| | Surgery | | 5 | 4 | 5 | 5 | 1 | | | 20 |
| | Urology | | | | 1 | 1 | | | | 2 |
| **All Departments** | **ALL PROGRAMS** | **67** | **84** | **100** | **91** | **35** | **11** | **2** | **1** | **391** |

84730211.2

**SUNY 001149**

ATTACHMENT L

**New York City
Health and Hospitals
Corporation**

Adopted by the Board of Directors
January 13, 1983
Reissued June 1997

**SUNY 001150**

## Index

Section I
Establishment of Code ...............2

Section II
Committee on Conduct and
Practices ................................2

Section III
Definitions .............................5

Section IV
Conflicts of Interest ...............6

Section V
Nepotism ..............................12

Section VI
Improper Use of Corporate
Funds & Assets ....................14

Section VII
Sanctions .............................15

Section VIII
Appeals ...............................16

Section IX
General Provisions ...............17

Section X
Implementation and
Effective Date .....................17

1

# Code of Ethics

### SECTION I. ESTABLISHMENT OF CODE

The Board of Directors of the New York City Health and Hospitals Corporation hereby establishes a standard of conduct governing the relationship between private interests and the proper discharge of official duties of members of the Corporation's Board of Directors, Corporate Officers, employees, members of the Corporation's Community Advisory Boards, Hospital Auxiliaries, and covered professional and academic affiliate personnel. This standard shall be known as the Code of Ethics of the New York City Health and Hospitals Corporation and become part of the Corporation's official Rules and Regulations.

### SECTION II. COMMITTEE ON CONDUCT AND PRACTICES

A. To implement this Code, there shall be a Committee within the Corporation, known as the Committee on Conduct and Practices, consisting of the General Counsel, the Inspector General, the Vice President of Corporate Affairs, and the Senior Vice President of Medical and Professional Affairs (or their designees). The Chair shall be designated by the members of the Committee.

B. The jurisdiction of the Committee shall not extend to matters arising under this Code that concern any member of the Board of Directors, whose standards of conduct or requests for advisory opinions shall be exclusively considered by an ad hoc committee of disinterested board members appointed by the Chairman of the Board of the Health and Hospitals Corporation on an as-needed basis. This ad hoc committee shall have such authority as granted to the Committee on Conduct and Practices by this Section II.

C. The Committee may request the Office of the Inspector General to investigate any matter within the jurisdiction of the Committee and to report the results of such investigation. Any report or information furnished to the Inspector General in accordance with the provisions of this section shall be deemed confidential and shall not be subject to inspection or disclosure in any manner except as expressly authorized by statute or court order.

D. The Committee shall render advisory opinions with respect to questions of ethical conduct, conflicts of interest, action that a person subject to this Code contemplates taking, and other matters arising under this Code. Such advisory opinions shall be rendered on the written request of any person presently or formerly subject to this Code or any supervisor of such person, on the Committee's own initiative, or on the basis of an investigation by the Inspector General. Opinions rendered

2

3

SUNY 001152

under this section are advisory only and shall not be binding on the President or Board of Directors of the Health and Hospitals Corporation, nor may they supervene the statutory powers or prerogatives of the President or the Board of Directors.

E. The Committee shall make public its advisory opinions with such deletions as may be necessary to prevent disclosure of the identity of any involved persons. The records, reports, memoranda, and files of the Committee are deemed confidential and shall not be subject to public inspection.

F. The Committee shall be empowered to call witnesses and to require the production of information from the Officers and employees of the Corporation, and to request such information from individuals, corporations, or associations doing business with the Corporation as an aid in determining matters concerning possible violations or prohibited conduct hereunder or other questionable activities of persons subject to this Code.

G. In any matter in which a member of the Committee has a personal or private interest, or feels for any reason that (s)he cannot decide the matter impartially, (s)he shall disqualify her/himself from the consideration of this matter, and the Chair, with the approval of the President, shall appoint a temporary replacement to serve on the Committee to consider

the specific matter.

H. The Chair of the Committee or a designee shall make a full report to the President concerning any matter considered by the Committee and shall, in appropriate instances, make recommendations for disciplinary or other action. Where willful or knowing intent is clearly shown, the Chair shall so indicate in the report. Reports and recommendations of the Chair under this Section H shall reflect a consensus of the Committee itself.

SECTION III.    DEFINITIONS

A. Persons subject to this Code include members of the Corporation's Board of Directors, its Officers and employees (including medical staff), Corporation Hospital Auxiliaries, members of the Corporation's Community Advisory Boards, and covered affiliate personnel. For purposes of this Code, the President shall be covered as an employee of the Corporation and not in his capacity as a member of the Health and Hospitals Corporation's Board of Directors.

Implicit in this Code of Ethics is the recognition of the governmental responsibility of the members of the Board of Directors who serve ex officio by virtue of their positions as City officials, such duality of service being mandated by the Corporation's Enabling Act. Accordingly, provisions of this Code shall not be construed to impede the reasonable exercise of those members' official duties and

4

5

their fiduciary responsibility to the Corporation.

B. Covered affiliate personnel is defined for purposes of this Code as any individual who is furnished to a Corporate facility directly by a professional or academic affiliate to render service at a Corporate facility on behalf of the Corporation.

SECTION IV.  CONFLICTS OF INTEREST

A. Conflicts Prohibited
Except as provided in Section IVB:
(1) no person subject to this Code shall have an interest in any contract with the Corporation when such person has the power or duty to:
- negotiate, prepare, authorize, approve, or review performance under the contract or authorize or approve payment thereunder;
- audit bills or claims under the contract; or
- appoint another person subject to the Code who has any of the powers or duties set forth above; and
(2) no chief fiscal officer, controller, or that person's deputy or subordinate shall have an interest in a bank or trust company designated as a depository, paying agent, or registration agent for funds of the Corporation or designated for investment of funds of the Corporation. The provisions of this section shall not, however, be construed to pre-

clude the payment of lawful compensation and necessary expenses of any person subject to the Code in one or more positions of public employment, the holding of which is not prohibited by law.

B. Exceptions
The provisions of Section IVA shall not:
(1) apply to a contract with a person, firm, corporation, or association in which a Corporation Officer or employee has an interest that is prohibited solely by reason of employment as an officer or employee thereof, if remuneration for such employment will not be directly affected as a result of such contract and the duties of such employment do not directly involve the procurement, preparation, or performance of any part of such contract.
(2) prohibit a person subject to this Code from acting as attorney, agent, broker, employee, officer, director, or consultant for any membership corporation or other voluntary not-for-profit corporation or association provided that:
- the not-for-profit entity has no business dealings with the Corporation. As used in this section, business dealings with the Corporation shall include any contract, service, work, or business with; any sale, renting, or other acquisition from; and any grant, license, permit, or other privilege from the Corporation, and any perfor-

6

7

mance of or litigation with respect to any of the foregoing; and

- such activities by the person subject to this Code shall be performed at times during which that person is not required to perform services for the Corporation; and
- the person subject to this Code receives no salary or other compensation in connection with such activities; and
- the proposed activity does not otherwise constitute a conflict of interest.

(3) apply to a contract with a corporation in which a person subject to this Code has an interest by reason of stockholdings when less than five per centum of the outstanding stock of the corporation is owned or controlled directly or indirectly by such persons subject to this Code.

### C. Certain Acts Prohibited

(1) No person subject to this Code shall:

- directly or indirectly, solicit any gift, or accept or receive any gift, whether in the form of money, service, loan, travel, entertainment, hospitality, thing, or promise, or in any other form, under circumstances in which it could reasonably be inferred that the gift was intended to influence him or her, or could reasonably be expected to influence him or her in the performance of official duties, or was intended as a reward for any official action on his or her part;
- disclose confidential information acquired in the course of his/her official duties or use such information to further his/her personal interests;
- receive or enter into any agreement, express or implied, for compensation for services to be rendered in relation to any matter before the Corporation;
- receive or enter into any agreement, express or implied, for compensation for services to be rendered in relation to any matter before the Corporation whereby his/her compensation is to be dependent or contingent upon any action by the Corporation with respect to such matter;
- enter into any business or financial relationship with another covered person who is a superior or who is a subordinate of such covered person;
- give opinion evidence as a paid expert against the interests of the Corporation in any civil litigation brought by or against the Corporation.

8

9

SUNY 001155

## D. Definitions

(1) *Chief fiscal officer means a controller, director of finance, or other officer possessing similar powers and duties.*

(2) *Contract means any claim, account or demand against or agreement with the Corporation, express or implied, and shall exclude the designation of a depository of public funds and the designation of a newspaper, including but not limited to an official newspaper, for the publication of any notice, resolution, or other proceeding where such publication is required or authorized by law.*

(3) *Interest means a direct or indirect pecuniary or material benefit accruing to persons subject to this Code as the result of a contract with the corporation which such person serves. For the purpose of this section, a person subject to this Code shall be deemed to have an interest in the contract of (a) his spouse, minor children and dependents, except a contract of employment with the corporation which such person serves, (b) a firm, partnership, or association of which such person is a member or employee, (c) a corporation of which such person is an officer, director, or employee, or (d) a corporation any stock of which is owned or controlled directly or indirectly by such person.*

## E. Disclosure

(1) Any person subject to this Code who has, will have, or later acquires an interest in any actual or proposed contract with the Corporation shall publicly disclose the nature and extent of such interest in writing to the Committee as soon as (s)he has knowledge of such actual or prospective interest. Such written disclosure shall be made part of and set forth in the official record of the Committee. Once disclosure has been made with respect to an interest in a contract with a particular person, firm, corporation, or association, no further disclosures need be made by such person with respect to additional contracts with the same party during the remainder of the fiscal year.

(2) Disclosure shall not be required in the case of an interest in a contract described in Section IVB.

## F. Compensation

(1) No person who is, or has been, subject to this Code, shall, while in a covered relationship or within a period of three years after expiration of his/her covered relationship with the Corporation, receive compensation for any services rendered on behalf of any person, firm, corporation, or other entity, in relation to any case, proceeding, or application or other matter with respect to which (s)he was directly concerned during his/her covered relationship with the Corporation.

(2) As used in this Section IVF, directly concerned means (a) personal participation by the person subject to the Code, wherein (s)he

10                                        11

had authority to exercise discretion or independent judgment as could affect the transaction of business or (b) when the covered individual, without such authority, acquired confidential information while employed to work on a particular matter provided, however, the establishment or continuation of a doctor/patient relationship that arose while the physician was in a covered relationship with the Corporation under this Code shall not be proscribed.

## SECTION V.    NEPOTISM

A.   For the purpose of this Code:

(1) whenever there are two or more relatives working in the same facility, no more than one of them shall be assigned to work in the same unit, even if no supervisory relationship exists;

(2) no individual employed by the Corporation shall be involved in the hiring or employment of a near relative;

(3) no individual employed in the Corporation shall supervise a near relative;

(4) no Executive Director, Department Head, Cost Group Manager, Cost Center Manager, or their deputies, shall supervise a near relative, directly or indirectly;

(5) whenever a situation defined in this Section V arises, the employees involved must report the relationship so that appropriate action can be taken;

(6) the President (or designee) may waive this policy where (s)he

believes that such a waiver will serve the best interest of the Corporation;

(7) nothing in this Section V shall be deemed to prohibit the employment of a qualified individual when such employment will not create a conflict of interest as specified in this Code.

B.   Nothing in this Section V shall supersede Civil Service Law of the State of New York, the Rules and Regulations of the NYC Health and Hospitals Corporation, or applicable collective bargaining agreements relating to the transfer of employees.

C.   Effective the date of the issuance of this Code, no assignments to any location in violation of this policy shall be made.

D.   Definitions

(1) Near relatives is defined, for purposes of this Code, as spouse; natural, foster, or stepparent; child, stepchild; brother or sister; father-in-law; mother-in-law; daughter-in-law; son-in-law; sister-in-law; brother-in-law; aunt; uncle; nephew; niece; grandparent; or grandchild.

(2) Hire or employ is defined, for purposes of this Code, as any substantial participation in the hiring, selection, promotion, or termination process, including requesting or approving employment or compensation, or the selection process involving evaluation of the credentials or experience of another individual.

(3) Supervise is defined, for the

12

13

SUNY 001157

purpose of this Code, as giving, furnishing, or directing work assignments, ratings, approval of ratings, evaluation of performance, recommending completion of probationary service or continuance in service beyond mandatory retirement age, or making decisions regarding working conditions, benefits, or privileges of another individual.

SECTION VI.   IMPROPER USE OF CORPORATE FUNDS & ASSETS

A.   The funds and assets of the Corporation shall not directly or indirectly be used for illegal or improper payments of any kind.

B.   The funds and assets of the Corporation shall not be used directly or indirectly for payments, gifts, or gratuities of any kind, whether legal or illegal, which indirectly or directly inure improperly to the personal benefit of any agent or employee of any entity with which the Corporation does business.

C.   The funds and assets of the Corporation shall not be used directly or indirectly for political contributions whether legal or illegal. The term political contribution is used in its broadest sense and includes but is not limited to local, state, or national fundraising dinners, banquets, raffles, or any funds or gifts (including the free use or discounted use of property or services) that could be routed directly or indirectly to a political candidate, party, committee, or organization. This section is not intended to limit or otherwise restrict lawful personal political activity of persons subject to this Code or political contribution through authorized payroll deductions.

