UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x

ODED GREENBERG,

                                        Plaintiff,

            -against-

STATE UNIVERSITY HOSPITAL-DOWNSTATE
MEDICAL CENTER a/ka/ THE STATE UNIVERSITY
OF NEW YORK HEALTH SCIENCE CENTER AT
BROOKLYN aka SUNY DOWNSTATE MEDICAL
CENTER, NEW YORK CITY HEALTH AND
HOSPITALS CORPORATION, KINGS COUNTY
HOSPITAL CENTER, UNITED UNIVERSITY
PROFESSIONALS, SUNY DOWNSTATE MEDICAL
CENTER CHAPTER OF UNITED UNIVERSITY
PROFESSIONALS, DEBORAH L. REEDE, STEVEN
PULITZER, and JOHN and JANE DOES 1-20,

                                        Defendants.

-------------------------------------------------------------------------X

15-CV-2343 (PKC)(VMS)

**HEALTH + HOSPITALS
DEFENDANTS' RESPONSE
PLAINTIFF'S RULE 56.1
STATEMENT OF
ADDITIONAL MATERIAL
FACTS
IN OPPOSITION TO
DEFENDANTS' MOTION
FOR SUMMARY
JUDGMENT**

        Defendants New York City Health + Hospitals Corporation ("H+H Corp.") and Kings

County Hospital Center ("KCHC") (hereinafter "Health + Hospitals Defendants"), by their

attorney Zachary W. Carter, Corporation Counsel of the City of New York, pursuant to Local

Civil Rule 56.1 of the United States District Court, Eastern District of New York, hereby submit

the following responses to the statement of material facts as to which Plaintiff alleges there are

no genuine issues to be tried.

        **Background Facts**

        1.        At the time that Dr. Greenberg was unlawfully terminated from his

employment at Downstate and KCHC, he had been a radiologist in the Emergency Room at

KCHC for over fourteen years.  See Second Amended Complaint ("Compl."), ¶ 1.  During his

employment at Downstate and KCHC, Dr. Greenberg served as a Director of ER Radiology from approximately 2005 or 2006 to 2009. Ex. 1 (Greenberg Dep.) at 89.[1] Dr. Greenberg's credentials were both unusually strong and versatile in that he was fellowship-trained in Body Imaging by an ACGME-approved program and was board-certified in two sub-specialties, Diagnostic Radiology and Anatomic Pathology, a versatility shared by no other colleague at KCHC. See Compl. ¶ 1.

Response: Disputed as to the characterization of Plaintiff's credentials as "unusually strong and versatile." Disputed to the extent the statement is argumentative and conclusory. Neita v. Precision Pipeline Sols., No. CV 15-649 (JS) (AKT), 2018 U.S. Dist. LEXIS 32898, at *25 (E.D.N.Y. Feb. 26, 2018), citing Hengjin Sun v. China 1221, Inc., No. 12-CV-7135, 2015 U.S. Dist. LEXIS 128637, at *3 (S.D.N.Y. Aug. 12, 2015) (finding legal argument in plaintiff's Rule 56.1 counter-statement improper and disregarding statements including improper argument); Watson v. Grady, No. 09-CV-3055, 2015 U.S. Dist. LEXIS 60719, at *1 (S.D.N.Y. May 7, 2015), aff'd sub nom. Watson v. Sims, 648 F. App'x 49 (2d Cir. 2016) (finding conclusory and/or argumentative allegations in 56.1 statement improper and declining to consider the same)Undisputed as to the length of Plaintiff's tenure and the positions previously held by him.

2. According to his colleagues, even to those who played a pivotal role in terminating his employment, namely, Dr. Deborah Reede, Chair of the Department of Radiology at Downstate and Dr. Pulitzer, Chief of Service, Department of Radiology, KCHC, Dr. Greenberg was a highly competent radiologist. Ex. 4 (SUNY000498); Ex. 5 (Pulitzer Dep.) at 426 ("Dr. Greenberg was a very well respected radiologist in our department. I mean, he was

[1] All subsequent citations to exhibits, "Ex.," will refer to those annexed to the Edgar Declaration.

one of the best radiologists we've ever had and people look up to him"); Ex. 6 (Scott Dep.) at 90. During 2013, according to departmental metrics that counted all studies completed by KCHC radiologists and then weighted those studies according to their complexity, out of 24 radiologists, Dr. Greenberg was the fifth highest in terms of productivity. Ex. 7 (SUNY 002439) (14,954 studies completed and weighted at 10,160.1). According to other colleagues, Dr. Greenberg was not only a highly capable radiologist but he was also a "good teacher." Ex. 6 (Scott Dep.) at 90.

   **Response:**  Undisputed as to the substance of the testimony given by Drs. Pulitzer and Scott as well as the statistics set forth in the exhibit referenced therein, but state that the facts are immaterial to the Health + Hospitals Defendants' motion.

### KCHC's Status As Dr. Greenberg's Employer

   3.  Dr. Greenberg, like many of his colleagues in the Radiology Department at KCHC, was considered a SUNY Downstate employee but practiced at KCHC subject to an affiliation agreement. Greenberg Decl., ¶ 2.

   **Response**:  Disputed as to any implication that Plaintiff was an employee of KCHC or H+H Corp. Undisputed that Plaintiff practiced at KCHC subject to an affiliation agreement.

