[Page 1]

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

--------------------------------X

ODED GREENBERG, M.D.,

15-cv-2343(PKC/VMS)

                    Plaintiff,

        -against-

SUNY DOWNSTATE ET AL.,

                    Defendants.

--------------------------------X

                        112 Madison Avenue

                        Sixth Floor

                        New York, New York 10016

                        October 26, 2016

                        9:43 a.m.

            EXAMINATION BEFORE TRIAL OF
              STEVEN PULITZER, M.D.

| | |
|---|---|
| 1 | 1 |
| 2  EXAMINATION BEFORE TRIAL of STEVEN PULITZER, | 2  A P P E A R A N C E S : |
| 3  M.D., a witness on behalf of the Defendant herein, | 3 |
| 4  Pursuant to the Federal Rules of Civil Procedure, | 4 |
| 5  and Court Order, taken on behalf of the Plaintiff, | 5  STATE OF NEW YORK |
| 6  held at the above-mentioned time and place, before | 6  OFFICE OF THE ATTORNEY GENERAL |
| 7  Elisheva Moskowitz, a Certified Court Reporter and | 7  ERIC T. SCHNEIDERMAN |
| 8  Notary Public for and within the State of New York. | 8  Attorneys for Defendants |
| 9 | 9  STEVEN PULITZER, M.D., DEBORAH L. |
| 10 | 10  REEDE, M.D. and SUNY DOWNSTATE |
| 11 | 11  120 Broadway |
| 12 | 12  New York, New York 10271 |
| 13 | 13  Tel: (212) 416-8556 |
| 14 | 14  BY: CHRISTOPHER V. COULSTON, ESQ. |
| 15 | 15  E-mail: christopher.coulston@ag.ny.gov |
| 16 | 16 |
| 17 | 17 |
| 18 | 18  THE STATE UNIVERSITY OF NEW YORK |
| 19 | 19  Assistant Counsel to Defendant |
| 20 | 20  SUNY DOWNSTATE MEDICAL CENTER |
| 21 | 21  State University Plaza |
| 22 | 22  Albany, New York 12246 |
| 23 | 23  Tel: (718) 270-3319 |
| 24 | 24  BY: WILLIAM S. VERSFELT, ESQ. |
| 25 | 25  E-mail: william.versfelt@downstate.edu |
| **[Page 2]** | **[Page 4]** |

| | |
|---|---|
| 1 | 1 |
| 2  A P P E A R A N C E S : | 2  A P P E A R A N C E S : |
| 3 | 3 |
| 4 | 4 |
| 5  LAW OFFICES OF ERIC M. NELSON | 5  ALSO PRESENT: |
| 6  Attorneys for Plaintiff | 6 |
| 7  ODED GREENBERG, M.D. | 7  ODED GREENBERG, M.D., |
| 8  112 Madison Avenue | 8  The Plaintiff |
| 9  Sixth Floor | 9 |
| 10  New York, New York 10016 | 10 |
| 11  Tel: (212) 354-3666 | 11 |
| 12  BY: ERIC M. NELSON, ESQ. | 12 |
| 13 | 13 |
| 14 | 14 |
| 15 | 15 |
| 16 | 16 |
| 17  NEW YORK CITY LAW DEPARTMENT | 17 |
| 18  OFFICE OF THE CORPORATION COUNSEL | 18 |
| 19  Attorneys for Defendant | 19 |
| 20  KINGS COUNTY HOSPITAL | 20 |
| 21  100 Church Street | 21 |
| 22  New York, New York 10007 | 22 |
| 23  Tel: (212) 356-3177 | 23 |
| 24  BY: TANYA N. BLOCKER, ESQ. | 24 |
| 25  E-mail: tblocker@law.nyc.gov | 25 |
| **[Page 3]** | **[Page 5]** |

[2] (Pages 2 to 5)

Page 110

S. PULITZER, M.D.

2  and she has a veto.
3      Is that a fair way to put it?
4      A. Yes.
5      Q. Okay.  Who fired Dr. Greenberg?
6      A. Labor Relations.
7      Q. What role did you have in that?
8      A. I was consulted.
9      Q. Okay.  And did you give advice, opinion or
10  recommendation in that regard?
11     A. Yes, I did.
12     Q. And what was that?
13     A. It -- for termination.
14     Q. And when did you -- when did you give that
15  recommendation?
16     A. Sometime in October.
17     Q. Okay.  At any time prior to October, did
18  you recommend Dr. Greenberg's termination?
19     A. No, I did not.
20     Q. When did you come to the conclusion that
21  Dr. Greenberg should be fired?
22     A. There was a series of disruptive behavior,
23  insubordination and issues with time and
24  attendance that were not only disruptive on an
25  -- on a specific individual level but were

Page 111

S. PULITZER, M.D.

2  disruptive to the entire department and to the
3  hospital, and at that time the decision was made
4  to make a suggestion to Labor Relations for
5  termination.
6      Q. Okay.  I appreciate that, but I was asking
7  for a -- a time, a date or a time period in my
8  last question.
9      Can you tell me when it was that you first
10  made the recommendation to Labor Relations that
11  Dr. Greenberg be fired?
12     A. I don't have an exact date.
13     Q. How specific can you be?
14     A. Sometime in October.
15     Q. Okay.
16     A. Sometime -- I don't know, sometime between
17  the middle to the -- whenever his ultimate date
18  of termination was.
19     Q. When you say "the middle", middle of what?
20     A. October.
21     Q. And when did the behaviors that you were
22  referring to as insubordination and time and
23  attendance issue arise?
24     A. There have been time and attendance
25  issues with Dr. Greenberg for many years.  When

Page 112

S. PULITZER, M.D.

2  I took over there was a -- time and attendance
3  issues in terms of start of the day and end of
4  the day, which I had tried to accommodate him
5  with multiple times, and so that's basically it.
6  It's just when I started there were issues.
7      Q. But those issues didn't prompt you to
8  want him fired at that time; it wasn't until
9  October that you decided you wanted him fired?
10     A. It was not until October that I was one
11  of a number of people that made the
12  recommendation for him to be terminated.
13     Q. Okay.  Let's leave other people aside
14  for the moment and talk just about you.
15     A. Yes.
16     Q. Is it true that -- that notwithstanding
17  these issues, apparently as you say existing
18  from the time you first became Chairman, is it
19  the case that it was not -- notwithstanding that
20  your recommendation that he be fired until
21  October?
22     A. Can you say that again?  I'm not following
23  the notwithstanding.
24     Q. Okay.  I believe you said that there
25  had been time and attendance issues with

Page 113

S. PULITZER, M.D.

2  Dr. Greenberg for several years and that --
3  that there were time and attendance issues after
4  you took over, meaning you became Chairman of
5  Radiology at KCH.
6      A. Yes.
7      Q. Is that correct?
8      A. That is correct.
9      Q. Okay.  You took over as Chairman of
10  Radiology at KCH in July of 2014.
11     Correct?
12     A. Yes.
13     Q. Okay.  Is it your testimony that
14  notwithstanding the fact that there were issues,
15  as you put it, when you took over -- meaning in
16  July of 2014 -- it was not your recommendation
17  to Labor Relations that he be fired until
18  October?
19     A. Yes.
20     Q. Okay.  During that period from July until
21  October --
22     A. Yes.
23     Q. -- when you made that recommendation, was
24  there a point at which you came to the conclusion
25  that Dr. Greenberg should be fired?

Page 114

S. PULITZER, M.D.

1
2    A. Yes.
3    Q. How long before you made the
4    recommendation to Labor Relations?
5    A. Almost concurrently.
6    Q. Okay.  So not until sometime in October?
7    A. Yes.
8    Q. Okay.  And what changed between say
9    September and October of 2014 that prompted you
10   to come to the conclusion that Dr. Greenberg had
11   been fired -- should be fired?
12        MR. COULSTON:  Should.
13        MR. NELSON:  Sorry.
14   A. Continued disruptive and insubordinate
15   behavior, continued problems with time and
16   attendance, and that was it.
17   Q. What continued behavior or problems
18   occurred between say September and October that
19   caused you to come to this conclusion that
20   Dr. Greenberg should be fired?
21    And I'm trying to narrow your focus to that
22   immediately prior time frame.
23   A. Mm hmm.
24   Q. You said that there were continued
25   problems.

Page 115

S. PULITZER, M.D.

1
2    A. Yes.
3    Q. What were those?
4    A. There were issues with time and
5    attendance, there were issues with a disruptive
6    attitude that was causing other staff members
7    to become difficult to manage, and there was a
8    number of -- or I guess the straw that -- that
9    broke the camel's back would probably be the
10   attestations that were -- which there were 150
11   -- that were inappropriate and improper placed
12   in the patients' medical records that made it to
13   the attention of the ultimate hospital
14   administration.
15   Q. Okay.
16   A. And that signalled to me at that time
17   that the egregiousness of placing something like
18   that in a patient's record, and putting not only
19   himself but colleagues in medical-legal jeopardy
20   and the reputation of the hospital in jeopardy,
21   that something had changed in him.
22   Q. All right.  Let's see if we can unpack
23   that a little bit.
24    You made reference to the hospital's
25   reputation.  What's your understanding of what

Page 116

S. PULITZER, M.D.

1
2    the hospital's reputation was at that time?
3        MR. COULSTON:  I object
4    to the form.
5    A. The hospital is a long-standing
6    institution that provides safety-net coverage
7    for uninsured patients or patients who have no
8    other means to pay for their insurance.  Within
9    the system of HHC it's viewed as equivalent to
10   their flagship hospital of Bellevue Hospital.  It
11   has a very good reputation within the system
12   itself.
13    The quality of physicians at that hospital
14   is excellent, and the care that people receive
15   there and the community's view of that hospital
16   is a place where they can go to get safe,
17   professional care.
18   Q. And what's the basis for your statements
19   with -- in that regard as to the hospital's
20   reputation?  Is that your personal observation or
21   something else?
22   A. I'm not sure I understand your question.
23   Q. Well, how do you know that that's the
24   hospital's reputation?
25   A. That is not my personal view.  It's from

Page 117

S. PULITZER, M.D.

1
2    having worked there and being at the level of
3    leadership that I am and having conversations
4    with, you know, decision-makers in Central Office
5    and what their opinions are of the services we
6    provide.
7     That is how I view our hospital.  It's
8    through those eyes.
9    Q. Okay.  Is it based on any outside source
10   or just the people that -- in management and
11   others that you've talked to inside the hospital?
12   A. That is the latter.
13   Q. Okay.  And sir, you made reference to
14   something you referred to as medical-legal
15   jeopardy.  What did you mean by that?
16   A. I mean that if one of those cases went
17   to a legal mis -- you know, a malpractice case
18   and there was a sarcastic mockery of -- of a --
19   of something on a chart and then all the sudden
20   there was -- there was something
21   medically-legally wrong, that that does not --
22   that that does -- that that gives the plaintiff
23   an advantage by saying, you know, what is -- who
24   are these people, what is the creditability of
25   the people reading this, and why is your

Page 138

S. PULITZER, M.D.

1
2  because I had to gather all the attestations, I
3  had to find out specifically how many there were
4  where they were, and it took me a little bit of
5  time to do that.
6      And then I also had to find -- so then I
7  presented it to him.  Then I also over the next
8  couple of weeks had to present to him what --
9  what happened with Risk Management, how do we
10 correct it, what do we do about it, how does
11 this work.  So there was a series of
12 conversations at that time.
13     Q. Between you and Dr. Jameladdine?
14     A. Between me and Dr. Jameladdine --
15     Q. Was anyone else --
16     A. -- because I was --
17     Q. -- a party to any of those conversations?
18     A. No.
19     Q. And how many in total were there?
20     A. I don't recall that.
21     Q. All right.  And when you say that "when
22 the attestations came out", what do you mean?
23     A. I mean that I received a call from one
24 of my staff members, physicians, saying:  "I
25 just read a report by Dr. Greenberg and there

Page 139

S. PULITZER, M.D.

1
2  is an attestation on the bottom which is
3  completely inappropriate.  You need to see this."
4      I don't know exactly where I was and on the
5  campus, if I was -- I wasn't in the department
6  at the time and I came back to the department
7  and I looked at it, and -- and then I didn't
8  know how many there were, what -- what the number
9  was or what was -- you know, I didn't know
10 anything really about it except that it had been
11 reported to me at that moment, so it took me a
12 little bit of time to investigate it and figure
13 out what it was.
14     Q. And who was the staff member who brought
15 it to your attention?
16     A. John Amodio.
17     Q. John?
18     A. Amodio.
19     Q. Amodio?
20     A. Yes.
21     Q. And who is -- is Amodio -- John Amodio a
22 physician?
23     A. Yes, he was the Chief of Pediatric
24 Radiology who -- he's not working there
25 currently.

