UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

ODED GREENBERG, M.D.

15 Civ. 2343 (PKC)(VMS)

                Plaintiff,

    -against-

STATE UNIVERSITY HOSPITAL – DOWNSTATE     ECF Case
MEDICAL CENTER et al.,

                Defendants.

-------------------------------------------------------------------X

## PLAINTIFF ODED GREENBERG'S MEMORANDUM
## IN OPPOSITION TO HEALTH + HOSPITALS DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Chad L. Edgar
Dawn M. Cardi
CARDI & EDGAR LLP
99 Madison Avenue, 8th Floor
New York, NY 10016
(212) 481-7770 (tel.)
cedgar@cardiedgarlaw.com
dcardi@cardiedgarlaw.com
*Attorneys for all defendants*

# TABLE OF CONTENTS

**Page**

Table of Authorities ............................................................................................................ii

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF FACTS ....................................................................................................2

ARGUMENT............................................................................................................................2

    I.       The Admissible Evidence Establishes That HHC and KCHC
            Were Dr. Greenberg's Joint Employer
            Under Title VII, The NYSHRL & NYCHRL ........................................................3

    II.     Dr. Greenberg Has Established A <u>Prima</u> <u>Facie</u> Case of Discrimination
            And There Are Disputed Material Facts Regarding These Claims
            With Respect to His Probation and His Unwarranted Termination
            As To The HHC Defendants ....................................................................................7

             A.      Dr. Reede and Dr. Pulitzer's Discriminatory Decision
                        To Refer Dr. Greenberg to Labor Relations Resulting
                        In His Probation ..........................................................................8

             B.      Dr. Reede and Dr. Pulitzer's Termination of Dr. Greenberg ........13

    III.    Dr. Greenberg Has Established That KCHC
            Was A Joint Employer With SUNY Downstate Under the FMLA .....................15

    IV.    Dr. Greenberg Has Established A <u>Prima</u> <u>Facie</u> Case
            Of Interference With His FMLA Rights And
            There Are Disputes of Material Fact That Require
            The Claim To Be Resolved At Trial ....................................................................16

    V.      Dr. Greenberg Has Established A <u>Prima</u> <u>Facie</u> Case of Retaliation
            For Invoking His FMLA Rights And
            There Are Disputes of Material Fact That Require
            The Claim To Be Resolved At Trial ....................................................................20

Conclusion ............................................................................................................................22

# TABLE OF AUTHORITIES

**Cases**          **Pages**

Barbosa v. Continuum Health Partners, Inc., 716 F. Supp. 2d 210
(S.D.N.Y. 2010) ...................................................................................7 n.3

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) .............................................2

Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29 (2d Cir. 1994) ..................2

Coutard v. Municipal Credit Union, 848 F.3d 102 (2d Cir. 2017) .........19, 20

Edusei v. Adventist Healthcare, Inc., 13 Civ. 157, 2014 WL 3345051
(D. MD. July 7, 2014) ..................................................................20, 21

Forsythe v. New York City Dept. of Citywide Administrative Services,
733 F. Supp. 2d 392, 397 (S.D.N.Y. 2010) ......................... 3, 4, 5 n.2

Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219
(2d Cir. 1994) ...........................................................................................2

Gonzalez v. City of New York, 15 Civ. 3158, 2015 WL 9450599
(E.D.N.Y. Dec. 22, 2015) ......................................................................7

Graziadio v. Culinary Institute of America, 817 F.3d 415 (2016) ....................16, 21 n.9

Khan v. Hilton Hotels, Inc., 13 Civ. 1919, 2015 WL 10851362,
(S.D.N.Y. Aug. 3, 2015) ........................................................................7

Li-Wei Kao v. Erie Community College, 11 Civ. 4158, 2015 WL 3823719
(W.D.N.Y. June 19, 2015) ............................................................. 7 n.3

Lima v. Addeco, 634 F. Supp. 2d 394, 400 (S.D.N.Y. 2009) ..........................3

Pineda v. Byrne Dairy, Inc., 212 F. Supp. 3d 467 (2016) ..............................7

Popat v. Levy, 253 F. Supp. 3d 527 (W.D.N.Y. 2017) .............................5, 6

Rengan v. FX Direct Dealer, LLC, 15 Civ. 4137, 2017 WL 3382074
(S.D.N.Y. August 4, 2017) ....................................................................2

Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597 (2d Cir. 2006) ...............3

Schwapp v. Town of Avon, 118 F.3d 106 (2d Cir. 1997) ...............................3

**Cases**                                                                                                    **Pages**

Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87
    (2d Cir. 2001) .................................................................................................................8

Stroder v. United Parcel Service, Inc., 750 F. Supp. 2d 582
    (M.D. N.C. 2010) ...........................................................................................................17

Vasquez v. Empress Ambulance Service, Inc., 835 F.3d 267
    (2d Cir. 2016) ......................................................................................................12, 13 n.5

Woods v. START Treatment & Recovery Centers, Inc., 864 F.3d 158
    (2d Cir. 2017) ....................................................................................................20 n.8, 21

**Federal Regulations**

29 C.F.R.
    § 825.104............................................................................................................................16
    § 825.106............................................................................................................................15
    § 825.110............................................................................................................................16
    § 825.124............................................................................................................................18

Plaintiff Oded Greenberg, M.D. ("Plaintiff" or "Dr. Greenberg") submits this memorandum of law in opposition to the motion for summary judgment to dismiss all claims in the complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure brought by defendants New York City Health and Hospitals Corporation ("HHC") and Kings County Hospital Center ("KCHC") (collectively, "the HHC Defendants"). In conjunction with this memorandum, Dr. Greenberg submits Plaintiff's Response to Defendants' Rule 56.1 Statement in Support of Their Motion for Summary Judgment and Plaintiff's 56.1 Statement of Additional Material Facts in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's 56.1 Statement"). Dr. Greenberg further submits the declaration of Chad L. Edgar dated July 6, 2018 (Edgar Decl.); the declaration of Esther Neiman dated June 27, 2018 (Neiman Decl.); and the declaration of Oded Greenberg, M.D. dated July 6, 2018 (Greenberg Decl.).[1]

## PRELIMINARY STATEMENT

The HHC Defendants hope to hide behind the affiliation agreement that governed a peculiar staffing arrangement between themselves and the State University of New York Downstate Medical Center ("SUNY") whereby the latter provided radiologists to the former who would be located at KCHC. As the affiliation agreement would have it, the radiologists would remain SUNY employees while being subject both to the rules and regulations of KCHC and its supervisors. In what follows we show how the record does not support the contention of the HHC Defendants that they were not the employers of the SUNY radiologists.

