UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
ODED GREENBERG, M.D.

                      15 Civ. 2343 (PKC)(VMS)

               Plaintiff,

    -against-

STATE UNIVERSITY HOSPITAL – DOWNSTATE    ECF Case
MEDICAL CENTER et al.,

               Defendants.
-------------------------------------------------------------------X


**PLAINTIFF ODED GREENBERG'S MEMORANDUM
IN OPPOSITION TO SUNY DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

Chad L. Edgar
Dawn M. Cardi
CARDI & EDGAR LLP
99 Madison Avenue, 8th Floor
New York, NY 10016
(212) 481-7770 (tel.)
cedgar@cardiedgarlaw.com
dcardi@cardiedgarlaw.com
*Attorneys for all defendants*

# TABLE OF CONTENTS

**Page**

Table of Authorities ..............................................................................................................iii

PRELIMINARY STATEMENT ..............................................................................................1

STATEMENT OF FACTS ........................................................................................................2

      The May Meeting Between Dr. Greenberg and Dr. Deborah Reede .................................3

      The July Meeting Where Dr. Reede Explains To Dr. Greenberg Why
      He Will Not Assume the Position of Director of ER Radiology That
      He Once Held ....................................................................................................................4

      Dr. Pulitzer's "Counseling" Of Dr. Greenberg on August 22, 2014 .................................5

      Events Leading Up To Dr. Greenberg's Request for FMLA Leave ...................................7

      Dr. Greenberg's Requests For FMLA Leave ....................................................................8

      Dr. Greenberg's Return To Work After Taking His FMLA Leave ..................................10

      Dr. Reede's and Dr. Pulitzer's Close Surveillance of Dr. Greenberg .............................11

ARGUMENT............................................................................................................................16

    I.     The Eleventh Amendment Does Not Bar Individual Liability Under
            SHRL And CHRL Nor Does It Bar Any of the FMLA Claims Here ..................16

    II.    There Are Disputed Material Facts Regarding Dr. Greenberg's Claims
            Arising Under Title VII and NYSHRL With Respect To
            The Decision Not to Appoint Him As Director of ER Radiology,
            His Probation and His Unwarranted Termination ................................................17

            A.     Dr. Reede's Discriminatory Decision to Promote
                     Dr. Jinel Scott Rather Than Dr. Greenberg To
                     Director of ER Radiology ...........................................................19

            B.     Dr. Reede and Dr. Pulitzer's Discriminatory Decision
                     To Refer Dr. Greenberg To Labor Relations
                     Resulting In His Probation ...........................................................22

            C.     Dr. Reede and Dr. Pulitzer's Termination of Dr. Greenberg ........25

i

III.    Dr. Greenberg Can Establish a Prima Facie Case of Retaliation
Under Title VII, The SHRL And The CHRL ........................................................27

IV.    Dr. Reede And Dr. Pulitzer Can Be Held Liable Individually
For Their Acts of Discrimination Under SHRL and CHRL ...............................28

V.    Dr. Greenberg Has Established A <u>Prima Facie</u> Case of
Interference With His FMLA Rights And There Are
Disputes of Material Fact With Respect
To the Claims That Require Them To Be Resolved At Trial ..............................29

VI.    Dr. Greenberg Has Established A <u>Prima Facie</u> Case of Retaliation
For Invoking His FMLA Rights And
There Are Disputes of Material Fact That Require
The Claim To Be Resolved At Trial ...................................................................34

Conclusion ...................................................................................................................36

# TABLE OF AUTHORITIES

**Cases**            **Page**

Amaya v. Ballyshear LLC, 295 F. Supp. 3d 204
(E.D.N.Y. 2018) ...................................................................................27 n.14

Byrnie v. Town of Cromwell, Bd. Of Educ., 243 F.3d 93
(2d Cir. 2001)...........................................................................................19

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) ......................................16

Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29 (2d Cir. 1994) ....................16

Coutard v. Municipal Credit Union, 848 F.3d 102 (2d Cir. 2017) ..............34 & 34 n.20

Craddock v. Little Flower Children & Family Services of New York,
12 Civ. 5062, 2016 WL 755631 (E.D.N.Y. Feb. 25, 2016) ......................28 n.15

Edusei v. Adventist Healthcare, Inc., 13 Civ. 157, 2014 WL 3345051
(D. MD. July 7, 2014) ...........................................................29 & 29 n.16

EEOC v. Ethan Allen, Inc., 44 F.3d 116 (2d Cir. 1994)..................................21

Feingold v. New York, 366 F.3d 138 (2d Cir. 2004) ...............................16, 17

Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219
(2d Cir. 1994) .........................................................................................16

Graziadio v. Culinary Institute of America, 817 F.3d 415 (2016) ..............31 & 31 n.19

James v. New York Racing Ass'n, 76 F. Supp. 2d 250 (E.D.N.Y. 1999) ...................21

Khan v. Hilton Hotels, Inc., 13 Civ. 1919,
2015 WL 10851362 (S.D.N.Y. Aug. 3, 2015) ....................................17

Pineda v. Byrne Dairy, Inc., 212 F. Supp. 3d 467 (2016) .......................17, 22

Rengan v. FX Direct Dealer, LLC, 15 Civ. 4137, 2017 WL 3382074
(S.D.N.Y. August 4, 2017) .....................................................................16

Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597 (2d Cir. 2006) ...................16 n.12

Schwapp v. Town of Avon, 118 F.3d 106 (2d Cir. 1997) ...............................16 n.12

Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87 (2d Cir. 2001) ................18

**Cases**                                                                      **Page**

Stroder v. United Parcel Service, Inc., 750 F. Supp. 2d 582
        (M.D. N.C. 2010) ........................................................................................................32

Treglia v. Town of Manlius, 313 F.3d 713 (2d Cir. 2002) ..........................................................18

Watson v. Richmond University Medical Center, 14 Civ. 1033,
        2016 WL 8465986 (E.D.N.Y. June 24, 2016) ..........................................................27 n.14

Woods v. START Treatment & Recovery Centers, Inc.,
        864 F.3d 158 (2d Cir. 2017) ..........................................................................29 n.16 & 35

**Federal Statutes**

29 U.S.C. § 2612(a)(1)(C) ...............................................................................................32

**Federal Regulations**

29 C.F.R.
        § 825.104........................................................................................................31
        § 825.110........................................................................................................31
        § 825.124........................................................................................................33

Plaintiff Oded Greenberg, M.D. ("Plaintiff" or "Dr. Greenberg") submits this memorandum of law in opposition to the motion for summary judgment to dismiss all claims in the complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure brought by defendant The State University of New York (SUNY) and individual defendants Dr. Deborah Reede ("Dr. Reede") and Dr. Steven Pulitzer ("Dr. Pulitzer") (collectively, "the SUNY Defendants"). In conjunction with this memorandum, Dr. Greenberg submits Plaintiff's Response to Defendants' Rule 56.1 Statement in Support of Their Motion for Summary Judgment and Plaintiff's 56.1 Statement of Additional Material Facts in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Response" and "Plaintiff's 56.1 Statement" respectively). Dr. Greenberg further submits the declaration of Chad L. Edgar dated July 6, 2018 ("Edgar Decl."); the declaration of Esther Neiman dated June 27, 2018 ("Neiman Decl."); and the declaration of Oded Greenberg, M.D. dated July 6, 2018 ("Greenberg Decl.") in opposition to the SUNY Defendants' motion.

## PRELIMINARY STATEMENT

At the center of this case are two questions: (1) whether Dr. Reede and Dr. Pulitzer acting on behalf of the SUNY Defendants violated Dr. Greenberg's right to take a family medical leave to take care of his special-needs son pursuant to the Family Medical Leave Act and (2) in doing so, whether they were motivated by discriminatory animus. The only escape the SUNY Defendants have from liability is persuading a jury that when Dr. Greenberg sought a family medical leave across three conversations with Dr. Pulitzer, a friend and colleague of Dr. Greenberg's for many years, he did not mention that the leave was to take care of his autistic son, Jayden. This account of their discussions strains credulity. In any event, it is a question that a jury must resolve.

Dr. Greenberg's contention is that Dr. Reede's and Dr. Pulitzer's denial of his FMLA leave to take care of Jayden was part and parcel of a campaign to get rid of him for discriminatory reasons. While it is always uncomfortable to allege, discrimination exists and it drove outcomes at Dr. Greenberg's place of employment where he was subject to Dr. Reede, who repeatedly demonstrated racist and ageist bias that was unchecked by Dr. Pulitzer, who was her sidekick, and at the time a newly minted administrator who had neither the political capital nor will to stop her. In the end, Dr. Pulitzer's lack of leadership led to an abrogation of his duty to run his department free of animus, a consequence of which was Dr. Greenberg's wrongful termination in violation of the FMLA, Title VII and other relevant federal, New York State and New York City statutes.

## STATEMENT OF FACTS

At the time that Dr. Greenberg was unlawfully terminated from his employment at State University of New York, Downstate Medical Center ("SUNY") and Kings County Hospital Center ("KCHC"), he had been a well-respected radiologist in the Emergency Room at KCHC for over fourteen years. Second Amended Complaint ("Compl."), ¶ 1. During his employment at SUNY and KCHC, Dr. Greenberg served as a Director of ER Radiology from approximately 2005 or 2006 to 2009. Edgar Decl., Ex. 1 (Greenberg Dep.) at 89.[1] Dr. Greenberg's credentials were both unusually strong and versatile in that he was fellowship-trained in Body Imaging by an ACGME-approved program and was board-certified in two sub-specialties, Diagnostic Radiology and Anatomic Pathology, a versatility shared by no other colleague at KCHC . Compl. ¶ 1.

---

[1] All subsequent citations to exhibits, "Ex.," will refer to those annexed to the Edgar Declaration.

