UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x

ODED GREENBERG,

                                        Plaintiff,

               -against-

STATE UNIVERSITY HOSPITAL-DOWNSTATE
MEDICAL CENTER a/ka/ THE STATE UNIVERSITY          15-CV-2343 (PKC)(VMS)
OF NEW YORK HEALTH SCIENCE CENTER AT
BROOKLYN aka SUNY DOWNSTATE MEDICAL
CENTER, NEW YORK CITY HEALTH AND
HOSPITALS CORPORATION, KINGS COUNTY
HOSPITAL CENTER, UNITED UNIVERSITY
PROFESSIONALS, SUNY DOWNSTATE MEDICAL
CENTER CHAPTER OF UNITED UNIVERSITY
PROFESSIONALS, DEBORAH L. REEDE, STEVEN
PULITZER, and JOHN and JANE DOES 1-20,

                                        Defendants.

-------------------------------------------------------------------------X

### PLAINTIFF'S RESPONSE TO DEFENDANTS' RULE 56.1
### STATEMENT IN SUPPORT OF THEIR MOTION
### FOR SUMMARY JUDGMENT AND
### PLAINTIFF'S RULE 56.1 STATEMENT OF ADDITIONAL MATERIAL FACTS
### IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Oded Greenberg, M.D. ("Greenberg" or "Dr. Greenberg"), by his attorneys,

Cardi & Edgar LLP, pursuant to Local Civil Rule 56.1 of the United States District Court,

Eastern District of New York, hereby submits the following responses to the statement of

material facts as to which defendants New York City Health + Hospitals Corporation ("HHC")

and Kings County Hospital Center ("KCHC") (collectively, the "Health + Hospitals defendants")

allege there are no genuine issues to be tried.  In addition, in accordance with Local Rule 56.1(b),

Dr. Greenberg includes a Statement of Additional Material Facts as to which he contends there exists a genuine issue to be resolved.[1]

## A.    Background

1.    Plaintiff Oded Greenberg is a board-certified radiologist authorized to practice in the State of New York who was formerly employed as a physician and radiologist by defendant State University of New York, Downstate Medical Center ("Downstate"), and assigned (at times) via an affiliation agreement to KCHC. *See* Dkt. No. 17 Second Amended Complaint, May 11, 2016 ("SAC"), Ex. "A," *passim*.

**Response**:    Disputed.  Plaintiff Oded Greenberg ("Dr. Greenberg") was also jointly employed as a physician and radiologist by defendants HHC and KCHC.  As support for the contention that HHC and KCHC were Dr. Greenberg's joint employer, the following can be supported by admissible evidence: (a) under the affiliation agreement between Downstate and HHC, Dr. Greenberg and his colleagues in the Radiology Department were obliged to observe and follow KCHC's policies, procedures, rules and regulations in the course of performing their duties; Declaration of Chad L. Edgar dated July 5, 2018 ("Edgar Decl."), Ex. 61 (HHC 0001-15)[2]; Declaration of Oded Greenberg, M.D. dated July 5, 2018 ("Greenberg Decl."), ¶ 2; (b) at all relevant times, Dr. Greenberg and his fellow radiologists were supervised by Dr. Steve Pulitzer whose KCHC title was Chief of Service, Department of Radiology and he was appointed to that title by the Chief of Executive of HHC; Ex. 25 (HHC 1135-36); Ex. 39 (SUNY000863-65); Ex. 60 (HHC 0158, 0163-64, 0174-75); Ex. 62 (HHC 2549-51); Greenberg Decl., ¶ 2; (c)

---

[1] In the event that that this case goes to trial, Dr. Greenberg reserves the right to contest facts stated herein, which are offered for the purposes of opposing defendants' motion for summary judgment.

[2] Subsequently, exhibits to the Edgar Decl. will be merely referenced as "Ex."

for a total of approximately 11 years, including during the relevant time period, Dr. Greenberg

worked full time and exclusively at KCHC; Greenberg Decl., ¶ 2; (d) during the relevant period,

KCHC stored and updated biennially the paperwork to support the practicing privileges of Dr.

Greenberg and his colleagues at KCHC; Ex. 63 (HHC 0261-75); Greenberg Decl., ¶ 2; (e)

during the relevant period, KCHC kept records of Dr. Greenberg's completion of Continuing

Medical Education courses; Greenberg Decl., ¶ 2; (f) during the relevant period, Dr. Pulitzer set

the work schedule of Dr. Greenberg and his colleagues; Ex. 38 (Pulitzer Dep. (Second)) at 21-22;

Greenberg Decl., ¶ 2; (g) Dr. Greenberg and his colleagues in the Radiology Department during

the relevant period used KCHC's facilities and equipment; Greenberg Decl., ¶ 2; (h) Dr.

Greenberg and his colleagues in the Radiology Department during the relevant held themselves

out as medical staff of KCHC in terms of uniforms and identification; Id.; (i) Dr. Greenberg and

his colleagues' salaries were paid by KCHC in a lump sum and SUNY then divvied up that lump

sum into the amounts that each radiologist actually was compensated; Ex. 38 (Pulitzer Dep.

(Second)) at 26-27; and finally, (j) Dr. Ghassan W. Jamaleddine, the Chief Medical Officer at

KCHC during the relevant time, played a significant role in the termination of radiologists

allegedly employed by Downstate, including but not limited to Dr. Alan Kantor, the predecessor

to Steven Pulitzer as Chief of Service in the Department of Radiology at KCHC and Dr.

Greenberg; Ex. 10 (Reede Dep.) at 31-33; Ex. 5 (Pulitzer Dep.) at 133-36; Ex. 38 (Pulitzer Dep.

(Second)) at 42. In addition to all of the above, pursuant to the Affiliation Agreement between

SUNY and HHC, the latter had the authority to request in writing that a radiologist not be

allowed to practice at KCHC and that request could turn into de facto removal from practice at

KCHC, if SUNY was unable to cure the issue underlying the request. Ex. 60 (HHC 0158, 163-

76) (emphasis on 2.1(c) (HHC 0172))

2. Defendant Deborah Reede ("Reede") is employed by Downstate as a professor and Chairperson of the Department of Radiology. Id. at ¶ 5.

> **Response:** Undisputed.

3. Defendant Stephen Pulitzer ("Pulitzer") is employed by Downstate as an assistant professor, and assigned via an affiliation agreement to KCHC. Id. at ¶6.

> **Response:** Disputed. The analysis with respect to Dr. Greenberg's status as an employee of Downstate on the one hand and HHC and KCHC on the other hand is equally applicable to Dr. Pulitzer. Therefore, we incorporate by reference here all that is alleged in our response to paragraph 1 above. In addition, we note the following. First, according to the Affiliation Agreement, as Chief of Service, Dr. Pulitzer would have been appointed to that position by the Chief Executive of HHC. Ex. 60 (HHC 0164). Second, pursuant to the Affiliation Agreement, as Chief of Service, Dr. Pulitzer was a HHC supervisor of SUNY affiliate radiologists and he was tasked with generating annual evaluations of them on behalf of HHC. Id. (HHC 0174-75). Dr. Pulitzer admitted that he reported to both Dr. Reede (associated with Downstate) and Dr. Jamaleddine (the Chief Medical Officer of KCHC) and the kinds of information he reported was substantially similar; Ex. 5 (Pulitzer Dep.) at 26 & 136; Ex. 38 (Pulitzer Dep. (2d)) at 13-16.

4. Alan Kantor is a radiologist formerly employed by Downstate as a Clinical Assistant Professor in the Department of Radiology at Downstate. *See* Kantor employee change status form, Ex. "B," SUNY001849.

> **Response:** Disputed. The analysis with respect to Dr. Pulitzer's status as an employee of Downstate on the one hand and HHC and KCHC on the other hand is equally applicable to Dr. Kantor who was Dr. Pulitzer's predecessor as Chief of Service, Department of

Radiology at KCHC. Therefore, we incorporate by reference here all that we allege above in response to paragraph 3.

