UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ODED GREENBERG, M.D.,

                        Plaintiff,          15 Civ. 2343 (PKC)(VMS)

       - against -

SUNY DOWNSTATE et al.,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**PLAINTIFF'S RESPONSE TO DEFENDANTS' RULE 56.1
STATEMENT IN SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT AND
PLAINTIFF'S RULE 56.1 STATEMENT OF ADDITIONAL MATERIAL FACTS
IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

      Plaintiff Oded Greenberg, M.D. ("Greenberg" or "Dr. Greenberg"), by his attorneys,

Cardi & Edgar LLP, pursuant to Local Civil Rule 56.1 of the United States District Court,

Eastern District of New York, hereby submits the following responses to the statement of

material facts as to which defendants Dr. Deborah Reede, Dr. Steven Pulitzer (the "Individual

Defendants"), The State University of New York ("SUNY") (collectively, the "SUNY

Defendants") allege there are no genuine issues to be tried. In addition, in accordance with Local

Rule 56.1(b), Dr. Greenberg includes a Statement of Additional Material Facts as to which he

contends there exists a genuine issue to be resolved at trial.[1]

    **I.**      **The Parties**

---

[1] In the event that that this case goes to trial, Dr. Greenberg reserves the right to contest facts
stated herein, which are offered for the purposes of opposing defendants' motion for summary
judgment.

1. Plaintiff, who self-identifies as White (Caucasian) and of the Jewish faith, was at least 54 years of age at the time of his termination. Second Amended Complaint ("Compl."), ¶ 1. He began his employment at SUNY Downstate in or about April 2001, and he was assigned to the Kings County Hospital Center ("KCHC") emergency room ("ER") pursuant to an affiliation agreement. Id., ¶¶ 4, 13. Besides a hiatus from 2008 to 2010, Plaintiff remained employed by SUNY Downstate until his termination in October 2014. Compl., ¶ 1; Greenberg Dep., p. 13:7-10.

   **Response**: Disputed only to the time period to which Dr. Greenberg's hiatus occurred, which he believes was from 2009 to 2010.[2]

2. Defendant Dr. Reede self-identifies as African-American, not Jewish, and is 67 years old. Reede Decl., ¶ 2. She was appointed Chair of Radiology at SUNY Downstate Medical Center in 2013, a position she holds to this day. Id., ¶ 3.

   **Response**: Undisputed.

3. Defendant Dr. Stephen Pulitzer self identifies as White and Jewish and is 51 years old. Pulitzer Decl., ¶ 2. Dr. Pulitzer was a SUNY employee working at KCHC as part of an affiliation agreement at the time of the events described herein. Id. In July 2014, he became the Interim Chair of Radiology at KCHC, and eventually the full Chair in January 2015. Id. In November 2016, he was named the Chief Medical Officer at KCHC. Id.

---

[2] While Dr. Greenberg does not contest he was an employee at SUNY Downstate (hereafter, "SUNY"), he reserves the right to contend that both he and Dr. Steven Pulitzer were joint employees of SUNY and New York City Health and Hospitals Corporation (NYCHHC) (operating through KCHC) for the purpose of opposing defendant NYCHCC's motion for summary judgment. For the purposes of defending the claims that the SUNY Defendants seek to dismiss here, Dr. Greenberg does not need to press the material factual disputes regarding joint employment status.

**Response**: Disputed only to the extent that Dr. Pulitzer was also an employee of KCHC or NYCHHC operating through KCHC. See supra, n.2. Also, it is our understanding that Dr. Pulitzer's official title as to KCHC was first Interim then Chief of Service, Department of Radiology, as such is the nomenclature used in the relevant affiliation agreement between SUNY and NYCHHC referenced by the SUNY Defendants. Edgar Decl., Ex. 60 (HHC 0158 & 164).[3]

4. Defendant SUNY is a legal entity constituted under N.Y. Educ. Law § 351 et seq.. As subdivisions of SUNY, the Downstate Medical Center is not a legally-cognizable entity separate from SUNY. See N.Y. Educ. Law §§ 351 and 352.

**Response**: Undisputed.

## II.    Facts Regarding ACGME Accreditation

5. The Accreditation Council for Graduate Medical Education (the "ACGME") is the body responsible for accrediting the majority of graduate medical training programs for physicians in the United States. Reede Decl., ¶ 6. The ACGME visited SUNY Downstate in 2013. Reede Dep., p. 96:2-11; Reede Decl., ¶ 6.

**Response**: Undisputed.

6. Following its visit in 2013, the ACGME conferred the adverse designation of "Probationary Accreditation" on SUNY's Radiology Department. Ex A. The ACGME noted in its findings that "'some faculty' do not 'show up' for their scheduled supervision assignments and the program has not enforced adherence to the schedule." Id., SUNY000683. The Department was also criticized for not demonstrating that "an appropriate level of supervision is in place for

---

[3] All subsequent references to exhibits will be those annexed to the Declaration of Chad L. Edgar dated July 6, 2018 submitted in opposition to SUNY Defendants' Motion for Summary Judgment.

3

all residents," and it was noted that "faculty do not demonstrate a strong interest in the education of the residents." Id., SUNY000684.

**Response**: Undisputed as to what ACGME noted in its findings in the document referenced, as it speaks for itself. To expand upon what SUNY Defendants described as the content of that document, there were 10 areas cited for improvement: (1) inadequate resources of space and facilities; (2) insufficient time devoted by faculty to supervision of residents; (3) faculty showing insufficient interest in educating residents; (4) inadequate IT support; (5) inadequate clerical support; (6) inadequate range of radiologic cases for residents; (7) inadequate procedures for residents and attending residents to communicate results to clinicians; (8) inadequate records to support that residents were learning to communicate in written or oral form the results of their studies; (9) untimely completion of evaluations of residents by faculty; (10) and no demonstrated incorporation of residents' reviews of program in order to improve it. Notably, of the 10 discrete areas for which the program was cited, only 3 of the areas could arguably be attributable to faculty shortcomings (areas (2), (3) & (9)).

7. The SUNY Radiology Department was the only department in the country on probation in 2014 out of 201 radiology departments. Reede Decl., ¶ 7; Ex. B.

**Response**: Undisputed.

8. Dr. Reede, along with Dr. Ross Clinchy, from the Dean's Office at SUNY, met with the KCHC Chief Medical Officer, Dr. Jamaleddine, on April 9, 2014 to discuss the ACGME review. Reede Decl., ¶ 9.

**Response**: Undisputed.

9. During the meeting, Dr. Reede discussed changes that she believed were required to fix the issues in the department. Id. As part of the changes, Dr. Reede proposed

4

replacing a number of faculty members, primarily based on teaching evaluations, and providing short term extensions for several others. Reede Dep., p. 67:15-69:8; Jamaleddine Dep., p. 101:11-17. She also emphasized the need for monitoring of faculty member performance, increased work performance for physicians, productivity monitoring, and monitoring of teaching and scholarly activity. Ex. B.

     **Response**:    Undisputed as to what Dr. Reede memorialized and then recalled at her deposition as to what was said during the aforesaid meeting.

     10.    Dr. Jamaleddine recommended that Dr. Kantor should also be nonrenewed, due to the unfavorable accreditation decision. Reede Dep., p. 31:18-25; Jamaleddine Dep., p. 109:6-110:17. Dr. Pulitzer replaced Dr. Kantor as Interim Chief in July 2014. Pulitzer Decl., ¶ 4.

     **Response**:    Disputed. According to Dr. Jamaleddine, his decision to replace Dr. Kantor was based on a perception that he was a weak leader and let problems linger. Edgar Decl., Ex. 47 (Jamaleddine Dep.) at 106-09. While one of the lingering problems that Dr. Jamaleddine identified as caused by Dr. Kantor's allegedly weak leadership was failure to assess the needs of the residency program, it was only one problem among others. He also cited ongoing issues with one of the radiologists whose competence was in question, delays in reading studies and the questionable quality of those readings. Id. at 107-08. Notably, Dr. Reede did not cite and/or recall that Dr. Jamaleddine removed Dr. Kantor because of the residency program being placed on probation. Edgar Decl., Ex. 10 (Reede Dep.) at 32.

## III.   Facts Regarding Appointment of Dr. Jinell Scott-Moore

     11.    Dr. Jinel Scott-Moore was a radiologist at LICH, and therefore a SUNY Downstate employee as of 2014, following SUNY Downstate's merger with LICH, who had

worked with Dr. Reede. Scott Dep., p. 73:23-74:8. She is also Black, younger than Plaintiff, and not Jewish. Compl., ¶ 25.

**Response**: Undisputed.

12.    Dr. Scott's resume showed more academic accomplishments than Plaintiff's. Ex YY, ZZ. Plaintiff's resume listed two publications without a date. Ex. YY. During his deposition, he admitted that one of them was never published, and the other was published in 1993 or 1994. Greenberg Dep., 10:23-12:4. Plaintiff had also let his membership lapse in the radiological professional societies. Id., 6:23-5. Dr. Scott on the other hand was a member of three professional societies in 2014, she had a number of recent scientific posters and education exhibits, and was actively engaged in research for publication. Ex. ZZ. Plaintiff had also submitted a summary of his scholarly activity in 2013-2104 [sic] to provide an update to the ACGME that showed zero hours spent engaging in "Research/scholarly activity with residents" and no scholarly activity in the prior year. Ex. BBB.

**Response**: Disputed. To be clear, Dr. Scott had no actual publications at the time of her appointment to the role of Director of ER Radiology. Ex. 48 (HHC 1787-88) (indicating only posters in the Bibliography section of her resume). In addition, in Dr. Scott's Faculty Self Assessment form for 2013 – 2014, in or around April of 2015, Dr. Reede handwrites on the evaluation that Dr. Scott needs to get published in addition to needing to "get on committees." Edgar Decl., Ex. 49 (SUNY 003844-52) (handwriting on the final page of the assessment). As for Dr. Greenberg's summary of his scholarly activity submitted in or around July 2014, he admits that he indicated zero hours spent engaging in "Research/scholarly activity with residents," but states that he was in a hurry to submit the form where he indicated zero hours, and was unclear as to what was meant by this category. Oded Greenberg Decl., ¶ 14. In 2013, Dr.

6

Greenberg, fellow radiologists and residents published two case reports. Id. Dr. Greenberg was also actively engaged in research projects with residents at the time of his termination. Id., ¶ 6.

13. There is no evidence that Dr. Scott had any time and attendance issues.

**Response**: Undisputed but notably Dr. Scott did not have the long-term tenure at KCHC that Dr. Greenberg had and therefore the lack of evidence of any time and attendance issues is of little significance.

