UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

ODED GREENBERG,

                        Plaintiff,                      15 Civ. 2343 (PKC) (VMS)

    - against -                                  **DECLARATION OF**
                                                               **ODED GREENBERG, M.D.**

SUNY DOWNSTATE et al.,

                        Defendants.

-------------------------------------------------------------X

       ODED GREENBERG, M.D., affirms under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am currently 58 years old. At the time that I was terminated from employment as a radiologist at SUNY Downstate Medical Center (SUNY) and Kings County Hospital Center (KCHC) I was 55 years old. I am Jewish, Caucasian and during the last few years of my employment at SUNY and KCHC one of my supervisors affiliated with SUNY, Dr. Deborah Reede, was African-American and non-Jewish.

2.      During the relevant period, I was a full-time practicing radiologist located at KCHC. I practiced there from 2001 until my termination in October of 2014. For about a year, from approximately 2009 until 2010, I took a hiatus from practicing at KCHC in order to stay at home to assist with the care of my special-needs son, Jayden. I understand that I was considered a SUNY employee in terms of compensation (I was on its payroll) and benefits (I had retirement accounts through it). Nonetheless, my ongoing employment relationship with KCHC was substantial, in that (a) I practiced only at KCHC and was obliged to observe and follow KCHC's policies, procedures, rules and regulations in the course of performing my duties; (b) my

credentials for practicing privileges were collected, renewed and stored by KCHC; (c) in the course of my daily practice, I used only KCHC equipment; (d) to the public, I and my colleagues were held out as KCHC representatives in terms of uniforms and identification; (e) records of my completion of Continuing Medical Education courses were kept by KCHC; and (f) during the relevant period, from July 2014 until my termination in October 2014, I was supervised by Dr. Steven Pulitzer who was Chief of Service, Department of Radiology at KCHC. Dr. Pulitzer set my work schedule, authorized any leaves I sought and referred me to SUNY's Labor Relations when he viewed my conduct as insubordinate.

3. By the end of August of 2014, at the time that I made my initial request for a leave to take care of my special-needs son, I had worked full-time (i.e., at least forty hours per week) for SUNY and KCHC continuously since 2010. SUNY and KCHC are both entities that are instrumentalities of New York State and New York City respectively.

4. Jayden Greenberg, my son, has been diagnosed with autism spectrum disorder from which he has suffered since he was two years old and continues to suffer from the condition to this date. Since before he was two and continuously to date, he has had services that include at least weekly speech therapy, occupational therapy, physical therapy, psychotherapy and social skills therapy. Since I can remember, Jayden has had an Individualized Education Program. Currently and at the time relevant to this litigation, Jayden was medicated for anxiety and depression. Around the time of events relevant to this litigation, in 2014, Jayden went to The Gateway School that caters to students with learning disabilities. At The Gateway School, Jayden's education was informed by an Individualized Education Plan which contemplated that he would be in a special education class with no more than 8 students per teacher at all times. It also contemplated that he would receive speech therapy and physical therapy twice per week and

psychological counseling once per week. During this time, as indicated above, he was also under the continuing supervision of a psychotherapist who treated him with medication for attention deficit disorder, along with depression and anxiety. Due to his severe deficits, during this time, when he was about eight years old, Jayden was unable to dress, eat and groom himself without assistance from my wife or me or his teachers when he was at school. In short, Jayden required adult supervision at all times. During the time when Jayden learned that he had to go to a new school, around the time that I asked for a short-term leave at work, he was presenting with tremendous stress and anxiety and I was concerned that it would lead to incapacity.

5.   I understand that Dr. Reede and Dr. Pulitzer have submitted declarations where they state that so-called Talk Station data is an accurate measure as to when radiologists are at work. I strongly disagree with this testimony. By way of background, it should be noted that Talk Station data does not capture when film is first opened for review by a radiologist but when he or she closes out of the study, usually after completion of review. Thus, the time first captured by Talk Station on any given day is when the radiologist completes his or her first study. During the time that Dr. Reede threatened closer scrutiny of each radiologist's productivity by examining Talk Station data, around the spring of 2014, many of my colleagues "gamed" the system by choosing a very easy study to review when they first arrived at work thereby memorializing the earliest possible time for a so-called "clock in." I refused to play that game. Rather, I always read whatever film I viewed in my professional opinion as the most pressing after consulting with my ER colleagues, even if it was complicated and meant that I would have a later "clock in" time than would otherwise be indicated. It should also be noted that when I came into the reading room at or around 9 or 9:30 a.m., a colleague had been reviewing film for three hours ahead of me and therefore there might be no cases to read immediately. Further, the

computer I used was frequently turned off and could take as long as 20 minutes to boot up and be available to start reading cases. Also, it was my habit upon arriving at work to take a tour of ER to see if there were any pending issues that needed to be addressed and to confer with multiple colleagues, if necessary. All of these factors and circumstances made the time of the completion of my first study upon arriving at work a poor proxy as to what time exactly I arrived there.

