1

Page 14

1  Greenberg
2  employment from 2008 to 2010?
3  A. I was doing teleradiology.
4  Q. Can you tell me what
5  teleradiology is?
6  A. Teleradiology is essentially
7  just being a radiologist but you don't --
8  you're not sitting in a hospital, you
9  can -- everything is digitized, so you can
10 read from home.
11 Q. So the films are sent to you on
12 a computer screen --
13 A. Correct.
14 Q. -- you can review them and
15 then --
16     MR. NELSON: Let him finish his
17   question before you begin your answer.
18     THE WITNESS: Yes.
19 Q. -- and then you can basically
20 give your report online and it's sent to
21 the hospital?
22 A. That's correct.
23 Q. And were you working for a
24 specific company at that point or were you
25 sort of a freelance teleradiologist?

Page 15

1  Greenberg
2  A. I worked for Virtual Radiologic.
3  Q. Where are they based?
4  A. Minneapolis.
5  Q. What was your annual salary when
6  you were employed by Virtual Radiologic?
7     MR. NELSON: I object to the
8   form. Lacks foundation. You can
9   answer.
10 A. That salary varied, but it was
11 probably around 400,000.
12 Q. Did it vary because it was based
13 on cases read?
14 A. Correct.
15 Q. Did you decide to leave Virtual
16 Radiologic to return to SUNY Downstate or
17 were you terminated or was there some
18 employment decision made against you by
19 them?
20     MR. NELSON: I object to the
21   form.
22 A. It was my decision.
23 Q. And why did you decide to return
24 to SUNY Downstate?
25 A. Number one, my son was in a

Page 16

1  Greenberg
2  better position, and he was already going
3  to school at that point, so it was less of
4  a stressor, and number two, I was -- I had
5  been working overnights, and that had
6  taken a toll on me.
7  Q. What was the overnight schedule
8  you had with Virtual Radiologic?
9  A. I believe it was 10 p.m. to 8
10 a.m.
11 Q. Now, was there a publicized
12 position at SUNY Downstate that you
13 applied for in 2010?
14 A. No.
15 Q. How did you go about returning
16 to employment at SUNY Downstate?
17 A. I contacted the chairman.
18 Q. And who was the chair at that
19 time?
20 A. Salvatore Sclafani.
21     MR. NELSON: Let him finish his
22   questions.
23     THE WITNESS: Okay, sorry.
24 Q. And I'm sure you can't remember
25 the exact conversation, but in substance,

Page 17

1  Greenberg
2  what did you say to Dr. Sclafani?
3  A. I asked him if there were any
4  positions available.
5  Q. And what did he say?
6  A. He said that he had one position
7  available.
8  Q. Do you know if that position was
9  being advertised at the time?
10 A. I don't.
11 Q. And did you ever see an
12 advertisement for any position at that
13 time?
14     MR. NELSON: I object to the
15   form. Ever, at that time, which would
16   you like him to answer?
17 Q. Do you understand the question?
18 A. I -- I don't.
19 Q. When you were applying in 2010
20 for a position at SUNY Downstate, did you
21 see an advertisement for a position in the
22 radiology department?
23 A. I did not.
24 Q. Did Dr. Sclafani tell you what
25 the opening was?

5 (Pages 14 - 17)

Page 42

Greenberg

Q. And did you think that this was a change that was occurring at SUNY Downstate or KCHC?

A. I definitely think it was something that was occurring at Downstate and KCHC, I think it's occurring in medicine in general.

Q. And you've had a long career, was there a point where you sort of saw this change coming?

A. Yeah, when Deborah Reede became chairman.

Q. Nationally that's when it started?

A. Nationally is when it started, I wasn't aware of what was going on nationally until it happened to me.

Q. Now that you know more about the national story, when do you think this did start nationally?

A. Probably before -- even before the introduction of Obama care, but Obama care is one of the major drivers of that.

Q. And what impact did it have on

Page 43

Greenberg

physicians caring for patients nationally?

MR. NELSON: What's it?

Q. The corporatization of medicine.

A. It's driving doctors out of practice and forcing them to retire early.

Q. How is it doing that?

A. It's taking control of what they do as physicians and how they take care of patients away from them, and those things are being governed by nonphysicians, insurers, administrators.

Again, there's a lot of focus on metrics and productivity and physicians are being forced to see more patients than they can deal with, and they're being forced to spend much more time documenting as opposed to caring for patients.

I think a lot of physicians feel that they're just cogs in a machine now rather than being independent professionals making decisions for their patients that they feel are appropriate.

Q. Is the use of attestations part of the corporatization of medicine?

Page 44

Greenberg

A. I believe so.

Q. Who was your supervisor at the time of your termination in October 2014?

A. My direct supervisor was Steven Pulitzer.

Q. Who was your supervisor prior to --

A. Alan Kantor.

MR. NELSON: Let him finish his question.

THE WITNESS: Sorry.

Q. Who was your supervisor before Dr. Pulitzer?

A. Dr. Alan Kantor.

Q. When did Dr. Kantor first become your supervisor?

A. When I came back in 2010.

Q. And what was his position?

A. He was the director of radiology at Kings County Hospital.

Q. Was he the director of radiology before you left SUNY Downstate in 2008?

A. I don't believe so.

Q. Do you know who was the director

Page 45

Greenberg

before Dr. Kantor?

MR. NELSON: I object to the form.

A. Salvatore Sclafani.

Q. And I think before you had said Dr. Sclafani was the one who hired you back to SUNY Downstate?

A. Uh-hum.

Q. Does that refresh your recollection he still had that position when you returned to SUNY Downstate?

A. He had the position as chairman as well as chief of service at Kings County.

Q. Okay.

A. So he had dual roles.

Q. Understood. So he did have, you believe he did have the position of director of radiology in 2010 at KCHC?

A. No, at that point I believe he was just the chairman, and he had made Alan Kantor the director.

Q. Did Dr. Kantor have anything to do with your hiring in 2010 --

12 (Pages 42 - 45)

Page 86

1  Greenberg
2  would agree that masks should be worn if
3  you are leaving the reading room to attend
4  to patients in any way. Dictating with a
5  mask on seems a little ridiculous if you
6  ask me. There's a specific mandate from
7  HHC with regard to this, please let me
8  know, do you see that?
9      A.  I don't recall writing this, but
10 yeah, I see it.
11     Q.  Do you have any reason to
12 believe you didn't send this e-mail to the
13 radiology department?
14     A.  I may have, I don't see my name
15 anywhere.
16     Q.  If you go to the first page, at
17 the very top of SUNY ESI 579, do you see
18 the from and then it says Oded Greenberg
19 next to that?
20     A.  Oh, yes, okay.
21     Q.  Is there any reason to believe
22 that you did not send this e-mail?
23     A.  No, it's here.
24     Q.  Did you dictate with a mask on
25 after receiving this e-mail?

