5

Page 10

1            S. PULITZER, M.D.
2   working there?
3       A. I am not sure.  I think so, but I don't
4   remember it clearly.
5       Q. Okay.  And you just encountered him in
6   the course of performing your daily duties.
7       A. Mm hmm.
8       Q. Is that correct?  You have to answer
9   verbally for the record.
10      A. Yes.
11      Q. Okay.  Tell me the positions that you have
12  held at Kings County since you first arrived in
13  August 2010.
14      A. I was a staff neuroradiologist, I was the
15  -- I am the Chief of the neuroradiology section
16  at Kings County Hospital.  For a short time I was
17  the Assistant Program Director for the Fellowship
18  of Neuroradiology at SUNY Downstate Medical
19  Center, and I then became the Program Director
20  of the Fellowship Program.
21      For a short time I was the Section Chief of
22  Neuroradiology at SUNY Downstate Medical Center,
23  and then I became the Clinical Director of
24  Radiology; and then the Chairman of Radiology,
25  Chief of Service, which I currently hold the

Page 11

1            S. PULITZER, M.D.
2   title.
3       Q. If okay.  And with the exception of
4   Assistant Program Director of the Fellowship
5   Program at SUNY Downstate and then Program
6   Director of that program --
7       A. Mm hmm.
8       Q. -- all of your positions were KCH
9   positions or titles?
10      A. Yes.
11      Q. Okay.  And when did you become Chief of
12  Neuroradiology?
13      A. In approximately 2011.
14      Q. Are you able to be any more specific;
15  maybe a month?
16      A. I'd have to look at my résumé.
17      Q. Okay.  When did you become Assistant
18  Program Director of the Fellowship Program at
19  SUNY Downstate?
20      A. In 2010.
21      Q. How long after first beginning in August
22  did you become Assistant Program Director --
23      A. Within --
24      Q. -- of the Fellowship Program?
25      A. -- a couple of months.

Page 12

1            S. PULITZER, M.D.
2       Q. So that's early Fall?
3       A. Potentially.
4       Q. Well, what does "potentially" mean?
5       A. It means that I don't remember the exact
6   day.
7       Q. Okay.  All right.  Does that sound like
8   the right time frame, early fall?
9       A. Potentially, yes.
10      Q. Okay.  What is potentially?
11      A. It means I don't remember the exact day.
12      Q. Okay.  Well, I'm not asking for the exact
13  day.  I'm asking:  Was it early fall, late fall.
14  Early winter?
15      You said it was in 2010 and you didn't come
16  until August, so I'm trying to narrow it down.
17      A. Okay.  I'll tell you exactly what I
18  remember.  I remember it was sometime in the 2010
19  time period.  I don't remember exactly -- exactly
20  when it was.
21      Q. Okay.  And when did you become the Program
22  Director of that program?
23      A. In 2013.
24      Q. Can you be any more specific?
25      A. In the spring of 2013.

Page 13

1            S. PULITZER, M.D.
2       Q. Thank you.
3       And when did you -- when did you become
4   Neuroradiology Section Chief?
5       A. At the same time.
6       Q. When did you become Clinical Director of
7   Radiology at KCH?
8       A. In June, July of 2013.
9       Q. And when did you become Chairman of
10  Radiology and Chief of the -- Chief of Service?
11      A. I was the Interim Chairman from July 1,
12  2014 through December 31, 2014, and I became the
13  Chairman, Chief of Service July 1, 2015.
14      Q. Okay.  Now, forgive me if I got this wrong
15  but --
16      A. I'm sorry, it's January.  January 1, 2015.
17      Q. Aha, okay.  Thank you, and that clarifies
18  it.
19      A. Sure.
20      Q. All right.  And that's the position you
21  currently hold?
22      A. That's correct.
23      Q. Chairman of Radiology and Chief of
24  Service, meaning chief of the radiology service
25  at KCH?

Page 26

1           S. PULITZER, M.D.
2     Q. -- the section chief.
3     A. -- not.
4     Q. You --
5     A. Not at SUNY Downstate. So, the -- the
6  titles that I have are Chief of Radiology or the
7  Chairman of Radiology -- it's the same thing,
8  Chief of Service of the Neuroradiology Section
9  -- and I'm a staff neuroradiologist.
10    Q. Okay. Now, I believe you said a little
11 earlier that you report information to the
12 Academic Chairman of Radiology at SUNY Downstate?
13    A. Yes, I do.
14    Q. Okay. Who is that?
15    A. Dr. Deborah Reede.
16    Q. And for how long have you been responsible
17 for -- as you say, reporting -- information to
18 Dr. Reede?
19    A. Since 2000 -- July of 2014.
20    Q. In other words, since you became Interim
21 Chairman?
22    A. Correct.
23    Q. Okay. Were you responsible for reporting
24 at all to Dr. Reede prior to July of 2014?
25    A. Yes, in a different capacity.

Page 27

1           S. PULITZER, M.D.
2     Q. Okay. Explain, please.
3     A. I was not the Chief of Service, so the
4  type of information that I was reporting to her
5  was when she asked me for certain types of
6  information to be gathered in the department. I
7  did not have a direct -- there was no solid line
8  between me and her in terms of a chain of command
9  or reporting.
10    Q. Okay. Was there, as -- as it might be
11 called, a dotted line?
12       MR. COULSTON: Object to
13          the form.
14    A. It was more of a -- I reported to my
15 chairman, and if that information was important
16 that would be reported up to her.
17    Q. Okay.
18    A. And through that chain.
19    Q. So prior to July of -- or July 1st of 2014
20 when you were reporting to -- as you call it,
21 your chairman -- who was that?
22    A. Alan Kantor.
23    Q. And for how long had you been reporting to
24 Dr. Kantor?
25    A. In the capacity of Clinical Director, one

Page 28

1           S. PULITZER, M.D.
2  year.
3     Q. And in some other capacity for longer?
4     A. He was my chairman while I was a staff
5  radiologist, and also the Chief of Service of
6  Neuroradiology.
7     Q. Okay. So essentially you assumed
8  Dr. Kantor's position?
9     A. Yes, I did.
10    Q. All right. And for a period you reported
11 directly to him and for a period prior to that
12 you reported to him simply because you were on
13 his service.
14       Is that correct?
15    A. That's correct.
16    Q. Okay. And what prompted the -- what
17 prompted your ascension to the Interim Chairman
18 position?
19    A. Dr. Kantor had left service.
20    Q. Okay. And do you know whether he left
21 voluntarily or not?
22    A. I do.
23    Q. And what is the answer to that?
24    A. He did not leave voluntarily.
25    Q. What's your understanding of the

Page 29

1           S. PULITZER, M.D.
2  circumstances under which he left?
3     A. He had a non-renewal of -- that expired
4  at the end of June and he was non-renewed.
5     Q. He had a non-renewal? What does that
6  mean?
7     A. Well, to get back to your earlier question
8  about terms, in July of 2013 we were all given a
9  one-year non-renewable. We were told our
10 contracts would end in one year, the -- at the
11 end of June 2013, and there was no guarantee that
12 on July 1, 2014 that we would have -- be
13 employed.
14       So he wasn't -- that's called being
15 non-renewed, so he was non-renewed.
16    Q. Okay.
17    A. As -- as far as I know.
18    Q. Now, you say "we were all given
19 non-renewals."
20    A. Right.
21    Q. Who is -- who is the "all" you're
22 referring to?
23    A. Every physician who was on the affiliation
24 contract.
25    Q. Radiology and non-radiology alike?

Page 114

S. PULITZER, M.D.

2  A. Yes.

3  Q. How long before you made the

4  recommendation to Labor Relations?

5  A. Almost concurrently.

6  Q. Okay. So not until sometime in October?

7  A. Yes.

8  Q. Okay. And what changed between say

9  September and October of 2014 that prompted you

10  to come to the conclusion that Dr. Greenberg had

11  been fired -- should be fired?

12          MR. COULSTON: Should.

13          MR. NELSON: Sorry.

14  A. Continued disruptive and insubordinate

15  behavior, continued problems with time and

16  attendance, and that was it.

17  Q. What continued behavior or problems

18  occurred between say September and October that

19  caused you to come to this conclusion that

20  Dr. Greenberg should be fired?

21      And I'm trying to narrow your focus to that

22  immediately prior time frame.

23  A. Mm hmm.

24  Q. You said that there were continued

25  problems.

Page 115

S. PULITZER, M.D.

2  A. Yes.

3  Q. What were those?

4  A. There were issues with time and

5  attendance, there were issues with a disruptive

6  attitude that was causing other staff members

7  to become difficult to manage, and there was a

8  number of -- or I guess the straw that -- that

9  broke the camel's back would probably be the

10  attestations that were -- which there were 150

11  -- that were inappropriate and improper placed

12  in the patients' medical records that made it to

13  the attention of the ultimate hospital

14  administration.

15  Q. Okay.

16  A. And that signalled to me at that time

17  that the egregiousness of placing something like

18  that in a patient's record, and putting not only

19  himself but colleagues in medical-legal jeopardy

20  and the reputation of the hospital in jeopardy,

21  that something had changed in him.

22  Q. All right. Let's see if we can unpack

23  that a little bit.

24      You made reference to the hospital's

25  reputation. What's your understanding of what

Page 116

S. PULITZER, M.D.

2  the hospital's reputation was at that time?

3          MR. COULSTON: I object

4          to the form.

5  A. The hospital is a long-standing

6  institution that provides safety-net coverage

7  for uninsured patients or patients who have no

8  other means to pay for their insurance. Within

9  the system of HHC it's viewed as equivalent to

10  their flagship hospital of Bellevue Hospital. It

11  has a very good reputation within the system

12  itself.

13      The quality of physicians at that hospital

14  is excellent, and the care that people receive

15  there and the community's view of that hospital

16  is a place where they can go to get safe,

17  professional care.

18  Q. And what's the basis for your statements

19  with -- in that regard as to the hospital's

20  reputation? Is that your personal observation or

21  something else?

22  A. I'm not sure I understand your question.

23  Q. Well, how do you know that that's the

24  hospital's reputation?

25  A. That is not my personal view. It's from

Page 117

S. PULITZER, M.D.

2  having worked there and being at the level of

3  leadership that I am and having conversations

4  with, you know, decision-makers in Central Office

5  and what their opinions are of the services we

6  provide.

7      That is how I view our hospital. It's

8  through those eyes.

9  Q. Okay. Is it based on any outside source

10  or just the people that -- in management and

11  others that you've talked to inside the hospital?

12  A. That is the latter.

13  Q. Okay. And sir, you made reference to

14  something you referred to as medical-legal

15  jeopardy. What did you mean by that?

16  A. I mean that if one of those cases went

17  to a legal mis -- you know, a malpractice case

18  and there was a sarcastic mockery of -- of a --

19  of something on a chart and then all the sudden

20  there was -- there was something

21  medically-legally wrong, that that does not --

22  that that does -- that that gives the plaintiff

23  an advantage by saying, you know, what is -- who

24  are these people, what is the creditability of

25  the people reading this, and why is your

Page 130

1           S. PULITZER, M.D.
2      A. Me and Dr. Reede.
3      Q. Okay.  And in what regard did he report
4   to you and in what regard did he report to
5   Dr. Reede?
6      A. Well, he reported to me for a daily
7   clinical duties and for Dr. Reede for academic,
8   and if there was anything outside the norm of
9   daily clinical activities that she was informed
10  of that required any sort of further
11  investigation or, you know, through the SUNY
12  system.
13     Q. Sir, is it your testimony that prior to
14  at least October 1 it was not your recommendation
15  that Dr. Greenberg be fired?
16     A. Okay.  It -- it was not my recommendation.
17     Q. Okay.  Now, do you know the date on which
18  Dr. Greenberg was in fact formally terminated?
19     A. I believe his last day of service was
20  October 20th.
21     Q. Okay.  How long before October 20th did
22  you make the recommendation that he be fired?
23     A. It was around that time.
24     Q. I understand that, sir.  I'd like you to
25  be more specific.