D.   No person subject to this Code shall willfully cause the Health and Hospitals Corporation to enter into any agreement with dealers, vendors, distributors, agents, or consultants: (1) which are not in compliance with the statutes of the State of New York and applicable local laws that may be involved or (2) which provide a commission rate or fee that is not reasonable and commensurate with the function or services to be rendered.

E.   The funds and assets of the Corporation shall be properly and accurately recorded on books and records of the Corporation in accordance with generally accepted accounting practices. No person subject to this Code shall willfully make false or artificial entries in the books and records or accounts of the Corporation, nor, on behalf of the Corporation, make or approve payments with the intention or understanding that any part of the payments may be used for any purpose other than described in documents supporting the payment.

14

15

SUNY 001158

## SECTION VII.  SANCTIONS

**A.  Corporation Contracts**
Consistent with the requirements of applicable statutes, any contract willfully entered into by or with the Corporation in which there is an interest prohibited by this Code shall be voidable at the option of the President or where appropriate, the Board of Directors of the Corporation, on the recommendation of the President, based on an opinion of the Committee.

**B.  Disciplinary Action**
Where a provision of this Code is clearly shown to have been violated by a covered person, the Committee shall so indicate in its report or advisory opinion. Depending on evidence of knowing or willful intent by the covered individual, appropriate advice or recommendation of disciplinary action shall be made. Corrective action, based upon the circumstances of each case, shall be taken by the President or the Board of Directors (as applicable) consistent with the provisions of this Code and applicable laws.

## SECTION VIII.  APPEALS

**A.**  Any member of the Corporation's Board of Directors who disagrees with the joint decision of the Chair and President based upon the recommendations of the ad hoc committee may appeal such decision to the full Board of Directors, who shall be empowered to hear the facts

16

of this matter de novo if it determines, in its discretion, that it is necessary to do so. Any member who is or may be affected by a decision in this matter may not vote or take part in any decision by the Board of Directors that concerns this matter.

**B.**  Any other individual subject to this Code who disagrees with the decision of the President with respect to the recommendation of the Committee, may exercise such appeal rights as are provided under applicable statutes, prevailing contracts, or pre-existing bylaws, rules or regulations.

## SECTION IX.  GENERAL PROVISIONS

**A.**  No provisions under this Code shall be construed to prevent the referral of any matter for professional sanction, criminal or civil action.

**B.**  The provisions of the Code are intended as guidelines of standards of conduct of persons subject to this Code, and insofar as the provisions of this Code are inconsistent with any law (general, special, or local) or applicable rules or regulations, the provisions of any such law, rule or regulation shall be controlling.

## SECTION X.  IMPLEMENTATION AND EFFECTIVE DATE

**A.**  This Code of Ethics shall take effect following its approval by the

17

SUNY 001159

Board of Directors of the Corporation upon ten (10) days written notice appropriately posted throughout the Corporation, including but not limited to all Central Administration offices, health facilities, hospitals, and Community Advisory Board offices. Copies of this Code shall be distributed to all persons subject to this Code within one month of its adoption by the Board of Directors and shall thereafter be made available to all persons who are subsequently subject to this Code.

B. The Committee on Conduct and Practices shall issue such regulations as shall, from time to time, be required to implement this Code, including reporting requirements and forms, and the requesting and granting of waivers when appropriate. Amendments to this Code shall be promulgated and implemented by the Board of Directors. Any questionnaire or form that the Committee requires to be submitted by a person subject to this Code is deemed confidential and shall not be subject to inspection or disclosure in any manner except as expressly authorized by statute or court order.

*Requests for Advisory Opinions under the Code of Ethics may be filed, in writing, with the Secretary to the Corporation Room 519 125 Worth Street New York, NY 10013*

18

Corporate Support Services
Forms Management and Graphic Services
Design and Typesetting: Jim Sears
PUB 1357 (R Jun 97)

**SUNY 001160**



125 Worth Street
New York, N.Y. 10013

NEW YORK CITY
HEALTH AND HOSPITALS
CORPORATION

SUNY 001161

<u>ATTACHMENT M</u>

Excerpts From Corp. Operating Agreement – Indemnification

AGREEMENT made this 16th day of June, 1970, pursuant to Chapter 1016 of the Laws of 1969, between THE CITY OF NEW YORK (herein called "City") and the NEW YORK CITY HEALTH AND HOSPITALS CORPORATION (herein called "Corporation"), a public benefit corporation.

W I T N E S S E T H :

WHEREAS, by Chapter 1016 of the Laws of 1969 (herein called "Act") the Corporation was created to deliver high quality and dignified health and medical services and provide health facilities for comprehensive care and treatment for the ill and infirm, both physical and mental, particularly to those who can least afford such services, and

WHEREAS, the parties hereto are required by the Act to enter into an agreement by July 1, 1970 for the operation of the hospitals then being operated by the City for the treatment of acute and chronic diseases, and

WHEREAS, pursuant to the Act, the Board of Estimate by resolution (Cal. No. 244 - June 18, 1970), has duly authorized the execution of this Agreement on behalf of the City, and

WHEREAS, Section 2 of said Act entitled, "Declaration of Policy and Statement of Purposes," provides as follows . . .

100155754_1

**SUNY 001162**

## ARTICLE VI
## INDEMNIFICATION

Section 6.1.  The City agrees to keep, save and hold harmless the Corporation from any and all liability, loss or damage arising from or in connection with the provision and delivery of health services, including any liability under the Workmen's Compensation Law.  The City will also keep, save and hold harmless the Directors, members, officers or agents of the Corporation from any act done or omitted in good faith and with ordinary discretion pursuant to its by-laws, rules, regulations or statutes governing the Corporation.  It is the intent of the parties that such exoneration of liability be consonant with the privileges afforded to the aforementioned pursuant to New York City Charter Section 1724.

Section 6.2.  The City further agrees to keep, save and hold harmless the Corporation and its physicians and dentists, as well as the medical schools and voluntary hospitals with whom the Corporation has an affiliation agreement by assignment from the City or otherwise to operate the hospitals transferred to the jurisdiction of the Corporation, from any and all liability, loss or damage for malpractice of the Corporation, its physicians and dentists, arising from the operation or supervision of the hospitals transferred to the Corporation, or the malpractice of the physicians and dentists of the medical schools and voluntary hospitals occurring during the performance

2

**SUNY 001163**

of the affiliation agreements existing now or hereafter with medical schools and voluntary hospitals for medical services in the hospitals named in Article I.

The foregoing shall not apply to acts performed at the medical school or voluntary hospital or apply or inure to the benefit of any physician or dentist who shall charge a fee for his services whether or not payment is made directly to him or not. However, a physician or dentist, who, at the direction of the Corporation, executes an assignment of his fee for the benefit of the Corporation shall not be deemed to charge a fee for his services hereunder. It is understood that the City shall not be liable for or obligated to defend, save harmless or indemnify the medical school or voluntary hospital or its physicians or dentists against or from any claim arising out of any act or omission on or at the premises of the medical school or voluntary hospital.

The foregoing is conditioned upon each of the following:

1. The Corporation, its physicians and dentists, and the medical school or voluntary hospital and its physicians and dentists, shall promptly forward to the City all summonses or notices of whatsoever nature, pertaining to claims received or served upon them or each of them.

3

SUNY 001164

2.  The Corporation and each of its physicians and dentists, and the medical schools and voluntary hospitals and their dentists and physicians, shall cooperate fully in aiding the City to investigate, adjust, settle or defend each claim, action or proceeding.

3.  The defense of all claims, actions and proceedings within the purview of this Article shall be conducted by the City.  The Corporation Counsel of the City shall appear and defend such actions and proceedings on behalf of the Corporation, its physicians and dentists, the medical schools and voluntary hospitals and their physicians and dentists.

No settlement shall be made without the approval of the City, including the Comptroller, and in accordance with procedures previously employed to settle actions involving municipal hospitals.

In the event of any appeal from a judgment against the Corporation, its physicians and dentists, or the medical schools or voluntary hospitals and their physicians and dentists, the City will promptly satisfy the judgment or stay the execution thereof by filing the appropriate bonds or instruments, so that execution shall not issue against the property of the Corporation, its physicians or dentists, or against the property of the medical schools or voluntary hospitals and their physicians and dentists.

4

SUNY 001165

It is understood that the City is not obligated to save harmless or indemnify the medical schools or voluntary hospitals or their physicians and dentists as well as the physicians and dentists employed or associated with the Corporation as a result of any act committed by them, tortious or otherwise, other than an act of malpractice or an act arising out of the treatment of patients.

The Corporation shall in no way increase the liability of The City of New York pursuant to this Article by agreement with its employees, officers, directors or with third parties by increasing the scope of its own liability for the actions of its officers, employees, directors and third parties.

100155754_1

**SUNY 001166**



**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK, N.Y. 10007

O. PETER SHERWOOD
*Corporation Counsel*

(212) 788-

June 11, 1993

Edna Wells Handy, Esq.
Vice President & General Counsel
Health & Hospitals Corporation
  Legal Affairs
125 Worth Street - Room 527
New York, New York  10013

Re:  Indemnification by the City of New York of
     Affiliated Employees under the Operating Agreement
     dated July 1, 1970 ("Operating Agreement") between
     the New York City Health and Hospitals Corporation
     ("HHC") and certain Affiliation Agreements between
     HHC and Affiliates of HHC Hospitals

Dear Ms. Handy:

        This is in response to your request concerning the
existing Operating Agreement and the proposed Affiliation Agreement
(the "Affiliation Contract") with respect to the indemnification of
the Affiliate and Affiliate employees.  The following is written
to clarify the City's indemnification pursuant to Section 6.2 of
the Operating Agreement, which Operating Agreement is to be
incorporated by reference in Section 12.7 of the Affiliation
Contract.

        As you are aware, in a letter dated May 25, 1983 from
Jeffrey E. Glen, Special Assistant Corporation Counsel, to Dan
Cohen, Esq., Acting General Counsel, a copy of which is attached
hereto (the "Glen Letter"), this office clarified the existing
Operating and Affiliation Contracts and specifically authorized
that (i) Affiliation Contracts may include not only physicians and
dentists but also other patient care providers employed by the
Affiliate in connection with any claim for malpractice and (ii)
may also include a statement which indemnifies doctors, dentists
and other health care providers for acts committed while performing
administrative functions which they are obligated or volunteer to
perform pursuant to the Affiliation Contract.  Notwithstanding
anything contained herein, this letter confirms, ratifies and
extends the agreements and understandings of the Glen Letter.

In addition, you have requested clarification concerning the indemnification of the Affiliate and all "Contract Service Providers"[1] for (i) malpractice arising out of patient care services, (ii) malpractice arising out of functions pertaining to the administration of the Affiliation Contract and (iii) "other acts or omissions arising out of the operation or supervision of services at the Hospital that are committed or alleged to have been committed by the Affiliate Contract Services Providers or any other Affiliate employees while they are performing functions pertaining to the administration of this Agreement either on an obligatory or volunteer basis" (Section 12.1(b)). This will confirm that the Affiliation Contract may provide for indemnification of the Affiliate and all Contract Services Providers for those matters set forth in (i), (ii) and (iii) of the previous sentence (subject to any limitations otherwise applicable).

Very truly yours,

O. PETER SHERWOOD
Corporation Counsel

BY: LAWRENCE S. KAHN

/ph

_____

[1] "Contract Services Providers" are defined in the Affiliation Contract as Physicians, Dentists, Physicians Assistants, Nurse Midwives, Nurse Practitioners, Nurse Anesthetists, Psychologists, Technicians, Therapists, Other Allied Health Professionals, Administrators, Affiliate Officers, Other Employees and Agents, Affiliate Directors and Certain Post-Graduate Trainees on Rotation.

**SUNY 001168**

LAW DEPARTMENT

GEORGE C. COLA
New York, N.Y. 1007
...

OFFICE OF DATA
...

The
City
of
New York

May 25, 1983

Dan Cohen, Esq.
Acting General Counsel
New York City Health and Hospitals
 Corporation
125 Worth Street
New York, New York

Re:  City Indemnification of Affiliate Employees

Dear Mr. Cohen:

This is in response to John McLaughlin's memorandum
dated March 17, 1983 wherein he requested certain clarifica-
tion concerning the existing Operating and Affiliation agree-
ments. The following is written to authorize an extension of
the City's indemnification pursuant to the last paragraph of
Sec. 6.2.3 of the Operating agreement.

Although the Affiliation and Operating agreements
specifically enumerate only physicians and dentists as those
persons entitled to be indemnified by the Corporation, in
fact, other health care providers including but not limited
to nurses, midwives, physicians' assistants are presently
indemnified when such cases arise.  When affiliate physicians
and other affiliate health care providers render services at
a Corporation hospital, it seems logical that they should be
indemnified against any claim for malpractice. Accordingly
affiliation agreements may include not only physicians and
dentists but also all other patient care providers employed
by the affiliate.