   4.  Dr. Greenberg's employment relationship with KCHC consisted of the following: (a) for a total of approximately 11 years, he practiced only at KCHC and he was obliged to observe and follow KCHC's policies, procedures, rules and regulations in the course of performing his duties; Greenberg Decl., ¶ 2; (b) his credentials for practicing privileges were collected, renewed and stored by KCHC; Id. (c) in the course of his practice, he used only KCHC equipment; Id. (d) to the public, Dr. Greenberg and his colleagues were held out as KCHC representatives in terms of uniforms and identification; Id. (e) records of his completion of

Continuing Medical Education courses were kept by KCHC; Id. (f) he was supervised by Dr. Steven Pulitzer who had a KCHC title (again, Chief of Service, Department of Radiology); Id. (g) Dr. Pulitzer set Dr. Greenberg's work schedule; Id. (h) when Dr. Greenberg requested time off he sought Dr. Pulitzer's permission; Id. and (i) Dr. Pulitzer was the manager who referred Dr. Greenberg to Labor Relations for discipline. Id.

**Response:** Disputed as to any implication that Plaintiff was an employee of KCHC or H+H Corp. and refer the Court to the affiliation agreement, annexed to the Shaffer Decl. as Exhibit "J", for an accurate recitation of both Plaintiff and Health + Hospitals Defendants' obligations.

### Dr. Steven Pulitzer's Position In the KCHC Organization

5. At his deposition, Dr. Pulitzer testified that as Chief of Service in the Radiology Department, he reported to the Chief Medical Officer of KCHC, which was Dr. Ghassan Jamaleddine. Ex. 38 (Pulitzer Dep. (2d)) at 13. By reporting to Dr. Jamaleddine, Dr. Pulitzer explained that he meant: "Everything that was going on in my department in terms of physicians, technical staff, clerical staff; regulatory issues ... any daily operation of the department." Id. at 14. With respect to what he reported to Dr. Jamaleddine concerning the radiologists in the department, he would share any performance issues that were identified such as time and attendance and unruly behavior. Id. at 15. Dr. Pulitzer noted that he also reported to Dr. Reede and shared with her the same information that he shared with Dr. Jamaleddine. Id. at 16.

**Response:** **D**isputed as to its materiality to the issues set forth in Health + Hospitals Defendants' motion for summary judgment. Undisputed as to the substance of the testimony given by Dr. Pulitzer.

**Dr. Reede and Dr. Pulitzer Target Dr. Greenberg**
**For Heightened Scrutiny and Then Mistreatment**

6.     Although Dr. Greenberg survived a round of layoffs that were approved in April of 2014 by Dr. Deborah Reede, Department of Radiology, Downstate, and Dr. Jammeladine, Chief Medical Officer at KCHC, see Declaration of Deborah Reede, M.D. dated March 26, 2018 ("Reede Decl."), ¶ 9, he was soon to be targeted for special scrutiny at this time by Dr. Reede and Dr. Pulitzer, who was then assistant to Dr. Kantor who was, in turn, Chief of Service at the Radiology Department at KCHC.  Specifically, on April 30, 2014, Dr. Pulitzer sent Dr. Reede an email conveying what he believed to be Dr. Greenberg's first case "read" and last case "read" from April 14 to April 22, 2014.  Ex. 55 (SUNY 003486).  Although there is no context for this email, it implies that that they were cooperating in the effort to scrutinize the hours worked by both Dr. Greenberg and Dr. Chen.  What is odd here is that Dr. Reede is not including Dr. Kantor in this surveillance project.[2]  Eventually, Dr. Greenberg would fill out his timesheet for April 2014, which is done monthly and once April is completed, and he fell into the trap set by Dr. Reede and Dr. Pulitzer by erroneously indicating that he worked 9 to 5 p.m. on April 21, 2014 when in fact he arrived later than 9 a.m.  Ex. 9 (SUNY 003511).  Dr. Reede requested a meeting with Dr. Greenberg to discuss this error, which meeting occurred on May 5, 2014.  See id.  Notably, Dr. Reede suggested that it was an assistant who drew her attention to Dr. Greenberg's incorrect time entry, "[t]he administrative assistant responsible for monitoring the time sheets reported a discrepancy in his April time sheet," but she was clearly involved in spotting the error, as Dr. Pulitzer would not have sent to her information about Dr. Greenberg's

---

[2]It is a safe assumption that Dr. Reede reached out to Dr. Pulitzer at this point and began exerting her influence because she knew, after discussions with Dr Jamaleddine, that Dr. Kantor was going to be terminated and Dr. Pulitzer was likely to be his replacement.  See Declaration of Deborah L. Reede, M.D. dated March 26, 2018 ("Reede Decl."), ¶ 9.

activity log without a request from her.  Id.; Ex. 10 (Reede Dep.) at 143-44.  In her deposition, Dr. Reede admitted that this meeting was not disciplinary in any way.  Ex 10 (Reede Dep.) at 143.  Her memo of the meeting, however, implies that it was a counseling and her inclusion of the remark, "he did not see what the problem was because he read all the films," suggests that she wanted that nugget in the file in case there were subsequent issues with Dr. Greenberg.  Ex. 9 (SUNY 003511).  Dr. Greenberg's memorialization of the meeting in the form of an email that he sent to Dr. Reede addresses an issue that she does not even mention: a resident evaluation. Ex. 11 (SUNY 000477).  It is as if Dr. Greenberg and Dr. Reede attended different meetings.

**Response:**     Disputed to the extent the statement is argumentative and conclusory as well as immaterial to the Health + Hospitals Defendants' motion.