Page 140

S. PULITZER, M.D.

1
2      Q. Okay.  So, Dr. Amodio told you that he
3  read an attestation by Dr. Greenberg that in
4  your -- in his words to you was totally
5  inappropriate.
6      Is that the way he put it?
7      A. It was something to that effect, yes.
8      Q. Well, I'm asking you specifically what
9  you recall.
10     A. Specifically I don't recall the exact
11 words, but the implication was -- yes, that was
12 the implication.
13     Q. Okay.  And how soon after that did he
14 convey that attestation to you?
15     A. How soon after what?
16     Q. The conversation or communication that
17 he found it totally inappropriate?
18     A. How soon after what did he have that
19 conversation?  I'm not following your timeline
20 or question.
21     Q. You learned of a -- an issue with an
22 attestation from Dr. Amodio.
23     Correct?
24     A. That is correct.
25     Q. How long after you learned of that did

Page 141

S. PULITZER, M.D.

1
2  you see the attestation itself from Dr. Amodio?
3      A. Within hours of it.
4      Q. Okay.  And how long after that did you
5  bring it to Dr. Jameladdine's attention?
6      A. Within days.
7      Q. When you say within days, you mean less
8  than a week?
9      A. Yes.
10     Q. Okay.  Can you be any more specific?
11     A. No.
12     Q. And how did Dr. Amodio communicate his
13 issue to you?  Did he do it by phone, e-mail,
14 face-to-face?
15     A. Phone.
16     Q. And how did you -- how did he convey the
17 attestation he was referring to to you?  Did he
18 e-mail it to you, bring it to you?  How did he
19 do that?
20     A. He read part of it to me on the phone
21 and then I got a copy of it.  We printed it out
22 after.
23     Q. Yeah, I'm asking you:  How did you get --
24     A. It wasn't directly from him.
25     Q. How did you print that copy out?  Where

Page 142

S. PULITZER, M.D.

1  did you get it from?
2      A. I got the medical record number from
3  Dr. Amodio.
4      Q. Okay.  The medical record number meaning
5  the patient's chart?
6      A. Mm hmm.
7      Q. That's -- is that a yes?
8      A. Yes, that is a yes.
9      Q. And how long did it take you to get the
10 chart and get the actual attestation in front
11 of you?
12     A. I don't remember.  It was within hours.
13     Q. Okay.
14     A. But I don't remember.
15     Q. And what was the first thing you did
16 after you reviewed the attestation yourself?
17     A. I went to our -- I don't know what you
18 call him; he's our IT guy -- and I said: "Is
19 there any way we can find out how many of these
20 there are; how many reports this attestation has
21 been put on?"
22     Q. How did you know that there was more than
23 one?
24     A. I didn't.

Page 143

S. PULITZER, M.D.

1      Q. Well, what prompted you to think that
2  there was more than one?
3      A. It's my job to know what the full extent
4  of anything is, so I -- that's part of my job.
5      Q. Well, you say you went to your IT person
6  and asked him how you could find out how many
7  there were.
8      A. If -- if there were any others, how many;
9  if there were, how many there were; can we print
10 out a log of all the cases that he's read and
11 checked them.  This is my job.
12     Q. I see.
13         And how long after you reviewed the
14 attestation that Dr. Amodio had brought to
15 your attention did you ask your IT person if
16 there were more how would you find that out?
17     A. Again, it was within hours.  And it was
18 also reported to me by that IT person that Dr.
19 Greenberg came to that IT person and said,
20 "Please erase them" or "Take them off" or
21 something to that effect.
22         So with that information in mind there was
23 an assumption that there were more.
24     Q. So, the communication that the IT -- well

Page 144

S. PULITZER, M.D.

1  first of all:  Who is the IT person?
2      A. Jayan Kurian.
3      Q. Okay.  Is that a male or a female?
4      A. Male.
5      Q. So Mr. Kurian at some point told
6  you that Dr. Greenberg had come to him and asked
7  whether they could be taken -- the attestations
8  could be taken off or erased.
9         Is that correct?
10     A. Something to that effect, yes.
11     Q. Yet he said that to you when you first
12 asked him about how many -- how you would find
13 out if there were more or how many more, or is
14 this a separate conversation?
15     A. This is a separate conversation.  I
16 don't remember the course of events; if I had
17 had that conversation with him first or after.
18     Q. Okay.  So, you had an initial conversation
19 with Mr. Kurian inquiring how you would find out
20 if -- if there were more and how many more.
21         Correct?
22     A. Yes.
23     Q. And either at that time or at some
24 subsequent time Mr. Kurian told you that

Page 145

S. PULITZER, M.D.

1  Dr. Greenberg had asked him how the attestations
2  might be removed.
3         Is that correct?
4      A. Removed, changed; something to that
5  effect.
6      Q. Okay.  To the best of your recollection,
7  was that one or more than one conversation?
8      A. I actually don't remember.
9      Q. What did Mr. Kurian tell you when you
10 asked him how you -- whether you -- how you would
11 find out if there were more and how many more?
12 What was his answer?
13     A. He said we could.
14     Q. Okay.  Did you ask him at that time to do
15 so?
16     A. I did.
17     Q. And did he in fact do so?
18     A. He did.
19     Q. And did he report back the results to you?
20     A. Yes.
21     Q. And how long after you asked him to do
22 so did he report back the results to you?
23     A. I don't remember if it was that same day
24 or within -- or within the next day.  I don't

Page 146

1            S. PULITZER, M.D.
2   know.
3       Q. Okay. By that time, to the best of your
4   recollection, had you brought this to
5   Dr. Jameladdine's attention or did you wait
6   until you had Mr. Kurian's results before you
7   did so?
8       A. I waited until I had the total number
9   that were there and if they were all the same,
10  if there was any variation. I had to review
11  them. I needed to know exactly what I was doing
12  with that information and if it needed to be
13  escalated or not.
14      Q. Okay. And what was going to determine
15  whether or not it needed to be escalated?
16      A. The number of reports that this was
17  placed on, and it was mostly the number of
18  reports.
19      Q. Okay. And how did you decide that the
20  number was going to be the determining factor
21  of whether or not you were going to escalate
22  this matter?
23      A. That was not a pre-determined thought.
24  There was no algorithm.
25      Q. Well, at some point you decided that

Page 147

1            S. PULITZER, M.D.
2   that was the criterion on which you were going
3   to decide whether or not to escalate.
4       Correct?
5           MR. COULSTON: I object
6       to the form.
7       A. If somebody puts a sarcastic comment in
8   one or two reports and then realizes that they've
9   made an error and then goes to try and correct
10  that error, I think that's very different than
11  putting it in over 100 reports and continuing to
12  do it for however long it takes you to do those
13  100 reports.
14      So, the magnitude of the discovery of how
15  many reports there were was -- was -- you know,
16  then how do you manage that data, how do you
17  manage those patients' charts? How do you manage
18  those 150 or so patients who now have this in
19  their charts and how do you follow them to see
20  if there's litigation or -- or whatever that --
21  that's a large number.
22      Two -- two is different than 150, and --
23  and I think there's -- there's no guideline for
24  that. That's part of being a manager and trying
25  to determine what is the severity of -- of an

Page 148

1            S. PULITZER, M.D.
2   error or what is the severity of a malicious
3   act, or is it a malicious act or is it acting
4   out?
5       These are not questions that are simple
6   answered with (indicating), a snap of a finger.
7       Q. Did you ask Dr. Greenberg about these
8   attestations immediately after Dr. Amodio brought
9   it to your attention or after you had spoken to
10  Mr. Kurian?
11      A. I do not recall when I spoke to
12  Dr. Greenberg about them.
13      Q. Do you recall that you ever spoke to
14  Dr. Greenberg about them?
15      A. I don't know if I did speak to him
16  directly. I -- I don't recall.
17      Q. Sitting here today you don't recall
18  speaking to him about it at any time.
19      Is that correct?
20      A. I don't recall the exact time that I
21  had spoken to him about it or what that
22  conversation would be. It was not a very
23  clear -- it's not a common thing to walk into.
24  It's not something that, you know, you image
25  the patient's right arm instead of the left

Page 149

1            S. PULITZER, M.D.
2   arm; and that's happened, you know, over the --
3   one of the things that's happened in the
4   Radiology Department.
5       And you know, how to deal with this is a
6   very unusual circumstance, and how to deal with
7   that and how to -- there's -- there's no
8   guideline for that.
9       So, I don't know when I spoke with him and
10  I don't remember the conversation with him about
11  it, but I do remember the damage-control and the
12  investigation around it more than I do any
13  specific conversation with him.
14      Q. Well I appreciate that answer, sir, but
15  let me ask you this:
16      Leaving aside what might have been said
17  and when it might have been said, if you spoke
18  to Dr. Greenberg about the attestations, all
19  I'm asking now is whether sitting here today
20  you are able to tell me yes or no, you spoke to
21  Dr. Greenberg about it at all.
22      A. I can't --
23      Q. If you're not able please say so, but if
24  you are I'm going to ask you more specifically.
25  So --

Page 154

S. PULITZER, M.D.

1  MR. NELSON:
2  Q. Okay.
3  A. -- are you asking me that?
4  MR. COULSTON: I'm
5  thinking --
6  A. No, I -- I mean no one's ever asked me
7  that. I don't know.
8  Q. I'm sure no one's ever asked you a fair
9  minimum of what we're asking you today.
10  A. Yeah.
11  Q. Okay. So sir, you were -- you were
12  testifying a few minutes ago that you assembled
13  information as to how many other attestations
14  there were, etcetera.
15  Do you recall doing that before you spoke
16  to Dr. Jameladdine about it or after you had
17  an initial conversation at least with him about
18  it?
19  A. I have -- after.
20  Q. Afterward?
21  A. I believe it was after.
22  Q. So you brought it to his attention before
23  you asked your IT guy to find out whether there
24  were more, and if so how many?

Page 155

S. PULITZER, M.D.

1  A. Brought it to whose attention?
2  Q. Dr. Jameladdine.
3  A. No, I had waited. What I remember is
4  that I had waited until I collected all of the
5  data as to how many there were, what they were
6  and what to do about it and then took it to him.
7  Q. I'm sorry, you say you collected data
8  about what to do about it.
9  What do you mean?
10  A. No, my own analysis. My own analysis of
11  what to do about it.
12  Q. And what was your analysis of what to do
13  about it?
14  A. To take it to Dr. Jameladdine and to ask
15  him what to do about it.
16  Q. Okay. Now, you say that at some point
17  you were sent to Risk Management, or you went to
18  Risk Management.
19  Do you recall that, saying that?
20  A. Mm hmm.
21  Q. Okay. Now, was that your idea,
22  Dr. Jameladdine's idea or someone else's idea?
23  A. Dr. Jameladdine's recommendation.
24  Q. So after you checked the data, went to

Page 156

S. PULITZER, M.D.

1  Dr. Jameladdine and informed him of it, he said
2  you should go to Risk Management?
3  A. (Indicating).
4  Q. Tell me yes or no.
5  A. Yes.
6  Q. Okay. Tell me to the best of your
7  recollection what specifically Dr. Jameladdine
8  told you to do.
9  A. To take these to Risk Management and find
10  out what our exposure is.
11  Q. Okay. Is this the same conversation in
12  which he asked in words or substance, "Why is
13  this person still working here?"
14  A. Yes.
15  MS. BLOCKER: Objection.
16  A. And I do believe that was more sarcastic
17  than -- than an actual sentiment.
18  Q. What was more sarcastic than an actual --
19  A. I -- I believe it was a phrase of -- of
20  -- it was a -- it wasn't a de -- it wasn't a
21  determination of hiring or firing this person.
22  It was just a -- a response to what was put in
23  front of him, and I don't believe it -- it was
24  not something that said, "Fire this guy right

Page 157

S. PULITZER, M.D.

1  away." It was just what -- it's a very unusual
2  thing, and so it was a what-is-this-and-why.
3  You know?
4  Q. Okay. You're telling me what your
5  impression was of what Dr. Jameladdine said in
6  that regard?
7  MS. BLOCKER: Objection.
8  A. My --
9  Q. That's what you're telling me now?
10  A. This -- this is what -- what my impression
11  of the interaction I had with Dr. Jameladdine
12  was, at that time was.
13  Q. Okay. He didn't say, "I'm only being
14  sarcastic", did he?
15  A. No, he didn't.
16  Q. Okay. And your impression of the
17  attestation language itself was also that it
18  was sarcastic, I believe you referred to earlier.
19  That was also your impression, correct?
20  A. My impression was that that was
21  inappropriate, yes.
22  Q. Okay. You used the term "sarcastic"
23  earlier. Was that also your impression of --
24  A. I believe --

Page 206

S. PULITZER, M.D.

1    A. I'm still unclear on the question.

2    Q. Okay.  I'm asking about correcting or

3 amending or revising the attestations that

4 Dr. Greenberg had put on these reports.

5    Okay?  Now, I believe you said that to do

6 that you needed to put a new attestation over

7 the old.