In this case, one of the SUNY radiologists covered by the affiliation agreement, Dr. Greenberg, brings discrimination and FMLA claims against not only SUNY but the HHC Defendants under the theory that these two entities were his joint employers. Under a joint

---

[1] All exhibits referenced in this submission are annexed to the Edgar Decl.

employer theory working in tandem with the fact that one of Dr. Greenberg's discriminators, individual defendant Steven Pulitzer, occupied a position within the KCHC organization, i.e., Chief of Service, Department of Radiology, the HHC Defendants cannot escape liability for the violative acts of one employee against another. Thus, the HHC Defendants' motion, predicated as it is that they were not the employers of Dr. Greenberg, must be denied in its entirety.

## STATEMENT OF FACTS

As with the HHC Defendants' memorandum of law in support of summary judgment, we refer the Court to Plaintiff's Rule 56.1 Statement of Additional Material Facts In Opposition to Defendants' Motion for Summary Judgment for a statement of relevant and material facts.

## ARGUMENT

This Court's task on summary judgment motion is simply to discern whether there are any genuine issues of material fact to be tried and not to decide them. Rengan v. FX Direct Dealer, LLC, 2017 WL 3382074, 15 Civ. 4137 (S.D.N.Y. August 4, 2017). The moving party bears the burden of informing the court as to the basis of the motion and identifying the matter that it believes demonstrates an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Court must resolve all ambiguities and draw all reasonable inferences against the moving party. Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party. Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).

It is well settled that district courts must exercise "an extra measure of caution" in determining whether to grant summary judgment to an employer in a discrimination case

"because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006); see also Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997).

**I.     The Admissible Evidence Establishes That HHC and KCHC**
**Were Dr. Greenberg's Joint Employer**
**Under Title VII, The NYSHRL & NYCHRL**

There are situations where multiple employers may be liable to an employee for a violation of Title VII. One of those situations occurs where two employers choose "to handle certain aspects of their employer-employee relationships jointly." Forsythe v. New York City Dept. of Citywide Administrative Services, 733 F. Supp. 2d 392, 397 (S.D.N.Y. 2010) (quoting Lima v. Addeco, 634 F. Supp. 2d 394, 400 (S.D.N.Y. 2009)). The so-called joint employer theory of liability is predicated on two employers have "'commonality of hiring, firing, discipline, pay, insurance, records and supervision.'" Id. Forsythe is particularly instructive as the facts there mirror the facts here. Like Dr. Greenberg, the plaintiff in Forsythe had a direct employer, Tristar, that processed his paychecks and provided him with benefits. Tristar, like SUNY, had an agreement with another party (New York City) to provide security guards at the sites controlled by the other party (the City) through a contract. Such an arrangement parallels SUNY's affiliation agreement with HHC whereby SUNY provided radiologists who practiced at KCHC. The plaintiff in Forsythe was subject to a collective bargaining agreement between his union and Tristar, which was the exact same arrangement here where Dr. Greenberg was subject to a collective bargaining agreement between his union and SUNY. What was crucial for the court in Forsythe to render the City liable as a joint employer was that it retained the right to reject and bar from its facility any employee hired by Tristar. See id. at 398.

3

Notably, according to the affiliation agreement between SUNY and HHC, HHC could request that a radiologist not practice at its facility. Memorandum of Law In Support Of Health + Hospitals Defendants' Motion For Summary Judgment ("Defendants' Memo") at 7. In doing so, HHC had to justify its reasons for making that request in writing and give SUNY a chance to cure the issue giving rise to the request. Id. at 8. The corollary to the provisions cited by the HHC Defendants is that under the affiliation agreement HHC had the power to remove a SUNY employee from its facility, if it reduced to writing the facts supporting its request and gave SUNY the opportunity to cure. If the cure was not forthcoming, then HHC could remove that SUNY employee. Ex. 60 (HHC 0172) ("Such Provider [here, radiologist] shall not, at the Corporation's [here, KCHC's] election and following a reasonable opportunity to cure if the issue does not involve a threat to Patient health or safety, thereafter provide Contract Services...").

In Forsythe, joint employer status is found there **because** the City was able to exert control over its premises by deciding not to allow Tristar's employee to work at its site. Here, HHC had exactly the same power, as long as it followed protocol as provided for in the affiliation agreement.

Of course, how these provisions worked in actual fact demonstrate that HHC and KCHC had unchecked power to prohibit a SUNY employee from practicing at KCHC. At her deposition, Dr. Reede testified that in or around the spring of 2014 Dr. Jamaleddine, the Chief Medical Officer of KCHC, requested that she replace Dr. Alan Kantor, the Chief of Service of the Radiology Department at KCHC, because he viewed the department as in need of new leadership. Ex. 10 (Reede Dep.) at 30-33. When pressed as to whether Dr. Jamaleddine's request was, in fact, a requirement she basically said yes. Id. In addition, at Dr. Pulitzer's

deposition when he was questioned about his ongoing discussions with Dr. Jamaleddine about the attestations that Dr. Greenberg affixed to patient studies, he stated that Dr. Jamaleddine made it clear to him that he would not let Dr. Greenberg return to practice at KCHC. Ex. 38 (Pulitzer (2d) Dep.) at 42-43. Dr. Pulitzer testified further on the issue by stating his belief that Dr. Jamaleddine had the power and discretion to override SUNY's decision to allow Dr. Greenberg back to work at KCHC, if that was its decision, by not allowing him to practice there. Id.