## The May Meeting Between Dr. Greenberg and Dr. Deborah Reede

In the spring of 2014, SUNY implemented a round of layoffs that were approved by Dr. Deborah Reede, Department Chair of Radiology, SUNY, and Dr. Jammeladine, Chief Medical Officer at KCHC, see Declaration of Deborah L. Reede, M.D. dated March 26, 2018 ("Reede Decl."), ¶ 9; although Dr. Greenberg survived this round, he was soon to be targeted for special scrutiny by Dr. Reede and Dr. Steven Pulitzer, who was then assistant to Dr. Alan Kantor who was, in turn, Chief of Service at the Radiology Department at KCHC. Specifically, on April 30, 2014, Dr. Pulitzer sent Dr. Reede an email where he indicated what he believed to be Dr. Greenberg's first case "read" and last case "read" from April 14 to April 22, 2014. Ex. 8 (SUNY 003486). Although there is no context for this email, it implies that they were cooperating in the effort to scrutinize the hours worked by both Dr. Greenberg and Dr. Chen. What is odd here is that Dr. Reede is not including Dr. Kantor in this surveillance; at this time, it appears that Dr. Reede and Dr. Pulitzer have formed an illicit alliance.[2] Eventually, Dr. Greenberg would fill out his timesheet for April 2014, which is done monthly and once April is completed, i.e., in early May, and he fell into the trap set by Dr. Reede by erroneously indicating that he worked 9 to 5 p.m. on April 21, 2014 when in fact he arrived later than 9 a.m. Ex. 9 (SUNY 003511). Dr. Reede requested a meeting with Dr. Greenberg to discuss this error, which occurred on May 5, 2014. See id. At her deposition, Dr. Reede suggested that it was an assistant who drew her attention to Dr. Greenberg's incorrect time entry but she was clearly involved in spotting the error. Id.; Ex. 10 (Reede Dep.) at 143-44. In her deposition, Dr. Reede admitted that this meeting was not disciplinary in any way. Id. at 143. Her memo of the meeting, however,

---

[2]It is a safe assumption that Dr. Reede reached out to Dr. Pulitzer at this point and began exerting her influence because she knew, after discussions with Dr. Jamaleddine, that Dr. Kantor was going to be terminated and Dr. Pulitzer was likely to be his replacement. See Reede Decl. dated March 26, 2018, ¶ 9.

3

suggests a counseling and her inclusion of the remark, "he did not see what the problem was because he read all the films," suggests that she wanted that nugget in the file in case there were subsequent issues with Dr. Greenberg. Ex. 9 (SUNY 003511).[3]

### The July 2014 Meeting Where Dr. Reede Explains To Dr. Greenberg Why He Will Not Assume the Position of Director of ER Radiology That He Once Held

Towards the end of June 2014, Dr. Reede announced to the department that four radiologists, including Dr. Kantor, were not being renewed. Notably, each of these four radiologists was Jewish.[4] One of the radiologists "downsized" was the Director of ER Radiology; in light of the open position, Dr. Greenberg offered himself to Dr. Reede as a candidate to take over the role. Ex. 12 (SUNY 000496). Little did Dr. Greenberg know that Dr. Reede had already given the position to Dr. Jinel Scott, a considerably younger radiologist who he himself had trained when she was a resident at reading film at KCHC; Dr. Reede had been Dr. Scott's boss when they both were at Long Island City Hospital.[5] Ex. 10 (Reede Dep.) at 118; Ex. 6 (Scott Dep.) at 60. Dr. Scott is black and not Jewish and was approximately 36 years old at the time of the appointment whereas Dr. Greenberg was 55 years old. Ex. 6 (Scott Dep.) at 54 & 175; Greenberg Decl., ¶ 1.

---

[3]Dr. Greenberg's memorialization of the meeting in the form of an email that he sent to Dr. Reede addressed an issue that she does not even mention in her memo: a resident evaluation. Ex. 11 (SUNY 000477). It is as if Dr. Greenberg and Dr. Reede attended different meetings.

[4]According to Esther Neiman, a staff member who worked alongside Dr. Reede, she appeared to harbor anti-Semitic sentiment. Dr. Reede expressed disapproval upon first assuming her office at the Department of Radiology at SUNY Downstate Medical Center when she saw observant Jewish staff and faculty gathering on the floor to perform midday prayers. Dr. Reede turned to Ms. Neiman and asked, "What are your people doing here at this time of day?" Neiman Decl., ¶ 4. Ms. Neiman also heard Dr. Reede state to other administrative staff that she was going to put an end to the midday prayers of the observant Jews. Id. Ms. Neiman also heard her sarcastically comment that she wished she were Jewish in order to get so many holidays from work. Id. She also heard Dr. Reede express dissatisfaction with Jewish radiologists and staff leaving work early on Fridays in order to observe Shabbat. Id.

[5]Although Dr. Scott could not remember when exactly Dr. Reede offered her the Directorship, it was before she began working at KCHC in August of 2014 and, given the bureaucracy involved in transferring posts within the SUNY system, it is probable that it was well before Dr. Greenberg wrote his email to Dr. Reede requesting the job on July 16, 2014. Ex. 6 (Scott Dep.) at 68-73.

4

On July 23, 2014, Dr. Greenberg met with Dr. Reede where she related to him the reasons why he would not be promoted to the Director. Ex. 13 (SUNY 000498). According to Dr. Reede's memo to the file, Dr. Greenberg: lacked participation in administrative functions in the department; his resident evaluations showed deficiencies; he had no significant scholarly activity; and he did not demonstrate an interest in academic pursuits. Id. None of these reasons was credible. See Plaintiff's 56.1 Statement, ¶ 11. Dr. Greenberg testifies that Dr. Reede also told him that the reason she preferred Dr. Scott to him was that she was closer to her residency and therefore would be a better mentor to the residents. Greenberg Decl., ¶ 6.

### Dr. Pulitzer's "Counseling" Of Dr. Greenberg on August 22, 2014

By the beginning of July 2014, Dr. Pulitzer assumed the position of Interim Chief of Service in the Department of Radiology at KCHC. Ex. 5 (Pulitzer Dep.) at 10 & 13. Upon assuming the position, Dr. Pulitzer demonstrated that his leadership of the department would be deeply intertwined with Dr. Reede's oversight as he intended to provide her daily updates. Ex. 14 (HHC_ESI_000363). According to the SUNY Defendants, around this time, in July and August 2014, Dr. Greenberg was allegedly working erratic hours. See Defendants' Local Civil Rule 56.1 Statement In Support of Their Motion for Summary Judgment ("Defendants' Rule 56.1 Statement"), ¶ 16. Notably, on July 23, 2014 when Dr. Reede and Dr. Greenberg had their meeting, Dr. Reede, a prolific memo-to-the-file writer, did not mention any issues related to his allegedly erratic work schedule. Ex. 13 (SUNY000498). In addition, in none of the abundant email correspondence between Dr. Pulitzer and Dr. Reede during these months is there any mention of it.

Nonetheless, it is clear that during this time Dr. Reede and Dr. Pulitzer were closely monitoring Dr. Greenberg's time and attendance. On August 20, 2014, Jayan Kurian, an IT

administrator at KCHC, sent to Dr. Pulitzer a daily log indicating when Dr. Greenberg completed a review of each film that he analyzed from July 1, 2014 to August 8, 2014. Ex. 15 (HHC_ESI_000777-871). Later the same day, Dr. Pulitzer forwarded this comprehensive log to Dr. Reede without a cover email, implying that they were in an ongoing conversation about Dr. Greenberg. Ex. 16 (HHC_ESI_873). No other radiologists in the department were singled out for scrutiny in this manner during this time period.

According to memos to the file that he created after the fact, Dr. Pulitzer approached Dr. Greenberg on either August 22 or 23, 2014 to "counsel" him about his erratic work schedule and to require him to work a set schedule of 9:30 a.m. to 5:30 p.m. Ex. 17 (HHC_ESI_001062-63; HHC_ESI_001091-92). At his deposition and under oath, Dr. Pulitzer recharacterized this encounter as a friendly discussion intended to accommodate Dr. Greenberg's scheduling preferences to the requirements of the department. Ex. 5 (Pulitzer Dep.) at 311. Notably, Dr. Pulitzer's memos to the file about this August 22 or 23, 2014 discussion between Dr. Greenberg and himself appear to have occurred after Dr. Greenberg approached him on September 2, 2014 to request permission to take the rest of the week off to take care of his autistic son – a request that Dr. Pulitzer immediately denied. Ex. 17 (HHC_ESI_001062-63).[6]

Dr. Greenberg has a far different account as to the content of this discussion with Dr. Pulitzer. Greenberg Decl., ¶ 7. Basically, Dr. Pulitzer related to Dr. Greenberg that although he understood that the new set schedule accorded neither with the schedule that Dr. Greenberg was historically asked to work nor his personal circumstances Dr. Reede was insisting on it because she was out to catch him and get rid of him. Id. According to Dr. Greenberg, he and Dr. Pulitzer

---

[6] A close examination of the memos that Dr. Pulitzer wrote to the file and to Dr. Reede regarding the August 22, 2014 "counseling" of Dr. Greenberg suggest that he engaged in the "predating" of memos in order to render the discussion more serious than he remembered it to be at his deposition. See Plaintiff's 56.1 Statement, ¶ 4.

did not discuss his so-called recent erratic work schedule nor the threat that continuation of such would lead to discipline. See id. In response to his discussion with Dr. Pulitzer, on August 25, 2014, Dr. Greenberg wrote an email where he continued the discussion about an earlier, set schedule in which he points out its illogic but agrees to comply. Ex. 3 (HHC_ESI_001006). It is a response that neither in tone nor in the fact that it includes three of his colleagues supports the theory that what just occurred was a disciplinary counseling.