5. Plaintiff responded to a job posting by Downstate and was hired in early 2001. Plaintiff was hired via a letter from Dr. David Stark ("Stark"), then Professor and Chairman of the Downstate Department of Radiology. The letter from Dr. Stark was printed on SUNY Downstate letterhead and does not reference Health + Hospitals defendants other than citing an affiliation agreement. *See* Plaintiff's Downstate Medical Center Personnel File ("Personnel File"), Ex. "C," at SUNY000218 & SUNY000207.

**Response**: Undisputed as to what the offer letter and job posting referenced above indicate, as said documents speak for themselves.

6. Plaintiff's [sic] was hired as an "Assistant Professor of Clinical Radiology" pursuant to an affiliation agreement between Downstate and Defendant HHC. Id. at SUNY000207 and SUNY000219.

**Response**: Undisputed that Downstate and Defendant HHC's position is that the radiologists at KCHC are Downstate employees who are merely physically located at KCHC but disputed that such is an accurate characterization. See supra, Responses to paragraphs 1, 3 & 4.

7. Plaintiff's employment eligibility was verified to the United States Department of Justice on March 16, 2001 and his employer was listed as Downstate. Id. at SUNY000223.

**Response**: Undisputed that Dr. Greenberg indicated Downstate as his employer when filling out the I-9 employment eligibility verification form in April of 2001.

8. Plaintiff's employment was verified by Downstate when he applied for a mortgage with Citibank. Id. at SUNY000001-000002 and SUNY000025.

**Response**: Undisputed that Dr. Greenberg indicated Downstate as his employer on an employment verification form in conjunction with establishing an account at a financial institution in or around September 9, 2014. See id.

9. Defendants HHC and KCHC were not involved in the hiring of plaintiff, and his Downstate personnel file is replete with indications that he was hired by Downstate. Id. *passim, see also* Deposition of Ghassan Jamaleddine ("Jamaleddine Tr."), Ex. "D," at 94:16-23.

**Response**: Disputed. The circumstances of Dr. Greenberg's return to employment at KCHC in or around 2010 or 2011 after stabilizing issues with his special-needs son was that he contacted Salvatore Sclafani who was then both Chair of the Radiology Department at Downstate and Chief of Service, Radiology Department at KCHC to see if there were any positions available. Ex. 1 (Greenberg Dep.) at 16-17 & 45. Like Dr. Pulitzer after him, Dr. Sclafani, in his role as Chief of Service, Radiology Department at KCHC, was appointed by and also acting on behalf of HHC. Ex. 64 (HHC 0548-49, 0562, 0580).

10. As an employee of Downstate, plaintiff was a member of United University Professions ("UUP"), a union representing nearly all of the physicians employed by Defendant SUNY, and was subject to the terms of the collective bargaining agreement between UUP and the State of New York. *See* Deposition of Oded Greenberg ("Pl. Tr."), Ex. "E," at 370:4-9 *see also* Union Agreement, Ex. "F," at SUNY 001620-001748.

**Response**: Undisputed that Dr. Greenberg was a member of UUP and some of the terms of his employment were informed by the collective bargaining agreement between UUP and the State of New York. It is also true, as mentioned in response to paragraph 1, that

Dr. Greenberg and his other colleagues in the Radiology Department at KCHC were subject to the rules, regulations and by-laws of KCHC.

11. As a member of UUP, plaintiff was only subject to discipline pursuant to article 19 of the agreement between UUP and the State of New York, which states "discipline shall be imposed upon employees only pursuant to this article." Health + Hospitals defendants were not a party to the agreement between UUP and the State of New York. *See* Union Agreement, Ex. "F," at SUNY001637-001638.

**Response**: Disputed. With respect to two instances relevant to this case, Dr. Jameladdine was integral, albeit de facto, to the discipline of a "Downstate employee." First, Dr. Jameladdine caused the termination of Dr. Kantor as Chief of Service of the Radiology Department to which fact Dr. Reede testified. Ex. 10 (Reede Dep.) at 31-34. Second, Dr. Jameladdine was included in the decision to terminate Dr. Greenberg. Ex. 5 (Pulitzer Dep.) at 133-376. In addition, Dr. Pulitzer testified that Dr. Jameladdine made it clear that he would override any decision by SUNY to allow Dr. Greenbeg to resume practice at KCHC after the administrative leave imposed by Dr. Reede and Dr. Pulitzer in early October of 2014. Ex. 38 (Pulitzer Dep. (Second)) at 42-43.

12. Plaintiff was paid by the State of New York and received pay increases pursuant to the agreement between UUP and the State of New York. *See* Personnel File, Ex. "C," at SUNY000050, SUNY000056 and SUNY000060.

**Response**: Undisputed that the documents that memorialized Dr. Greenberg's pay raises were on Downstate letterhead. Nonetheless, it is not disputed that HHC and/or KCHC paid the SUNY radiologists for their services in the aggregate, whereas the exact amount to be given to each radiologist remained within the discretion of SUNY. Edgar Ex. 38 (Pulitzer Dep.

(Second)) at 26-27. Notably, when Downstate was considering revamping the shift structure of the Radiology Department at KCHC commencing January of 2015 by adding an on-site night shift as opposed to using virtual radiologists, Dr. Reede and Dr. Pulitzer presented the plan to Dr. Jamaleddine in a PowerPoint presentation that included number of hires and their compensation rate; in a cover email to a draft version of this presentation sent to Dr. Reede, Dr. Pulitzer noted: "Here is a beginning proposal. As long as it is cost neutral I think he [Dr. Jamaleddine] will not block it." Ex. 46 (HHC_ESI_002267).

13. Plaintiff's health insurance and related benefits were provided by virtue of his employment at Downstate. Id. at SUNY000092-93 and SUNY000105-106.

**Response**: Undisputed that Dr. Greenberg's health insurance and related benefits were provided through a plan purchased by Downstate.

14. Plaintiff's time and attendance records were maintained by Downstate. *See* Time and Attendance Records, Ex. "G," at SUNY001750-001813.

**Response**: Undisputed that certain time and attendance records associated with Dr. Greenberg were maintained by Downstate. Although Downstate kept attendance sheets, Dr. Pulitzer made it a point to tell radiologists at a monthly departmental meeting in July 2014 that if a radiologist was sick and needed to call out then he or she was required to call staff at both Downstate and KCHC. Ex. 42 (HHC 1382). .

15. Plaintiff temporarily resigned from his employment in April 2008, via letter to Dr. Salvatore Scalfani, then the Chairman of the Department of Radiology at Downstate. *See* Personnel File, Ex. "C," at SUNY000070.

**Response**: Undisputed that the letter that Plaintiff wrote to Dr. Scalfani in April of 2008 in which he formalized his resignation was addressed to him qua Chairman of the

Department of Radiology at Downstate. As referenced above, Dr. Scalfani was also Chief of Service, Department of Radiology at KCHC.

16. On October 19, 2009, while plaintiff was working part-time as an hourly employee, Dr. Scalfani unilaterally reassigned plaintiff from KCHC to University Hospital, a facility maintained by the State University of New York. Id. at SUNY000075.

       **Response**:    Undisputed.

17. In 2010, plaintiff was rehired to a full time position by Dr. Scalfani via letter written on Downstate letterhead. Plaintiff was re-hired as a "clinical assistant professor of radiology" in the College of Medicine of the State University of New York Downstate Medical Center. The position was subject to the approval of the Dean and President of SUNY Downstate Medical Center, Ian Taylor, M.D., and required only funding approval from HHC. *See* September 21, 2010 rehire letter, Ex. "H".

       **Response**:    Undisputed.

18. Throughout his employment plaintiff was supervised by defendant Pulitzer, Dr. Alan Kantor, and Dr. Scalfani. *See* Pl. Tr., Ex. "E," at 44:3-45:5.

       **Response**:    Undisputed.

19. Plaintiff acknowledges that his employer was Downstate, but nevertheless contends that Health + Hospitals defendants were "joint/co-employers" with Downstate, Reede, and Pulitzer (hereinafter "Downstate defendants"). *See* Plaintiff's Responses and Objections to Health + Hospitals Defendants' First Set of Contention Interrogatories ("cont. rog. resp.), Ex. "I," *passim, see also* Pl. Tr., Ex "E," at 373:10-375:4.