## IV. Plaintiff's Problems with Time and Attendance

14. On May 5, 2014, following the ACGME report, Dr. Reede met with Plaintiff to discuss an incorrect time entry from April 21, 2014. Ex. I. Dr. Reede reminded Plaintiff that "his job responsibilities require him to be present for consultations as well as resident supervision and education." Id. He was told to report his time correctly going forward. Id.

**Response**: Undisputed that a meeting occurred between Dr. Reede and Dr. Greenberg on this date. To the extent that SUNY Defendants hope to suggest that this was a disciplinary meeting, such is disputed as Dr. Reede testified it was not. Ex. 10 (Reede Dep.) at 143. This meeting marked the commencement of Dr. Reede's scrutiny of Dr. Greenberg with an eye to his termination. While she testified at her deposition that her assistant caught Dr. Greenberg's timesheet error, she, in fact, caught it. Id. at 143-44. In advance of Dr. Greenberg submitting his April timesheet, Dr. Reede apparently asked Dr. Pulitzer to review Dr. Greenberg's so-called Talk Station data in order to establish when he first completed a study and the time of his last completed study from April 14 to April 22, 2014. Ex. 8 (SUNY 003486). He obeyed her instruction and sent the information. Id. She is the one who must have spotted the

timesheet entry error for April 21, 2014 but at her deposition she deflected responsibility for the catch to her assistant.

15.    On May 8, 2014, Dr. Reede reminded all of the attending radiologists in the department that "everyone documents accurate information on their timesheets." Ex. L. This was repeated during the KCHC Department Meeting on June 26, 2014 led by Dr. Pulitzer, who noted that time and attendance will be monitored and that time sheets should reflect the actual time a physician was in the hospital. Ex. M, SUNY002458.

Response:    Undisputed.

16.    Dr. Pulitzer, who oversaw the schedule at KCHC, testified that, beginning in late July or August 2014, Plaintiff was "coming in late, he was on occasion leaving early. I ... often didn't know what time he was going to be in that day .... I couldn't reliably plan the schedule." Pulitzer Dep., p. 305:23-306:9. Dr. Reede testified that she received reports that Plaintiff was sometimes not in the emergency room when "residents would be looking for him." Reede Dep., p. 142:22-143:9. Plaintiff's Talk Station data from the time showed that he was often not reading his first case until 10:30 or later. Ex. R.

Response:    Disputed. Notably, in her memo to the file dated July 23, 2014 about a meeting with Dr. Greenberg as to why he was not going to be made Director of ER Radiology at KCHC, Dr. Reede did not cite as a reason for not getting the promotion that he had attendance issues. Ex. 4 (SUNY 000498). During this period when Dr. Greenberg was allegedly working erratic hours, on July 31, 2014, Dr. Pulitzer stated at a Departmental meeting that radiologists were expected to arrive at KCHC by 9 a.m. Ex. 42 (HHC 1335 & 1349). It was not until August 22, 2014, however, that Dr. Pulitzer allegedly approached Dr. Greenberg and requested that he arrive at KCHC at 9 or 9:30 a.m. Ex. 17 (HHC_ESI_001091-92;

8

HHC_ESI_001062-63). This delay in applying the requirement to Dr. Greenberg suggests that the set, earlier schedule did not apply to him, which it did not historically. Greenberg Decl., ¶ 7; Ex. 3 ("Hi Steve, following up on our discussion, I just want to reiterate that prior to recent changes in the schedule I was asked by Alan to change my hours to 10 to 6 to help cover Vin during the early evening"). According to Dr. Greenberg, Alan Kantor, the previous Chief of Service, always pushed him to come in later in order to stay later to assist with the crush of cases that came into ER Radiology between 4 p.m. and 8 p.m. Greenberg Decl., ¶ 7. According to Dr. Greenberg's account of his discussion with Dr. Pulitzer about a set schedule in late August, Dr. Pulitzer knew that Dr. Kantor historically wanted Dr. Greenberg to come in later but Dr. Reede was insisting that he come in earlier. Greenberg Decl., ¶ 7. Thus, the notion that Dr. Greenberg was working erratic hours in July and August by coming in late does not accord with Dr. Greenberg's account that Dr. Pulitzer knew that in the past he was asked to work a later schedule and his work hours continued to reflect it.

17. The general expectation at KCHC is that radiologists spent most of their workday reading films. Pulitzer Decl., ¶ 6. Time spent reading film gets reflected, if only approximately, in "talk station" data. Id. Talk Station data comprises information about a particular film, including which radiologist read the film, and when the film was opened and signed for by a radiologist. Id. By reviewing the data for one day, an approximation of when a radiologist started reading film and when he or she stopped can be discerned. Id.

**Response**: Disputed. According to Dr. Greenberg, Talk Station data is a poor proxy for the hours that he worked. See Greenberg Decl., ¶ 5. Talk Station data does not capture when film is first opened for review by a radiologist but when he or she closes out of the study, usually after completion of review. Id. Thus, the time first captured by Talk Station on

9

any given day is when the radiologist completes his or her first study. Id. During the time that Dr. Reede threatened closer scrutiny of each radiologist's productivity by examining Talk Station data, around the spring of 2014, many of Dr. Greenberg's colleagues "gamed" the system by choosing a very easy study to review when they first arrived at work thereby memorializing the earliest possible time for a so-called "clock in." Id. Dr. Greenberg refused to play that game. Id. Rather, he always read whatever film he viewed in his professional opinion as the most pressing after consulting with his ER colleagues, even if it was complicated and meant that he would have a later "clock in" time than would otherwise be indicated. Id. Also, with respect to Dr. Greenberg, when he came into the reading room at or around 9 or 9:30 a.m., his colleague had usually been reviewing film for three hours ahead of him and therefore there might not be any cases to read immediately. Id. Further, the computer he used was frequently turned off and could take as long as 20 minutes to boot up and be available to start reading cases. Id. Also, it was Dr. Greenberg's habit upon arriving at work to take a tour of ER to see if there were any pending issues that needed to be addressed and to confer with multiple colleagues, if necessary. Id. All of these factors and circumstances made the time of the completion of his first study upon arriving at work a poor proxy as to what time exactly he arrived there. Id.

18.     Dr. Scott, who worked in the same room as Plaintiff, testified that "[Plaintiff] was sometimes very erratic about his hours." Scott Dep., p. 137:19-25. She noted that Plaintiff "would often come late to work. It could vary from like half an hour late to an hour to an hour and a half, to two." Id., p. 153:21-25.

**Response**:     Disputed. Dr. Scott initially testified that she did not really know to which shift exactly Dr. Greenberg was assigned when she first began working at KCHC, which she characterizes as in August of 2014. Ex. 6 (Scott Dep.) at 127. Therefore, since she

did not know the hours of his shift, her testimony that he would arrive late is lacking in credibility. Further, Dr. Scott's sample size of Dr. Greenberg's allegedly erratic hours is limited to the month of August since by September he was being closely monitored for time and attendance by Dr. Reede and Dr. Pulitzer and he had only one alleged misstep. Ex. 37 (HHC_ESI_001274) (example of the close monitoring by Dr. Reede and Dr. Pulitzer). The only time and attendance issue that they caught was an alleged unauthorized absence from the building for approximately two hours in the afternoon of September 23, 2014. Ex. 39 (SUNY 000863-64). It is likely that Dr. Scott is referring to Dr. Greenberg's erratic hours during the week that he was supposed to be on vacation and volunteered to pitch in.

19.    In August 2014, Plaintiff originally requested vacation for August 11-August 22. Ex. O. On August 13, 2014, Plaintiff emailed Dr. Pulitzer while on vacation, and asked if he could return the following week, and then instead take off the week of August 25th. Ex. P.

**Response**:    Undisputed.

20.    On August 22, 2014, Dr. Pulitzer counseled Plaintiff in person on issues of time and attendance. Ex. R. Dr. Pulitzer addressed specific time entries with Plaintiff during this meeting that appeared to be inaccurate based on his Talk Station dictation system entries. Id. Dr. Pulitzer reminded him of the need to be at the hospital for set hours of 9:30-5:30. Id.

**Response**:    Disputed. Dr. Pulitzer testified that this discussion with Dr. Greenberg was not a "disciplinary counseling." Ex. 5 (Pulitzer Dep.) at 310. Rather it was an attempt to find what schedule would work for Dr. Greenberg, given his personal circumstances. Id. at 311. Pulitzer testified that his intent in going into this discussion was to work with whatever schedule was manageable for Dr. Greenberg. Id. It is only Dr. Pulitzer's memos

11

regarding this meeting, which were written after Dr. Greenberg's request for family leave on September 2, 2014, that characterize or suggest that this discussion had a counseling component to it.[4] Ex. 17 (HHC_ESI_001062-63 & 001091-92). In Dr. Greenberg's version of the discussion, Dr. Pulitzer approached him in a "Don't shoot the messenger" fashion and shared that Dr. Reede wanted Dr. Greenberg to work an earlier set shift of 9 to 5. Greenberg Decl. ¶ 7. To which Dr. Greenberg questioned why since Dr. Kantor always wanted him to start work later to help out with the high volume of cases in the late afternoon. Id. According to Dr. Greenberg, Dr. Pulitzer replied that Dr. Reede was like a cop and wanted to catch Dr. Greenberg in order to get rid of him. Id.

21.     Despite his scheduled vacation the week of August 25th, Plaintiff returned to work on August 26. Ex. S; Pulitzer Dep., p:334:8-21. Dr. Pulitzer received reports that Plaintiff was working "erratic" hours. Pulitzer Dep., p. 334:8-21. Plaintiff's time sheet indicates that, instead of 9:30 am to 5:30 pm, he claimed to have worked from 11 am to 7 pm on three days that week and 10 am to 6 pm on the other day he was in the office. Ex. T.

---

[4] The first mention Dr. Pulitzer makes of a meeting or discussion with Dr. Greenberg in late August in personnel paperwork or email traffic is on September 2, 2014 when he wrote a brief memo to the file dated that day without using KCHC letterhead memorializing his conversation with Dr. Greenberg about the additional leave that he sought on September 2, 2014. Edgar Decl., Ex. 17 (HHC_ESI_1062-63). In this memo, Dr. Pulitzer references an earlier conversation with Dr. Greenberg that he erroneously dates as August 23, 2014. Id. he states that "Oded was counseled in person on time and attendance." Dr. Pulitzer's habit after writing a memo dealing with a personnel issue was to send it immediately to his assistant; he did so with respect to the memo without letterhead dated September 2, 2014. Id. On September 5, 2014, Dr. Pulitzer sent to his assistant and Dr. Reede a more formal memo of his encounter with Dr. Greenberg on August 22, 2014 bearing a date of August 22, 2014. Edgar Decl., Ex. 17 (HHC_ESI_001092). There is no evidence via a cover email that this memo was sent to his assistant on August 22, 2014. Therefore, it is a safe assumption that this memo dated August 22, 2014 was actually written after that date, which means Dr. Pulitzer pre-dated a memo dealing with what he believed was a serious personnel issue.