6. In July of 2014, I wrote an email to Dr. Reede requesting that I be promoted to the position of Director of ER Radiology vacated by the termination of my then colleague Dr. David Areman. As far as I understood, the position had not been officially posted nor had there been any announcements about an application process. Dr. Reede met with me and let me know that I would not be getting the job. One of the reasons that Dr. Reede stated that I would not be given the position was that I lacked scholarly activity and/or interest in academics. I disagreed with her. I was interested in scholarly activity and academics; in fact, I was working on collecting data for two studies in which I was collaborating with residents at the time I sought the Director position. When I stated as much during our meeting, Dr. Reede evinced no interest in my current studies. Also, Dr. Reede told me that one of the reasons that she was choosing Dr. Scott over me as the Director was that Dr. Scott was closer to her residency and therefore a more effective mentor, which I understood to mean that because Dr. Scott was younger the residents would relate to her better than to me. I of course disagreed because I thought I had good relationships with the residents and prided myself in efforts to make myself approachable by all. In the end, Dr. Reede offered the job of Director of ER Radiology to Dr. Scott, an African-American woman considerably younger than I, who had less experience than I (with no experience in a Level One trauma ER as opposed to my more than a decade, except for when she was a resident) and who had, in fact, been trained by me when she was a resident.

7. In mid- to late August of 2014, Steve Pulitzer approached me at work about my schedule. In sum and substance, he related to me in a "don't shoot the messenger" sort of way that Dr. Reede wanted me to start to adhere to a set work schedule of 9 a.m. to 5 p.m. I was not counseled or warned about my recent so-called erratic work schedule nor threatened that it might lead to counseling or referral to Labor Relations. My response was that such a schedule made no sense in light of the fact that a high volume of cases to read occurred between 4 p.m. and 8 p.m., during most of which time, under such a schedule I would not be in the ER to help. I also reminded him that Dr. Kantor, the previous Service Chief of Radiology at KCHC, had always pushed me to come in at noon and leave at 8 p.m. in order to assist with the high volume of cases between 4 p.m. and 8 p.m. Dr. Kantor and I ended up compromising to the extent that I tended to come in around 10 or 11 a.m. and work for 8 hours from that point. That was the schedule to which I tended to adhere, especially when my children were in school. On that point, I reminded Dr. Pulitzer of my family issues, that I assisted my special-needs son to get ready for summer camp, which often made me later to work than 9 a.m. Dr. Pulitzer responded in sum and substance that he knew of those circumstances as did Dr. Reede. He then said that she was like a cop and was looking to catch me. I understood Dr. Pulitzer to mean that Dr. Reede was on a campaign to get rid of me. I agreed to the new set schedule once school was underway in September.

8. On August 26, 2014, I attended a multi-disciplinary meeting at KCHC, even though I was scheduled to be on vacation that day. At the meeting, I presented findings of my investigation as to why certain studies in the Radiology Department were not performed in a timely manner. One of the causes was the fact that the department was short staffed due to recent layoffs of radiology faculty. After I attended this meeting, I went to the ER and stopped by the reading room where

radiologists usually sit reading film. I saw that no one was in the reading room. Since I had just related to a group of my peers that the Radiology Department sometimes underperformed because of short-staffing issues I felt morally obligated to sit down and start reading cases to pitch in. It turns out that my vacation plans had recently fallen through in any event so I could pitch in on August 26th and the rest of the week. Dr. Hammill, one of my colleagues and another radiologist, was supervising the department while Dr. Pulitzer was on vacation this week. Dr. Hammill appeared to welcome my assistance that week and never complained about my presence.

9. On August 29, 2014, my wife and I received an email from Gateway School where my special-needs son, Jayden, attended since 2011. In this email, a representative from the school notified us that in all probability Jayden would not be able to continue to attend there. My wife and I conferred and in light of my special relationship with Jayden, we thought it was best that I sought leave from work in order to assist with any arrangements that needed to be made in conjunction with the transfer to a new school and to help Jayden with this transition by providing love and support because he was likely to find it a very difficult transition, given his special needs. On the very same day that we received this email, I called Dr. Reede in order to notify her of my need for a leave. Her voicemail was full so I was unable to leave her a message. I could not ask Dr. Pulitzer about my need for a leave because he was on vacation. I then emailed Dr. Reede's assistant alerting her of my need to take a short leave from work the following week and sought guidance as to how to proceed. I did not know that Dr. Reede's assistant was also on vacation on that day. In the end, the first time I was able to confer with management about this need for a leave occurred on September 2, 2014 when Dr. Pulitzer returned from his vacation that spanned the previous week. The reason that Dr. Pulitzer cited for denying my leave was that