Page 87

1  Greenberg
2      A.  I'm sure I did whatever was
3  required.
4          MR. COULSTON: This is Greenberg
5      9.
6          [Whereupon, at this time, the
7      reporter marked as Greenberg Exhibit 9
8      the above-mentioned e-mail exchange
9      between the witness and Dr. Kantor for
10     identification.]
11     Q.  This is an e-mail exchange
12 between you and Dr. Kantor, do you see
13 that?
14     A.  Uh-hum.
15     Q.  Just answer with a yes or no.
16     A.  Yes.
17     Q.  Who's Alvin Aviles, if that's
18 how you pronounce it?
19     A.  I believe he's like -- was the
20 president of HHC or something like that, I
21 don't remember.
22     Q.  And you see Dr. Kantor saying
23 that this is a mandate from Alvin Aviles
24 and this is following up on your e-mail to
25 him about wearing a mask?

Page 88

1  Greenberg
2      A.  I don't know if it was a
3  followup to that.
4      Q.  If you go back to Greenberg 8,
5  you see how the subject there is flu
6  vaccine, if you go to the third page and
7  you see how the subject on SUNY ESI 584,
8  which is Greenberg 9, is also flu vaccine?
9      A.  Uh-hum.
10     Q.  Does this appear to be a
11 response to your e-mail to Dr. Kantor?
12     A.  Could be.
13     Q.  And you wrote I won't do it,
14 he's going to have to fire me?
15     A.  Apparently I wrote that.
16     Q.  Did you wear a mask when you
17 were dictating cases?
18     A.  I believe I was referring to the
19 vaccine.
20     Q.  To getting the vaccine?
21     A.  Uh-hum.
22     Q.  Did you get the vaccine?
23     A.  No.
24     Q.  Did you wear the mask while you
25 were dictating cases then?

Page 89

1  Greenberg
2      A.  I did.
3      Q.  You think there was a mandate in
4  place for all physicians to get the flu
5  vaccine?
6      A.  I can only tell you what's
7  written here, I don't recall the details,
8  and I'm sure if I wrote it to Alan, it was
9  jokingly.
10     Q.  You'd been director of ER
11 radiology prior to leaving SUNY Downstate
12 in 2008, is that correct?
13     A.  Yes.
14     Q.  And how long were you the
15 director of ER radiology?
16     A.  I'm not sure of the exact date
17 that Dr. Sclafani gave me that title, but
18 it may have been 2005-2006.
19     Q.  That was my next question, Dr.
20 Sclafani gave you the title?
21     A.  Yes.
22     Q.  Did you have to apply for the
23 job of director of ER radiology?
24     A.  I did not.
25     Q.  Do you know if there was a

23 (Pages 86 - 89)

Page 222

1  Greenberg
2  A. That's possible, if you have
3  information to that effect. I don't
4  remember.
5  Q. Did anyone tell you you
6  shouldn't have been there the week of
7  August 25th at KCHC?
8  MR. NELSON: I object to the
9  form.
10  A. On the contrary, they seemed to
11  welcome my help.
12  Q. Did you ever tell Dr. Pulitzer
13  that you were going to be working the week
14  of August 25th?
15  A. I wrote him an e-mail on August
16  25th or 24th.
17  Q. Did you ever have a conversation
18  with him about working that week?
19  A. I had a conversation with
20  Patrick Hammil who was taking his place.
21  Q. What did Patrick Hammil say?
22  A. He didn't say anything. He said
23  okay.
24  Q. So after not taking your
25  vacation the week of August 25th, did you

Page 223

1  Greenberg
2  make a request later in that week to take
3  off part of the first week of September?
4  A. I spoke with Steve Pulitzer on
5  several occasions about taking time off to
6  take care of my son.
7  Q. Who did you first ask to take
8  leave?
9  A. I wrote an e-mail to Linda
10  McMurren, I think on that Friday the 28th
11  or the 29th.
12  MR. COULSTON: Let's mark this
13  as Greenberg 26.
14  [Whereupon, at this time, the
15  reporter marked as Greenberg Exhibit
16  26 the above-mentioned e-mail from
17  Karina Moltz to the witness for
18  identification.]
19  Q. Handing you what's been marked
20  as Greenberg 26, this is an e-mail at the
21  top from Karina Moltz to you to your MSN
22  account and your wife and then CC'd some
23  other people.
24  Do you recognize this document?
25  A. Yes.

Page 224

1  Greenberg
2  Q. What is this e-mail?
3  A. It's an e-mail from the -- I
4  think she was the director at that point,
5  telling us that he wouldn't have a place
6  at Gateway unless we did one thing or
7  another here.
8  Q. What was the reason for your
9  request for time off the first week of
10  September?
11  A. We had difficulty contacting the
12  department of -- the DOE, we still
13  believed we could keep him at Gateway, and
14  that's what we were trying to do, despite
15  this letter. We couldn't get hold of the
16  DOE and we had to come to some sort of a
17  conclusion as to where he would -- what
18  facility he would go to.
19  Q. Was this the first notice you
20  had received that he would not be able to
21  return to Gateway?
22  A. I think that this was the first
23  e-mail to that effect.
24  Q. There's a reference to an August
25  19th letter, do you see that, in the first

Page 225

1  Greenberg
2  sentence?
3  A. Yeah, I see a reference to
4  August 19th, I don't recall what that
5  letter said, or where it is.
6  Q. Do you recall that you were
7  notified on August 19th that Jayden would
8  not have a place at Gateway in September
9  or does this refresh your recollection if
10  you don't recall independently?
11  A. I don't believe that there was
12  another letter specifically stating that
13  he would not have a place at Gateway, they
14  may have said something else on August
15  19th, but this is the only letter I
16  remember.
17  Q. So why did you request time off
18  from work, what did you plan to do in
19  response to this letter?
20  MR. NELSON: I object to the
21  form. Compound.
22  A. My son has severe deficits, he
23  has an autism spectrum disorder, he needs
24  a lot of care. I need -- I was the
25  closest person to him, and I needed to

57 (Pages 222 - 225)

**Page 226**

1  Greenberg
2  care for him and help him transition to a
3  new school.
4  Q. As of August 29th, did you know
5  he was not going to be able to return to
6  Gateway?
7  A. As of August 29th, I know what
8  was said in this letter. We didn't know
9  whether we could stay at Gateway or not
10 despite this letter.
11 Q. When was he scheduled to start
12 school at Gateway for the new academic
13 year?
14 A. I don't know when he was
15 supposed to start at Gateway, but it was
16 presumably within the next week or two.
17 Q. Now, when you originally
18 requested leave, did you request to have
19 off September 3rd through September 5th?
20 A. I don't recall. I just remember
21 asking for the 4th and 5th.
22     MR. COULSTON: Mark this
23 Greenberg 27.
24     [Whereupon, at this time, the
25 reporter marked as Greenberg Exhibit

**Page 227**

1  Greenberg
2  27 the above-mentioned document Bates
3  stamped SUNY ESI 659 for
4  identification.]
5  Q. I'm handing you what's been
6  marked Greenberg 27, SUNY ESI 659. And if
7  you look at the top e-mail, it's from you
8  to Jinel Scott and Linda McMurren, and you
9  write yes, of course, 9/20, thanks, I will
10 CC Linda. Also, I was told I can't take
11 off the rest of this week so I will be in
12 tomorrow, probably around the same time as
13 today, Oded.
14     Does that refresh your
15 recollection that you asked for the 3rd,
16 4th and 5th originally?
17     MR. NELSON: I object to the
18 form.
19 A. I can only say whatever is on
20 here, I don't recall specifically. I
21 remember asking for the 3rd and 4th, but,
22 you know, whatever it says on here is what
23 happened.
24 Q. The 3rd and the 4th or the 4th
25 and the 5th?