Page 131

1           S. PULITZER, M.D.
2      A. I can't.
3      Q. Can you tell me was it a day, a week?
4      A. No, I can't.
5      Q. Three weeks?
6      A. I can't.
7      Q. Who asked you or to whom did you volunteer
8   your recommendation?
9      A. My recommendation was sought in the Labor
10  Relations Department.
11     Q. Okay.  And who specifically there sought
12  your recommendation?
13     A. Stephanie Bernadel.
14     Q. Okay.  Anyone else?
15     A. Not that I'm aware of.
16     Q. Okay.  Do you know who Leonzo Cuiman is?
17     A. Yes, I do.
18     Q. Did Dr. -- did Mr. Cuiman ever solicit
19  your recommendation in that regard?
20     A. I don't recall.
21     Q. How about Michael Arabian?  Is that
22  someone who -- of with whom you're familiar?
23     A. I am familiar with Michael Arabian.
24     Q. Okay.  You are familiar with the fact
25  that Mr. Arabian worked in Labor Relations at

Page 132

1           S. PULITZER, M.D.
2   Downstate during that time period?
3      A. Well, Mr. Arabian was not employed at
4   Downstate during October-time.
5      Q. Okay.  Prior -- immediately prior to
6   October, do you understand him to have been
7   employed by SUNY Downstate?
8      A. Yes, I do.
9      Q. Did you interact with him concerning
10  Dr. Greenberg during that immediate period
11  before he left the hospital?
12     A. Before who left the hospital?
13     Q. Dr. -- Mr. Arabian.
14     A. Yes, I had --
15     Q. Okay.
16     A. -- contact with him.
17     Q. Did Mr. Arabian ever solicit your
18  recommendation or did you ever volunteer it to
19  him whether -- as to whether Dr. Greenberg
20  should be fired?
21     A. No, not that I recall.
22     Q. So he neither solicited it nor did you
23  offer it.
24       Is that correct?
25     A. Not that I recall, no.

Page 133

1           S. PULITZER, M.D.
2      Q. Okay.  And sir, do you know if Dr. Reede
3   ever recommended Dr. Greenberg's termination or
4   directed it or asked that it happen?
5           MR. COULSTON:  I object
6           to the form.
7      A. Yes, we were asked as a -- a group
8   consensus, so we were asked our opinion.
9      Q. All right.  Who do you mean by "a group
10  consensus"?  Who was asked?
11     A. Well, me -- me and Dr. Reede were asked.
12     Q. By whom?
13     A. And -- by Labor Relations.
14     Q. Specifically?
15     A. Me specifically by, I recall Stephanie
16  Bernadel.
17     Q. Okay.  And when were you and Dr. Reede
18  as a group asked?
19     A. We were asked on -- on an individual
20  basis, but we were asked to -- what our opinion
21  was as a group.  It wasn't a decision -- it
22  wasn't a one-person decision made for this is
23  what I'm trying to say.
24     Q. Okay.  Who else was part of this group?
25     A. Dr. Jameladdine.

Page 134

S. PULITZER, M.D.

1  Q. Okay. Have you now told me all of the
2  people in the group?
3  A. As far as I am aware of, yes. If there
4  are --
5  Q. So that would be --
6  A. -- others, I'm not aware of them.
7  Q. I'm sorry, I didn't mean to interrupt.
8  A. If there are other members, I'm not aware
9  of any.
10  Q. Okay. So you, Dr. Reede and
11  Dr. Jameladdine were all solicited for your
12  opinion or recommendation.
13     Is that a correct way to characterize it?
14  A. Yes.
15  Q. Is it your understanding that Dr. Reede
16  was consulted individually; i.e. separately from
17  you?
18  A. Yes.
19  Q. How do you know that?
20  A. Because I recall discussing it with her
21  and I recall there having had been a
22  conversation.
23  Q. A conversation --
24  A. Of --

Page 135

S. PULITZER, M.D.

1  Q. -- by whom, with whom, when?
2  A. Well, with her and Labor Relations around
3  the same time that I had spoken to Labor
4  Relations.
5  Q. Yes, that's what I'm trying to get at,
6  sir. I'm trying to find out what was done
7  individually and what was done together with
8  others.
9  A. Right. I don't remember exactly, but I
10  do remember that I -- both of us spoke with
11  Labor Relations independently and both of us
12  spoke of this issue together.
13     And there were conversations, and I can't
14  tell you if one was with one person on one day
15  or one was with another person on another day
16  -- I just simply don't remember it -- but I can
17  tell you that it wasn't one person's decision.
18  Q. Okay. And how do you know that
19  Dr. Jameladdine was consulted?
20  A. Dr. Jameladdine was consulted through me,
21  and I don't know if he spoke directly with Labor
22  Relations or not.
23  Q. I see. So, to the extent that
24  Dr. Jameladdine was involved it was because you

Page 136

S. PULITZER, M.D.

1  initiated some consultation with him in that
2  regard?
3  A. I report to Dr. Jameladdine. Anything
4  that goes on in my department has to be reported
5  to Dr. Jameladdine and anything that goes on with
6  a physician in my department is directly reported
7  to Dr. Jameladdine, so Dr. Jameladdine was aware
8  of what was happening in my department from the
9  very beginning.
10  Q. Okay. But we're now talking about an
11  actual request or recommendation that
12  Dr. Greenberg be fired.
13     Is that something you discussed with
14  Dr. Jameladdine?
15  A. Yes, it was.
16  Q. Okay. And did you solicit
17  Dr. Jameladdine's recommendation or opinion on
18  that matter?
19  A. Indirectly at first, but when I went to
20  Dr. Jameladdine and showed him the attestations,
21  his response to me was, "Why is this person
22  still employed here; this is egregious", and I
23  was sent to Risk Management to evaluate what
24  the damage to the hospital and what the potential

Page 137

S. PULITZER, M.D.

1  medical-legal implications were from that
2  conversation.
3  Q. And when did Dr. Jameladdine say to you,
4  "Why is this person still employed here?"
5  A. I don't know if he said it in those words,
6  but that was the implication; and it was whatever
7  the day was that the attestations came out, and
8  that had to be in late September, early October.
9  I'm not -- I don't remember exactly the day that
10  those came in, so --
11  Q. So you --
12  A. So that was -- that was something that
13  was felt to be very problematic for the hospital.
14  I think that the phrase-wise, "Why is this person
15  still employed here" is just, you know, how did
16  this happen in -- in that instance, and what do
17  we do about it and please go to Risk Management
18  and find out how to handle this.
19  Q. And it's your recollection that your
20  discussion with Dr. Jameladdine was the same
21  day that the attestations came out.
22     Is that correct?
23  A. I don't know if it was the same day. It
24  was -- it was around -- within a couple of days,

Page 138

S. PULITZER, M.D.

1     because I had to gather all the attestations, I
2     had to find out specifically how many there were
3     where they were, and it took me a little bit of
4     time to do that.
5          And then I also had to find -- so then I
6     presented it to him.  Then I also over the next
7     couple of weeks had to present to him what --
8     what happened with Risk Management, how do we
9     correct it, what do we do about it, how does
10    this work.  So there was a series of
11    conversations at that time.
12        Q.  Between you and Dr. Jameladdine?
13        A.  Between me and Dr. Jameladdine --
14        Q.  Was anyone else --
15        A.  -- because I was --
16        Q.  -- a party to any of those conversations?
17        A.  No.
18        Q.  And how many in total were there?
19        A.  I don't recall that.
20        Q.  All right.  And when you say that "when
21    the attestations came out", what do you mean?
22        A.  I mean that I received a call from one
23    of my staff members, physicians, saying:  "I
24    just read a report by Dr. Greenberg and there

Page 139

S. PULITZER, M.D.

1     is an attestation on the bottom which is
2     completely inappropriate.  You need to see this."
3          I don't know exactly where I was and on the
4     campus, if I was -- I wasn't in the department
5     at the time and I came back to the department
6     and I looked at it, and -- and then I didn't
7     know how many there were, what -- what the number
8     was or what was -- you know, I didn't know
9     anything really about it except that it had been
10    reported to me at that moment, so it took me a
11    little bit of time to investigate it and figure
12    out what it was.
13        Q.  And who was the staff member who brought
14    it to your attention?
15        A.  John Amodio.
16        Q.  John?
17        A.  Amodio.
18        Q.  Amodio?
19        A.  Yes.
20        Q.  And who is -- is Amodio -- John Amodio a
21    physician?
22        A.  Yes, he was the Chief of Pediatric
23    Radiology who -- he's not working there
24    currently.

Page 140

S. PULITZER, M.D.

1     Q.  Okay.  So, Dr. Amodio told you that he
2     read an attestation by Dr. Greenberg that in
3     your -- in his words to you was totally
4     inappropriate.
5          Is that the way he put it?
6     A.  It was something to that effect, yes.
7     Q.  Well, I'm asking you specifically what
8     you recall.
9     A.  Specifically I don't recall the exact
10    words, but the implication was -- yes, that was
11    the implication.
12    Q.  Okay.  And how soon after that did he
13    convey that attestation to you?
14    A.  How soon after what?
15    Q.  The conversation or communication that
16    he found it totally inappropriate?
17    A.  How soon after what did he have that
18    conversation?  I'm not following your timeline
19    or question.
20    Q.  You learned of a -- an issue with an
21    attestation from Dr. Amodio.
22        Correct?
23    A.  That is correct.
24    Q.  How long after you learned of that did

Page 141

S. PULITZER, M.D.

1     you see the attestation itself from Dr. Amodio?
2     A.  Within hours of it.
3     Q.  Okay.  And how long after that did you
4     bring it to Dr. Jameladdine's attention?
5     A.  Within days.
6     Q.  When you say within days, you mean less
7     than a week?
8     A.  Yes.
9     Q.  Okay.  Can you be any more specific?
10    A.  No.
11    Q.  And how did Dr. Amodio communicate his
12    issue to you?  Did he do it by phone, e-mail,
13    face-to-face?
14    A.  Phone.
15    Q.  And how did you -- how did he convey the
16    attestation he was referring to to you?  Did he
17    e-mail it to you, bring it to you?  How did he
18    do that?
19    A.  He read part of it to me on the phone
20    and then I got a copy of it.  We printed it out
21    after.
22    Q.  Yeah, I'm asking you:  How did you get --
23    A.  It wasn't directly from him.
24    Q.  How did you print that copy out?  Where

Page 146

1           S. PULITZER, M.D.
2  know.
3     Q. Okay. By that time, to the best of your
4  recollection, had you brought this to
5  Dr. Jameladdine's attention or did you wait
6  until you had Mr. Kurian's results before you
7  did so?
8     A. I waited until I had the total number
9  that were there and if they were all the same,
10 if there was any variation. I had to review
11 them. I needed to know exactly what I was doing
12 with that information and if it needed to be
13 escalated or not.
14    Q. Okay. And what was going to determine
15 whether or not it needed to be escalated?
16    A. The number of reports that this was
17 placed on, and it was mostly the number of
18 reports.
19    Q. Okay. And how did you decide that the
20 number was going to be the determining factor
21 of whether or not you were going to escalate
22 this matter?
23    A. That was not a pre-determined thought.
24 There was no algorithm.
25    Q. Well, at some point you decided that

Page 147

1           S. PULITZER, M.D.
2  that was the criterion on which you were going
3  to decide whether or not to escalate.
4     Correct?
5        MR. COULSTON: I object
6        to the form.
7     A. If somebody puts a sarcastic comment in
8  one or two reports and then realizes that they've
9  made an error and then goes to try and correct
10 that error, I think that's very different than
11 putting it in over 100 reports and continuing to
12 do it for however long it takes you to do those
13 100 reports.
14    So, the magnitude of the discovery of how
15 many reports there were was -- was -- you know,
16 then how do you manage that data, how do you
17 manage those patients' charts? How do you manage
18 those 150 or so patients who now have this in
19 their charts and how do you follow them to see
20 if there's litigation or -- or whatever that --
21 that's a large number.
22    Two -- two is different than 150, and --
23 and I think there's -- there's no guideline for
24 that. That's part of being a manager and trying
25 to determine what is the severity of -- of an

Page 148

1           S. PULITZER, M.D.
2  error or what is the severity of a malicious
3  act, or is it a malicious act or is it acting
4  out?
5     These are not questions that are simple
6  answered with (indicating), a snap of a finger.
7     Q. Did you ask Dr. Greenberg about these
8  attestations immediately after Dr. Amodio brought
9  it to your attention or after you had spoken to
10 Mr. Kurian?
11    A. I do not recall when I spoke to
12 Dr. Greenberg about them.
13    Q. Do you recall that you ever spoke to
14 Dr. Greenberg about them?
15    A. I don't know if I did speak to him
16 directly. I -- I don't recall.
17    Q. Sitting here today you don't recall
18 speaking to him about it at any time.
19    Is that correct?
20    A. I don't recall the exact time that I
21 had spoken to him about it or what that
22 conversation would be. It was not a very
23 clear -- it's not a common thing to walk into.
24 It's not something that, you know, you image
25 the patient's right arm instead of the left