Although I am sure the instances are rare, it is
again reasonable that if an affiliate doctor, for example,
is required to sit on a committee of a Corporation hospital,
that doctor should be indemnified if he or she is sued as a
result of a decision made by the committee.  Instead of indem-
nifying doctors, dentists and other health care providers
only for acts "arising out of the diagnosis and treatment of
patients", Section 12.04 of the Affiliation agreement may

SUNY 001169

Mr. Dan Cohen
Page 2
May 25, 1983

also include a statement which indemnifies them for acts com-
mitted while performing other administrative functions which
they are obligated or volunteer to perform pursuant to said
agreement.

Yours truly

FREDERICK A.O. SCHWARZ, JR.
Corporation Counsel


JEFFERY E. GLEN
Special Assistant
Corporation Counsel

JEG:lf

**SUNY 001170**

## MASTER PREMISES AGREEMENT

This Premises Agreement ("Agreement") by and between SUNY DOWNSTATE MEDICAL CENTER ("Institution") located at 450 Clarkson Avenue, Brooklyn, NY 11203 and NEW YORK CITY HEALTH AND HOSPITALS CORPORATION ("HHC"), with an office located at 160 Water Street, 11th Floor, New York, NY 10038 on behalf of its facility Kings County Hospital Center (hereinafter collectively "Facility") 451 Clarkson Avenue, Brooklyn NY 11203, is made as of the date of the last signature hereon (the "Effective Date").

WHEREAS, Facility has entered into a Memorandum of Understanding with Institution dated June 12, 2007, regarding research projects and activities, which shall remain in full force and effect and is hereinafter incorporated by reference.

WHEREAS, Facility has agreed to permit Investigator, Institution and its staff to conduct certain clinical trials at Facility, using Facility's premises, equipment, personnel and facilities and to enroll and evaluate eligible research subjects at the Facility;

As a "master" form of contract, this Agreement allows the parties to contract for multiple projects through the issuance of multiple clinical study work orders (hereinafter, Work Order(s)). Facility will provide to Institution clinical research services on an identified pharmaceutical investigational drug (each, a "Study Drug"), as described in one or more Work Orders that may be executed from time to time by Sponsor and Institution. Sponsor will provide a copy of the study protocol ("Protocol") to Institution and Facility, and Institution and Facility shall agree on (i) a budget setting forth the cost for all the activities described in the study protocol and the payment terms, (ii) a designated principal investigator who shall be an individual physician eligible to conduct such clinical studies ("Principal Investigator" or "PI"), and (iii) a study schedule for the clinical study to be performed pursuant to the study protocol (the implementation of a study protocol shall be referred to as the "Study").

Now, therefore, in consideration of the promises and covenants expressed herein, the parties agree as follows:

1. Performance of Study: Facility acknowledges that the Study may be performed on its premises, using its facilities, and certain of its personnel and equipment. Facility shall perform its duties, if any, for the Study in compliance with this Agreement, the rules, regulations and conditions of approval of the Institutional Review Board with jurisdiction over this Study, all applicable rules and regulations (such as the Declaration of Helsinki) governing the protection of human study subjects, the Protocol, the Health Insurance Portability and Accountability Act of 1996 (together with any regulations and official guidelines promulgated thereunder, "HIPAA"), generally accepted standards of good clinical and medical practices and all applicable laws, rules, and regulations (including those promulgated by the FDA).

Facility's pharmacy will handle and dispense Study drug(s). Facility shall use the drug, device, product or compound being tested (the "Study Product"), and any comparator or other products provided in connection with the Study, solely for the purpose of properly completing the Study in accordance with the Protocol and shall maintain all Study Product and any comparator

1

products in a locked, secured area at all times in accordance with Sponsor's instructions and applicable laws and regulations. Upon completion or termination of the Study or this Agreement, Facility shall promptly return to Institution, CRO, Sponsor or Sponsor's designee (in any case, as Sponsor shall direct) all unused Study Product, comparators, equipment, and materials and all copies of Confidential Information (as defined below).

No Facility personnel shall undertake or agree to perform any obligations in respect of the Study which would require such persons to execute an FDA Form 1572 without prior written notice to, and the prior written consent of, Sponsor. Without limiting the foregoing, Facility shall complete and submit to CRO and Sponsor any and all required regulatory and other documentation referred to herein or required by applicable law and regulation prior to the shipment of clinical supplies, including Study Product, to Facility for use in the Study.

2. Ownership of Study Data: Confidentiality: (a) Facility shall have no right or interest in any data, inventions or discoveries directly arising as a result of the Study, including any relating to Sponsor's drug products (such as the Study Product), or to any of the Confidential Information (as specified below), or any of Sponsor's patents, copyrights, trade secrets or other intellectual property.

(b) All protected health information shall be treated as confidential by Facility in accordance with all applicable federal, state, or local laws and regulations governing the confidentiality and privacy of protected health information, including without limitation, HIPAA and any regulations and official guidelines promulgated thereunder.

(c) The Facility shall keep the confidential information strictly confidential (subject to Facility's rights to publish Study) and shall disclose it only to:

   (i) its employees who are under obligations of confidentiality and who are involved in conducting the Study, and then only on a need-to-know basis,

   (ii) Institutional Review Boards as required, and

   (iii) as necessary to be included in the informed consent form to the Study.

These confidentiality obligations shall continue until 7 years after completion of the Study, but shall not apply to confidential information to the extent that it:

   i) is or becomes publicly available through no fault of the Facility;

   ii) is disclosed to the Facility by a third party not subject to any confidentiality obligation(s);

   iii) was known by the Facility prior to the date of disclosure as can be established by written documentary evidence and provided that such information is not otherwise subject to an existing confidentiality obligation;
   iv) is required by applicable law to be disclosed;

2

SUNY 001172

3. Intellectual Property Rights: Inventions, discoveries, copyrights or other intellectual property rights, that are conceived, developed, or reduced to practice, including all improvements, enhancements or modifications which (i) rely on, use, or necessarily incorporate the Study Drug, or (ii) rely on, use, or incorporate any Confidential Information, shall be the exclusive property of Sponsor (collectively referred to as "Inventions").

4. Publication; Publicity.

Notwithstanding anything in this Agreement to the contrary and without further notice, the Parties hereto acknowledge and agree that each of the Parties may disclose the existence of this Agreement, the title of the protocol, identify the Parties to this Agreement, and disclose the amount of funding actually received pursuant to this Agreement, including but not limited to acknowledgment in any publication or presentation relating to the results of the study as provided herein; and that Investigator may disclose the same information in a curriculum vitae. However, no Party shall use the name of the other in any publication, news release, promotion, advertisement, or other public announcement, whether written or oral, that endorses services, organizations or products, without the prior written approval of the other.

5. Monitoring of Study: Facility agrees to permit CRO, the Sponsor and its representatives, and subject to Section 15, FDA and/or other regulatory authorities, to examine promptly and fully, including for the purpose of verifying the accuracy of Study data, complying with Sponsor's and CRO's monitoring and other obligations under applicable law and regulation and for audit purposes: (i) the facilities, equipment and premises used to conduct the Study, (ii) all medical and Study records regarding research subjects and (iii) any other relevant information (including any of same relating to the receipt, storage, dispensation and disposition of Study Product) necessary to confirm that Study is being conducted in conformance with the Protocol, the terms of this Agreement, FDA regulations and applicable legal requirements. The Facility shall assist CRO and Sponsor in promptly resolving any questions and in performing audits or reviews of original subject records, reports, or data sources. Facility shall work with Institution to ensure that they obtain all such authorizations, waivers and consents as may be required under HIPAA or other applicable law to permit the CRO and Sponsor, its affiliates and its representatives to obtain, use, and disclose all protected health information for all purposes necessary to successfully complete the Study and to use the results thereof, including, without limitation monitoring of the Study, collection and analysis of patient data and preparation of submissions to FDA and equivalent foreign regulatory agencies.

6. Compensation: All payments due for performance of the Study, including for use of Facility's premises, equipment, personnel or facilities, will be made to Facility pursuant to the attached Appendix A, which is hereinafter incorporated by reference.

All payments hereunder will be payable to "The New York City Health and Hospital Corporation" (Federal Tax Identification No.: 13-2655001) and shall be made payable as follows:

Mail:     Stacy-Ann Christian
          Research Administration

3

7. Indemnification: (a) Institution agrees to indemnify, defend and hold harmless Facility and its trustees, officers, agents and employees (collectively, "Facility Indemnitees") against any claims, suits, judgments, losses, damages, costs, and expenses (collectively, "Claims") made or instituted against any of them for bodily injuries to or death of research subjects participating in the Study under the Protocol, to the extent such Claims are caused by and result directly from the administration of the Study Drug, provided such administration is effected in strict accordance with Sponsor's standards as set forth in the Protocol.

(b) Facility hereby represents that it shall be responsible for the acts or omissions of the HHC, the Hospital, or such person, in connection with this Agreement. This representation is based upon and limited to the obligation of the City of New York to defend, indemnify and hold harmless HHC, its officers, employees, agents and contracted affiliates from any and all liability and damages arising from or in connection with the provision and delivery of health services.

8. Reimbursement for Costs Relating to Treatment of Subject Injuries: Institution shall reimburse Facility for reasonable costs actually incurred by Facility for reasonable and necessary medical diagnoses and treatment performed by Facility for any bodily injury sustained by a Study subject to the extent that such injury is directly related to a Study procedure or the use and/or administration of the Study drug.

9. Insurance: Facility shall maintain adequate insurance coverage of sufficient amounts to cover claims arising from the acts and omissions of the Facility.

10. Financial Disclosure: If CRO or Sponsor provides financial disclosure forms to Facility pursuant to United States regulatory requirements, Facility agrees that, for each listed or identified investigator or subinvestigator who is directly involved in the treatment or evaluation of research subjects and prior to commencement of the Study, it shall promptly return to CRO a financial disclosure form that has been completed and signed by such investigator or subinvestigator, which shall disclose any applicable interests held by those investigators or subinvestigators or their spouses or dependent children. The Facility shall ensure that all such forms are promptly updated as needed to maintain their accuracy and completeness during the Study and for one year after its completion. The Facility acknowledges and agrees that the completed forms may be subject to review by governmental or regulatory agencies, Sponsor, CRO, and their agents, and the Facility consents to such review.

11. Electronic Records; Record Maintenance:

(a) Facility shall maintain full, complete and accurate records in sufficient detail to properly reflect all procedures performed and results achieved during the Study in accordance with the Protocol, including without limitation, records with respect to Study subject identification, clinical observations, patient medical records, laboratory tests, drug receipt and disposition, CRFs, informed consents and any other records required to be maintained by the Facility, or under the Protocol, or by applicable FDA rules and regulations. Facility shall cooperate fully

4

and promptly with Institution, and Sponsor in furnishing any information or data necessary to permit Sponsor to meet regulatory reporting requirements. Facility shall retain essential Study documents for the time specified by current good clinical practice guidelines, local laws, and FDA archival guidelines.

12. Representations and Certifications: Facility further represents and certifies that:

(a) Facility is a duly formed and validly existing entity under the laws of the State of New York.

(b) Facility has the power and authority (corporate or otherwise) to execute and deliver this Agreement and to perform Facility's obligations hereunder. Facility's execution and delivery of, and performance under, this Agreement have been duly and validly authorized by all necessary action, corporate or otherwise.

(c) Upon execution and delivery of this Agreement, this Agreement shall constitute a legal, valid and binding agreement of the Facility, enforceable in accordance with its terms, except to the extent enforceability may be affected by applicable bankruptcy, reorganization, insolvency and moratorium laws and other laws applicable generally to creditors' rights and debtors' remedies from time to time in effect.

(d) Neither the execution and delivery of this Agreement nor the Facility's performance of any of its obligations hereunder will violate or breach, or otherwise constitute or give rise to a default under, nor conflict with (i) the terms or provisions of its certificate of incorporation, by-laws or other organizational or governing documents, or (ii) any material contract, commitment or other obligation to which the Facility is party (including without limitation any agreement with Institution), or any judgment, order, decree, rule or regulation of any court or governmental agency to which the Facility is subject.

13. Notices: Any notice or report required or permitted to be given or made under this Agreement by one of the parties hereto to the other shall be in writing, delivered personally or by facsimile (and promptly confirmed by personal delivery or courier) or by courier addressed to such other party at its address indicated below and shall be effective upon receipt by the addressee:

To Facility:                New York City Health and Hospitals Corp.
                                Research Administration
                                Attn: Stacy-Ann Christian
                                160 Water Street, 11th floor
                                New York, NY 10038
                                Phone: (212) 788-9676
                                Fax No.: (212) 788-9731

with a copy to:          Kings County Hospital Center
                                451 Clarkson Avenue
                                A-Building, Room 7203
                                Brooklyn, NY 11203

5

**SUNY 001175**

Attn: Noreen Bhola

To Institution:          SUNY Downstate Medical Center
                         450 Clarkson Avenue
                         Brooklyn, NY 11203
                         Attn: Paul J. Davis, Interim Chief Financial Officer
                         Phone: (718)270-3176
                         Fax No: (718)270-4161

with a copy to:          SUNY Downstate Medical Center
                         450 Clarkson Avenue
                         Brooklyn, NY 11203
                         Attn: John Allen

14. **Debarment:** Facility shall not utilize or employ persons who have been excluded from participation in any governmental healthcare program or banned or debarred by the FDA under 21 USC § 335a (Section 306, Federal Food, Drug and Cosmetic Act) or any other governmental agency from conducting or participating in clinical trials, or who is under investigation by any governmental agency or authority in proceedings that could lead to debarment, exclusion or any similar prohibition in any country or State, and Facility shall notify CRO and Sponsor immediately if any such investigation, exclusion, debarment or ban occurs. Facility understands that any such debarment, exclusion or ban may result in immediate termination of this Agreement.