### Dr. Pulitzer's "Counseling" Of Dr. Greenberg on August 22, 2014

7.     By the beginning of July 2014, Dr. Pulitzer assumed the position of Interim Chief of Service at the Department of Radiology.  Ex. 5 (Pulitzer Dep.) at 10 & 13. Upon assuming the position, Dr. Pulitzer demonstrated that his leadership of the department would be deeply intertwined with Dr. Reede's oversight in that he intended to provide to her daily updates.  Ex. 14 (HHC_ESI_000363).

**Response:**     Disputed as to the exhibit referenced therein establishing that Pulitzer's leadership would be "deeply intertwined" with Dr. Reede's oversight and his daily intentions. The exhibit referenced by Plaintiff establishes only that Dr. Pulitzer provided an update to Dr. Reede on June 23, 2014. Undisputed as to the position held by Dr. Pulitzer.

8.     Dr. Pulitzer was also focused on closely monitoring Dr. Greenberg's time and attendance.  On August 20, 2014, Jayan Kurian, an IT administrator at KCHC, sent to Dr. Pulitzer a daily log indicating when Dr. Greenberg completed a review of each film that he

analyzed from July 1, 2014 to August 8, 2014. Ex. 15 (HHC_ESI_000777-872). Later the same day, Dr. Pulitzer forwarded this comprehensive log to Dr. Reede without a cover email, implying that they were in an ongoing conversation about Dr. Greenberg's time and attendance and/or productivity. Ex. 16 (HHC_ESI_873). No other radiologists in the department were singled out for scrutiny in this manner during this time period.

      **Response:**    Disputed as to statements unsupported by citation to record evidence. Disputed to the extent the statement is argumentative and conclusory as well as immaterial to the Health + Hospitals Defendants' motion. Disputed to the extent the statements mischaracterize the cited evidence. See Trs. of the Local 8A-28A Welfare Fund v. Am. Grp. Adm'rs, No. 14-CV-1088 (RRM)(PK), 2017 U.S. Dist. LEXIS 137365, at *9 (E.D.N.Y. Aug. 25, 2017). Undisputed as to the fact that information was sent to Dr. Pulitzer and then from Dr. Pulitzer to Dr. Reede.

      9.     Two or three days after receiving the logs from Kurian, Dr. Pulitzer approached Dr. Greenberg at work to discuss his schedule. According to memos to the file that he created after the fact, Dr. Pulitzer approached Dr. Greenberg on either August 22 or 23, 2014 to "counsel" him about his erratic work schedule and to require him to work a set schedule of 9:30 a.m. to 5:30 p.m. Ex. 17 (HHC_ESI_001062-63; HHC_ESI_001092). At his deposition and under oath, Dr. Pulitzer recharacterized this encounter as a friendly discussion intended to accommodate Dr. Greenberg's scheduling preferences to the requirements of the department. Ex. 5 (Pulitzer Dep.) at 311. Notably, Dr. Pulitzer's memos to the file about this August 22 or 23, 2014 discussion between Dr. Greenberg and himself appear to have occurred after Dr. Greenberg approached him on September 2, 2014 to request permission to take the rest of the

week off to take care of his autistic son – a request that Dr. Pulitzer immediately denied.  Ex. 17 (HHC_ESI_001062-63).  See, infra, ¶ 22.

      **Response:**    Disputed to the extent statements are not supported by record evidence.  Disputed to the extent the statement is argumentative, conclusory, and mischaracterizes the record evidence. Disputed as immaterial to the Health + Hospitals Defendants' motion.  Undisputed to the extent the documents speak for themselves.

      10.    Dr. Greenberg has a far different account as to the content of this discussion with Dr. Pulitzer.  Greenberg Decl., ¶ 7.  Basically, Dr. Pulitzer related that Dr. Reede wanted to impose an early, set schedule on Dr. Greenberg, in spite of the fact that imposing such would leave the later ER radiology shift without his assistance during most of the busiest hours from 4 p.m. to 8 p.m. and created a hardship for Dr. Greenberg who often came in later than 9 a.m. because he helped his special-needs son get ready for summer camp in the morning.  Id.  Dr. Pulitzer conveyed to Dr. Greenberg that Dr. Reede was insisting on the schedule and was out to get him.  Id.  According to Dr. Greenberg, he and Dr. Pulitzer did not discuss his so-called recent erratic work schedule nor the threat that continuation of such would lead to discipline.  See id.  In response to his discussion with Dr. Pulitzer, on August 25, 2014, Dr. Greenberg wrote an email where he continued the discussion about an earlier, set schedule in which he points out its illogic but agrees to comply.  Ex. 3 (HHC_ESI_001006).  It is a response that neither in tone nor in the fact that it includes three of his colleagues supports the theory that what just occurred was a disciplinary counseling.  At his deposition when Dr. Pulitzer was questioned whether he made the statement to Dr. Greenberg that Dr. Reede was a like a cop and out to get him, Dr. Pulitzer stated that he could not remember whether he ever made this statement (as opposed to denying having ever made the statement to him).  Ex. 5 (Pulitzer Dep.) at 325.

**Response:** Disputed to the extent statements are not supported by record evidence and are immaterial to the Health + Hospitals Defendants' motion. Disputed to the extent the statements are argumentative and mischaracterize the record evidence. Disputed to the extent Plaintiff asserts that Dr. Pulitzer told Plaintiff that Dr. Reede was "like a cop and out to get him" as the testimony clearly establishes the fact is in dispute. Undisputed to the extent the documents, not including plaintiff's self-serving affidavit, speak for themselves, and as to the substance of the testimony given by Dr. Pulitzer.