8    A. Right.

9    Q. And what I assume you mean is along with,

10 or instead of.

11    Is that correct?

12    A. In addition to, yes.

13    Q. In addition to.  Okay.

14    And where did the language of that additional

15 attestation come from?

16    A. That there were three attestations that

17 were approved by the billing company and by the

18 hospital's Risk Management that we were able to

19 use for the billing -- for the purposes of

20 billing, and I -- those -- I used that, one of

21 those three attestations.

22    Q. Okay.  Who made the corrections to these

23 various reports --

24    A. Me.

25

Page 207

S. PULITZER, M.D.

1    Q. -- that had Dr. Greenberg's attestations

2 on them that you thought were a problem?

3    A. I did.

4    Q. Okay.  And you did it for all of them?

5    A. Yes.

6    Q. And did you use the same attestation

7 language in addition to the prior attestation

8 for all of the reports?

9    A. I'm not sure I'm following your question.

10    Q. You said that there was attestation

11 language that you had that you used for this

12 purpose, and I'm asking:  Was that language the

13 same for all of the reports you corrected or

14 amended?

15    A. Yes, I put the correct attestation that

16 was approved by the hospital and the billing

17 company on each report.

18    Q. Okay.  And to do that -- well, to correct

19 or amend the attestations, was anything else

20 required other than simply adding the -- as you

21 say, language -- that had been approved --

22    A. Yes.

23    Q. -- to it?  What else was required?

24    A. I had to read each study, because if I

25

Page 208

S. PULITZER, M.D.

1    attest that I've read the study and that I agree

2 with what is written then I'm liable for it in

3 court.

4    Q. I see.  So you signed the attestation, and

5 in order to do so you were attesting to the

6 correctness of the report.

7    A. Yes.

8    Q. Correct?

9    A. That is correct.

10    Q. Okay.  And to do that you needed to read

11 the report first.

12    Correct?

13    A. I needed to look at the image and read the

14 report and see if I agreed.

15    Q. Okay.  And prior to you doing that report

16 review --

17    A. Yes.

18    Q. -- and adding your attestation --

19    A. Yes.

20    Q. -- who else had reviewed that report?

21 Anyone?

22    A. We can do a search for that kind of

23 information, but that's not readily available to

24 me.  I don't know who or who has not read those

25

Page 209

S. PULITZER, M.D.

1    reports in the interim between when they were

2 written and I went back and did my attestation.

3    Q. Okay.

4    A. There's no way for me to know that.

5    Q. But you did know that, for example, the

6 resident -- a resident may have done the report

7 initially --

8    A. Yes.

9    Q. -- and Dr. Greenberg also had read the

10 report because his attestation was on it.

11    Correct?

12    A. Right.

13    Q. Okay.  So, prior to you putting the

14 additional attestation on the report --

15    A. Yes.

16    Q. -- after reviewing the report yourself --

17    A. Yes.

18    Q. -- the persons we know for sure had

19 reviewed the report, the scan and whatever might

20 have been written included the resident and

21 Dr. Greenberg.

22    Correct?

23    A. Are you saying who saw his attestation

24 or who read the report?  I'm not sure --

25

Page 262

S. PULITZER, M.D.

1
2    A. Yes.
3    Q. And they were all hired as staff
4  radiologists?
5    A. Yes.
6    Q. And they were all hired to work at Kings
7  County Hospital?
8    A. Yes.
9    Q. Okay. Can you tell me how many of these
10  individuals were over age 40 at the time of
11  their hire?
12    A. Bernard Istria was over age 40.
13    Q. Okay.
14    A. And that's it -- Robert Sullivan. And
15  Robert Sullivan.
16    Q. Okay. And when was Dr. Sullivan hired?
17    A. Dr. Sullivan was hired -- he started in
18  July of this year.
19    Q. When was Dr. Istria hired?
20    A. He was hired last year.
21    Q. All right.
22    A. And the spring, potentially.
23    Q. So spring of 2015?
24    A. I'm trying to think if he's been there
25  that long. No, he -- he was -- he came in the

Page 263

S. PULITZER, M.D.

1
2  beginning of this year, so in the beginning of
3  2016.
4    Q. Okay. So the beginning --
5    A. He came right after Jethwa left and
6  Jethwa left right in 2016, so he came in the --
7  he's been there just a couple of months.
8    Q. Okay. So early 2016 for Dr. Istria.
9    A. Yeah.
10    Q. July of 2016 for Dr. Sullivan.
11    A. Right.
12    Q. If you recall, when was Dr. Jethwa hired?
13    A. Dr. Jethwa started in 2015, like around
14  January 1st.
15    Q. Okay. And he -- you say he was -- he
16  left approximately a year later?
17    A. Mm hmm.
18    Q. Dr. Bell?
19    A. Dr. Bell started in July of this year.
20    Q. Okay. Dr. Dubay -- Dubey?
21    A. July of this year.
22    Q. Dr. Ling -- Dr. Leung? Is it Leung?
23    A. Yes.
24    Q. Is that the correct --
25    A. Yes.

Page 264

S. PULITZER, M.D.

1
2    Q. -- pronunciation?
3    A. Yeah, Kevin Leung. His start date is
4  December 1st this year.
5    Q. He hasn't started yet. Is that right?
6    A. He hasn't started, no.
7    Q. Okay. And Dr. Loona?
8    A. Dr. Loona started in -- I don't remember
9  if it was in the fall of 2015 or a little
10  earlier. I'm not sure.
11    Q. Okay. Was Dr. Istria hired specifically
12  to replace Dr. Jethwa?
13    A. Yes.
14    Q. Okay. And it seems that Doctors Bell,
15  Dubey and Sullivan were all -- all came onboard
16  at the same time.
17    A. Yes.
18    Q. Can you tell me what event prompted you
19  to have three radiologists all join at about the
20  same time?
21    A. Yes. Dr. Bell is a neurointerventional
22  radiologist, and so we started a -- the stroke
23  guidelines changed for the treatment of stroke,
24  so the hospital invested in a neuroscience
25  program, and he is an interventional

Page 265

S. PULITZER, M.D.

1
2  neuroradiologist which we did not have on-staff
3  before.
4    We've gone to 24-hour for coverage for the
5  Emergency Department, so we hired three
6  individuals to rotate into the 8:00 p.m. to
7  6:00 a.m. shift.
8    Q. Doctors Dubey, Sullivan and --
9    A. Leung.
10    Q. Okay. Going back to the attestation
11  discussion we had earlier for a moment, I believe
12  you said that at some point in time within a
13  month of discovering this issue you had corrected
14  all the attestations.
15    Is that correct?
16    A. That's what I remember.
17    Q. Okay. And when you corrected them you
18  added an attestation; one of the approved
19  attestations at the bottom of the -- each of
20  the reports you were reviewing.
21    Is that correct?
22    A. Yes.
23    Q. What happened to the old attestation? Was
24  that deleted?
25    A. You can't delete it from the medical

Page 266

                    S. PULITZER, M.D.
1
2  record.
3       Q. I see.  So now those reports all appear
4  with Dr. Greenberg's attestation followed by
5  yours.
6       Is that the way it would actually appear if
7  I were reviewing the report?
8       A. Yes.
9       Q. Okay.  By the way, when we talk about --
10  when you talk about films and I talk about scans,
11  you understand that I'm talking about the same
12  thing --
13      A. Yes.
14      Q. -- as you are.  Correct?
15      A. Yes, I do.
16      Q. Okay.  So, in each of Dr. -- of the
17  attestations with which you took issue, your
18  attestation now appears below Dr. Greenberg's.
19      Correct?
20      A. Yes.
21      Q. Okay.  Did anyone else participate in
22  the amendment or correction of the attestations?
23  I mean --
24      A. No.
25      Q. -- does any other doctor have a signed

Page 267

                    S. PULITZER, M.D.
1
2  attestation below Dr. Greenberg's?
3       A. Not that I'm aware of, no.
4       Q. All right.  You also testified this
5  morning that Dr. Greenberg had had issues with
6  time and attendance for years, I believe was
7  your expression.
8       Can you tell me what you meant?
9       A. Dr. Greenberg -- again, I think I'm going
10  more into the referencing of the 12:00 to 8:00
11  shift and not being able to fulfill that shift.
12      Q. Okay.
13      A. Also, just generally starting later than
14  the nons; and for whatever reasons these were
15  accommodated in the department and so that's
16  sort of the -- those were there.
17      Q. Well sir, I -- I appreciate that they may
18  have been accommodated by the department, but I
19  believe you testified that Dr. Greenberg had had
20  -- that there had been issues or problems with
21  respect to Dr. Greenberg's time and attendance
22  for years.
23      Was that not a correct understanding of your
24  testimony?
25      A. It was not -- there -- there was no

Page 268

                    S. PULITZER, M.D.
1
2  punitive or disciplinary action to it, no.
3       Q. Okay.  Well thank you for that, but let
4  me ask you this.  Was there there some issue
5  with Dr. Greenberg's time and attendance -- as
6  you put it, for years -- prior to 2014?
7       A. Yes, there was.
8       Q. Okay.  What was that issue and when?
9       A. So, there were issues of times of when he
10  started and when he was, you know, coming late.
11  And when exactly those days that they were I
12  don't know, but it was periodic.  I was not in
13  a position at that point to monitor those things,
14  and that's my statement.
15      Q. You say that he was coming late
16  periodically.
17          DR. GREENBERG:  No,
18          that's not correct.
19  MR. NELSON:
20      Q. Was there a point in time that you
21  understood that to be an issue for someone
22  other than you, since you say you weren't in a
23  position to monitor that or address it at the
24  time?
25      A. It was an issue for the prior chairman.

Page 269

                    S. PULITZER, M.D.
1
2       Q. That would be Dr. Kantor?
3       A. Yes.
4       Q. Okay.  And what kind of issue was it for
5  Dr. Kantor, if you know?
6       A. When you staff the ER --
7       Q. Okay.
8       A. -- that's the one area where somebody has
9  to be there at a certain time and someone has to
10  be sitting there.  And so, you rely on the person
11  who's doing the ER rotation to be there at a
12  specified time so that you know that there's
13  specified coverage; the hospital is depending on
14  it.
15      And if that person is not there at the same
16  time, or reliably at the same time, then as the
17  administrator you're responsible for that.  So
18  you need to make sure that that happens and --
19      Q. Yeah, I'm asking you:  Specifically what
20  issue did Dr. Kantor have with Dr. Greenberg's
21  time and attendance and when?
22      A. I can't recall a specific issue that has
23  a specific time to it on a specific date, if
24  that's what you're asking, but there was -- in
25  general in conversations with Dr. Kantor there

Page 286

```
1                    S. PULITZER, M.D.
2      A. Yes.
3      Q. Okay.  And you did that face-to-face.
4  Correct?
5      A. I did, yes.
6      Q. And you did it in her office.  Is that
7  correct?
8      A. Yes.
9      Q. Okay.  Sir, tell me what you said or --
10 said to or asked of Ms. Welcome and what she
11 said or responded to you in the course of that
12 conversation.
13          THE WITNESS:  Before I
14          answer that, can I just
15          ask what I'm -- what am
16          I supposed to --
17          MS. BLOCKER:  You can --
18          MR. COULSTON:  There's
19          no privilege.
20          MS. BLOCKER:  There's
21          no privilege.  You can
22          discuss it.
23          MR. COULSTON:  They're
24          not asserting -- they're
25          not asserting a privilege,
```

Page 287

```
1                    S. PULITZER, M.D.
2          so you can answer --
3          THE WITNESS:  So I
4          can say everything?
5          MR. COULSTON:  -- it
6          freely.
7          THE WITNESS:  Okay.
8      A. I showed the attestation to Ms. Welcome
9  and I asked:  What is the liability that we have
10 as for the hospital with these attestations on
11 these cases and what do we do?  What do we need
12 to do to decrease any liability that we have or
13 correct the situation, and I asked her what her
14 recommendations were.
15     She called somebody in Central Office to
16 find out, you know, what happens in a case like
17 this, and the recommendation was to have a
18 second reader put in an -- an attestation over
19 it so that the case was read and the proper
20 attestation was put on it.
21     Q. Did she make that recommendation to you
22 before you left her office?
23     A. Yes.
24     Q. Do you know who she spoke to before -- on
25 the phone during your meeting?
```