Under these circumstances, where KCHC through Dr. Jamaleddine had de facto control over whether SUNY Downstate radiologists could continue to provide services at KCHC there is clearly a dispute of material fact, following Forsythe, as to whether the HHC Defendants were joint employers of Dr. Greenberg under Title VII.[2]

District courts continue to struggle as to what standard to use in finding indirect (i.e., "single" or "joint") employer liability under the NYSHRL. See Popat v. Levy, 253 F. Supp. 3d 527 (W.D.N.Y. 2017). As Defendants note, the Second Circuit recently certified to the New York State Court of Appeals the question as to whether the joint employer and/or single employer doctrines should be used in the context of holding a so-called indirect employer liable for discriminating against the plaintiff due to his criminal history. Defendants' Memo at 6-7. The New York State Court of Appeals answered that under this particular provision of the

---

[2]There is a key difference between the facts in Forsythe and here that make the case for joint employer status even more compelling in this case. In Forsythe, Tristar had an on-site supervisor at the City premises who monitored the daily activities of the plaintiff. The interactions between plaintiff and City representatives were few and far between. Here, Dr. Greenberg's immediate supervisor who monitored his daily activities was Dr. Pulitzer who was an employee of SUNY Downstate but also a representative and agent of the HHC Defendants in that he was Interim Chief of Service, Department of Radiology, Kings County Hospital Center. By his own admission, Dr. Pulitzer reported to Dr. Jamaleddine. Ex. 38 at 13-15. That became abundantly apparent when he was investigating the issue with the attestations: he felt that he had to provide frequent updates to Dr. Jamaleddine as to his findings and action plan. Further and notably, when Dr. Pulitzer wrote memos to personnel files regarding Dr. Greenberg and memos to SUNY Downstate's Labor Relations department he did so on KCHC letterhead. See, e.g., Ex. 25. Given the fact that Dr. Greenberg was under the daily supervision of a KCHC representative and disciplinary memos of his conduct were authored and kept by that representative there can be no dispute that here, there is a material factual dispute regarding the HHC Defendants' joint employer status as to Dr. Greenberg under Title VII.

NYSHRL the standard to be used was a four-factor test adopted by an earlier appellate court, which was comprised of the following questions to ask of the putative employer: (1) did it select and engage the "employee"? (2) did it pay the "employee"? (3) did it have the power to dismiss the "employee"? and (4) did it have the power to control the "employee's" conduct? Popat, 253 F. Supp. 3d at 542-43. Notably, the New York State Court of Appeals held that the fourth factor was the most important. Id.

Here, in adopting the four-factor test, KCHC and therefore HHC clearly qualifies as Dr. Greenberg's employer. As indicated above, HHC acting through KCHC had the ability to prevent Dr. Greenberg from practicing at its facility both according to the terms of the affiliation agreement and in actual fact. While this power did not extend to being able to terminate Dr. Greenberg from his employment as a SUNY employee, i.e., SUNY could transfer Dr. Greenberg to another facility, nonetheless, HHC could dismiss Dr. Greenberg from its premises at KCHC. In addition, Dr. Pulitzer, as Interim Chief of Service, Department of Radiology, Kings County Hospital Center, was a representative of KCHC and acting on its behalf when: (1) he made, oversaw and adjusted the work schedule of radiologists in the department; (2) he monitored the time, attendance and misconduct of radiologists and reported same in a memo using KCHC letterhead to a personnel file that he kept or that he sent to Labor Relations when referring a radiologist there; and (3) when he provided routine updates to the Chief Medical Officer regarding his department. In light of the fact that two of the four factors required to show that a putative employer was an actual employer are satisfied here, including the most important factor of control, it is a disputed material fact that must be decided by a jury as to whether the HHC Defendants were joint employers of Dr. Greenberg under the NYSHRL.

District courts appear to view the standard for analyzing whether a putative employer is a joint employer under the NYCHRL to be the same as that used under the NYSHRL. See, e.g., Gonzalez v. City of New York, 15 Civ. 3158, 2015 WL 9450599 at *3 (E.D.N.Y. Dec. 22, 2015). Therefore, under the NYCHRL, Dr. Greenberg can show that there is a material factual dispute as to whether the HHC Defendants were his joint employers.[3]

## II. Dr. Greenberg Has Established A Prima Facie Case of Discrimination And There Are Disputed Material Facts Regarding These Claims With Respect To His Probation And His Unwarranted Termination As To The HHC Defendants

It is well-settled that plaintiff's burden at the prima facie stage in a discrimination action is minimal for the purpose of deciding a summary judgment motion. Pineda v. Byrne Dairy, Inc., 212 F. Supp. 3d 467 (2016); see also Khan v. Hilton Hotels, Inc., 13 Civ. 1919, 2015 WL 10851362, at * (S.D.N.Y. Aug. 3, 2015) ("Plaintiff's burden at this stage is 'not a heavy one'"). With respect to the first three elements of the prima facie case of discrimination, there appears to be no dispute.[4] Dr. Greenberg is in two protected classes or categories under all of the relevant discrimination statutes as a Jew who was over forty years old during the relevant period. Greenberg Decl., ¶ 1. He was also Caucasian while the primary decision-maker driving the decisions to place him on probation and terminate his employment was African-American. See