### Events Leading Up To Dr. Greenberg's Request for FMLA Leave

During the week of August 25, 2014, Dr. Greenberg was scheduled to be on vacation for at least part of the week. Ex. 18 (HHC_ESI_000969-71). In the email that Dr. Greenberg sent to Dr. Pulitzer on August 25, 2014, he also mentioned that despite the fact that he was on vacation he was going to attend a multi-disciplinary meeting at KCHC where he was to present his findings as to why certain serious cases in the ER were not timely read by the Radiology Department. Ex. 3 (HHC_ESI_001006). After Dr. Greenberg attended the multi-disciplinary meeting, he went down to ER to check in with his colleagues and he saw that no one was in the Radiology reading room; he decided to pitch in by reading cases. Greenberg Decl., ¶ 8. According to Dr. Greenberg, Dr. Hammill, the colleague in charge of the department while Dr. Pulitzer was on vacation this week, welcomed the assistance. Id. The official schedule of the department was revised on August 26, 2014 to show that Dr. Greenberg would be working for the rest of the week. Ex. 19 (HHC_ESI_001044-46).

On Friday, August 29, 2014, Dr. Greenberg and his wife learned by email that their special needs son was in all probability going to be transferred to a different school. Ex. 20 (G212); Ex. 1 (Greenberg Dep. at 224-26). Upon learning that Jayden was likely to have to attend a different school for the new academic year, Dr. Greenberg and his wife conferred and

came to the decision that in light of his special bond with Jayden, Dr. Greenberg should take leave from work for a few days the following week in order to assist with any arrangements that needed to be made to facilitate the transfer and to provide love and support to his son while he made the difficult transition to another school. Greenberg Decl., ¶ 9. On the same day that he received the email from Gateway School, on August 29, 2014, Dr. Greenberg attempted to call Dr. Reede to notify her of his need for a leave. Id. Dr. Reede was on vacation and her voicemail was full and not taking any additional messages. Id. With Dr. Pulitzer also on vacation, Dr. Greenberg resorted to emailing Dr. Reede's assistant, Linda McMurren, to notify her of his need to take a few days off the following week "on an emergent basis." Ex. 22 (HHC_ESI_001090). Linda McMurren, like her boss Dr. Reede, was on vacation on August 29, 2014; she did not respond to this email until September 4, 2014. Id. (HHC_ESI_001089). Dr. Greenberg's first opportunity to have a discussion about his need for a leave occurred on September 2, 2014, when Dr. Pulitzer arrived at work after being on vacation the previous week.

### Dr. Greenberg's Requests For FMLA Leave

What was said during the first, second and third discussions between Dr. Greenberg and Dr. Pulitzer commencing on September 2, 2014 and continuing into the next day about the former's request of the latter for permission to take a brief (i.e., 2 or 3 days) leave of absence to assist with arrangements for his son's transfer to a different school and to provide him with love, care and support during the transition is the material factual dispute that cannot be resolved without trial as the two participants' accounts of these discussions clash on all material points. Dr. Greenberg contends that he notified Dr. Pulitzer from the outset that the reason he needed the time off was to help Jayden with his transition to a new school. Ex. 1 (Greenberg Dep.) at 228-29. At his deposition, Dr. Pulitzer vehemently denied that Dr. Greenberg mentioned Jayden, a

8

transition to a new school, and the need for Dr. Greenberg to be with his son to assist in this transition in the context of asking for this time off, which context included three separate discussions between them. Ex. 5 (Pulitzer Dep.) at 341, 345 & 359. Pulitzer admitted at his deposition that if he had known that the needs of Jayden were involved in the request for leave he would have worked to accommodate the request. Id. at 361.[7]

Dr. Greenberg took off September 4 and 5, 2014 without the authorization of Dr. Pulitzer and under the threat that in doing so he would be referred to Labor Relations. In fact, Jayden did have to transition to a different school. By the morning of September 4, 2014, Jayden's maternal grandmother arrived in town to assist Dr. Greenberg and his wife provide love, support and care to Jayden while he made the transition. Ex. 1 (Greenberg Dep.) at 242. On September 5, 2014, Dr. Greenberg wrote an email to Linda McMurren and carbon copied Dr. Pulitzer to provide an update as to his absence. Ex. 22. In this email, Dr. Greenberg related that he intended to come to work on September 4th but he threw his back out and was unable to come in because of it. Id. When questioned about this email at his deposition, Dr. Greenberg admitted that this email was written to provide an excuse for his absence since he was in fear of losing his job. Ex. 1 (Greenberg Dep.) at 246-47. When asked whether his resolve ever changed about not showing up for work on September 4 and 5, 2014, Dr. Greenberg testified no – that he always intended to stay at home to help Jayden. Id. at 242 & 247.

While Dr. Greenberg was attending to his special-needs son on September 4 and 5, Dr. Reede and Dr. Pulitzer were busy papering the proverbial file and conferring with Labor Relations in order to set in motion the disciplinary machine that awaited Dr. Greenberg upon his return. On September 4, 2014 at 2:48 p.m., Dr. Reede notified Labor Relations that Dr.

---

[7]For a detailed description of the material facts regarding the three discussions that Dr. Greenberg and Dr. Pulitzer had about the former's request for leave in early September see Plaintiff's 56.1 Statement, ¶¶ 17-19 & 21.

Greenberg did not come into work as ordered. Ex. 23 (SUNYESI000000278). Michael Arabian of Labor Relations reached out to Dr. Pulitzer later that day to get complete details as to what occurred when he hand-delivered the September 3, 2014 letter to Dr. Greenberg denying his request for leave. Ex. 24 (SUNY 000493-94). Dr. Pulitzer responded to the inquiry by sending Mr. Arabian a memo that addressed much more than what Mr. Arabian sought: a detailed background as to Dr. Greenberg's allegedly disruptive behavior throughout the month of August in addition to what occurred surrounding the request for leave. Ex. 25 (HHC 1135-36). Later the same day, Dr. Pulitzer generated a formal but "predated" memo on KCHC letterhead regarding his alleged "counseling" session with Dr. Greenberg on August 22, 2014. Ex. 17 (HHC_ESI_001091-2). At some point on September 5, 2014, Dr. Reede, Dr. Pulitzer and Mr. Arabian met to discuss Dr. Greenberg's referral to Labor Relations. Ex. 5 (Pulitzer Dep.) at 363-72. Dr. Pulitzer admitted that the meeting was arranged through Dr. Reede's office since she was familiar with Labor Relations and he was "a very, very new administrator." Id. at 364.

### Dr. Greenberg's Return To Work After Taking His FMLA Leave

When Dr. Greenberg returned to work on September 8, 2014, Dr. Pulitzer sent him to Labor Relations where he was interrogated for a couple of hours. What is notable about Dr. Greenberg's interrogation are the clear statements that he makes regarding the reasons why he sought a brief leave: that he had a special needs son; that this son was being transferred to a new school; that the son would find the transfer to be particularly difficult in light of his autism spectral disorder; and that his son needed him for love, care and support. Ex. 26 (SUNY 001290-91, 1303-04, 1308-11). In hearing these reasons, Mr. Arabian, the Labor Relations representative interrogating him, did not probe Dr. Greenberg as to whether he presented these

circumstances to Dr. Pulitzer when he asked for the leave nor did he inquire further himself to see if they might fall within the ambit of the Family Medical Leave Act.[8]

While Dr. Reede and Dr. Pulitzer testified that they had nothing to do with the terms of the settlement agreement presented to Dr. Greenberg, Mr. Arabian testified that in his experience at Labor Relations a settlement agreement would not be presented to an employee without first running its terms by the department heads who would be affected by the agreement. Ex. 27 (Arabian Dep.) at 224-25. Here, the department heads were Dr. Reede and Dr. Pulitzer.

According to the terms of the settlement agreement, Dr. Greenberg could be terminated should he have any subsequent issues with: unscheduled absences; tardiness; interference with the operations of the department; insubordination or misrepresentation of hours worked on timesheets. Ex. 29 (SUNY 006626-27). Notably, the terms of Dr. Greenberg's settlement stick out as conspicuously harsh when compared to settlements reached with other staff in the Radiology Department around the same time.[9]

### Dr. Reede's and Dr. Pulitzer's Close Surveillance of Dr. Greenberg

After Dr. Greenberg's execution of the draconian settlement agreement, both Dr. Pulitzer and Dr. Reede intensified their already close scrutiny of Dr. Greenberg. On September 9, 2014, Dr. Greenberg wrote an email to Dr. Pulitzer in which he complained about the slow speed in

---

[8] At his deposition, when Mr. Arabian was asked whether he believed that the reasons that Dr. Greenberg stated for his request for a leave might qualify for the Family Medical Leave Act, he responded no. Ex. 27 (Arabian Dep.) at 272. Mr. Arabian admitted that he did not remember having any training on FMLA while employed at SUNY; further, he believed that the issue of FMLA was associated with Human Resources and not Labor Relations. Id. at 270-71. Mr. Arabian was incorrect about FMLA being outside the jurisdiction of Labor Relations; his colleague within Labor Relations, Stephanie Bernadel, was the point person for FMLA leave. Ex. 28 (Bernadel Dep.) at 32. Notably, Mr. Arabian also admitted at his deposition that he believed he was effectively terminated by his supervisors, Leonzo Cuiman and Ms. Conde-Billy, the former of whom was intimately involved in Dr. Greenberg's initial encounter with Labor Relations and eventual termination from same, for taking too many days off for a serious medical condition. Ex. 27 (Arabian Dep.) at 45-50; 53-54; 73-80.

[9] Of the 9 settlement agreements that SUNY Defendants produced with respect to employees other than Dr. Greenberg who allegedly committed misconduct during the relevant period that warranted referral to Labor Relations only one strips the employee of his or her protection of termination for cause as was the case with Dr. Greenberg's settlement. Ex. 30 (SUNY 6601-3, 6582-83, 6625, 6652-53, 6621-22, and 6654-57).

which certain archived messages were accessed by his computer; he asked if a workaround was available. Ex. 32 (HHC_ESI_001238). Dr. Pulitzer requested that his assistant put this email in Dr. Greenberg's personnel folder. Id. On September 12, 2014, Dr. Pulitzer emailed Dr. Reede one of his updates and the first item that he addressed was Dr. Greenberg: "Will monitor time and attendance and number of cases read per day." Ex. 33 (HHC_ESI_1243). On September 15, 2014 at 8:52 a.m., Dr. Reede emailed Dr. Pulitzer and posed the question: "is Dr. Greenberg reading films?" Ex. 34 (HHC_ESI_1259). Dr. Pulitzer responded within 35 **minutes** with the answer, "Yes. He is." Ex. 35 (HHC_ESI_1262).