       **Response**:    Undisputed.

**B.**    **Affiliation Agreement**

20. The affiliation agreement ("the agreement") under which plaintiff was assigned to work at KCHC classifies plaintiff as a "physician provider", refers to HHC as "the Corporation", and to Downstate as "the Affiliate". *See* Affiliation Agreement, Ex. "J," at SUNY001011 and SUNY001015.

> **Response**: Undisputed as the document speaks for itself.

21. The agreement provides that "[Downstate] may follow its own internal personnel policies and procedures with respect to hiring Physician Providers." Id. at SUNY001022.

> **Response**: Undisputed but note that in the following paragraph it is stated that HHC may accept or reject any hiring recommendation of Downstate "provided any such rejection is provided in writing and is not unreasonable." Id.

22. The agreement provides no mechanism for Health + Hospitals defendants to terminate a Physician Provider. Id. at *passim*.

> **Response**: Disputed. While Health + Hospitals defendants could not terminate a Physician Provider from the employment of Downstate, HHC could make a request in writing that a Physician Provider not be assigned to one of its facilities, which would go into effect if the situation could not be cured to its satisfaction, as described above. As Dr. Pulitzer clarified at his deposition, Dr. Jamaleddine had complete jurisdiction over KCHC while he was there as Chief Medical Officer and if he believed that a physician should not practice at KCHC he could effect their termination de facto by revoking his or her privileges. Ex. 38 (Pulitzer Dep. (Second)) at 42-43.

23. The agreement only allows HHC to "request in writing that the affiliate no longer assign such person to the facility." Additionally, upon making such a request to have a

Physician Provider reassigned, Health + Hospitals defendants must "provide a written justification for such a request . . . and a reasonable opportunity to cure if the issue does not involve a threat to patient health or safety." Id. at SUNY001056-001057.

>**Response**: Undisputed.

24. The agreement requires Downstate to maintain the time and attendance records of physician providers. Id. at SUNY001057-001558.

>**Response**: Undisputed.

25. The agreement requires Downstate to ensure that physician providers are qualified for employment. Id. at SUNY001025-001029.

>**Response**: Disputed. Downstate's role in the credentialing process as outlined in the affiliation agreement is to notify in a timely fashion those physicians who need to complete forms, furnish those forms for completion and collect them in order to provide them to HHC, which then confirms that those documents are filled out completely and accurately. See id. Notably, as discussed above, the Chief of Service of the Radiology Department had to perform annual evaluations of the radiologists as per the Affiliation Agreement.

26. The agreement contemplates that in the performance of duties pursuant to the agreement, physician providers are considered employees of Downstate. Id. at SUNY001079.

>**Response**: Undisputed that the affiliation agreement states as much.

27. The agreement clearly establishes that Health + Hospitals and Downstate defendants have separate management, ownership, and control. Id. *passim.*

>**Response**: Disputed.

## C. Plaintiff's Termination

28. On May 5, 2014, and again on August 22, 2014, plaintiff was warned about the need to accurately report his time and attendance, as well as the need to report on time for his scheduled shift of 9:30 a.m. to 5:30 p.m. *See* August 22, 2014 Letter, Ex. "K," HHC1241.

**Response**:    Disputed. To the extent that the above statement is meant to suggest that Dr. Greenberg was officially warned in the disciplinary sense on May 5, 2014 and then again on August 22, 2014, it is disputed. On May 5, 2014, Dr. Reede met with Dr. Greenberg about an inaccuracy on his April timesheet. Ex. 9 (SUNY 003511). She characterized this meeting as informal and not a disciplinary event. Ex. 10 (Reede Dep.) at 143. On August 22, 2014, Dr. Pulitzer met with Dr. Greenberg to relate that Dr. Reede wanted him to work an early, set schedule. Dr. Pulitzer characterized this meeting as informal, friendly and most definitely not a counseling; he was basically trying to figure out what earlier set schedule Dr. Greenberg could adopt, given his personal constraints. Ex. 5 (Pulitzer Dep.) at 310-11. The "letter" referenced as Exhibit "K" was likely a "predated" memo written by Dr. Pulitzer. There is no indication that it was written at the time that he met with Dr. Greenberg on August 22, 2014, as usually Dr. Pulitzer sent personnel memos written to the file to his administrative assistant immediately upon writing them. There is no indication that he did so with this memo. *See* (below), Plaintiff's 56.1 Statement, ¶ 21.

29. On September 3, 2014, plaintiff was informed via letter by defendant Pulitzer that he was not authorized to take leave from September 4, 2014 through September 5, 2014. The letter directed plaintiff to report to work on those dates, and that a failure to do so would result in a referral to Downstate Labor Relations. *See* September 3, 2014 Letter, Ex. "L," HHC1206.

**Response**:    Undisputed.

30. Plaintiff did not appear for work on September 4, 2014 or September 5, 2014, and as a result was directed to appear at the Downstate Labor Relations Office. *See* Pl. Tr. Ex. "E," at 242:4-250:22.

**Response**:    Undisputed that Plaintiff did not go to work on September 4 and September 5, 2014.

31. On or about September 8, 2014, plaintiff entered into a settlement with Downstate to resolve allegations of 1) unscheduled absences, 2) tardiness, 3) interfering with departmental operations, 4) insubordination, and 5) misrepresenting hours worked on his timesheets. A penalty up to and including termination was held in abeyance so long as plaintiff did not engage in any similar conduct. Additionally, pursuant to the settlement agreed to with Downstate, plaintiff was placed on "time and attendance watch". Health + Hospitals defendants were not a party to the settlement agreement nor did they participate in any of the proceeding or negotiations leading to it. *See* Settlement Agreement, Ex. "M," SUNY000012-000013.

**Response**:    Disputed as to Health + Hospital defendants not being a participant in any of the proceedings leading to the Settlement Agreement to the extent that the referral to Labor Relations and the inevitable result of that referral - the execution of a settlement agreement - was done jointly by Dr. Reede and Dr. Pulitzer, the latter of whom at the time was Interim Chief of Service, Department of Radiology, Kings County Hospital Center. In that role, Dr. Pulitzer was an agent of Health + Hospitals and conducting himself on its behalf. Further, according to Mr. Michael Arabian, the representative of Labor Relations who entered into the settlement agreement on its behalf, before he presented a settlement agreement to an employee he would confirm with those who sent the employee to Labor Relations that they were in

agreement with its terms. Ex. 27 (Arabian Dep.) at 224-25. Here, that would have been Dr. Reede and Dr. Pulitzer.

32. On or about September 24, 2014, defendant Pulitzer reported two incidents involving plaintiff. The first incident involved an unauthorized leave of absence in violation of the September 8, 2014 agreement. The second involved the use of unauthorized attestations on patient medical records. *See* September 24, 2014 Letter, Ex. "N," HHC1522-1524.

**Response**: Undisputed as to what the September 24, 2014 letter states, as it speaks for itself.

33. On October 10, 2014, plaintiff was questioned by the Downstate Labor Relations Office in regards to the issues referenced in the September 24, 2014 letter. At that time it was determined that plaintiff had violated the terms of the September 8, 2014 settlement agreement. On October 20, 2014, plaintiff was afforded an opportunity to explain why he should not be terminated as a result of the incidents described in the September 2014 letter. By letter dated October 22, 2014, plaintiff was informed by Downstate Labor Relations' Assistant Vice President, Leonzo Cuiman that he was being terminated effective immediately. *See* October 22, 2014 Letter, Ex. "O," SUNY001275.