**Response**: Disputed. As Dr. Greenberg was scheduled to be off the week of August 25th but instead decided to work both because his vacation plans fell through and the Department appeared to need the assistance, we strain to understand how his schedule could be criticized as erratic since he was not supposed to be working in the first instance. In any event, if Dr. Greenberg's account is to be credited, he worked the week of August 25, 2014 because the Radiology department appeared short-staffed and he wanted to help out. Greenberg Decl., ¶ 8. Further, it appears undisputed that the busiest time in ER Radiology was between 4 p.m. and 8 p.m. Ex. 6 (Scott Dep.) at 128. Dr. Greenberg's schedule in encompassing those busiest hours was in conformity with the department's most acute need. Further, during the week of August 25, 2015, Dr. Greenberg received no complaints from Dr. Hammil about erratic hours he was working; rather, Dr. Hammil appeared to be appreciative of Dr. Greenberg's willingness to help when they were short of staff. Greenberg Decl., ¶ 8.

## V.  Facts Regarding the September 4th and 5th Absences

22.     On August 29, 2014, the Friday before Labor Day weekend, Plaintiff emailed Linda McMurren asking how he could get approval for days off the following week "on an emergent basis." Ex. U, SUNYESI000994. Ms. McMurren was not authorized to approve vacation requests; the site director - Dr. Pulitzer - was the appropriate person to contact. Reede Dep., p. 290:9-15.

**Response**:     Disputed. This account does not tell the entire story of Dr. Greenberg's attempts to notify his various employers of his need for an unexpected leave of absence. While it is true that Dr. Greenberg emailed Linda McMurren on August 29, 2014 requesting guidance as to how to seek approval for days off the following week for an emergency, he first attempted to notify Dr. Reede via telephone but her voicemail was too full to

13

accept another message because she was on vacation. Greenberg Decl., ¶ 9. Dr. Pulitzer could

not be notified because he too was on vacation. Id. Dr. Greenberg then resorted to emailing

Linda McMurren in order to get guidance about how he best should proceed in taking the leave

of absence. Notably, according to relevant policy at SUNY, the protocol for notifying

management when an employee had to take an unexpected leave was to notify the Department

Chair, which would be Dr. Reede. Ex. 59 (SUNY 000677). That is exactly what Dr. Greenberg

attempted to do. Dr. Greenberg made his request to the first available manager on September 2,

2014, which was the date that Dr. Pulitzer finally returned from his vacation the previous week.

23.     Plaintiff requested this "emergent" leave five days before he intended to

take it, and he did not submit the approved form, which he had received on a number of

occasions, to Dr. Pulitzer indicating who would provide coverage, the reason for the leave, and

how much time he intended to take off. Ex. V, SUNYESI000805-6; Pulitzer Decl. ¶ 9.

**Response**:     Disputed. Dr. Greenberg contends that his request constituted an

"Unexpected Absence" for which he followed governing policy by immediately attempting to

direct his request to the Department Chair. Ex. 59 (SUNY 000677). Even if for the sake of

argument, Dr. Greenberg's request was not an "Unexpected Absence," and he was required to

submit an approved leave form to Dr. Pulitzer as SUNY Defendants appear to contend, Dr.

Pulitzer was on vacation at the time Dr. Greenberg became aware of the need on August 29,

2014. Ex. 5 (Pulitzer Dep.) at 333. Immediately upon Dr. Pulitzer's return from vacation, Dr.

Greenberg posed to him his request, which was immediately denied. Id. Once Dr. Pulitzer

immediately denied Dr. Greenberg's request for an emergency family leave, it would have been

futile for Dr. Greenberg to present Dr. Pulitzer with the proper paperwork for the leave request.

24.     The following Tuesday, September 2, 2014, Plaintiff asked Dr. Pulitzer to take the remainder of the week off. Ex. W, SUNY 827. This was the first time Dr. Pulitzer had heard of this request. Pulitzer Dep. 349:23-350:3.

**Response**:     Disputed to the extent that Dr. Greenberg does not remember whether he asked for the rest of the week off or just September 4 and 5, 2014. Ex. 1 (Greenberg Dep.) at 227-28.

25.     Dr. Pulitzer denied his request, due to the operational needs of the department, since Dr. Patrick Hammil, the only other body imager, was scheduled to be off that same week. Ex. S; Ex. X, SUNY001289-1290; Reede Dep., p. 303:25-304:12.

**Response**:     Undisputed that Dr. Pulitzer denied the request and that he stated that the reasons for the denial was because the only other radiologist who could read body images, Dr. Hammil, was scheduled to be on vacation the week for which Dr. Greenberg sought an absence. Disputed as to whether his statement that Dr. Hammil was the only other body imager in the Department is accurate, as there were many other radiologists available that week and who worked on the days at issue who could read body images. Greenberg Decl., ¶ 9.

26.     Dr. Pulitzer testified that he does not recall Plaintiff specifying the reason he wanted to take the leave. Pulitzer Dep., 344:5-9; 345:16-346:12; 359:16-22. Dr. Pulitzer did not tell Dr. Reede that there was a specific reason for the request, and Plaintiff did not speak to her at all regarding his request. Reede Dep., 282:13-23. There is no written evidence of Plaintiff specifying the reason for his request prior to taking leave.

**Response**:     Undisputed that Dr. Pulitzer testified that he does not recall Dr. Greenberg's stated reason for needing the leave. Disputed that his testimony is credible. <u>See, infra</u>, <u>Plaintiff's Statement of Material Facts That Preclude Summary Judgment</u>, ¶¶ 17, 19 & 21.

Undisputed that Dr. Reede did not ask Dr. Pulitzer why Dr. Greenberg was being so obstinate about taking the leave nor did she request that he inquire of Dr. Greenberg the reason for the leave. Edgar Ex. 10 (Reede Dep.) at 282-84.

27.    On September 3, Plaintiff returned to Dr. Pulitzer and informed him that he would be absent on September 4 and September 5. Pulitzer Dep., p. 351:9-24. After consulting with Dr. Reede, Dr. Pulitzer drafted a letter to Plaintiff that specifically denied his request for time off on September 4th and 5th, and Plaintiff was directed to report for duty or the matter would be referred to the Labor Relations Department. Ex. Y; Pulitzer Dep. 355:18-356:7.

**Response**:    Undisputed to the extent that Dr. Pulitzer and Dr. Greenberg spoke on September 3, 2014 about the September 4th and 5th absences but note that they spoke twice about those absences. According to Dr. Pulitzer, their first discussion was initiated by Dr. Greenberg who related to Dr. Pulitzer that he still intended to take those days off. Ex. 5 (Pulitzer Dep.O at 351-52. To which Dr. Pulitzer responded that he did not want Dr. Greenberg to take those days off. Id. at 352. Dr. Pulitzer admitted that at this point he did not warn Dr. Greenberg that there would be consequences if he proceeded to take those days off. Id. After relating to Dr. Reede what just took place, Dr. Reede "advised" Dr. Pulitzer to write a letter denying Dr. Greenberg's request and state therein that if he proceeded to take the days off in any event he would be referred to Labor Relations. Id. at 356. Again, according to Dr. Pulitzer's own account, the second discussion about the leave on September 3, 2014 occurred when Dr. Pulitzer hand-delivered this letter to Dr. Greenberg himself and read its contents aloud to him. Id. at 358. To which Dr. Greenberg responded according to Dr. Pulitzer's paraphrase, "Well, you're making me choose between my job and my family." Id. at 360. To which Dr. Pulitzer replied, according

16

to his own testimony, "I'm not making that choice." Id. Dr. Pulitzer admitted that he did not ask Dr. Greenberg any follow-up questions as to why Dr. Greenberg stated to him that he was making him decide between his job and his family. Id. at 360-61. In an email that he wrote to Mr. Arabian, the representative of Labor Relations who investigated Dr. Greenberg's case once it was referred there when Dr. Greenberg did not show up for work on September 4, 2014, Dr. Pulitzer stated that he and Dr. Greenberg talked a few minutes about each other's family towards the end of their third discussion about the leave (or the second discussion on September 3, 2014). Ex. 50 (HHC_ESI_1087).

28.     On September 4, 2014, Plaintiff e-mailed Linda McMurren to confirm that he was not coming in "due to important family issues," the nature of which he did not specify. Ex. Z. Short on staff, Dr. Pulitzer arranged for multiple radiologists to cover Plaintiff's shifts those days. Pulitzer Dep., p. 354:3-23.

**Response**:     Undisputed that Dr. Greenberg emailed Linda McMurren on September 4, 2014. Disputed that the Radiology Department at KCH was short on staff, as there were multiple radiologists that were available on these days to cover for Dr. Hammil who was on vacation and the so-called body imager. Greenberg Decl., ¶ 9.

29.     On September 5, 2014, however, Plaintiff e-mailed Ms. McMurren again and cc'd Dr. Pulitzer, writing that he "was going to come in regardless of my last email Thursday, the family issues having been resolved Thursday morning, I then managed to throw my back out." Ex. U. Plaintiff was absent from work on Thursday, September 4 and Friday, September 5. Ex. FF, SUNYESI001401.

**Response:**     Undisputed that Dr. Greenberg wrote the above-referenced email but disputed as to its purport. According to Dr. Greenberg, he never intended to come in on

September 4th but stated otherwise in the email in order to protect his job, which he thought was in jeopardy. Ex. 1 (Greenberg Dep. at 242, 246-47).

30. Plaintiff called Ms. McMurren the following Monday, September 8, at 10:40 a.m. (nearly two hours after his shift began) to inform her that he would be in late because he had to go to Urgent Care for his back. Ex. AA. Plaintiff arrived for work at about 12:30 p.m. and provided documentation from Premier Care of Park Slope, indicating that he received treatment for back pain that morning. Exs. BB; X, SUNY001291.

**Response:** Undisputed.

## VI. Facts Regarding Plaintiff's First Interrogation

31. Upon his arrival on September 8, Plaintiff was directed to Labor Relations, where he met with Michael Arabian. Ex. X. After reading the Statement of Rights Letter regarding his rights to representation by a union attorney or counsel of his choice during the hearing, Plaintiff elected to represent himself. Id., SUNY001280. Plaintiff was also advised by Mr. Arabian that he must respond truthfully to the questions asked during the interrogation or he could be subject to further discipline. Id., SUNY001281. The investigation was into Plaintiff's absences and failure to follow supervisors' directives regarding time and attendance. Id.