the department was short staffed due to recent layoffs and the only other body imager in the department was going to be off the days I needed to take a leave. I know these reasons to be untrue because of the four radiologists that had been downsized three had been replaced. As for the reason that there was a lack of body imagers available, any radiologist who does on-call duty must be able to read body images and there were many radiologists who do on-call duty that were available on the days that I sought to take off. Indeed, only one radiologist, Dr. Hammil was scheduled to be out on those days.

10. On my return to work on September 8, 2014, I was directed by Dr. Pulitzer to report to Labor Relations after commencing work for less than an hour. I believe I was interrogated by Michael Arabian, a representative of SUNY Labor Relations, for approximately 2 hours. After he finished asking me questions and ceased recording our conversation, I sat in the room where he questioned me for another few hours. I was not allowed to leave the room to eat, to stretch or to take pain medication that had been prescribed that morning due to a recent episode of back spasms. I was in excruciating pain after sitting in the same chair for approximately 4 hours at the time that Mr. Arabian presented the Settlement Agreement for me to sign. I believe I was not in a proper frame of mind when I signed the Agreement that I later learned stripped me of the job security provided by the collective bargaining agreement of which I was a beneficiary.

11. On September 22, 2014, there was a Radiology department meeting to which I arrived late. Before I arrived apparently there had been a discussion about the use of attestations that were now required for the purpose of being paid for Medicaid and/or Medicare patients. An attestation is used by an attending physician to indicate whether he or she agrees or disagrees with a residents' reading of a film or study. Since I did not hear the entire discussion about attestations, I was under the impression that each faculty member would be required to author an

attestation that met insurers' requirements. As we were a department down in manpower, I was in disbelief that we were going to be required to perform another bureaucratic task that would slow our reading of cases and detrimentally affect our ability timely to provide care to patients. I have no doubt that I may have expressed my frustration with this new requirement to some of my colleagues. When I returned to the reading room after this meeting, out of frustration and in a fit of pique, I drafted an attestation that I believed met the insurers' requirements but was playful or at worst sarcastic. I started using it immediately on cases that were months old, had already been acted upon in terms of treating patients, had been submitted to insurers for reimbursement and rejected for lack of an attestation. I had no idea that the required attestation was available as a macro from one of my colleagues. If I had known that such was available I would never have bothered to waste my time by creating my own. Also, apparently, our billing service, Phycare, had previously come to the Department to explain attestations and other issues to my colleagues but I was unable to attend the meeting.

12. At some point on September 22, 2014, when I had started to use the attestation that I authored, one of my colleagues, Dr. Velayudhan, alerted me that it was causing a stir in the hallways. He suggested that I modify my attestation and see if it could be inserted in the studies I had already completed instead of the attestation that I had authored. I went to the IT Department and spoke to someone there. I asked if the studies onto which I had affixed an attestation could be modified to bear a different attestation. The IT employee told me that he could but it would get him into trouble. I immediately responded that I did not want to do anything that would get him into trouble.

13. Dr. Pulitzer never approached me to discuss the attestations that I had affixed to cases that led to my termination. Also, he never approached me to discuss whether I had left my post

without his authorization in the afternoon of September 23, 2014. I understand that he alleges that he was looking for me that afternoon. That makes no sense because I always carried a pager and he knew my cell phone number. If he really needed to reach me, he had the means of doing so. Dr. Pulitzer and I had been colleagues for many years. I considered him a friend and in addition to professional matters we would often talk about our personal lives, including our families. To this day, I still do not understand why Dr. Pulitzer never asked me directly about the attestations or the alleged unauthorized leave from work on September 23, 2014 or any of the circumstances that led him to believe that I was angry or acting out during the relevant period.

14. I understand that defendants in this case suggest that I had no discernible interest or activity in scholarship in or around 2014 because a summary of scholarly activity that I submitted in or around July 2014 indicates that I spent zero hours doing "Research/scholarly activity with residents." I remember submitting this form; I was in a hurry to do so because I was late in submitting it. I did not understand what exactly was meant by this category so not wanting to offer a false statement I put zero. In actual fact, I was interested in academic research and scholarship in 2014; in 2013, for example, I and fellow radiologists and residents had two case reports published.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Brooklyn, New York
July 6, 2018

_____
Oded Greenberg, M.D.