**Page 228**

1  Greenberg
2  A. I'm sorry, the 4th and the 5th.
3  Q. Do you think it's possible you
4  asked for the 3rd off as well originally?
5     MR. NELSON: I object to form.
6  A. It's possible, I just don't
7  remember that.
8  Q. When did you first ask Dr.
9  Pulitzer whether or not you could have off
10 days in that first week of September 2014?
11 A. Well, Monday was Labor Day,
12 Tuesday was the first workday, it was
13 Tuesday, September 2nd.
14 Q. And what was said during that
15 conversation?
16 A. I told him that I had to care
17 for my son, that he had to transition to a
18 new school, and that I needed the time off
19 to be with him.
20 Q. And is that what you said
21 verbatim?
22 A. I don't know what I said
23 verbatim.
24 Q. Do you remember anything
25 specifically that you said?

**Page 229**

1  Greenberg
2  A. I don't remember specifically.
3  I know that I told him he -- you know, he
4  was well aware of my son's special needs,
5  and I told him that I needed that time off
6  to care for him during a very difficult
7  transition.
8  Q. How did Dr. Pulitzer respond?
9  A. He said something to the effect
10 of -- I forget the words he used. He said
11 he couldn't let me have the time off due
12 to departmental needs.
13 Q. Did he explain what those needs
14 were?
15 A. He did not.
16 Q. Did you ever submit a form
17 requesting leave for any days that first
18 week of September?
19 A. I didn't, and the first step in
20 filling out those forms is to get approval
21 from your supervisor, and that's what I
22 was doing.
23 Q. What do you mean the first step
24 is to get approval from your supervisor?
25 A. My supervisor has to sign that

Page 230

1  Greenberg
2  form, so I first brought it to his
3  attention, he did not -- he said I
4  couldn't take the time off, there was then
5  no point in me bringing him the form.
6  Q.  Did you ever put in writing what
7  the reasons were for you requesting that
8  leave?
9  A.  In writing, I alluded to it in
10 e-mails to Linda McMurren and I informed
11 Michael Arabian during my interrogation on
12 September 8th in detail.
13 Q.  With respect to the e-mail to
14 Linda McMurren, is that where you said you
15 were taking the time off due to important
16 family issues?
17 A.  Yes.
18 Q.  Did you provide any additional
19 detail besides saying that it was for
20 important family issues?
21 A.  In the original e-mail, I
22 requested emergently, what do I need to do
23 for an emergently, so I used the words
24 emergent and family issues.
25 Q.  Do you recall any e-mails or

Page 231

1  Greenberg
2  know of any e-mails that you sent to Dr.
3  Pulitzer or Linda McMurren where you
4  stated that it was to care for your son,
5  stated the leave was requested to care for
6  your son?
7  A.  After the fact, yes, not that
8  time.
9  Q.  Did you have a subsequent
10 conversation with Dr. Pulitzer requesting
11 leave that week?
12 A.  I spoke with Dr. Pulitzer, I
13 believe, on three separate occasions.
14 Q.  The first occasion was September
15 2nd?
16 A.  I may have spoken to him -- I
17 probably spoke to him twice on September
18 3rd, yes, and once on September 2nd.
19 Q.  What was the first conversation
20 on September 3rd?
21 A.  I don't remember the time.
22 Q.  What was discussed?
23 A.  I need this time off to care for
24 my son.
25 Q.  And what did you say

Page 232

1  Greenberg
2  specifically?
3  A.  I said that I must have this
4  time off to care for my son.  This is a
5  difficult transition for him.
6  Q.  And what did he say?
7  A.  He said, again, due to
8  operational needs of the department, I
9  can't let you have the time off.
10 Q.  Did you say anything else about
11 why you needed to care for your son?
12 A.  I might have, I don't remember
13 my exact words.  Dr. Pulitzer was well
14 aware, he has a son on the autism spectrum
15 as well, so he understood.
16 Q.  Is there anything that would
17 refresh your recollection about what was
18 said in that conversation besides what
19 you've already testified about?
20 A.  At this moment, I don't recall
21 anything else.
22 Q.  What happened during the second
23 conversation on September 3rd?
24 A.  The second conversation entailed
25 him handing me a document that said

Page 233

1  Greenberg
2  essentially you better report to work
3  tomorrow or you're going to labor
4  relations.
5  Q.  And did you say anything to Dr.
6  Pulitzer at that time?
7  A.  I said to him that I had been
8  telling him this to get the department
9  prepared for me to be off, I was telling
10 him in advance, and when he gave me that
11 paper, I said I can't believe that you're
12 forcing me to choose between my family and
13 my career.
14 Q.  And did you say anything else?
15 A.  I can't recall.
16 Q.  And did you provide any other
17 details regarding the care you intended to
18 provide to your son during the time off?
19 A.  I said to him that my son was
20 emotionally fragile and that I was the
21 closest person to him and I needed to be
22 there for him.
23 Q.  Did you tell him why you needed
24 to be there?
25     MR. NELSON:  I object to the

59 (Pages 230 - 233)

Page 242

1  Greenberg
2  Dr. Pulitzer?
3  A.  I don't know.
4  Q.  What happened on September 4th?
5  A.  On September 4th, I stayed home
6  with my son to care for him, to talk with
7  him, to try to get him to understand what
8  was going on.
9      When I got out of bed that
10 morning, I injured my back. I remained
11 home with him, my mother-in-law had come,
12 and between all of us, we were there to
13 support him.
14 Q.  When you woke up, did you plan
15 to go to work that day?
16 A.  The truth of the matter is I
17 didn't plan to go to work that day.
18 Q.  Okay. You never planned to go
19 to work on September 4th?
20     MR. NELSON: I object to the
21 form. That's not his testimony.
22 A.  I planned to stay home and take
23 care of my son.
24     MR. COULLSTON: Okay. Twenty-
25 nine.