Page 149

1           S. PULITZER, M.D.
2  arm; and that's happened, you know, over the --
3  one of the things that's happened in the
4  Radiology Department.
5     And you know, how to deal with this is a
6  very unusual circumstance, and how to deal with
7  that and how to -- there's -- there's no
8  guideline for that.
9     So, I don't know when I spoke with him and
10 I don't remember the conversation with him about
11 it, but I do remember the damage-control and the
12 investigation around it more than I do any
13 specific conversation with him.
14    Q. Well I appreciate that answer, sir, but
15 let me ask you this:
16    Leaving aside what might have been said
17 and when it might have been said, if you spoke
18 to Dr. Greenberg about the attestations, all
19 I'm asking now is whether sitting here today
20 you are able to tell me yes or no, you spoke to
21 Dr. Greenberg about it at all.
22    A. I can't --
23    Q. If you're not able please say so, but if
24 you are I'm going to ask you more specifically.
25 So --

Page 150

```
1              S. PULITZER, M.D.
2      A. I -- I don't recall.
3      Q. Okay.  Are you -- this is a yes or a no.
4      Are you able sitting here today to tell me
5      that you did speak to Dr. Greenberg about these
6      attestations after the issue arose?
7              MR. COULSTON:  I object
8           to the form.
9   MR. NELSON:
10     Q. Yes or no?
11             MR. COULSTON:  I object
12          to the form.
13     A. I cannot.
14     Q. I'm sorry?
15     A. I -- I don't remember.  I don't recall.
16     Q. Okay.
17             MR. COULSTON:  Eric, I
18          just want to stop you for
19          a second.  This is getting
20          -- we've have been going
21          for about an hour and 45.
22          Right now I know you're
23          in the middle of something,
24          but in a couple of minutes
25          I think we should take a
```

Page 151

```
1              S. PULITZER, M.D.
2      break for lunch, if you
3      want to do lunch.
4      MR. NELSON:  Well, look
5      --
6      MR. COULSTON:  But let's
7      take a --
8      MR. NELSON:  I don't
9      want the -- the afternoon
10     gets very long if we take
11     lunch real early.  I'd
12     like to take lunch at
13     1:00 --
14     MR. COULSTON:  Do you
15     want --
16     MR. NELSON:  -- today
17     because we got a little
18     bit of a late start.
19     MR. COULSTON:
20     MR. NELSON:  If that's
21     agreeable -- if that's
22     not agreeable --
23     MR. COULSTON:  That's
24     another 30 minutes from
25     now.
```

Page 152

```
1              S. PULITZER, M.D.
2      MR. NELSON:  I'm not
3      going to --
4      MR. COULSTON:  That's
5      a lot.
6      MR. NELSON:  Yeah,
7      well I'm not going to
8      force anything --
9      MR. COULSTON:  Well,
10     how are you?
11     MR. NELSON:  -- but
12     that's my preference.
13     MR. COULSTON:  What do
14     you want to do?
15     THE WITNESS:  I could
16     use a break at some point.
17     MR. COULSTON:  I mean,
18     we can take a break and
19     do lunch at like 1:30 if
20     -- I don't know how hungry
21     you are.
22     Are we off the record?
23     THE COURT REPORTER:  No.
24     MR. NELSON:  All right,
25     look.  Let's figure it out
```

Page 153

```
1                  S. PULITZER, M.D.
2      off the record.  Let's go
3      off the record.
4          (Whereupon, at 12:27
5          p.m., an off the record
6          discussion was held.)
7          (Whereupon, at 12:28
8          p.m., a brief recess was
9          taken.)
10         (Whereupon, at 12:38
11         p.m., the deposition
12         continued.)
13     MR. NELSON:
14     Q. All right.  We are back on the record.
15     Dr. Pulitzer, I remind you you're still under
16     oath.
17     A. Mm hmm.
18     Q. Anything you've testified to today that
19     you want to add or change or correct in any
20     respect?
21     A. Not at this time, but --
22     Q. Okay.
23     A. -- perhaps later.  I don't know.  I mean,
24     why --
25             MR. COULSTON:  Okay.
```

Page 186

```
1           S. PULITZER, M.D.
2    witness is directed
3    about, and what's not
4    privileged I'm able to
5    get --
6       MR. COULSTON:  If --
7       MR. NELSON:  -- the
8    answers to.
9       MR. COULSTON:  Okay.
10   Yes.
11      MS. BLOCKER:  Well,
12   if we're going to come
13   back to this, Eric,
14   essentially you can
15   refer -- circle back to
16   this line of questioning,
17   and we'll -- we would
18   ask for that courtesy --
19      MR. NELSON:  Well I --
20      MS. BLOCKER:  -- so
21   that way --
22      MR. NELSON:  Well,
23   except that I need to
24   know -- you need to
25   either direct the
```

Page 187

```
1            S. PULITZER, M.D.
2         witness or let him
3         answer.
4    MR. NELSON:
5       Q. So Dr. Pulitzer, after your conversation
6    with Ms. Welcome, did you do anything with
7    respect to the attestations?
8       A. Like?
9       Q. Like anything.
10      A. I went and spoke with Dr. Jameladdine
11   about --
12      Q. Okay.
13      A. -- what --
14      Q. What did you tell to Dr. Jameladdine, or
15   what did Dr. Jameladdine tell you?
16         MS. BLOCKER:  Objection.
17         I think that, again, if
18         there's going to be a
19         discussion about what
20         was discussed with Ms.
21         Welcome to Dr. Jameladdine
22         and we have already agreed
23         to take a break with
24         respect to this -- these
25         lines -- specific of
```

Page 188

```
1            S. PULITZER, M.D.
2         questioning for purposing
3         of inquiring as to whether
4         to -- privilege is invoked
5         here, if to the extent
6         that he's going to disclose
7         the contents of that
8         conversation, that isn't
9         -- that falls within the
10        realm of what we just
11        discussed.
12   MR. NELSON:
13      Q. Okay.  Well, let me ask you this then.
14      Without -- without conveying anything that
15   Ms. Welcome told you, what did you say to
16   Dr. Jameladdine and what did Dr. Jameladdine
17   say to you in the conversation that followed
18   your meeting with Ms. Welcome?
19      A. I really don't see how I can answer that
20   question without disclosing what I talked about.
21      Q. Okay.  So, are you -- fair enough, but
22   now least we have that on the record.
23      A. Mm hmm.
24      Q. Okay.  And how long after your meeting
25   with Ms. Welcome did you speak to Dr. Jameladdine
```

Page 189

```
1            S. PULITZER, M.D.
2    again?
3       A. Within -- within the same day.
4       Q. All right.  So you went from
5    Dr. Jameladdine to Ms. Welcome back to
6    Dr. Jameladdine.
7       Correct?
8       A. Yes.
9       Q. All right.  Did you take any action with
10   respect to the attestations other than going back
11   to speak to Dr. Jameladdine?
12      A. I'm still unclear as to what you mean by
13   "actions did I take".  Like what -- what action
14   are we discussing?
15      Q. Did you ask for any further information,
16   did you tell anybody else, did you review
17   anything else, did you contact Dr. Greenberg?
18   Anything; anything with regard to the
19   attestations.
20      A. Over the course of the next day or two
21   I gathered the attestations together, I made a
22   file and a folder of all the attestations, and
23   I showed that to Dr. Reede.
24      I don't remember if I had a conversation
25   directly with Dr. Greenberg or not regarding the
```

Steven Pulitzer MD
October 26, 2016                                        190 to 193

Page 190

1                S. PULITZER, M.D.
2   attestations or -- or when that was.
3       Q. Okay.
4       A. And the next course of action I needed
5   to do was to figure out how to amend those
6   reports.
7       Q. Okay. Sir, you mentioned Dr. Reede in
8   your last answer. Why did you go to
9   Dr. Jameladdine in the first place rather than
10  Dr. Reede?
11      A. Because this happened at County. It was
12  a clinical issue at County and I needed to report
13  that to Dr. Jameladdine because the patients are
14  clinic's -- County patient's.
15      Q. When you mean "County patients", you mean
16  Kings County Hospital patients?
17      A. Yes, sir.
18      Q. Okay. So then why did you make the folder
19  and show it to Dr. Reede if it was a clinical
20  matters re -- involving Kings County patients?
21      A. Because an affiliate physician was
22  involved with the clinical issue, and she is --
23  and I need to report any incidents that happen
24  with the affiliate physicians --
25      Q. Okay.

Page 191

1                S. PULITZER, M.D.
2       A. -- to her.
3       Q. And how long after this day where you
4   went from Dr. Jameladdine to Ms. Welcome to
5   Dr. Jameladdine again did you make this folder
6   and show it to Dr. Reede?
7       A. Within -- within like a day.
8       Q. Okay. And when you met with Dr. Reede,
9   did you do that face-to-face, over the phone or
10  other -- or otherwise?
11      A. I told her of the incident over the phone
12  before I met with her and showed her the
13  attestations.
14      Q. Okay. When did you tell her over the
15  phone about the issue in the time -- in the -- in
16  the progress of events that we've been talking
17  about?
18      A. Very shortly after it happened. Before
19  I gathered all the information I informed him her
20  that there was an attestation, I did not know
21  what it says or what it was or the extent of it,
22  but I was going to investigate it and follow up.
23      Q. So that was even before you went to the
24  IT fellow and asked how you can find out if there
25  were more, and if so how many?

Page 192

1                S. PULITZER, M.D.
2       A. Probably. I don't know the exact course
3   of events.
4       Q. Okay. And when you told her about this at
5   that time --
6       A. Yes.
7       Q. -- you did that by phone?
8       A. Mm hmm.
9       Q. Okay. Tell me what you said to her and
10  what she said to you in that conversation.
11      A. I told her that there was an attestation
12  that was written by Dr. Greenberg that was
13  brought to my attention that was inappropriate;
14  I don't know how many there are, I don't know
15  what exactly it says, but I'm investigating it.
16      Q. Okay.
17      A. And I will get back to her when I have my
18  findings.
19      Q. And what did she say?
20      A. "Okay."
21      Q. That's it?
22      A. Well, that's all I remember.
23      Q. Okay. So there's nothing that Dr. Reede
24  said to you in that conversation that you
25  remember other than "okay"?

Page 193

1                S. PULITZER, M.D.
2       A. Yes.
3       Q. That's correct?
4       A. Yes.
5       Q. Okay. Now, you say after you had all the
6   attestations and you had been to Dr. Jameladdine
7   and you had been to Ms. Welcome and then back
8   to Dr. Jameladdine again you actually met with
9   Dr. Reede and showed her the attestations.
10      Correct?
11      A. Yes, at some point during that whole --
12      Q. Okay.
13      A. -- 24-hour period.
14      Q. All right. What exactly did you show her?
15  Did you show her the one that Dr. Amodio had
16  mentioned or others or something else?
17      A. I had just showed her -- I don't know if
18  I showed her the exact one that Dr. Amodio had
19  mentioned or I showed her one that -- they were
20  all the same, so --
21      Q. And when you had this meeting with her,
22  where did that take place?
23      A. I believe it was her office. I don't
24  remember.
25      Q. At Downstate?