15. **Inspection and Audit:** The Facility agrees to permit authorized representatives of Sponsor, and governmental and regulatory authority personnel direct access to the Facility's records relating to the Study, including patient medical records, for monitoring, auditing, and inspection purposes. The Facility shall immediately notify CRO of, and provide CRO with copies of, any inquiries, correspondence or communications to or from any governmental or regulatory authority relating to the Study, including, but not limited to, requests for inspection or audit of the Facility's premises or facilities used in the performance of the Study, and the Facility shall permit and arrange for representatives of CRO and Sponsor to attend any such inspections. The Facility will make reasonable efforts to separate, and not disclose confidential materials that are not required to be disclosed during such inspections.

16. **Termination:** (a) Either party may terminate this Agreement, any Clinical Study Work Order and/or a Principal Investigator's participation in a Study effective upon 15 days' written notice, or immediately upon written notice for health or safety reasons. Upon termination, the Facility shall make all reasonable efforts to minimize further costs, and Facility shall cooperate with Sponsor and/or Institution to withdraw Study subjects from the Study Product using medically reasonable procedures.

(b) Institution shall make a final pro-rated payment for services and procedures properly performed and all reasonable non-cancelable commitments incurred or payments actually made by Facility which were previously approved in writing or expressly specified in the Budget,

6

**SUNY 001176**

pursuant to this Agreement and the Protocol to the date of termination in the amounts specified in the Study Budget;

17. _Entire Agreement:_ This Agreement sets forth the entire agreement and understanding between the parties hereto as to the subject matter hereof and has priority over all contemporaneous or prior documents, verbal agreements, or understandings. None of the terms of this Agreement may be amended or modified, except in writing signed by the parties hereto.

18. _Additional Contractual Provisions:_

(a) The parties to this Agreement shall be independent contractors and shall not be considered partners, agents, employees, or representatives of any other party hereto.

(b) Failure to enforce any term of this Agreement shall not constitute a waiver of such term. If any part of this Agreement is found to be unenforceable, the rest of this Agreement will remain in effect. This Agreement shall be binding upon the parties and their successors and assigns.

(c) The Facility shall not assign or transfer any rights or obligations under this Agreement without the prior written consent of Institution.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives.

**NEW YORK CITY HEALTH AND HOSPITALS CORPORATION**

By: _____
Printed Name: Ernesto Marrero
Title: Corporate Compliance Officer
Date: _1/20/10_

**SUNY DOWNSTATE**

By: _____
Printed Name: Paul J. Davis
Title: Interim Chief Financial Officer
Date: _____

7

## CLINICAL STUDY WORK ORDER [*Insert* Study No. ]

This Clinical Study Work Order is issued pursuant to the Master Premise Agreement, (the "Agreement") dated as of the _____ day of _____, 2009, between SUNY DOWNSTATE ("Institution"), and NEW YORK CITY HEALTH AND HOSPITALS CORPORATION on behalf of its facility Kings County Hospital Center, with an office and place of business located at 160 Water Street, 11th floor, New York, NY 10038 ("Facility" or "HHC"), and incorporates all of the terms and conditions therein.

Any capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Agreement.

**Sponsor Name:**

**Principal Investigator(s) Name:**

**Protocol Title and Number:**

A copy of the Protocol and any amendments thereto, to be performed under this Work Order has been provided to the Facility and incorporated herein by this reference.

**Study Schedule:**

1.  Enrollment.

    (a)   It *is anticipated that the Principal Investigator(s) will use reasonable efforts consistent with applicable law to enroll up to* _____ *Research Subjects into the Study* (the "Site Maximum"). Enrollment of each Research Subject over the Site Maximum requires the agreement of Institution, Sponsor or its designee.

    (b)   Notwithstanding whether the Site Maximum has been reached, Principal Investigator(s) shall immediately cease enrolling Research Subjects upon notice from Institution, Sponsor or its designee that, in the sole discretion of Institution, Sponsor or its designee either (1) Sponsor's target enrollment for the Study has been achieved; (2) the rate of enrollment at the Facility has fallen below an acceptable rate per calendar quarter, or (3) business reasons so require.

    (c)   Institution may terminate this Work Order in accordance with the terms of the Agreement.

8

**Payment Schedule and Budget:**

The Payment Schedule and Study Budget are attached hereto as Attachment B which is incorporated herein by this reference.

This Work Order is entered into and made effective as of the last date signed below.

Accepted and Agreed to by:

SUNY DOWNSTATE

NEW YORK CITY HEALTH AND HOSPITALS CORPORATION

By: _____

Name: _____

Title: _____

Date: _____

By: _____

Name: Ernesto Marrero

Title: Corporate Compliance Officer

Date: _____

9

# ATTACHMENT B

The Facility will be reimbursed based upon the attached schedule.

## C. ADVANCE PAYMENT:

Upon notification of IRB approval and receipt by Institution of all contractual and regulatory documentation, an advance in the amount of one completed patient or _____ Dollars ($_____) will be issued which advance is to be offset against initial patient monies earned. Any advanced monies not earned through participation in the Study in accordance with the Clinical Trial Agreement and the budget shall be returned to Institution promptly.

## D. SCREENING FAILURE PAYMENTS:

If expressly stated on the attached Budget, Reimbursement for XXXX screen failures will be paid according to the screening visit(s) of the attached budget and will not exceed an amount of XXXX. To be eligible for reimbursement of screening visit, Facility must submit to Institution completed screening CRF pages and any additional information, which may be requested by Sponsor or Institution to appropriately document the patient screening procedures.

## E. ORIGINAL INVOICES:

Original Invoices pertaining to this study for the following items should be submitted to Institution at the following address:

_____

_____

Attn: _____

## F. PATIENT RECRUITMENT/ADVERTISING

Advertising (e.g., newspapers, radio stations etc.) will be reimbursed for actual costs paid by the Facility on a pass through basis upon receipt of original supporting invoices. Reimbursement will only be made if the advertisement(s) were previously approved by Sponsor, Institution and the IRB/IEC. The reimbursement will not include overhead and will not exceed $XXXXX. Said invoices should be directed as instructed in this Attachment.

## G. FACILITY START-UP COSTS

Non-refundable start-up costs shall include as applicable:

| | |
|---|---|
| Standard administrative review fee | $2500 |
| Pharmacy | $750 |
| Pathology | $250 |

10

SUNY 001180

<u>**Guidelines for Use of Master Premise Agreement & MOU:**</u>

Guidelines for use of the **Master Premise Agreement and Memorandum of Understanding (MOU)** (established for setting forth budgetary arrangements relative to existing Industry/Pharmaceutical studies, to be conducted at KCHC). (Costs for NIH and other grant funded studies shall be negotiated separately via contracts and sub-agreements through HHC's Office of Research – Ms. Stacy-Ann Christian)

1. PIs seeking approval to conduct industry/pharma funded studies at KCHC must complete and submit the following as part of the initial application process:

   a. <u>Attachment A – Clinical Study Work Order (Pgs. 8 & 9) of the Master Premise Agreement - (to be signed by official representatives of SUNY Downstate and HHC as indicated)</u>

   b. <u>Attachment B – payment schedule (pg 10), and submit along with the two (2) budget documents described below:</u>

2. **PIs must submit original study budget, and an additional budget prepared strictly for services rendered or expected to be rendered by KCHC. Such budget must (mirror the original). Any research related costs (e.g. tests, procedures, labs, pharmacy, patient follow-ups, space, Medical records, EMRs etc.,) must be indicated on the second budget.**

3. The Facility start up costs on attachment B represents the modified costs (as applicable) for administrative, pharmacy and pathology fees initially set forth in the MOU.

4. All other costs remain in effect as per MOU (Research Fee Schedule)

5. The Finance Reviewer(s) in collaboration with the FRC (and in consultation with the HHC Senior Director for Research) will evaluate each study independently, and work out research related fees/costs in accordance with required services/resources.

6. PIs will provide quarterly updates to Finance and the FRC for services utilized, whereupon Finance will generate necessary invoices to PIs, for appropriate reimbursements via SUNY Research Foundation and/or any other named source or sponsor.

Noreen Bhola, FRC
January 30, 2010

Kings County Hospital Center
Research Fee Schedule

Administrative Review Fees
Standard                                        $1,980
Increment for Pathology Involvement             $190
Increment for Pharmacy Involvement              $310

Fringe & Affiliation Rates
Kings County Hospital Center Fringe             38.91%
Affiliation Staff Fringe                        23.14%
Affiliation Overhead Rate                       2.00%   applies to Affiliation salary & fringe
Affiliation OTPS Rate                           3.93%   applies to Affiliation salary & fringe

Direct Charges
Space Rental                                    $66.78  per sqf per year
Telephone                                       $1,045  per dedicated phone line per year
Copies                                          $2.50   per 25
Medical Chart Pulls (non-archive)               $25     per record, in excess of 10
Medical Chart Pulls (archive)                   $30     per record
Collection of Existing Specimens                $3      per specimen


Federal Indirect Cost Rate                      46.70%

Non-Federal Indirect Cost Rate with Space       44.90%
Non-Federal Indirect Cost Rate w/o Space        17.49%

**Example Budget: Federally funded study with pharmaceuticals**

Research Fees

    <u>Administrative Review Fees</u>
    Standard Fee                                             $1,980.00
    Pharmacy Increment                                 $310.00

    <u>Research Support Fee</u>                             NA

KCHC Resource Usage

    <u>Personnel</u>
    Affiliated Physician ($130,000 annual salary, 1 hr per week x 12 weeks)   $1,709.59
       Fringe @ 23.14%                                 $395.60
       Affiliation Overhead @ 2.00%                        $42.10
       Affiliation OTPS @ 3.93%                          $82.73
    KCHC Physician ($130,000 annual salary, 0.5 hr per week x 12 weeks)   $854.79
       Fringe @ 38.91%                                   $332.62

    <u>OTPS</u>
    50 sqf Room (12 weeks)                              $770.54
    15 Non-Archive Medical Record Pulls                   $125.00

Total Direct Costs                                   $6,602.98

Indirect Costs @ 46.70%                             $1,154.86

Total Payment to KCHC                             $7,757.84

---

**Example Budget: Commercially funded study with no KCHC resource usage,**
**$50,000 total direct cost budget and 75% of study patients recruited from KCHC**

Research Fees

    <u>Administrative Review Fees</u>
    Standard Fee                                             $1,980.00

    <u>Research Support Fee</u>                             375.00

KCHC Resource Usage

    <u>Personnel</u>
    No additional effort                                   NA

    <u>OTPS</u>
    None                                                NA

Total Direct Costs                                     $2,355.00

Indirect Costs @ 17.49%                               $411.89

Total Payment to KCHC                             $2,766.89

MEMORANDUM OF UNDERSTANDING
Between
KINGS COUNTY HOSPITAL CENTER
And
SUNY DOWNSTATE MEDICAL CENTER

The purpose of this Memorandum of Understanding, dated this 12th day of June, 2007, is to set forth the discussions, understanding and agreements made between Kings County Hospital Center (KCHC) and SUNY Downstate Medical Center (DMC) regarding research projects and activities (hereinafter "Research Activities") performed at KCHC by members of the DMC faculty.

Detailed below are the provisions by which DMC shall reimburse KCHC for expenses applicable to DMC research activities that use KCHC facilities and/or patients to conduct such research projects.

1.    KCHC and DMC recognize the potential benefits of clinical research to the Brooklyn Community served by KCHC and DMC.

2.    Consistent with the policies and procedures of the NYC Health and Hospitals Corporation (HHC), no study requiring the use of KCHC resources or patients may be initiated without the prior approval of KCHC.

3.    Consistent with the policies and procedures of HHC and DMC, no study involving the use of human subjects may be initiated without the prior approval of the DMC/KCHC Institutional Review Board (IRB) or the HHC approved independent IRBs.

KCHC and HHC imparts to the facilities', affiliates' or the HHC approved independent Institutional Review Boards (IRBs) the authority to review, approve/deny, modify, and monitor research protocols in full compliance with 45 CFR 46, 21 CFR Parts 50 and 56 and other relevant federal regulations.

The IRBs which review protocols for HHC are responsible for:

- Developing and maintaining policies and operating procedures and complying with them;
- providing initial and continuing review of human subjects research;
- ascertaining acceptability of proposed research in terms of policies and procedures, including all pertinent provisions relative to full disclosure and informed patient consent are adhered to and;
- all pertinent provisions relative to full disclosure and informed patient consent are adhered to and;
- providing education, training, advice and information to investigators engaged in research involving human subjects;

**SUNY 001184**

- developing policy, procedures, information, and instructions regarding human subjects research and documenting its activities;
- ensuring compliance with all pertinent provisions of federal, state, and local laws, statutes, rules and regulations, mandated policies documenting its activities in accordance to these policies;
- adjudicating differences and reviewing problems arising in research involving human subjects;
- ensuring the protection of human subjects and the quality of all underlying research-related services provided and;
- reporting to the appropriate HHC institutional officials and, for research governed by HHS regulations, to the Secretary of HHS, any serious or continuing adverse events or investigator noncompliance with requirements and determinations of the IRB.