## Events Leading Up To Dr. Greenberg's Request for FMLA Leave

11. During the week of August 25, 2014, Dr. Greenberg was scheduled to be on vacation for at least part of the week. Ex. 18 (HHC_ESI_000969-71). In the email that Dr. Greenberg sent to Dr. Pulitzer on August 25, 2014, he also mentioned that despite the fact that he was on vacation he was going to attend a multi-disciplinary meeting at KCHC where he was to present his findings as to why certain serious cases in the ER were not timely read by the Radiology Department. Ex. 3 (HHC_ESI_001006). After Dr. Greenberg attended the multi-disciplinary meeting, he went down to ER to check in with his colleagues and he saw that no one was in the Radiology reading room. Greenberg Decl., ¶ 8. Because he had just attended a meeting where he attributed one of the causes for untimely reading of cases in ER Radiology to staffing cuts Dr. Greenberg felt morally obligated to start reading cases to help the department. Id. According to Dr. Greenberg, Dr. Hammill, the colleague in charge of the department while Dr. Pulitzer was on vacation, welcomed the assistance. Id. Further, the official schedule of the department was revised on August 26, 2014 to the extent of indicating that Dr. Greenberg would be working for the rest of the week. Ex. 19 (HHC_ESI_001044-45).

**Response:** Disputed to the extent statements are not supported by record evidence. Disputed to the extent the statements are argumentative and mischaracterize the record evidence. Disputed to the extent the statements are immaterial to the Health + Hospitals Defendants' motion. Undisputed to the extent the documents speak for themselves.

12.     On Friday, August 29, 2014, Dr. Greenberg and his wife learned by email that their special needs son was in all probability going to be transferred to a different school. Ex. 20 (G212-13); Ex. 1 (Greenberg Dep.) at 224-26.

**Response:** Disputed to the extent the statements are immaterial to the Health + Hospitals Defendants' motion.

13.     Upon learning that Jayden was likely to have to attend a different school for the new academic year, Dr. Greenberg and his wife conferred and came to the decision that in light of his special bond with Jayden, Dr. Greenberg should take leave from work for a few days the following week in order to assist with any arrangements that needed to be made to facilitate the transfer and to provide love and support to his son while he made the difficult transition to another school. Greenberg Decl., ¶ 9. On the same day that he received the email from Gateway School, on August 29, 2014, Dr. Greenberg attempted to call Dr. Reede to notify her of his need for a leave. Id. Dr. Reede was on vacation and her voicemail was full and not taking any additional messages. Id. With Dr. Pulitzer also on vacation, Dr. Greenberg resorted to emailing Dr. Reede's assistant, Linda McMurren, to notify her of his need to take a few days off the following week "on an emergent basis." Ex. 22 (HHC_ESI_001090). Linda McMurren, like her boss Dr. Reede, was on vacation on August 29, 2014; she did not respond to this email until September 4, 2014. Id. Dr. Greenberg's first opportunity to have a discussion about his need for

a leave occurred on September 2, 2014, when Dr. Pulitzer arrived at work after his previous week's vacation.

    **Response:**    Disputed as the statements are immaterial to the Health + Hospitals Defendants' motion. Undisputed to the extent the documents speak for themselves.

14.    In attempting to reach out to Dr. Reede on the very same day that he learned that he would need a leave of absence the following week, Dr. Greenberg was following protocol in reaching out to Downstate's Department Chair to notify her of the need for an unexpected absence. Ex. 59 (SUNY 000677).

    **Response:**    Disputed to the extent the statements are immaterial to the Health + Hospitals Defendants' motion. Undisputed to the extent the document speaks for itself.

### Dr. Greenberg's Three Discussions With Dr. Pulitzer About His Unexpected Family Leave

15.    After Dr. Pulitzer told Dr. Greenberg that Dr. Reede was like a cop looking to catch him, Dr. Greenberg approached Dr. Pulitzer on September 2, 2014 in order to obtain permission to take a multi-day leave related to his special-needs son's unexpected transfer from one school to another. Ex. 17 (HHC_ESI_001063). On the very same day that Dr. Greenberg sought the leave from Dr. Pulitzer, Dr. Pulitzer denied it. Id. ("The operational needs of the department would not permit him to be off this week"). The next day Dr. Greenberg approached Dr. Pulitzer again stating that he needed to take the leave and was going to take it in any event. Ex. 5 (Pulitzer Dep.) at 351-52; 355-56. In response to Dr. Greenberg's statement that he was going to take the leave despite Dr. Pulitzer's denial of the request, Dr. Pulitzer testified that he sought the advice of Dr. Reede. Id. Dr. Reede told him to write a letter to Dr. Greenberg in which he expressly denied the leave request, ordered Dr. Greenberg to come to work on the days that he requested off and threaten to send him to Labor Relations if he failed to

show up for work.  Id. at 355-56.  According to Dr. Pulitzer's testimony, he wrote the letter that Dr. Reede told him to write then went to Dr. Greenberg to hand deliver it.  Ex. 5 at 358.  He read the contents of the letter to Dr. Greenberg.  Id.  Dr. Greenberg said in sum and substance you are making me choose between my job and my family to which Dr. Pulitzer responded in sum and substance that he was not making that choice.  Id. at 360. They had a conversation about each other's families for a few minutes and then he left Dr. Greenberg.  Ex. 50 (HHC_ESI_001087).

   **Response:**  Disputed to the extent that exhibit 17 does not indicate Plaintiff's leave was related to his special-needs son's unexpected transfer from one school to another. Disputed to the extent that it is clearly in dispute as to whether Dr. Pulitzer told Plaintiff that Dr. Reede was "like a cop".  Disputed to the extent the statement is argumentative and conclusory. Disputed to the extent the statements are immaterial to the Health + Hospitals Defendants' motion. Undisputed as to the substance of the testimony given by Dr. Pulitzer and to the extent the documents cited speak for themselves.