Page 288

```
1                    S. PULITZER, M.D.
2      A. I do not know that.
3      Q. Okay.  Do you know whether or not that
4  recommendation came from that person?  Did she
5  say, "So-and-so says to do this", or did she make
6  the recommendation on her own?
7      A. I don't remember whose, you know,
8  recommendation it is; if it was hers and it got
9  confirmed or if it was theirs.  I don't know.
10     Q. Okay.  Now, I believe you said that after
11 you met with Ms. Welcome you spoke again with
12 Dr. Jameladdine.
13     A. Right.
14     Q. Correct?
15     A. Correct.
16     Q. And did you report this recommendation to
17 Dr. Jameladdine?
18     A. Yes, I did.
19     Q. Did he agree with it?
20     A. Yes, he did.
21     Q. And did you in fact proceed to do that at
22 some subsequent time?
23     A. Yes.
24     Q. Was there any other recommendation that
25 -- that Ms. Welcome made other than to have an
```

Page 289

```
1                    S. PULITZER, M.D.
2  additional attestation put on the reports?
3      A. No.
4      Q. Was there any additional recommendation
5  that Dr. Jameladdine had in -- beyond putting
6  an additional attestation on the reports?
7      A. Not that I recall.
8      Q. Okay.  Did either one of them tell you
9  to fire Dr. Greenberg because of that?
10     A. Not directly, but the conversation came
11 up.
12     Q. Okay.  And what do you mean "the
13 conversation came up"?  With whom and --
14     A. So --
15     Q. -- what was said?
16     A. With -- with Dr. Jameladdine about the
17 -- this is inappropriate behavior for one of the
18 staff physicians and that it should be referred
19 to Labor Relations, it should be disciplined, and
20 it should be looked at as to what the next step
21 is to do this; does this need to go to Office of
22 Professional Medical Misconduct and what do we
23 need to do about this situation.
24     Q. Okay.
25     A. So --
```

Page 290

S. PULITZER, M.D.

2  Q. What do you mean by "Office of
3  Professional Medical Misconduct"?  What is
4  that?
5     A. So, that's called a OPMC and it's a --
6  it's for our physicians who are not behaving
7  in a standard way that you can report them to
8  that.
9     Q. So, you mean the Office of Professional
10  Medical Conduct?
11     A. Conduct.
12     Q. Correct?
13     A. Yes.
14     Q. Okay.  That's an office that exists
15  outside the hospital.
16     Correct?
17     A. Yes, it is.
18     Q. Okay.
19     A. It's an H --
20     Q. It's essentially a -- an entity or
21  organization that -- that regulates and/or
22  disciplines physicians?
23     A. Yes.
24     Q. Okay.  And that was Dr. Jameladdine's
25  suggestion or recommendation?

Page 291

S. PULITZER, M.D.

2     A. That was -- Dr. Jameladdine asked me to
3  find those things out and figure out how to --
4  what we should do with this situation, and that
5  was it.
6     Q. I'm sorry.  Okay.  I want to make a
7  distinction here.
8     Can you please tell me what Dr. Jameladdine
9  told you to do as distinguished from what
10  Dr. Jameladdine asked you to do?
11     A. Dr. Jameladdine told me to find out what
12  the legal implications were of this, if this
13  needs to be reported to the Office of
14  Professional Conduct -- Medical Conduct, and to
15  refer this to Labor Relations and to see what
16  -- what kind of disciplinary action needs to
17  happen with this physician.
18     And I don't know in what order he said that,
19  but that was what he said, so --
20     Q. And he did all of this in the same
21  conversation after you came back from Ms.
22  Welcome?
23     A. Yes.
24     Q. Okay.  And you say that meeting occurred
25  on the same day that you met with Ms. Welcome?

Page 292

S. PULITZER, M.D.

1     A. Yes.
3     Q. Had you gone -- had you brought this
4  issue to the attention of Labor Relations before
5  Dr. Jameladdine told you to do so?
6     A. I don't -- I don't know.  I don't
7  remember.
8     Q. Did you do so after he told you to do so?
9     A. Yes.
10     Q. And whom did you contact in Labor
11  Relations and when?
12     A. I don't recall exactly the day or -- or
13  if I had spoke with Stephanie Bernadel or if
14  Michael was still there.  I don't remember
15  exactly who my contact was if there -- you know,
16  I don't know.
17     Q. How long after this meeting with
18  Dr. Jameladdine in which he directed that you
19  bring this to the attention of Labor Relations
20  did you bring it to the attention of Labor
21  Relations?
22     A. Within 24 hours.
23     Q. And did you do that by phone, e-mail,
24  face-to-face or otherwise?
25     A. I don't recall.  It may have been a

Page 293

S. PULITZER, M.D.

2  combination.
3     Q. What do you mean a combination?
4     A. It may have been a phone call and an
5  e-mail.  I don't -- I don't remember.
6     Q. Okay.  Whom did you try to reach there?
7  Did you try to reach Mr. Arabian?
8     A. I don't remember.
9     Q. But sitting here today, the referral to
10  Labor Relations was prompted by a direction
11  from Dr. Jameladdine.
12     Is that correct?
13          MS. BLOCKER:  Objection.
14     A. It -- yes, it was prompted by
15  Dr. Jameladdine.
16     Q. Okay.  Where was Dr. Reede, if anywhere,
17  in the course of addressing what you had been
18  told by or recommended to you by Ms. Welcome?
19  Did she have any role?
20     A. No, not in that.
21     Q. Did you tell her, meaning Dr. Reede, what
22  Ms. Welcome had told you?
23     A. Yes.
24     Q. When?
25     A. At some time, again, within 24 hours of

Page 302

S. PULITZER, M.D.

2    Q. Did you have any occasion to speak with
3    Dr. Jameladdine further about the attestation
4    issue at any time after coming back to him with
5    the substance of what had been discussed between
6    you and Ms. Welcome?
7    A. My job is to give him updates as to when
8    these things are getting done and how they're
9    getting done, so at some point yes, I did tell
10   him that the attestations were done.
11   Q. I see. So, other than telling him at
12   some subsequent time that the attestations had
13   been corrected --
14   A. Yes.
15   Q. -- was there any other discussion between
16   the two of you regarding the attestations after
17   the one at which he said: Bring this to the
18   attention of Labor Relations?
19   A. I don't recall a specific -- there were
20   conversations that this -- this was something
21   that was talked about because it was a problem.
22   Q. Okay.
23   A. So I really don't recall the number or
24   the nature of the exact conversations, but the
25   gist of it was that it -- it needed correction

Page 303

S. PULITZER, M.D.

2    and it needed disciplinary action.
3    Q. Have you now told me all that you recall
4    of your discussion with Ms. Welcome --
5    A. Yes.
6    Q. -- or is there something additional?
7    A. I don't remember anything else.
8    Q. Have you now told me all that you recall
9    of your discussions with Dr. Reede up to this
10   point in time regarding the attestation issue
11   --
12   A. Yes.
13   Q. -- or is there something additional?
14   A. No, that's it.
15   Q. No, what?
16   A. That was all I remember.
17   Q. Okay. And have you now told me all that
18   you recall of your discussions with
19   Dr. Jameladdine on these occasions before and
20   after you spoke with Ms. Welcome?
21   A. Yes. Yes.
22   Q. Yes to which? Yes, you've told me
23   everything or yes, there's something additional?
24   A. Can you ask me the question again, please?
25   Q. Yeah.

Page 304

S. PULITZER, M.D.

2    Have you now told me everything that you
3    recall discussing with Dr. Jameladdine regarding
4    the attestation issue both before and after
5    speaking to Ms. Welcome?
6    A. I have told you everything I remember.
7    Q. Okay. Sir, you've made a reference when
8    we were talking about time and attendance a few
9    minutes ago to something in the spring of 2014.
10   Can you tell me specifically when you recall
11   that occurrence?
12   A. When I recall what about it?
13   Q. In other words: Do you recall whether
14   it was in March or early June or any -- be any
15   more specific?
16   A. It was sometime between March and April,
17   May. Like, you know --
18   Q. Okay. And what do you recall occurring
19   at that time?
20   A. I recall that there was a question of
21   where Dr. Greenberg was at certain times and
22   that his timesheet didn't reflect whether he
23   was in or out of the hospital and that he was
24   counseled on having more accurate reporting.
25   Q. And who was he counseled by?

Page 305

S. PULITZER, M.D.

2    A. Dr. Reede.
3    Q. And how are you aware of what went on
4    between Dr. Greenberg and Dr. Reede?
5    A. I became aware of that after I became
6    the Interim --
7    Q. And how did you --
8    A. -- Chairman.
9    Q. -- become aware of it?
10   A. From Dr. Reede.
11   Q. And in what way did you become aware of
12   it from Dr. Reede?
13   A. When we started to have attendance issues
14   with Dr. Greenberg it was brought to my attention
15   that this was something in the past that
16   happened.
17   Q. Okay. And when did you start to have
18   attendance issues with Dr. Reede (sic) that
19   prompted Dr. Reede to bring it to your attention?
20   MR. COULSTON: With
21   Dr. Greenberg?
22   MR. NELSON: Yes.
23   A. We started to have attendance issues with
24   Dr. Greenberg in August. Maybe late July, in
25   August.

Page 306

S. PULITZER, M.D.

Q. And what were the issues that you started to have in late July or early August?

A. Dr. Greenberg was coming in late, he was on occasion leaving early. I never knew when -- often -- I don't want to say never, but often didn't know what time he was going to be in that day. I didn't know -- I couldn't reliably plan the schedule.

And I had talked to him about it and said: "Well, what hours can you work? How can I work with you?" That was my thing.

I was coming in new, I was new, and I wanted to be able to work with staff, and I know staff had different needs. And if people can not have to think about those needs they're more productive, so as a general philosophy of running a department I extended this to Dr. Greenberg and tried to get hours that would be reasonable for him.

Q. And what did he tell you when you asked him this?

A. He said reasonably for him 9:30 to 5:30 would work.

Q. And did he say why?

Page 307

S. PULITZER, M.D.

A. I don't remember the exact reason why. He said he has to -- family things to do.

Q. I'm sorry. He said he has family things to do, was that before or after work?

A. Just responsibilities in the morning for his family.

Q. I see. So he didn't want to start before 9:30. Is that what you're saying?

A. That he could reliably be there by 9:30 and take care of the issues that he needs to take care of in his personal life.

Q. Was there any issue or concern raised by Dr. Greenberg with respect to the time at which he would finish work?

A. I -- yes. So, he said for him what would work best would be 9:30 to 5:30, and so I accommodated that.

Q. And why did he say 5:30 was a time that would work best for him?

A. I don't recall.

Q. Okay. Did Dr. Greenberg ever mention family?

A. As the reason to leave at 5:30?

Q. Either to come in at 9:30 or to leave at

Page 308

S. PULITZER, M.D.

5:30?

A. Yes, he did.

Q. Okay. Did he mention any particular member of his family?

A. Not that I recall. I don't know if I probed.

Q. Did he say what the reason -- what the family-related reason was?

A. Not that I recall.

Q. Now, when you had this conversation with him, you recall it being in late July or early August.

Is that correct?

A. Sometime in July --

Q. Can you be --

A. -- or August.

Q. -- any more specific?

A. I cannot.

Q. Did the two of you come to an agreement or understanding as to what Dr. Greenberg's hours would be henceforth?

A. Yes, that was my understanding.

Q. And what was the understanding that you reached, as you recall it?

Page 309

S. PULITZER, M.D.

A. That he could reliably be there from 9:30 to 5:30 and that I could count on him to be sitting there and reading cases.

Q. Okay. And prior to that, what had Dr. Greenberg's hours been?

A. What were his assigned hours?

Q. As you understood them, yes.

A. 9:00 to 5:00.

Q. Okay. And so, the only adjustment needed as a result of your conversation with him was him coming in a half an hour later and working a half an hour later.

Is that correct?

A. Yes.

Q. Did you ever raise with him your desire that he work from 12:00 to 8:00?

A. Had I ever talked to him about working 12:00 to 8:00?

Q. At that time during that time period or during that conversation, did you raise your desire to have him work 12:00 to 8:00?