---

[3] We note that the HHC Defendants omit from their discussion of joint employer status the § 1981 and § 1983 claims (9th to 12th Causes of Action). Since they have the burden to "inform" the court as to the basis of the motion and identify[] the matter that it believes demonstrates an absence of a genuine issue of material fact" and they fail to discuss joint employer status in the context of the § 1981 and § 1983 claims, these claims survive HHC Defendants' argument about lack of joint employer status. In any event, district courts have held that the joint employer doctrine is applicable to § 1981 claims. See, e.g., Li-Wei Kao v. Erie Community College, 11 Civ. 4158, 2015 WL 3823719, at *8 (W.D.N.Y. June 19, 2015) (citing Barbosa v. Continuum Health Partners, Inc., 716 F. Supp. 2d 210, 216-17 (S.D.N.Y. 2010)

[4] In Point IV of their brief, the HHC Defendants appear to attack only the Title VII claims on the ground that Dr. Greenberg cannot show that any discriminatory conduct was either enacted or known to KCHC employees. Towards the end of Point IV, the argument turns to the contention that Dr. Greenberg cannot show that the stated reasons for his termination were pretextual. Then, at the end of the section, the HHC Defendants call for the dismissal of all discrimination claims. Out of an abundance of caution, Dr. Greenberg presents evidence that shows that he can establish a prima facie case for the purposes of all the statutory discrimination claims, the pretextual nature of the stated reasons for the adverse employment actions at issue and circumstances that require a jury to decide whether discriminatory animus was a factor in his probation and termination.

id.; Reede Decl., ¶ 2. With respect to the second element, again, there appears to be no dispute that he was a qualified radiologist, as his direct supervisor, Dr. Pulitzer, stated that he believed Dr. Greenberg was one of the best radiologists that ever practiced at KCHC and all of his colleagues looked up to him. Edgar Decl., Ex. 5 (Pulitzer Dep.) at 426-27. Dr. Greenberg experienced two different adverse employment actions implicating the HHC Defendants. First, after he took a leave of absence of two days to attend to his special-needs son, Dr. Greenberg was presented with a settlement agreement that stripped him of his job security by placing him on probation and rendered him subject to immediate and unappealable termination if he incurred the slightest infraction thereafter. Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 95 (2d Cir. 2001) (finding that plaintiff's probation was an adverse employment action). Second, Dr. Greenberg was terminated, an obvious adverse employment action.

### A. Dr. Reede and Dr. Pulitzer's Discriminatory Decision To Refer Dr. Greenberg To Labor Relations Resulting In His Probation

If Dr. Greenberg's testimony is to be believed, and it must be for the purpose of this motion, he repeatedly told Dr. Pulitzer that he needed two days off in early September in order to assist in the making of arrangements related to the unexpected transfer of his special-needs son from one school to another and to provide care to him as he was feeling anxious and depressed about the transition. In violation of the obligations of the Family Medical Leave Act, Dr. Pulitzer did not inquire further to see if the leave that Dr. Greenberg sought fell within the Act's protections. Dr. Pulitzer admitted at his deposition that he turned to Dr. Reede for guidance as to how to proceed when Dr. Greenberg stated that he intended to take the leave despite Dr. Pulitzer's refusal to grant the request.

Notably, at this point in time, commencing in or around late June of 2014, Dr. Pulitzer was wearing two hats: on the one hand, he continued to be a state employee as a professor at SUNY and an affiliated provider located at KCHC and on the other hand he was a representative of KCHC as its Interim Chief of Service, Department of Radiology, Kings County Hospital Center. Thus, with respect to the second hat that he wore as Chief of Service, Dr. Pulitzer's actions were imputable to KCHC, which would then be imputable to the HHC Defendants. Significantly, Dr. Pulitzer admitted at his deposition that as Chief of Service he viewed it as part of his job responsibility routinely to report to KCHC's Chief Medical Officer to provide updates as to the Radiology Department. Although the HHC Defendants argue that they are not liable for actions about which they were ignorant, i.e., Dr. Jamaleddine was without knowledge as to how Dr. Reede and Dr. Pulitzer were treating Dr. Greenberg before and up to the moment when they sent him to Labor Relations, they argue in vain. See Defendants' Memo at 18. The HHC Defendants are liable for the conduct of all of their supervisors, including Dr. Pulitzer.

According to Dr. Pulitzer, when he sought Dr. Reede's advice about Dr. Greenberg's insistence that he was going to take his FMLA leave whether Dr. Pulitzer authorized it or not, she told him to deny Dr. Greenberg's request in writing, require him to come to work and threaten to refer him to Labor Relations if he did not. Apparently, all of the actions that Dr. Pulitzer took that led to Dr. Greenberg's interrogation at Labor Relations and the execution of a settlement agreement that stripped him of his job security was at the instigation of Dr. Reede.

The denial of Dr. Greenberg's rights under the FMLA is evidence of his mistreatment by Dr. Reede, which mistreatment was aided and abetted by Dr. Pulitzer. Dr. Reede's mistreatment can only be explained by resort to discrimination. There can be no other reason why a sophisticated administrator such as Dr. Reede who was aware, by her own admission, of the

9

contours of FMLA would fail to do her duty with respect to it when it came to Dr. Greenberg's request.

But what further imbues her conduct and that of her aider and abettor Dr. Pulitzer with an aura of improper motive is their resort to falsehoods and fabrications in the package of misconduct that Dr. Pulitzer sent to Labor Relations for Dr. Greenberg's interrogation and the memo to the file that he wrote to justify their joint determination to refer him to Labor Relations.