On September 15, 2014, Dr. Greenberg wrote to Dr. Pulitzer and carbon copied Dr. Reede. In this email, he provided his account of events that led up to his allegedly insubordinate leave of absence on September 4 and 5, 2014. Ex. 36 (HHC 1529-30). What is particularly notable about this email is his return to the theme that he felt he had the right to take a leave of absence "for important family issues." Id. at 1529. Here, Dr. Greenberg is expressly and in writing referencing a family issue that was the basis for his request. In response to this email, neither Dr. Reede nor Dr. Pulitzer responded to Dr. Greenberg; rather, they wrote to each other with Dr. Reede observing: "I see d ... Dr. Greenberg is trying to cover his tracts [sic]." Ex. 37 (HHC_ESI_001274). To which Dr. Pulitzer responded: "Yes I have filed his email in his file. He is really all over the map." [10] Id.

On September 22, 2014, there was a Radiology Department meeting to which Dr. Greenberg arrived late. Greenberg Decl., ¶ 11. During the portion of the meeting that Dr. Greenberg attended, he understood that another weight had been placed on him and his already

---

[10]At her deposition, Dr. Reede admitted that she was aware that Dr. Greenberg had a special-needs child, which makes her decision not to ask Dr. Greenberg follow-up questions to this email especially egregious. Ex. 10 (Reede Dep.) at 324-25.

overly burdened colleagues – attestations that would have to be affixed to all studies that indicated whether attending physicians agreed or disagreed with residents' initial readings of films. Id. Dr. Greenberg was frustrated by this new requirement that would have him author language that he viewed as unnecessary and would add a step to the review of patient studies with the likely consequence that it would cause a backlog in the flow of work. Id. When Dr. Greenberg returned to the reading room at ER after the meeting, in his frustration, he authored an attestation that met the insurers' requirements as far as he understood them but in a playful or, at worst sarcastic, manner. Id. Having arrived late for the departmental meeting, he had no idea that the attestations to be used were available as a macro from one of his colleagues. Id. Dr. Greenberg started immediately affixing this attestation that he authored on studies.[11]

On the very day that Dr. Greenberg's attestations were affixed to studies, one of his colleagues, Dr. Velayudhan, alerted him that it was causing a stir in the hallways – other physicians and radiologists were whispering about it. Greenberg Decl., ¶ 12. Dr. Velayudhan suggested to Dr. Greenberg that he inquire as to whether he could modify the attestation. Id. When Dr. Greenberg realized that his attestation was creating controversy, he immediately took action. He went to the IT Department to ascertain whether it was possible to revise the attestation that he already affixed to studies. Greenberg Decl., ¶ 12; Ex. 1 (Greenberg Dep.) at 291-93. Notably, he did not request the IT Department to do so, as the SUNY Defendants suggest; he merely asked whether it was possible. Greenberg Decl., ¶ 12.

Notably, Dr. Pulitzer, who according to his account of this episode at his deposition and in his affidavit viewed it as a grave act of misconduct that was allegedly beyond the pale, never

---

[11]The studies to which Dr. Greenberg affixed his attestation were stale in the sense that they were months old, had already been acted upon clinically speaking, and were lingering in the department only because insurers rejected them because they lacked an attestation. Greenberg Decl., ¶ 11

discussed the "playful" or "sarcastic" attestation with Dr. Greenberg. Ex. 5 (Pulitzer Dep.) at 148-50; Greenberg Decl., ¶ 13. In the immediate aftermath of the discovery of Dr. Greenberg's attestations, Dr. Pulitzer convened meetings with the Chief Medical Officer of KCHC, Dr. Ghassan Jamaleddine, and the Legal Department at KCHC to obtain guidance as to how he should proceed both with respect to the studies that had the attestation and what, if any, disciplinary measures should be imposed on Dr. Greenberg. See Defs' Rule 56.1 Statement, ¶¶ 42-43. Dr. Jamaleddine was of the opinion that Dr. Greenberg must be terminated; in fact, he made it clear that he would not allow Dr. Greenberg to practice anymore at KCHC. Ex. 38 (Pulitzer Dep. (Second)) at 42. Dr. Reede and Dr. Pulitzer were both of the opinion that Dr. Greenberg should be terminated. Ex. 28 (Bernadel Dep.) at 9; Ex. 5 (Pulitzer Dep.) at 420-421. According to Dr. Pulitzer, Dr. Greenberg's use of the attestation suggested that he had become a different person and was therefore unfit for continued practice at KCHC. Ex. 5 (Pulitzer Dep.) at 115. Given this conclusion to which Dr. Pulitzer admits, it is strange that he never sought out Dr. Greenberg in order to ask him for some sort of explanation as to why he was behaving in this manner.

On September 24, 2014, Dr. Pulitzer sent a memo to Labor Relations in order to report two incidents that he viewed as violations of the terms of Dr. Greenberg's Settlement Agreement with Labor Relations. Ex. 39 (SUNY000863-65). The second incident described was the attestation that created a stir. Id. (SUNY000864-65). The first incident was Dr. Greenberg's alleged insubordination in leaving the ER without authorization after Dr. Pulitzer denied his request to be permitted to take a few hours off in the afternoon in addition to an authorized absence that he took in the morning to deal with funding issues related to Jayden's education. Id. (SUNY000863). Dr. Greenberg testified that he did not leave ER without authorization; rather,

14

during the time in dispute, which was about 1 hour and 40 minutes, he conferred with another radiologist and then other clinicians at the ER and then for about 40 to 50 minutes he crossed the street to eat lunch at the SUNY Downstate Medical Center campus, which he was allowed to do without asking for leave. Ex. 1 (Greenberg Dep.) at 300-305; 308-09. Dr. Pulitzer never approached Dr. Greenberg to get his account of this alleged unauthorized absence from the ER. Greenberg Decl., ¶ 13.

In a letter sent by Labor Relations dated October 3, 2014, Dr. Greenberg was notified that he was to report to Labor Relations for another interrogation regarding alleged misconduct. Ex. 40 (SUNY000014). The interrogation was rescheduled to October 10, 2014 and continued on October 20, 2014. Ms. Bernadel of Labor Relations was in charge of the second referral of Dr. Greenberg to Labor Relations. In the course of her investigation, she spoke to Dr. Pulitzer in advance of the first interrogation; in the notes of that conversation, Dr. Pulitzer appears to opine that Dr. Greenberg was acting out because he was passed over for the ER Director position. Ex. 31 (SUNY 000429). Dr. Pulitzer never talked to Dr. Greenberg about any such anger or alleged "acting out." Greenberg Decl., ¶ 13. On October 14, 2014, she interviewed three radiologists who attended the September 22, 2014 meeting where attestations were discussed. Ex. 41 (SUNY 448-49 & 1252). The radiologists had varying accounts of the status of the attestations, i.e., whether there was an official policy at the time that Dr. Greenberg created his. Notably, Dr. Rhonda Osborne stated that she was unsure whether a final attestation form had been established at the time. Id. (SUNY 1252). Around the time of the second interrogation, Ms. Bernadel, along with her supervisor Leonzo Cuiman, spoke with Dr. Reede and Dr. Pulitzer either individually or together. Ex. 28 (Bernadel Dep.) at 9. According to Ms. Bernadel's account, she and Mr. Cuiman merely presented their findings of facts to Dr. Reede and Dr. Pulitzer as to Dr.

Greenberg's conduct; in light of those facts, Dr. Reede and Dr. Pulitzer decided to terminate Dr. Greenberg. Id.; Ex. 5 (Pulitzer Dep.) at 420-421.

## ARGUMENT

This Court's task on a summary judgment motion is simply to discern whether there are any genuine issues of material fact to be tried and not to decide them. Rengan v. FX Direct Dealer, LLC, 2017 WL 3382074, 15 Civ. 4137 (S.D.N.Y. August 4, 2017). The moving party bears the burden of informing the court as to the bases of the motion and identifying the matter that it believes demonstrates an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Court must resolve all ambiguities and draw all reasonable inferences against the moving party. Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party. Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).[12]

## I. The Eleventh Amendment Does Not Bar Individual Liability Under SHRL And CHRL Nor Does It Bar Any of the FMLA Claims Here

In Feingold, the Second Circuit made clear to what extent the Eleventh Amendment bars claims against a state and its employees in federal court. There, the Second Circuit held that individual defendants who participated in the alleged discrimination can be found liable under New York State and City Law qua individuals as opposed to in their official capacity. Feingold v. New York, 366 F.3d 138, 157-59 (2d Cir. 2004). Dr. Greenberg's claims under New York

---

[12]It is well settled that district courts must exercise "an extra measure of caution" in determining whether to grant summary judgment to an employer in a discrimination case "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006); see also Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997).

State and New York City law (13th to 20th and 25th to 28th Causes of Action) to the extent that they are brought against the individual defendants Dr. Reede and Dr. Pulitzer are not subject to the SUNY Defendants' Eleventh Amendment challenge.

The Second Circuit also assumes that a § 1983 claim can be brought against individuals who discriminated against the plaintiff under the color of state law. See Feingold at 159. Notably, Dr. Greenberg's 11th and 12th Causes of Action, the § 1983 claims, are brought against all defendants. To the extent that they are brought against Dr. Reede and Dr. Pulitzer, they are viable.

Finally, the SUNY Defendants' attempt to dismiss Dr. Greenberg's FMLA claims (the 1st through 3rd Causes of Action) on Eleventh Amendment grounds is to no avail. Dr. Greenberg's FMLA claims are based on the leave that he sought on behalf of his special-needs son, as opposed to himself, therefore the immunity from suit on Eleventh Amendment grounds for FMLA self-care is irrelevant. See infra Part V to VI.