**Response**: Undisputed that plaintiff was interrogated by a representative of Downstate Labor Relations on October 10, 2014. Undisputed that plaintiff met once again with representatives of Downstate Labor Relations on October 20, 2014. Undisputed that Leonzo Cuiman signed a letter dated October 22, 2014 that stated that Dr. Greenberg's employment at KCHC was terminated. Undisputed that Labor Relations decided in conjunction with and approval from Dr. Pulitzer, Dr Reede and Dr. Jamaleddine that Dr. Greenberg's alleged conduct merited termination. Ex. 5 (Pulitzer Dep.) at 133, 135, 290, 439; Ex. 38 (Pulitzer Dep. (2d)) at

37, 41-42. Disputed that "[a]t that time it was determined that plaintiff had violated the terms of the September 8, 2014 settlement agreement" to the extent that the statement makes unclear who decided that Dr. Greenberg was in violation of the terms of the settlement agreement and when that determination was made.

34. The decision to terminate plaintiff was made jointly by Leonzo Cuiman, Assistant Vice President of Downstate Labor Relations, and Stephanie Bernadel, Senior Personnel Associate in the Downstate Labor Relations Office, along with Adriana Conde-Billy, Director of Downstate Labor Relations, and defendant Reede without input from any HHC or KCHC employee. *See* Deposition Leonzo Cuiman, ("Cuiman Tr."), Ex. "P," at 6:25-7:4; 63:20-64:4; 221:8-222:14; and 231:7-9.

**Response**:    Disputed. Dr. Pulitzer testified at his deposition that he, Dr. Reede and Dr. Jamaleddine were very involved in the decision to terminate Dr. Greenberg after the attestation episode. See Response above in paragraph 33. Dr. Jamaleddine and Dr. Pulitzer, at the time that they were discussing Dr. Greenberg's fate after the second referral to Labor Relations, were representatives of HHC and KCHC in that Dr. J was the Chief Medical Officer of KCHC and Dr. Pulitzer was the Section Chief of the Radiology Department there.

35. Ms. Bernadel did not speak with any HHC employees in connection with the investigation into Plaintiff's behavior, nor was anyone from KCHC notified when plaintiff was terminated. *See* Deposition of Stephanie Bernadel ("Bernadel Tr."), Ex. "Q," at 214:2-6 and 305:8-21, *see also* Cuiman Tr., Ex. "P," at 222:17-19.

**Response**:    Disputed in light of the fact that Dr. Pulitzer can be fairly characterized as an HHC and/or KCHC employee and he testified that he spoke with Ms. Bernadel after he referred Dr. Greenberg to Labor Relations the second time. Ex. 38 (Pulitzer

Dep. (2d)) at 41. Also, Dr. Pulitzer testified that it was his impression that after the second referral of Dr. Greenberg to Labor Relations, someone there spoke to Dr. Jamaleddine about Dr. Greenberg. See id. at 41-42. Further, Ms. Bernadel did interview a KCHC employee by the name of Andre Pyle in the course of investigating Dr. Greenberg's conduct. Ex. 65 (SUNY 000455).

36. Dr. Ghassan Jamaleddine, then the Chief Medical Officer of KCHC, was never told by anyone that they wanted plaintiff fired, never asked anyone himself to see to it that plaintiff would be fired, or even indicated that he himself wanted plaintiff to be fired. See Jamaleddine Tr., Ex. "D," at 179:18-180:6.

**Response**:    Disputed. Dr. Pulitzer testified that Dr. Jamaleddine conveyed to him multiple times that he agreed with the decision that Dr. Greenberg should be terminated and let it be known that he would not allow him to return to KCHC after the attestation episode. Ex. 5 (Pulitzer Dep.) at 133, 136-37, 439; Ex. 38 (Pulitzer Dep. (Second)) at 37 & 42.

## C.    Alleged Discrimination

37. Plaintiff alleges that his termination was part of an effort by defendant Reede to "reduce the number of non-black (principally White/Caucasian), and particularly Jewish, physicians and other personnel in the department [of radiology], and increase the number who were/are Black (African-or Caribbean American), non-Jewish and largely, if not uniformly, younger." See SAC, Ex "A," at ¶17.

**Response**:    Undisputed as to what the Second Amended Complaint states.

38. Plaintiff alleges that the alleged discriminatory effort by defendant Reede included such actions as "the outright discharge of several White, Jewish and/or older physicians and other personnel; the slashing of the compensation of other White (including Jewish) and/or

older physicians and other personnel who were not immediately discharged (while the compensation of Black, non-Jewish and/or younger physicians was maintained); and the micro-management of those physicians in the conduct of their daily duties." Id at ¶¶17-20.

**Response**:    Undisputed as to what the Second Amended Complaint states.

39. Plaintiff alleges that defendant Reede "made statements which disparaged and/or stereotyped Jews, cast them in a negative light, or otherwise made clear her plain and obvious bias against them on the basis of their race and religion. Id. at ¶ 21.

**Response**:    Undisputed as to what the Second Amended Complaint states.

40. Plaintiff's only support for the aforementioned allegations is inadmissible hearsay. See Pl. Tr., Ex. "E," 510:20-519:7.

**Response**: Disputed.  Esther Neiman testifies that Dr. Reede evinced discriminatory bias against Jews on several occasions while they worked in close proximity to each other in 2013.  Declaration of Esther Neiman dated June 27, 2018.

41. The termination of other non-parties was for legitimate non-discriminatory reasons. Specifically, upon information and belief as set forth in the record, a restructuring of the Downstate Radiology Department took place following a report by the Accreditation Council for Graduate Medical Education ("ACGME"), that placed the department on probation. See ACGME Report, Ex. "R", passim, see also Deposition of Dr. Deborah Reede ("Reede Tr."), Ex. "S," 67:12-97:12.

**Response**:    Undisputed only to the extent that the residency program at SUNY was placed on probation.  Disputed as to the legitimacy of any non-discriminatory reasons.

41. Plaintiff does not believe that Dr. Jamaleddine discriminated against him. See Pl. Tr., Ex. "E", at 463:10-25.

**Response**:    Undisputed as to what Dr. Greenberg stated at his deposition.

Notably, it is fairer characterization of Dr. Greenberg's testimony regarding Dr. Jamaleddine that

he willingly participated in a process that was informed by discriminatory animus. Id. at 463.

## Plaintiff's Statement of Material Facts That Preclude Summary Judgment

### Background Facts

1.     At the time that Dr. Greenberg was unlawfully terminated from his

employment at Downstate and KCHC, he had been a radiologist in the Emergency Room at

KCHC for over fourteen years. See Second Amended Complaint ("Compl."), ¶ 1. During his

employment at Downstate and KCHC, Dr. Greenberg served as a Director of ER Radiology from

approximately 2005 or 2006 to 2009. Ex. 1 (Greenberg Dep.) at 89.[3] Dr. Greenberg's

credentials were both unusually strong and versatile in that he was fellowship-trained in Body

Imaging by an ACGME-approved program and was board-certified in two sub-specialties,

Diagnostic Radiology and Anatomic Pathology, a versatility shared by no other colleague at

KCHC. See Compl. ¶ 1.

2.     According to his colleagues, even to those who played a pivotal role in

terminating his employment, namely, Dr. Deborah Reede, Chair of the Department of Radiology

at Downstate and Dr. Pulitzer, Chief of Service, Department of Radiology, KCHC, Dr.

Greenberg was a highly competent radiologist. Ex. 4 (SUNY000498); Ex. 5 (Pulitzer Dep.) at

426 ("Dr. Greenberg was a very well respected radiologist in our department. I mean, he was

one of the best radiologists we've ever had and people look up to him"); Ex. 6 (Scott Dep.) at 90.

During 2013, according to departmental metrics that counted all studies completed by KCHC

radiologists and then weighted those studies according to their complexity, out of 24 radiologists,

---

[3]All subsequent citations to exhibits, "Ex.," will refer to those annexed to the Edgar Declaration.

Dr. Greenberg was the fifth highest in terms of productivity. Ex. 7 (SUNY 002439) (14,954 studies completed and weighted at 10,160.1). According to other colleagues, Dr. Greenberg was not only a highly capable radiologist but he was also a "good teacher." Ex. 6 (Scott Dep.) at 90.