**Response:** Undisputed as to Dr. Greenberg being directed to Labor Relations by Dr. Pulitzer and what occurred at the interrogation as the transcript thereof speaks for itself. Disputed as to the merits of the claim that Dr. Greenberg had any issues with time, attendance and absences other than his insistence that he be allowed to take a leave covered by the Family Medical Leave Act.

18

32.     During the interrogation, Plaintiff stated that he was "on the [department's] schedule as 9 to 5," but he would occasionally "come in later and stayed later," sometimes arriving at 10-10:30 or even "a little bit later." Id., SUNY001283. Plaintiff further stated that "if I come in late it doesn't make a difference. I stay a little bit later. I've been keep - adhering to a schedule between, say, 10 and 11 and 6 and 7 in the evening." Id., SUNY001284. When Plaintiff was asked whether he had the authority to make his own schedule, he replied that he felt he had the "moral authority to do so if I feel the department is failing to -- to take care of their patients." Id., SUNY001284. Plaintiff admitted that he had recently been told by Dr. Pulitzer to adhere to set hours, which he assumed were "9 to 5 as written on the schedule." Id., SUNY001284.

**Response**:     Undisputed to the extent that such was said at the interrogation, which otherwise speaks for itself.

33.     When discussing the September 4 and 5 absences, Plaintiff stated that "I have a child with special needs and he was kicked out of his school and he was to attend a new school and I had to spend time with him," but he said that was not the reason he did not appear for work on September 4 and 5. Id., SUNY001290-1291. Plaintiff's mother-in-law came from out of town to help with his son, and while Plaintiff "had initially planned to take the day off, but I-I-I was gonna come in, I rolled out of bed and I - and I stretched my back out and I've been in pain and not able to be mobile since then." Id., SUNY001291. Plaintiff stated that he knew "that [his] son would have appropriate support" after his mother-in-law arrived. Id., SUNY001292.

**Response**:     Undisputed as to what Dr. Greenberg stated at his interrogation, as the transcript thereof speaks for itself.

34. Following the interrogation, Mr. Arabian consulted with Leonzo Cuiman, the Assistant Vice President for Labor Relations, and prepared a Settlement Agreement, which Plaintiff signed. Cuiman Dep., p. 237:22-238:6; Ex. CC. Dr. Reede and Dr. Pulitzer had no role in preparing the agreement, nor were they informed that Mr. Arabian was preparing such a document. Reede Dep., 314:12-25; Pulitzer Decl., ¶ 11.

**Response**: Disputed. While Mr. Arabian had no specific recollection of the interrogation of Dr. Greenberg and entering into the settlement agreement with him, he said it was standard operating procedure to confer with department heads that supervised the employee referred to Labor Relations about the terms of a settlement agreement before presenting it to an employee. Ex. 27 (Arabian Dep.) at 224-25. Therefore, it is likely that Dr. Reede and Dr. Pulitzer weighed in on or ratified the terms of the settlement agreement.

35. The Settlement Agreement, covered Plaintiff's September 4 and 5 absences as well as his time and attendance issues in July and August. Ex. CC. The Settlement Agreement stated that in lieu of a Notice of Discipline for: "(1) unscheduled absences, (2) tardiness, (3) interfering with the operations of the department, (4) insubordination and (5) misrepresenting hours worked on time sheets, as a result of absences and tardiness, [and] switching schedule without authorization of his supervisor" a penalty ranging from a letter of reprimand to termination would be held in abeyance for one year provided Plaintiff could abide by its terms. Id.

**Response**: Undisputed as to the terms of the Settlement Agreement and what it sought to address in terms of disciplinary issues, as the document speaks for itself. Disputed as to whether Dr. Greenberg had time and attendance issues in July and August.

36.     The language included was standard for a settlement agreement from Labor Relations Department. Ex. CC; Arabian Dep., p. 209:7-21. It called for Plaintiff to work his scheduled shift of 9:00 a.m. to 5:00 p.m., accurately list the hours he works, seek approval for any leave, and adhere to all Departmental policies and procedures. Id. The Agreement provided that if Plaintiff failed to abide by its terms, he could be punished with discipline ranging from a letter of reprimand to termination. Id. This language was subject to negotiation when it was presented to Plaintiff, who, having turned down assistance of counsel from his union, did not request for any of the terms to be changed; subsequently stating that he did not even read the agreement. Cuiman Dep., p. 255-257:4; Ex. DD, SUNY001353; Greenberg Dep., 274:12-275:18. The agreement also waived any claims Plaintiff had related to any incidents occurring up to and including September 8, 2014. Ex. CC.

**Response**:     Undisputed as to the terms of the Settlement Agreement, which document speaks for itself. Disputed as to the "language" being "standard" for a "settlement agreement," to the extent that the terms of probation meted out to Dr. Greenberg were more onerous than the terms of probation of Radiology Department employees referred to Labor Relations around the same time. Ex. 30 (SUNY 6601-03, 6582-83, 6625, 6652-53, 6621-22, 6654-57). Undisputed that during the course of his interrogation and executing the Settlement Agreement, Dr. Greenberg waived the right to counsel, did not negotiate the terms of the Settlement Agreement and signed it without reviewing it carefully. Notably, Dr. Greenberg was in acute pain from back spasms during the time that he sat through the Interrogation, awaited the presentation of the Settlement Agreement and signed same - a time period spanning approximately 4-5 hours. Ex. 1 (Greenberg Dep. at 268-71); Greenberg Decl., ¶ 10.

## VII.     Plaintiff's Use of Unapproved Attestations

37. An attestation is a written statement made by an attending physician to certify that he or she had reviewed a patient's report and that the report is now final. Pulitzer Decl., ¶ 12. Attestations are legal documents that are vital to hospital billing, and non-conforming ones could trigger an investigation by the Centers for Medicare & Medicaid Services ("CMS"), as well as potential financial liability. Id. Risk Management approved the use of three attestations and, beginning in July 2014, staff were informed at numerous meetings on how to use them. GG, SUNY001270.

**Response**: Undisputed as to what an attestation is. Disputed as to its significance in terms of triggering investigations and any financial liability other than the hospital not being paid for the service performed if a non-conforming attestation is submitted. See, e.g., Ex. 42 (HHC 1367) ("Attestations ..... Must be on ALL exams or we will not get paid") see also Ex. 51 (SUNY 2537) ("Missing Attestations ..... We need to be compliant so we can show we are a revenue generating department"). Disputed as to the status of the acceptable form of different attestations during the summer and fall of 2014 as it appears that they were a work in progress as evidenced by the statement of Dr. Rhonda Osborne, one of Dr. Greenberg's colleagues and a radiologist at KCHC, who stated that even after the September 22, 2014 departmental meeting where the attestations were once again discussed the form of same was not yet finalized. Ex. 41 (SUNY 1252) ("However, I believe that they were still working on it because there was major and a minor, meaning if you had a major disagreement versus a minor disagreement"). Disputed as to whether Dr. Greenberg was fully informed as to the form of the attestation to be used. With respect to the September 22, 2014 Departmental meeting where the form of attestations was discussed by Dr. Pulitzer and the other radiologists in the department, Dr. Greenberg was late in arriving to the meeting. Ex. 1 (Greenberg Dep. at 276-77); Greenberg

Decl. ¶ 11. In addition, Dr. Greenberg missed the departmental meeting where KCHC's billing vendor explained the attestations. See Greenberg Decl., ¶ 11.

38. Phycare, which handles the billing for the department, gave a presentation on September 15, 2014 on the attestations. Id.

**Response**: Undisputed. Notably, Dr. Greenberg was not able to attend this presentation because he had to cover the ER on that day. Greenberg Decl., ¶ 11.

39. All Radiology Department staff, including Plaintiff, were personally instructed by Dr. Pulitzer to use the approved attestations during a staff meeting on September 22, 2014. Pulitzer Decl., ¶ 1; Ex. HH. The approved language was as follows:

> "I, _____, MD, have personally reviewed the images and concur with the preliminary report and the interpretation as stated and signed by the resident. This report now represents the FINAL REPORT for this patient." Ex. GG.

**Response**: Disputed. First, Dr. Osborne's statement referenced above clarifies that she at least believed that even after the September 22, 2014 meeting the issue surrounding the form of attestations to be used by herself and her colleagues was still evolving. Ex. 41 (SUNY 1252). Second, Dr. Greenberg arrived late to the meeting and missed portions of the discussion regarding the form and use of attestations. Ex. 1 (Greenberg Dep. at 276-77); Greenberg Decl., ¶ 11. Dr. Greenberg left the meeting believing that the attestations that Dr. Pulitzer presented were examples from which he had to tailor his own attestations rather than available to him as a macro that he could easily copy and incorporate into his studies with a simple click. Greenberg Decl., ¶ 11.

40. Shortly after the meeting, Plaintiff attached to patients' records approximately 180 unapproved attestations that were filled with sarcastic language, stating the following:

"I, Oded Greenberg M.D., Board Certified Diagnostic attending
Radiologist and Board Certified Pathologist, have personally,
painstakingly reviewed each and every one of the provided images and
reviewed the available clinical information. The above report, based on
my own extensive knowledge and skill as well as meticulous observation
and careful interpretation now represents the final report."

Ex. LL, SUNY00506-659.

**Response**:     Undisputed only to the extent that Dr. Greenberg attached the

attestation above to the records of patients around September 22, 2014.

41.     Dr. Pulitzer was informed that Plaintiff subsequently had asked Jayan

Kurian, an employee in the IT Department, to "take off" or "erase" the incorrect attestations,

which would have been tampering with a legal medical file. Pulitzer Dep., p. 143:13-144:11.

Dr. Pulitzer was extremely concerned by the number of reports, which he believed indicated a

more severe "malicious" act, as well as posing problems for managing the data for all of the

cases with the unauthorized language, which would need to be tracked. Id., p. 147:7-148:4.

**Response**:     Disputed as to what Plaintiff asked Jayan Kurian. Dr. Greenberg

merely asked Mr. Kurian whether it was possible to modify or change these attestations. Ex. 1

(Greenberg Dep. at 292-93). When Mr. Kurian related to Dr. Greenberg that he could but that it

would not be appropriate for him to do so, Dr. Greenberg reassured him that he did not want to

get him into any trouble. Id. at 293.

42.     After collecting and reviewing the attestations, Dr. Pulitzer then escalated

the issue to Dr. Jamaleddine at KCHC, and scheduled a meeting with Risk Management at

KCHC at his recommendation. Pulitzer Dep., p. 155:3-156:11. Risk Management believed the

conduct was at least insubordinate, and told Dr. Pulitzer to consider a Medical Board Hearing.