Page 243

1  Greenberg
2      [Whereupon, at this time, the
3  reporter marked as Greenberg Exhibit
4  29 the above-mentioned e-mail from the
5  witness' Downstate e-mail account to
6  CTM@Outtengolden.com for
7  identification.]
8  Q.  Handing you what's been marked
9  Greenberg 29, this is an e-mail you sent
10 from your Downstate e-mail account to
11 CTM@Outtengolden.com, do you see that?
12 A.  Uh-hum.
13 Q.  Who is CTM@Outtengolden.com?
14 A.  That's Carmelyn, I forgot her
15 last name. It's a law firm, Outten &
16 Golden, I'm sure you know.
17 Q.  You sent this on October 9th,
18 and you wrote I didn't know my mother-in-
19 law would be coming from PA to help out.
20 I'd hurt my back. I thought initially
21 that I could make it and subsequently
22 decided against it.
23     Does this mean, at least does
24 the e-mail state that you had intended to
25 go to work that day --

Page 244

1  Greenberg
2      MR. NELSON: I'm directing --
3  Q.  -- but after you hurt your back
4  you decided not to, is that correct?
5      MR. NELSON: I direct you not to
6  answer anything further.
7      MR. COULSTON: This was sent on
8  a Downstate e-mail account, there's no
9  expectation of privacy, it is not a
10 privileged communication.
11     MR. NELSON: That's a
12 conversation you and I can have --
13     MR. COULSTON: It is.
14     MR. NELSON: -- or we can have
15 before a judge, but he's not going to
16 testify any further about a
17 communication --
18     MR. COULSTON: Eric.
19     MR. NELSON: -- that appears to
20 be directly between him and an
21 attorney whether he used a server
22 thinking that it was secure or he used
23 a server not thinking it was secure.
24 You might as well move on, because I'm
25 going to direct him on this document.

Page 245

1  Greenberg
2      MR. COULSTON: Well, we might
3  have to return to it on another
4  occasion.
5      MR. NELSON: Okay.
6      MR. COULSTON: I mark for the
7  record that we reserve our rights to
8  continue questioning on this.
9      MR. NELSON: You sure do.
10     MR. COULSTON: This is Greenberg
11 30.
12     [Whereupon, at this time, the
13 reporter marked as Greenberg Exhibit
14 30 the above-mentioned document Bates
15 stamped SUNY EIS 752 to 753 for
16 identification.]
17     MR. NELSON: And we'll just
18 assert for the record that any
19 arguable waiver of privilege as it was
20 inadvertent with respect to Exhibit
21 29, SUNY ESI 710.
22     MR. COULSTON: It was our
23 document.
24     MR. NELSON: It's only your
25 document because you took it down off

## Page 246

```
 1        Greenberg
 2  your server, it was still a
 3  communication between my client and
 4  his attorney at the time, and there
 5  was no one else on that e-mail
 6  exchange. You and I may know --
 7     MR. COULSTON: We've moved on.
 8     MR. NELSON: You and I may know
 9  that servers are not secure --
10     MR. COULSTON: We've moved on.
11     MR. NELSON: -- but that's not
12  necessarily something that the witness
13  knew.
14     Q. If you look at Greenberg 30,
15  SUNY EIS 752 to 753, the top e-mail is you
16  forwarding this with no commentary,
17  fortunately, to JRosenberg@tpglaws.com.
18  If you go below that, there's an e-mail
19  from you to Linda McMurren CC'g Steve
20  Pulitzer, do you see that?
21     A. Uh-huh.
22     Q. And in the text of the e-mail
23  you write as it turns out, I was going to
24  come in regardless of my last e-mail
25  Thursday, the family issues having been
```

## Page 247

```
 1        Greenberg
 2  resolved Thursday morning. I then managed
 3  to throw my back out. My mobility has
 4  been severely limited since, please
 5  forgive the confusion.
 6        You had testified that you never
 7  intended to go to work on September 4th,
 8  is this just not true what you were
 9  writing in this e-mail?
10     A. I was protecting my job, I
11  wasn't aware of my FMLA rights, and I
12  thought I was going to get fired, so when
13  I hurt my back which was where I was
14  entitled to sick leave, I let them know
15  that I hurt my back. I fully intended to
16  stay home and take care of my son.
17     Q. Now, if you were immobilized,
18  how did you care for your son?
19     A. There was no lifting or doing
20  anything involved, I simply had to speak
21  to him and be with him.
22     Q. What did you do on September
23  4th?
24     MR. NELSON: I object to the
25  form. That's asked and answered. Go
```

## Page 248

```
 1        Greenberg
 2  ahead.
 3     A. I stayed home to care for my
 4  son.
 5     Q. What specifically did you do?
 6     A. I had a long conversation with
 7  him, he was very sad. He didn't want to
 8  go to a new school. He had made friends
 9  in his old school and he was afraid, and
10  he had a lot of anxiety around it. And I
11  spent all day with him cheering him up and
12  basically providing some emotional and
13  psychological comfort for him.
14     Q. Where were you on September 4th?
15     A. At home.
16     Q. The whole day?
17     A. Yes.
18     Q. Was Jayden at home the entire
19  day?
20     A. I believe so.
21     Q. Was your wife at home the entire
22  day?
23     A. I can't remember if she was home
24  the whole day, but...
25     Q. Was your mother-in-law there the
```

## Page 249

```
 1        Greenberg
 2  entire day?
 3     A. As far as I remember, she was
 4  there most of the day.
 5     Q. You believe it was required that
 6  you needed to be there to care for your
 7  son as well?
 8     MR. NELSON: I object to the
 9  form.
10     A. My son is closest to me, I have
11  a special relationship with him. He loves
12  his mom, he lives his mother-in-law, he
13  loves his brother, but me and him connect
14  on a special level.
15     MR. NELSON: I believe you meant
16  his grandmother, not his mother-in-
17  law.
18     THE WITNESS: My mother-in-law.
19  He doesn't have a mother-in-law.
20     MR. COULSTON: That would be
21  strange.
22     Q. So his mother and his
23  grandmother alone, though, would not have
24  provided sufficient care for him on
25  September 4th?
```


Page 266

Greenberg

2 Q. When was the first time you told
3 someone or put in writing that you never
4 intended to go to work on September 4th?
5 A. First time I put that in
6 writing?
7 Q. Yes.
8     MR. NELSON: I object to the
9 form.
10 Q. Let me ask it a different way.
11     In your interrogation you said
12 it was your back injury that led you to
13 not show up for work on September 4th,
14 correct?
15     MR. NELSON: He said whatever he
16 said in the transcript.
17 A. Yes, whatever it said in the
18 transcript is exactly what...
19 Q. Which is what we just discussed?
20 A. Yes.
21 Q. And there's the e-mail that we
22 just looked at to Linda McMurren and Dr.
23 Pulitzer where you said that you were
24 going to come in but then you hurt your
25 back, correct?