Page 254

1           S. PULITZER, M.D.
2   adjustments in schedules outside of the normal
3   12:00 to 8:00 or 4:00 to -- excuse me -- or 4:00
4   to 12:00 for people from time to time?
5       A. Yes, for Dr. Greenberg.
6       Q. Other than for him?
7       A. Not on a regular basis, no.
8       Q. Okay.  And what adjustment did you make
9   for Dr. Greenberg?
10      A. Well, Dr. Greenberg did not want to do
11  the 12:00 to 8:00 shift, and he had spoken with
12  my previous chairman, Alan, who took him off the
13  8:00 to 8:00 shift and put him on like a 9:00
14  to 5:00 shift, 9:30 to 5:30 -- something to that
15  effect -- and there was ability to do that.
16      Q. I thought you said that the 9:00 to 5:00
17  and the 8:00 to 4:00 were interchangeable; that
18  they existed as regular shifts and that you could
19  choose one or the other?
20          MR. COULSTON:  He said
21          12:00 to 8:00, didn't he?
22          THE WITNESS:  Were you
23          --
24      A. What was your question?
25      Q. Did you or did you not testify earlier

Page 255

1           S. PULITZER, M.D.
2   when you were telling me what shifts there
3   were --
4       A. Mm hmm.
5       Q. -- that there was -- there was an 8:00
6   to 4:00 which also could be a 9:00 to 5:00?
7       A. Yes.
8       Q. So that was a regular shift, no?
9       A. That is a regular shift.
10      Q. Okay.  So what accommodation did you make
11  for Dr. Greenberg by giving him merely a shift
12  that already existed?
13          MR. COULSTON:  I object
14          to the form.
15      A. I -- I did not do it at that point.  This
16  was my predecessor, this was Dr. Kantor.
17      Q. Okay.  Then I guess --
18      A. And I --
19      Q. I'm sorry.
20      A. I can't speak for what Dr. Kantor's
21  actions were, but the 12:00 to 8:00 -- the
22  requirement for the 12:00 to 8:00 shift for
23  Dr. Greenberg was lifted so that he could be
24  there.  I don't know if it was 10:00 to 6:00,
25  I don't know the exact hours, to be honest, but

Page 256

1           S. PULITZER, M.D.
2   I know that it was changed; so you can ask
3   Dr. Greenberg.
4       Q. Okay.  But what I'm asking you is:
5       In light of your earlier testimony that
6   there was an 8:00 to 4:00 or 9:00 to 5:00 shift,
7   those were considered the same shift, what
8   accommodation are you saying Dr. Kantor made
9   for Dr. Greenberg if that shift already existed?
10          MR. COULSTON:  I
11          object to the form.  It
12          mischaracterizes his
13          testimony.
14          THE WITNESS:  I'm
15          sorry?
16  MR. NELSON:
17      Q. Okay.  You can answer.
18          MR. COULSTON:  You
19          can answer.
20      A. Okay.  So, the emergency radiologists have
21  a different shift schedule than the non-emergency
22  radiologists, and I think this is where your
23  confusion is.
24      Q. Uh huh.
25      A. The non-emergency radiologists were given

Page 257

1           S. PULITZER, M.D.
2   from SUNY, from the administration at SUNY, the
3   choice of working 8:00 to 4:00 or 9:00 to 5:00,
4   but if you picked it that's -- those are the
5   hours that you're expected to be there so that
6   we knew that there was coverage.
7       In the emergency room the shifts were
8   6:00 a.m. to 2:00 p.m., there was a 12:00 to
9   8:00 at -- at that point, and a 4:00 to midnight
10  shift.
11      So, in the beginning when we first started
12  working here there was a 9:00 to 5:00 shift in
13  the ER which then got subsumed and put into the
14  8:00 to 12:00 so that we would have continuous
15  coverage in the Emergency Department.
16      Q. I see.  So, in another -- in other words,
17  Dr. Greenberg was essentially allowed to work
18  the same shift a non-emergency room radiologist
19  would have been able to work even though that
20  shift would not have independently existed in
21  the ER otherwise.
22      A. Correct.
23      Q. Okay.  Sir, perhaps we should have covered
24  -- well, let me ask you this.
25      You said that you had the power, and Doctors

Page 290

1              S. PULITZER, M.D.
2      Q. What do you mean by "Office of
3  Professional Medical Misconduct"?  What is
4  that?
5      A. So, that's called a OPMC and it's a --
6  it's for our physicians who are not behaving
7  in a standard way that you can report them to
8  that.
9      Q. So, you mean the Office of Professional
10  Medical Conduct.
11      A. Conduct.
12      Q. Correct?
13      A. Yes.
14      Q. Okay.  That's an office that exists
15  outside the hospital.
16     Correct?
17      A. Yes, it is.
18      Q. Okay.
19      A. It's an H --
20      Q. It's essentially a -- an entity or
21  organization that -- that regulates and/or
22  disciplines physicians?
23      A. Yes.
24      Q. Okay.  And that was Dr. Jameladdine's
25  suggestion or recommendation?

Page 291

1              S. PULITZER, M.D.
2      A. That was -- Dr. Jameladdine asked me to
3  find those things out and figure out how to --
4  what we should do with this situation, and that
5  was it.
6      Q. I'm sorry.  Okay.  I want to make a
7  distinction here.
8     Can you please tell me what Dr. Jameladdine
9  told you to do as distinguished from what
10  Dr. Jameladdine asked you to do?
11      A. Dr. Jameladdine told me to find out what
12  the legal implications were of this, if this
13  needs to be reported to the Office of
14  Professional Conduct -- Medical Conduct, and to
15  refer this to Labor Relations and to see what
16  -- what kind of disciplinary action needs to
17  happen with this physician.
18     And I don't know in what order he said that,
19  but that was what he said, so --
20      Q. And he did all of this in the same
21  conversation after you came back from Ms.
22  Welcome?
23      A. Yes.
24      Q. Okay.  And you say that meeting occurred
25  on the same day that you met with Ms. Welcome?

Page 292

1              S. PULITZER, M.D.
2      A. Yes.
3      Q. Had you gone -- had you brought this
4  issue to the attention of Labor Relations before
5  Dr. Jameladdine told you to do so?
6      A. I don't -- I don't know.  I don't
7  remember.
8      Q. Did you do so after he told you to do so?
9      A. Yes.
10      Q. And whom did you contact in Labor
11  Relations and when?
12      A. I don't recall exactly the day or -- or
13  if I had spoke with Stephanie Bernadel or if
14  Michael was still there.  I don't remember
15  exactly who my contact was if there -- you know,
16  I don't know.
17      Q. How long after this meeting with
18  Dr. Jameladdine in which he directed that you
19  bring this to the attention of Labor Relations
20  did you bring it to the attention of Labor
21  Relations?
22      A. Within 24 hours.
23      Q. And did you do that by phone, e-mail,
24  face-to-face or otherwise?
25      A. I don't recall.  It may have been a

Page 293

1              S. PULITZER, M.D.
2  combination.
3      Q. What do you mean a combination?
4      A. It may have been a phone call and an
5  e-mail.  I don't -- I don't remember.
6      Q. Okay.  Whom did you try to reach there?
7  Did you try to reach Mr. Arabian?
8      A. I don't remember.
9      Q. But sitting here today, the referral to
10  Labor Relations was prompted by a direction
11  from Dr. Jameladdine.
12     Is that correct?
13          MS. BLOCKER:  Objection.
14      A. It -- yes, it was prompted by
15  Dr. Jameladdine.
16      Q. Okay.  Where was Dr. Reede, if anywhere,
17  in the course of addressing what you had been
18  told by or recommended to you by Ms. Welcome?
19  Did she have any role?
20      A. No, not in that.
21      Q. Did you tell her, meaning Dr. Reede, what
22  Ms. Welcome had told you?
23      A. Yes.
24      Q. When?
25      A. At some time, again, within 24 hours of

Page 310

1          S. PULITZER, M.D.
2      Q. -- raised with him a desire to have him
3  work 12:00 to 8:00?
4      A. Not that I recall specifically, no.
5      Q. Did he ever express to you an issue with
6  working 12:00 to 8:00?
7      A. He had expressed it to my previous boss.
8      Q. And what, to your knowledge, did he
9  express to your previous boss?
10     A. That he couldn't work those hours, those
11  hours didn't work for him, and it was not
12  something he could do.
13     Q. Do you know why?
14     A. I do not.
15     Q. Do you know what reason he expressed to
16  your boss -- your prior boss?
17     A. I do not.
18     Q. When we're referring to your prior boss,
19  are we referring to Dr. Kantor?
20     A. Yes.
21     Q. Okay. Now sir, on this occasion that
22  you had this conversation with him regarding
23  him working reliably 9:30 to 5:30, was this a
24  disciplinary counseling?
25     A. No, it was not.

Page 311

1          S. PULITZER, M.D.
2      Q. Was it disciplinary at all?
3      A. He was -- it was an attempt to engage
4  an employee who was having problems with
5  attendance and with being someplace at a certain
6  time, and it was a negotiation to try and see:
7      Well, I can bend. You can come in later.
8  If you want to work 10:00 to 6:00, if you want
9  to work 11:00 to 7:00, that's fine. Whatever
10  hours -- whatever eight hours you want to do
11  I'll work around you, but what's going to make
12  your life better because if I can -- I just
13  need to know the exact hours you're here so I
14  can plan around you.
15     That -- that was the nature of that
16  conversation.
17     Q. Okay. So you were pretty -- you were --
18  you're saying that you were willing to
19  accommodate any eight hours Dr. Greenberg would
20  say he could work.
21     A. I was, yes.
22     Q. Even if it meant 11:00 to 7:00 or --
23     A. If that -- if that would reliably have
24  him there from 11:00 to 7:00, yes, because then
25  I could schedule around him.

Page 312

1          S. PULITZER, M.D.
2      Q. Okay. Was there any disciplinary aspect
3  to this counseling you say that Dr. Greenberg
4  received from Dr. Reede in the spring of 2014?
5      A. I don't know. You'd have to ask
6  Dr. Reede.
7      Q. Did she ever say she disciplined
8  Dr. Greenberg for some time and attendance
9  violation in the spring of 2014?
10     A. Well, when I was having issues with time
11  and attendance with Dr. Greenberg she said that
12  she had spoken with him. I don't know what the
13  counseling -- I don't know.
14     There's different degrees of counseling
15  and -- and stuff for the union, so I don't know
16  if -- technically what it was but that there --
17  he had -- she had spoken to him about his time
18  and attendance and about his timesheets, and
19  that is what I knew from that time.
20     Q. Sir, are you familiar with the term
21  "progressive discipline"?
22     A. No.
23     Q. Okay. Are you aware that in a corporate
24  environment there is a progression of discipline
25  from say a verbal warning to a written warning

Page 313

1          S. PULITZER, M.D.
2  to a counseling to a suspension to a termination?
3  Is that of any familiarity to you?
4      A. Yes, that is.
5      Q. Okay. Sir, are you aware of whether or
6  not a progressive discipline policy exists either
7  at Kings County Hospital or at Downstate?
8      A. Yes, it does.
9      Q. Okay. At which, or does it exist at both?
10     A. At both.
11     Q. All right. Sir, do you know of any
12  occasion on which any step in a progressive
13  discipline occurred with respect to
14  Dr. Greenberg?
15     A. Can you repeat that?
16     Q. Let me rephrase.
17     Are you aware of any occasion on which a
18  step in progressive discipline was administered
19  to Dr. Greenberg?
20     A. The only occasion I am aware of in --
21  with respect to time and attendance is his
22  meeting with Dr. Reede, but I do not know what
23  level of progressive discipline -- to use your
24  term -- that was done -- that was taken, or if
25  that was in fact documented in such a way. I

Case 1:15-cv-02343-PKC-VMS    Document 95-5    Filed 09/14/18    Page 15 of 28 PageID #: 2143
Steven Pulitzer MD
October 26, 2016

322 to 325

Page 322

1                S. PULITZER, M.D.
2          break.
3              MR. COULSTON:  Okay.
4              So let's take a couple
5              of minutes.
6    MR. NELSON:
7         Q. Sir, was there in 2014 any way to
8    authoritatively determine when a physician
9    arrived at the hospital for work or left the
10   hospital?
11             MR. COULSTON:  I
12             object to the form.
13        A. There is a way to know when a physician
14   comes and leaves the hospital.
15        Q. What is that?
16        A. A video camera that the hospital runs
17   24 hours.
18        Q. Okay.  Have you ever employed a video
19   camera to determine when a physician arrived
20   or left?
21        A. In one instance I've had to use that.
22        Q. Okay.  Who was that?
23        A. Qi Chen.
24        Q. Okay.  Have you ever had -- and did you
25   ever have occasion to do so with respect to

Page 323

1                S. PULITZER, M.D.
2    Dr. Greenberg?
3         A. No, I did not.
4         Q. Okay.  Is there any other way that you're
5    aware of to authoritatively determine when a
6    physician arrives and leaves the hospital other
7    than the video camera that operates 24 hours a
8    day?
9         A. No.
10        Q. And sir, when you spoke to Dr. Reede and
11   -- I'm sorry.
12             When you spoke to Dr. Greenberg in the
13   conversation you were recounting a few minutes
14   ago in late July or early August, did you do that
15   on your own or was that at -- at someone else's
16   request or behest?
17        A. That was my own initiative to try and run
18   the department.
19        Q. Okay.  And did you -- did Dr. Reede know
20   you were doing that?
21        A. Yes.
22        Q. She knew in advance of you doing it?
23        A. Yes.
24        Q. And how is that?  How did she know that?
25        A. Because I said I was having a problem

Page 324

1                S. PULITZER, M.D.
2    with his time and attendance, and we discussed
3    various ways as to how to help him meet the
4    goals.
5         Q. All right.  Did she tell you to have the
6    conversation with him or you told her you were
7    going to?
8         A. I told her I needed to have one with him
9    because I need to -- my job is to make sure
10   people are in the right place at the right time,
11   and my job was to make sure that if I tell the
12   hospital that their patients are getting a
13   certain level of care in the emergency room from
14   one of my physicians that they get it.
15        Q. Okay.
16             MR. NELSON:  Could you
17             read my last question
18             back?
19             (Whereupon, a portion
20             of the record was read back
21             by the court reporter.)
22   MR. NELSON:
23        Q. Okay.  Did you -- what did she say when
24   you told her what you just recounted?
25        A. I don't recall exactly, but we had a

Page 325

1                S. PULITZER, M.D.
2    difference of opinion on being flexible.  She's
3    a little more strict in her time management
4    than I am.
5             Well, not time management but she's a
6    little bit more strict about having people go
7    specific hours and to meet those needs, and I
8    wanted to try something different.
9         Q. What do you mean a specific -- more
10   specific?
11        A. It's 9:00 to 5:00 or 8:00 to 4:00.  That's
12   it.
13        Q. Okay.  In other words, she was
14   hard-and-fast to that?
15        A. Yes.
16        Q. Okay.  Did you ever say to Dr. Greenberg
17   in words or substance that Dr. Reede was like a
18   cop trying to catch him in some time or
19   attendance violation?
20        A. Not that I recall.
21        Q. Okay.  So you might have said it; you
22   just don't remember it sitting here now?
23        A. I don't recall saying that.
24        Q. Okay.  But you don't rule it out?
25        A. I don't remember.