4. Consistent with the Affiliation Agreement between KCHC and DMC, study subjects recruited at KCHC:
   a. May not be seen off the KCHC campus, for research study visits that involve patient care and which may be reimbursable.
   b. May be seen at DMC for study visits that involve patient care for the following purposes only: tests and procedures not available at KCHC and only available at DMC. Such arrangements must be approved by the KCHC Research Committee prior to start of study. Principal Investigators must ensure that patients are returned to respective clinics and care providers at KCHC.
   c. Principal Investigators not adhering to this practice will be barred from conducting studies at KCHC and be reported to the KCHC and DMC institutional officials and to the appropriate authorities.
   d. As a condition of HHC/KCHC Renewal of studies, Principal Investigators are required to indicate separately (not jointly with DMC or any other sites) on the "Annual Progress Report", the actual number of KCHC patients enrolled into each study

5. The following research fees will be charged to all funded studies requiring the use of KCHC resources or patients:
   a. Regardless of funding source, all studies will be charged an Administrative Review fee, which will vary depending on which KCHC Departments will be involved in the study review and approval. These fees are outlined on the attached fee schedule.
   b. All commercially funded studies will be charged a Research Support Fee equal to 1% of the entire direct cost budget for the study, whether incurred at KCHC or elsewhere. When such studies include patients other than those recruited from KCHC, the Research Support Fee percentage will be applied to a prorated budget reflecting the percentage of KCHC patients in the study's patient population. The

**SUNY 001185**

Fee may be paid over the course of the study, either quarterly or at each milestone that results in a payment from the funder. Proposed payment schedules must be approved by the KCHC Finance Department.

6. In addition to the applicable research fees, funded studies will be charged for all KCHC resources used in the course of the study which, in the absence of the study, would not have been used in providing routine patient care. The Principal Investigator shall identify to KCHC all specific, quantifiable KCHC resources (e.g. staffing, space, patient record retrieval, laboratory tests, etc.) expected to be necessary to carry out the proposed project.

    a. KCHC resources identified must include actual salary and fringe benefit costs associated with time spent by KCHC or Affiliate staff performing research activities, that is in excess of time that would have otherwise been spent on routine patient care or other obligations under the Affiliation Agreement. Fringe costs must be calculated using the current applicable rates, which are included on the attached fee schedule. Consistent with the Affiliation Agreement, affiliate salary and fringe costs must be inflated by Overhead and OTPS percentages, outlined on the attached fee schedule.

    b. Use of medical equipment and all pathology and pharmacy services will be charged at the current billing rate. Principal Investigators must identify all needed services to KCHC and will be provided with the current rates.

    c. Costs for certain administrative/facility resources are outlined on the attached schedule. Costs for resources not specifically addressed must be negotiated with the KCHC Finance Department.

    d. It is the Principal Investigator's responsibility for understanding the rules and regulations that oversee research billing. It is of utmost importance that research tests and procedures paid for by the research project is not billed to any third party payors. Any research tests and procedures are not billed as 'standard of care' but identified as 'research-related' and paid by the grant or DMC.

7. The combined value of all applicable research fees and any KCHC resource usage shall constitute the KCHC direct costs for the proposed study. Direct costs shall be inflated by the KCHC indirect cost rate to determine total KCHC charges for the study. The current indirect cost rate is included on the attached schedule.

8. All fees and rates are subject to change at anytime by giving 60 days notice to DMC. Updated schedules will be provided by KCHC at least annually. DMC will make this agreement and such schedules available to all researchers.

9. Principal Investigators must include all KCHC fees and costs in proposed budgets submitted to any funder. All budgetary issues must be addressed and resolved collaboratively between the Principal Investigator, Research

**SUNY 001186**

Foundation and KCHC prior to submission of any research proposal to a granting or funding agency. Additionally, Principal Investigators must review any budget information proposed to be entered into the electronic 641 (aka: REASON system) with the KCHC Finance Department prior to system entry. The HHC Form 641 (aka: electronic 641/Reason System) shall serve as the basis of the local and corporate review process. This form and associated instructions shall be periodically reviewed and updated, including periodic updates of the methodology for calculating research-related costs. These periodic updates shall be issued as revisions of HHC Operating Procedure 160-1, "HHC Review, Approval and Cost Recovery from Affiliation – Sponsored Research Activities Performed in Corporation Facilities". It is the responsibility of the Principal Investigator (PI) to assure that research is conducted in compliance with the HHC Research Policy and Procedures, and with the conditions set by agreements with funding agencies. It is the responsibility of the PI to cooperate fully with the appropriate HHC financial group to facilitate record keeping and compliance with funding conditions.

10.  Principal Investigators must, at least quarterly, provide KCHC with sufficient information on project activities to permit the preparation of appropriate invoices. Such invoices shall be submitted by KCHC to the Principal Investigator/SUNY Research Foundation for payment.

11.  Each Facility shall retain its separate identity and independence and shall have exclusive control of its policies, procedures, management, assets and activities. Each party shall have full administrative and management control and financial responsibility for its operation. Neither party shall, by reason of this MOU assume the liability for any legal or financial debts or obligations incurred by the other party.

12.  Each Party to this MOU will use its best efforts to carry out its responsibilities under this MOU on a timely basis.

13.  This MOU shall not create any agency, partnership, association, or joint venture between the parties. Neither party shall have any right or authority to create any obligation or responsibility, express or implied, on behalf of the other party, or to bind the other party contractually in any manner whatsoever.

14.  Nothing in this MOU shall prohibit either Facility from affiliating or contracting with any other hospital, facility, association or organization for any purpose whatsoever.

15.  Neither Facility shall use the name of the other party in any promotional or advertising material without first obtaining review and prior approval of the intended use from the Administrative Officer of the Facility whose name is to be used.

**SUNY 001187**

16. This MOU shall be governed by and construed in accordance with New York State Law. The parties shall submit to the jurisdiction of the Federal and State Courts located in New York County for the resolution of any disputes arising hereunder.

17. This MOU represents the entire understanding between the Facilities. The MOU and applicable policies and procedures may be amended or modified by mutual consent of the parties, but no such modification, amendment or supplement shall be binding upon either party unless the same is attached in writing and signed by authorized officials of both Facilities.

IN WITNESS THEREOF, the parties hereto have signed their names, the date and year first above written.

Approved by:

Jean G. Leon, RN, MPA
Senior Vice President CBFHN
Executive Director, Kings County Hospital Center

Date 10/1/07

John C. LaRosa, MD
President
SUNY Downstate Medical Center

Date 10/11/07

Julian John
Chief Financial Officer, KCHC

Frederick J. Hammond, Jr.
Senior Vice President and
Chief Financial Officer, DMC

SUNY 001188

**Kings County Hospital Center**
**Research Fee Schedule**

Administrative Review Fees
Standard                                                    $1,980
Increment for Pathology Involvement                          $190
Increment for Pharmacy Involvement                           $310

Fringe & Affiliation Rates
Kings County Hospital Center Fringe                        38.91%
Affiliation Staff Fringe                                   23.14%
Affiliation Overhead Rate                                   2.00% applies to Affiliation salary & fringe
Affiliation OTPS Rate                                       3.93% applies to Affiliation salary & fringe

Direct Charges
Space Rental                                               $66.78 per sqf per year
Telephone                                                 $1,045 per dedicated phone line per year
Copies                                                     $2.50 per 25
Medical Chart Pulls (non-archive)                            $25 per record, in excess of 10
Medical Chart Pulls (archive)                                $30 per record
Collection of Existing Specimens                              $3 per specimen.

Federal Indirect Cost Rate                                 46.70%

Non-Federal Indirect Cost Rate with Space                  44.90%
Non-Federal Indirect Cost Rate w/o Space                   17.49%

## Example Budget: Federally funded study with pharmaceuticals

**Research Fees**

Administrative Review Fees

| | |
|---|---|
| Standard Fee | $1,980.00 |
| Pharmacy Increment | $310.00 |

Research Support Fee | NA

**KCHC Resource Usage**

Personnel

| | |
|---|---|
| Affiliated Physician ($130,000 annual salary, 1 hr per week x 12 weeks) | $1,709.59 |
| Fringe @ 23.14% | $395.60 |
| Affiliation Overhead @ 2.00% | $42.10 |
| Affiliation OTPS @ 3.93% | $82.73 |
| KCHC Physician ($130,000 annual salary, 0.5 hr per week x 12 weeks) | $854.79 |
| Fringe @ 38.91% | $332.62 |

OTPS

| | |
|---|---|
| 50 sqf Room (12 weeks) | $770.54 |
| 15 Non-Archive Medical Record Pulls | $125.00 |

| | |
|---|---|
| **Total Direct Costs** | $6,602.98 |
| **Indirect Costs @ 46.70%** | $1,154.86 |
| **Total Payment to KCHC** | $7,757.84 |

## Example Budget: Commercially funded study with no KCHC resource usage, $50,000 total direct cost budget and 75% of study patients recruited from KCHC

**Research Fees**

Administrative Review Fees

| | |
|---|---|
| Standard Fee | $1,980.00 |

Research Support Fee | 375.00

**KCHC Resource Usage**

Personnel

| | |
|---|---|
| No additional effort | NA |

OTPS

| | |
|---|---|
| None | NA |

| | |
|---|---|
| **Total Direct Costs** | $2,355.00 |
| **Indirect Costs @ 17.49%** | $411.89 |
| **Total Payment to KCHC** | $2,766.89 |

ATTACHMENT P

ADDRESSES FOR NOTICES

AFFILIATE

Name of Organization:     SUNY Downstate Medical Center

Address of Principal Place of Business:     450 Clarkson Avenue, Box 1
Brooklyn, New York 11203-2098

Name of responsible officials (to whom notices pursuant to the Affiliate Agreement should be sent):

President:

John F. Williams, M.D.
SUNY Downstate Medical Center
450 Clarkson Avenue, Box 1
Brooklyn, New York 11203-2098
Tel. (718) 270-2611
Fax (718) 270-4732
john.williams@downstate.edu

With Copy To:

Ian L. Taylor, M.D., Ph.D.
Senior Vice President for Biomedical Education and
Research and Dean of the College of Medicine
SUNY Downstate Medical Center
450 Clarkson Avenue, Box 97
Tel. (718) 270-1101
Fax (718) 270-4047
ian.taylor@downstate.edu


Alan Dzija
Chief Financial Officer
SUNY Downstate Medical Center
450 Clarkson Avenue, Box 65
Tel. (718) 270-3176
Fax (718) 270-4161
alan.dzija@downstate.edu

CORPORATION

Name of Organization:     New York City Health and Hospitals Corporation

Address of Principal Place of Business:     125 Worth Street, New York, N.Y. 10013

Telephone Numbers:     (212) 788-3321     Office of the President
(212) 788-3663     Operations
(212) 788-3532     Office of Professional Services & Affiliations

Fax Numbers:     (212) 788-0040     Office of the President
(212) 788-5483     Operations
(212) 341-9849     Office of Professional Services & Affiliations

Name of Responsible officials (to whom notices pursuant to the Affiliation Contract should be sent):

<u>President:</u>

New York City Health & Hospitals Corporation
125 Worth Street, Rm. 514
New York, N.Y. 10013

<u>With a Copy To:</u>

Assistant Vice President
Office of Professional Service & Affiliations
New York City Health & Hospitals Corporation
125 Worth Street, Rm. 418
New York, New York 10013


A copy of all notices to the Corporation should
also be sent to:

The Chief Executive
Kings County Hospital Center
451 Clarkson Avenue
Room B-1137
Brooklyn, NY 11203

Telephone:      (718)-245-3901
Fax:            (718)-953-1316

100155786_1

| Standard Contract Clauses State University of New York | EXHIBIT A | January 6, 2012 |
|---|---|---|

The parties to the attached contract, license, lease, amendment or other agreement of any kind (hereinafter, "contract") agree to be bound by the following clauses which are hereby made a part of the contract (the word "Contractor" herein refers to any party other than the State, whether a Contractor, licensor, licensee, lessor, lessee or any other party):

**1. EXECUTORY CLAUSE.** In accordance with Section 41 of the State Finance Law, the State shall have no liability under this contract to the Contractor or to anyone else beyond funds appropriated and available for this contract.