   16.  Dr. Greenberg contends that he notified Dr. Pulitzer from the outset that the reason he needed the time off in early September was to help Jayden with his transition to a new school.  Ex. 1 (Greenberg Dep.) at 228-29.  Dr. Pulitzer vehemently denied that Dr. Greenberg mentioned Jayden, a transition to a new school, and the need for Dr. Greenberg to be with his son to assist in this transition in the context of asking for this time off, which context included three separate discussions between them.  Ex. 5 (Pulitzer Dep.) at 341, 345 & 359. Pulitzer admitted at his deposition that if he had known that the needs of Jayden were involved in the request for leave he would have worked to accommodate the request.  Id. at 361.

**Response:** Disputed to the extent the statement is immaterial to the Health + Hospitals Defendants' motion. Undisputed to the extent Plaintiff contends there is a conflict and therefor a dispute as to the facts testified to by Dr. Pulitzer and Plaintiff.

17. At the time that Dr. Greenberg sought a multi-day leave to assist in making arrangements for his special-needs son's transfer to another school and provide to him love, care and support because this transition was likely to be very difficult for Jayden given his severe mental deficits, Dr. Greenberg was eligible for leave under the Family Medical Leave Act, as he worked full time at KCHC (i.e., at least 40 hours per week) continuously since 2010. Greenberg Decl., ¶ 2.

**Response:** Disputed to the extent the statement is immaterial to the Health + Hospitals Defendants' motion.

18. SUNY Downstate and KCHC are both entities that are instrumentalities of New York State and New York City respectively and therefore are "covered employers" as defined by the FMLA, meaning that they are obligated to provide FMLA leave for eligible requests. Greenberg Decl., ¶ 3.

**Response:** Disputed to the extent the statement is immaterial to the Health + Hospitals Defendants' motion.

19. Jayden Greenberg has a serious condition. He has been diagnosed with autism spectrum disorder from which he has suffered since he was two years old and continues to suffer from the condition to this date. Greenberg Decl.,¶ 4. Since before he was two and continuously to date, he has had services that include at least weekly speech therapy, occupational therapy, physical therapy, psychotherapy and social skills therapy. Id. Since Dr. Greenberg can remember, Jayden has had an Individualized Education Program. Id. Currently

and at the time relevant to this litigation, Jayden was medicated for anxiety and depression.  Id.
Around the time of events relevant to this litigation, in 2014, Jayden went to The Gateway
School that caters to students with learning disabilities.  Id.  At The Gateway School, Jayden's
education was informed by an Individualized Education Plan which contemplated that he would
be in a special education class with no more than 8 students per teacher at all times.  Id.  It also
contemplated that he would receive speech therapy and physical therapy twice per week and
psychological counseling once per week.  Id.  During this time, as indicated above, he was also
under the continuing supervision of a psychotherapist who treated him with medication for
attention deficit disorder, along with depression and anxiety.  Id.  Due to his severe deficits,
during the time relevant to the litigation, when he was about eight years old, Jayden was unable
to dress, eat and groom himself without assistance from Dr. Greenberg or his wife or his teachers
when he was at school.  Id.  In short, Jayden required adult supervision at all times.  Id.  During
the time when Jayden learned that he had to go to a new school, around the time that Dr.
Greenberg asked for a short-term leave at work, he was presenting with tremendous stress and
anxiety and Dr. Greenberg was concerned that it would lead to incapacity.  Id.

      **Response:**    Disputed to the extent the statement is immaterial to the Health +
Hospitals Defendants' motion.

### Dr. Greenberg Takes His Family Medical Leave
### Despite Dr. Pulitzer's Threat Of Referral to Labor Relations

      20.    Dr. Greenberg took off September 4 and 5, 2014 without the permission of
Dr. Pulitzer and under the threat that in doing so he would be referred to Labor Relations.  In
fact, Jayden did have to transition to a different school.  By the morning of September 4, 2014,
Jayden's maternal grandmother arrived in town to assist Dr. Greenberg and his wife provide
love, support and care to Jayden while he made the transition.  Ex. 1 (Greenberg Dep.) at 242.

On September 5, 2014, Dr. Greenberg wrote an email to Linda McMurren and carbon copied Dr. Pulitzer to provide an update as to his absence. Ex. 22 (HHC_ESI_001089-90). In this email, Dr. Greenberg related that he intended to come to work on September 4th but he threw his back out and was unable to come in because of it. Id. When questioned about this email at his deposition, Dr. Greenberg admitted that this email was written to provide an excuse for his absence since he was in fear of losing his job. Edgar Decl., Ex. 1 (Greenberg Dep.) at 246-47. When asked whether his resolve ever changed about not showing up for work on September 4 and 5, 2014, Dr. Greenberg testified no – that he always intended to stay at home to help Jayden. Id. at 242 & 247.

       **Response:**    Disputed to the extent the statement is immaterial to the Health + Hospitals Defendants' motion. Undisputed to the extent Plaintiff admitted that he did not disclose the reasons for his absence. Undisputed to the extent the document speaks for itself and to the extent that Plaintiff provided the cited testimony.