A. No.

Q. Had you ever --

A. I don't recall at the time.

Page 310

S. PULITZER, M.D.

1
2    Q. -- raised with him a desire to have him
3  work 12:00 to 8:00?
4    A. Not that I recall specifically, no.
5    Q. Did he ever express to you an issue with
6  working 12:00 to 8:00?
7    A. He had expressed it to my previous boss.
8    Q. And what, to your knowledge, did he
9  express to your previous boss?
10   A. That he couldn't work those hours, those
11 hours didn't work for him, and it was not
12 something he could do.
13   Q. Do you know why?
14   A. I do not.
15   Q. Do you know what reason he expressed to
16 your boss -- your prior boss?
17   A. I do not.
18   Q. When we're referring to your prior boss,
19 are we referring to Dr. Kantor?
20   A. Yes.
21   Q. Okay. Now sir, on this occasion that
22 you had this conversation with him regarding
23 him working reliably 9:30 to 5:30, was this a
24 disciplinary counseling?
25   A. No, it was not.

Page 311

S. PULITZER, M.D.

1
2    Q. Was it disciplinary at all?
3    A. He was -- it was an attempt to engage
4  an employee who was having problems with
5  attendance and with being someplace at a certain
6  time, and it was a negotiation to try and see:
7       Well, I can bend. You can come in later.
8  If you want to work 10:00 to 6:00, if you want
9  to work 11:00 to 7:00, that's fine. Whatever
10 hours -- whatever eight hours you want to do
11 I'll work around you, but what's going to make
12 your life better because if I can -- I just
13 need to know the exact hours you're here so I
14 can plan around you.
15      That -- that was the nature of that
16 conversation.
17   Q. Okay. So you were pretty -- you were --
18 you're saying that you were willing to
19 accommodate any eight hours Dr. Greenberg would
20 say he could work.
21   A. I was, yes.
22   Q. Even if it meant 11:00 to 7:00 or --
23   A. If that -- if that would reliably have
24 him there from 11:00 to 7:00, yes, because then
25 I could schedule around him.

Page 312

S. PULITZER, M.D.

1
2    Q. Okay. Was there any disciplinary aspect
3  to this counseling you say that Dr. Greenberg
4  received from Dr. Reede in the spring of 2014?
5    A. I don't know. You'd have to ask
6  Dr. Reede.
7    Q. Did she ever say she disciplined
8  Dr. Greenberg for some time and attendance
9  violation in the spring of 2014?
10   A. Well, when I was having issues with time
11 and attendance with Dr. Greenberg she said that
12 she had spoken with him. I don't know what the
13 counseling -- I don't know.
14      There's different degrees of counseling
15 and -- and stuff for the union, so I don't know
16 if -- technically what it was but that there --
17 he had -- she had spoken to him about his time
18 and attendance and about his timesheets, and
19 that is what I knew from that time.
20   Q. Sir, are you familiar with the term
21 "progressive discipline"?
22   A. No.
23   Q. Okay. Are you aware that in a corporate
24 environment there is a progression of discipline
25 from say a verbal warning to a written warning

Page 313

S. PULITZER, M.D.

1  to a counseling to a suspension to a termination?
2
3  Is that of any familiarity to you?
4    A. Yes, that is.
5    Q. Okay. Sir, are you aware of whether or
6  not a progressive discipline policy exists either
7  at Kings County Hospital or at Downstate?
8    A. Yes, it does.
9    Q. Okay. At which, or does it exist at both?
10   A. At both.
11   Q. All right. Sir, do you know of any
12 occasion on which any step in a progressive
13 discipline occurred with respect to
14 Dr. Greenberg?
15   A. Can you repeat that?
16   Q. Let me rephrase.
17      Are you aware of any occasion on which a
18 step in progressive discipline was administered
19 to Dr. Greenberg?
20   A. The only occasion I am aware of in --
21 with respect to time and attendance is his
22 meeting with Dr. Reede, but I do not know what
23 level of progressive discipline -- to use your
24 term -- that was done -- that was taken, or if
25 that was in fact documented in such a way. I

Page 334

S. PULITZER, M.D.

1
2     Q. And what's --
3     A. A ballpark.
4     Q. -- the basis of that?
5     A. By a report and -- by physical reports by
6  Dr. Hammil and by the cross-referencing with the
7  dictation data.
8     Q. And when -- when was it reported to you
9  that Dr. Greenberg was coming to work that week?
10    A. I got a call pretty much every day, except
11 for Monday, that: "Dr. Greenberg is here, he's
12 coming at erratic hours, why is he here, he's
13 not on the schedule, what's going on." And I
14 said: "I don't know.  I'm on vacation."
15    Q. Okay.  And who were those calls from?
16    A. Dr. Hammil.
17    Q. In each instance?
18    A. Yes.
19    Q. And do you recall Dr. Hammil calling you
20 each day?
21    A. Yes.
22    Q. Do you recall telling Dr. -- Dr. Hammil
23 what he should do about that?
24    A. No.
25    Q. Okay.  Well, what did you -- did you

Page 335

S. PULITZER, M.D.

1
2  instruct anybody else to do anything with
3  regard to Dr. Greenberg coming in that week?
4     A. No.
5     Q. Did you talk to Dr. Greenberg --
6     A. No.
7     Q. -- that week?
8     A. I did not.
9     Q. To your knowledge, did Dr. Greenberg
10 perform his ordinary, regular duties that week
11 other than attending that committee meeting?
12    A. He read cases from the ER, yes.
13    Q. Okay.  And what did you say to Dr. Hammil
14 other than, "I'm on -- I don't know; I'm on
15 vacation", when he brought this to your
16 attention, if anything?
17    A. I said:  "Ask him why he's here, what --
18 what -- what he's doing and find out what's
19 going on."
20    Q. Okay.  And did Dr. Hammil, to your
21 knowledge, do that?
22    A. I don't know if -- if he got a straight
23 answer.  I think he asked him one day, but I
24 -- it wasn't clear to either of us what was
25 happening.

Page 336

S. PULITZER, M.D.

1
2     Q. Okay.  Did Dr. Hammil ever report back
3  to you that he had had such a conversation with
4  Dr. Greenberg?
5     A. I don't recall specifically the
6  conversation, but I -- I remember asking him to
7  find out why he's there.
8     Q. Yes.
9     A. And --
10    Q. No, I get that part but I'm --
11    A. I don't remember the conversations.
12    Q. But I'm asking whether or not you ever --
13    A. Right.
14    Q. -- learned of a result --
15    A. I never --
16    Q. -- of that --
17    A. I never got a good answer.
18    Q. Okay.  And when did you return to work?
19    A. The Tuesday after Labor Day.
20    Q. So that would have been the 2nd of
21 September or the 9th of September?
22    A. 2nd.
23    Q. All right.
24    A. Yes.
25    Q. And then, did you speak to Dr. Greenberg

Page 337

S. PULITZER, M.D.

1
2  at any time from the 2nd on about his having come
3  to work that prior week?
4     A. Yes.
5     Q. When?
6     A. Dr. Greenberg and I had a conversation on
7  September 2nd.
8     Q. And what was the conversation that you
9  had?
10    A. Dr. Greenberg came to my office and asked
11 me if he could have a -- the Thursday and Friday
12 of that week off, and I said:  "I can't cover
13 you that week.  I don't have any staff.  No, I
14 can't approve that.  I just worked with you for
15 the last month trying to adjust the vacation
16 schedule so that you could have any days that
17 you want off."
18    I gave him two consecutive weeks in a row
19 with one week notice and was -- was almost four
20 physicians down at that point.  I got a call at
21 the end of that week saying that he needed to
22 change his schedule.
23    And I reiterated this to Dr. -- to
24 Dr. Greenberg and that I was able to accommodate
25 it, and that I could not accommodate this

Page 338

S. PULITZER, M.D.

1    request; that I've been very flexible, but this
2    particular week on this particular time I don't
3    have staff to cover you.
4        Q. You're referring to not having staff on
5    the 4th and the 5th when he had asked to have
6    those days off?
7        A. Yes.
8        Q. And that was in a conversation on the 2nd?
9        A. Yes.
10       Q. Face-to-face?
11       A. Yes, in my office.
12       Q. Where did this conversation take place?
13       A. In the S Building on the second floor in
14   my office.
15       Q. And who in fact was off that Thursday and
16   Friday that -- that made you, as I think you put
17   it, four physicians down?
18       A. We were -- we had just had four physicians
19   non-renewed and we were -- we had people on
20   vacation, so we were just running a very skeleton
21   crew to begin with.
22        And I don't recall -- I don't remember
23   exactly who was off that day or that week, but
24   I do remember that people -- I did not have
25

Page 339

S. PULITZER, M.D.

1    the people, the personnel, to cover anyone else's
2    absence and I was relying on Dr. Greenberg to be
3    there because I had given other people time off.
4        Q. Yeah, and I'm asking you not with regard
5    to who had been non-renewed.
6        A. Mm hmm.
7        Q. Okay? Well, but let's talk about that
8    for a moment. When you said you just had four
9    physicians non-renewed --
10       A. Right.
11       Q. -- you're referring to Drs. Areman,
12   Kantor, Roitberg and someone else?
13       A. Well, Cathy Mason had been part of that
14   crew, so we were -- we still hadn't replaced
15   that line.
16       Q. Okay. So those --
17       A. We were down.
18       Q. -- were the four you were referring to?
19       A. Yeah.
20       Q. Okay. Apart from those who were no longer
21   working at the hospital any day --
22       A. Yes.
23       Q. -- okay, who was out or on vacation on the
24   4th and the 5th?
25

Page 340

S. PULITZER, M.D.

1        A. I would have to check the records and the
2    schedule.
3        Q. Okay. Sitting here now, are you able to
4    identify anyone who was out that -- that -- on
5    either of those two days?
6        A. I'd have to check the schedule.
7        Q. And you referred --
8        A. It was a long time ago.
9        Q. When you referred to being four physicians
10   down, you're referring to the four physicians who
11   were --
12       A. Mm hmm.
13       Q. -- non-renewed?
14       A. Yes, I am.
15       Q. Okay. So let's leave aside the four
16   physicians who were non-renewed.
17       A. Okay.
18       Q. Okay? Are you able at all sitting here
19   today to tell me who was out on the 4th and the
20   5th that precluded you from being able to give
21   Dr. Greenberg those days off?
22       A. I need to look at the schedule.
23       Q. Okay.
24       A. I don't remember.
25

Page 341

S. PULITZER, M.D.

1        Q. All right. So the answer is: You can't
2    tell me without looking at the schedule.
3        Is that right?
4        A. That's correct.
5        Q. Now sir, when he came to you on the 2nd
6    and asked you for those days off, did he tell you
7    why he needed the time off?
8        A. Not that I recall, no.
9        Q. Sir, do you have children?
10       A. Yes, I do.
11       Q. Do you know if Dr. Greenberg has children?
12       A. Yes, I do.
13       Q. And what do you know about Dr. Greenberg
14   having children? Do you know how many he has?
15       A. As far as I know, two.
16       Q. Okay. And do you know their names?
17       A. One is named Jaden. I don't know the
18   other.
19       Q. Okay. And did you and Dr. Greenberg
20   during the time you worked at the hospital
21   together ever talk about your kids to each
22   other?
23       A. Yes.
24       Q. And in the course of those discussions,
25

Page 342

S. PULITZER, M.D.

2  did you ever learn that Dr. Greenberg's son
3  Jaden was a child with special needs?
4      A. Yes.
5      Q. And what was it that you -- you were --
6  you understood Jaden's special needs to be or
7  his condition to be?
8      A. My understanding of his condition was
9  that there was a learning disability and with
10  something -- you know, some sort of sensitivity
11  along the spectrum of -- with sensitivity issues.
12      Q. Okay. When you say --
13      A. But I don't know all the --
14      Q. -- "along the spectrum", what spectrum
15  are you referring to?
16      A. The spectrum to autism. Sensitivity to
17  autism.
18      Q. Sensitivity to autism, did you say?
19      A. Mm hmm.
20      Q. Okay. Is that what a layperson like me
21  would refer to as the autism spectrum?
22      A. Perhaps.
23      Q. Okay. And when did you learn that
24  Dr. Greenberg's son Jaden was on the autism
25  spectrum?

Page 343

S. PULITZER, M.D.

2      A. I don't know. It was shortly after I met
3  him.
4      Q. Okay. And that was in August or in 2010
5  or thereabouts?
6      A. Mm hmm, and so it was sometime within
7  the next couple of years. I knew that it was --
8      Q. Okay. And when --
9      A. Or the next year or two.
10      Q. -- you say "mm hmm", you mean yes?
11      A. Yes.
12      Q. Okay. So sir, you had known for several
13  years at that point that Dr. Greenberg had a son
14  with -- who was -- who is on the autism spectrum.
15      Correct?
16      A. Yes.
17      Q. Okay. Did you know in particular what
18  Jaden had been diagnosed with?
19      A. No, I don't know.
20      Q. Did you know whether or not Jaden had any
21  special needs as a result of being on the autism
22  spectrum?
23      A. I do not know what those needs are, no.
24      Q. I see. How many children do you have?
25      A. I have two.