For Labor Relations, Dr. Pulitzer authored a memo in which he gave background information as to Dr. Greenberg's previous unruly conduct. Ex. 25 (HHC 1135-36). In the memo, Dr. Pulitzer suggested that Dr. Greenberg was somehow being disruptive by appearing at the hospital and working when he should have been on vacation during the last week of August; he also noted that Dr. Greenberg never discussed this schedule change with him. See id. In actual fact, Dr. Greenberg wrote Dr. Pulitzer an email on August 25, 2014 informing him that he would be attending an inter-departmental meeting the next day. Ex. 3 (HHC_ESI_001006). So Dr. Pulitzer's contention that Dr. Greenberg never told him about his intent to come in the last week of August is inaccurate at best and a lie at worst. Also, on August 26, 2014, an official revised work schedule that included Dr. Greenberg was circulated within the department, which undermines Dr. Pulitzer's narrative that Dr. Greenberg was somehow going rogue this week. Ex. 19 (HHC_ESI_001044-46). Dr. Greenberg further testifies, that Dr. Hammil, the radiologist supervising the department the week at issue, appeared appreciative that he was willing to work on his scheduled vacation; he never complained to Dr. Greenberg that he was being disruptive. Greenberg Decl., ¶ 8. In light of these facts, Dr. Pulitzer's misleading, if not false, memo to Labor Relations, presumably following the advice of Dr. Reede, was intended by both of them to

10

place Dr. Greenberg in the worst possible light, as Labor Relations turned to his refusal to come to work for two days.

In addition to the memo to Labor Relations, on September 5, 2014, Dr. Pulitzer papered Dr. Greenberg's personnel file with a "predated" memo characterizing a discussion that he had with Dr. Greenberg about his work schedule as something akin to a "counseling." See Plaintiff's 56.1 Statement, ¶ 21. Dr. Pulitzer's later recantation of this memo at his deposition by characterizing their August 22, 2014 meeting as friendly and meant to be accommodating to Dr. Greenberg's circumstances and Dr. Greenberg's account of this discussion that Dr. Pulitzer related to him in a "Don't shoot the messenger" kind of way that Dr. Reede was out to get him raise the strong inference that Dr. Pulitzer was following marching orders from Dr. Reede to single out Dr. Greenberg for illicit mistreatment.

The disturbing culmination of Dr. Reede's and Dr. Pulitzer's illicit campaign against Dr. Greenberg was their callous disregard of his attempt one last time on September 15, 2014 to clarify the reasons why he sought leave and insisted upon it: he had "important family issues." Ex. 36 (HHC 1529). Rather than seizing this opportunity to inquire as to what Dr. Greenberg meant exactly by his "important family issues," Dr. Pulitzer responded to it by placing it in Dr. Greenberg's personnel file as if it was another instance of misconduct and Dr. Reede wrote: "Dr. Greenberg is trying to cover his tracts [sic]." Ex. 37 (HHC_ESI_001274). Dr. Reede viewed the campaign against Dr. Greenberg as a game of chess in which she was winning.

Notably, Mr. Arabian, who was the Labor Relations representative who interrogated Dr. Greenberg and presented him with the Settlement Agreement that he signed and which stripped Dr. Greenberg of his job security, testified that it was his practice to confer with department heads supervising the employee sent to Labor Relations as to the terms of any settlement. Ex. 27

(Arabian Dep.) at 224-25. Here, that means that Mr. Arabian or one of his supervisors signing off on the Settlement Agreement likely conferred with Dr. Reede and Dr. Pulitzer about its terms, which included placing Dr. Greenberg on probation. Thus, they are both implicated as decision-makers in the adverse employment action of probation.

As noted in the declaration of Ms. Neiman, Dr. Reede made statements that evinced anti-Semitic animus. Also, in the context of a discussion that she had with Dr. Greenberg about his desire to be promoted to Director of ER Radiology in July of 2014, she told him that a younger candidate, who ended up getting the position, was better suited for the job because she was closer to her residency and therefore would be a better mentor to the younger residents. See Greenberg Decl., ¶ 6. Dr. Greenberg reasonably interpreted this statement to mean that he was too old for the job. Therefore, there is admissible evidence that during the relevant period Dr. Reede discriminated on the basis of age in a previous employment decision with respect to Dr. Greenberg and she evinced a predisposition to discriminate on the basis of religion and race.

Thus, in addition to the falsehoods that informed Dr. Pulitzer and Dr. Reede's conduct in sending Dr. Greenberg to Labor Relations, there is the fact that the primary driver of that conduct can be fairly characterized in light of the evidence as a discriminator. Further, Dr. Pulitzer, as the "official" supervisor whose letterhead was used to send Dr. Greenberg to Labor Relations, i.e., KCHC letterhead, allowed Dr. Reede to drive his decision. Under a cat's paw theory of liability under Title VII, which theory the Second Circuit has recently adopted in the retaliation context, Dr. Pulitzer as representative and supervisor of the HHC Defendants renders his employers liable for Dr. Reede's discriminatory acts, if he was negligent in adopting them. Vasquez v. Empress Ambulance Service, Inc., 835 F.3d 267, 274 (2d Cir. 2016). Thus, the related questions as to whether Dr. Greenberg was placed on probation due to discriminatory

animus based on race, religion and/or age and whether Dr. Pulitzer negligently allowed such to happen must be for the jury to decide.[5]

## B.     Dr. Reede and Dr. Pulitzer's Termination of Dr. Greenberg

On September 22, 2014, Dr. Greenberg affixed to studies of patient films unapproved attestations that Dr. Pulitzer viewed as sarcastic. For Pulitzer, Dr. Greenberg's action with respect to these attestations suggested a colleague who was careening out of control in his reckless departure from any concern about the hospital's reputation and exposure to liability. Edgar Decl., Ex. 5 (Pulitzer Dep.) at 115 ("that something had changed in him"). From Dr. Greenberg's perspective, Dr. Pulitzer's reaction was unwarranted and therefore suspicious. First, the studies upon which Dr. Greenberg affixed the attestations were stale: they were months old, had already been acted on by clinicians in terms of treatment, had been submitted in conjunction with reimbursement from insurers and rejected for lack of an attestation. Greenberg Decl., ¶ 11. Second, the only way that the attestations could possibly expose the hospital to liability would be if someone along the chain of clinicians treating a patient associated with the study committed malpractice and presumably the liability would arise from that malpractice and not Dr. Greenberg's attestation on the chart. Third, Dr. Pulitzer always drove home the point at departmental meetings that the attestation was significant in its role in guaranteeing reimbursement, i.e., the department being paid and thereby showing the hospital that it was a strong revenue stream. See, e.g., Edgar Decl., Ex. 42 (HHC 1335 & 1367). Dr. Pulitzer never gave the attestation the aura of importance with which he invested it after the episode with Dr. Greenberg.