**II.     There Are Disputed Material Facts Regarding Dr. Greenberg's Claims
Arising Under Title VII and NYSHRL With Respect To
The Decision Not to Appoint Him As Director of ER Radiology,
His Probation And His Unwarranted Termination**

It is well-settled that plaintiff's burden at the prima facie stage of a discrimination case is minimal for the purpose of deciding a summary judgment motion. Pineda v. Byrne Dairy, Inc., 212 F. Supp. 3d 467 (2016); see also Khan v. Hilton Hotels, Inc., 13 Civ. 1919, 2015 WL 10851362, at * (S.D.N.Y. Aug. 3, 2015) ("Plaintiff's burden at this stage is 'not a heavy one'"). With respect to the first three elements of the prima facie case of discrimination, there appears to be no dispute. Dr. Greenberg is in two protected classes under Title VII and NYSHRL as a Jew who was over forty years old. Greenberg Decl., ¶ 1. He was also Caucasian whereas the primary decision-maker driving the decisions not to promote him, to place him on probation and

then played a significant role in deciding to terminate his employment, Dr. Reede, was African-American and not Jewish. Id.; Reede Decl., ¶ 2. With respect to the second element, again, there appears to be no dispute that he was a qualified radiologist and qualified for the position of Director of ER Radiology as his direct supervisor during the relevant time period, Dr. Pulitzer, stated that he believed Dr. Greenberg was one of the best radiologists that ever practiced at KCHC and all of his colleagues looked up to him. Ex. 5 (Pulitzer Dep.) at 426-27. In addition, with respect to his qualifications, we simply note that Dr. Greenberg was a prior Director of ER Radiology at KCHC and SUNY Defendants can raise no red flags about his prior tenure in the position. There appears to be no dispute that Dr. Greenberg experienced three different adverse employment actions. First, he was not promoted to the position of Director of ER Radiology, even though he was qualified for the position; rather, Dr. Scott, an African-American woman under 40 years of age was given the position. See Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002) (holding that failure to promote is one of the well-established examples of adverse employment action). Second, after he took a leave of absence of two days to make arrangements arising from the transfer of his special-needs son from one school to another (and to provide him with love, care and support during this difficult time), Dr. Greenberg was presented with a settlement agreement that stripped him of his job security by placing him on probation and subject to immediate and unappealable termination if he incurred the slightest infraction thereafter. Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 95 (2d Cir. 2001) (finding that plaintiff's probation was an adverse employment action). Finally, Dr. Greenberg was terminated, an obvious adverse employment action. Thus, all that SUNY Defendants challenge with respect to the prima facie discrimination case involving these three

adverse employment actions is whether Dr. Greenberg can point to evidence that gives rise to an inference of discrimination.

### A. Dr. Reede's Discriminatory Decision to Promote Dr. Jinel Scott Rather Than Dr. Greenberg To Director of ER Radiology

With respect to Dr. Jinel Scott's promotion to Director of ER Radiology rather than Dr. Greenberg, by merely pointing out the fact that the non-Jewish and black decision-maker, here, Dr. Reede, hired another non-Jewish black who was also younger than Dr. Greenberg, i.e., Dr. Scott, the fourth element of a prima facie case of discrimination is satisfied: Dr. Greenberg has established that circumstances surrounding the failure to promote him give rise to an inference of discrimination based on race, religion and age. See Byrnie v. Town of Cromwell, Bd. Of Educ., 243 F.3d 93, 102 (2d Cir. 2001) (the "minimal" burden to prove a prima facie case at the summary judgment stage is met when the plaintiff can show that he is in a protected category, qualified for a job and lost the job to someone not in his protected category); see also Khan v. Hilton Hotels, Inc., 13 Civ. 1919, 2015 WL 10851362, at *3 (S.D.N.Y. Aug. 3, 2015) (citing termination cases where courts held that the prima facie case was satisfied merely by showing that the replacement worker was not in plaintiff's protected category).

Dr. Greenberg's prima facie case of discrimination based on race, religion and age is further strengthened by the fact that Dr. Greenberg was not only better qualified for the position but substantially so. Where a plaintiff's credentials are so superior to the credentials of the person selected for the job at issue such that "'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question,'" summary judgment must be denied. See Byrnie at 103. Here, Dr. Greenberg's credentials were clearly superior to those of Dr. Scott. As Dr. Pulitzer testified, Dr. Greenberg was not only a legendary radiologist within the KCHC universe but he was highly respected by his colleagues

who sought to imitate him. He had been a radiologist for more than twice the numbers of years as Dr. Scott; he had spent more than a decade practicing at a Level One Trauma Center, i.e., KCHC, which by definition demands more of practitioners because of the high volume of difficult cases, while Dr. Scott had no such experience, except when she was doing her residency at KCHC under Dr. Greenberg's supervision amongst others; and she had never been a Director of an ER Radiology Department at a Level One Trauma Center, while Dr. Greenberg had. In these circumstances, where Dr. Greenberg's credentials are so clearly superior to those of Dr. Scott, summary judgment must be denied on this basis alone with respect to the failure to promote claim.

In addition to the credential differential between Dr. Greenberg and Dr. Scott, Dr. Reede displayed her discriminatory animus by citing pretextual reasons for appointing Dr. Scott rather than Dr. Greenberg as Director at the time that she made the decision. See Byrnie at 102 (court explaining that a plaintiff can defeat summary judgment in the absence of direct evidence of bias by relying on the prima facie case "combined with circumstantial evidence that [defendants'] stated reason for [the adverse employment action] is pretext").

One of Dr. Reede's primary reasons for preferring Dr. Scott to Dr. Greenberg for the position of Director was that Dr. Scott was more academically and scholarly inclined. When Dr. Scott was deposed, however, she related what she understood to be her mission as Director: to get the department running more smoothly rather than focus on research and publications. Ex. 6 (Scott Dep.) at 272-73. If Dr. Scott's account is to be believed, and there is no reason to doubt it, and we further assume that Dr. Reede encouraged her to be above all else an effective administrator then she must have been lying to Dr. Greenberg when Dr. Reede stated to him that she wanted someone more academically inclined in the Director position. Since Dr. Greenberg

had already performed administrative tasks as a prior Director of ER Radiology at KCHC, and presumably successfully, Dr. Reede resorted to pretextual reasons not to hire him in order to conceal her discriminatory animus.

According to Dr. Greenberg's account of his conversation with Dr. Reede on July 23, 2014 when she broke the bad news to him that he was not going to be Director, she said that Dr. Scott was the preferred candidate because she was closer to her residency and therefore she would be a better mentor to the residents. Greenberg Decl., ¶ 6. Dr. Greenberg understood Dr. Reede to mean that Dr. Scott was more qualified for the position merely because she was younger. With such an explicit statement of bias based on age directly connected to the adverse employment action, Dr. Greenberg has no need to satisfy the burden-shifting paradigm of McDonnell Douglas with respect to his age discrimination claim. James v. New York Racing Ass'n, 76 F. Supp. 2d 250, 254 (E.D.N.Y. 1999). Dr. Reede's statement reflecting obvious ageism is exactly the kind of evidence for which a reasonable juror could find that age discrimination was the "but for" reason that Dr. Scott was promoted rather than him.

In addition to Dr. Reede's expressly discriminatory and pretextual reasons for not promoting Dr. Greenberg to the Director position, she also changed her pretextual reasons over time. Where plaintiffs can show their employer changed its explanations for taking an adverse employment action against him or her, such evidence can be highly probative of pretext and an improper motive. See Byrnie at 105-06; see also EEOC v. Ethan Allen, Inc., 44 F.3d 116, 120 (2d Cir. 1994) (noting that a juror can reasonably view an employer's changing explanations as "pretextual, developed over time to counter the evidence suggesting ... discrimination"). At her deposition, Dr. Reede stated for the first time that Dr. Greenberg was not a good candidate for the Director position because he had availability issues, meaning that residents sometimes could

not find him when they wanted to confer with him. Ex. 10 (Reede Dep.) at 142-43. Since discovery disclosed that Dr. Reede was keeping a careful watch on the radiologists by routinely examining their so-called Talk Station data and she was a prolific writer of memos to the file it strains credulity that she would have omitted this issue from the memo that she wrote about the decision not to promote Dr. Greenberg.

Finally, Dr. Reede was known to voice anti-Semitic sentiment. Neiman Decl., ¶¶ 4-6. According to Ms. Esther Neiman who had frequent contact with Dr. Reede during the relevant period, she disapproved of observant Jews who came to the floor of the Radiology Department for midday prayers, which practice she intended to stop because she viewed it as disruptive to the department's operations. Id., ¶ 4. She was also heard to make a sarcastic remark about the abundance of Jewish holidays and complained about observant Jews leaving work early on Fridays to observe Shabbat. Id., ¶ 6.

As the court well knows, where a plaintiff can show evidence that demonstrates that the employer's reasons for an adverse employment action are pretextual and can also present admissible comments that a decision-maker involved in the adverse employment action was influenced by discriminatory animus, the question of discrimination is for jurors to decide. See, e.g., Pineda v. Byrne Dairy, Inc., 212 F. Supp. 3d 467, 477 (S.D.N.Y. 2016). Dr. Reede's articulated anti-Semitic sentiments must necessarily defeat any attempt by SUNY Defendants to defeat the failure to promote case based on religion and racial discrimination. Dr. Reede's ageist comment to Dr. Greenberg means that his failure to promote claim based on age discrimination must also survive summary judgment.