### KCHC's Status As Dr. Greenberg's Employer

3.      Dr. Greenberg, like many of his colleagues in the Radiology Department at KCHC, was considered a SUNY Downstate employee but practiced at KCHC subject to an affiliation agreement. Greenberg Decl., ¶ 2.

4.      Dr. Greenberg's employment relationship with KCHC consisted of the following: (a) for a total of approximately 11 years, he practiced only at KCHC and he was obliged to observe and follow KCHC's policies, procedures, rules and regulations in the course of performing his duties; Greenberg Decl., ¶ 2; (b) his credentials for practicing privileges were collected, renewed and stored by KCHC; Id. (c) in the course of his practice, he used only KCHC equipment; Id. (d) to the public, Dr. Greenberg and his colleagues were held out as KCHC representatives in terms of uniforms and identification; Id. (e) records of his completion of Continuing Medical Education courses were kept by KCHC; Id. (f) he was supervised by Dr. Steven Pulitzer who had a KCHC title (again, Chief of Service, Department of Radiology); Id. (g) Dr. Pulitzer set Dr. Greenberg's work schedule; Id. (h) when Dr. Greenberg requested time off he sought Dr. Pulitzer's permission; Id. and (i) Dr. Pulitzer was the manager who referred Dr. Greenberg to Labor Relations for discipline. Id.

### Dr. Steven Pulitzer's Position In the KCHC Organization

5.      At his deposition, Dr. Pulitzer testified that as Chief of Service in the Radiology Department, he reported to the Chief Medical Officer of KCHC, which was Dr. Ghassan Jamaleddine. Ex. 38 (Pulitzer Dep. (2d)) at 13. By reporting to Dr. Jamaleddine, Dr.

Pulitzer explained that he meant: "Everything that was going on in my department in terms of physicians, technical staff, clerical staff; regulatory issues ... any daily operation of the department." Id. at 14. With respect to what he reported to Dr. Jamaleddine concerning the radiologists in the department, he would share any performance issues that were identified such as time and attendance and unruly behavior. Id. at 15. Dr. Pulitzer noted that he also reported to Dr. Reede and shared with her the same information that he shared with Dr. Jamaleddine. Id. at 16.

### Dr. Reede and Dr. Pulitzer Target Dr. Greenberg
### For Heightened Scrutiny and Then Mistreatment

6.     Although Dr. Greenberg survived a round of layoffs that were approved in April of 2014 by Dr. Deborah Reede, Department of Radiology, Downstate, and Dr. Jammeladine, Chief Medical Officer at KCHC, see Declaration of Deborah Reede, M.D. dated March 26, 2018 ("Reede Decl."), ¶ 9, he was soon to be targeted for special scrutiny at this time by Dr. Reede and Dr. Pulitzer, who was then assistant to Dr. Kantor who was, in turn, Chief of Service at the Radiology Department at KCHC. Specifically, on April 30, 2014, Dr. Pulitzer sent Dr. Reede an email conveying what he believed to be Dr. Greenberg's first case "read" and last case "read" from April 14 to April 22, 2014. Ex. 55 (SUNY 003486). Although there is no context for this email, it implies that that they were cooperating in the effort to scrutinize the hours worked by both Dr. Greenberg and Dr. Chen. What is odd here is that Dr. Reede is not including Dr. Kantor in this surveillance project.[4] Eventually, Dr. Greenberg would fill out his timesheet for April 2014, which is done monthly and once April is completed, and he fell into

---

[4]It is a safe assumption that Dr. Reede reached out to Dr. Pulitzer at this point and began exerting her influence because she knew, after discussions with Dr Jamaleddine, that Dr. Kantor was going to be terminated and Dr. Pulitzer was likely to be his replacement. See Declaration of Deborah L. Reede, M.D. dated March 26, 2018 ("Reede Decl."), ¶ 9.

the trap set by Dr. Reede and Dr. Pulitzer by erroneously indicating that he worked 9 to 5 p.m. on April 21, 2014 when in fact he arrived later than 9 a.m. Ex. 9 (SUNY 003511). Dr. Reede requested a meeting with Dr. Greenberg to discuss this error, which meeting occurred on May 5, 2014. See id. Notably, Dr. Reede suggested that it was an assistant who drew her attention to Dr. Greenberg's incorrect time entry, "[t]he administrative assistant responsible for monitoring the time sheets reported a discrepancy in his April time sheet," but she was clearly involved in spotting the error, as Dr. Pulitzer would not have sent to her information about Dr. Greenberg's activity log without a request from her. Id.; Ex. 10 (Reede Dep.) at 143-44. In her deposition, Dr. Reede admitted that this meeting was not disciplinary in any way. Ex 10 (Reede Dep.) at 143. Her memo of the meeting, however, implies that it was a counseling and her inclusion of the remark, "he did not see what the problem was because he read all the films," suggests that she wanted that nugget in the file in case there were subsequent issues with Dr. Greenberg. Ex. 9 (SUNY 003511). Dr. Greenberg's memorialization of the meeting in the form of an email that he sent to Dr. Reede addresses an issue that she does not even mention: a resident evaluation. Ex. 11 (SUNY 000477). It is as if Dr. Greenberg and Dr. Reede attended different meetings.

### Dr. Pulitzer's "Counseling" Of Dr. Greenberg on August 22, 2014

7.     By the beginning of July 2014, Dr. Pulitzer assumed the position of Interim Chief of Service at the Department of Radiology. Ex. 5 (Pulitzer Dep.) at 10 & 13. Upon assuming the position, Dr. Pulitzer demonstrated that his leadership of the department would be deeply intertwined with Dr. Reede's oversight in that he intended to provide to her daily updates. Ex. 14 (HHC_ESI_000363).

8.     Dr. Pulitzer was also focused on closely monitoring Dr. Greenberg's time and attendance. On August 20, 2014, Jayan Kurian, an IT administrator at KCHC, sent to Dr.

Pulitzer a daily log indicating when Dr. Greenberg completed a review of each film that he analyzed from July 1, 2014 to August 8, 2014. Ex. 15 (HHC_ESI_000777-872). Later the same day, Dr. Pulitzer forwarded this comprehensive log to Dr. Reede without a cover email, implying that they were in an ongoing conversation about Dr. Greenberg's time and attendance and/or productivity. Ex. 16 (HHC_ESI_873). No other radiologists in the department were singled out for scrutiny in this manner during this time period.

        9.     Two or three days after receiving the logs from Kurian, Dr. Pulitzer approached Dr. Greenberg at work to discuss his schedule. According to memos to the file that he created after the fact, Dr. Pulitzer approached Dr. Greenberg on either August 22 or 23, 2014 to "counsel" him about his erratic work schedule and to require him to work a set schedule of 9:30 a.m. to 5:30 p.m. Ex. 17 (HHC_ESI_001062-63; HHC_ESI_001092). At his deposition and under oath, Dr. Pulitzer recharacterized this encounter as a friendly discussion intended to accommodate Dr. Greenberg's scheduling preferences to the requirements of the department. Ex. 5 (Pulitzer Dep.) at 311. Notably, Dr. Pulitzer's memos to the file about this August 22 or 23, 2014 discussion between Dr. Greenberg and himself appear to have occurred after Dr. Greenberg approached him on September 2, 2014 to request permission to take the rest of the week off to take care of his autistic son – a request that Dr. Pulitzer immediately denied. Ex. 17 (HHC_ESI_001062-63). See, infra, ¶ 22.