Ex. MM, HHC_ESI_001344; Pulitzer Decl., ¶ 16. Risk Management also told Dr. Pulitzer to

have a "second reader" add a new, proper attestation to each file, and they were concerned that

"if any of these cases became a medical legal case that there could be potential exposure to the hospital." Pulitzer Dep., p. 287:8-20; Pulitzer Dep. II, p. 108:23-109:3.

     **Response**:    Undisputed as to what Dr. Pulitzer did and the recommendations of Risk Management with respect to the attestations.

     43.    Dr. Pulitzer again conferred with Dr. Jamaleddine and they agreed that Plaintiff should be referred to Labor Relations, as well as a possible referral to the Office of Professional Medical Conduct, which investigates complaints against physicians. Pulitzer Dep., p. 289:8-23; 290:20-291:17. Dr. Reede was consulted and agreed with referring the matter to Labor Relations at SUNY Downstate. Pulitzer Decl., ¶ 16; Reede Decl., ¶ 15.

     **Response**:    Disputed. Dr. Pulitzer's testimony was that Dr. Jamaleddine told him rather than merely agreeing with him to refer Dr. Greenberg to Labor Relations. Ex. 5 (Pulitzer Dep. at 291). ("Dr. Jameladdine told me to find out what the legal implications were of this, if this needs to be reported to the Office of Professional Conduct - Medical Conduct, and to refer this to Labor Relations ....").

## VIII.  Facts Regarding Plaintiff's September 23 Absence

     44.    After taking off part of the morning of September 23, 2014, Plaintiff asked for two hours of additional leave that afternoon. Pulitzer Dep., p. 389:22-390:6; Ex. GG. Defendant Pulitzer denied this request, because there was no one available to adequately cover for Plaintiff. Id.

     **Response**:    Undisputed that Dr. Greenberg asked for two hours of additional leave the afternoon of September 23, 2014 and that Dr. Pulitzer denied the request and cited as the reason that there was no one to cover Dr. Greenberg. Notably, Dr. Greenberg asked for the

additional leave in order to attend further meetings related to the funding for the education of his special needs son, Jayden. Ex. 44 (HHC 1526).

45.     That afternoon, Dr. Pulitzer learned that, in spite of the denied request for leave, Plaintiff "had left the building," and Dr. Pulitzer was unable to locate him for a number of hours. Pulitzer Dep., p. 402:20-403:6; 413:15-20. According to Talk Station data there was a gap of approximately two hours from 2:50 to 4:52. Ex. QQ, SUNY001326. Dr. Pulitzer learned that Dr. Greenberg had asked Dr. Amiram Samin to cover for him during that period, but Dr. Samin was not able to read neuroradiology cases, leaving the ER inadequately covered. Id. p. 401:24-403:6; 413:15-20. This issue was referred to Labor Relations as well. Ex. GG.

**Response**: Disputed. Dr. Greenberg did not leave the hospital in the afternoon of September 23, 2014 in any sort of unauthorized fashion. Dr. Greenberg testified that in the afternoon on that day, he left the reading room either to confer with clinicians in the Emergency Room about patients or to take a lunch break (which he was allowed to do across the street at SUNY Downstate Hospital). Ex. 1 (Greenberg Dep. at 300-05; 308-09). Dr. Greenberg had a cell phone and pager that his colleagues could use in the event that he was needed and it is not disputed that neither Dr. Pulitzer nor any of Dr. Greenberg's colleagues attempted to locate him by calling or paging him during the afternoon of September 23, 2014. Greenberg Decl., ¶ 13.

## IX.     Facts Regarding Plaintiff's Second Visit to Labor Relation

46.     On October 3, 2014, Plaintiff was notified that he was to report to Labor Relations "to discuss allegations of insubordination, leaving the worksite without authorization and related matters." Ex. RR. This new case was handled by Stephanie Bernadel. Bernadel Dep., 11:22-12:6. After a delay so Plaintiff could attempt to locate an outside attorney, an

interrogation was held on October 10, 2014. Ex. QQ. Plaintiff was accompanied by his wife who is an attorney, and again waived his right to union representation. Ex. SS.

**Response**:     Undisputed.

47.     During the interrogation, Plaintiff was asked about the two hour gap in his Talk Station data on September 23. Ex. QQ, SUNY001323-1328. Plaintiff admitted that he left his desk during this period, and claimed it was only to talk to colleagues, his wife and eat lunch across the street at SUNY Downstate. Id., SUNY001326.

**Response**:     Disputed. Dr. Greenberg's testimony at the interrogation with respect to the two-hour gap was that he went to lunch for an hour, during which time he spoke with his wife about the day's events concerning his special-needs son, and the rest of the time was spent conferring with clinical staff in the ER to discuss several patients' cases from earlier in the day. Ex. 52 (SUNY 001326).

48.     During the interrogation, Plaintiff described the attestations as "a Medicare and insurance hoop to jump through." Id., SUNY001329. He admitted the purpose of the attestations was explained to him, and that it was important to the hospital. Id. But he also admitted that he "thought it was ridiculous." Id., SUNY001329-30. He admitted that he complained about the forms during the meeting, and he continued to complain about the attestations during the interrogation, stating "I don't see why signing the document isn't attesting to me checking his work." Id., SUNY001330, 1340, 1337-8. Plaintiff admitted that he wrote the unapproved attestations, and he admitted that he thought the language was "playful." Id., SUNY001339.

**Response**:     Undisputed as to what Dr. Greenberg said at his interrogation, as the transcript speaks for itself.

49.     At the interrogation, Plaintiff mentioned possible allegations of discrimination for the first time. Ex. QQ, SUNY001335. In response, Ms. Bernadel sent Plaintiff a letter directing him to contact The Office of Diversity & Inclusion regarding any complaints of discrimination. Ex. TT.

**Response**:     Undisputed only to the extent that Dr. Greenberg alleged a formal complaint of discrimination to Labor Relations for the first time in the context of the interrogation on October 10, 2014. Undisputed that Ms. Bernadel sent the above-referenced letter subsequent to the interrogation on October 10, 2014.

50.     Shortly after the interrogation, it was reported to Labor Relations that Plaintiff "harassed" employees outside of KCHC. Ex. UU, SUNYESI000101. As a result, Plaintiff was informed that he was not allowed to be on the hospital premises pending the outcome of the disciplinary action. Id.

**Response**:     Undisputed that Labor Relations alleged that Dr. Greenberg "harassed" employees outside of KCHC shortly after the interrogation but dispute that such actually occurred. Rather, Dr. Greenberg merely chatted with a KCHC employee with whom he thought he was friendly about the fact that he was frustrated with his employer and it looked like he was going to be terminated. Ex. 1 (Greenberg Dep. at 346).

51.     On October 20, 2014, Ms. Bernadel and Mr. Cuiman met with Plaintiff again, who this time was accompanied by counsel from the New York State Unified Teachers, as well as his wife. Ex. DD, SUNY001345. Plaintiff continued to complain about the use of the required attestations during this meeting, repeating his view that the "purpose of the attestation" was "so that insurance companies make you jump through another hoop before they pay you" or, he added, "so that you can get sued better … there's no real good reason for it." Id.,

28

SUNY001364. He went on to say that "[i]t just adds more work to my day." Id., SUNY001365. Despite admitting he did not use the approved attestations, Plaintiff blamed Dr. Reede for his situation, and stated that her character was "really piss-poor." Id., SUNY001393. Plaintiff concluded the meeting by stating that "I expect to get my job back. I expect an apology from [Dr. Reede] and I expect a raise." Id., SUNY001394.

> **Response**: Disputed to the extent that the statement indicates that Mr. Cuiman met with Dr. Greenberg for a second time, as he was not present at either the initial interrogation with Mr. Arabian nor the second interrogation with Stephanie Bernadel. Undisputed as to what Dr. Greenberg said at the interrogation, as the transcript thereof speaks for itself.

52.     As part of her investigation, Stephanie Bernadel interviewed a number of employees regarding Plaintiff's use of the unapproved attestations. Dr. Scott told Ms. Bernadel that Plaintiff complained during that meeting about the use of the attestations, telling her that "this is the beginning of the end of medicine, this is the corporatization of medicine." Ex. HH.

> **Response**: Undisputed as to what Dr. Scott's witness statement says.

53.     Dr. James Walsh told Ms. Bernadel that Plaintiff told him after the meeting that "I can't believe I have to write an attestation." Ex. II.

> **Response**: Undisputed. Notably, this statement attributed to Dr. Greenberg supports the contention that he misunderstood the mandate - that he had to write an attestation to every report rather than merely adopt a macro and with one click add it to a patient's report.

## X.     Facts Regarding Other Statements Made by Plaintiff

54.     On September 30, Plaintiff sent a letter to Dr. Pulitzer complaining that "[t]he hyper-vigilance and micromanagement is often insulting and I no longer look forward to coming to works [sic] as a result of the corporatization of medicine." Ex. JJ. Plaintiff repeated

this concern about the "corporatization" of medicine in an email following his termination, saying that "the new administrations [sic] polices have negatively affected morale and patient care in the name of corporatization." Ex. KK. Plaintiff believed this "corporatization of medicine" began at SUNY Downstate when Dr. Reede became chairwoman. Greenberg Dep., p. 42:9-13.

> **Response**: Undisputed to the extent of noting that the emails referenced above speak for themselves. Undisputed to the extent that it is a fair characterization that Dr. Greenberg's concern has always been primarily focused on the delivery of quality patient care above all else.

## XI. Facts Regarding Plaintiff's Termination

55. On October 22, 2014, Plaintiff was terminated for violations of the September 8 disciplinary settlement by the Labor Relations Department, in consultation with Drs. Pulitzer and Reede, following "allegations of insubordination, leaving the worksite without authorization and related matters." Ex. VV; Bernadel Dep., p. 5:12-18; Pulitzer Dep., p. 420:23-421:2. Dr. Pulitzer also conferred with Dr. Jamaleddine prior to Plaintiff's termination, and he agreed with the decision. Pulitzer Dep., p. 439:12-24.

> **Response**: Disputed. It was Dr. Reede and Dr. Pulitzer who decided to terminate Dr. Greenberg. Ex. 28 (Bernadel Dep. at 9). According to Ms. Bernadel, after interrogating Dr. Greenberg about the allegations that prompted his referral in October of 2014 and investigating the allegations by interviewing other witnesses to his conduct, Ms. Bernadel and Mr. Cuiman presented their findings to Dr. Reede and Dr. Pulitzer and together and separately it was his two supervisors who decided that Dr. Greenberg should be terminated. Id.; Ex. 5 (Pulitzer Dep., 420-21). Ms. Bernadel and Mr. Cuiman apparently were in agreement with

that decision. Ex. 28 (Bernadel Dep. at 9). According to Dr. Pulitzer, Dr. Jamaleddine made it known that he would not allow Dr. Greenberg to continue to practice at KCHC and therefore, in effect, he was saying that Dr. Greenberg had to be terminated. Ex. 38 (Pulitzer Dep. (2d)) at 42.