Page 267

Greenberg

2 A. I did say that.
3 Q. Did you ever inform anyone at
4 SUNY Downstate that you never intended to
5 come to work because of your back injury
6 or for some other reason on September 4th?
7 A. I don't believe so.
8 Q. Are there any other inaccurate
9 statements in this transcript that you're
10 aware of?
11 A. Not that I'm aware of.
12     MR. COULSTON: Let's mark this
13 as Greenberg 33.
14     [Whereupon, at this time, the
15 reporter marked as Greenberg Exhibit
16 33 the above-mentioned document for
17 identification.]
18 Q. In your complaint, you refer to
19 the settlement agreement that was signed
20 at the end of the interrogation as an
21 extorted agreement?
22 A. Yes.
23 Q. How was the agreement an
24 extorted agreement?
25 A. I was under threat of being

Page 268

Greenberg

2 fired or suspended, and not being able to
3 come back and read studies and take care
4 of my patients that I had started earlier
5 that day unless I signed the document.
6 Q. And who told you you'd be fired
7 or suspended unless you signed the
8 document?
9 A. I believe Mr. Arabian did.
10 Q. Did anyone ever tell you that
11 during the interrogation on September 8th?
12 A. Not during the interrogation.
13 Q. Did you talk to anyone else at
14 labor relations that day?
15     MR. NELSON: We're talking
16 September 8th?
17     MR. COULSTON: Yes.
18 A. Not that I remember, no.
19 Q. Are there any other factors that
20 led you to call this an extorted agreement
21 in your complaint?
22 A. Yes, I was in severe back pain
23 and I was forced to wait in a really
24 cramped room for hours. I wasn't able to
25 go take any medication. I wasn't allowed

Page 269

Greenberg

2 out for lunch.
3 Q. What time did you appear at
4 labor relations?
5 A. I think it was at noon or a
6 little thereafter, I'm not sure.
7 Q. Were you offered the opportunity
8 for union representation prior to the
9 interrogation?
10 A. Yes.
11 Q. And did you accept union
12 representation?
13 A. I did not.
14 Q. Why not?
15 A. In my previous experiences with
16 the union, they were not very helpful, and
17 I didn't expect that they would be.
18 Q. In retrospect, do you think it
19 would have been helpful to have a union
20 attorney present when negotiating the
21 settlement agreement?
22     MR. NELSON: I object to the
23 form.
24 A. In retrospect, it would have
25 been nice to know my FMLA rights.

Page 270

1  Greenberg
2  Q. That wasn't my question, though.
3  In retrospect, would it have
4  been helpful to have a union attorney
5  present during the interrogation and the
6  negotiation of your settlement agreement?
7  A. I'm not sure the answer to that.
8  Q. How long was the interrogation?
9  A. Hours.
10 Q. Now, the portion on the record
11 is not hours long, though, right?
12 A. Yeah, but I spent many hours --
13     MR. NELSON: The question is a
14 yes or no question.
15     MR. COULSTON: Again, I'd ask
16 Plaintiff's Counsel to stop
17 interrupting.
18 A. Repeat the question, please.
19 Q. I'll ask a different question.
20 Besides the part of the
21 interrogation that's on the transcript,
22 what else were you doing at labor
23 relations that afternoon?
24 A. Waiting.
25 Q. Did you let anyone know that you

Page 271

1  Greenberg
2  had back pain issues that day?
3  A. Absolutely, I told Mr. Arabian.
4  Q. When did you tell him?
5  A. Probably when I walked in, and
6  when I was sitting in the room cramped up.
7  Q. And what did he say?
8  A. I don't recall.
9  Q. Did you ask to postpone the
10 interrogation because you had back pain
11 issues?
12 A. I did not.
13 Q. And you said you couldn't get
14 your medication, where was your
15 medication?
16 A. I had to go to a pharmacy to get
17 it, and I -- I hadn't had a chance to do
18 that.
19 Q. So you had not picked up your
20 medication --
21 A. No.
22 Q. -- as of the time the
23 interrogation started?
24 A. I had not.
25 Q. I'm going to hand you what's

Page 272

1  Greenberg
2  been marked as Greenberg 33. You
3  recognize this document?
4  A. Yes.
5      MR. NELSON: Okay, before you
6  recognize this document, let me just
7  say for the record that while the
8  pages are consecutive out of
9  Plaintiff's production, it's not clear
10 that we're dealing with only one
11 document here, and the witness ought
12 to take a look at the entirety of the
13 exhibit before he answers.
14 A. Yes, I have seen these documents
15 before.
16 Q. On G177, do you see that? Is
17 that your signature on G177?
18 A. Yes, it is.
19 Q. And if you go back to G174, in
20 paragraph one, the first sentence says in
21 lieu of Dr. Greenberg, clinical associate
22 professor, being served a notice of
23 discipline for, one, unscheduled absences,
24 two, tardiness, three, interfering with
25 the operation of the department, four,

Page 273

1  Greenberg
2  insubordination and five, misrepresenting
3  hours worked on timesheets as a result of
4  absences and tardiness, switching schedule
5  without authorization or supervisor, all
6  parties agree that Dr. Greenberg shall
7  have a fine ranging from a letter of
8  reprimand to termination from State
9  service held in abeyance until one year
10 from signing of this agreement.
11     Did you understand these were
12 the charges against you as part of the
13 interrogation process on September 8th?
14 A. That's what they felt the
15 charges were, yeah.
16 Q. You thought the charges just
17 related to September 4th and September
18 5th?
19 A. I'd never been disciplined for
20 any of these other things, so yes, only
21 September 4th and September 5th.
22 Q. You had had a meeting on August
23 22nd with Dr. Pulitzer regarding time and
24 attendance issues?
25 A. Yes.

69 (Pages 270 - 273)

Page 274

1  Greenberg
2  Q. Isn't that right?
3  A. Yes.
4  Q. And you'd had a meeting on May
5  5th with Dr. Reede regarding time and
6  attendance issues, isn't that right?
7  A. Yes.
8  Q. Did you discuss issues besides
9  the September 4th and 5th absences during
10 your interrogation on September 8, 2014?
11 A. Yes, it's all in the document.
12 Q. Did you have time to review the
13 settlement agreement prior to signing it?
14 A. No.
15 Q. You did not have time to review
16 it?
17 A. I barely reviewed it.
18 Q. How long would you need to read
19 this document?
20    MR. NELSON: I object to the
21 form. Today?
22 Q. How long would you need to read
23 this document?
24    MR. NELSON: I object to the
25 form.

Page 275

1  Greenberg
2  Q. You can answer.
3  A. I don't know, ten -- five, ten
4  minutes.
5  Q. Were you not given five to ten
6  minutes to review it?
7  A. There's a lot of legal terms
8  here that I didn't understand, and I
9  didn't understand the nature of the
10 document.
11 Q. But did you read it?
12 A. I flew through it, I didn't read
13 every word of it.
14 Q. So you're saying you skimmed
15 this agreement before signing it?
16 A. Yes.
17 Q. And then you did sign it?
18 A. Yes.
19 Q. What is an attestation?
20 A. An attestation is something that
21 is added to a radiology report to attest
22 that I reviewed the study with the
23 resident and that I agreed or disagreed.
24 Q. And why do hospitals use
25 attestations?