Page 330

S. PULITZER, M.D.

1
2    A. No.
3    Q. Okay. Sir, when we were talking about
4    the seven radiologists that have been hired since
5    you became Chairman, I asked you first about
6    their age.
7    Are you aware of whether or not any of those
8    physicians are Jewish?
9    A. I'm not.
10    Q. Okay. Are you aware of any -- do you
11    know any to not be Jewish?
12    A. I actually don't know what their religious
13    background is.
14    Q. Okay. Do you know what the ethnicity of
15    any or all of them are?
16    A. Most, yeah.
17    Q. Sorry?
18    A. Yes.
19    Q. Okay. Let's take them one at a time.
20    Dr. Bell?
21    A. African American.
22    Q. Dr. Duby or Dubey?
23    A. Indian.
24    Q. Dr. Sullivan?
25    A. He's Anglo-Saxon.

Page 331

S. PULITZER, M.D.

1
2    Q. Okay. Dr. Leung?
3    A. Asian.
4    Q. Dr. Jethwa?
5    A. Indian.
6    Q. Dr. Loona?
7    A. Anglo-Saxon.
8    Q. And Dr. Istria?
9    A. Anglo-Saxon. He's from France, I don't
10    know.
11    Q. From?
12    A. France.
13    Q. Does that make him Anglo-Saxon?
14    A. I don't --
15    Q. Okay.
16    A. I think he's white. He's from France.
17    Q. Okay. Sir, I want to call your attention
18    now to the last full week of August of 2014. I
19    believe the Monday was August the 25th and Friday
20    was August the 29th.
21    Okay?
22    A. Yes.
23    Q. Does that time period ring a bell with
24    you?
25    A. Mm hmm. Yes.

Page 332

S. PULITZER, M.D.

1
2    Q. Okay. That was a week that Dr. Greenberg
3    had arranged to take off and then ended up coming
4    into work beginning on the 26th.
5    Correct?
6    A. Yes.
7    Q. Okay. And he worked the 26th, the 27th,
8    28th and the 29th.
9    Is that correct?
10    A. Yes, he was in the hospital.
11    Q. Okay. But not the 25th, correct?
12    A. No.
13    Q. Okay. Sir, there had been some switching
14    of weeks of vacation for Dr. Greenberg
15    immediately prior to that.
16    Correct?
17    A. Yes.
18    Q. And you had expected him to be out, but
19    his vacation cancelled and he came into work
20    anyway.
21    Correct?
22    A. On the week that you're talking about?
23    Q. Yes.
24    A. Yes.
25    Q. All right. And sir, did you also

Page 333

S. PULITZER, M.D.

1
2    understand Dr. Greenberg to be coming into the
3    hospital on the 26th to attend a meeting of a
4    committee at the hospital on which he served?
5    A. I had no knowledge that Dr. Greenberg
6    would be in the hospital for any reason that
7    week.
8    Q. Okay. You were on vacation that week
9    yourself.
10    Correct?
11    A. Yes, I was.
12    Q. And who was standing in for you that week?
13    A. Dr. Hammil.
14    Q. And to your knowledge, was Dr. Greenberg
15    on the schedule that week at all?
16    A. No.
17    Q. Do you know whether or not he was
18    subsequently -- withdrawn -- that he was at
19    some time added to the schedule?
20    A. I don't know.
21    Q. Okay. Do you have any knowledge as to
22    what Dr. Greenberg's hours were on the Tuesday
23    through Friday of that week?
24    A. I do have knowledge of when he was in
25    the hospital, yes.

Page 334

1           S. PULITZER, M.D.
2     Q. And what's --
3     A. A ballpark.
4     Q. -- the basis of that?
5     A. By a report and -- by physical reports by
6  Dr. Hammil and by the cross-referencing with the
7  dictation data.
8     Q. And when -- when was it reported to you
9  that Dr. Greenberg was coming to work that week?
10    A. I got a call pretty much every day, except
11 for Monday, that: "Dr. Greenberg is here, he's
12 coming at erratic hours, why is he here, he's
13 not on the schedule, what's going on." And I
14 said: "I don't know. I'm on vacation."
15    Q. Okay. And who were those calls from?
16    A. Dr. Hammil.
17    Q. In each instance?
18    A. Yes.
19    Q. And do you recall Dr. Hammil calling you
20 each day?
21    A. Yes.
22    Q. Do you recall telling Dr. -- Dr. Hammil
23 what he should do about that?
24    A. No.
25    Q. Okay. Well, what did you -- did you

Page 335

1           S. PULITZER, M.D.
2  instruct anybody else to do anything with
3  regard to Dr. Greenberg coming in that week?
4     A. No.
5     Q. Did you talk to Dr. Greenberg --
6     A. No.
7     Q. -- that week?
8     A. I did not.
9     Q. To your knowledge, did Dr. Greenberg
10 perform his ordinary, regular duties that week
11 other than attending that committee meeting?
12    A. He read cases from the ER, yes.
13    Q. Okay. And what did you say to Dr. Hammil
14 other than, "I'm on -- I don't know; I'm on
15 vacation", when he brought this to your
16 attention, if anything?
17    A. I said: "Ask him why he's here, what --
18 what -- what he's doing and find out what's
19 going on."
20    Q. Okay. And did Dr. Hammil, to your
21 knowledge, do that?
22    A. I don't know if -- if he got a straight
23 answer. I think he asked him one day, but I
24 -- it wasn't clear to either of us what was
25 happening.

Page 336

1           S. PULITZER, M.D.
2     Q. Okay. Did Dr. Hammil ever report back
3  to you that he had had such a conversation with
4  Dr. Greenberg?
5     A. I don't recall specifically the
6  conversation, but I -- I remember asking him to
7  find out why he's there.
8     Q. Yes.
9     A. And --
10    Q. No, I get that part but I'm --
11    A. I don't remember the conversations.
12    Q. But I'm asking whether or not you ever --
13    A. Right.
14    Q. -- learned of a result --
15    A. I never --
16    Q. -- of that --
17    A. I never got a good answer.
18    Q. Okay. And when did you return to work?
19    A. The Tuesday after Labor Day.
20    Q. So that would have been the 2nd of
21 September or the 9th of September?
22    A. 2nd.
23    Q. All right.
24    A. Yes.
25    Q. And then, did you speak to Dr. Greenberg

Page 337

1           S. PULITZER, M.D.
2  at any time from the 2nd on about his having come
3  to work that prior week?
4     A. Yes.
5     Q. When?
6     A. Dr. Greenberg and I had a conversation on
7  September 2nd.
8     Q. And what was the conversation that you
9  had?
10    A. Dr. Greenberg came to my office and asked
11 me if he could have a -- the Thursday and Friday
12 of that week off, and I said: "I can't cover
13 you that week. I don't have any staff. No, I
14 can't approve that. I just worked with you for
15 the last month trying to adjust the vacation
16 schedule so that you could have any days that
17 you want off."
18       I gave him two consecutive weeks in a row
19 with one week notice and was -- was almost four
20 physicians down at that point. I got a call at
21 the end of that week saying that he needed to
22 change his schedule.
23       And I reiterated this to Dr. -- to
24 Dr. Greenberg and that I was able to accommodate
25 it, and that I could not accommodate this

Page 338

1           S. PULITZER, M.D.
2   request; that I've been very flexible, but this
3   particular week on this particular time I don't
4   have staff to cover you.
5       Q. You're referring to not having staff on
6   the 4th and the 5th when he had asked to have
7   those days off?
8       A. Yes.
9       Q. And that was in a conversation on the 2nd?
10      A. Yes.
11      Q. Face-to-face?
12      A. Yes, in my office.
13      Q. Where did this conversation take place?
14      A. In the S Building on the second floor in
15  my office.
16      Q. And who in fact was off that Thursday and
17  Friday that -- that made you, as I think you put
18  it, four physicians down?
19      A. We were -- we had just had four physicians
20  non-renewed and we were -- we had people on
21  vacation, so we were just running a very skeleton
22  crew to begin with.
23      And I don't recall -- I don't remember
24  exactly who was off that day or that week, but
25  I do remember that people -- I did not have

Page 339

1           S. PULITZER, M.D.
2   the people, the personnel, to cover anyone else's
3   absence and I was relying on Dr. Greenberg to be
4   there because I had given other people time off.
5       Q. Yeah, and I'm asking you not with regard
6   to who had been non-renewed.
7       A. Mm hmm.
8       Q. Okay? Well, but let's talk about that
9   for a moment. When you said you just had four
10  physicians non-renewed --
11      A. Right.
12      Q. -- you're referring to Drs. Areman,
13  Kantor, Roitberg and someone else?
14      A. Well, Cathy Mason had been part of that
15  crew, so we were -- we still hadn't replaced
16  that line.
17      Q. Okay. So those --
18      A. We were down.
19      Q. -- were the four you were referring to?
20      A. Yeah.
21      Q. Okay. Apart from those who were no longer
22  working at the hospital any day --
23      A. Yes.
24      Q. -- okay, who was out or on vacation on the
25  4th and the 5th?

Page 340

1           S. PULITZER, M.D.
2       A. I would have to check the records and the
3   schedule.
4       Q. Okay. Sitting here now, are you able to
5   identify anyone who was out that -- that -- on
6   either of those two days?
7       A. I'd have to check the schedule.
8       Q. And you referred --
9       A. It was a long time ago.
10      Q. When you referred to being four physicians
11  down, you're referring to the four physicians who
12  were --
13      A. Mm hmm.
14      Q. -- non-renewed?
15      A. Yes, I am.
16      Q. Okay. So let's leave aside the four
17  physicians who were non-renewed.
18      A. Okay.
19      Q. Okay? Are you able at all sitting here
20  today to tell me who was out on the 4th and the
21  5th that precluded you from being able to give
22  Dr. Greenberg those days off?
23      A. I need to look at the schedule.
24      Q. Okay.
25      A. I don't remember.

Page 341

1           S. PULITZER, M.D.
2       Q. All right. So the answer is: You can't
3   tell me without looking at the schedule.
4       Is that right?
5       A. That's correct.
6       Q. Now sir, when he came to you on the 2nd
7   and asked you for those days off, did he tell you
8   why he needed the time off?
9       A. Not that I recall, no.
10      Q. Sir, do you have children?
11      A. Yes, I do.
12      Q. Do you know if Dr. Greenberg has children?
13      A. Yes, I do.
14      Q. And what do you know about Dr. Greenberg
15  having children? Do you know how many he has?
16      A. As far as I know, two.
17      Q. Okay. And do you know their names?
18      A. One is named Jaden. I don't know the
19  other.
20      Q. Okay. And did you and Dr. Greenberg
21  during the time you worked at the hospital
22  together ever talk about your kids to each
23  other?
24      A. Yes.
25      Q. And in the course of those discussions,

Page 342

1          S. PULITZER, M.D.
2    did you ever learn that Dr. Greenberg's son
3    Jaden was a child with special needs?
4        A. Yes.
5        Q. And what was it that you -- you were --
6    you understood Jaden's special needs to be or
7    his condition to be?
8        A. My understanding of his condition was
9    that there was a learning disability and with
10   something -- you know, some sort of sensitivity
11   along the spectrum of -- with sensitivity issues.
12       Q. Okay. When you say --
13       A. But I don't know all the --
14       Q. -- "along the spectrum", what spectrum
15   are you referring to?
16       A. The spectrum to autism. Sensitivity to
17   autism.
18       Q. Sensitivity to autism, did you say?
19       A. Mm hmm.
20       Q. Okay. Is that what a layperson like me
21   would refer to as the autism spectrum?
22       A. Perhaps.
23       Q. Okay. And when did you learn that
24   Dr. Greenberg's son Jaden was on the autism
25   spectrum?