**2. PROHIBITION AGAINST ASSIGNMENT.** Except for the assignment of its right to receive payments subject to Article 5-A of the State Finance Law, the Contractor selected to perform the services herein are prohibited in accordance with Section 138 of the State Finance Law from assigning, transferring, conveying, subletting or otherwise disposing of its rights, title or interest in the contract without the prior written consent of SUNY and attempts to do so are null and void. Notwithstanding the foregoing, SUNY may, with the concurrence of the New York Office of State Comptroller, waive prior written consent of the assignment, transfer, conveyance, sublease or other disposition of a contract let pursuant to Article XI of the State Finance Law if the assignment, transfer, conveyance, sublease or other disposition is due to a reorganization, merger or consolidation of Contractor's its business entity or enterprise and Contractor so certifies to SUNY. SUNY retains the right, as provided in Section 138 of the State Finance Law, to accept or reject an assignment, transfer, conveyance, sublease or other disposition of the contract, and to require that any Contractor demonstrate its responsibility to do business with SUNY.

**3. COMPTROLLER'S APPROVAL.** (a) In accordance with Section 112 of the State Finance Law, Section 355 of New York State Education Law, and 8 NYCRR 316, Comptroller's approval is not required for the following contracts: (i) materials; (ii) equipment and supplies, including computer equipment; (iii) motor vehicles; (iv) construction; (v) construction-related services; (vi) printing; and (vii) goods for State University health care facilities, including contracts for goods made with joint or group purchasing arrangements.

(b) Comptroller's approval is required for the following contracts: (i) contracts for services not listed in Paragraph (3)(a) above made by a State University campus or health care facility certified by the Vice Chancellor and Chief Financial Officer, if the contract value exceeds $250,000; (ii) contracts for services not listed in Paragraph (3)(a) above made by a State University campus not certified by the Vice Chancellor and Chief Financial Officer, if the contract value exceeds $50,000; (iii) contracts for services not listed in Paragraph (3)(a) above made by health care facilities not certified by the Vice Chancellor and Chief Financial Officer, if the contract value exceeds $75,000; (iv) contracts whereby the State University agrees to give something other than money, when the value or reasonably estimated value of such consideration exceeds $10,000; (v) contracts for real property transactions if the contract value exceeds $50,000; (vi) all other contracts not listed in Paragraph 3(a) above, if the contract value exceeds $50,000, e.g. SUNY acquisition of a business and New York State Finance Article 11-B contracts and (vii) amendments for any amount to contracts not listed in Paragraph (3)(a) above, when as so amended, the contract exceeds the threshold amounts stated in Paragraph (b) herein;

(c) Any contract that requires Comptroller approval shall not be valid, effective or binding upon the State University until it has been approved by the Comptroller and filed in the Comptroller's office.

**4. WORKERS' COMPENSATION BENEFITS.** In accordance with Section 142 of the State Finance Law, this contract shall be void and of no force and effect unless the Contractor shall provide and maintain coverage during the life of this contract for the benefit of such employees as are required to be covered by the provisions of the Workers' Compensation Law.

**5. NON-DISCRIMINATION REQUIREMENTS.** To the extent required by Article 15 of the Executive Law (also known as the Human Rights Law) and all other State and Federal statutory and constitutional non-discrimination provisions, the Contractor will not discriminate against any employee or applicant for employment because of race, creed, color, sex, national origin, sexual orientation, age, disability, genetic predisposition or carrier status, or marital status. Furthermore, in accordance with Section 220-e of the Labor Law, if this is a contract for the construction, alteration or repair of any public building or public work or for the manufacture, sale or distribution of materials, equipment or supplies, and to the extent that this contract shall be performed within the State of New York, Contractor agrees that neither it nor its subcontractors shall, by reason of race, creed, color, disability, sex, or national origin: (a) discriminate in hiring against any New York State citizen who is qualified and available to perform the work; or (b) discriminate against or intimidate any employee hired for the performance of work under this contract. If this is a building service contract as defined in Section 230 of the Labor Law, then, in accordance with Section 239 thereof, Contractor agrees that neither it nor its subcontractors shall by reason of race, creed, color, national origin, age, sex or disability: (a) discriminate in hiring against any New York State citizen who is qualified and available to perform the work; or (b) discriminate against or intimidate any employee hired for the performance of work under this contract. Contractor is subject to fines of $50.00 per person per day for any violation of Section 220-e or Section 239 as well as possible termination of this contract and forfeiture of all moneys due hereunder for a second or subsequent violation

**6. WAGE AND HOURS PROVISIONS.** If this is a public work contract covered by Article 8 of the Labor Law or a building service contract covered by Article 9 thereof, neither Contractor's employees nor the employees of its subcontractors may be required or permitted to work more than the number of hours or days stated in said statutes, except as otherwise provided in the Labor Law and as set forth in prevailing wage and supplement schedules issued by the State Labor Department. Furthermore, Contractor and its subcontractors must pay at least the prevailing wage rate and pay or provide the prevailing supplements, including the premium rates for overtime pay, as determined by the State Labor Department in accordance with the Labor Law. Additionally, effective April 28, 2008, if this is a public work contract covered by Article 8 of the Labor Law, the Contractor understands and agrees that the filing of payrolls in a manner consistent with Subdivision 3-a of Section 220 of the Labor Law shall be a condition precedent to payment by SUNY of any SUNY-approved sums due and owing for work done upon the contract.

**7. NON-COLLUSIVE BIDDING CERTIFICATION.** In accordance with Section 139-d of the State Finance Law, if this contract was awarded based on the submission of competitive bids, Contractor affirms, under penalty of perjury, that each person signing on behalf of Contractor, and in the case of a joint bid each party thereto certifies as to its

own organization, under penalty of perjury, that to the best of its knowledge and belief that its bid was arrived at independently and without collusion aimed at restricting competition. Contractor further affirms that, at the time Contractor submitted its bid, an authorized and responsible person executed and delivered to SUNY a non-collusive bidding certification on Contractor's behalf.

**8. INTERNATIONAL BOYCOTT PROHIBITION.** In accordance with Section 220-f of the Labor Law and Section 139-h of the State Finance Law, if this contract exceeds $5,000, the Contractor agrees, as a material condition of the contract, that neither the Contractor nor any substantially owned or affiliated person, firm, partnership or corporation has participated, is participating, or shall participate in an international boycott in violation of the federal Export Administration Act of 1979 (50 USC App. Sections 2401 et seq.) or regulations thereunder. If such Contractor, or any of the aforesaid affiliates of Contractor, is convicted or is otherwise found to have violated said laws or regulations upon the final determination of the United States Commerce Department or any other appropriate agency of the United States subsequent to the contract's execution, such contract, amendment or modification thereto shall be rendered forfeit and void. The Contractor shall so notify the State Comptroller within five (5) business days of such conviction, determination or disposition of appeal (2 NYCRR 105.4).

**9. SET-OFF RIGHTS.** The State shall have all of its common law, equitable and statutory rights of set-off. These rights shall include, but not be limited to, the State's option to withhold for the purposes of set-off any moneys due to the Contractor under this contract up to any amounts due and owing to the State with regard to this contract, any other contract with any State department or agency, including any contract for a term commencing prior to the term of this contract, plus any amounts due and owing to the State for any other reason including, without limitation, tax delinquencies or monetary penalties relative thereto. The State shall exercise its set-off rights in accordance with normal State practices including, in cases of set-off pursuant to an audit, the finalization of such audit by the State, its representatives, or the State Comptroller.

**10. RECORDS.** The Contractor shall establish and maintain complete and accurate books, records, documents, accounts and other evidence directly pertinent to performance under this contract (hereinafter, collectively, "the Records"). The Records must be kept for the balance of the calendar year in which they were made and for six (6) additional years thereafter. The State Comptroller, the Attorney General and any other person or entity authorized to conduct an examination, as well as SUNY and its representatives and entities involved in this contract, shall have access to the Records during normal business hours at an office of the Contractor within the State of New York or, if no such office is available, at a mutually agreeable and reasonable venue within the State, for the term specified above for the purposes of inspection, auditing and copying. SUNY shall take reasonable steps to protect from public disclosure any of the Records which are exempt from disclosure under Section 87 of the Public Officers Law (the "Statute") provided that: (i) the Contractor shall timely inform an appropriate State official, in writing, that said Records should not be disclosed; and (ii) said Records shall be sufficiently identified; and (iii) designation of said Records as exempt under the

Statute is reasonable. Nothing contained herein shall diminish, or in any way adversely affect, SUNY's or the State's right to discovery in any pending or future litigation.

## 11. IDENTIFYING INFORMATION AND PRIVACY NOTIFICATION.

Identification Number(s). Every invoice or New York State Claim for Payment submitted to the State University of New York by a payee, for payment for the sale of goods or services or for transactions (e.g., leases, easements, licenses, etc.) related to real or personal property must include the payee's identification number. The number is any or all of the following: (i) the payee's Federal employer identification number; (ii) the payee's Federal social security number; and/or (iii) the payee's Vendor Identification Number assigned by the Statewide Financial System. Failure to include such number or numbers may delay payment. Where the payee does not have such number or numbers, the payee, on its invoice or Claim for Payment, must give the reason or reasons why the payee does not have such number or numbers.

(b) Privacy Notification. (1) The authority to request the above personal information from a seller of goods or services or a lessor of real or personal property, and the authority to maintain such information, is found in Section 5 of the State Tax Law. Disclosure of this information by the seller or lessor to the State University of New York is mandatory. The principal purpose for which the information is collected is to enable the State to identify individuals, businesses and others who have been delinquent in filing tax returns or may have understated their tax liabilities and to generally identify persons affected by the taxes administered by the Commissioner of Taxation and Finance. The information will be used for tax administration purposes and for any other purpose authorized by law. (2) The personal information is requested by the purchasing unit of the State University of New York contracting to purchase the goods or services or lease the real or personal property covered by this contract or lease. The information is maintained in the Statewide Financial System by the Vendor Management Unit within the Bureau of State Expenditures, Office of the State Comptroller, 110 State Street, Albany, New York 12236.

## 12. EQUAL EMPLOYMENT OPPORTUNITIES FOR MINORITIES AND WOMEN.

(a) In accordance with Section 312 of the Executive Law and 5 NYCRR 143, if this contract is: (i) a written agreement or purchase order instrument, providing for a total expenditure in excess of $25,000.00, whereby a contracting agency is committed to expend or does expend funds in return for labor, services, supplies, equipment, materials or any combination of the foregoing, to be performed for, or rendered or furnished to the contracting agency; or (ii) a written agreement in excess of $100,000.00 whereby a contracting agency is committed to expend or does expend funds for the acquisition, construction, demolition, replacement, major repair or renovation of real property and improvements thereon; or (iii) a written agreement in excess of $100,000.00 whereby the owner of a State assisted housing project is committed to expend or does expend funds for the acquisition, construction, demolition, replacement, major repair or renovation of real property and improvements thereon for such project, then the following shall apply and by signing this agreement the Contractor certifies and affirms that it is Contractor's equal employment opportunity policy that:

(1) The Contractor will not discriminate against employees or applicants for employment because of race, creed, color, national origin, sex, age, disability or marital status, and will undertake or continue existing programs of affirmative action to ensure that minority group members and women are afforded equal employment opportunities without discrimination. Affirmative action shall mean recruitment, employment, job assignment, promotion, upgradings, demotion, transfer, layoff, or termination and rates of pay or other forms of compensation;

(2) at SUNY's request, Contractor shall request each employment agency, labor union, or authorized representative of workers with which it has a collective bargaining or other agreement or understanding, to furnish a written statement that such employment agency, labor union or representative will not discriminate on the basis of race, creed, color, national origin, sex, age, disability or marital status and that such union or representative will affirmatively cooperate in the implementation of the Contractor's obligations herein; and

(3) Contractor shall state, in all solicitations or advertisements for employees, that, in the performance of the State contract, all qualified applicants will be afforded equal employment opportunities without discrimination because of race, creed, color, national origin, sex, age, disability or marital status.

(b) Contractor will include the provisions of "1", "2" and "3", above, in every subcontract over $25,000.00 for the construction, demolition, replacement, major repair, renovation, planning or design of real property and improvements thereon (the "Work") except where the Work is for the beneficial use of the Contractor. Section 312 does not apply to: (i) work, goods or services unrelated to this contract; or (ii) employment outside New York State. The State shall consider compliance by a Contractor or sub-contractor with the requirements of any federal law concerning equal employment opportunity which effectuates the purpose of this section. SUNY shall determine whether the imposition of the requirements of the provisions hereof duplicate or conflict with any such federal law and if such duplication or conflict exists, SUNY shall waive the applicability of Section 312 to the extent of such duplication or conflict. Contractor will comply with all duly promulgated and lawful rules and regulations of the Department of Economic Development's Division of Minority and Women's Business Development pertaining hereto.

## 13. CONFLICTING TERMS.

In the event of a conflict between the terms of the contract (including any and all attachments thereto and amendments thereof) and the terms of this Exhibit A, the terms of this Exhibit A shall control.

## 14. GOVERNING LAW.

This contract shall be governed by the laws of the State of New York except where the Federal supremacy clause requires otherwise.

## 15. LATE PAYMENT.

Timeliness of payment and any interest to be paid to Contractor for late payment shall be governed by Article 11-A of the State Finance Law to the extent required by law.

## 16. NO ARBITRATION.

Disputes involving this contract, including the breach or alleged breach thereof, may not be submitted to binding arbitration (except where statutorily authorized) but must, instead, be heard in a court of competent jurisdiction of the State of New York.