       21.    On September 4 and 5, Dr. Reede and Dr. Pulitzer were busy papering the proverbial file and conferring with Labor Relations in order to set in motion the disciplinary machine that awaited Dr. Greenberg upon his return. On September 4, 2014 at 2:48 p.m., Dr. Reede notified Labor Relations that Dr. Greenberg did not come into work as ordered. Ex. 23 (SUNYESI000000278). Michael Arabian of Labor Relations reached out to Dr. Pulitzer later that day to get complete details as to what occurred when he hand-delivered the September 3, 2014 letter to Dr. Greenberg denying his request for leave. Ex. 24 (SUNY 000494). Dr. Pulitzer responded to the inquiry by sending Mr. Arabian a memo that addressed much more than what Mr. Arabian sought: a detailed background as to Dr. Greenberg's allegedly disruptive behavior throughout the month of August in addition to what occurred surrounding the request for leave.

Ex. 25 (HHC 1135-36). On the same day that he sent the memo to Mr. Arabian, September, 5, 2014, Dr. Pulitzer generated what appears to be a "predated" memo to the file on KCHC letterhead; it purported to summarize the discussion with Dr. Greenberg on August 22, 2014. Ex. 17 (HHC_ESI_001092). Although the memo on KCHC letterhead omits use of the term "counseled" to describe this meeting (notably, the term was used in the unofficial memo to the file on September 2, 2014, Ex. 17 (HHC_ESI_001063)), it nonetheless suggests that the meeting was disciplinary in nature. Significantly, Dr. Pulitzer was in the habit of sending memos regarding personnel issues immediately upon being written to his administrative assistant, Sade Jemmott. See, e.g., Ex. 17 (HHC_ESI_001062-63). The "predated" memo bears the date August 22, 2014 but there is no indication that he sent this memo to Ms. Jemmott on that date; rather, he sent it to her and Dr. Reede on September 5, 2014.

**Response:** Disputed to the extent the statement is argumentative, conclusory and immaterial to the Health + Hospitals Defendants' motion. Disputed to the extent the record evidence does not support the statement. Undisputed to the extent the cited documents speak for themselves.

22. At some point on September 5, 2014, Dr. Reede, Dr. Pulitzer and Mr. Arabian met to discuss Dr. Greenberg's referral to Labor Relations. Ex. 5 (Pulitzer Dep.) at 363-72. Dr. Pulitzer admitted that the meeting was arranged through Dr. Reede's office since she was familiar with Labor Relations and he was "a very, very new administrator." Id. at 363.

**Response:** Disputed to the extent the statement is a immaterial to the Health + Hospitals Defendants' motion. Undisputed as to the testimony given by Dr. Pulitzer.

**Dr. Greenberg's Return To Work After Taking His FMLA Leave**

23.     Dr. Greenberg returned to work on September 8, 2014 and was told by Dr. Pulitzer to report to Labor Relations immediately.  Ex. 5 (Pulitzer Dep.) at 373.  Dr. Greenberg reported to Labor Relations where he was interrogated by Mr. Arabian for approximately two hours regarding the circumstances arising from his request for a leave of absence, the denial of that request and what occurred on September 4th and 5th.  Ex. 26 (SUNY 001280-1314).  He was then asked to remain in his seat and in the room where he was interrogated for many hours while Mr. Arabian consulted with his supervisor as to the proposed terms of a settlement with Dr. Greenberg.  Greenberg Decl., ¶ 10.

**Response:**     Disputed to the extent the statement is immaterial to the Health + Hospitals Defendants' motion. Undisputed that Plaintiff returned to work on September 8, 2014 and was told to report to Labor Relations. Undisputed that Plaintiff reported to Labor Relations.

24.     What is notable about Dr. Greenberg's interrogation are the clear statements that he makes regarding the reasons why he sought a brief leave: that he had a special needs son; that this son was being transferred to a new school; that the son would find the transfer to be particularly difficult in light of his autism spectral disorder; and that his son needed him for love, care and support.  Ex. 26 (SUNY 001290-91, 1303-04, 1308-11).  In hearing these reasons, Mr. Arabian nonetheless did not probe Dr. Greenberg as to whether he presented these circumstances to Dr. Pulitzer when he asked for the leave nor did he appear to probe further himself to see if they might fall within the ambit of the Family Medical Leave Act.  At his deposition, when Mr. Arabian was asked whether he believed that the reasons that Dr. Greenberg stated for his request for a leave might qualify for the Family Medical Leave Act, he responded no.  Ex. 27 (Arabian Dep.) at 272.  Mr. Arabian admitted that he did not remember having any

training on FMLA while employed at SUNY; further, he believed that the issue of FMLA was associated with Human Resources and not Labor Relations. Id. at 270-71.

**Response:** Disputed as immaterial to the Health + Hospitals Defendants' motion.

25. After signing a settlement agreement presented to him by Mr. Arabian in circumstances that can fairly be described as under duress, Dr. Greenberg returned to work. While Dr. Reede and Dr. Pulitzer testified that they had nothing to do with the terms of the settlement agreement presented to Dr. Greenberg, it is noteworthy that Mr. Arabian testified that in his experience at SUNY Labor Relations a settlement agreement would not be presented to an employee without first running its terms by the department heads who would be affected by the agreement. Id. at 224-25. Here, the department heads were Dr. Reede and Dr. Pulitzer.

**Response:** Disputed to the extent the statement is immaterial to the Health + Hospitals Defendants' motion. Undisputed to the extent the statement establishes that Plaintiff as well as Drs. Reede and Pulitzer were employed by the SUNY Defendants.