Page 344

S. PULITZER, M.D.

2      Q. Two. Do you also have a child with
3  special needs?
4      A. Yes.
5      Q. Okay. And what's the -- if you don't
6  mind -- the nature of your child's special needs?
7      A. He's got sensitivity special needs.
8  He's, as you would say, on the sensitivity
9  spectrum.
10      Q. I see. And then, you shared that
11  information with Dr. Greenberg at some point
12  during the time that you worked together?
13      A. Yes, I did.
14      Q. Okay. So, you basically shared some of
15  the issues that you faced as parents of children
16  with special needs.
17      Correct?
18      A. Yes.
19      Q. And you, as a parent of a child with
20  special needs yourself, would understand some
21  of the demands that that makes upon a parent.
22      Correct?
23          MR. COULSTON: I
24          object to the form.
25      A. Yes.

Page 345

S. PULITZER, M.D.

2      Q. Sir, at any point in time during this
3  discussion on the 2nd, did Dr. Greenberg
4  reference his family or anything about his family
5  as a basis for the -- for him needing the days
6  September 4th and 5th off?
7      A. Not that I recall.
8      Q. Okay. Did you ask him what the reason
9  was why he needed those days off?
10      A. No, I don't remember.
11      Q. I'm sorry. No, you don't remember?
12      A. I -- I don't remember asking him the
13  specific reason --
14      Q. Okay.
15      A. -- why he needed the days off.
16      Q. Okay. And when you say you don't recall
17  him telling you, are you saying that he
18  definitely did not tell you or you just don't
19  recall whether or not he told you?
20      A. I don't recall any conversations saying
21  that: "I need the time off to tend to my special
22  needs child on these two days."
23      Q. Okay.
24      A. Having have my own child with special
25  needs I am very sensitive to that.

Page 346

S. PULITZER, M.D.

2  Q. Okay. Well, let me ask you the question
3  again that I just asked.
4    Are you saying that you don't recall him
5  saying that or you don't recall whether or not
6  he said that?
7    A. I don't recall the context of which he
8  asked for the time off to be related to anything
9  to do with Jaden.
10   Q. What do you recall it being related to?
11   A. I don't -- I -- it was not specific. It
12  wasn't specified to me.
13   Q. So, Dr. Greenberg came to you and asked
14  for two days off and to your recollection didn't
15  tell you why and you didn't ask.
16    Is that correct?
17   A. It's my recollection I don't -- yeah, I
18  don't remember.
19   Q. And when you told him that you could not
20  accommodate him for those two days off --
21   A. Mm hmm.
22   Q. -- what, as specifically as you can
23  recall, did you say in that regard?
24        MR. COULSTON: I
25        object to the form.

Page 347

S. PULITZER, M.D.

2  A. I said: "I don't have the staff to cover
3  you. People are out; I need you here. I just
4  worked with you for the past couple of weeks,
5  and I need you to be here this week because I --
6  I don't have anyone who can do what you do in
7  the ER."
8  Q. And what did Dr. Greenberg say in response
9  to that, if anything?
10  A. He was angry. He was angry because he
11  felt that he had come in the week before on his
12  vacation on his own volition to help the
13  department, and that therefore I should give
14  him the time off. And that he felt entitled to
15  it and he was angry that he didn't get it.
16  Q. Okay. You're saying that he said these
17  things or was that -- that was the overall
18  impression you had?
19  A. He told me that he had come in the week
20  before and that he was, you know, helping the
21  department as best he can and that he needs
22  these days off, and I said: "I can't, I just
23  can't. There's so much I can do."
24   I have just done the best that I can. I
25  even tried to adjust -- adjust his schedule for

Page 348

S. PULITZER, M.D.

2  him so that he can get to work on time. I mean,
3  so I don't --
4  Q. So you specifically recall him being
5  angry and you specifically recall him referencing
6  having worked the prior week, but you don't
7  recall whether or not he gave you a reason why
8  he needed the time off, nor that you asked him
9  what his reason was.
10    Is that correct?
11  A. Yes, that's correct.
12  Q. Okay. And what else, if you can recall
13  anything, was said between the two of you in that
14  conversation? And I mean other than you've
15  already testified.
16  A. I don't remember.
17  Q. You don't remember anything else is
18  what --
19  A. I don't remember --
20  Q. -- you're saying?
21  A. -- anything.
22  Q. Was anything else said and you just don't
23  remember it or was nothing else said?
24  A. I don't remember anything else, but that's
25  what it --

Page 349

S. PULITZER, M.D.

2  Q. Okay.
3  A. Those highlights of those conversations
4  are were what I remember.
5  Q. Okay. You don't remember anything else
6  that Dr. Greenberg said to you in that
7  conversation?
8  A. I do not.
9  Q. And sir, as of the time that Dr. Greenberg
10  left your office, what was your understanding
11  about what was going to happen? Was it your
12  understanding he was going to be coming into work
13  on the 4th and the 5th?
14  A. Yes, it was.
15  Q. Okay. And what was the basis for you
16  understanding that? Did he say he would be
17  coming in even though he had wanted the time
18  off?
19  A. I think -- I don't remember exactly if
20  he said he's coming in, but the time was not
21  approved to be off so in my mind he was coming
22  in.
23  Q. Okay. Sir, had you known prior to
24  Dr. Greenberg coming to you that he was seeking
25  that time off? In other words, did you learn

Page 350

S. PULITZER, M.D.

1  it from some other source?
2     A. No, I didn't.
3     Q. Do you know who Linda McMurran is?
4     A. Yes, I do.
5     Q. Who is Linda McMurran?
6     A. She's the secretary for the department, or
7  Dr. Reede.
8     Q. Is it fair to call her Dr. Reede's
9  secretary?
10    A. Sure.
11    Q. And was she in that role at that time?
12    A. Yes.
13    Q. August of -- and early September of 2014?
14    A. Mm hmm.
15    Q. Yes?
16    A. Yes.
17    Q. By the way, was Ms. McMurran essentially
18  the -- the manager or custodian of time and
19  attendance records, like timesheets --
20    A. Yes.
21    Q. -- during that period of time?
22    A. Yes.
23    Q. Is that correct?
24    A. That's correct.

Page 351

S. PULITZER, M.D.

1     Q. Okay.  Sir, what happened after this
2  encounter with Dr. Greenberg with regard to
3  his request for time off?  Did you report his
4  request to someone else?
5     A. No.
6     Q. Did you discuss it with Dr. Reede?
7     A. I don't -- I don't remember doing that.
8     Q. Okay.  And did Dr. Greenberg subsequently
9  notify you or anyone else that he was going to
10  be taking the time off notwithstanding?
11    A. Yes, he did.
12    Q. And whom did he inform of that?
13    A. Me.
14    Q. And when did he inform you of that?
15    A. On the next day Wednesday, the 3rd.
16    Q. And on the 3rd what did he say to you?
17    A. He came to my neuroradiology reading
18  room, which is on the second floor of the S
19  Building at Kings County Hospital, and he said:
20     "I'm just letting you know that I won't be
21  here tomorrow and Thursday.  Out of respect to
22  you I'm giving you time -- you know, I'm giving
23  you notice now to -- to cover me."
24     And I said:  "All right.  I -- you know, I

Page 352

S. PULITZER, M.D.

1  can't.  I can't cover you," or something to that
2  effect; and he said he's going to take the time
3  off anyway.
4     Q. Okay.
5     A. And I --
6     Q. Did you say anything to him on that
7  occasion?
8     A. I said to him I don't -- you know, I
9  don't want him to take the time off.
10    Q. Did you tell him there would be any
11  consequences if he did take the time off?
12    A. Not at that conversation, I did not.
13    Q. Did you tell him not to take the time
14  off?
15    A. Not in that conversation.
16    Q. Okay.  And what else did you say to him
17  in that conversation or did he say to you in
18  that conversation that you have not already
19  testified to?
20    A. In that one I don't remember anything
21  else.
22    Q. Okay.  Did the reason why he needed the
23  time off come up in that conversation?
24    A. Not that I recall, no.

Page 353

S. PULITZER, M.D.

1     Q. So, you don't recall him telling you why
2  he needed the time off nor did you ask in that
3  second conversation.
4     Is that correct?
5     A. Well I mean, Dr. Greenberg came into my
6  office and -- and he told me in a blanket
7  statement:  I will not be in; end of story.  See
8  ya.  That's basically what he said.  "I do
9  respect you; that's why I'm telling you now."
10  And I appreciated that, but it still left me in
11  the same position; and then left my office.
12         DR. GREENBERG:
13         (Indicating).
14         MR. NELSON:  Why?
15         DR. GREENBERG:  Okay.
16  MR. NELSON:
17    Q. At that point or at any prior point,
18  did you try to cover Dr. Greenberg's position
19  or schedule since he had said he wouldn't be in?
20    A. Prior to him coming to my office and
21  telling me he's not coming in?
22    Q. Yeah.  I mean at any time from the first
23  conversation on, had you made any effort to cover
24  him?

Page 354

```
1                 S. PULITZER, M.D.
2      A. No.
3      Q. Did you make any effort to cover him
4  after the second conversation, the one you've
5  just testified to that occurred on the 3rd?
6      A. Yes, I did.
7      Q. And did you manage to cover --
8      A. Yes.
9      Q. -- him?
10     A. Yes, we covered the service.
11     Q. How did you manage to do that?
12     A. I don't remember exactly.  You'll have to
13 look at the schedule.
14     Q. Okay.  You were able to get another
15 radiologist to stand in for Dr. Greenberg?
16     A. There was a -- we divided the work.
17     Q. Okay.  So, you're saying multiple people
18 covered Dr. Greenberg's --
19     A. Yes.
20     Q. -- position that day?
21     A. Yes.
22     Q. Those two days?
23     A. Yes.
24     Q. And did Dr. Greenberg in fact not come to
25 work on the 4th?
```

Page 355

```
1                 S. PULITZER, M.D.
2      A. He did not.
3      Q. And did he in fact not come to work on the
4  5th?
5      A. No, he did not.
6      Q. Did you have any further discussion --
7  discussions with him other than the one on the
8  2nd and the one on the 3rd that week --
9      A. Yes --
10     Q. -- regarding him --
11     A. -- I spoke to him.
12     Q. -- and/or his absences on the 4th or the
13 5th?
14     A. Yes, I did.
15     Q. When was the next one after the one
16 you've just recounted on the 3rd?
17     A. On the 3rd also, later in the day.
18     Q. And what happened?  And -- tell me
19 about that conversation now.
20     A. So, I had to -- I had an employee come
21 and tell me that he wasn't going to be in the
22 next day, and I reported that to Dr. Reede
23 because I am the one who is ultimately
24 responsible for the work not getting done if
25 it doesn't get done or if people don't show up
```

Page 356

```
1                 S. PULITZER, M.D.
2  and for how it works.
3      I went, I -- I asked her how to handle this
4  situation, and she advised me to write a letter
5  saying that I officially deny his time off, and
6  that if he takes the time off he'll be refer --
7  referred to Labor Relations.
8      Q. And when did you have this conversation
9  with Dr. Reede?
10     A. Right after Dr. Greenberg left my office.
11     Q. Okay.  Did you talk to Dr. Greenberg at
12 all on the 4th or the 5th?
13     A. No.
14     Q. Did you talk to Dr. Greenberg more than
15 the one time you've now testified to on the 3rd?
16     A. Yes.
17     Q. Okay.  And how many more times that day
18 did you talk to Dr. Greenberg?
19     A. Once.
20     Q. So, in total there were three
21 conversations with Dr. Greenberg regarding his
22 need for time off on the 4th and the 5th?
23     A. Mm hmm.
24     Q. One on the 2nd and two on the 3rd.  Is
25 that correct?
```

Page 357

```
1                 S. PULITZER, M.D.
2      A. Yes.
3      Q. What was the -- when -- did you have the
4  conversation that you've just recounted with
5  Dr. Reede before or after the third conversation
6  with Dr. Greenberg?
7      A. It's after the second conversation.
8      Q. Okay.  So the first one was on the 2nd.
9      A. Yes.
10     Q. Then you had a conversation with
11 Dr. Greenberg on the 3rd.
12     A. Yes.
13     Q. Then you had a conversation with
14 Dr. Reede.
15     A. Yes.
16     Q. And then you had another conversation with
17 Dr. Greenberg.
18     Is that correct?
19     A. That's correct, yes.
20     Q. Okay.  Have you told me everything that
21 was said between you and Dr. Reede during your
22 conversation with her regarding Dr. Greenberg
23 on the 3rd?
24     A. Yes, as far as I can recall.
25     MR. COULSTON:  I object
```

Page 358

S. PULITZER, M.D.

2    to the form.