---

[5]Because New York State and City discrimination claims, along with the § 1981 and § 1983 claims, follow Title VII jurisprudence, we view Vasquez as applicable to all of Dr. Greenberg's discrimination claims.

What is most suspicious about Dr. Pulitzer's conduct in relation to Dr. Greenberg after the time in which he was placed on probation was the manner in which he surreptitiously kept close tabs on Dr. Greenberg but yet never approached him with his concerns about his out-of-control behavior. See Plaintiff's 56.1 Statement, ¶¶ 27-28 (the close monitoring of Dr. Greenberg by both Dr. Reede and Dr. Pulitzer after implementation of probation). It is especially strange in that Dr. Pulitzer and Dr. Greenberg had been colleagues and friends for many years and had discussions that ranged from professional matters to personal matters such as each other's family life. Greenberg Decl., ¶ 13. He never discussed with Dr. Greenberg the attestations that caused him to have to run from consultation after consultation as to what he should do. Id. Also, when he sent Dr. Greenberg to Labor Relations for the attestation issue when it was combined with his belief that Dr. Greenberg had left his work post without permission, he never confronted Dr. Greenberg about this alleged unauthorized departure. Id. It is as if Dr. Pulitzer had become his earlier characterization of Dr. Reede: a cop waiting for Dr. Greenberg to screw up in order to get rid of him rather than a good manager who engages an employee who seems to be in distress to see whether the situation could be remedied. In the end, Dr. Pulitzer's behavior, guided by Dr. Reede, gives rise to the inference that any reasonable juror might have that Dr. Reede was determined to get rid of Dr. Greenberg and Dr. Pulitzer was negligent in allowing her discriminatory animus to run its full course to termination.[6]

---

[6] HHC Defendants may argue that Dr. Pulitzer is White, Jewish and of an age similar to Dr. Greenberg's so it is unlikely that he would be motivated by animus towards these categories. To this argument, we merely refer to the fact established by the evidence that he handed over the reins in terms of employment decisions regarding Dr. Greenberg to Dr. Reede. Ex. 5 at 356. & 364. As he admitted at his deposition, he was a very new administrator when the relevant conduct occurred and therefore looked to Dr. Reede for guidance. Id. at 364. If the Court were to disagree with our analysis that Dr. Pulitzer was acting on behalf of the HHC Defendants when he negligently allowed Dr. Reede to implement her discriminatory campaign, then HHD Defendants still do not escape liability because then the cat's paw theory of liability would be extended to Dr. Jamaleddine's negligent supervision of Dr. Pulitzer. Under this theory, it should be noted that: (1) Dr. Pulitzer testified that he was required to report to Dr. Jamaleddine as to all material personnel issues in the department; Plaintiff's 56.1 Statement, ¶ 5; (2) that he told Dr. Jamaleddine about the circumstances of Dr. Greenberg's "unauthorized" leave on September 4 and 5, 2014, albeit

14

**III.    Dr. Greenberg Has Established That KCHC
         Was A Joint Employer With SUNY Downstate Under the FMLA**

The FMLA's regulations provide guidance, albeit of limited value, as to whether two

employers are joint employers. See 29 C.F.R. § 825.106.  Notably, the regulations provide in

pertinent part: "joint employment will ordinarily be found to exist when a temporary placement

agency supplies employees to a second employer." § 825.106(b)(1).  The affiliation agreement

between SUNY and KCHC by which the former provides radiologists to the latter, subject to the

terms and conditions that KCHC establishes at its facility, is closely analogous to the relationship

between a temporary placement agency and its client-employers.  Alternatively, the regulations

provide the following admonition: "A determination of whether or not a joint employment

relationship exists is not determined by the application of any single criterion, but rather the

entire relationship to be viewed in its totality."  Id.  The four-factor test that district courts use in

the context of discerning whether a joint employer relationship exists in the context of Title VII

claims is arguably an attempt to assess the relationship "in its totality."  As discussed above,

under this test, KCHC is clearly a joint employer with SUNY Downstate.

The HHC Defendants argue that even if KCHC and/or HHC is found to be a joint

employer under the FMLA, they nonetheless are immunized from liability from Dr. Greenberg's

claims because of their status as a secondary employer.  See Defendants' Memo at 15-16.  HHC

Defendants nonetheless concede, as they must, that the regulations required that they, as

secondary employers, comply with the prohibited acts provision of the FMLA, including the

prohibitions against interfering with Dr. Greenberg's exercise of his rights under the FMLA and

terminating his employment related to any such exercise. § 825.106(e).

---

after the fact; Id., ¶ 29; and (3) Dr. Jamaleddine was very involved in the decision-making regarding Dr.
Greenberg's termination. Id., ¶ 35.

HHC Defendants' theory of defense is predicated on the erroneously assumed fact that Dr. Pulitzer was solely operating as a SUNY Downstate employer and representative. Thus, to the extent that he interfered with Dr. Greenberg's FMLA rights it would create liability only for SUNY Downstate and himself and not KCHC. Defendants are incorrect, however, in assuming that Dr. Pulitzer was not an employee and/or agent of KCHC. He clearly was and assuming that fact to be true, or at least a fact in dispute, then the FMLA claims cannot be dismissed as against the HHC Defendants.