**B.**   **Dr. Reede and Dr. Pulitzer's Discriminatory Decision**
        **To Refer Dr. Greenberg To Labor Relations**
        **Resulting In His Probation**

If Dr. Greenberg's testimony is to be believed, and it must be for the purpose of this motion, he repeatedly told Dr. Pulitzer that he needed two days off in early September in order to assist his wife in making arrangements related to his special-needs son's transfer to another school and provide love, care and support to him during the transition. In violation of the obligations of the FMLA, Dr. Pulitzer not only denied the request but did not inquire further to see if the leave that Dr. Greenberg sought fell within the Act's protections. Dr. Pulitzer admitted at his deposition that he turned to Dr. Reede for guidance as to how to proceed when Dr. Greenberg insisted on taking the leave in any event. According to Dr. Pulitzer, Dr. Reede told him to deny the request in writing, require Dr. Greenberg to come to work and threaten to refer him to Labor Relations if he did not show. All of the actions that Dr. Pulitzer took that led to Dr. Greenberg's interrogation at Labor Relations and the execution of a settlement agreement that stripped him of his job security and placed him on probation was at the instigation of Dr. Reede.[13]

The denial of Dr. Greenberg's rights under the FMLA is further evidence of Dr. Reede's discriminatory campaign against him. There can be no other reason why two sophisticated persons such as Dr. Reede and Dr. Pulitzer who were aware, by their own admission, of the contours of FMLA would fail to do their duty with respect to it when it came to Dr. Greenberg's request.

But what presses forward the discriminatory nature of Dr. Reede's campaign against Dr. Greenberg is the resort to falsehoods and fabrications in the package of misconduct that she,

---

[13] We emphasize Dr. Reede's role as puppet-master to Dr. Pulitzer with respect to the events that led to Dr. Greenberg's probation because SUNY Defendants cite the fact that Dr. Pulitzer's Caucasian and Jewish status undermine Dr. Greenberg's contention that he was the target of racial and anti-Jewish bias. If our theory is right, then the discriminatory animus behind the refusal to grant FMLA leave to Dr. Greenberg was primarily that of Dr. Reede and Dr. Pulitzer aided and abetted it by his passivity.

operating through Dr. Pulitzer, sent to Labor Relations for the purpose of his interrogation and the memo to the file that they wrote to justify the determination to refer him to Labor Relations.

For Labor Relations, Dr. Pulitzer authored a memo in which he gave background information as to Dr. Greenberg's previous unruly conduct. Ex. 25 (HHC 1135-36). In the memo, Dr. Pulitzer suggested that Dr. Greenberg was somehow being disruptive by appearing at the hospital and working when he should have been on vacation; he also noted that Dr. Greenberg never discussed this schedule change with him. See id. In actual fact, Dr. Greenberg wrote Dr. Pulitzer an email on August 25, 2014 informing him that he would be attending an inter-departmental meeting the next day. Ex. 3 (HHC_ESI_00106). Also, on August 26, 2014, an official revised work schedule that included Dr. Greenberg was circulated, which undermines Dr. Pulitzer's narrative that Dr. Greenberg was somehow going rogue this week. Ex. 19 (HHC_ESI_001044-46). Dr. Greenberg further testifies, that Dr. Hammil, the radiologist supervising the department the week at issue, appeared appreciative that he was willing to work on his scheduled vacation; he never complained to Dr. Greenberg that he was being disruptive. Greenberg Decl., ¶ 8. In light of these facts, Dr. Pulitzer's misleading, if not false, memo to Labor Relations presumably following the advice of Dr. Reede was intended by both of them to place Dr. Greenberg in the worst possible light, as Labor Relations turned to the issue of his refusal to come to work for two days.

In addition to the memo to Labor Relations, Dr. Pulitzer papered Dr. Greenberg's personnel file with a "predated" memo where he characterized his August 22, 2014 discussion with Dr. Greenberg as a counseling. Dr. Pulitzer's recantation of this memo by recharacterizing the discussion as friendly at his deposition serves to strengthen the strong inference that he and

Dr. Reede were singling out Dr. Greenberg for unjustified and therefore suspicious mistreatment, from which he clearly tried to distance himself when he was under oath.

The disturbing culmination of Dr. Reede's and Dr. Pulitzer's illicit campaign against Dr. Greenberg was their callous disregard of his attempt one last time on September 15, 2014 to clarify the reasons why he sought leave and insisted upon it: he had an emergency family issue. Ex. 36 (HHC 1529 & 1531). Rather than seizing this opportunity to inquire as to what Dr. Greenberg meant exactly by his "important family issues" that required "an emergent absence," Dr. Pulitzer responded to it by placing it in Dr. Greenberg's personnel file as if it was another instance of misconduct and Dr. Reede wrote: "Dr. Greenberg is trying to cover his tracts [sic]." Dr. Reede viewed the campaign against Dr. Greenberg as a game of chess in which she was winning.

As discussed earlier, Mr. Arabian likely conferred with Dr. Reede and Dr. Pulitzer about placing Dr. Greenberg on probation, as such was standard operating procedure with Labor Relations. Thus, they are both implicated as decision-makers in the adverse employment action of probation.

In light of Dr. Reede's anti-Semitic remarks discussed above and her ageist comment to Dr. Greenberg in the context of the promotion decision, coupled with the fact that she led the campaign towards Dr. Greenberg's referral to Labor Relations, which was based on fabrications, the question as to whether Dr. Greenberg was placed on probation due to discriminatory animus based on race, religion and/or age must be for the jury to decide.

**C.** **Dr. Reede and Dr. Pulitzer's Termination of Dr. Greenberg**

On September 22, 2014, Dr. Greenberg affixed to patient studies unapproved attestations that Dr. Pulitzer viewed as playful, if not sarcastic. For Pulitzer, Dr. Greenberg's action with

respect to these attestations suggested a colleague who was careening out of control in his reckless departure from any concern about the hospital's reputation and exposure to liability. Ex. 5 (Pulitzer Dep.) at 115. From Dr. Greenberg's perspective, Dr. Pulitzer's reaction was unwarranted and therefore suspicious. First, the studies upon which Dr. Greenberg affixed the attestations were stale: they were months old, had already been acted on by clinicians in terms of treatment, had been submitted in conjunction with reimbursement from insurers and rejected for lack of an attestation. Greenberg Decl., ¶ 11. Second, the only way that the attestations could possibly expose the hospital to liability would be if someone along the chain of clinicians treating a patient committed malpractice and presumably even then the liability would arise from that malpractice and not Dr. Greenberg's attestation on the chart. Third, Dr. Pulitzer always drove home the point at departmental meetings that the attestation was significant solely in its role in guaranteeing reimbursement. Ex. 42 (HHC 1335 & 1367). Dr. Pulitzer never gave the attestation the aura of importance with which he invested it inr the episode with Dr. Greenberg.

What is most suspicious about Dr. Pulitzer's conduct in relation to Dr. Greenberg was the manner in which he surreptitiously kept close tabs on Dr. Greenberg but yet never approached him with his concerns about his out-of-control behavior. It is especially strange in that Dr. Pulitzer and Dr. Greenberg had been colleagues and friends for at least four years and had discussions at work that ranged from professional matters to personal matters such as each other's family life. Greenberg Decl., ¶ 13. It is as if Dr. Pulitzer had become his earlier characterization of Dr. Reede: a cop waiting for Dr. Greenberg to screw up in order to get rid of him

As a further indication of the suspicious conduct that surrounded Dr. Greenberg's termination, we note Dr. Pulitzer's resort to rumors of emails that Dr. Greenberg allegedly sent

to the previous Service Chief, Alan Kantor in which he allegedly expressed insubordination. Apparently, rumors of these emails were considered as a factor in the decision to terminate Dr. Greenberg, even though they had never actually been retrieved and reviewed before the decision to terminate was made. Ex. 43 (SUNY 000273) (Ms. Bernadel requesting Dr. Pulitzer to retrieve the emails for her files).

In the end, Dr. Pulitzer's mendacious and furtive conduct in the campaign that led to Dr. Greenberg's termination, which behavior was clearly guided by Dr. Reede whose animus towards Jews can be established with admissible evidence, gives rise to the reasonable inference that Dr. Greenberg's termination was at least partially motivated by discriminatory animus towards his religion, race and/or age. Therefore, the question as to whether his termination was motivated by discrimination is one that a jury must answer rather than this Court.[14]

### III.    Dr. Greenberg Can Establish a <u>Prima Facie</u> Case of Retaliation Under Title VII, The SHRL And The CHRL

SUNY Defendants' argument that Dr. Greenberg cannot state a <u>prima facie</u> case of retaliation depends on their account that his formal allegation of anti-Semitic discrimination on October 10, 2014 occurred after progressive discipline against him had been pending since May of 2014. SUNY Defendants' account is factually incorrect. During her deposition, Dr. Reede

---

[14]In order to establish a <u>prima facie</u> case of discrimination pursuant to § 1983 as to Dr. Reede and Dr. Pulitzer, Dr. Greenberg needs to demonstrate as an initial matter that the they acted under color of state law and were personally involved in the alleged discrimination. <u>Watson v. Richmond University Medical Center</u>, 14 Civ. 1033, 2016 WL 8465986, at *11 (E.D.N.Y. June 24, 2016). Here, as in <u>Watson</u>, Dr. Greenberg satisfies these initial criteria by establishing the indisputable facts that both Dr. Reede and Dr. Pulitzer were professors at SUNY Downstate and they were actively involved in the decisions not to promote him (Dr. Reede only), to place him on probation and ultimately to fire him. <u>Id.</u> Once Dr. Greenberg establishes these threshold criteria then analyzing whether he established a <u>prima facie</u> case incorporates the analysis associated with his Title VII claims. <u>Id.</u> For the same reasons as stated above regarding SUNY Defendants' challenges to his Title VII claims, Dr. Greenberg has shown that there are disputes of material fact that require a jury to decide whether Dr. Reede and Dr. Pulitzer discriminated against Dr. Greenberg in violation of § 1983. It is well settled that claims under § 1981 may be brought against individuals who allegedly participated in the race-based discrimination at issue. <u>Amaya v. Ballyshear LLC</u>, 295 F. Supp. 3d 204, 223-25 (E.D.N.Y. 2018). They are otherwise analyzed using Title VII jurisprudence. <u>Id.</u> In light of the discussion above, the § 1981 claims lie with respect to both Dr. Reede and Dr. Pulitzer.

admitted that her meeting with Dr. Greenberg in May of 2014 was not a disciplinary event. In addition, Dr. Pulitzer characterized his discussion with Dr. Greenberg about scheduling on or around August 22, 2015 as friendly rather than disciplinary. Thus, SUNY Defendants' account of an escalating course of discipline that predated the alleged retaliatory termination does not accord with the facts. Rather, they are stuck with the strong inference that arises from the very close proximity of time between Dr. Greenberg's complaint of discrimination and the decision to terminate him – twelve days to be exact. Given such a close proximity of time, courts routinely find causation for the purposes of establishing a prima facie case. Siuzdak v. Sessions, 295 F. Supp. 3d 77, 101-02 (D. Conn. 2018).