        10.     Dr. Greenberg has a far different account as to the content of this discussion with Dr. Pulitzer. Greenberg Decl., ¶ 7. Basically, Dr. Pulitzer related that Dr. Reede wanted to impose an early, set schedule on Dr. Greenberg, in spite of the fact that imposing such would leave the later ER radiology shift without his assistance during most of the busiest hours from 4 p.m. to 8 p.m. and created a hardship for Dr. Greenberg who often came in later than 9

a.m. because he helped his special-needs son get ready for summer camp in the morning. Id. Dr. Pulitzer conveyed to Dr. Greenberg that Dr. Reede was insisting on the schedule and was out to get him. Id. According to Dr. Greenberg, he and Dr. Pulitzer did not discuss his so-called recent erratic work schedule nor the threat that continuation of such would lead to discipline. See id. In response to his discussion with Dr. Pulitzer, on August 25, 2014, Dr. Greenberg wrote an email where he continued the discussion about an earlier, set schedule in which he points out its illogic but agrees to comply. Ex. 3 (HHC_ESI_001006). It is a response that neither in tone nor in the fact that it includes three of his colleagues supports the theory that what just occurred was a disciplinary counseling. At his deposition when Dr. Pulitzer was questioned whether he made the statement to Dr. Greenberg that Dr. Reede was a like a cop and out to get him, Dr. Pulitzer stated that he could not remember whether he ever made this statement (as opposed to denying having ever made the statement to him). Ex. 5 (Pulitzer Dep.) at 325.

### Events Leading Up To Dr. Greenberg's Request for FMLA Leave

11.     During the week of August 25, 2014, Dr. Greenberg was scheduled to be on vacation for at least part of the week. Ex. 18 (HHC_ESI_000969-71). In the email that Dr. Greenberg sent to Dr. Pulitzer on August 25, 2014, he also mentioned that despite the fact that he was on vacation he was going to attend a multi-disciplinary meeting at KCHC where he was to present his findings as to why certain serious cases in the ER were not timely read by the Radiology Department. Ex. 3 (HHC_ESI_001006). After Dr. Greenberg attended the multi-disciplinary meeting, he went down to ER to check in with his colleagues and he saw that no one was in the Radiology reading room. Greenberg Decl., ¶ 8. Because he had just attended a meeting where he attributed one of the causes for untimely reading of cases in ER Radiology to staffing cuts Dr. Greenberg felt morally obligated to start reading cases to help the department.

Id. According to Dr. Greenberg, Dr. Hammill, the colleague in charge of the department while Dr. Pulitzer was on vacation, welcomed the assistance. Id. Further, the official schedule of the department was revised on August 26, 2014 to the extent of indicating that Dr. Greenberg would be working for the rest of the week. Ex. 19 (HHC_ESI_001044-45).

12.    On Friday, August 29, 2014, Dr. Greenberg and his wife learned by email that their special needs son was in all probability going to be transferred to a different school. Ex. 20 (G212-13); Ex. 1 (Greenberg Dep.) at 224-26.

13.    Upon learning that Jayden was likely to have to attend a different school for the new academic year, Dr. Greenberg and his wife conferred and came to the decision that in light of his special bond with Jayden, Dr. Greenberg should take leave from work for a few days the following week in order to assist with any arrangements that needed to be made to facilitate the transfer and to provide love and support to his son while he made the difficult transition to another school. Greenberg Decl., ¶ 9. On the same day that he received the email from Gateway School, on August 29, 2014, Dr. Greenberg attempted to call Dr. Reede to notify her of his need for a leave. Id. Dr. Reede was on vacation and her voicemail was full and not taking any additional messages. Id. With Dr. Pulitzer also on vacation, Dr. Greenberg resorted to emailing Dr. Reede's assistant, Linda McMurren, to notify her of his need to take a few days off the following week "on an emergent basis." Ex. 22 (HHC_ESI_001090). Linda McMurren, like her boss Dr. Reede, was on vacation on August 29, 2014; she did not respond to this email until September 4, 2014. Id. Dr. Greenberg's first opportunity to have a discussion about his need for a leave occurred on September 2, 2014, when Dr. Pulitzer arrived at work after his previous week's vacation.

14.     In attempting to reach out to Dr. Reede on the very same day that he learned that he would need a leave of absence the following week, Dr. Greenberg was following protocol in reaching out to Downstate's Department Chair to notify her of the need for an unexpected absence. Ex. 59 (SUNY 000677).

### Dr. Greenberg's Three Discussions With Dr. Pulitzer About His Unexpected Family Leave

15.     After Dr. Pulitzer told Dr. Greenberg that Dr. Reede was like a cop looking to catch him, Dr. Greenberg approached Dr. Pulitzer on September 2, 2014 in order to obtain permission to take a multi-day leave related to his special-needs son's unexpected transfer from one school to another. Ex. 17 (HHC_ESI_001063). On the very same day that Dr. Greenberg sought the leave from Dr. Pulitzer, Dr. Pulitzer denied it. Id. ("The operational needs of the department would not permit him to be off this week"). The next day Dr. Greenberg approached Dr. Pulitzer again stating that he needed to take the leave and was going to take it in any event. Ex. 5 (Pulitzer Dep.) at 351-52; 355-56. In response to Dr. Greenberg's statement that he was going to take the leave despite Dr. Pulitzer's denial of the request, Dr. Pulitzer testified that he sought the advice of Dr. Reede. Id. Dr. Reede told him to write a letter to Dr. Greenberg in which he expressly denied the leave request, ordered Dr. Greenberg to come to work on the days that he requested off and threaten to send him to Labor Relations if he failed to show up for work. Id. at 355-56. According to Dr. Pulitzer's testimony, he wrote the letter that Dr. Reede told him to write then went to Dr. Greenberg to hand deliver it. Ex. 5 at 358. He read the contents of the letter to Dr. Greenberg. Id. Dr. Greenberg said in sum and substance you are making me choose between my job and my family to which Dr. Pulitzer responded in sum and substance that he was not making that choice. Id. at 360. They had a conversation about each other's families for a few minutes and then he left Dr. Greenberg. Ex. 50 (HHC_ESI_001087).

16.     Dr. Greenberg contends that he notified Dr. Pulitzer from the outset that the reason he needed the time off in early September was to help Jayden with his transition to a new school. Ex. 1 (Greenberg Dep.) at 228-29. Dr. Pulitzer vehemently denied that Dr. Greenberg mentioned Jayden, a transition to a new school, and the need for Dr. Greenberg to be with his son to assist in this transition in the context of asking for this time off, which context included three separate discussions between them. Ex. 5 (Pulitzer Dep.) at 341, 345 & 359. Pulitzer admitted at his deposition that if he had known that the needs of Jayden were involved in the request for leave he would have worked to accommodate the request. Id. at 361.

17.     At the time that Dr. Greenberg sought a multi-day leave to assist in making arrangements for his special-needs son's transfer to another school and provide to him love, care and support because this transition was likely to be very difficult for Jayden given his severe mental deficits, Dr. Greenberg was eligible for leave under the Family Medical Leave Act, as he worked full time at KCHC (i.e., at least 40 hours per week) continuously since 2010. Greenberg Decl., ¶ 2.

18.     SUNY Downstate and KCHC are both entities that are instrumentalities of New York State and New York City respectively and therefore are "covered employers" as defined by the FMLA, meaning that they are obligated to provide FMLA leave for eligible requests. Greenberg Decl., ¶ 3.

19.     Jayden Greenberg has a serious condition. He has been diagnosed with autism spectrum disorder from which he has suffered since he was two years old and continues to suffer from the condition to this date. Greenberg Decl.,¶ 4. Since before he was two and continuously to date, he has had services that include at least weekly speech therapy, occupational therapy, physical therapy, psychotherapy and social skills therapy. Id. Since Dr.

Greenberg can remember, Jayden has had an Individualized Education Program. Id. Currently and at the time relevant to this litigation, Jayden was medicated for anxiety and depression. Id. Around the time of events relevant to this litigation, in 2014, Jayden went to The Gateway School that caters to students with learning disabilities. Id. At The Gateway School, Jayden's education was informed by an Individualized Education Plan which contemplated that he would be in a special education class with no more than 8 students per teacher at all times. Id. It also contemplated that he would receive speech therapy and physical therapy twice per week and psychological counseling once per week. Id. During this time, as indicated above, he was also under the continuing supervision of a psychotherapist who treated him with medication for attention deficit disorder, along with depression and anxiety. Id. Due to his severe deficits, during the time relevant to the litigation, when he was about eight years old, Jayden was unable to dress, eat and groom himself without assistance from Dr. Greenberg or his wife or his teachers when he was at school. Id. In short, Jayden required adult supervision at all times. Id. During the time when Jayden learned that he had to go to a new school, around the time that Dr. Greenberg asked for a short-term leave at work, he was presenting with tremendous stress and anxiety and Dr. Greenberg was concerned that it would lead to incapacity. Id.