56.     Dr. Pulitzer himself ultimately had to correct the approximately 180 attestations by re-reading each study, confirming that he agreed or disagreed, and affixing a new counter-attestation. Ex. WW; Pulitzer Dep., 207:19-208:15.

**Response**:     Uncontested that Dr. Pulitzer decided, along with Risk Management, that he would re-read each study and after confirming or disagreeing with the report, affix an appropriate attestation to the report.

## XII.     Facts Regarding the ACGME Reassessment

57.     Following the changes in personnel and the new standards put in place for all physicians in the department, the ACGME restored the Radiology Department's "Continued Accreditation" in August 2015. Ex. XX. The department was taken off probation at that time, and it remains accredited today. Reede Decl., ¶ 17. The ACGME report in 2015 commended the department "for a quick turnaround and implementing significant changes that have greatly improved the educational program." Ex. SS, SUNY00697.

**Response**:     Undisputed.

### Plaintiff's Rule 56.1 Statement of Additional Material Facts
### In Opposition to Defendants' Motion For Sumary Judgment

### Dr. Greenberg's Qualifications as a Competent and Caring Professional

1.     Throughout his employment at SUNY and KCHC, Dr. Greenberg was a fierce advocate for quality assurance and patient care. When he first arrived at KCHC, he wrote to David Stark, then Chief of Radiology and his supervisor, to draw attention to deficiencies both in patient care, especially during after hours, and resident teaching. Ex. 2 (SUNY 003388-90).

Notably, Dr. Greenberg offered to take over supervision of emergent cases during off hours. Id. During the period in which Dr. Greenberg was supposedly "acting out" as the SUNY Defendants would have it, the summer of 2014, he took on the daunting administrative task of researching the causes for lapses in care attributable to the Radiology Department at KCHC as his contribution to a multi-departmental longitudinal study on quality assurance with participants from various departments in the hospital, even going so far as to attend one of the study's meetings during his scheduled vacation. Ex. 3 (HHC_ESI_001006).

2. According to his colleagues, even those who played a pivotal role in terminating his employment, Dr. Greenberg was a highly competent radiologist. Ex. 4 (SUNY000498); Ex. 5 (Pulitzer Dep.) at 426 ("Dr. Greenberg was a very well respected radiologist in our department. I mean, he was one of the best radiologists we've ever had and people look up to him"); Ex. 6 (Scott Dep.) at 90. During 2013, according to departmental metrics that counted all studies completed by radiologists and then weighted those studies according to their complexity, out of 24 radiologists, Dr. Greenberg was the fifth highest in terms of productivity. Ex. 7 (SUNY 002439) (14,954 studies completed and weighted at 10,160.1). According to other colleagues, Dr. Greenberg was not only a highly capable radiologist but he was also a "good teacher." Ex. 6 (Scott Dep. at 90).

### Evidence Of Dr. Reede and Dr. Pulitzer's Surreptitious Scrutiny Of Dr. Greenberg And Fabricating Issues In His Personnel File

3. On May 5, 2014, Dr. Greenberg and Dr. Reede met. Ex. 54 (SUNY 3469). In anticipation of that meeting, Dr. Reede had a pre-printed agenda with bullet points. Id. She also had carefully prepared data to confront Dr. Greenberg with the fact that while on his timesheet he had written that he worked 9 to 5 p.m. on April 21, 2014, in fact an email that he had written on April 21, 2014 to Linda McMurren indicated that he was running late and Talk

Station data indicated that he did not start work until about noon. Ex. 55 (SUNY 003485-86 & 88). Notably, it was Dr. Pulitzer who provided Dr. Reede with an analysis of Talk Station data about Dr. Greenberg on the day in question. Id. (SUNY 003486). At this point, Dr. Pulitzer had not yet been appointed Interim Section Chief of Radiology - that role still belonged to Dr. Kantor. Ex. 5 (Pulitzer Dep.) at 13. While she handwrote notes of the meeting, there is no indication in those notes that the meeting was disciplinary or involved counseling about performance issues or anything of grave concern. Ex 54 (SUNY 3469). Dr. Reede did type a memo to the file about this meeting and stated in that memo that the occasion of the meeting was "incorrect reporting of time and attendance." Ex. 9 (SUNY 003511). In this memo, she focused on the issue of time and attendance and added nuggets like her summary of Dr. Greenberg's response to arriving late for work: "he did not see what the problem was because he read all the films. See id. In a follow-up email to this meeting, Dr. Greenberg wrote to Dr. Reede about the issue that he believed was the focus of their meeting - a negative resident evaluation. Ex. 11 (SUNY 000477). In this email, Dr. Greenberg does not even mention the time and attendance issue, which Dr. Reede suggests was the focus of their meeting. See id. At her deposition and in contrast to the negative tone of her typed memo to the file about this meeting, Dr. Reede characterized it as informal and almost friendly. Ex. 10 (Reede Dep. at 148-151).

      4.     In a memo that Dr. Pulitzer authored, apparently on September 2, 2014, he stated that he had "counseled in person [Dr. Greenberg] on time and attendance" on August 23, 2014. Ex. 17 (HHC_ESI_1063). In another memo, one that was more formalized by being placed on KCHC letterhead and dated August 22, 2014, Dr. Pulitzer stated that the "counseling" took place on August 22, 2014. Ex. 17 (HHC_ESI_001092). Dr. Pulitzer's first memo to the file about the alleged counseling of Dr. Greenberg on August 22, 2014, which he inaccurately dates

as August 23, 2014, was likely generated on September 2, 2014, as that is the date of the cover email to his administrative assistant instructing her to file the memo in Dr. Greenberg's personnel file. Ex. 17 (HHC_ESI_001062). The second, more formal memo was likely "pre-dated" as the date it bears is August 22, 2014, yet there is no evidence that he instructed his assistant to file any memos on that date, which was his usual habit. Notably, it was on September 2, 2014 that Dr. Greenberg approached Dr. Pulitzer about taking two days off under the Family Medical Leave Act. Ex. 5 (Pulitzer Dep.) at 337. At his deposition, Dr. Pulitzer characterized his August 22, 2014 meeting with Dr. Greenberg as a friendly attempt to get Dr. Greenberg to commit to a shift that he could reliably maintain, given his constraints. Id. at 311. Dr. Greenberg recalls a far different conversation in which Dr. Pulitzer told him that Dr. Reede was the person who wanted Dr. Greenberg to work an early, set shift, that he knew that historically Dr. Greenberg was asked to come in later and work later and that, finally, Dr. Reede was out to get rid of him. Greenberg Decl., ¶ 7.

## Dr. Reede and Dr. Pulitzer's Continued Surveillance Of Dr. Greenberg

5.      On August 20, 2014, Jayan Kurian, an IT administrator at KCHC, sent to Dr. Pulitzer a daily log indicating when Dr. Greenberg completed review of films while at work from July 1, 2014 to August 8, 2014. Ex. 15 (HHC_ESI_000777-872). Later that same day, Dr. Pulitzer forwarded this log to Dr. Reede without a cover email, implying that they were in an ongoing conversation about Dr. Greenberg's time and attendance and/or productivity. Ex. 16 (HHC_ESI_873). Discovery has indicated that no other radiologist was singled out for scrutiny in this manner at this point in time.

6.     At her deposition, Dr. Scott admitted that Dr. Pulitzer would reach out to her in July and August of 2014 to get details about Dr. Greenberg's work hours. Ex. 6 (Scott Dep. at 136-39, 141-43 & 187).

### The Promotion Of Dr. Scott Rather Than Dr. Greenberg To The Directorship

7.     The position of Director of ER was never officially posted. Greenberg Decl., ¶ 6. By the time Dr. Greenberg requested to be considered for the position and he attended a meeting to discuss his request with Dr. Reede, she had already decided he would not get the position and apparently already offered it to Dr. Scott. Ex. 6 (Scott Dep. at 68-73).

8.     Dr. Scott testified that her mission as Director of ER as far as she understood it (and which must have been conveyed by Dr. Reede who hired her for the position) was to get the department running more smoothly rather than focus on her own research and publications. Ex. 6 (Scott Dep. at 272-73). At the time that Dr. Scott was appointed Director of ER, she had no peer-reviewed journal publications listed in the bibliography section of her resume. Ex. 48 (HHC 1787).

9.     As previous Director of ER Radiology at KCHC, Dr. Greenberg had run a service in a department that was not placed on probation by ACGME. Also, at the time that Dr. Greenberg sought to become the Director of ER Radiology he had twice as much clinical experience as Dr. Scott with the majority of it at an institution categorized as a Level One trauma ER, as opposed to Dr. Scott's experience which was not at a Level One trauma ER. Greenberg Decl., at ¶ 6. Dr. Greenberg was also board certified in both anatomic pathology and diagnostic radiology, which is unusual and not the case with Dr. Scott. Complaint ¶ 1. He also completed an ACGME-approved fellowship in radiology while Dr. Scott had not. Id.

10.     At the meeting on July 23, 2014, where Dr. Reede and Dr. Greenberg discussed the latter's request to be made Director of ER Radiology, Dr. Reede said in sum and substance that she believed Dr. Scott was the better candidate because she was closer to her residency and therefore would be a more effective mentor to residents. <u>See</u> Greenberg Decl., ¶ 6. Dr. Greenberg understood this comment to mean that he would be a less effective teacher of residents because he was older. <u>Id.</u>

11.     According to Dr. Reede's memo to the file of the July 23, 2014 meeting between Dr. Greenberg and herself to discuss why he would not become Director of ER Radiology under her watch, (Ex. 13 (SUNY 000498)), Dr. Greenberg (1) lacked participation in administrative functions in the department; (2) his resident evaluations showed deficiencies; (3) he had no significant scholarly activity; and (4) he did not demonstrate an interest in academic pursuits. <u>Id.</u> None of these reasons was credible. First, Dr. Greenberg's day-time schedule and duties required that he remain in the ER at all times so attending administrative meetings posed tremendous challenges. Ex. 56 (HHC_ESI_000144-45). Second, Dr. Greenberg's resident evaluations were well above average, except for one resident who had an ax to grind, which Dr. Greenberg had explained to Dr. Reede in great detail previously. Ex. 11 (SUNY 000477). Third, Dr. Reede never gave Dr. Greenberg a chance to explain that he had been engaged in academic research during the past year and remained interested in pursuing such. Greenberg Aff., ¶ 6. Notably, at her deposition, Dr. Scott made clear that her mission as the new Director of ER Radiology, as must have been explained to her by Dr. Reede, was not to focus on academic and scholarly activity but to render more efficient clinical processes and staffing so that films of patients would be read more quickly and in a timely fashion, an issue that had been Dr.