Page 276

1  Greenberg
2    MR. NELSON: I object to the
3  form as to why somebody else does
4  something.
5  A. I don't know.
6  Q. You have no idea why?
7  A. I don't know of any good reason.
8  Q. Do you know of any reasons that
9  the hospital uses, though?
10 A. It's a requirement by certain
11 insurance agencies and Medicare to -- in
12 order to get reimbursed.
13 Q. And did you know that as of
14 September 22, 2014?
15 A. September 22nd, I believe I did.
16 Q. Do you recall a meeting the
17 morning of September 22, 2014 where
18 attestations were discussed?
19 A. I recall coming late to a
20 meeting at the very end.
21 Q. So you missed most of the
22 meeting?
23 A. I did.
24 Q. And if others were to testify
25 that you were there for the meeting, they

Page 277

1  Greenberg
2  would not be telling the truth?
3  A. If they were to -- I was at the
4  meeting.
5  Q. You were not there for the
6  entire meeting?
7  A. That's true.
8  Q. How much of the meeting were you
9  there for?
10 A. Probably the end of it or half
11 of it.
12 Q. How long?
13 A. I do not recall.
14 Q. What do you recall being
15 discussed regarding attestations in that
16 meeting?
17 A. I recall some templates being
18 presented to us, and I was led to believe
19 that they were examples of what to use as
20 an attestation.
21 Q. What lead you to believe that
22 they were examples?
23 A. Dr. Pulitzer.
24 Q. And what words did he use to
25 convey that?

70 (Pages 274 - 277)

Page 290

Greenberg

1
2 overheard, I guess he was referring to
3 Steven, W-A-I-T, and Patrick Hammil,
4 making comments about my attestation and
5 he was just calling me in a friendly
6 manner and in warning me and telling me
7 that, you know, perhaps I should change
8 them, because it could be an issue.
9 Q. Did he say why he thought it
10 might be an issue?
11 A. He said that he didn't trust
12 those guys.
13 Q. Did he say anything more about
14 that, why he didn't trust them?
15 A. He didn't have to say anything
16 more.
17 Q. I guess I'm a little confused.
18 What did that mean to you in that context,
19 he didn't trust them?
20 A. They had shown themselves to not
21 be trustworthy.
22 Q. And what were you concerned
23 about that they would do that would not be
24 trustworthy?
25 A. Well, he --

Page 291

Greenberg

1
2 MR. NELSON: Objection to the
3 form.
4 A. He was concerned.
5 Q. What was he concerned that they
6 would do that would not be trustworthy?
7 MR. NELSON: I object to the
8 form.
9 A. He was concerned that they would
10 make an issue of it and get me in trouble.
11 Q. And what did you do when you
12 heard that?
13 A. I thought perhaps I should
14 change the attestation, and I then wrote a
15 different attestation that I thought would
16 be more palatable. I also went to speak
17 with Jayan Kurian who was an IT person
18 that I was friendly with.
19 Q. What did the new attestation
20 say?
21 A. It was much simpler, I don't
22 remember the exact words.
23 Q. Was it identical to the one that
24 had been provided at the September 22nd
25 meeting?

Page 292

Greenberg

1
2 A. I don't recall now, but it could
3 have been.
4 Q. What did Jayan Kurian say to you
5 when you asked if you could change the
6 attestations?
7 MR. NELSON: I don't believe
8 there's been any testimony to that
9 effect, so the question is improper as
10 to form. Assumes facts not in
11 evidence.
12 Q. You can answer.
13 A. I never asked him, nor did I
14 tell you, that I asked him to change the
15 attestations.
16 Q. What did you ask him to do?
17 MR. NELSON: I object to the
18 form. Also assumes facts not in
19 evidence.
20 Q. You can answer.
21 A. I didn't ask him to do anything,
22 I --
23 Q. What did you ask him?
24 MR. NELSON: I object to the
25 form. Again, assumes facts not in

Page 293

Greenberg

1
2 evidence.
3 A. I asked him if it were possible
4 to modify or change them.
5 Q. And what did he tell you?
6 A. He said that he could change
7 them, but it would not be appropriate for
8 him to do so, and I said I don't want you
9 to get in trouble and I don't want you to
10 change them, I just want to know if it
11 were possible.
12 Q. And then what did you do?
13 A. I left.
14 Q. Did you think about this issue
15 anymore?
16 A. I probably did, but I don't
17 remember what happened after that.
18 Q. Did you reach out to Dr.
19 Pulitzer about it?
20 A. No, not really.
21 Q. Did you reach out to anyone
22 about it?
23 A. No.
24 Q. People were pretty upset about
25 this, weren't they?

Page 294

1  Greenberg
2      MR. NELSON: I object to the
3  form as to what other people were
4  upset about.
5  A. I don't know. I mean, you can
6  characterize it as upset, I don't know.
7  Q. You don't know if Dr. Pulitzer
8  was upset about this when he found out
9  about it?
10 A. Dr. Pulitzer got uptight about a
11 lot of things.
12 Q. He did?
13 A. Unrelated to me.
14 Q. What else did he get uptight
15 about?
16 A. I don't know. I don't remember.
17 Q. Was he upset about the
18 attestations that you used?
19     MR. NELSON: I object to the
20 form as to what other people thought.
21 A. I don't know if he was. He
22 never -- he never spoke to me about it.
23 Q. Did he refer this issue to labor
24 relations?
25 A. I believe he did.

Page 295

1  Greenberg
2  Q. Do you know if Dr. Reede was
3  upset about the attestations that you
4  used?
5  A. I don't know.
6      MR. NELSON: I object to the
7  form on the same basis.
8  Q. Do you know if Dr. Jamalledine
9  was upset about the attestations?
10     MR. NELSON: Objection to the
11 form.
12 A. I don't even know Dr.
13 Jamalledine.
14 Q. You think these attestations
15 were proper?
16     MR. NELSON: I object to the
17 form.
18 Q. You can answer.
19 A. I don't think there's a
20 particular problem with them.
21 Q. You could understand that
22 someone else might find that they're
23 problematic, or no?
24     MR. NELSON: I object to the
25 form.

Page 296

1  Greenberg
2  A. I don't know what other people
3  would think.
4  Q. Have you ever used this kind of
5  language in a report before?
6      MR. NELSON: I object to the
7  form.
8  A. What kind of language?
9  Q. Flippant language.
10 A. I don't recall ever doing that,
11 no.
12 Q. This is the only time you've
13 ever used flippant language in a report?
14     MR. NELSON: I object to the
15 form. Asked and answered.
16 A. I don't know.
17 Q. If a resident used language that
18 was flippant, would you ask him or her to
19 revise it?
20     MR. NELSON: Objection to the
21 form. Hypothetical.
22 A. I don't know, it depends on what
23 they wrote.
24 Q. Did you know the attestations
25 that were circulated at the September 22nd

Page 297

1  Greenberg
2  meeting were approved by risk management?
3      MR. NELSON: I object to the
4  form. Lacks foundation.
5      MR. COULSTON: I said do you
6  know.
7  A. I didn't know that at the time.
8  Q. You learned that subsequently?
9  A. Yes.
10 Q. Did you ask the IT department to
11 erase the attestations from the report?
12     MR. NELSON: I object to the
13 form. Asked and answered. You can
14 answer.
15     MR. COULSTON: It's a different
16 question, Eric. You're interrupting
17 the deposition.
18     MR. NELSON: No, I'm making a
19 form objection. He can answer.
20     MR. COULSTON: You can say
21 object to the form, then.
22 A. No.
23 Q. Did you ask to take time off the
24 morning of September 23, 2014?
25 A. Yes.