Page 343

1          S. PULITZER, M.D.
2        A. I don't know. It was shortly after I met
3    him.
4        Q. Okay. And that was in August or in 2010
5    or thereabouts?
6        A. Mm hmm, and so it was sometime within
7    the next couple of years. I knew that it was --
8        Q. Okay. And when --
9        A. Or the next year or two.
10       Q. -- you say "mm hmm", you mean yes?
11       A. Yes.
12       Q. Okay. So sir, you had known for several
13   years at that point that Dr. Greenberg had a son
14   with -- who was -- who is on the autism spectrum.
15        Correct?
16       A. Yes.
17       Q. Okay. Did you know in particular what
18   Jaden had been diagnosed with?
19       A. No, I don't know.
20       Q. Did you know whether or not Jaden had any
21   special needs as a result of being on the autism
22   spectrum?
23       A. I do not know what those needs are, no.
24       Q. I see. How many children do you have?
25       A. I have two.

Page 344

1          S. PULITZER, M.D.
2        Q. Two. Do you also have a child with
3    special needs?
4        A. Yes.
5        Q. Okay. And what's the -- if you don't
6    mind -- the nature of your child's special needs?
7        A. He's got sensitivity special needs.
8    He's, as you would say, on the sensitivity
9    spectrum.
10       Q. I see. And then, you shared that
11   information with Dr. Greenberg at some point
12   during the time that you worked together?
13       A. Yes, I did.
14       Q. Okay. So, you basically shared some of
15   the issues that you faced as parents of children
16   with special needs.
17        Correct?
18       A. Yes.
19       Q. And you, as a parent of a child with
20   special needs yourself, would understand some
21   of the demands that that makes upon a parent.
22        Correct?
23           MR. COULSTON: I
24        object to the form.
25       A. Yes.

Page 345

1          S. PULITZER, M.D.
2        Q. Sir, at any point in time during this
3    discussion on the 2nd, did Dr. Greenberg
4    reference his family or anything about his family
5    as a basis for the -- for him needing the days
6    September 4th and 5th off?
7        A. Not that I recall.
8        Q. Okay. Did you ask him what the reason
9    was why he needed those days off?
10       A. No, I don't remember.
11       Q. I'm sorry. No, you don't remember?
12       A. I -- I don't remember asking him the
13   specific reason --
14       Q. Okay.
15       A. -- why he needed the days off.
16       Q. Okay. And when you say you don't recall
17   him telling you, are you saying that he
18   definitely did not tell you or you just don't
19   recall whether or not he told you?
20       A. I don't recall any conversations saying
21   that: "I need the time off to tend to my special
22   needs child on these two days."
23       Q. Okay.
24       A. Having have my own child with special
25   needs I am very sensitive to that.

Page 350

```
1                 S. PULITZER, M.D.
2    it from some other source?
3         A. No, I didn't.
4         Q. Do you know who Linda McMurran is?
5         A. Yes, I do.
6         Q. Who is Linda McMurran?
7         A. She's the secretary for the department, or
8    Dr. Reede.
9         Q. Is it fair to call her Dr. Reede's
10   secretary?
11        A. Sure.
12        Q. And was she in that role at that time?
13        A. Yes.
14        Q. August of -- and early September of 2014?
15        A. Mm hmm.
16        Q. Yes?
17        A. Yes.
18        Q. By the way, was Ms. McMurran essentially
19   the -- the manager or custodian of time and
20   attendance records, like timesheets --
21        A. Yes.
22        Q. -- during that period of time?
23        A. Yes.
24        Q. Is that correct?
25        A. That's correct.
```

Page 351

```
1                 S. PULITZER, M.D.
2         Q. Okay.  Sir, what happened after this
3    encounter with Dr. Greenberg with regard to
4    his request for time off?  Did you report his
5    request to someone else?
6         A. No.
7         Q. Did you discuss it with Dr. Reede?
8         A. I don't -- I don't remember doing that.
9         Q. Okay.  And did Dr. Greenberg subsequently
10   notify you or anyone else that he was going to
11   be taking the time off notwithstanding?
12        A. Yes, he did.
13        Q. And whom did he inform of that?
14        A. Me.
15        Q. And when did he inform you of that?
16        A. On the next day Wednesday, the 3rd.
17        Q. And on the 3rd what did he say to you?
18        A. He came to my neuroradiology reading
19   room, which is on the second floor of the S
20   Building at Kings County Hospital, and he said:
21        "I'm just letting you know that I won't be
22   here tomorrow and Thursday.  Out of respect to
23   you I'm giving you time -- you know, I'm giving
24   you notice now to -- to cover me."
25        And I said: "All right.  I -- you know, I
```

Page 352

```
1                 S. PULITZER, M.D.
2    can't.  I can't cover you", or something to that
3    effect; and he said he's going to take the time
4    off anyway.
5         Q. Okay.
6         A. And I --
7         Q. Did you say anything to him on that
8    occasion?
9         A. I said to him I don't -- you know, I
10   don't want him to take the time off.
11        Q. Did you tell him there would be any
12   consequences if he did take the time off?
13        A. Not at that conversation, I did not.
14        Q. Did you tell him not to take the time
15   off?
16        A. Not in that conversation.
17        Q. Okay.  And what else did you say to him
18   in that conversation or did he say to you in
19   that conversation that you have not already
20   testified to?
21        A. In that one I don't remember anything
22   else.
23        Q. Okay.  Did the reason why he needed the
24   time off come up in that conversation?
25        A. Not that I recall, no.
```

Page 353

```
1                 S. PULITZER, M.D.
2         Q. So, you don't recall him telling you why
3    he needed the time off nor did you ask in that
4    second conversation.
5         Is that correct?
6         A. Well I mean, Dr. Greenberg came into my
7    office and -- and he told me in a blanket
8    statement: I will not be in; end of story.  See
9    ya.  That's basically what he said.  "I do
10   respect you; that's why I'm telling you now."
11   And I appreciated that, but it still left me in
12   the same position; and then left my office.
13             DR. GREENBERG:
14             (Indicating).
15             MR. NELSON:  Why?
16             DR. GREENBERG:  Okay.
17   MR. NELSON:
18        Q. At that point or at any prior point,
19   did you try to cover Dr. Greenberg's position
20   or schedule since he had said he wouldn't be in?
21        A. Prior to him coming to my office and
22   telling me he's not coming in?
23        Q. Yeah.  I mean at any time from the first
24   conversation on, had you made any effort to cover
25   him?
```

Page 354

1                S. PULITZER, M.D.
2      A. No.
3      Q. Did you make any effort to cover him
4    after the second conversation, the one you've
5    just testified to that occurred on the 3rd?
6      A. Yes, I did.
7      Q. And did you manage to cover --
8      A. Yes.
9      Q. -- him?
10     A. Yes, we covered the service.
11     Q. How did you manage to do that?
12     A. I don't remember exactly.  You'll have to
13   look at the schedule.
14     Q. Okay.  You were able to get another
15   radiologist to stand in for Dr. Greenberg?
16     A. There was a -- we divided the work.
17     Q. Okay.  So, you're saying multiple people
18   covered Dr. Greenberg's --
19     A. Yes.
20     Q. -- position that day?
21     A. Yes.
22     Q. Those two days?
23     A. Yes.
24     Q. And did Dr. Greenberg in fact not come to
25   work on the 4th?

Page 355

1                S. PULITZER, M.D.
2      A. He did not.
3      Q. And did he in fact not come to work on the
4    5th?
5      A. No, he did not.
6      Q. Did you have any further discussion --
7    discussions with him other than the one on the
8    2nd and the one on the 3rd that week --
9      A. Yes --
10     Q. -- regarding him --
11     A. -- I spoke to him.
12     Q. -- and/or his absences on the 4th or the
13   5th?
14     A. Yes, I did.
15     Q. When was the next one after the one
16   you've just recounted on the 3rd?
17     A. On the 3rd also, later in the day.
18     Q. And what happened?  And -- tell me
19   about that conversation now.
20     A. So, I had to -- I had an employee come
21   and tell me that he wasn't going to be in the
22   next day, and I reported that to Dr. Reede
23   because I am the one who is ultimately
24   responsible for the work not getting done if
25   it doesn't get done or if people don't show up

Page 356

1                S. PULITZER, M.D.
2    and for how it works.
3      I went, I -- I asked her how to handle this
4    situation, and she advised me to write a letter
5    saying that I officially deny his time off, and
6    that if he takes the time off he'll be refer --
7    referred to Labor Relations.
8      Q. And when did you have this conversation
9    with Dr. Reede?
10     A. Right after Dr. Greenberg left my office.
11     Q. Okay.  Did you talk to Dr. Greenberg at
12   all on the 4th or the 5th?
13     A. No.
14     Q. Did you talk to Dr. Greenberg more than
15   the one time you've now testified to on the 3rd?
16     A. Yes.
17     Q. Okay.  And how many more times that day
18   did you talk to Dr. Greenberg?
19     A. Once.
20     Q. So, in total there were three
21   conversations with Dr. Greenberg regarding his
22   need for time off on the 4th and the 5th?
23     A. Mm hmm.
24     Q. One on the 2nd and two on the 3rd.  Is
25   that correct?

Page 357

1                S. PULITZER, M.D.
2      A. Yes.
3      Q. What was the -- when -- did you have the
4    conversation that you've just recounted with
5    Dr. Reede before or after the third conversation
6    with Dr. Greenberg?
7      A. It's after the second conversation.
8      Q. Okay.  So the first one was on the 2nd.
9      A. Yes.
10     Q. Then you had a conversation with
11   Dr. Greenberg on the 3rd.
12     A. Yes.
13     Q. Then you had a conversation with
14   Dr. Reede.
15     A. Yes.
16     Q. And then you had another conversation with
17   Dr. Greenberg.
18     Is that correct?
19     A. That's correct, yes.
20     Q. Okay.  Have you told me everything that
21   was said between you and Dr. Reede during your
22   conversation with her regarding Dr. Greenberg
23   on the 3rd?
24     A. Yes, as far as I can recall.
25             MR. COULSTON:  I object

Page 358

1                    S. PULITZER, M.D.
2          to the form.
3      A. Yes.
4      Q. Is there anything else sitting here now
5  that you recall saying to her or that you recall
6  her saying to you in that conversation?
7      A. No.
8      Q. How long after talking to Dr. Reede did
9  you speak again with Dr. Greenberg?
10     A. It took me about 15, 20 minutes to type
11  a letter, so within a half hour of that
12  conversation with Dr. Reede. So everything took
13  place within an hour, I think.
14     Q. Okay. And once you finished the letter,
15  what did you do then?
16     A. I walked downstairs to Dr. Greenberg's
17  reading room. I went into his reading room and
18  I said, "Oded, I have to give you this letter.
19  I can't approve your time off", and I read him
20  what the letter said; you know, "If you can't
21  -- if you don't come in you're going to be
22  referred to Labor Relations".
23        And I then said -- you know, advised him
24  not to do it. I -- just as a -- I -- you know,
25  he and I go back a long way and I -- I like him

Page 359

1                    S. PULITZER, M.D.
2  and just don't want to refer him to Labor
3  Relations. And you know, I just said: "Please
4  don't do this."
5      Q. And what did he say?
6      A. He said: "I'm -- I'm doing it. I have
7  to do it."
8      Q. Did he say why he had to do it?
9      A. Not that I recall, no.
10     Q. So, it's your testimony that you had
11  three separate conversations with Dr. Greenberg
12  on the 2nd and the 3rd --
13     A. Mm hmm.
14     Q. -- collectively?
15     A. Yes.
16     Q. And at no time during that -- any of
17  those three conversations did he say why he
18  needed that -- those days off.
19        That's your testimony?
20     A. Yes, that was -- that is my testimony.
21  I don't know what the exact reason is that he
22  needed those days off.
23     Q. And it's also your testimony that in none
24  of those three conversations did you ever ask him
25  why he needed that time off.