## 17. SERVICE OF PROCESS.

In addition to the methods of service allowed by the State Civil Practice Law & Rules ("CPLR"), Contractor hereby consents to service of process upon it by registered or certified mail, return receipt requested. Service hereunder shall be complete upon Contractor's actual receipt of process or upon the State's receipt of the return thereof by the United States Postal Service as refused or undeliverable. Contractor must promptly notify the State, in writing, of each and every change of address to which service of process can be made. Service by the State to the last known address shall be sufficient. Contractor will have thirty (30) calendar days after service hereunder is complete in which to respond.

## 18. PROHIBITION ON PURCHASE OF TROPICAL HARDWOODS.

The Contractor certifies and warrants that all wood products to be used under this contract award will be in accordance with, but not limited to, the specifications and provisions of State Finance Law §165 (Use of Tropical Hardwoods), which prohibits purchase and use of tropical hardwoods, unless specifically exempted, by the State or any governmental agency or political subdivision or public benefit corporation. Qualification for an exemption under this law will be the responsibility of the contractor to establish to meet with the approval of the State. In addition, when any portion of this contract involving the use of wood, whether supply or installation, is to be performed by any subcontractor, the prime Contractor will indicate and certify in the submitted bid proposal that the subcontractor has been informed and is in compliance with specifications and provisions regarding use of tropical hardwoods as detailed in Section 165 of the State Finance Law. Any such use must meet with the approval of the State, otherwise, the bid may not be considered responsive. Under bidder certification, proof of qualification for exemption will be the responsibility of the Contractor to meet with the approval of the State.

## 19. MacBRIDE FAIR EMPLOYMENT PRINCIPLES.

In accordance with the MacBride Fair Employment Principles (Chapter 807 of the Laws of 1992) , the Contractor hereby stipulates that Contractor and any individual or legal entity in which the Contractor holds a ten percent or greater ownership interest and any individual or legal entity that holds a ten percent or greater ownership interest in the Contractor either (a) have no business operations in Northern Ireland, or (b) shall take lawful steps in good faith to conduct any business operations in Northern Ireland in accordance with the MacBride Fair Employment Principles (as described in Section 165(5) of the State Finance Law), and shall permit independent monitoring of compliance with such principles.

## 20. OMNIBUS PROCUREMENT ACT OF 1992.

It is the policy of New York State to maximize opportunities for the participation of New York State business enterprises, including minority and women-owned business enterprises as bidders, subcontractors and suppliers on its procurement contracts.

Information on the availability of New York State subcontractors and suppliers is available from:

NYS Department of Economic Development
Division for Small Business
30 South Pearl St., 7th Floor
Albany, NY 12245
Tel: 518-292-6220
Fax 518-292-6884
http://www.empire.state.ny.us

A directory of certified minority and women-owned business enterprises is available from:

NYS Department of Economic Development
Division of Minority and Women's Business Development
30 South Pearl St., 7th Floor
Albany, NY 12245
Tel: 518-292-6250
Fax 518-292-5803
http://www.empire.state.ny.us

The Omnibus Procurement Act of 1992 requires that by signing this bid proposal or contract, as applicable, Contractors certify that whenever the total bid amount is greater than $1 million:

(a) The Contractor has made reasonable efforts to encourage the participation of New York State Business Enterprises as suppliers and subcontractors, including certified minority and women-owned business enterprises, on this project, and has retained the documentation of these efforts to be provided upon request to SUNY;

(b) The Contractor has complied with the Federal Equal Employment Opportunity Act of 1972 (P.L. 92-261), as amended;

(c) The Contractor agrees to make reasonable efforts to provide notification to New York State residents of employment opportunities

on this project through listing any such positions with the Job Search Division of the New York State Department of Labor, or providing such notification in such manner as is consistent with existing collective bargaining contracts or agreements. The contractor agrees to document these efforts and to provide said documentation to the State upon request; and

(d) The Contractor acknowledges notice that SUNY may seek to obtain offset credits from foreign countries as a result of this contract and agrees to cooperate with SUNY in these efforts.

**21. RECIPROCITY AND SANCTIONS PROVISIONS.** Bidders are hereby notified that if their principal place of business is located in a country, nation, province, state or political subdivision that penalizes New York State vendors, and if the goods or services they offer will be substantially produced or performed outside New York State, the Omnibus Procurement Act of 1994 and 2000 amendments (Chapter 684 and Chapter 383, respectively) require that they be denied contracts which they would otherwise obtain. Contact the NYS Department of Economic Development, Division for Small Business, 30 South Pearl Street, Albany, New York 12245, for a current list of jurisdictions subject to this provision.

**22. COMPLIANCE WITH NEW YORK STATE INFORMATION SECURITY BREACH AND NOTIFICATION ACT.** Contractor shall comply with the provisions of the New York State Information Security Breach and Notification Act (General Business Law Section 899-aa; State Technology Law Section 208).

**23. COMPLIANCE WITH CONSULTANT DISCLOSURE LAW.** If this is a contract for consulting services, defined for purposes of this requirement to include analysis, evaluation, research, training, data processing, computer programming, engineering, environmental health and mental health services, accounting, auditing, paralegal, legal or similar services, then in accordance with Section 163(4-g) of the State Finance Law, the Contractor shall timely, accurately and properly comply with the requirement to submit an annual employment report for the contract to SUNY, the Department of Civil Service and the State Comptroller.

**24. PURCHASES OF APPAREL AND SPORTS EQUIPMENT.** In accordance with State Finance Law Section 165(7), SUNY may determine that a bidder on a contract for the purchase of apparel or sports equipment is not a responsible bidder as defined in State Finance Law Section 163 based on (a) the labor standards applicable to the manufacture of the apparel or sports equipment, including employee compensation, working conditions, employee rights to form unions and the use of child labor; or (b) bidder's failure to provide information sufficient for SUNY to determine the labor conditions applicable to the manufacture of the apparel or sports equipment.

**25. PROCUREMENT LOBBYING.** To the extent this agreement is a "procurement contract" as defined by State Finance Law Sections 139-j and 139-k, by signing this agreement the contractor certifies and affirms that all disclosures made in accordance with State Finance Law Sections 139-j and 139-k are complete, true and accurate. In the event such certification is found to be intentionally false or intentionally incomplete, the State may terminate the agreement by providing written notification to the Contractor in accordance with the terms of the agreement.

**26. CERTIFICATION OF REGISTRATION TO COLLECT SALES AND COMPENSATING USE TAX BY CERTAIN STATE CONTRACTORS, AFFILIATES AND SUBCONTRACTORS.** To the extent this agreement is a contract as defined by Tax Law Section 5-a, if the Contractor fails to make the certification required by Tax Law Section 5-a or if during the term of the contract, the Department of Taxation and Finance or SUNY discovers that the certification, made under penalty of perjury, is false, then such failure to file or false certification shall be a material breach of this contract and this contract may be terminated, by providing written notification to the Contractor in accordance with the terms of the agreement, if SUNY determines that such action is in the best interests of the State.

---

**THE FOLLOWING PROVISIONS SHALL APPLY ONLY TO THOSE CONTRACTS TO WHICH A HOSPITAL OR OTHER HEALTH SERVICE FACILITY IS A PARTY**

27. Notwithstanding any other provision in this contract, the hospital or other health service facility remains responsible for insuring that any service provided pursuant to this contract complies with all pertinent provisions of Federal, state and local statutes, rules and regulations. In the foregoing sentence, the word "service" shall be construed to refer to the health care service rendered by the hospital or other health service facility.

28. (a) In accordance with the 1980 Omnibus Reconciliation Act (Public Law 96-499), Contractor hereby agrees that until the expiration of four years after the furnishing of services under this agreement, Contractor shall make available upon written request to the Secretary of Health and Human Services, or upon request, to the Comptroller General of the United States or any of their duly authorized representatives, copies of this contract, books, documents and records of the Contractor that are necessary to certify the nature and extent of the costs hereunder.

(b) If Contractor carries out any of the duties of the contract hereunder, through a subcontract having a value or cost of $10,000 or more over a twelve-month period, such subcontract shall contain a clause to the effect that, until the expiration of four years after the furnishing of such services pursuant to such subcontract, the subcontractor shall make available upon written request to the Secretary of Health and Human Services or upon request to the Comptroller General of the United States, or any of their duly authorized representatives, copies of the subcontract and books, documents and records of the subcontractor that are necessary to verify the nature and extent of the costs of such subcontract.

(c) The provisions of this section shall apply only to such contracts as are within the definition established by the Health Care Financing Administration, as may be amended or modified from time to time.

**1. DEFINITIONS.** The following terms shall be defined in accordance with Section 310 of the Executive Law:

*STATE CONTRACT* herein referred to as "State Contract", shall mean: (a) a written agreement or purchase order instrument, providing for a total expenditure in excess of twenty-five thousand dollars ($25,000.00), whereby the State University of New York ("University") is committed to expend or does expend funds in return for labor, services including but not limited to, legal, financial and other professional services, supplies, equipment, materials or an combination of the foregoing, to be performed for, or rendered or furnished to the University; (b) a written agreement in excess of one hundred thousand dollars ($100,000.00) whereby the University is committed to expend or does expend funds for the acquisition, construction, demolition, replacement, major repair or renovation of real property and improvements thereon; and (c) a written agreement in excess of one hundred thousand dollars ($100,000.00) whereby the University as an owner of a state assisted housing project is committed to expend or does expend funds for the acquisition, construction, demolition, replacement, major repair or renovation of real property and improvements thereon for such project.

*SUBCONTRACT* herein referred to as "Subcontract", shall mean any agreement providing for a total expenditure in excess of $25,000 for construction, demolition, replacement, major repair, renovation, planning or design of real property and improvements thereon between a Contractor and any individual, partnership, corporation, or not-for-profit corporation, in which a portion of a Contractor's obligation under a State Contract is undertaken or assumed, but shall not include any construction, demolition, replacement, major repair, renovation, planning or design of real property and improvements thereon for the beneficial use of Contractor.

*WOMEN-OWNED BUSINESS ENTER-PRISE* herein referred to as "WBE", shall mean a business enterprise, including a sole proprietorship, partnership or corporation that is: (a) at least fifty-one percent owned by one or more United States citizens or permanent resident aliens who are women; (b) an enterprise in which the ownership interest of such women is real, substantial and continuing; (c) an enterprise in which such women ownership has and exercises the authority to control independently the day-to-day business decisions of the enterprise; (d) an enterprise authorized to do business in this state and independently owned and operated; (e) an enterprise owned by an individual or individuals, whose ownership, control and operation are relied upon for certification, with a personal net worth that does not exceed three million five hundred thousand dollars, as adjusted annually on the first of January for inflation according to the consumer price index of the previous year; and (f) an enterprise that is a small business pursuant to subdivision twenty of this section.

A firm owned by a minority group member who is also a woman may be certified as a minority-owned business enterprise, a woman-owned business enterprise, or both, and may be counted towards either a minority-owned business enterprise goal or a women-owned business enterprise goal, in regard to any Contract or any goal, set by an agency or authority, but such participation may not be counted towards both such goals. Such an enterprise's participation in a Contract may not be divided between the minority-owned business enterprise goal and the women-owned business enterprise goal.

*MINORITY-OWNED BUSINESS ENTER-PRISE* herein referred to as "MBE", shall mean a business enterprise, including a sole proprietorship, partnership or corporation that is: (a) at least fifty-one percent (51%) owned by one or more minority group members; (b) an enterprise in which such minority ownership is real, substantial and continuing; (c) an enterprise in which such minority ownership has and exercises the authority to control independently the day-to-day business decisions of the enterprise; (d) an enterprise authorized to do business in this state and independently owned and operated; (e) an enterprise owned by an individual or individuals, whose ownership, control and operation are relied upon for certification, with a personal net worth that does not exceed three million five hundred thousand dollars, ($3,500,000.00) as adjusted annually on the first of January for inflation according to the consumer price index of the previous year; and (f) an enterprise that is a small business pursuant to subdivision twenty of this section.

*MINORITY GROUP MEMBER* shall mean a United States citizen or permanent resident alien who is and can demonstrate membership in one of the following groups: (a) Black persons having origins in any of the Black African racial groups; (b) Hispanic persons of Mexican, Puerto Rican, Dominican, Cuban, Central or South American of either Indian or Hispanic origin, regardless of race; (c) Native American or Alaskan native persons having origins in any of the original peoples of North America. (d) Asian and Pacific Islander persons having origins in any of the Far East countries, South East Asia, the Indian Subcontinent or Pacific Islands.

*CERTIFIED ENTERPRISE OR BUSINESS* shall mean a business verified as a minority or women- owned business enterprise pursuant to section 314 of the Executive Law. A business enterprise which has been approved by the DMWBD for minority or women-owned enterprise status subsequent to verification that the business enterprise is owned, operated, and controlled by minority group members or women, and that also meets the financial requirements set forth in the regulations.

**2. TERMS.** The parties to the attached State Contract agree to be bound by the following provisions which are made a part hereof (the word "Contractor" herein refers to any party other than the University:

1(a) Contractor and its Subcontractors shall undertake or continue existing programs of affirmative action to ensure that minority group members and women are afforded equal employment opportunities without discrimination. For these purposes, affirmative action shall apply in the areas of recruitment, employment, job assignment, promotion, upgrading, demotion, transfer, layoff, or termination and rates of pay or other forms of compensation.