26. According to the terms of the settlement agreement, Dr. Greenberg could be terminated should he have any subsequent issues with: (1) unscheduled absences; (2) tardiness; (3) interference with the operations of the department; (4) insubordination or (5) misrepresentation of hours worked on timesheets. Ex. 29 (SUNY 006626-27). The terms of Dr. Greenberg's settlement were conspicuously harsh when compared to settlements reached with other staff in the Radiology Department around the same time: of the nine settlement agreements that defendants produced with respect to employees other than Dr. Greenberg who allegedly committed misconduct during the relevant period that warranted referral to Labor Relations only one stripped the employee of his or her protection of termination for cause in a manner similar to

Dr. Greenberg's settlement. Ex. 30 (SUNY 6601-3, 6582-83, 6625, 6652-53, 6621-22, and 6654-57).

> **Response:** Disputed to the extent the statement is argumentative, conclusory, and immaterial to the Health + Hospitals Defendants' motion. Undisputed to the extent the settlement agreements speak for themselves.

### Dr. Reede's and Dr. Pulitzer's Close Surveillance of Dr. Greenberg

27. Both Dr. Pulitzer and Dr. Reede intensified their already close scrutiny of Dr. Greenberg after he returned to work after the referral to Labor Relations. On September 9, 2014, Dr. Greenberg wrote an email to Dr. Pulitzer in which he complained about the slow speed in which certain archived messages were accessed by his computer; he asked if a workaround was available. Ex. 32 (HHC_ESI_001238). Dr. Pulitzer requested that his assistant put this email in Dr. Greenberg's personnel folder. Id. On September 12, 2014, Dr. Pulitzer emailed Dr. Reede one of his updates and the first item that he addressed was Dr. Greenberg: "Will monitor time and attendance and number of cases read per day." Ex. 33 (HHC_ESI_1243). On September 15, 2014 at 8:52 a.m., Dr. Reede emailed Dr. Pulitzer and posed the question: "is Dr. Greenberg reading films?" Ex. 34 (HHC_ESI_1259). Dr. Pulitzer responded within 35 **minutes** with the answer, "Yes. He is." Ex. 35 (HHC_ESI_1262).

> **Response:** Disputed to the extent the statement does not include citations to record evidence, is argumentative, conclusory, and immaterial to Health + Hospitals Defendants' motion. Undisputed to the extent the documents speak for themselves.

28. On September 15, 2014, Dr. Greenberg wrote to Dr. Pulitzer and carbon copied Dr. Reede. In this email, he provided his account of events that led up to his allegedly insubordinate leave of absence on September 4 and 5, 2014. Ex. 36 (HHC 1529). What is

particularly notable about this email is his return to the theme that he felt he had the right to take a leave of absence "for important family issues." Id. Here, Dr. Greenberg is expressly and in writing referencing a family issue that was the basis for his request. In response to this email, neither Dr. Reede nor Dr. Pulitzer responded to Dr. Greenberg; rather, they wrote to each other with Dr. Reede observing: "Dr. Greenberg is trying to cover his tracts [sic]." Ex. 37 (HHC_ESI_001274). To which Dr. Pulitzer responded: "Yes I have filed his email in his file. He is really all over the map." Id.

**Response:** Disputed to the extent the statement is argumentative, conclusory, and immaterial to Health + Hospitals Defendants' motion. Undisputed to the extent the documents speak for themselves.

29. Dr. Pulitzer testified that he related to Dr. Jamaleddine the circumstances that led to Dr. Greenberg's initial referral to Labor Relations for taking an unauthorized leave of absence on September 4 and 5, 2014. Ex. 38 (Pulitzer Dep. (2d)) at 23-24.

**Response:** Disputed as immaterial to Health + Hospitals Defendants' motion. Undisputed that Dr. Pulitzer gave the cited testimony.

### Dr. Greenberg's Alleged Violation of His Probation

30. On September 22, 2014, there was a Radiology Department meeting to which Dr. Greenberg arrived late. Greenberg Decl., ¶ 11. During the portion of the meeting that Dr. Greenberg attended, he understood that another hurdle had been placed on him and his already overly burdened colleagues – attestations that would have to be affixed to all studies that indicated whether attending physicians agreed or disagreed with residents' initial readings of films. Id. Dr. Greenberg was frustrated by this new requirement that would have him author language that he viewed as unnecessary and would add a step to the review of patient studies

with the likely consequence that it would cause a backlog in the flow of work. Id. When Dr. Greenberg returned to the reading room at ER after the meeting, in his frustration, he authored an attestation that met the insurers' requirements as far as he understood them but in a playful or, at worst sarcastic, manner. Id. Having arrived late for the departmental meeting, he had no idea that the attestations to be used were available as a macro from one of his colleagues. Id. Dr. Greenberg started immediately affixing this attestation that he authored on studies that were stale, clinicians had already acted upon and were on his desk because they were rejected by insurers for lack of an attestation. Id.

      **Response:** Disputed as conclusory and immaterial to Health + Hospitals Defendants' motion. Disputed that Plaintiff did not know or should not have known what was required of him by his employers simply because he may have been a few minutes late to a meeting that he was required to attend.

      31. On the very day that Dr. Greenberg's attestations were affixed to studies, one of his colleagues, Dr. Velayudhan, alerted him that it was causing a stir in the hallways – other physicians and radiologists were whispering about it. Greenberg Decl. ¶ 12. Dr. Velayudhan suggested to Dr. Greenberg that he inquire as to whether he could modify the attestation. Id. When Dr. Greenberg realized that his attestation was creating controversy, he immediately took action. He went to the IT Department to ascertain whether it was possible to modify the attestation that he already affixed to studies. Greenberg Decl., ¶ 12; Edgar Decl., Ex. 1 (Greenberg Dep.) at 291-93. Notably, he did not request the IT Department to do so, as defendants suggest; he merely asked whether it was possible. Greenberg Dec., ¶ 12. When one of the employees in the IT Department responded that it was possible but he would get in trouble

for doing so, Dr. Greenberg reassured him that he would not ask him to do anything that was improper or would get him into trouble.  Id.; Ex. 1 (Greenberg Dep.) at 293.