3    A. Yes.

4    Q. Is there anything else sitting here now

5 that you recall saying to her or that you recall

6 her saying to you in that conversation?

7    A. No.

8    Q. How long after talking to Dr. Reede did

9 you speak again with Dr. Greenberg?

10    A. It took me about 15, 20 minutes to type

11 a letter, so within a half hour of that

12 conversation with Dr. Reede.  So everything took

13 place within an hour, I think.

14    Q. Okay.  And once you finished the letter,

15 what did you do then?

16    A. I walked downstairs to Dr. Greenberg's

17 reading room.  I went into his reading room and

18 I said, "Oded, I have to give you this letter.

19 I can't approve your time off", and I read him

20 what the letter said; you know, "If you can't

21 -- if you don't come in you're going to be

22 referred to Labor Relations".

23    And I then said -- you know, advised him

24 not to do it.  I -- just as a -- I -- you know,

25 he and I go back a long way and I -- I like him

Page 359

S. PULITZER, M.D.

2 and just don't want to refer him to Labor

3 Relations. And you know, I just said:  "Please

4 don't do this."

5    Q. And what did he say?

6    A. He said:  "I'm -- I'm doing it.  I have

7 to do it."

8    Q. Did he say why he had to do it?

9    A. Not that I recall, no.

10    Q. So, it's your testimony that you had

11 three separate conversations with Dr. Greenberg

12 on the 2nd and the 3rd --

13    A. Mm hmm.

14    Q. -- collectively?

15    A. Yes.

16    Q. And at no time during that -- any of

17 those three conversations did he say why he

18 needed that -- those days off.

19    That's your testimony?

20    A. Yes, that was -- that is my testimony.

21 I don't know what the exact reason is that he

22 needed those days off.

23    Q. And it's also your testimony that in none

24 of those three conversations did you ever ask him

25 why he needed that time off.

Page 360

S. PULITZER, M.D.

2    Is that correct?

3    A. I don't recall.

4    Q. Did you ever ask him, if not for the

5 actual reason why he was needing the time off,

6 why he was so insistent that he was going to have

7 to take it off notwithstanding?

8    A. No, I just said to him -- I mean I said,

9 "I hope you know what you're doing", and that was

10 the end of it.

11    Q. Do you recall him saying anything else to

12 you in the context of you saying, "I hope you

13 know what you're doing?"

14    A. He said to me:  "Well, you're making me

15 choose between my job and my family."  And I

16 said:  "I'm not making that choice"; and that

17 was the end of that conversation.

18    Q. Did you ask him what he meant by that?

19    A. I don't re -- I don't think I did.  I'm

20 not sure.

21    Q. Did you ask him what he meant by "choosing

22 between his job and his family"?  Did you

23 understand that in any particular way?

24    A. I didn't.

25    Q. Did you inquire any further what he meant

Page 361

S. PULITZER, M.D.

2 by "family" in that context?

3    A. I don't remember inquiring, but I do

4 remember that had I known or had this been

5 presented to me in the context of his child,

6 Jaden, on Tuesday or on Monday or whenever it

7 was that I would have tried to work with him to

8 accommodate him, so that did not come into my

9 purview.

10    Q. When you -- you said you came back on

11 Tuesday, the 2nd.

12    Correct?

13    A. Yes.

14    Q. Okay.  So it couldn't have happened on

15 Monday.  Did I say Monday?

16    A. Did I say Monday?

17    Q. Yes.

18    A. All right.  Tuesday.

19    Q. Okay.  Tuesday was the 2nd; Wednesday was

20 the 3rd?

21    A. Yes.

22    Q. Are you saying sitting here today that

23 he definitely did not mention Jaden or his --

24 one of his children as a reason why he needed

25 the time off?

Page 386

S. PULITZER, M.D.

1   I don't -- I don't have specific names, I did
2   not act on it. This is just information that
3   made it to me.
4       Q. So, this is kind of like those -- like
5   that majority of radiologists you testified to
6   earlier; you don't know who it was, when it
7   occurred or what was said but you still think
8   that that was how you -- that was something you
9   learned --
10          MR. COULSTON: Objection.
11  MR. NELSON:
12      Q. -- from those -- from people you can't
13  identify now.
14      Is that correct?
15          MR. COULSTON: I object.
16          I object to the form.
17      A. I don't recall specifically which person
18  told me about this, but multiple people had told
19  me, so -- and when you hear multiple things from
20  multiple people over the course of a day for
21  many days in a row, that's another way to monitor
22  him.
23      And if you asking me, you know --
24      Q. So, you heard from multiple people for

Page 387

S. PULITZER, M.D.

1   multiple days in a row that Dr. Greenberg was
2   angry and thought that somehow some retribution
3   was being taken against him.
4       A. Mm hmm.
5       Q. Is that correct?
6       A. Yes.
7       Q. But sitting here now you can't identify
8   a single one of those conversations or a single
9   one of the people who said that to you.
10      Is that correct?
11      A. I don't remember if anyone specifically,
12  no.
13      Q. Okay. So that's a yes?
14      A. That's a yes.
15      Q. Were you reporting to Dr. Reede anything
16  with regard to the monitoring you were doing on
17  Dr. Greenberg during this period?
18      A. Just the timekeeping.
19      Q. Okay. And was there any point in time
20  at which timekeeping again became an issue for
21  you?
22      A. The process of timekeeping, no.
23      Q. Well, what I'm saying is:
24      To your observation, did -- did Dr. Greenberg

Page 388

S. PULITZER, M.D.

1   continue to comply with whatever conditions you
2   understood him to be under?
3       A. For the most part, yes.
4       Q. When you say "for the most part", in what
5   part were -- was he not complying?
6       A. There may have been a couple of days of
7   fluctuation, but it wasn't anything egregious and
8   so it wasn't reported.
9       Q. Okay. I'm saying --
10      A. So --
11      Q. -- was there anything that you learned or
12  observed regarding Dr. Greenberg during your
13  monitoring that you did report to
14  Labor Relations?
15      A. Yes.
16      Q. What?
17      A. I reported that Dr. Greenberg had left
18  the building without my authority, he had
19  abandoned his station, and I referred that to
20  Labor Relations.
21      Q. And when was that?
22      A. September -- around the end of September.
23  The 23rd, 24th or something.
24      Q. Okay. And so, you reported to Labor

Page 389

S. PULITZER, M.D.

1   Relations that Dr. Greenberg had left without
2   your authorization on the 23rd, or you reported
3   on the 23rd that at some other date Dr. Greenberg
4   had left his station without your permission?
5       A. I reported on a date around the 23rd that
6   Dr. Greenberg had left the building and left his
7   station unattended without my permission sometime
8   -- the incident was the 23rd, but I reported it
9   on the 24th or the 25th.
10      Well the 25th was probably a Saturday, but
11  somewhere around there.
12      Q. So, is it correct to say that
13  Dr. Greenberg during this period was not
14  permitted to leave the building without your
15  permission?
16          MR. COULSTON: Objection.
17          Mischaracterizes his
18          testimony.
19          MR. NELSON: That's why
20          I'm asking.
21      A. Dr. Greenberg that morning was given
22  permission to be out of the hospital for two
23  hours, and that was pre-arranged prior to that
24  date. Dr. Greenberg returned after five or

**Page 390**

```
1                    S. PULITZER, M.D.
2   five and a half hours to the hospital, and then
3   within an hour or two called me to say -- ask
4   if he could leave again; and I said no because I
5   can't cover you.  I don't have anyone to cover
6   you.  And that was where I left it.
7        Q.  Okay.  And did he say why he needed to be
8   out of the building again?
9        A.  No.
10       Q.  Did you ask?
11       A.  I didn't -- I don't recall.
12       Q.  Now, you're saying that he had asked to
13  be out of the building for two hours on the
14  23rd?
15       A.  Mm hmm.
16       Q.  You recall him making a specific request
17  for -- just to be out for two hours?
18       A.  It was told to me that he needed a -- a
19  couple of hours, like 2:00 in the morning, and
20  that he would come in early, read cases, leave,
21  go do his thing and come back and be there for
22  the rest of the day, and that's it.
23       Q.  And I'm sorry, who reported that to you?
24       A.  The conversation I had with Dr. Greenberg
25  when I gave him permission to take that morning
```

**Page 391**

```
1                    S. PULITZER, M.D.
2   off.
3        Q.  Yes.  And what I'm asking is:
4            What did Dr. Greenberg ask -- ask for for
5   that morning in the way of time off?
6        A.  To me it was implied that it was about
7   two hours, a couple of hours.  I -- I don't
8   remember the exact language.
9        Q.  Did he ask for a specific amount of time
10  or just did he express a need to be out that
11  morning?
12       A.  He expressed a need to be out that
13  morning, and he gave a time frame of two hours
14  around.
15       Q.  Two hours --
16       A.  A couple --
17       Q.  -- around?
18       A.  -- of hours.  I don't know if -- you know,
19  it wasn't a normal -- it wasn't a large amount of
20  time, so --
21       Q.  Okay.  And when was it that he had asked
22  for this time off?
23       A.  I don't remember the exact day, if it was
24  -- if it was within a couple of days of when he
25  needed it.  It wasn't within weeks, but it
```

**Page 392**

```
1                    S. PULITZER, M.D.
2   wasn't --
3        Q.  Was it a verbal request, an e-mail
4   request, a written request or something else?
5        A.  I remember it verbal, but I don't remember
6   it specifically.
7        Q.  Okay.  And sitting here now, are you able
8   to say whether or not Dr. Greenberg specified
9   either a minimum or a maximum amount of time that
10  he needed off that morning?
11       A.  The implication to me was around two
12  hours.
13       Q.  Okay.  I understand the implication.  I'm
14  not sure what you mean by it, but let's --
15       A.  Dr. Greenberg --
16       Q.  I'm asking you now --
17       A.  Yeah.
18       Q.  -- about what's -- what was actually said.
19           Do you recall Dr. Greenberg specifying either
20  a -- a minimum or a maximum amount of time that
21  he needed to be out that morning?
22       A.  I remember Dr. Greenberg saying he needed
23  to be out about two hours in the morning of the
24  23rd, can I accommodate that, and I said yes.
25           Did he say, "I'm going to be out two hours
```

**Page 393**

```
1                    S. PULITZER, M.D.
2   and 15 minutes", no.
3        Q.  Did he say he needed to be out for a
4   couple of hours, did he say he needed to be out
5   for four hours, did he say he needed to be out
6   for the morning; any of those things?
7        A.  My recollection is around two hours.
8        Q.  Okay.  And sir, you approved that time.
9   Correct?
10       A.  Yes.
11       Q.  And Dr. Greenberg took that time?
12       A.  Yes.
13       Q.  And in fact, I think you said you believe
14  with he took longer than -- than the two hours
15  you had understood he was needing.
16       A.  Yes.
17       Q.  Is that correct?
18       A.  Yes.
19       Q.  And what was the reason Dr. Greenberg
20  asked for that time off?
21       A.  He had a personal issue he needed to
22  attend to.
23       Q.  What was that personal issue?
24       A.  I don't recall.
25       Q.  Do you recall him telling you and you
```

Page 402

```
 1              S. PULITZER, M.D.
 2  afternoon?
 3     A. Yes, I did.
 4     Q. And how long did he take off?  Do you
 5  know?
 6     A. Approximately two hours.
 7     Q. How --
 8     A. Somewhere around there.
 9     Q. -- do you know that?
10     A. Again, from the talk station data.
11     Q. Okay.  And the talk station data is an
12  approximation, as you've said a few times today.
13     Correct?
14     A. It's an approximation.
15     Q. So it could have been more than two hours,
16  but it also could have been less?
17     A. It could have been less, but the main
18  point is it that I had denied his leave and he
19  left without my knowing and my ER was uncovered.
20     And the person who sat there -- he did try
21  to get coverage -- couldn't read all the studies,
22  so it was not covered in a way that was safe for
23  the patients, and I am responsible for that.
24     And I mean, the main problem is not the
25  length of time that he had left the building;
```

Page 403

```
 1              S. PULITZER, M.D.
 2  it's that I didn't know that he was leaving
 3  the building and I didn't know that there was a
 4  problem.  And if something happened during that
 5  problem, that would have been a very large
 6  problem for the department.  That's the problem.
 7     Q. Sir --
 8     A. That's the issue.
 9     Q. -- in the wake of learning of these
10  conditions that had been placed on Dr. Greenberg
11  around the 8th or 9th --
12     MR. COULSTON:  Oh, Eric.
13     I'm sorry.
14     THE WITNESS:  I just
15     need -- I'm supposed to
16     pick up my kids in about
17     20 minutes.  I just need
18     to call them and tell
19     them I won't be there.
20     MR. COULSTON:  Okay.
21     So let's take a two or
22     three-minute break so
23     you can make this call.
24     MR. NELSON:  Okay.
25     Just let me get an
```