IV.   **Dr. Greenberg Has Established A <u>Prima Facie</u> Case**
      **Of Interference With His FMLA Rights And**
      **There Are Disputes of Material Fact That Require**
      **<u>The Claim To Be Resolved At Trial</u>**

In order to establish a prima facie case of interference with FMLA rights, Dr. Greenberg must show: (1) that he was an eligible employee under the FMLA; (2) that Defendants were employers as defined by the FMLA; (3) that he was entitled to take leave under the FMLA; (4) that he gave notice to the Defendants of his intention to take leave; and (5) that he was denied benefits to which he was entitled under the FMLA. <u>See</u> <u>Graziadio v. Culinary Institute of</u> <u>America</u>, 817 F.3d 415 (2016). We assume that it is undisputed that Dr. Greenberg was an eligible employee under the FMLA, as he worked full-time and continuously at KCHC since 2010. <u>See</u> Greenberg Decl., ¶ 2; 29 C.F.R. § 825.110. We also assume that it is undisputed that KCHC meets the statutory definition of a covered employer, as it and HHC are instrumentalities of New York City. <u>See</u> <u>id.;</u> 29 C.F.R. § 825.104. Finally, we assume that the HHC Defendants will not contest that if we are right that they are joint employers of Dr. Greenberg and Dr. Pulitzer, they, through Dr. Pulitzer, denied Dr. Greenberg's request to take a leave of absence in September 2014, which we view as having been FMLA-eligible.

Thus, the contest over Dr. Greenberg's interference claim will focus on the third and fourth elements.[7] Since Dr. Greenberg has admissible evidence with respect to these elements, his FMLA interference claims cannot be dismissed on summary judgment.

With respect to Dr. Greenberg's eligibility for leave, it is based on the assistance that he needed to provide in making arrangements for his special-needs son's unexpected transfer to another school and the care that he needed to provide to him since he would find the transition difficult in light of his deficits. It is undisputed that an employee is entitled to FMLA leave to care for a child who has a serious health condition. 29 U.S.C. 2612(a)(1)(C). Here, Dr. Greenberg alleges that at the time that he made the request for a leave he told Dr. Pulitzer that it was because he needed to take care of his special-needs son.

Autism is routinely viewed as a serious condition under the FMLA. See Stroder v. United Parcel Service, Inc., 750 F. Supp. 2d 582, 591 n.5 (M.D. N.C. 2010) (collecting cases where courts take for granted that autism is a serious condition under the FMLA). Jayden Greenberg has an autism spectrum disorder. Ex. 1 (Greenberg Dep.) at 225. He has severe mental deficits that include but are not limited to speech impairments, attention deficit disorder, anxiety and depression. Id.; Greenberg Decl., ¶ 4. He has been on medications to treat these deficits since at least 2011. Greenberg Decl., ¶ 4. Also, since he was very young, Jayden has been subject to an Individualized Education Program, which requires any school that he attends

---

[7]HHC Defendants have the burden to present in their moving papers the basis for challenging claims on summary judgment. With respect to the FMLA claims, they limit their challenge to the fact that HHC was not a primary employer of Dr. Greenberg. Defendants' Memo at 15-16. This argument appears to boil down to the fact that the individual who interfered with Dr. Greenberg's FMLA rights was Dr. Pulitzer, a SUNY employee. As previously discussed, this argument does not work because Dr. Pulitzer is fairly characterized as being a KCHC employee and therefore an HHC employee at the time that he denied Dr. Greenberg's right to family leave on September 2 and 3 of 2014. With respect to the FMLA retaliation claim, Defendants merely argue that there was a legitimate business reason for terminating Dr. Greenberg. Defendants' Memo at 16. In any event, out of an abundance of caution, we briefly outline how Dr. Greenberg establishes a prima facie case of interference and retaliation claims under the FMLA against the HHC Defendants warranting trial on the issue. A fuller discussion can be found in Dr. Greenberg's opposition papers to the SUNY Defendants' Motion for Summary Judgment.

to provide specialized services. Id. At the relevant time, Jayden's IEP included the following: a special education classroom at all times with no more than 8 students; speech-language, physical therapy and occupational therapy to be provided two times per week; and counseling services to be provided once per week. Greenberg Decl., ¶ 4; Ex. 21 (SUNY 007286 & 7296). From 2011 until 2013, Jayden was enrolled at The Gateway School, which caters to students with learning disabilities. Greenberg Decl. ¶ 4; Ex. 21 (SUNY 7302). At all relevant times, Jayden was unable to engage in many routine daily activities such as dressing himself, grooming himself, taking care of his hygiene, and eating without the assistance of his parents or teachers. Greenberg Decl., ¶ 4. Also, during this time, he had periodic visits with social workers at school and periodic visits with a psychotherapist to monitor his progress and the efficacy of his various medications. Id. The evidence clearly establishes that Jayden has a serious condition as defined by the FMLA.

The leave that Dr. Greenberg sought is FMLA-eligible to the extent that he can show that he was "needed to care for" Jayden. Dr. Greenberg sought the leave for two reasons: (1) he and his wife needed to go to field offices of the New York City Board of Education in order to explore whether Jayden could remain at The Gateway School or to make arrangements to have him placed at an alternative school that met his special needs; and (2) if the worst emerged, Dr. Greenberg had to provide love and support to Jayden who because of his severe deficits is unable to endure transitions and was likely to be incapacitated by grief and loss by being transferred from his school. Greenberg Decl., ¶ 9; Edgar Decl., Ex. 1 (Greenberg Dep. at 224-26). Making arrangements for the change of care of a family member with a serious condition is a core activity protected by the FMLA. 29 C.F.R. 825.124 (b). Also, the regulations make clear that the employee wishing to take leave in order to make arrangements for changes in care or to care

for a family member need not be the only available family member to provide that care. Id. Therefore, Dr. Greenberg's request to have time off to make appropriate arrangements related to his son's change of schooling, which schooling provides important psycho-social support and care to Jayden, and to provide care during this difficult transition was clearly the kind of request protected by the FMLA.