## IV.    Dr. Reede And Dr. Pulitzer Can Be Held Liable Individually For Their Acts of Discrimination Under SHRL and CHRL

SUNY Defendants argue that Dr. Greenberg's aiding and abetting claims directed at Dr. Reede and Dr. Pulitzer fail as a matter of law under these circumstances where the primary violator, SUNY, is immune from liability under these statutes. Defendants' Memo at 29-30. While there are many reported decisions of district courts in this Circuit that have so held, it is also clear that the Second Circuit has yet to address the issue.

In any event, it is clear that Dr. Reede and Dr. Pulitzer could be found individually liable under both the SHRL and CHRL as primary violators of Dr. Greenberg's rights so there is no need to resort to an aiding and abetting theory.[15]

---

[15] The NYSHRL provides for the imposition of liability on individual defendants under § 296(1) where they actually participate in the conduct giving rise to discrimination and they have the authority to hire and fire employees. See Craddock v. Little Flower Children & Family Services of New York, 12 Civ. 5062, 2016 WL 755631, at *(E.D.N.Y. Feb. 25, 2016). Here, the plaintiff's theory has always been and there is admissible evidence to support the theory that both Dr. Reede and Dr. Pulitzer directly participated in the conduct alleged to be discriminatory. In addition, Dr. Reede and Dr. Pulitzer were key decision-makers in Dr. Greenberg's termination. Both satisfy the criteria for holding them individually liable under NYS Executive Law § 296(1). The NYCHRL expressly contemplates individual employee liability. § 8-107(1)(a). Thus, even if this Court finds that Dr. Reede and Dr. Pulitzer are not liable for their discriminatory conduct pursuant to an aiding and abetting theory, they would nonetheless be individually liable under the NYSHRL and NYCHRL (here 13-16 and 21-24 causes of action).

**V.** **Dr. Greenberg Has Established A <u>Prima</u> <u>Facie</u> Case**
    **Of Interference With His FMLA Rights And**
    **There Are Disputes of Material Fact With Respect**
    **<u>To the Claims That Require Them To Be Resolved At Trial</u>**

SUNY Defendants err when they characterize Dr. Greenberg's claims under the FMLA

as retaliation as opposed to interference. As a court has noted, the "distinction between an

interference claim and a retaliation claim under the FMLA is not always clear." <u>Edusei v.

Adventist Healthcare, Inc.</u>, 13 Civ. 157, 2014 WL 3345051 at *6 (D. MD. July 7, 2014). Here,

as in <u>Edusei</u>, the same facts support both interference and retaliation claims.[16]  On the one hand,

Dr. Greenberg contends that he requested a FMLA-eligible leave from August 29, 2014 until

September 3, 2014 using the appropriate channels for an emergency request. His request was not

only denied but his decision to proceed with a FMLA-eligible leave in any event led to his

probation, which, in turn, left him susceptible to termination for subsequent infractions, which

susceptibility would not have existed but for his probation status linked to his request for FMLA

leave. In the manner in which the same chain of events supports both an interference and

retaliation claim, Dr. Greenberg's circumstances mirror those of the plaintiff in <u>Edusei</u>.[17]

SUNY Defendants also err by suggesting that they are somehow saved from their

interference claim by Dr. Greenberg stating around the time that he took an FMLA-eligible leave

that he had decided not to take the leave but on the morning that he was supposed to report to

---

[16]In <u>Woods v. Start Treatment & Recovery Centers</u>, 864 F.3d 158 (2017), the Second Circuit added to the confusion between retaliation and interference claims by holding that a retaliation claim that is predicated on a termination for using FMLA-eligible leave has its statutory basis in what has traditionally been viewed as the interference provision. <u>Id.</u> at 167 (terminations for exercising legitimate FMLA leave [] are actionable under § 2615(a)(1)). Here, the distinction is without a difference since Dr. Greenberg brings FMLA claims under § 2615(a)(1) and (b).
[17]In a footnote SUNY Defendants' suggest that because Dr. Greenberg was awarded sick leave for those days that he requested FMLA leave he was not prejudiced and therefore cannot succeed in a FMLA claim. In <u>Edusei</u>, the court readily dispensed with a similar argument by noting that prejudice could be found where the evidence supports the theory that the employer based its termination decision on the prior warning unlawfully issued to the plaintiff in violation of her FMLA rights. Here, Dr. Greenberg's termination was similarly predicated on the employer's unlawful actions, the Settlement Agreement, which was a punitive measure directly related to Dr. Greenberg's exercise of his FMLA rights..

work, September 4, 2014, he injured his back. SUNY Defendants are wrong both on the facts and the law in making this argument. First, at his interrogation on September 8, 2014 and in an email to Dr. Pulitzer and Dr. Reede on September 15, 2014, Dr. Greenberg clearly related to Mr. Arabian and to his two supervisors that he sought an FMLA-eligible leave, which was denied. He never said that he sought the leave for back spasms that had not yet occurred. At the time that Dr. Pulitzer heard facts that suggested that Dr. Greenberg may be seeking an FMLA-eligible leave on September 2nd and 3rd, he had a duty as a supervisor to inquire further as to the circumstances that required the leave. The fact remains that he did not make that inquiry, he denied the request and that denial was then approved of and encouraged by Dr. Reede. SUNY Defendants appear, however, to argue that because Dr. Greenberg had second thoughts about taking his protected rights under the FMLA on the morning of September 4, 2014 and decided to come into work before he threw out his back they are off the liability hook. That is clearly not how the FMLA works, since it renders any conduct of the employer that chills those rights a violation and a basis for a private right of action. The SUNY Defendants' foregrounding of Dr. Greenberg's "back injury" as the real reason that he was absent, an excuse to which Dr. Greenberg resorted in an attempt to save his job and later recanted, is a classic red herring argument.[18]

In order to establish a <u>prima facie</u> case of interference with FMLA rights, Dr. Greenberg must show: (1) that he was an eligible employee under the FMLA; (2) that SUNY Defendants were covered employers as defined by the FMLA; (3) that he was entitled to take leave under the

---

[18]The fact that Dr. Reede and Dr. Pulitzer did not make further inquiry regarding Dr. Greenberg's back spasms once they heard about it in his September 15, 2014 email is further evidence that they were determined to abrogate their duty under FMLA to ascertain whether a leave may be protected under the Act. What further confuses the SUNY Defendants' position with respect to Dr. Greenberg's leave, i.e., whether it was FMLA eligible, is the very curious entry on Dr. Greenberg's time sheet for the days at issue, September 4 & 5 of 2014, completed by an administrator at SUNY Defendants after he had been terminated: it reads "FMLA Leave." Ex. 66 (SUNYESI00001503)

FMLA; (4) that he gave notice to the SUNY Defendants of his intention to take leave; and (5)

that he was denied benefits to which he was entitled under the FMLA. See Graziadio v. Culinary

Institute of America, 817 F.3d 415 (2016). We assume that it is undisputed that Dr. Greenberg

was an eligible employee under the FMLA, as he worked full-time and continuously for SUNY

and KCHC since 2010. Greenberg Decl., ¶ 3; 29 C.F.R. § 825.110. We also assume that it is

undisputed that both SUNY and KCHC meet the statutory definition of a covered employer, as

they are instrumentalities of New York State and New York City respectively. Greenberg Decl.,

¶ 3; 29 C.F.R. § 825.104.[19] Finally, we assume that SUNY Defendants will not contest that they

denied Dr. Greenberg's request to take a leave of absence on September 3 and 4 of 2014.

     Thus, in the contest over Dr. Greenberg's interference claims, the focus is on the third

and fourth elements; Dr. Greenberg has admissible evidence with respect to both of these

elements.

     With respect to Dr. Greenberg's eligibility for leave, it is based on the assistance that he

needed to provide with arrangements for the transfer of his special-needs son from one school to

---

[19]Both Dr. Pulitzer and Dr. Reede are covered employers under the FMLA. See Graziado, at 422-23 (Second Circuit finding individual liability lies under the FMLA if that individual meets the criteria of an employer used in analyzing individual liability under the FLSA). There is a four-factor test to analyze whether a particular supervisor qualifies as an employer under the FLSA: (1) the power to hire and fire the employee; (2) supervision and control over the employee's work schedule or conditions of employment; (3) discretion to determine the rate and method of compensation; and (4) maintenance of employment records. With respect to all of these factors, Dr. Reede and Dr. Pulitzer satisfy the criteria. Both Dr. Reede and Dr. Pulitzer were integral in the decision to terminate Dr. Greenberg. Ex. 28 (Bernadel Dep.) at 9-11. Given all of the memos that are in the record regarding Dr. Pulitzer's and Dr. Reede's "counseling" of Dr. Greenberg, their requirement that he work a set schedule, their reprimands of him, their referrals of him to Labor Relations, it is obvious that they supervised Dr. Greenberg. Both Dr. Reede and Dr. Pulitzer controlled the rate of pay of radiologists in the department. For example, on November 7, 2014, less than a month after she terminated Dr. Greenberg, Dr. Reede sent letters to three of Dr. Greenberg's colleagues informing them that due to the department's financial status their salaries had to be adjusted downwards. Ex. 45 (SUNY 002737, 2739 & 2741). In December of 2014, both Dr. Reede and Dr. Pulitzer were working together to prepare for a presentation to Dr. Jamaleddine, the Chief Medical Officer of KCHC, where they intended to argue in favor of replacing overnight virtual radiology support to an overnight staff comprising of varying numbers of staff; in a cover email to this presentation, Dr. Pulitzer observed that Dr. Jamaleddine was likely to support the proposal as long as the salaries that they suggested for the new staff would be cost neutral. Ex. 46 (HHC_ESI_002267). Both Dr. Reede and Dr. Pulitzer were decision-makers and/or influencers in the amount of compensation Dr. Greenberg and his colleagues received. Finally, it goes without saying that both Dr. Reede and Dr. Pulitzer not only generated but kept, i.e., maintained memos that memorialized their significant encounters with Dr. Greenberg.

another and to provide love, support and care during the transition. It is undisputed that an employee is entitled to FMLA leave to care for a child who has a serious health condition. 29 U.S.C. 2612(a)(1)(C). Here, Dr. Greenberg alleges that he told Dr. Pulitzer that he needed the two days requested to take care of his special-needs son. See supra at 8-9 and citations therein.