### Dr. Greenberg Takes His Family Medical Leave Despite Dr. Pulitzer's Threat Of Referral to Labor Relations

20.     Dr. Greenberg took off September 4 and 5, 2014 without the permission of Dr. Pulitzer and under the threat that in doing so he would be referred to Labor Relations. In fact, Jayden did have to transition to a different school. By the morning of September 4, 2014, Jayden's maternal grandmother arrived in town to assist Dr. Greenberg and his wife provide love, support and care to Jayden while he made the transition. Ex. 1 (Greenberg Dep.) at 242. On September 5, 2014, Dr. Greenberg wrote an email to Linda McMurren and carbon copied Dr.

Pulitzer to provide an update as to his absence. Ex. 22 (HHC_ESI_001089-90). In this email, Dr. Greenberg related that he intended to come to work on September 4th but he threw his back out and was unable to come in because of it. Id. When questioned about this email at his deposition, Dr. Greenberg admitted that this email was written to provide an excuse for his absence since he was in fear of losing his job. Edgar Decl., Ex. 1 (Greenberg Dep.) at 246-47. When asked whether his resolve ever changed about not showing up for work on September 4 and 5, 2014, Dr. Greenberg testified no – that he always intended to stay at home to help Jayden. Id. at 242 & 247.

21.     On September 4 and 5, Dr. Reede and Dr. Pulitzer were busy papering the proverbial file and conferring with Labor Relations in order to set in motion the disciplinary machine that awaited Dr. Greenberg upon his return. On September 4, 2014 at 2:48 p.m., Dr. Reede notified Labor Relations that Dr. Greenberg did not come into work as ordered. Ex. 23 (SUNYESI000000278). Michael Arabian of Labor Relations reached out to Dr. Pulitzer later that day to get complete details as to what occurred when he hand-delivered the September 3, 2014 letter to Dr. Greenberg denying his request for leave. Ex. 24 (SUNY 000494). Dr. Pulitzer responded to the inquiry by sending Mr. Arabian a memo that addressed much more than what Mr. Arabian sought: a detailed background as to Dr. Greenberg's allegedly disruptive behavior throughout the month of August in addition to what occurred surrounding the request for leave. Ex. 25 (HHC 1135-36). On the same day that he sent the memo to Mr. Arabian, September, 5, 2014, Dr. Pulitzer generated what appears to be a "predated" memo to the file on KCHC letterhead; it purported to summarize the discussion with Dr. Greenberg on August 22, 2014. Ex. 17 (HHC_ESI_001092). Although the memo on KCHC letterhead omits use of the term "counseled" to describe this meeting (notably, the term was used in the unofficial memo to the

file on September 2, 2014, Ex. 17 (HHC_ESI_001063)), it nonetheless suggests that the meeting was disciplinary in nature. Significantly, Dr. Pulitzer was in the habit of sending memos regarding personnel issues immediately upon being written to his administrative assistant, Sade Jemmott. See, e.g., Ex. 17 (HHC_ESI_001062-63). The "predated" memo bears the date August 22, 2014 but there is no indication that he sent this memo to Ms. Jemmott on that date; rather, he sent it to her and Dr. Reede on September 5, 2014.

22.     At some point on September 5, 2014, Dr. Reede, Dr. Pulitzer and Mr. Arabian met to discuss Dr. Greenberg's referral to Labor Relations. Ex. 5 (Pulitzer Dep.) at 363-72. Dr. Pulitzer admitted that the meeting was arranged through Dr. Reede's office since she was familiar with Labor Relations and he was "a very, very new administrator." Id. at 363.

### Dr. Greenberg's Return To Work After Taking His FMLA Leave

23.     Dr. Greenberg returned to work on September 8, 2014 and was told by Dr. Pulitzer to report to Labor Relations immediately. Ex. 5 (Pulitzer Dep.) at 373. Dr. Greenberg reported to Labor Relations where he was interrogated by Mr. Arabian for approximately two hours regarding the circumstances arising from his request for a leave of absence, the denial of that request and what occurred on September 4th and 5th. Ex. 26 (SUNY 001280-1314). He was then asked to remain in his seat and in the room where he was interrogated for many hours while Mr. Arabian consulted with his supervisor as to the proposed terms of a settlement with Dr. Greenberg. Greenberg Decl., ¶ 10.

24.     What is notable about Dr. Greenberg's interrogation are the clear statements that he makes regarding the reasons why he sought a brief leave: that he had a special needs son; that this son was being transferred to a new school; that the son would find the transfer to be particularly difficult in light of his autism spectral disorder; and that his son needed

him for love, care and support. Ex. 26 (SUNY 001290-91, 1303-04, 1308-11). In hearing these reasons, Mr. Arabian nonetheless did not probe Dr. Greenberg as to whether he presented these circumstances to Dr. Pulitzer when he asked for the leave nor did he appear to probe further himself to see if they might fall within the ambit of the Family Medical Leave Act. At his deposition, when Mr. Arabian was asked whether he believed that the reasons that Dr. Greenberg stated for his request for a leave might qualify for the Family Medical Leave Act, he responded no. Ex. 27 (Arabian Dep.) at 272. Mr. Arabian admitted that he did not remember having any training on FMLA while employed at SUNY; further, he believed that the issue of FMLA was associated with Human Resources and not Labor Relations. Id. at 270-71.

25.     After signing a settlement agreement presented to him by Mr. Arabian in circumstances that can fairly be described as under duress, Dr. Greenberg returned to work. While Dr. Reede and Dr. Pulitzer testified that they had nothing to do with the terms of the settlement agreement presented to Dr. Greenberg, it is noteworthy that Mr. Arabian testified that in his experience at SUNY Labor Relations a settlement agreement would not be presented to an employee without first running its terms by the department heads who would be affected by the agreement. Id. at 224-25. Here, the department heads were Dr. Reede and Dr. Pulitzer.

26.     According to the terms of the settlement agreement, Dr. Greenberg could be terminated should he have any subsequent issues with: (1) unscheduled absences; (2) tardiness; (3) interference with the operations of the department; (4) insubordination or (5) misrepresentation of hours worked on timesheets. Ex. 29 (SUNY 006626-27). The terms of Dr. Greenberg's settlement were conspicuously harsh when compared to settlements reached with other staff in the Radiology Department around the same time: of the nine settlement agreements that defendants produced with respect to employees other than Dr. Greenberg who allegedly

committed misconduct during the relevant period that warranted referral to Labor Relations only one stripped the employee of his or her protection of termination for cause in a manner similar to Dr. Greenberg's settlement. Ex. 30 (SUNY 6601-3, 6582-83, 6625, 6652-53, 6621-22, and 6654-57).

### Dr. Reede's and Dr. Pulitzer's Close Surveillance of Dr. Greenberg

27.     Both Dr. Pulitzer and Dr. Reede intensified their already close scrutiny of Dr. Greenberg after he returned to work after the referral to Labor Relations. On September 9, 2014, Dr. Greenberg wrote an email to Dr. Pulitzer in which he complained about the slow speed in which certain archived messages were accessed by his computer; he asked if a workaround was available. Ex. 32 (HHC_ESI_001238). Dr. Pulitzer requested that his assistant put this email in Dr. Greenberg's personnel folder. Id. On September 12, 2014, Dr. Pulitzer emailed Dr. Reede one of his updates and the first item that he addressed was Dr. Greenberg: "Will monitor time and attendance and number of cases read per day." Ex. 33 (HHC_ESI_1243). On September 15, 2014 at 8:52 a.m., Dr. Reede emailed Dr. Pulitzer and posed the question: "is Dr. Greenberg reading films?" Ex. 34 (HHC_ESI_1259). Dr. Pulitzer responded within 35 **minutes** with the answer, "Yes. He is." Ex. 35 (HHC_ESI_1262).