Greenberg's hobbyhorse during his entire tenure at KCHC.[5] Ex. 6 (Scott Dep. 272-73). Finally, at the meeting and not memorialized in the memo to the file, Dr. Reede told Dr. Greenberg that one of the reasons she had chosen Dr. Scott rather than he to be Director was that she was closer to her residency and therefore would be a more effective mentor to them, which Dr. Greenberg understood her to mean that Dr. Scott was younger than he was and therefore more able to relate to them. Greenberg Aff., ¶ 6.

12.    Dr. Scott testified that as a resident supervised by Dr. Greenberg she could state that he was "a good teacher ... an excellent radiologist." Ex. 6 (Scott Dep.) at 90. Even Dr. Reede admitted at her deposition that Dr. Greenberg had a reputation as a highly productive and accurate radiologist and good teacher. Ex. 10 (Reede Dep) at 264; Ex. 57 (Reede (Second) Dep.) at 118.

13.    Dr. Pulitzer admitted that Dr. Greenberg was an admired ER radiologist: "[he] was a very well respected radiologist in our department. I mean, he was one of the best radiologists we've ever had and people look up to him. People looked to him to model what he's doing, just like a Michael Jordan or whomever." Ex. 5 (Pulitzer Dep. at 426-27).

**The Shifts For ER Radiologists At KCHC**

14.    Dr. Scott testified that when she began working at KCH the 9 to 5 shift was for non-ER radiologists "upstairs." Ex. 6 (Scott Dep. at 127). She believed that Dr. Greenberg worked the 9 to 5 shift but she was unsure. Id. After he left, the 9-5 shift in ER Radiology was eradicated. Id. Dr. Scott testified that the 9-5 shift assigned to Dr. Greenberg did

---

[5] In Dr. Reede's memo of the July 23, 2014 meeting with Dr. Greenberg, she noted that she was seeking a Director with an academic predisposition because "we want to explore the possibility of starting an ER Fellowship." Ex. 4 (SUNY 000498) This note is pretextual to the extent that we can believe Dr. Scott's testimony that Dr. Reede told her to focus on administrative tasks; furthermore, the Department of Radiology has yet to implement any such ER Fellowship.

not conform well to the needs of the ER since the volume of film from 9 to 2 did not justify two people being there. Id. at 128.

15.     In fact, in the past, what shift Dr. Greenberg worked was a topic of continued discussion when he was supervised by Dr. Alan Kantor, Chief of Service in the Radiology at KCHC before Dr. Pulitzer. Dr. Kantor wanted Dr. Greenberg routinely to work from noon to 8 p.m. Ex. 5 (Pulitzer Dep. at 255-56); Greenberg Decl, ¶ 7. Dr. Greenberg found the noon to 8 p.m. shift very difficult to balance with his family obligations, which included care of a special needs son. Ex. 58 (HHC_ESI_00068). Eventually, Dr. Greenberg accepted a compromise position with Dr. Kantor - he would come in between 10 and 11 a.m. and work 8 hours from his start time - until approximately 6 or 7 p.m. Greenberg Decl., ¶ 7. Dr. Greenberg worked the modified 12 to 8 p.m. shift up to the point that Dr. Pulitzer conveyed to him that Dr. Reede was demanding that Dr. Greenberg work a 9 to 5 p.m. schedule in or around August 22, 2014. Greenberg Decl., ¶ 7. Dr. Greenberg agreed to work the 9 to 5 p.m. schedule commencing in September of 2014 when his children were established in their school routines. Id.

### Dr. Greenberg's Request for FMLA Leave

16.     On August 29, 2014, Dr. Greenberg and his wife received an email from a representative of the school where their special needs son, Jayden, had been matriculated notifying them that it was likely that their son would have to be transferred to another school. Ex. 20 (G212); Ex. 1 (Greenberg Dep. at 224-26). Jayden has a serious condition (i.e., has been diagnosed as on the autism spectrum) and throughout his lifetime has received extensive support from health and mental-health professionals and during the relevant period attended school with the assistance of an Individualized Education Plan (IEP). Greenberg Decl., ¶ 4; Ex. 1

(Greenberg Dep.) at 225-26; Ex. 21 (SUNY 007281-7302). At the time relevant to this case, he was unable to perform regular life activities, unless he received assistance from his parents. Greenberg Decl., ¶ 4. In light of the news about Jayden, Dr. Greenberg wanted to take a leave of a few days to assist in the necessary arrangements for Jayden's transfer and to provide him with love, support and care during what was likely to be a difficult period for Jayden, which was likely to lead to depression, anxiety and incapacitation. Greenberg Decl., ¶ 9. In light of his son's situation, on August 29, 2014, Dr. Greenberg attempted to call Dr. Reede at her office because he understood that what he was requesting was on short notice. Greenberg Decl., ¶ 9. Dr. Reede's voicemail was full because she was on vacation and therefore he was unable to leave a message. See id. Knowing that Dr. Pulitzer was on vacation too, Dr. Greenberg reached out to the only other person that might be able to guide him as to how to proceed - Linda McMurren who was Dr. Reede's administrative assistant. Ex. 22 (HHC_ESI_001090). Dr. Greenberg did not realize that Ms. McMurren was also on vacation, as she did not reply to his email until September 4, 2014. Id. (HHC_ESI_001089). In contacting Dr. Reede immediately upon learning of his need to take time off for an emergency family matter that related to the care of his son who has a serious condition, Dr. Greenberg followed relevant policy regarding unexpected absences. Ex. 59 (SUNY 000677).

17.    Not hearing back from Linda McMurren, on September 2, 2014, Dr. Greenberg approached Dr. Pulitzer about taking off September 4th and 5th later that week. Ex. 1 (Greenberg Dep. at 228); Ex. 5 (Pulitzer Dep. at 337). Dr. Greenberg provided the reason why he needed the leave: "I told him that I had to care for my son, that he had to transition to a new school, and that I needed the time off to be with him." Ex. 1 (Greenberg Dep.) at 228. Dr. Pulitzer knew that Dr. Greenberg had a special-needs son. Ex. 5 (Pulitzer Dep.) at 341-42. He

denied that Dr. Greenberg mentioned that he needed the time off to take care of Jayden during any of their conversations about the leave. Id. at 341 & 345. He admitted that he never asked Dr. Greenberg why he needed the time off in spite of three conversations about the request, including one conversation in which he admitted that Dr. Greenberg told him in sum and substance that you are making me choose between my job and my family. Id. at 360. To all of Dr. Greenberg's requests for a leave, Dr. Pulitzer responded verbally and finally in writing that he could not allow Dr. Greenberg to take the days off because of staffing deficiencies and departmental operational needs. Ex. 1 (Greenberg Dep. at 232); Ex. 5 (Pulitzer Dep. at 337-38); Ex 58 (SUNY 000482).

18.     At his deposition, Dr. Pulitzer stated that he could not grant Dr. Greenberg leave on September 4 and 5, 2014 because he was down four radiologists from recent non-renewals and other radiologists were on vacation. Ex. 5 (Pulitzer Dep. at 338-39). In fact, at the time, the department had replaced three of the four of the radiologists that had been let go. Greenberg Decl., ¶ 9. Dr. Greenberg also remembers Dr. Pulitzer stating as another reason he could not permit his leave is that the department lacked someone who could do body imaging, if Dr. Greenberg was not around. Id. As for the lack of body imagers on the days in question, according to Dr. Greenberg, any radiologist who did weekend call, such as Drs. Scott, Chen, Samin, Zinn, Pulitzer and Waite, could have done body imaging and each of whom was working the days in question. Id.

19.     On September 3, 2014, Dr. Greenberg approached Dr. Pulitzer once again about the two days that he needed to take off in order to care for his special needs son. Ex. 5 (Pulitzer Dep. at 351); Ex. 1 (Greenberg Dep. at 231-32). According to Dr. Greenberg, he said to Pulitzer amongst other statements about his need for the leave to take care of his son: "I must

have this time off to care for my son. This is a difficult transition for him." Id., Ex. 1

(Greenberg Dep. at 232). Again, Dr. Pulitzer denied the request in sum and substance by stating:

"due to the operational needs of the department, I can't let you have the time off." Id.

      20.     After Dr. Greenberg approached Dr. Pulitzer the second time to request

two days off to take care of his special-needs son, Dr. Pulitzer sought Dr. Reede's assistance as to

how to handle the situation. Ex. 5 (Pulitzer Dep. at 355-56). She advised him to write a letter to

Dr. Greenberg officially denying the time off, ordering him to report for work and warning him

that if he were to disobey the command he would be referred to Labor Relations. Id. at 356. Dr.

Pulitzer followed Dr. Reede's recommendation and generated the letter described above.

      21.     Dr. Pulitzer delivered the letter recommended by Dr. Reede to Dr.

Greenberg within 30 minutes of discussing the matter with Dr. Reede. Ex. 5 (Pulitzer Dep. at

358). He went to the reading room where Dr. Greenberg was working and said: "Oded, I have to

give you this letter. I can't approve your time off." Id. He then read the contents of the letter to

Dr. Greenberg and after doing so told him not to take the time off. Id. Dr. Pulitzer admitted that

Dr. Greenberg said to him at this juncture, "Well, you're making me choose between my job and

my family," to which he responded "I'm not making that choice." Id. at 360. Dr. Pulitzer

admitted that he did not inquire as to what Dr. Greenberg meant by stating that he was making

Dr. Greenberg choose between his job and family. Id. at 360-61. In an email that Dr. Pulitzer

wrote to Michael Arabian, the Labor Relations representative who was assigned to Dr.

Greenberg's case after the "insubordination" of September 4, 2014, he stated that during the third

discussion, after he had read the official letter that he wrote to Dr. Greenberg officially denying

his request for leave and warning him that he would be referred to Labor Relations if he did not

show up (and presumably after he had heard Dr. Greenberg state, "you're making me choose

between my job and my family"), he and Dr. Greenberg talked for a few minutes about each other's mutual families. Ex. 50 (HHC_ESI_1087). At his deposition, Dr. Pulitzer testified that if he had known that the leave of absence was to take care of Dr. Greenberg's special-needs son Jayden he would have made every attempt to accommodate the request. Id. at 361.