75 (Pages 294 - 297)

Page 298

1  Greenberg
2  Q. Did you take that time off?
3  A. Yes, I did.
4  Q. And approximately how long were
5  you out of the office during that time
6  off?
7  A. I don't know, maybe three hours
8  or so, three, three and a half hours.
9  Q. And about from when to when were
10 you out? What time did you leave and what
11 time did you return?
12 A. I left around 8:15, 8:30.
13 Q. I'm sorry.
14 A. I left around 8:15, I think, and
15 I came back around 11:30.
16 Q. And then did you ask to take
17 additional time off that afternoon?
18 A. Yes, I did.
19 Q. And who did you ask for
20 additional time off that afternoon?
21 A. Dr. Pulitzer.
22 Q. And was your request denied?
23 A. Yes, it was.
24 Q. Did you say why you wanted to
25 take leave that afternoon?

Page 299

1  Greenberg
2  A. I told him that it had to do
3  with my son and his education.
4  Q. Anything else?
5  A. I might have mentioned that it
6  was related to his IEP.
7  Q. Was this verbally that you
8  communicated this?
9  A. Yes.
10 Q. And why did you want to take
11 leave in the afternoon of September 23rd?
12 A. I was subsequently informed
13 that -- in the morning, we had gone to
14 Harlem, in Manhattan, to Department of
15 Education, and Jayden's new school was
16 going to be in Brooklyn, so we were told
17 that we had to go to the Department of
18 Education in Brooklyn. And I found that
19 out after the fact, after I'd come back to
20 work.
21 Q. Did you go to that meeting?
22 A. I did not.
23 Q. Where were you from
24 approximately 2:30 to 4:50 that day?
25     MR. NELSON: I object to the

Page 300

1  Greenberg
2  form.
3  A. I don't know where you get the
4  time 2:30 from or 4:30.
5  Q. I'm just asking where you were
6  that day.
7  A. Okay.
8  Q. During that time period.
9  A. So part of that time, I was in
10 the reading room, and I subsequently left
11 the reading room. I spoke to Dr. Ami
12 Samin about covering me, and -- because
13 there was no resident in the ER, there was
14 nobody sitting in there, and then I went
15 and spoke to the ER clinicians for about a
16 half hour, and then I went to lunch.
17 Q. What time was it that you ate
18 lunch that day?
19 A. I don't know, probably around
20 2:30 or three, I don't remember exactly.
21 Q. In the calendar, the log that
22 you were maintaining, actually, let's just
23 pull it out, it's Greenberg 24, do you
24 have that? It should be the thickest
25 document in the stack.

Page 301

1  Greenberg
2  A. Uh-hum.
3  Q. And if you open to G399, and you
4  see the entry for 23rd Tuesday?
5  A. Uh-hum.
6  Q. And that's September 23rd?
7  A. Yes.
8  Q. And you have a note that you
9  left from 2:50 to 4:30, do you see that?
10 A. Uh-hum.
11 Q. And what do you mean by you
12 left?
13 A. I left the reading room.
14 Q. So these notes only reflect when
15 you were in the reading room?
16 A. Yes.
17 Q. Why were you keeping track of
18 when you were in the reading room?
19 A. Because after having gone to
20 labor relations and having gone through
21 all that, I wanted to make sure that I
22 documented all my time since they were
23 closely watching me.
24 Q. Wouldn't you document the time
25 you worked?

76 (Pages 298 - 301)

Page 302

Greenberg

2  MR. NELSON: I object to the
3  form.
4  A. Not necessarily.
5  Q. So --
6  A. I mean, that's included in here
7  anyway.
8  Q. I'm not sure I understood that.
9  That's included in here anyway, what do
10 you mean by that?
11 A. Arrive 7 a.m., left at whatever
12 time --
13 Q. Left at 8 a.m.?
14 A. -- returned and then left at 7
15 p.m.
16 Q. Right, and these are the hours
17 that you worked during the day, whether
18 it's doing consulting with other
19 physicians, reading film, anything like
20 that, right?
21 A. Right.
22 Q. So what were you doing for the
23 hour and 40 minutes from 2:50 to 4:30?
24 A. Part of that time, I had gone up
25 to speak with Dr. Samin to get coverage

Page 303

Greenberg

2 for the ER, because I didn't want to leave
3 the ER uncovered, part of it that time was
4 spent with the clinicians in the ER
5 discussing patients and making sure that
6 there was nothing I needed to read right
7 at that moment, and part of that was
8 lunch, and then part of that on the way
9 back I again spoke to the clinicians and
10 made sure that everything was okay.
11 Q. I guess what I don't understand
12 is when you were talking to the
13 clinicians, you're working, correct?
14 A. Yes, but I had left the ED, I
15 had left the reading room.
16 Q. So these hours don't reflect
17 what your actual hours worked were, it's
18 just when you were in that room?
19 A. I was being closely watched as
20 to time and attendance, and I tried to
21 maintain a very, you know, detailed --
22 Q. I understand that, but --
23 A. -- account.
24 Q. -- but what I'm saying is --
25 MR. NELSON: Please don't

Page 304

Greenberg

2 interrupt the witness.
3 Q. What I'm saying is that this is
4 not --
5 MR. NELSON: Please don't
6 interrupt the witness.
7 Q. -- this is not --
8 MR. NELSON: Let him finish his
9 answer.
10 MR. COULSTON: Eric, please stop
11 talking.
12 MR. NELSON: Not until --
13 MR. COULSTON: Eric --
14 MR. NELSON: -- you let the
15 witness finish the answer.
16 MR. COULSTON: -- that's enough.
17 MR. NELSON: No, not until you
18 let the witness finish the answer.
19 You've done this a number of times.
20 The witness gets to finish his answer
21 before you ask another question.
22 Q. It says left from 2:50 to 4:30,
23 correct?
24 A. Correct.
25 Q. And what you're saying is that

Page 305

Greenberg

2 you were being monitored for time and
3 attendance at this time, right?
4 A. Correct.
5 Q. But when you were talking to
6 other physicians, that would be time that
7 you were working, right?
8 A. They were monitoring my time
9 through computer records.
10 Q. It's a yes or no question, is
11 that time that you were working --
12 MR. NELSON: You answered --
13 Q. -- when you were talking to the
14 physicians?
15 MR. NELSON: You answer the
16 question however you see fit. You're
17 not limited to his instructions.
18 THE WITNESS: Right.
19 MR. COULSTON: I have to ask
20 Plaintiff's Counsel once again to
21 limit his objections to form
22 objections.
23 MR. NELSON: When you start
24 telling my client how he is to answer
25 questions, I am going to correct you.