Page 360

1                    S. PULITZER, M.D.
2      Is that correct?
3      A. I don't recall.
4      Q. Did you ever ask him, if not for the
5  actual reason why he was needing the time off,
6  why he was so insistent that he was going to have
7  to take it off notwithstanding?
8      A. No, I just said to him -- I mean I said,
9  "I hope you know what you're doing", and that was
10  the end of it.
11     Q. Do you recall him saying anything else to
12  you in the context of you saying, "I hope you
13  know what you're doing?"
14     A. He said to me: "Well, you're making me
15  choose between my job and my family." And I
16  said: "I'm not making that choice"; and that
17  was the end of that conversation.
18     Q. Did you ask him what he meant by that?
19     A. I don't re -- I don't think I did. I'm
20  not sure.
21     Q. Did you ask him what he meant by "choosing
22  between his job and his family"? Did you
23  understand that in any particular way?
24     A. I didn't.
25     Q. Did you inquire any further what he meant

Page 361

1                    S. PULITZER, M.D.
2  by "family" in that context?
3      A. I don't remember inquiring, but I do
4  remember that had I known or had this been
5  presented to me in the context of his child,
6  Jaden, on Tuesday or on Monday or whenever it
7  was that I would have tried to work with him to
8  accommodate him, so that did not come into my
9  purview.
10     Q. When you -- you said you came back on
11  Tuesday, the 2nd.
12        Correct?
13     A. Yes.
14     Q. Okay. So it couldn't have happened on
15  Monday.
16     A. Did I say Monday?
17     Q. Yes.
18     A. All right. Tuesday.
19     Q. Okay. Tuesday was the 2nd; Wednesday was
20  the 3rd?
21     A. Yes.
22     Q. Are you saying sitting here today that
23  he definitely did not mention Jaden or his --
24  one of his children as a reason why he needed
25  the time off?

Page 362

S. PULITZER, M.D.

1
2    A. I -- I am saying that that was not
3    communicated to me and that that was not my
4    understanding of why the time was off.  I did
5    not know exactly why the time needed to be off.
6        Q. When you brought to Dr. Reede's attention
7    that Dr. Greenberg had said that he was needing
8    this time off and saying he was going to take it
9    notwithstanding that you said you couldn't give
10   it to him, did she ask why he needed the time
11   off?
12       A. I don't recall.
13       Q. Do you recall telling her a reason why
14   he needed -- he said he needed the time off?
15       A. I don't recall.
16       Q. So Dr. Reede might have asked; you don't
17   recall whether she did or not?
18       A. That's correct.
19       Q. All right.  Did Dr. Greenberg at any
20   point in any of those three conversations we've
21   been talking about say he -- it was emergent or
22   an emergency that he needed this time off?
23       A. Not that I remember.
24       Q. And did you subsequently learn why
25   Dr. Greenberg had needed that time off?

Page 363

S. PULITZER, M.D.

1
2    A. I've -- I heard that he was doing
3    something with his child, but that was after.
4    That was after-the-fact.
5        Q. How long after-the-fact?
6        A. I don't know.  It was not on that week
7    or not that day.
8        Q. Okay.  Now, had you spoken to anyone in
9    Labor Relations before speaking to Dr. Reede and
10   having her tell you to draft a letter, as you've
11   described?
12       A. I did not.  She may have; I did not.
13       Q. Okay.
14       A. I don't know.
15       Q. When was the first time you spoke with
16   or otherwise communicated with anyone in Labor
17   Relations regarding this matter, the 4th and the
18   5th?
19       A. I spoke with Michael Arabian.
20       Q. Okay.
21       A. And I remember being in Dr. Reede's office
22   and the three of us were there discussing this.
23   I don't remember if there were e-mails or
24   anything before that, but that -- I remember that
25   -- I just remember having a meeting.

Page 364

S. PULITZER, M.D.

1
2        Q. Well, do you recall how Dr. -- how
3    Mr. Arabian came to be in Dr. Reede's office for
4    a meeting of the three of you?
5        A. I don't.  I think a lot of this was
6    initiated from Dr. Reede, because she's at SUNY.
7    So I -- I don't know the people there and I was
8    a -- a very, very new administrator.  I did not
9    know anyone on that side of the street.
10       Q. Had you had any dealings with Mr. Arabian
11   prior to that day?
12       A. To -- to this incident?  No.
13       Q. Do you recall either speaking on the phone
14   or e-mailing with Mr. Arabian at any time prior
15   to this meeting in Dr. Reede's office?
16       A. It's possible, yeah.
17       Q. Well anything is possible, sir.  I'm
18   asking what you remember.
19       A. I don't remember specifically.
20       Q. Okay.  Do you have a belief as to who
21   initiated the meeting with Mr. Arabian?
22       A. I don't recall.
23       Q. Do you believe it was you or do you
24   believe it was Mr. -- Dr. Reede or do you
25   believe it was someone else?

Page 365

S. PULITZER, M.D.

1
2        A. I believe that we had a problem.  We
3    had objectively an -- an insubordinate employee
4    and a problem covering a service, and it was
5    referred to Labor Relations and it was -- there
6    were conversations between me, Dr. Reede and
7    Labor Relations.
8        And however that filtered out I don't
9    remember, but it -- it wasn't done in a vacuum.
10       Q. When did the meeting that you've just
11   referred to with Dr. Reede and Mr. Arabian
12   occur?  What day?
13       A. Possibly Friday.
14       Q. Meaning --
15       A. I don't know.
16       Q. -- the 5th?
17       A. Yes.
18       Q. Okay.  Was that the first meeting that
19   you had with Mr. Arabian on the matter?
20       A. That was the first time I met Mr. Arabian.
21       Q. So the answer is yes?
22       A. Well, that was the first physical meeting
23   that I had with him that I remember.
24       Q. Okay.  Did you have any subsequent
25   physical meeting with him?

Page 366

1            S. PULITZER, M.D.
2     A. I don't remember.
3     Q. And how long did you and Dr. Reede meet
4  with Mr. Arabian on -- on the 5th?
5     A. I don't know.
6     Q. Five minutes, an hour?
7     A. Half hour, maybe. I don't remember. I
8  don't know.
9     Q. And what was discussed among you at that
10  time?
11     A. What the process and procedure is when
12  you refer somebody to Labor Relations, and you
13  know, what are the things as administrators that
14  we're supposed to do and how to handle it.
15     Q. And during that meeting, did Mr. Arabian
16  ask you or Dr. Reede why Dr. Greenberg had said
17  he needed the leave?
18     A. I don't recall. I don't know.
19     Q. Do you recall saying to Mr. Arabian or
20  Dr. Reede saying to Mr. Arabian a reason that
21  Dr. Greenberg said he needed the leave?
22     A. I don't remember.
23     Q. Do you remember the subject, the topic
24  coming up, the reason why Dr. Greenberg needed
25  the leave?

Page 367

1            S. PULITZER, M.D.
2     A. I honestly don't.
3     Q. Okay. Now, if you met with Dr. Reede
4  and Mr. Arabian on the 5th, that was on one of
5  the days that Dr. Greenberg was not on the
6  premises.
7     Correct?
8     A. Yes.
9     Q. But you had given him the letter --
10     A. Yes.
11     Q. -- on the 3rd. Is that correct?
12     A. I gave him the -- well, I gave him the
13  letter from me saying that I deny your leave
14  and if you go I'll refer it to Labor Relations.
15     So then it was referred to Labor Relations,
16  but that was the only letter that I -- that I
17  gave him.
18     Q. Okay.
19     A. But then there had -- there was other
20  processes that are in place once you refer
21  somebody, and so Mr. Arabian was informing us
22  of -- of what his department then needs to do
23  once it's referred to them.
24     Q. Okay. Well, what I'm trying to get at
25  is: Prior to Dr. Greenberg actually taking the

Page 368

1            S. PULITZER, M.D.
2  4th first and then the 5th off, had you referred
3  the matter to Labor Relations?
4     A. The -- he was not referred to Labor
5  Relations until at least the 4th when he didn't
6  show up on that day. The 3rd was informative of
7  what -- what do you do, and the people that you
8  call when that happens is Labor Relations. I
9  mean, it's not a new charge, so --
10     Q. Okay. Sir, I'm simply asking: Before
11  the 4th --
12     A. Mm hmm.
13     Q. -- had you, or to your knowledge
14  Dr. Reede, communicated any of this to Labor
15  Relations?
16     A. I -- I think Dr. Reede did communicate
17  it to them in getting advice on how to deal with
18  the situation.
19     Q. Okay. And what's your basis for believing
20  that?
21     A. Because I -- I think that that's what
22  happened. I don't -- I don't fully remember all
23  the details.
24     Q. Did Dr. Reede ever tell you that she had
25  contacted Labor Relations prior to the 4th?

Page 369

1            S. PULITZER, M.D.
2     A. She may have in the conversation,
3  follow-up conversation. I don't -- I don't
4  remember.
5     Q. All right. How did you find out about
6  the meeting in Dr. Reede's office with
7  Mr. Arabian? Did Dr. Reede or Ms. McMurray, her
8  secretary, let you know about it?
9     A. I don't remember the -- the chain of
10  events, but it was set up through there.
11     Q. Was anyone else present besides the three
12  of you?
13     A. Not that I remember.
14     Q. Okay. And did Mr. Arabian give you or
15  Dr. Reede any advice about how you should
16  proceed?
17     A. He --
18     Q. And I mean at the meeting on the 5th.
19     A. Right. I mean from what I remember from
20  that meeting, it was more about the process. So
21  now that we've referred someone to Labor
22  Relations, then what happens.
23     And so Labor Relations, they don't report
24  back to your -- to the area. They don't come
25  back to work; they have to first go to Labor

Page 370

1       S. PULITZER, M.D.
2  Relations and discuss the incident.  So he told
3  us the process, how that works.
4      Q. Okay.
5      A. Or that's what I remember from that
6  conversation.
7      Q. Other than telling you of the process and
8  how it worked, do you recall anything else that
9  Mr. Arabian said to either you or Dr. Reede while
10 you were meeting with him?
11     A. Just what I told you.
12     Q. Did Dr. -- did Mr. Arabian ever ask you
13 or Dr. Reede anything about Dr. Greenberg's
14 request at this meeting or did he already seem
15 to know about it?
16     A. Honestly, I don't remember.
17     Q. Okay.  And it's your testimony that you
18 gave the September 3rd letter to Dr. Greenberg
19 in his hand?
20     A. Mm hmm.
21     Q. Is that a yes?
22     A. That is a yes.
23     Q. And it's also your testimony that you
24 don't believe that you had spoken with
25 Mr. Arabian prior to doing so.

Page 371

1       S. PULITZER, M.D.
2    Is that correct?
3      A. Yes, I don't believe that I did.  I think
4  Dr. Reede did.  I -- I don't think we did this in
5  a vacuum in terms of (indicating), you know, just
6  a blanket threat.
7      Q. Thank you, sir.  I'm perfectly happy to
8  have you tell me more than I ask, but I would
9  appreciate if you would just answer the questions
10 that I ask.  If you are going to say more, that's
11 fine.
12     What was your understanding of what was
13 going to happen based on what you had been told
14 by Mr. Arabian at that meeting?
15     A. That Dr. Greenberg would be counseled and,
16 that from whatever that counseling session would
17 be he would then return to work.
18     Q. Was the -- did Mr. Arabian tell you or
19 Dr. Reede to do anything in connection with
20 that?
21     A. I'm not sure I understand your question.
22     Q. Did he tell you to communicate in any
23 particular respect further with Dr. Greenberg
24 about the matter, to take Dr. Greenberg off the
25 schedule, to -- anything at all did Dr. -- did

Page 372

1       S. PULITZER, M.D.
2  Mr. Arabian tell you or Dr. Reede to do?
3      A. The only thing that I remember is that
4  Mr. Arabian said a letter would be drafted from
5  Labor Relations now; that this matter is referred
6  to Labor Relations instructing Dr. Greenberg to
7  report to Labor Relations on -- upon his return
8  to work, whenever that is.
9      Q. Okay.  Did you have an --
10     A. Not to return --
11     Q. I'm sorry.
12     A. And -- and not to return to Kings County
13 before going there.
14     Q. Okay.  So, it was your understanding that
15 Dr. Greenberg's next occasion to be at Kings
16 County would be to go to Labor Relations instead
17 of coming to his normal work station.
18     A. Yeah.
19     Q. Is that correct?
20     A. Yes.
21     Q. And did that in fact transpire?
22     A. No.
23     Q. What happened?
24     A. Dr. Greenberg came to work.  I -- I was
25 informed a little later in the morning that he

Page 373

1       S. PULITZER, M.D.
2  was there on a Monday.  I called Dr. Reede; I may
3  have called Labor Relations, I don't remember.  I
4  don't remember.  And they said to tell him to
5  come to Labor Relations.
6      And so, I went down to his reading room and
7  I said, "You have to go to Labor Relations", and
8  he went.  He took his coat and he went.
9      Q. And what else was said between you and
10 Dr. Greenberg on that occasion?
11     A. I don't remember.  He was angry, but I
12 don't remember what else he said.
13     Q. Did he ask you anything?
14     A. I don't remember.
15     Q. Did he ask you why he had to go to Labor
16 Relations?
17     A. I don't remember.
18     Q. Did he seem to know about the letter that
19 Mr. Arabian said would be sent to him instructing
20 him to come to Labor Relations?
21     A. No, he didn't.
22     Q. Do you know whether or not in fact he
23 had received that letter by the time you spoke
24 to him on that day?
25     A. I don't have any knowledge of that.