(b) Prior to the award of a State Contract, the Contractor shall submit an equal employment opportunity (EEO) policy statement to the University within the time frame established by the University.

(c) As part of the Contractor's EEO policy statement, the Contractor, as a precondition to entering into a valid and binding State Contract, shall agree to the following in the performance of the State Contract: (i) The Contractor will not discriminate against any employee or applicant for employment, will undertake or continue existing programs of affirmative action to ensure that minority group members and women are afforded equal employment opportunities without discrimination, and shall make and document its conscientious and active efforts to employ and utilize minority group members and women in its work force on State Contracts;(ii) The Contractor shall state in all solicitations or advertisements for employees that, in the performance of the State Contract, all qualified applicants will be afforded equal employment opportunities without discrimination; (iii) At the request of the University the Contractor shall request each employment agency, labor union, or authorized representative of workers with which it has a collective bargaining or other agreement or understanding, to furnish a written statement that such employment agency, labor union, or representative will not discriminate, and that such union or representative will affirmatively cooperate in the implementation of the Contractor's obligations herein.

(d) Except for construction Contracts, prior to an award of a State Contract, the Contractor shall submit to the contracting agency a staffing plan of the anticipated work force to be utilized on the State Contract or, where applicable, of the Contractor's total work force, including apprentices, broken down by specified ethnic background, gender, and Federal occupational categories or other appropriate categories specified by the contracting agency. The form of the staffing plan shall be supplied by the contracting agency. If Contractor fails to provide a staffing plan, or in the alternative, a description of its entire work force, the University may reject Contractor's bid, unless Contractor either commits to provide such information at a later date or provides a reasonable justification in writing for its failure to provide the same.

(e) After an award of a State Contract, the Contractor shall submit to the University a workforce utilization report, in a form and manner required by the agency, of the work force actually utilized on the State Contract, broken down by specified ethnic background, gender, and Federal occupational categories or

other appropriate categories specified by the University.

(f) The Contractor shall include the provisions of this section in every Subcontract in such a manner that the requirements of the provisions will be binding upon each Subcontractor as to work in connection with the State Contract, including the requirement that Subcontractors shall undertake or continue existing programs of affirmative action to ensure that minority group members and women are afforded equal employment opportunities without discrimination, and, when requested, provide to the Contractor information on the ethnic background, gender, and Federal occupational categories of the employees to be utilized on the State Contract.

(g) To ensure compliance with the requirements of this paragraph, the University shall inquire of a Contractor whether the work force to be utilized in the performance of the State Contract can be separated out from the Contractor's and/or Subcontractors' total work force and where the work of the State Contract is to be performed. For Contractors who are unable to separate the portion of their work force which will be utilized for the performance of this State Contract, Contractor shall provide reports describing its entire work force by the specified ethnic background, gender, and Federal Occupational Categories, or other appropriate categories which the agency may specify.

(h) The University may require the Contractor and any Subcontractor to submit compliance reports, pursuant to the regulations relating to their operations and implementation of their affirmative action or equal employment opportunity program in effect as of the date the State Contract is executed.

(i) If a Contractor or Subcontractor does not have an existing affirmative action program, the University may provide to the Contractor or Subcontractor a model plan of an affirmative action program. Upon request, the Director of New York State Department of Economic Development, Division of Minority and Women Business Development (DMWBD) shall provide a contracting agency with a model plan of an affirmative action program.

(j) Upon request, DMWBD shall provide the University with information on specific recruitment sources for minority group members and women, and contracting agencies shall make such information available to Contractors

2. Contractor must provide the names, addresses and federal identification numbers of certified minority- and women-owned business enterprises which the Contractor intends to use to perform the State Contract and a description of the Contract scope of work which the Contractor intends to structure to increase the participation by Certified minority- and/or women-owned business enterprises on the State Contract, and the estimated or, if known, actual dollar amounts to be paid to and performance dates of each component of a State Contract which the Contractor intends to be performed by a certified minority- or woman-owned business enterprise. In the event the Contractor responding to University solicitation is joint venture, teaming agreement, or other similar arrangement that includes a minority-and women owned business enterprise, the Contractor must submit for review and approval: i. the name, address, telephone number and federal identification of each partner or party to the agreement; ii. the

federal identification number of the joint venture or entity established to respond to the solicitation, if applicable; iii. A copy of the joint venture, teaming or other similar arrangement which describes the percentage of interest owned by each party to the agreement and the value added by each party; iv. A copy of the mentor-protégé agreement between the parties, if applicable, and if not described in the joint venture, teaming agreement, or other similar arrangement.

3. PARTICIPATION BY MINORITY GROUP MEMBERS AND WOMEN. The University shall determine whether Contractor has made conscientious and active efforts to employ and utilize minority group members and women to perform this State Contract based upon an analysis of the following factors:

(a) Whether Contractor established and maintained a current list of recruitment sources for minority group members and women, and whether Contractor provided written notification to such recruitment sources that contractor had employment opportunities at the time such opportunities became available.

(b) Whether contractor sent letters to recruiting sources, labor unions, or authorized representatives of workers with which contractor has a collective bargaining or other agreement or understanding requesting assistance in locating minority group members and women for employment.

(c) Whether contractor disseminated its EEO policy by including it in any advertising in the news media, and in particular, in minority and women news media.

(d) Whether contractor has attempted to provide information concerning its EEO policy to Subcontractors with which it does business or had anticipated doing business.

(e) Whether internal procedures exist for, at a minimum, annual dissemination of the EEO policy to employees, specifically to employees having any responsibility for hiring, assignment, layoff, termination, or other employment decisions. Such dissemination may occur through distribution of employee policy manuals and handbooks, annual reports, staff meetings and public postings.

(f) Whether Contractor encourages and utilizes minority group members and women employees to assist in recruiting other employees.

(g) Whether Contractor has apprentice training programs approved by the N.Y.S. Department of Labor which provides for training and hiring of minority group members and women.

(h) Whether the terms of this section have been incorporated into each Subcontract which is entered into by the Contractor.

4. PARTICIPATION BY MINORITY AND WOMEN-OWNED BUSINESS ENTERPRISES. Based upon an analysis of the following factors, the University shall determine whether Contractor has made good faith efforts to provide for meaningful participation by minority-owned and women-owned business enterprises which have been certified by DMWBD:

(a) Whether Contractor has actively solicited bids for Subcontracts from qualified M/WBEs, including those firms listed on the Directory of Certified Minority and Women-Owned Business Enterprises, and has documented its good faith efforts towards

meeting minority and women owned business enterprise utilization plans by providing, copies of solicitations, copies of any advertisements for participation by certified minority- and women-owned business enterprises timely published in appropriate general circulation, trade and minority- or women-oriented publications, together with the listing(s) and date(s) of the publications of such advertisements; dates of attendance at any pre-bid, pre-award, or other meetings, if any, scheduled by the University, with certified minority- and women-owned business enterprises, and the reasons why any such firm was not selected to participate on the project.

(b) Whether Contractor has attempted to make project plans and specifications available to firms who are not members of associations with plan rooms and reduce fees for firms who are disadvantaged.

(c) Whether Contractor has utilized the services of organizations which provide technical assistance in connection with M/WBE participation.

(d) Whether Contractor has structured its Subcontracts so that opportunities exist to complete smaller portions of work.

e) Whether Contractor has encouraged the formation of joint ventures, partnerships, or other similar arrangements among Subcontractors.

(f) Whether Contractor has requested the services of the Department of Economic Development (DED) to assist Subcontractors' efforts to satisfy bonding requirement.

(g) Whether Contractor has made progress payments promptly to its Subcontractors.

(h) Whether the terms of this section have been incorporated into each Subcontract which is entered into by the Contractor, it shall be the responsibility of Con- tractor to ensure compliance by every Subcontractor to these provisions.

5. GOALS. (a) GOALS FOR MINORITY AND WOMEN WORK FORCE PARTICIPATION. (i) The University shall include relevant work force availability data, which is provided by the DMWBD, in all documents which solicit bids for State Contracts and shall make efforts to assist Contractors in utilizing such data to determine expected levels of participation for minority group members and women on State Contracts.

(ii) Contractor shall exert good faith efforts to achieve such goals for minority and women's participation. To successfully achieve such goals, the employment of minority group members and women by Contractor must be substantially uniform during the entire term of this State Contract. In addition, Contractor should not participate in the transfer of employees from one employer or project to another for the sole purpose of achieving goals for minority and women's participation.

(b) GOALS FOR MINORITY AND WOMEN-OWNED BUSINESS ENTER-PRISES PARTICIPATION. For all State Contracts in excess of $25,000.00 whereby the University is committed to expend or does expend funds in return for labor, services including but not limited to legal, financial and other professional services, supplies, equipment, materials or an combination of the

foregoing or all State Contracts in excess of $100,000.00 whereby the University is committed to expend or does expend funds for the acquisition, construction, demolition, replacement, major repair or renovation of real property and improvements thereon, Contractor shall exert good faith efforts to achieve a participation goal of _____ percent (____%) for Certified Minority-Owned Business Enterprises and _____ percent (____%) for Certified Women-Owned Business Enterprises.

**6. ENFORCEMENT.** The University will be responsible for enforcement of each Contractor's compliance with these provisions. Contractor, and each Subcontractor, shall permit the University access to its books, records and accounts for the purpose of investigating and determining whether Contractor or Subcontractor is in compliance with the requirements of Article 15-A of the Executive Law. If the University determines that a Contractor or Subcontractor may not be in compliance with these provisions, the University may make every reasonable effort to resolve the issue and assist the Contractor or Subcontractor in its efforts to comply with these provisions. If the University is unable to resolve the issue of noncompliance, the University may file a complaint with the DMWBD.

**7. DAMAGES FOR NON COMPLIANCE.**
Where SUNY determines that Contractor is not in compliance with the requirements of the Contract and Contractor refuses to comply with such requirements, or if Contractor is found to have willfully and intentionally failed to comply with the MWBE participation goals, Contractor shall be obligated to pay to SUNY liquidated damages. Such liquidated damages shall be calculated as an amount equaling the difference between:

a. All sums identified for payment to MWBEs had the Contractor achieved the contractual MWBE goals; and

b. All sums actually paid to MWBEs for work performed or materials supplied under the Contract.

In the event a determination has been made which requires the payment of liquidated damages and such identified sums have not been withheld by SUNY, Contractor shall pay such liquidated damages to SUNY within sixty (60) days after they are assessed by SUNY unless prior to the expiration of such sixtieth day, the Contractor has filed a complaint with the Director of the Division of Minority and Woman Business Development pursuant to Subdivision 8 of Section 313 of the Executive Law in which event the liquidated damages shall be payable if Director renders a decision in favor of SUNY.

# ATTACHMENT R

| | PERFORMANCE INDICATOR | MEASUREMENT INDICATOR WITHHOLDS | Annual Threshold | Annual Financial Impact |
|---|---|---|---|---|
| 1. | *Regulatory – SDOH Citations re Patient Care* | *Notice of Citations related to quality of care deficiencies attributed to physicians, provided to Affiliate on receipt. Agreement Sec. 9 (fines and failure to cure) remain unaffected* | 5 or more as determined by Executive Director and Medical Director | $40,000 |
| 2. | *Regulatory – Sentinel Events* | *QAC Board Report, based on criteria identified by Joint Commission("Reviewable Sentinel Events") or Reportable Incidents in NYS Hospital Code (§405.8(b)(1))* *Sentinel Event determined by the Executive Director and the Medical Director to be solely related to action (commission or omission) of physician.* | 3 or more | $40,000 |
| 3. | *Regulatory – Malpractice Claims* | *Actual Notice of Claims asserted against physicians employed by the Affiliate and related to such Physician Providers' act or failure to act in providing patient care services in fiscal year. Determined by the Executive Director and the Medical Director to be directly related to action (commission or omission) of physician.* | > 10% increase each year. | $15,000 |
| 4. | *Efficiency – Readmission rate w/in 7 days of Emergency room visit for Asthma.* | *Random sample of 100 charts. (Attributable to physicians as determined by Executive Director and Medical Director)* | > 10% increase each year | $5,000 |
| | | | **Total Amount Subject to Withholds:** | **$100,000** |

| | PERFORMANCE INDICATOR | MEASUREMENT INDICATOR PERFORMANCE BONUSES | Annual Threshold | Annual Financial Impact |
|---|---|---|---|---|
| 5. | *Efficiency/Quality – Screening Mammography readings* | *Reading of screening mammography completed within 4 days of procedure.(with minimum of 30 screening procedures/day)* | 80% (quarterly average) | $40,000 |
| 6. | *Efficiency/Quality- Dictation of diagnostic Radiology reports* | *Dictation turnaround time within 24 hours of radiology procedure (MRI, CT and plain films)* | 95% (quarterly average) | $25,000 |
| 7. | *Efficiency/Quality- Emergency Department* | *Triage to Physician encounter time-(Adult Emergency Room ESI 3) 40 minutes* | 90% (quarterly average) | $35,000 |
| | | | **Total Performance Bonuses:** | **$100,000** |

**SUNY 001199**