   **Response:** Disputed to the extent the statement is self-serving, conclusory, and immaterial to Health + Hospitals Defendants' motion. Undisputed as to whether plaintiff gave the cited testimony.

   32. Notably, Dr. Pulitzer, who according to his account of the attestation episode at his deposition and in his affidavit, viewed its distribution as a grave act of misconduct that was allegedly beyond the pale, never discussed the episode with Dr. Greenberg.  Ex. 5 (Pulitzer Dep.) at 148-50; Greenberg Decl., ¶ 13.  In the immediate aftermath of the discovery of Dr. Greenberg's attestations, Dr. Pulitzer convened meetings with the Chief Medical Officer of KCHC, Dr. Ghassan Jamaleddine, and the Legal Department at KCHC to obtain guidance as to how he should proceed both with respect to the studies that had the attestation and what, if any, disciplinary measures should be imposed on Dr. Greenberg; Dr. Jamaleddine was of the opinion that Dr. Greenberg must be terminated; in fact, he made it clear that he would not allow Dr. Greenberg to practice anymore at KCHC.  Ex. 38 (Pulitzer Dep. (Second)) at 42.  Dr. Reede and Dr. Pulitzer were both of the opinion that Dr. Greenberg should be terminated.  Ex. 28 (Bernadel Dep.) at 9; Ex. 5 (Pulitzer Dep.) at 420-421.  According to Dr. Pulitzer, Dr. Greenberg's use of the attestation suggested that "something had changed in him" and was therefore unfit for continued practice at KCHC.  Ex. 5 (Pulitzer Dep.) at 115.

   **Response:** Disputed to the extent the statement mischaracterizes the testimony given by Dr. Pulitzer, and to the extent the statement is immaterial to the Health + Hospitals Defendants' motion.

33. On September 24, 2014, Dr. Pulitzer sent a memo to Labor Relations in order to report two incidents that he viewed as violations of the terms of Dr. Greenberg's Settlement Agreement with Labor Relations. Ex. 39 (SUNY000863-65). The second incident described was the attestation that created a stir. Id. (SUNY000863). The first incident was Dr. Greenberg's alleged insubordination in leaving the ER without authorization after Dr. Pulitzer denied his request to be permitted to take a few hours off in the afternoon in addition to an authorized absence that he took in the morning to deal with funding issues related to Jayden's education. Id.; Ex. 44 (HHC 1526). Dr. Greenberg testified that he did not leave ER without authorization; rather, during the time in dispute, which was about 1 hour and 40 minutes, he conferred with another radiologist and then other clinicians at the ER and then for about 40 to 50 minutes he crossed the street to eat lunch at the SUNY campus, which he was allowed to do without asking for leave. Ex. 1 (Greenberg Dep.) at 300-305; 308-09. Dr. Pulitzer never approached Dr. Greenberg to get his account of this alleged unauthorized absence from the ER. Greenberg Decl., ¶ 13.

**Response:** Disputed to the extent the statement is immaterial to Health + Hospitals Defendants' motion. Undisputed as to what Plaintiff testified to. Undisputed as the documents speak for themselves.

34. In a letter sent by Labor Relations dated October 3, 2014, Dr. Greenberg was notified that he was to report to Labor Relations on October 8, 2014 for another interrogation regarding alleged misconduct. Ex. 40 (SUNY000014). The interrogation was rescheduled to October 10, 2014 and continued on October 20, 2014. Ms. Bernadel of Labor Relations was in charge of the second referral of Dr. Greenberg to Labor Relations. In the course of her investigation, she spoke to Dr. Pulitzer in advance of the first interrogation. Ex. 31

(SUNY 429-30). On October 14, 2014, she interviewed three radiologists who attended the September 22, 2014 meeting where attestations were discussed. Ex. 41 (SUNY 448-49 & 1252). The radiologists had varying accounts of the status of the attestations, i.e., whether there was an official policy at the time that Dr. Greenberg created his. Notably, Dr. Rhonda Osborne stated that she was unsure whether a final attestation form had been established at the time. Id. (SUNY 1252). Around the time of the second interrogation, Ms. Bernadel, along with her supervisor Leonzo Cuiman, spoke with Dr. Reede and Dr. Pulitzer either individually or together. Ex. 28 (Bernadel Dep.) at 9. According to Ms. Bernadel's account, she and Mr. Cuiman merely presented their findings of facts to Dr. Reede and Dr. Pulitzer as to Dr. Greenberg's conduct; in light of those facts, Dr. Reede and Dr. Pulitzer decided to terminate Dr. Greenberg. Id.; Ex. 5 (Pulitzer Dep.) at 420-421.

      **Response:** Disputed to the extent the statement mischaracterizes the cited testimony, and is immaterial to the Health + Hospitals Defendants' motion.

35.     Dr. Pulitzer testified that he repeatedly consulted with Dr. Jamaleddine about Dr. Greenberg's conduct in September of 2014, including Dr. Greenberg's use of an unauthorized attestation, and with respect to the decision to terminate Dr. Greenberg's employment.  Ex. 5 (Pulitzer Dep. ) at 136-38; 189-193; 438-39.

**Response:**     Disputed to the extent the statement mischaracterizes the cited testimony, and is immaterial to the Health + Hospitals Defendants' motion.

Date:   New York, New York
        September 14, 2018


By:            /s                          
        RYAN G. SHAFFER