Page 404

```
 1              S. PULITZER, M.D.
 2     answer to this question.
 3     Would you re-pose it?
 4     (Whereupon, a portion
 5     of the record was read back
 6     by the court reporter.)
 7  MR. NELSON:
 8     Q. Did --
 9     MR. NELSON:  All
10     right.  You know what --
11     MR. COULSTON:  Let's
12     take a break.
13     MR. NELSON:  Let's
14     just take a break.  Let
15     just let him make the
16     call.
17     MR. COULSTON:  Okay.
18     MR. NELSON:  Okay.  Off
19     the record, please.
20     (Whereupon, an off
21     the record discussion
22     was held.)
23     (Whereupon, at 5:23
24     p.m., a brief recess was
25     taken.)
```

Page 405

```
 1              S. PULITZER, M.D.
 2     (Whereupon, at 5:32
 3     p.m., the deposition
 4     continued.)
 5  MR. NELSON:
 6     Q. Dr. Pulitzer, were there any issues of
 7  time and attendance or insubordination or other
 8  matters with respect to which you understood the
 9  conditions to have been imposed in September of
10  2014 that you haven't told me about?
11     MR. COULSTON:  I'm
12     going to object to the
13     form.
14  MR. NELSON:
15     Q. Or have you mentioned them in the course
16  of our discussion here today?
17     A. I think I've mentioned them.
18     Q. All right.
19     MR. NELSON:  May I
20     have my last question
21     before the break?  The
22     last full question and
23     answer, and then the
24     question I started but
25     didn't finish.
```

Page 410

S. PULITZER, M.D.

1
2    Q. And you don't know for how long he was
3  out of the building that afternoon.
4    Is that correct?
5    A. I know how long he was away from his
6  station, but I don't know where he was during
7  that time.
8    Q. But you -- okay. And so you don't know
9  how long he was out of the building that
10  afternoon.
11    Correct?
12    A. If you're telling me he was out of the
13  building then he was out of the building. I
14  don't know.
15    Q. Okay. And when you say you know how
16  long he was away from his station, is that
17  because of the talk station data?
18    A. I know how long he had between the
19  reports, and when somebody came to me and told
20  me that Dr. Greenberg left the building and that
21  another physician is covering for him.
22    Q. Is it because of the talk station data
23  that you say you know how long Dr. Greenberg was
24  away from his station; yes or no?
25    MR. COULSTON: Object

Page 411

S. PULITZER, M.D.

1
2    to the form.
3    A. Yes.
4    Q. Okay. Even though had he dictated a
5  report immediately upon returning, it still
6  would have taken him several minutes to do so,
7  so the time on that report would still have been
8  a few minutes after he had returned.
9    Correct?
10    A. Well, there's a way to cheat the system
11  where you pick up a case that was done hours
12  before and you sign it, and when you sign it it
13  dates back to the time that you were there. So
14  I actually don't know if -- what he did in that
15  situation.
16    Q. All right. But you testified earlier
17  that the only way to know for sure when a
18  physician enters or leaves the building is to
19  check the video.
20    A. Correct.
21    Q. Did you check the video with regard to
22  Dr. Greenberg on the afternoon -- for the
23  afternoon of the 23rd of September?
24    A. Did Dr. Greenberg deny that he was out
25  of the building?

Page 412

S. PULITZER, M.D.

1
2    MR. COULSTON: No --
3  MR. NELSON:
4    Q. Sir, I don't really want to get into a
5  debate with you. I would just want to -- I
6  appreciate you answering my question.
7    Did you check the video with respect to
8  Dr. Greenberg leaving the building on the
9  afternoon of September 23rd?
10    MR. COULSTON: Objection.
11  MR. NELSON:
12    Q. It's a yes or no.
13    MR. COULSTON: I
14    object to the form. He
15    has already testified
16    he didn't know if he
17    left the building; he
18    says he wasn't at the
19    talk station.
20    Right? That's the
21    issue.
22    MR. NELSON: Fair
23    enough.
24  MR. NELSON:
25    Q. Did you check the video with respect to

Page 413

S. PULITZER, M.D.

1
2  Dr. Greenberg for September the 23rd?
3    A. No.
4    Q. Did anyone else do so, to your knowledge?
5    A. No.
6    Q. See how easy that was?
7    MR. COULSTON: Objection.
8  MR. NELSON:
9    Q. Okay. Now sir, after Dr. -- and who was
10  it that told you that Dr. Greenberg was away that
11  afternoon, out of the building?
12    A. Dr. Hammil.
13    Q. And --
14    A. And Dr. Samin.
15    Q. Okay. And once you heard this from
16  Dr. Hammil and Dr. Samin, what did you do?
17    A. I called Dr. Samin who was covering for
18  Dr. Greenberg to see if this was true and what
19  he knew, and then I tried to find somebody who
20  could read the neuroradiology cases.
21    Q. So, Dr. Samin told you this while
22  Dr. Greenberg was still out of the building?
23    A. Yes.
24    Q. And you --
25    A. Or away from his station. I don't know

Page 418

S. PULITZER, M.D.

1      decided upon, if anything, would be done to or
2      with Dr. Greenberg as a result of that
3      interrogation?
4          MR. COULSTON:  I
5          object to the form.
6      A. I was told that there would be another
7      meeting; that you know, it was adjourned for that
8      day and that there was going to be another
9      meeting.
10     Q. Okay.  And in the course of these events
11     --
12     A. Yeah.
13     Q. -- you reporting the September 23rd
14     incident, you learning that Dr. Greenberg had
15     had an interrogation again at Labor Relations,
16     etcetera -- did you have occasion to speak with
17     Leonzo Cuiman?
18     A. I don't remember if I spoke to him
19     directly.
20     Q. Do you recall attending any meeting at
21     which he was also present in this time frame
22     regarding Dr. Greenberg?
23     A. I don't remember that.
24     Q. Do you recall any -- do you recall any

Page 419

S. PULITZER, M.D.

1      meeting with Mr. Arabian, Ms. Bernadel,
2      Mr. Cuiman or anyone else regarding Dr. Greenberg
3      in this time frame?  And I'm talking late
4      September early October of 2014.
5      A. I don't recall a meeting specifically,
6      no.
7      Q. Do you recall speaking on the phone with
8      Mr. Cuiman, Ms. Bernadel, Mr. Arabian or anyone
9      else regarding Dr. Greenberg's second
10     interrogation or anyone else during this time
11     frame?
12     A. I recall speaking with Stephanie Bernadel.
13     Q. Okay.  How many times?
14     A. At least once.  I don't know.
15     Q. And when was that?
16     A. It was around the time between the
17     interrogations.
18     Q. So, between Mr. Arabian's interrogation
19     and Ms. Bernadel's you spoke with Ms. Bernadel
20     on the phone?
21     A. It was around the time of the two in
22     October.
23     Q. Oh, the two in October.  Okay.  So between
24     those two --

Page 420

S. PULITZER, M.D.

1      A. Yeah.
2      Q. -- as you recall?
3      A. That is what I recall.
4      Q. So, after Ms. Bernadel had done the
5      interrogation of Dr. Greenberg and some
6      subsequent occasion on which there was also a
7      meeting with Dr. Greenberg you recall speaking
8      with Ms. Bernadel on the telephone.
9          Is that correct?
10     A. Yes.
11     Q. And what was said between the two of you
12     on that occasion?
13     A. Well, I don't remember the exacts of
14     what was said, but she asked -- they were trying
15     to decide of what to do in terms of an -- a
16     negotiation or bargaining or whatever they're
17     going to do with them and what do we want to do;
18     do we want to go with suspension, do we want to
19     go with termination, how far we want to take
20     this; and the decision was made to -- to go with
21     the termination.
22     Q. Okay.  So Ms. Bernadel asked you what
23     you wanted to do and you responded with
24     termination.

Page 421

S. PULITZER, M.D.

1      A. I said that, yes.
2      Q. Okay.  And was Dr. Reede part of this
3      conversation?
4      A. I don't remember this being a three-way
5      conversation, but all of this was happening
6      simultaneously.  Like it -- it wasn't one thing.
7      I don't remember it being a -- like a phone in
8      the middle of the room conversation (indicating),
9      but I just don't exactly remember it.
10     Q. Okay.  Going back to the afternoon of
11     the 23rd, did you know before Dr. Greenberg took
12     that time out of the building that afternoon why
13     he was taking that time out of the building that
14     afternoon?
15     A. No.
16     Q. Do you know why he wanted to take that
17     time that afternoon?
18     A. All I knew is that he needed the time and
19     I gave it to him.
20     Q. In the afternoon?
21     A. Oh, no, I'm sorry.  In the morning.
22     Q. No, I'm asking about the afternoon now.
23     A. No, I didn't know why he needed it.
24     Q. Did you ever ask?

Page 438

S. PULITZER, M.D.

1            S. PULITZER, M.D.
2  determine that?
3        MR. COULSTON:  This is --
4     A. No.
5     Q. Are you aware of anyone else at either
6  Downstate or Kings County Hospital --
7     A. Mm mm.
8     Q. -- who did so?
9     A. No.
10    Q. Okay.  Sir, what role did Dr. Jameladdine
11 play, if any, in the immediate -- the period of
12 days immediately preceding Dr. Greenberg's
13 termination?  Was he someone also consulted as
14 to whether or not Dr. Greenberg should be
15 terminated?
16    A. Separately by who?  Who would consult him?
17    Q. I'm asking.  Do you know whether or not
18 he was consulted?
19    A. I don't know.
20    Q. Okay.  To this day, have you had any
21 conversation with Dr. Jameladdine regarding
22 whether Dr. Greenberg should be terminated?
23    A. Yes.
24    Q. When?
25    A. Around that same time of (indicating) --

Page 439

1            S. PULITZER, M.D.
2  between the two.  In October between the two
3  things when I was asked.
4     Q. Okay.  So, between the interrogation and
5  the final meeting you had a conversation with
6  Dr. Jameladdine?
7     A. Yes.
8     Q. Okay.  And what was the substance of
9  your conversation with Dr. Jameladdine?
10    First:  Was it by phone or face-to-face?
11    A. Face-to-face.
12    Q. And what was it that you said to
13 Dr. Jameladdine and he said to you during that
14 conversation?
15    A. What I remember from that conversation
16 was giving him an update on the -- what I knew
17 of the case and saying that the question was
18 asked whether we wanted to go for termination --
19 if we wanted to go as far as termination or --
20 or a suspension, and that my recommendation would
21 be for termination.  And he said:  "Okay, I
22 agree."
23    Q. He said:  "Okay, I agree?"
24    A. Yes.
25    Q. What else did he say?

Page 440

1            S. PULITZER, M.D.
2     A. That's all I remember.
3     Q. Did he tell you before you told him that
4  you were in favor of termination that he was in
5  favor of termination?
6        MS. BLOCKER:  Objection.
7        You can answer it.
8        THE WITNESS:  Oh.
9     A. Not that I'm aware of.
10    Q. Sir, did you prepare or propose or
11 submit to Labor Relations during this period of
12 September, October 2014 a policy or a proposed
13 policy for physician work hours?
14    A. Yes.
15    Q. Why?
16    A. That was actually in the works before
17 this happened, but in light of the events that
18 were happening as well when I took over I was
19 told by my administration at my hospital that
20 there were a few things that I needed to
21 correct.
22    What I needed to correct was that there
23 were many, many, many unread cases that were
24 unacceptable, there were many physicians with
25 time and attendance issues and unruly -- you

Page 441

1            S. PULITZER, M.D.
2  know, not unruly but unscheduled absences, there
3  were too many, and that I -- I needed -- in
4  order to not end up like my boss who I had just
5  seen terminated -- correct these things.
6     So, when I took over the first thing I did
7  was have a zero backlog policy and try and make
8  sure that we covered our stuff; and the second
9  thing that I worked on was time and attendance,
10 and it happened to coincide with the events that
11 were happening here.
12    Q. Well, when you proposed the policy you did
13 so in writing.
14    Correct?
15    A. I would -- I proposed it for approval from
16 Labor Relations.
17    Q. Okay.  In writing.  You submitted
18 something to them in writing.
19    A. Mm hmm.
20    Q. And when you did that, was that because
21 there was no existing written policy for work
22 hours for physicians at that time?
23    A. There was a policy from SUNY, from the
24 SUNY -- from Dr. Reede's office which I had
25 mentioned earlier; 8:00 to 4:00 and 9:00 to