In Dr. Greenberg's account of his conversations with Dr. Pulitzer, he provided sufficient notice of his intent to take a leave that was covered by the FMLA. At his deposition, Dr. Greenberg testified that he told Dr. Pulitzer on September 2, 2014 that he needed two days off in order "to care for my son, that he had to transition to a new school, and that I needed the time off to be with him." Edgar Decl., Ex. 1 (Greenberg Dep.) at 228. Dr. Greenberg also testified as did Dr. Pulitzer that he knew that Dr. Greenberg had a special needs son. If Dr. Greenberg's testimony is taken to be true, as it must for the purpose of this motion, Dr. Pulitzer's failure to inquire further as to the circumstances that required Dr. Greenberg to take time off in order to address matters related to his special-needs son was a failure to fulfill the responsibilities imposed on employers by the FMLA. After all, employees are not required to recite the magic words "FMLA leave" in order to trigger an employer's inquiry as to whether such a leave is being requested. Rather, all that they need to provide at the time of the request is information that reasonably indicates that the FMLA may apply. See Coutard v. Municipal Credit Union, 848 F.3d 102, 111 (2d Cir. 2017). Thus, at the time of the request for a leave, the employer is burdened with the responsibility of listening carefully to confirm whether the leave requested has FMLA implications and the burden continues by requiring the employer to inquire further if the FMLA may be so implicated.

With Coutard as a backdrop by which to interpret the moments where Dr. Greenberg related to Dr. Pulitzer in no less than three occasions that he needed time off in order to assist in resolving issues related to his special-needs son who was suddenly being transferred to a different school, it is clear that it is at least a factual question for a jury to resolve whether Dr. Pulitzer was under an obligation to ask further questions of Dr. Greenberg as to the exact nature of the circumstances to see if it qualified as FMLA-eligible leave. His failure to do so after three discussions with Dr. Greenberg and then reading the words "important family issues" in an email that Dr. Greenberg wrote to him and Dr. Reede on September 15, 2014 to explain why he needed the leave is a glaring, inhumane and deeply troubling abrogation of responsibility under the FMLA. Clearly, Dr. Greenberg's FMLA interference claims cannot be dismissed as a matter law, given the admissible evidence in the record to date.

V.  **Dr. Greenberg Has Established A Prima Facie Case of Retaliation For Invoking His FMLA Rights And There Are Disputes of Material Fact That Require The Claim To Be Resolved At Trial**

Dr. Greenberg's case is unusual in that the same factual bases support not only a FMLA interference claim but a FMLA retaliation claim too.[8] See, e.g., Edusei v. Adventist Healthcare, Inc., 13 Civ. 157, 2014 WL 3345051 at *6 (D. MD. July 7, 2014). In order to establish a retaliation claim, Dr. Greenberg must demonstrate evidence of the following: (1) that he exercised rights protected by the FMLA; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under

---

[8] In Woods v. Start Treatment & Recovery Centers, 864 F.3d 158 (2017), the Second Circuit added to the confusion between retaliation and interference claims by holding that a retaliation claim that is predicated on a termination for using FMLA-eligible leave has its statutory basis in what has traditionally been viewed as the interference provision. Id. at 167 (terminations for exercising legitimate FMLA leave [] are actionable under § 2615(a)(1)). Here, the distinction is without a difference since Dr. Greenberg brings FMLA claims under § 2615(a)(1) and (b).

circumstances giving rise to an inference of retaliatory intent. Graziado v. Culinary Institute of America, 817 F.3d 415 (2d Cir. 2016).

With respect to the first element, Dr. Greenberg need merely reference the previous section where he discusses his interference claim to demonstrate that his decision to take the family leave that was denied to him constituted exercising a right protected by the FMLA (or at least presents a question for the jury as to whether he was doing so). See Edusei, 2014 WL 3345051, at *11. With respect to the second element, there can be no dispute; Dr. Greenberg's colleagues, even those who wanted to get rid of him, i.e., Dr. Reede and Dr. Pulitzer, understood him to be a highly competent radiologist. There can be no dispute that Dr. Greenberg suffered an adverse employment action when he was terminated. All that remains in dispute is whether Dr. Greenberg's exercise of his FMLA rights was a motivating factor in his termination. See Woods v. START Treatment & Recovery Centers, Inc., 864 F.3d 158, 169 (2d Cir. 2017) (holding that plaintiffs need only show that the exercise of FMLA rights was a motivating factor as opposed to "but for" cause for the adverse employment action at issue).

Since the express reason for Dr. Greenberg's termination, according to Dr. Pulitzer, was his violation of the Settlement Agreement and that agreement was the punitive measure that was meted out to him for exercising his FMLA rights, the HHC Defendants cannot argue that Dr. Greenberg's exercise of his FMLA rights was not a motivating factor in his termination. Given this irrefutable logic, should Dr. Greenberg prevail on his FMLA interference claim, he will prevail as a matter of law on his FMLA retaliation claim. Since the FMLA interference claim remains a question for the jury, so does the retaliation claim.[9]

---

[9]HHC Defendants do not address the issue of individual liability, presumably because they view Dr. Reede and Dr. Pulitzer as employees of SUNY rather than HHC and/or KCHC. We merely note that there is individual liability under the FMLA and Dr. Pulitzer would be individually liable under the Second Circuit's standard for imposing it established in Graziadio. 817 F.3d at 422 (finding supervisors liable who satisfy four non-exclusive factors: (1)

## Conclusion

For all the reasons outlined above, Defendants' motion for summary judgment should be denied in its entirety and the Court should provide plaintiff with any further relief that it deems just and proper.

Dated: New York, New York
      July 6, 2018

CARDI & EDGAR LLP

_____
Chad L. Edgar
Dawn M. Cardi
99 Madison Avenue, 8th Floor
New York, NY 10016
212.481.7770 (tel.)
212.271.0665 (fax)
cedgar@cardiedgarlaw.com
dcardi@cardiedgarlaw.com

---

power to hire and fire; (2) control over employee's work schedule; (3) determination of employee's rate and method of pay; and (4) maintenance of employment records).