Autism is routinely viewed as a serious condition under the FMLA. See Stroder v. United Parcel Service, Inc., 750 F. Supp. 2d 582, 591 n.5 (M.D. N.C. 2010) (collecting cases where courts take for granted that autism is a serious condition under the FMLA). Jayden Greenberg has been diagnosed as having an autism spectrum disorder. See Greenberg Dep. at 225. He has severe mental deficits that include but are not limited to speech impairments, attention deficit disorder, anxiety and depression. Id.; Ex. 21 (SUNY 007296 & 7281). He has been on medications to treat these deficits since at least 2011. Greenberg Decl., ¶ 4. Also, since he was very young, Jayden has been subject to an Individualized Education Program; at the relevant time, Jayden's IEP included the following: a special education classroom at all times with no more than 8 students; speech-language, physical therapy and occupational therapy to be provided two times per week; and counseling services to be provided once per week. Id.; Ex. 21 (SUNY 007286 & 7296). From 2011 until 2013, Jayden was enrolled at The Gateway School, which caters to students with learning disabilities. Greenberg Decl., ¶ 4; Ex. 21 (SUNY 7302). At all relevant times, Jayden was unable to engage in many "regular daily activities" such as dressing himself, grooming himself, taking care of his hygiene, and eating without the assistance of his parents or teachers. Greenberg Decl., ¶ 4. Also, during this time, he had periodic visits with social workers at school and periodic visits with a psychotherapist to monitor his progress and the efficacy of his various medications. Id. The evidence clearly establishes that at the time that Dr. Greenberg sought FMLA leave, Jayden had a serious condition as defined by the FMLA.

The leave that Dr. Greenberg sought was FMLA-eligible to the extent that he can show that he was "needed to care for" Jayden. Dr. Greenberg sought the leave for two reasons: (1) he and his wife needed to go to field offices of the New York City Board of Education in order to explore whether Jayden could remain at The Gateway School or to make arrangements to have him placed at an alternative school that met his special needs; and (2) if the worst emerged, Dr. Greenberg had to provide love and support to Jayden who, because of his severe deficits, is unable to endure transitions and was likely to be incapacitated by grief and loss by being transferred from his school. Ex. 1 (Greenberg Dep.) at 224-26. Making arrangements for the change of care of a family member with a serious condition is a core activity protected by the FMLA. 29 C.F.R. 825.124 (b). Also, the regulations make clear that the employee wishing to provide the care need not be the only available family member to provide that care. Id. Therefore, Dr. Greenberg's request to have time off to make appropriate arrangements related to his son's change of schooling, which schooling provides important psycho-social support and care to Jayden, and the need to take care of Jayden during a difficult transition where he was likely to be incapacitated by depression and anxiety were clearly the kind of circumstances for which the FMLA was implemented.

In Dr. Greenberg's account of his conversations with Dr. Pulitzer, he provided sufficient notice of his intent to take a leave that was covered by the FMLA. At his deposition, Dr. Greenberg testified that he told Dr. Pulitzer on September 2, 2014 that he needed two days off in order "to care for my son, that he had to transition to a new school, and that I needed the time off to be with him." Ex. 1 (Greenberg Dep. at 228). Dr. Greenberg also testified and Dr. Pulitzer admitted that he knew that Dr. Greenberg had a special needs son. If Dr. Greenberg's testimony is taken to be true, as it must for the purpose of this motion, Dr. Pulitzer's failure to inquire

further as to the circumstances that required Dr. Greenberg to care for his son constitutes a failure to fulfill the responsibilities imposed on employers by the FMLA. Employees are not required to recite the magic words "FMLA leave" in order to trigger an employer's inquiry as to whether such a leave is being requested. Rather, all that they need to provide at the time of the request is information that reasonably indicates that the FMLA may apply. See Coutard v. Municipal Credit Union, 848 F.3d 102, 111 (2d Cir. 2017). Thus, at the time of the request for leave, the employer is burdened with the responsibility of listening carefully to confirm whether the leave may have FMLA implications and to ask further questions, if necessary.

With Coutard as a backdrop, it is clear that it is at least a factual question whether Dr. Pulitzer was under an obligation to ask further questions of Dr. Greenberg as to the exact nature of the circumstances that drove him to seek a leave to see if it qualified as FMLA-eligible.[20] His failure to do so after three discussions with Dr. Greenberg and then after reading the September 15, 2014 email where Dr. Greenberg mentions "important family issues" in connection with the leave sought is glaring, inhumane and deeply troubling. Clearly, Dr. Greenberg's FMLA interference claims cannot be dismissed as a matter law, given the admissible evidence in the record to date.[21]

## VI. Dr. Greenberg Has Established A Prima Facie Case of Retaliation For Invoking His FMLA Rights And There Are Disputes of Material Fact That Require The Claim To Be Resolved At Trial

---

[20]It is not without significance that the conduct giving rise to this litigation and much of the litigation itself occurred before the decision in Coutard. It does not strain belief to imagine that the SUNY Defendants like the defendant in Coutard were under the belief that at the time of making a request for FMLA leave the burden rested with the employee to present information that demonstrated that he qualified for FMLA leave rather than presenting facts that suggested that he may qualify and it was the employer's burden to ask the necessary follow-up questions.
[21]SUNY Defendants argue that Dr. Greenberg failed to provide notice of his need for a FMLA-eligible leave according to their customary notice and procedural requirements. SUNY Defendants are wrong on the facts. As soon as Dr. Greenberg became aware that he needed a brief leave, he followed proper protocol. See Plaintiff's Response, ¶ 16.

As discussed earlier, Dr. Greenberg's case is unusual in that the same factual bases support not only a FMLA interference claim but a retaliation claim too. SUNY Defendants move to dismiss the retaliation claim on two grounds: (1) Dr. Greenberg did not exercise rights protected under the FMLA; and (2) he cannot show that his termination occurred under circumstances that give rise to an inference of retaliatory intent. With respect to the issue as to whether Dr. Greenberg exercised rights protected under the FMLA, we merely note in light of the previous section that the issue is one for a jury. As for the second ground, the challenge must fail in light of the Second Circuit's recent decision that causality in the FMLA retaliation context is not "but for" but motivating factor. See Woods v. START Treatment & Recovery Centers, Inc., 864 F.3d 158, 169 (2d Cir. 2017). All Dr. Greenberg need show for a retaliation claim is that his termination was partially motivated by the desire to punish him for exercising his rights under the FMLA.

It cannot be disputed that Dr. Greenberg was terminated because of his violation of the Settlement Agreement, as Ms. Bernadel expressly testifies that such was the case. Ex. 28 (Bernadel Dep.) at 9. The Settlement Agreement, in turn, was a result of Dr. Greenberg insisting on taking a leave that Dr. Pulitzer and Dr. Reede would have known was FMLA eligible if they had inquired further as to the circumstances for which he sought the leave pursuant to their obligations to do so under the Act. Instead, they denied the leave and then viewed his conduct as insubordinate when he insisted on taking it and referred him to Labor Relations. They were likely consulted as to the terms of the Settlement Agreement, according to Mr. Arabian, as that was the standard operating procedure. The Settlement Agreement was a punitive measure and represented, in and of itself, retaliation for exercising his FMLA rights. In addition, any subsequent use of the Settlement Agreement by the SUNY Defendants to terminate Dr.

Greenberg, i.e., any argument that his termination was warranted because of his violation of its terms, would constitute additional retaliation for exercising his FMLA rights.

Here, given the fact that the Settlement Agreement was the basis for Dr. Greenberg's termination, SUNY Defendants cannot argue that it was unrelated to his exercise of FMLA rights, if we are correct that the leave at issue was, in fact, FMLA protected.[22]

### CONCLUSION

Dr. Greenberg respectfully requests that the Court deny SUNY Defendants' motion to dismiss the complaint, except for those claims against which SUNY has immunity from suit in federal court based on the Eleventh Amendment (i.e., 11th through 16th Causes of Action) and any other relief that the Court may find just and proper.

Dated: New York, New York
      July 6, 2018

                                    CARDI & EDGAR LLP

                                    Chad L. Edgar
                                    Dawn M. Cardi
                            99 Madison Avenue, 8th Floor
                            New York, NY 10016
                            212.481.7770 (tel.)
                            212.271.0665 (fax)
                            cedgar@cardiedgarlaw.com
                            dcardi@cardiedgarlaw.com

---

[22] In addition to the attestations that Dr. Greenberg affixed to studies on September 22, 2014, Dr. Pulitzer cited Dr. Greenberg's brief but unauthorized absence from work on September 23, 2014 as a separate basis for referring him to Labor Relations. Dr. Greenberg's absence earlier in the day and his request for another brief absence in the afternoon was related to education funding associated with his special needs son. Ex. 44 (HHC 1526). Dr. Pulitzer's denial of Dr. Greenberg's request to take additional time in the afternoon that he knew was associated with the education funding needs of Jayden is highly probative of his predisposition to deny leaves that may be FMLA eligible.