28.     On September 15, 2014, Dr. Greenberg wrote to Dr. Pulitzer and carbon copied Dr. Reede. In this email, he provided his account of events that led up to his allegedly insubordinate leave of absence on September 4 and 5, 2014. Ex. 36 (HHC 1529). What is particularly notable about this email is his return to the theme that he felt he had the right to take a leave of absence "for important family issues." Id. Here, Dr. Greenberg is expressly and in writing referencing a family issue that was the basis for his request. In response to this email, neither Dr. Reede nor Dr. Pulitzer responded to Dr. Greenberg; rather, they wrote to each other

with Dr. Reede observing: "Dr. Greenberg is trying to cover his tracts [sic]." Ex. 37

(HHC_ESI_001274). To which Dr. Pulitzer responded: "Yes I have filed his email in his file.

He is really all over the map." Id.

      29.    Dr. Pulitzer testified that he related to Dr. Jamaleddine the circumstances

that led to Dr. Greenberg's initial referral to Labor Relations for taking an unauthorized leave of

absence on September 4 and 5, 2014. Ex. 38 (Pulitzer Dep. (2d)) at 23-24.

### Dr. Greenberg's Alleged Violation of His Probation

      30.    On September 22, 2014, there was a Radiology Department meeting to

which Dr. Greenberg arrived late. Greenberg Decl., ¶ 11. During the portion of the meeting that

Dr. Greenberg attended, he understood that another hurdle had been placed on him and his

already overly burdened colleagues – attestations that would have to be affixed to all studies that

indicated whether attending physicians agreed or disagreed with residents' initial readings of

films. Id. Dr. Greenberg was frustrated by this new requirement that would have him author

language that he viewed as unnecessary and would add a step to the review of patient studies

with the likely consequence that it would cause a backlog in the flow of work. Id. When Dr.

Greenberg returned to the reading room at ER after the meeting, in his frustration, he authored an

attestation that met the insurers' requirements as far as he understood them but in a playful or, at

worst sarcastic, manner. Id. Having arrived late for the departmental meeting, he had no idea

that the attestations to be used were available as a macro from one of his colleagues. Id. Dr.

Greenberg started immediately affixing this attestation that he authored on studies that were

stale, clinicians had already acted upon and were on his desk because they were rejected by

insurers for lack of an attestation. Id.

31.     On the very day that Dr. Greenberg's attestations were affixed to studies, one of his colleagues, Dr. Velayudhan, alerted him that it was causing a stir in the hallways – other physicians and radiologists were whispering about it. Greenberg Decl. ¶ 12. Dr. Velayudhan suggested to Dr. Greenberg that he inquire as to whether he could modify the attestation. Id. When Dr. Greenberg realized that his attestation was creating controversy, he immediately took action. He went to the IT Department to ascertain whether it was possible to modify the attestation that he already affixed to studies. Greenberg Decl., ¶ 12; Edgar Decl., Ex. 1 (Greenberg Dep.) at 291-93. Notably, he did not request the IT Department to do so, as defendants suggest; he merely asked whether it was possible. Greenberg Dec., ¶ 12. When one of the employees in the IT Department responded that it was possible but he would get in trouble for doing so, Dr. Greenberg reassured him that he would not ask him to do anything that was improper or would get him into trouble. Id.; Ex. 1 (Greenberg Dep.) at 293.

32.     Notably, Dr. Pulitzer, who according to his account of the attestation episode at his deposition and in his affidavit, viewed its distribution as a grave act of misconduct that was allegedly beyond the pale, never discussed the episode with Dr. Greenberg. Ex. 5 (Pulitzer Dep.) at 148-50; Greenberg Decl., ¶ 13. In the immediate aftermath of the discovery of Dr. Greenberg's attestations, Dr. Pulitzer convened meetings with the Chief Medical Officer of KCHC, Dr. Ghassan Jamaleddine, and the Legal Department at KCHC to obtain guidance as to how he should proceed both with respect to the studies that had the attestation and what, if any, disciplinary measures should be imposed on Dr. Greenberg; Dr. Jamaleddine was of the opinion that Dr. Greenberg must be terminated; in fact, he made it clear that he would not allow Dr. Greenberg to practice anymore at KCHC. Ex. 38 (Pulitzer Dep. (Second)) at 42. Dr. Reede and Dr. Pulitzer were both of the opinion that Dr. Greenberg should be terminated. Ex. 28 (Bernadel

Dep.) at 9; Ex. 5 (Pulitzer Dep.) at 420-421. According to Dr. Pulitzer, Dr. Greenberg's use of the attestation suggested that "something had changed in him" and was therefore unfit for continued practice at KCHC. Ex. 5 (Pulitzer Dep.) at 115.

  33. On September 24, 2014, Dr. Pulitzer sent a memo to Labor Relations in order to report two incidents that he viewed as violations of the terms of Dr. Greenberg's Settlement Agreement with Labor Relations. Ex. 39 (SUNY000863-65). The second incident described was the attestation that created a stir. Id. (SUNY000863). The first incident was Dr. Greenberg's alleged insubordination in leaving the ER without authorization after Dr. Pulitzer denied his request to be permitted to take a few hours off in the afternoon in addition to an authorized absence that he took in the morning to deal with funding issues related to Jayden's education. Id.; Ex. 44 (HHC 1526). Dr. Greenberg testified that he did not leave ER without authorization; rather, during the time in dispute, which was about 1 hour and 40 minutes, he conferred with another radiologist and then other clinicians at the ER and then for about 40 to 50 minutes he crossed the street to eat lunch at the SUNY campus, which he was allowed to do without asking for leave. Ex. 1 (Greenberg Dep.) at 300-305; 308-09. Dr. Pulitzer never approached Dr. Greenberg to get his account of this alleged unauthorized absence from the ER. Greenberg Decl., ¶ 13.

  34. In a letter sent by Labor Relations dated October 3, 2014, Dr. Greenberg was notified that he was to report to Labor Relations on October 8, 2014 for another interrogation regarding alleged misconduct. Ex. 40 (SUNY000014). The interrogation was rescheduled to October 10, 2014 and continued on October 20, 2014. Ms. Bernadel of Labor Relations was in charge of the second referral of Dr. Greenberg to Labor Relations. In the course of her investigation, she spoke to Dr. Pulitzer in advance of the first interrogation. Ex. 31

(SUNY 429-30).  On October 14, 2014, she interviewed three radiologists who attended the

September 22, 2014 meeting where attestations were discussed.  Ex. 41 (SUNY 448-49 & 1252).

The radiologists had varying accounts of the status of the attestations, i.e., whether there was an

official policy at the time that Dr. Greenberg created his.  Notably, Dr. Rhonda Osborne stated

that she was unsure whether a final attestation form had been established at the time.  Id. (SUNY

1252).  Around the time of the second interrogation, Ms. Bernadel, along with her supervisor

Leonzo Cuiman, spoke with Dr. Reede and Dr. Pulitzer either individually or together.  Ex. 28

(Bernadel Dep.) at 9.  According to Ms. Bernadel's account, she and Mr. Cuiman merely

presented their findings of facts to Dr. Reede and Dr. Pulitzer as to Dr. Greenberg's conduct; in

light of those facts, Dr. Reede and Dr. Pulitzer decided to terminate Dr. Greenberg.  Id.; Ex. 5

(Pulitzer Dep.) at 420-421.

35.     Dr. Pulitzer testified that he repeatedly consulted with Dr. Jamaleddine

about Dr. Greenberg's conduct in September of 2014, including Dr. Greenberg's use of an

unauthorized attestation, and with respect to the decision to terminate Dr. Greenberg's

employment.  Ex. 5 (Pulitzer Dep. ) at 136-38; 189-193; 438-39.

Date:   New York, New York
        July 6, 2018

CARDI & EDGAR LLP

By:    _____
       Chad L. Edgar
       Dawn M. Cardi

       99 Madison Avenue, 8th Floor
       New York, New York 10016
       212.481.7770 (tel.)
       212.271.0665 (fax)
       cedgar@cardiedgarlaw.com
       dcardi@cardiedgarlaw.com