22. Dr. Greenberg did not go to work on September 4 and 5 of 2014. In fact, on the schedule for this week were sufficient radiologists to cover for Dr. Greenberg's absence on these two days. Greenberg Decl., ¶ 9. The services that Dr. Greenberg would have covered were covered on these two days. Ex. 5 (Pulitzer Dep. at 354). Dr. Greenberg never filled out forms to request his FMLA leave because his supervisor, Dr. Pulitzer, made it clear through discussion and the September 3, 2014 letter ordering him to work that he would not approve the request.

23. On September 4, 2014 at 2:48 p.m., Dr. Reede notified Labor Relations that Dr. Greenberg did not come into work as ordered; therefore, a case regarding him that was already "opened" at Labor Relations and assigned to Michael Arabian was set to be pursued. Ex. 23 (SUNYESI0000278). Later that day, Arabian reached out to Dr. Pulitzer by email and asked for the details as to what occurred when he hand-delivered the letter dated September 3, 2014 that denied Dr. Greenberg's request for two days off. At 10:57 a.m. the next morning, Dr. Pulitzer emailed Arabian an attachment that described his interactions with Dr. Greenberg in detail. Ex. 24 (SUNY 000494); Ex. 25 (HHC 1135-36) (the memo that Dr. Pulitzer sent to Mr. Arabian). In his memo to Labor Relations, Dr. Pulitzer described Dr. Greenberg's conduct the week of August 25th, coming into work rather than staying out on vacation, in a manner to suggest that it was a problem, even though Dr. Hammil, according to Dr. Greenberg, welcomed Dr. Greenberg's help. Ex. 25 (HHC 1135); Greenberg Decl., ¶ 8. Arabian responded to this memo about 10 minutes later by asking for more details as to what happened when Dr. Pulitzer

handed to Dr. Greenberg the September 3, 2014 letter denying his request. Ex. 24 (SUNY 000493). Dr. Pulitzer responded 20 minutes later and stated in pertinent part: "I advised him to show up for work on September 4 and to revise his plans or this matter would be referred to labor relation. He thanked me for my recommendation and said that he intended to continue with his original plan. I stayed an additional five minutes and had small talk about his family." Ex. 24 (SUNY 000493). Later this same day, Dr. Pulitzer sent to Dr. Reede the "pre-dated" memo discussed above. Ex. 17 (HHC_ESI_001091-92).

24. On September 5, 2015, Dr. Reede, Dr. Pulitzer and Michael Arabian from SUNY Labor Relations met to talk about what would happen, i.e., the process now that Dr. Greenberg had been referred to Labor Relations. Ex. 5 (Pulitzer Dep. 363-72). Dr. Pulitzer noted that the meeting was arranged through Dr. Reede's office because she was familiar with Labor Relations and he was "a very, very new administrator." Id. at 364.

25. On September 5, 2014, Dr. Greenberg wrote an email to Linda McMurren and cc'd Dr. Pulitzer to provide an explanation of his absence. Ex. 22 (HHC_ESI_001089). Therein, he wrote, "[a]s it turns out I was going to come in regardless of my last email Thursday, the family issues having been resolved Thursday morning. I then managed to throw my back out. My mobility has been severely limited since. Please forgive the confusion." Id. At his deposition, Dr. Greenberg made clear that this email was an attempt to save his job by misrepresenting that he had intended to come to work on the two days that he missed but he threw his back out on the morning of the 4th; he always intended to take his leave in order to be available for Jayden and assist in his transfer from one school to another. Ex. 1 (Greenberg Dep. at 246-47).

The Settlement Agreement that Dr. Greenberg Signed Under Duress

26.     When Dr. Greenberg returned to work on his next scheduled work day, September 8, 2014, he went to the reading room where he began reading cases. Edgar Decl., Ex. 5 (Pulitzer Dep. at 373). Shortly after arriving, Dr. Pulitzer approached him and instructed him to cease working immediately and report to Labor Relations. Id. After being interrogated for a few hours and having to wait another few hours for Labor Relations to draft and present to him a Settlement Agreement, all the while suffering from back spasms, Dr. Greenberg signed a draconian Settlement Agreement. Ex. 29 (SUNY 006626-27). By its terms, in lieu of any immediate discipline, the Settlement Agreement provided that Dr. Greenberg would be on probation for a year and any subsequent infraction posed the real possibility that he could be terminated immediately. Id. (¶ 4). This settlement agreement, the terms of which were likely discussed between Mr. Arabian and Dr. Reede and Dr. Pulitzer because that was the standard operating procedure, was especially severe in light of the fact that of the nine other settlement agreements presented to employees during this time period by SUNY Labor Relations only one other stripped the employee of his or her job security. Ex. 27 (Arabian Dep. at 224-25) (conferring with those supervisors affected by the agreement would routinely occur); Ex. 30 (nine other settlement agreements). In the cover email to the Settlement Agreement, Mr. Arabian instructed Dr. Pulitzer to keep a close eye on Dr. Greenberg to confirm that he did not stray from its strict terms.

### The Heightened Surveillance of Dr. Greenberg and His Alleged Violations of the Settlement Agreement

27.     Dr. Greenberg was subject to unremitting scrutiny by Dr. Reede and Dr. Pulitzer upon his return to work after signing the Settlement Agreement. On September 9, 2014, Dr. Greenberg wrote an email to Dr. Pulitzer wherein he complained about the slow speed in which archived images were made accessible due to computer issues. Ex. 32

(HHC_ESI_001238). In response to this email, Dr. Pulitzer sent it to his assistant to file in his personnel folder. Id. On September 12, 2014, Dr. Pulitzer wrote an email to Dr. Reede with the subject line of "week in review September 12, 2013." Ex. 33 (HHC_ESI_001243-44). The first item addressed is Dr. Greenberg and in relation to him, Dr. Pulitzer wrote: "Will monitor time and attendance and number of cases read per day." Id. On September 15, 2014 at 8:52 a.m., Dr. Reede emailed Dr. Pulitzer and posed the question: "is Dr. Greenberg reading films?" Ex. 34 (HHC_ESI_1259). Dr. Pulitzer responded within 35 minutes with the answer, "Yes. He is." Ex. 35 (HHC_ESI_1262).

28.     On September 15, 2014 at around 2:47 p.m., Dr. Greenberg wrote to Dr. Pulitzer while carbon copying Dr. Reede in which he gave his account of what occurred leading up to his absences on September 4 and 5, 2014, emphasizing the fact that he emailed Dr. Pulitzer and Dr. Reede about coming in the week of August 25th and emailed Linda McMurren about the need to take off days the following week. Ex. 36 (HHC 1529 & 1531). In response to this email, Dr. Reede wrote to Dr. Pulitzer: "Dr. Greenberg is trying to cover his tracts [sic]." Ex. 37 (HHC_ESI_001274). To which Dr. Pulitzer responded, "Yes I have filed his email in his file. he is really all over the map." Id.

29.     On September 22, 2014, Dr. Greenberg attended a departmental meeting but arrived late. Greenberg Decl., ¶ 11. During the departmental meeting, the use of attestation clauses was discussed but because he arrived late Dr. Greenberg was not there for the whole discussion. According to Dr. Greenberg, he left the meeting thinking that he had to draft an attestation clause that met the criteria discussed at the meeting. Greenberg Decl., ¶ 11. He had no idea that the clauses were available as macro templates from a colleague and they could therefore be easily placed onto reports. Id. Out of frustration and in a fit of pique about this

additional bureaucratic hurdle that would slow down reading times and be an impediment to timely turnaround of radiological studies for patient care and not realizing that what was required of him was simply copying a macro template from a colleague, Dr. Greenberg wrote an attestation clause that was playful or sarcastic at worse. Id. Soon after his studies started circulating with the attestation, colleagues in the ER were talking about them. One of Dr. Greenberg's colleagues approached him, told him about the stir that the attestations were creating and advised him to modify or revise them. Id., ¶ 12. Dr. Greenberg approached an employee in the IT department and asked whether it was possible to change the attestations that he had included in his studies. Ex. 1 (Greenberg Dep. at 291-93). When the employee expressed discomfort in involving himself in such, Dr. Greenberg immediately clarified that he was not asking that the attestations be changed or to do anything wrongful. Id. at 293.

30.    On September 23, 2014, Dr. Greenberg took off time in the morning in order to attend a meeting related to his special-needs son's IEP. Ex. 1 (Greenberg Dep. at 297-98). After returning to work, Dr. Greenberg asked Dr. Pulitzer for additional time off in the afternoon in order to attend another such meeting. Id. at 298. His request was denied. Id. That afternoon, he left the reading room from 2:50 to 4:30 p.m. Part of that time was spent consulting with colleagues in ER and another part was spent taking lunch at the SUNY campus across the street from KCHC, which he was allowed to do, and he used part of the lunch break to talk to his wife about the IEP meeting that he missed. Id. at 302-03.

31.    On October 3, 2014, Labor Relations sent a letter to Dr. Greenberg instructing him to report to Labor Relations to be interrogated as to alleged violations of the Settlement Agreement. Ex. 40 (SUNY 000014). Dr. Greenberg was eventually terminated from employment in or around October 22, 2014.

### Dr. Reede's Anti-Semitic Remarks

32.     During the relevant period, in 2013, Esther Neiman sat in a room adjacent to Dr. Reede. Declaration of Esther Neiman dated June 27, 2018, ¶ 3. She also frequently interacted with Dr. Reede. Id. She testified that when Dr. Reede first arrived at SUNY to assume the position of Department Chair of Radiology she was taken aback and showed evident disapproval that observant Jews from all over the hospital were coming to the Radiology Department to participate in midday prayers. In this context, she asked Ms. Neiman, "What are your people doing here at this time of day?" Id., ¶ 4. To which Ms. Neiman responded, after being shocked that Dr. Reede would use the phrase "your people" something to the effect of I believe they are doing their daily prayers. Id. Ms. Neiman also heard Dr. Reede state to other administrative staff that she was going to put an end to the midday prayers because it was disruptive to her department's operations. Id. ¶ 5. Ms. Neiman also heard Dr. Reede state sarcastically that she wished she were Jewish because then she too could have a lot of holidays from work and express frustration with observant Jews who she could not reach or find on Friday afternoons because they left work early to observe Shabbat. Id. ¶ 6.

Date:   New York, New York
        July 6, 2018

                                        CARDI & EDGAR LLP

                        By:     _____
                                Chad L. Edgar
                                Dawn M. Cardi

                                99 Madison Avenue, 8th Floor
                                New York, New York 10016
                                212.481.7770 (tel.)
                                212.271.0665 (fax)
                                cedgar@cardiedgarlaw.com