Page 306

1  Greenberg
2  If you have a problem with that, call
3  the judge.
4      MR. COULSTON: Well, we will
5  cite testimony where you asked the
6  very same questions to other witnesses
7  and there were no problems.
8      MR. NELSON: You can do what you
9  wish --
10     MR. COULSTON: Okay.
11     MR. NELSON: -- but you can't
12 instruct my client --
13     MR. COULSTON: Let's continue
14 the examination.
15     MR. NELSON: -- how to answer,
16 all you can do is ask the questions.
17     MR. COULSTON: Can you read back
18 the question.
19  A.  I heard the question.
20  Q.  You remember what it was?
21  A.  Yes.
22  Q.  You can answer.
23  A.  You can call that time whatever
24 you want, I was doing things in
25 preparation for leaving the ER and making

Page 307

1  Greenberg
2  sure that the patients were taken care of
3  appropriately.
4   Q.  When you filled out your
5  timesheet, would you consider time spent
6  consulting with other physicians as time
7  worked or leave or time away from the
8  office?
9   A.  Timesheets never included this
10 kind of time, timesheets were when I came
11 in and when I left.
12  Q.  So --
13  A.  So everything included in that
14 time including lunch, including anything,
15 going to the bathroom was included in that
16 time.
17  Q.  So the only relevant thing was
18 when you arrived and when you left?
19  A.  On timesheets, yeah.
20  Q.  For timesheets?
21  A.  Yes.
22  Q.  And what you did in between was
23 irrelevant?
24      MR. NELSON: I object to the
25 form.

Page 308

1  Greenberg
2  A.  Whatever I -- what I did in
3  between was work hard to take care of
4  patients at Kings County.
5   Q.  So you say you left from 2:50 to
6  4:30, how much time did you spend eating
7  lunch during that period?
8   A.  Less than an hour.
9   Q.  Did you tell Dr. Pulitzer you
10 were leaving the ER from 2:50 to 4:30?
11  A.  It wasn't my habit to tell him
12 when I was going to lunch.
13  Q.  Well, he had denied leave from
14 the hospital for two hours that afternoon,
15 correct?
16  A.  Correct.
17  Q.  And then you left the ER for an
18 hour and 40 minutes, right?
19  A.  I left the ER for about 45 to 50
20 minutes.
21  Q.  Well, you left the ER reading
22 room for an hour and 40 minutes, correct?
23  A.  Yes, but I was in the vicinity
24 for much of that time.
25  Q.  How long did you say that you

Page 309

1  Greenberg
2  left the ER?
3   A.  The reading room?
4   Q.  No, the ER.
5   A.  For about 45 or 50 minutes.
6   Q.  And that was to do what?
7   A.  To go eat lunch.
8   Q.  What time were you having lunch
9  this day?
10  A.  I don't recall the exact time.
11  Q.  Did you usually eat lunch at
12 around 3:30?
13  A.  I ate whenever I got hungry.
14  Q.  Did you make a call to your wife
15 during this time period as well?
16  A.  Yes, I did.
17  Q.  How long was that phone call?
18  A.  I think it was pretty short. I
19 needed to know what was going on and how
20 she's going to manage without me, so we
21 had a very short conversation about that.
22  Q.  What's your opinion of Dr.
23 Reede?
24  A.  I think that she's very
25 political, she's all about herself and

78 (Pages 306 - 309)

Page 346

1  Greenberg
2  A. I think it's Pyle, P-Y-L-E,
3  maybe.
4  Q. Do you recall if this was on
5  October 10, 2014 or thereabouts?
6  A. Yeah.
7  Q. What was the substance of your
8  conversation with Andre Pyle?
9  A. I don't remember all the
10 details. I spoke with him very briefly,
11 and I just told him that I was frustrated,
12 and I felt like they were going to fire
13 me.
14 Q. Why were you at the hospital
15 that day when you had a conversation with
16 Andre Pyle?
17 A. I think I had to go to labor
18 relations that day.
19 Q. And so this is before you
20 reported to labor relations?
21 A. No, I think it was after, and I
22 was going to get my car.
23 Q. Did you ever talk to Andre
24 Pyle about that incident after October
25 10th?

Page 347

1  Greenberg
2  A. No.
3  Q. And you didn't talk to anyone
4  else that day?
5  A. Not that I remember.
6  Q. Dr. Greenberg, you're seeking
7  damages in this complaint for emotional
8  distress, correct?
9  A. Yes.
10 Q. Tell me about the emotional
11 distress you've suffered as a result of
12 your termination.
13 A. It has been a trying situation
14 for my family, it's a difficult situation
15 catching up on bills. Our lives were
16 turned upside down by this. I had to find
17 another job, and now instead of being able
18 to see my special needs child in the
19 evening, I've got to work evenings half
20 the time.
21 Q. Have you suffered any physical
22 symptoms related to the emotional
23 distress?
24 A. Anxiety, sleeplessness, back
25 spasms.

Page 348

1  Greenberg
2  Q. Any other symptoms that you've
3  experienced?
4  A. That's about it.
5  Q. Were you experiencing anxiety,
6  sleeplessness or back spasms prior to your
7  termination at SUNY Downstate?
8  A. They were different anxieties
9  and less severe.
10 Q. So you were experiencing anxiety
11 prior to your termination at SUNY
12 Downstate?
13 A. Yeah, they were trying to fire
14 me, it was an anxious time.
15 Q. How about prior to July 2014?
16 A. It had become a hard place to
17 work.
18 Q. Were you having any issues with
19 your marriage prior to your termination at
20 SUNY Downstate?
21 A. Not specifically that I can
22 remember.
23 Q. Had you seen a psychiatrist or
24 psychologist before your termination at
25 SUNY Downstate?

Page 349

1  Greenberg
2  A. I tried to see somebody at
3  Downstate, but they dropped the ball.
4  Q. Who did you try to see?
5  A. I forget the gentleman's name,
6  you showed me the document earlier. He
7  referred me to Dr. Feola.
8     MR. NELSON: Five minutes,
9  Chris.
10 Q. Were you taking any medications
11 for anxiety and depression at the time of
12 your termination from SUNY Downstate?
13 A. Yes.
14 Q. When did you start taking
15 medications for anxiety and depression?
16 A. It's been a couple of years, and
17 I don't remember when it started.
18 Q. How long before your
19 termination?
20 A. A few years. I don't remember.
21 Q. A few years before your
22 termination you had been taking
23 medication?
24 A. Yeah.
25 Q. Have you changed your medication

88 (Pages 346 - 349)