Page 418

1           S. PULITZER, M.D.
2  decided upon, if anything, would be done to or
3  with Dr. Greenberg as a result of that
4  interrogation?
5           MR. COULSTON:  I
6           object to the form.
7       A. I was told that there would be another
8  meeting; that you know, it was adjourned for that
9  day and that there was going to be another
10 meeting.
11      Q. Okay.  And in the course of these events
12 --
13      A. Yeah.
14      Q. -- you reporting the September 23rd
15 incident, you learning that Dr. Greenberg had
16 had an interrogation again at Labor Relations,
17 etcetera -- did you have occasion to speak with
18 Leonzo Cuiman?
19      A. I don't remember if I spoke to him
20 directly.
21      Q. Do you recall attending any meeting at
22 which he was also present in this time frame
23 regarding Dr. Greenberg?
24      A. I don't remember that.
25      Q. Do you recall any -- do you recall any

Page 419

1           S. PULITZER, M.D.
2  meeting with Mr. Arabian, Ms. Bernadel,
3  Mr. Cuiman or anyone else regarding Dr. Greenberg
4  in this time frame?  And I'm talking late
5  September early October of 2014.
6       A. I don't recall a meeting specifically,
7  no.
8       Q. Do you recall speaking on the phone with
9  Mr. Cuiman, Ms. Bernadel, Mr. Arabian or anyone
10 else regarding Dr. Greenberg's second
11 interrogation or anyone else during this time
12 frame?
13      A. I recall speaking with Stephanie Bernadel.
14      Q. Okay.  How many times?
15      A. At least once.  I don't know.
16      Q. And when was that?
17      A. It was around the time between the
18 interrogations.
19      Q. So, between Mr. Arabian's interrogation
20 and Ms. Bernadel's you spoke with Ms. Bernadel
21 on the phone?
22      A. It was around the time of the two in
23 October.
24      Q. Oh, the two in October.  Okay.  So between
25 those two --

Page 420

1           S. PULITZER, M.D.
2       A. Yeah.
3       Q. -- as you recall?
4       A. That is what I recall.
5       Q. So, after Ms. Bernadel had done the
6  interrogation of Dr. Greenberg and some
7  subsequent occasion on which there was also a
8  meeting with Dr. Greenberg you recall speaking
9  with Ms. Bernadel on the telephone.
10      Is that correct?
11      A. Yes.
12      Q. And what was said between the two of you
13 on that occasion?
14      A. Well, I don't remember the exacts of
15 what was said, but she asked -- they were trying
16 to decide of what to do in terms of an -- a
17 negotiation or bargaining or whatever they're
18 going to do with them and what do we want to do;
19 do we want to go with suspension, do we want to
20 go with termination, how far we want to take
21 this; and the decision was made to -- to go with
22 the termination.
23      Q. Okay.  So Ms. Bernadel asked you what
24 you wanted to do and you responded with
25 termination.

Page 421

1           S. PULITZER, M.D.
2       A. I said that, yes.
3       Q. Okay.  And was Dr. Reede part of this
4  conversation?
5       A. I don't remember this being a three-way
6  conversation, but all of this was happening
7  simultaneously.  Like it -- it wasn't one thing.
8  I don't remember it being a -- like a phone in
9  the middle of the room conversation (indicating),
10 but I just don't exactly remember it.
11      Q. Okay.  Going back to the afternoon of
12 the 23rd, did you know before Dr. Greenberg took
13 that time out of the building that afternoon why
14 he was taking that time out of the building that
15 afternoon?
16      A. No.
17      Q. Do you know why he wanted to take that
18 time that afternoon?
19      A. All I knew is that he needed the time and
20 I gave it to him.
21      Q. In the afternoon?
22      A. Oh, no, I'm sorry.  In the morning.
23      Q. No, I'm asking about the afternoon now.
24      A. No, I didn't know why he needed it.
25      Q. Did you ever ask?

Page 426

1                    S. PULITZER, M.D.
2        A. No.
3        Q. -- besides that?
4             MR. COULSTON:  I object
5           to the form.
6   MR. NELSON:
7        Q. And with regard to what you called
8    disruptive behavior --
9        A. Mm hmm.
10       Q. -- what was it you understand that to be
11   or to -- to refer to when it was among the
12   reasons Dr. Reede was in favor of termination?
13        What disruptive -- what was the disruptive
14   behavior?
15       A. The disruptive behavior was the
16   absenteeism or lack of coming in at the right
17   time, just showing up when he felt like he was
18   going to show up, telling people he was going
19   to leave when he was wants to leave; basically
20   doing whatever he wants when he wants to do it,
21   and that being a model physician.
22        Dr. Greenberg was a very well respected
23   radiologist in our department.  I mean, he was
24   one of the best radiologists we've ever had
25   and people look up to him.  People looked to

Page 427

1                    S. PULITZER, M.D.
2    him to model what he's doing, just like a Michael
3    Jordan or whomever.
4        So when you have a guy who's in your
5    department who's really good and he's doing
6    things that are very disruptive, everyone else
7    is like:  "Well, why can't I do it?  He's --
8    you know, we're watching him."  And it's -- it's
9    very disruptive in the department.
10       Q. Sir, did you -- during the time that you
11   worked with Dr. Greenberg, did you ever know him
12   to lie?
13       A. No.
14       Q. When you understood -- when you were
15   referring to disruptive behavior just a moment
16   ago, you were essentially referring to time and
17   attendance-related matters.
18        Was your understanding of what was
19   characterized as disruptive behavior and what
20   was described as time and attendance issues the
21   same thing?
22       A. No.
23       Q. What else was, as you understood it,
24   disruptive behavior on Dr. Greenberg's part that
25   formed part or all of the bases for his

Page 428

1                    S. PULITZER, M.D.
2    termination or yours or Dr. Reede's
3    recommendation for termination, besides --
4             MR. COULSTON:  Objection.
5   MR. NELSON:
6        Q. -- the time and attendance issues?
7        A. The attestations, the negative attitude
8    of, you know, telling the residents that, you
9    know, these guys are after me, the -- you know,
10   whatever.  Just the negative talk coming from
11   that, and mostly just with that negativity and
12   with the, you know, putting 150 attestations
13   out when somebody has asked you to -- to do
14   this for billing because the hospital needs to
15   be billed and you come back and you do something
16   that mocks it.  That's disruptive.
17       Q. Okay.  But other than the time and
18   attendance issues and this negativity that you
19   were just referring to --
20       A. Mm hmm.
21       Q. -- was there any other specific act by
22   Dr. Greenberg that you characterize -- that
23   you would characterize as disruptive behavior?
24             MR. COULSTON:  Objection.
25             Mischaracterizes prior

Page 429

1                    S. PULITZER, M.D.
2          testimony.
3        A. Not --
4        Q. Sorry?
5        A. Not at the moment.  Nothing comes to mind.
6        Q. Okay.  And you said that the things that
7    was really, I believe you used the expression
8    "was over the top", was the attestations.
9        Sir, is it your testimony that the main
10   reason for Dr. Reede -- Dr. Greenberg being
11   terminated were the attestations?
12       A. It was part of it.  It was a large part
13   of it.
14       Q. Okay.  How large a part of it?
15       A. I don't know exactly, but I do know that
16   that was a very -- that that was a very serious
17   thing, and the hospital administration at my
18   hospital took that very seriously.
19       Q. Okay.
20       A. It's a patient record.
21       Q. Did anyone in Labor Relations tell you
22   what they thought should happen after the second
23   interrogation to Dr. Greenberg?
24       A. No.
25       Q. Did they say, for example, that they

Page 438

```
1              S. PULITZER, M.D.
2    determine that?
3        MR. COULSTON:  This is --
4    A. No.
5    Q. Are you aware of anyone else at either
6    Downstate or Kings County Hospital --
7    A. Mm mm.
8    Q. -- who did so?
9    A. No.
10   Q. Okay.  Sir, what role did Dr. Jameladdine
11   play, if any, in the immediate -- the period of
12   days immediately preceding Dr. Greenberg's
13   termination?  Was he someone also consulted as
14   to whether or not Dr. Greenberg should be
15   terminated?
16   A. Separately by who?  Who would consult him?
17   Q. I'm asking.  Do you know whether or not
18   he was consulted?
19   A. I don't know.
20   Q. Okay.  To this day, have you had any
21   conversation with Dr. Jameladdine regarding
22   whether Dr. Greenberg should be terminated?
23   A. Yes.
24   Q. When?
25   A. Around that same time of (indicating) --
```

Page 439

```
1              S. PULITZER, M.D.
2    between the two.  In October between the two
3    things when I was asked.
4    Q. Okay.  So, between the interrogation and
5    the final meeting you had a conversation with
6    Dr. Jameladdine?
7    A. Yes.
8    Q. Okay.  And what was the substance of
9    your conversation with Dr. Jameladdine?
10   First:  Was it by phone or face-to-face?
11   A. Face-to-face.
12   Q. And what was it that you said to
13   Dr. Jameladdine and he said to you during that
14   conversation?
15   A. What I remember from that conversation
16   was giving him an update on the -- what I knew
17   of the case and saying that the question was
18   asked whether we wanted to go for termination --
19   if we wanted to go as far as termination or --
20   or a suspension, and that my recommendation would
21   be for termination.  And he said:  "Okay, I
22   agree."
23   Q. He said:  "Okay, I agree?"
24   A. Yes.
25   Q. What else did he say?
```

Page 440

```
1              S. PULITZER, M.D.
2    A. That's all I remember.
3    Q. Did he tell you before you told him that
4    you were in favor of termination that he was in
5    favor of termination?
6        MS. BLOCKER:  Objection.
7        You can answer it.
8        THE WITNESS:  Oh.
9    A. Not that I'm aware of.
10   Q. Sir, did you prepare or propose or
11   submit to Labor Relations during this period of
12   September, October 2014 a policy or a proposed
13   policy for physician work hours?
14   A. Yes.
15   Q. Why?
16   A. That was actually in the works before
17   this happened, but in light of the events that
18   were happening as well when I took over I was
19   told by my administration at my hospital that
20   there were a few things that I needed to
21   correct.
22   What I needed to correct was that there
23   were many, many, many unread cases that were
24   unacceptable, there were many physicians with
25   time and attendance issues and unruly -- you
```

Page 441

```
1              S. PULITZER, M.D.
2    know, not unruly but unscheduled absences, there
3    were too many, and that I -- I needed -- in
4    order to not end up like my boss who I had just
5    seen terminated -- correct these things.
6    So, when I took over the first thing I did
7    was have a zero backlog policy and try and make
8    sure that we covered our stuff; and the second
9    thing that I worked on was time and attendance,
10   and it happened to coincide with the events that
11   were happening here.
12   Q. Well, when you proposed the policy you did
13   so in writing.
14   Correct?
15   A. I would -- I proposed it for approval from
16   Labor Relations.
17   Q. Okay.  In writing.  You submitted
18   something to them in writing.
19   A. Mm hmm.
20   Q. And when you did that, was that because
21   there was no existing written policy for work
22   hours for physicians at that time?
23   A. There was a policy from SUNY, from the
24   SUNY -- from Dr. Reede's office which I had
25   mentioned earlier; 8:00 to 4:00 and 9:00 to
```