10

Page 29

1  REEDE
2  you meet with them subsequent to that?
3  A  The only one that I met with was
4  Dr. Jamaleddine.
5  Q  And when did you meet with
6  Dr. Jamaleddine?
7  A  It was maybe -- I don't know. I had
8  been at Downstate probably -- I don't know --
9  more than six months.
10 Q  Now, part of your responsibilities as
11 chair of the department of radiology is to have
12 under your management or supervision the
13 radiologists employed by Downstate, correct?
14 A  Yes.
15 Q  And that includes the radiologists
16 employed by Downstate who worked at Kings
17 County Hospital, correct?
18 A  Yes.
19 Q  Was there someone with whom you
20 liaised or otherwise dealt in connection with
21 the day-to-day conduct of the practice by the
22 physicians employed at Downstate but working at
23 Kings County?
24 A  Yes.
25 Q  Who?

Page 30

1  REEDE
2  A  Dr. Kantor.
3  Q  Okay. Is that Dr. Alan Kantor?
4  A  Yes.
5  Q  And what was Dr. Kantor's position?
6  A  He was the chief of service.
7  Q  What do you mean? Chief of what
8  service?
9  A  Chief of the radiology service at
10 Kings County Hospital.
11 Q  Okay. And in what way did you
12 interact with Dr. Kantor regarding the
13 radiologists employed by Downstate working at
14 Kings County?
15 A  I mean he -- I mean, I would come to
16 staff meetings, you know, to let -- you know,
17 let them know when -- we would let them know
18 when there were grand rounds. They were also
19 making arrangements for various meetings for
20 the faculty to attend, you know, maybe some
21 discussions about service coverage.
22 Q  And at the time, Dr. Kantor was the
23 chief of radiology at Kings County; is that
24 correct?
25 A  Yes.

Page 31

1  REEDE
2  Q  Did he report to you?
3  A  Yes.
4  Q  Was there anybody between the two of
5  you or were -- was -- were you his direct
6  supervisor?
7  A  I'm his direct supervisor.
8  Q  Okay. And did that change at some
9  point?
10 A  No.
11 Q  Is Dr. Kantor still chief of service
12 at Kings County?
13 A  No.
14 Q  When did he cease to be the chief of
15 service at Kings County?
16 A  On or around July of -- what is it?
17 2014, I believe.
18 Q  And what were the circumstances of
19 that?
20 A  Administration at Kings County
21 Hospital said that they would prefer that --
22 they would prefer that -- to have him replaced.
23 Q  And who do you mean by administration
24 at Kings County Hospital?
25 A  Dr. Jamaleddine.

Page 32

1  REEDE
2  Q  And when did Dr. Jamaleddine convey
3  that sentiment to you?
4  A  During a meeting when we were
5  discussing staffing.
6  Q  And when was that meeting?
7  A  Sometime in the spring of 2014.
8  Q  And who attended that meeting other
9  than you and Dr. Jamaleddine?
10 A  Dr. Clinchy.
11 Q  Anyone else?
12 A  No.
13 Q  And as best you can recall, what did
14 Dr. Jamaleddine specifically say in that
15 regard?
16 A  He said that he didn't think that
17 the -- that the radiology department was run as
18 good as it could be. They -- he felt they
19 needed new leadership.
20 Q  Did he tell you in particular why he
21 thought it wasn't being as run as good as it
22 could be?
23 A  I don't remember the particulars.
24 Q  So you're saying you don't recall if
25 he said that?

Page 33

REEDE
2 A  Yes.
3 Q  What did Dr. Clinchy say on the
4 subject?
5 A  He didn't say anything.
6 Q  And what did you say in that regard
7 at that meeting?
8 A  I didn't say anything.
9 Q  Were you obliged if Dr. Jamaleddine
10 requested that the chief of the radiology
11 service at Kings County be replaced to, in
12 fact, replace him?
13 A  That is my understanding.
14 Q  So you essentially were obliged to do
15 what Dr. Jamaleddine directed; is that correct?
16    MS. BLOCKER: Objection.
17 Q  You can answer.
18 A  Well, I mean, that was his
19 recommendation, that he would like to have new
20 leadership. And so I feel that if that's what
21 the CMO of the hospital is asking for, I don't
22 really feel I'm in the position to argue with
23 him about that.
24 Q  Was that the first time he had said
25 that in words or substance to you?

Page 34

REEDE
2 A  Yes.
3 Q  That meeting in the spring?
4 A  Yes.
5 Q  So you had no prior notice of, say,
6 his dissatisfaction with Dr. Kantor's
7 leadership prior to that meeting; is that
8 correct?
9 A  Yes.
10 Q  And what did you do in response to
11 Dr. Jamaleddine's request or -- well, let me go
12 back a step.
13    Was it a request, a recommendation,
14 or an order or direction that Dr. Kantor be
15 replaced?
16 A  I think it was a request. That's
17 kind of how I look at it.
18 Q  Okay. But it was one you felt you
19 were compelled to honor; is that correct?
20 A  Correct.
21 Q  I'm sorry. I think I may have
22 stepped on your answer. Your answer was yes?
23 A  Yes.
24 Q  And what did you do once
25 Dr. Jamaleddine had conveyed that request or

Page 35

REEDE
2 recommendation to you?
3 A  I had to call Dr. Kantor and inform
4 him of what the decision was.
5 Q  Okay. And what was the decision?
6 A  That he was to be removed from Kings
7 County Hospital.
8 Q  So you're talking about his
9 employment entirely or just his holding the
10 position of chief of service?
11 A  His employment.
12 Q  And why was his employment affected
13 rather than just his position as chief of the
14 service?
15 A  Because there were -- he had asked if
16 he could come to UHV, to University Hospital,
17 but I had no salary lines.
18 Q  All right. Let me make a distinction
19 here. There are radiologists who work at
20 Downstate hospital, correct?
21 A  Yes.
22 Q  And there are radiologists that work
23 at Kings County Hospital, correct?
24 A  Yes.
25 Q  And both of those are part of your

Page 36

REEDE
2 department, correct?
3 A  Yes.
4 Q  And there's a chief of service at
5 Kings County Hospital who was at that time
6 Dr. Kantor, correct?
7 A  Yes.
8 Q  Tell me, did Dr. Jamaleddine request
9 or recommend that Dr. Kantor be removed as
10 chair -- sorry -- as head of the radiology
11 service or that he actually be dismissed from
12 employment at Kings County Hospital entirely?
13    MS. BLOCKER: Objection.
14 A  I don't recall the exact particulars.
15 Q  Okay. Tell me, then, why, when he
16 made that request, you ended Dr. Kantor's
17 employment entirely rather than just, for
18 example, returning him to being a practicing
19 radiologist who was no longer the chief of the
20 service?
21 A  Because we have to have salary lines
22 for the people, and I would believe that it
23 would be rather difficult for somebody to stay
24 in a position in a department if they were
25 removed from being the chief of the service.

Page 117

REEDE
A Dr. Sri Kolla.
Q Interventional radiology, again, when you arrived?
A That's Dr. Huntz Liu.
Q Spell that.
A H-u-n-t-z L-i-u.
Q Is that one word or a hyphenated?
A No. First and last name.
Q Okay. So Dr. Liu.
Chest when you arrived?
A Dr. Steven Waite.
Q And ultrasound when you arrived?
A Really would be Dr. Dan Zinn.
Q Okay. Now, those were all of the chiefs of the subspecialties when you arrived. Have any of them changed other than, I assume, Dr. Areman? I'm asking about the others now. Have any of those changed?
A Neuroradiology is Dr. Lindin.
Q Okay. Are the other six the same?
A Yes.
Q All right. And who replaced -- so Dr. Lindin replaced Dr. Nath when she left or resigned?

Page 118

REEDE
A Yes.
Q And who replaced Dr. Areman?
A Dr. Janelle Scott.
Q Okay. And she serves in that position today?
A Yes.
Q Is that the same as Dr. Scott Moore?
A Yes.
Q We can refer to her as Dr. Scott, and we'll be talking about the same person?
A Yes.
Q Okay. Good. When did Dr. Scott take over for Dr. Areman as chief of ER radiology?
A I don't know if it was July or August of 2014.
Q And what were the circumstances of that? I mean, how did Dr. Scott become the ER radiology chief?
A She was working at Long Island College Hospital, and so I decided to move her into that position.
Q When did you decide to do that?
A I don't know. Maybe it was, like, in July of 2014.

Page 119

REEDE
Q Is Long Island College Hospital still open?
A No.
Q When did it close?
A I don't recall.
Q Do you recall what year it closed?
A I don't recall.
Q Had Dr. Scott worked with you at Long Island College Hospital?
A Yes.
Q And when I say "worked with you," she worked as a radiologist in the department when you were the chair of the department at LICH, correct?
A Yes.
Q How long had Dr. Scott worked for you as a radiologist at LICH?
A Maybe approximately three years.
Q And when was it that you just decided to appoint her to be director of ER radiology? I'm not asking when she started work. I'm asking when you decided you wanted her as the ER radiology chief.
A You already asked me that question.

Page 120

REEDE
Q Okay. Forgive me. I'm sorry. I thought I asked a different question. What was the answer?
A On or around July of 2014.
Q Is that because you had determined to nonrenew Dr. Areman?
    MR. COULSTON: Object to the form.
A Well, when I decided to nonrenew Dr. Areman, I had to put somebody in that position.
Q So that's a yes?
A Yes.
Q And when did you decide not to renew Dr. Areman?
A I don't remember the exact date.
Q Tell me how you went about replacing Dr. Areman with Dr. Scott. What did you do?
A I looked at the people that were available for the position already on staff, and it basically boiled down to the two possibilities would either be Dr. Greenberg or Dr. Que Chen.
Q Okay. And then what did you do?
A Then I had to look at, you know,

Page 141

REEDE

1 made earlier?
2 A  I don't recall.
3 Q  When you say "availability," are you
4 referring to the same things as I just
5 mentioned with Dr. Chen, or was there something
6 different than I've just described that you
7 mean by "availability"?
8 A  You would have to explain that.
9 Q  There were also issues with time and
10 attendance by Dr. Chen and Dr. Greenberg?
11 A  Right.
12 Q  So now we've talked about Dr. Chen.
13 We've talked about time and attendance. I'm
14 asking, since you distinguish between time and
15 attendance and availability, I'm asking, did
16 you mean something different when you said
17 "availability" from what you meant when you
18 said "time and attendance"?
19 A  So I would say availability refers to
20 if you were scheduled to be at a place on the
21 schedule, and you're supposed to work during
22 that time period, that you should be available
23 unless there are other -- unless you're at --
24 let's say doing a conference, either in another

Page 142

REEDE

1 department, you're teaching the residents or if
2 you went to get lunch.
3 Q  And you're saying that was the not
4 the case for Dr. Chen? He was not available
5 except for those reasons?
6 A  There were other instances when he
7 was not available.
8 Q  Okay. And is that the same thing as
9 you were referring to in terms of him
10 disappearing?
11 A  Yes.
12 Q  Okay. Now, let's talk about
13 Dr. Greenberg. Did you mean to say there were
14 time and attendance and availability issues for
15 Dr. Greenberg as well?
16 A  Yes.
17 Q  And that those entered into your
18 consideration when you were determining who to
19 make ER radiology chief?
20 A  Yes.
21 Q  What were the time and attendance
22 issues with Dr. Greenberg?
23 A  Not reporting to work on time.
24 Again, availability, sometimes not being

Page 143

REEDE

1 available when they -- when he was supposed to
2 be in the emergency room and the residents
3 would be looking for him, and they didn't know
4 where he was.
5 Q  Anything else?
6 A  Time and attendance. Also, one time
7 I spoke to him about the recording on his time
8 sheets to make sure they were accurate.
9 Q  Anything else?
10 A  I believe that's it.
11 Q  Okay. Let's take these one at a
12 time. You said you spoke to Dr. Greenberg once
13 about time sheet accuracy. Was that a
14 disciplinary conversation?
15 A  No. It was just noted that there was
16 a discrepancy on the time sheet, and I just
17 wanted to bring it to his attention.
18 Q  Okay. And what prompted you to
19 notice that and to want to bring it to his
20 attention?
21 A  There's an employee that is the
22 timekeeper that is in charge of all of the time
23 sheets to ensure accuracy that people are --
24 that people are reporting the time correctly.

Page 144

REEDE

1 Like, if you were on vacation, you put it down
2 as vacation; if it's a comp time, you put it as
3 comp time; if it's sick time, you put it as
4 sick time; and then if you -- if you're
5 supposed to be there from a certain time, and
6 you put down some time other than that. So
7 there was a discrepancy.
8 Q  Right. And how did that come to your
9 attention?
10 A  Linda McMurren brought it to my
11 attention.
12 Q  Is she the timekeeper you were
13 referring to?
14 A  Yes.
15 Q  Miss McMurren, what is her position?
16 A  She's one of the clerical staff in
17 the department.
18 Q  Is she your secretary?
19 A  She's one of my assistants.
20 Q  One of your assistants. Okay. But
21 she works directly for you?
22 A  Yes.
23 Q  Okay. And is she in the same
24 position now as she was during this time frame

**Page 145**

1 REEDE
2 we're talking about: 2013, 2014?
3 A Yes.
4 Q Now, when you say she's the
5 timekeeper, is she responsible for -- well, let
6 me not ask it that way.
7 What is her responsibility as
8 timekeeper?
9 A She -- you know, when the chief of
10 staff at the County and the chief of staff at
11 University Hospital give her the work
12 schedules, she's responsible for making sure
13 they're all imported into the schedule
14 correctly; all of the requests for time off,
15 you know, the permission slips, after they're
16 signed, are given to her; if you call in
17 sick -- if you're going to call in sick, you
18 have to notify her; if it was on the Downstate
19 side, it would be me; and send her either --
20 usually most people will send her an E-mail or
21 call in and let her know that they're not
22 coming. So she just makes sure that everything
23 matches.
24 Q Is she somehow an official
25 timekeeper, or is that sort of an informal

**Page 146**

1 REEDE
2 function she has?
3 A I guess that's an informal function.
4 Q Do you rely on what she does in terms
5 of keeping time-related records?
6 A Yes. They go to the State.
7 Q Well, I'm asking you, do you
8 personally rely on what she tells you as being
9 accurate reflections of what, in fact, was
10 going on with time and attendance?
11 MR. COULSTON: Object to the form.
12 A She would present documentation to
13 verify whatever she is saying.
14 Q And have you had occasion to doubt
15 the accuracy of what she has told you or
16 presented to you in terms of time and
17 attendance on any occasion?
18 A No.
19 Q So, since you've been at Downstate,
20 has she been in that role?
21 A Yes.
22 Q And from the time you first came to
23 Downstate to today, you're saying you've not
24 had occasion to question either what she told
25 you or what she was -- records she -- the

**Page 147**

1 REEDE
2 accuracy of records she was keeping regarding
3 time and attendance?
4 MR. COULSTON: Object to the form.
5 A Can you repeat that?
6 MR. NELSON: Would you read it back?
7 (Record read.)
8 A No problems.
9 Q Was there anyone else who performs
10 that function, or is she the person exclusively
11 responsible for it?
12 A She's the person.
13 Q And has she reported directly to you
14 since you came to Downstate?
15 A Yes.
16 Q Now, when you spoke to Dr. Greenberg
17 about whatever his time sheet reflected on
18 that, was that one occasion or more than one
19 occasion?
20 A That was one occasion.
21 Q And was it with regard to one time
22 sheet or more than one time sheet?
23 A One time sheet.
24 Q And how did that issue with that time
25 sheet come to your attention? Was that

**Page 148**

1 REEDE
2 Ms. McMurren brought it to your attention, or
3 did you learn of it some other way?
4 A Miss McMurren brought it to my
5 attention.
6 Q Did she tell you why she was bringing
7 it to your attention?
8 A She said, "I just want you to see
9 that Dr. Greenberg has this notation in his
10 time sheet that's not correct."
11 Q Okay. So you then met with
12 Dr. Greenberg?
13 A Yes.
14 Q Okay. And when you did that, tell me
15 what you said to him and what he said to you.
16 A He was receptive. I told him, you
17 know, just to be careful about the accuracy and
18 reporting of your time, because you don't want
19 it to be perceived as, you know, theft of
20 service. So just make sure that you keep your
21 time sheets correctly.
22 And I -- we had -- I had spoken to
23 the person in charge of the affiliation
24 agreement, because he had already signed it and
25 everything, and I just spoke to Leo Johnson and

Page 149

REEDE

said, "Would it be okay if I just leave it as it is so that -- you know, that there would be no problems in the future?" And I said, "I know that there are some times when he might stay late, so I'm really not going to penalize somebody for this. I'm not going to report them to HR. I'd just like to, you know, just bring it to somebody's attention."

And we did have HR come in and speak to the faculty -- I can't remember exactly when -- on this whole issue of time and attendance and truth in reporting. So it was something that had been discussed with the entire department by HR.

His comment to me at one point was, "Well, all of the films are read."

And I said, "Well, that is not really the issue, all of the films are read, because you're also supposed to be there for other reasons other than to read films. You know, we're supposed to be there to supervise residents, to have consultations with the clinicians. And so I really need you to be there when you're supposed to be there."

Page 150

REEDE

Q  How would you characterize the nature of this conversation? Was it friendly? Was it formal? Was it disciplinary? How would you characterize it?

A  No. I think it was, just, you know, formal, just to make note that there was a problem on the time sheets. I just wanted to bring it to his attention and also just to say, again, that, you know, "Just be mindful of the fact that we have to be where we're supposed to be."

I did also mention that, you know, we are -- we could potentially have audits from the County. Sometimes the County can send people up to make sure people are where they're supposed to be. And so if I have a number of staff members that are not where they're supposed to be, we might have problems with our affiliation agreement.

Q  Did you bring this occasion that you spoke to Dr. Greenberg about to the attention of HR --

A  No.

Q  -- or labor relations?

Page 151

REEDE

A  No.

Q  If it had been disciplinary in nature, would you have been obliged to do that?

A  Well, I think that, you know, when you're dealing with faculty, you would like first to inform somebody of what a problem is besides just taking them straight over to HR. I mean, otherwise, I'd be inundating them with people every time I call in somebody to tell them a little of this or that.

I mean, it was just a case of -- you know, I mean, you could fill out your time sheet, and we just want to say, "Just be mindful of the time that you're putting down, be honest about the time, because, you know, if there's some sort of an audit, I don't want it to be a problem."

So, I mean, if it -- you know, this is the first time I had called him in about anything.

Q  Okay. And was this the -- was this one of several times that you spoke to him about a time sheet issue, or were there more than one?

Page 152

REEDE

A  This is the only time sheet issue I had.

Q  Okay. You also, I think, mentioned with regard to Dr. Greenberg a few minutes ago that he was not available, that at some point he was not available when he was supposed to be in the ER. Can you tell me what you meant by that?

A  Like when you're the person that's on covering, you should be in the emergency room available to the ER physicians and to the residents working there. And, you know, residents had complained that sometimes he's not there. One resident even said that, "Oh, he goes home to eat dinner with his family and then comes back."

Q  And who was that?

A  I can't recall, but that was one of the comments that was made.

Q  When was it that that resident made that comment?

A  I can't recall.

Q  Was it before or after you had this conversation with Dr. Greenberg about his time

Page 261

REEDE

Q When did you request that that be done?
A I don't recall.
Q Why did you request that that be done?
A It's standard operating procedure in most radiology departments.
Q Had it not been happening prior to your request?
A It had not been happening.
Q Okay. So you were basically asking Dr. Pulitzer to commence that practice; is that right?
A Yes.
Q And what purpose would knowing how many cases physicians in your faculty were reading have for you?
A It would tell you about the productivity in the department. It would also give you some indication as to whether you needed to hire more staff. And if you're looking at the times the cases are read, it would also help you if you're going to

Page 262

REEDE

rearrange the schedule. So that's the reason why everybody keeps that.
Q But you could, with the existing systems in place, request that information at any given time, could you not?
A Yes.
Q My question is, why would you request that that happen on a regular basis as opposed to simply requesting the information about how many cases were read when you had a particular purpose for that information?
A No. We're provided with that information on a daily basis. Every place I know gets that information on a daily basis, and that's something that the people that are running the department look at or should be looking at on a daily basis.
Q And what was the request you made of Dr. Pulitzer in that regard? Was it for weekly reports, daily reports, do you recall?
A It should be -- you should aim to have them daily.
Q So you would know -- or Dr. Pulitzer would know on an everyday basis how many cases

Page 263

REEDE

each physician was reading, correct?
A Yes.
Q And doctor -- and that would be for all members of your faculty who were at KCH, correct?
A Yes.
Q Because Dr. Pulitzer was the chief of the radiology service at that time, either on an interim or on a deputy basis, correct?
A Yes.
Q Okay. Was there a concern on your part at some point in time that physicians at KCH on your faculty were not reading a sufficient number of cases on a daily basis?
A There were times -- there were questions about turnaround times with the readings. So this is one way of looking to see how many films people are reading.
Q Right. But what I'm asking is, were you -- did you have a concern at some point in time that there were physicians, radiologists, on your faculty who were not reading a sufficient number of cases on a daily basis?
A I can't really comment on that unless

Page 264

REEDE

I have that information. This is, as I said, standard operating procedure in radiology departments. The person that's in charge is provided with this information on a daily basis.
Q At any time while you and Dr. Greenberg were both employed at Downstate, was there ever an issue with the number of cases Dr. Greenberg was reading on a daily basis?
A Not to my knowledge.
Q You seem pretty certain of that. Can you tell me why?
    MR. COULSTON: Object to the form.
    You can answer.
A Because he's known as a high-volume reader, so I mean, I wouldn't be -- you know, that's why.
Q And how was his accuracy?
A Very good accuracy.
Q Do you know the difference between a salaried and a non-salaried appointment as those terms are used either at Downstate or KCH?

Page 281

REEDE

Q How were you involved in all of that?
A I received a phone call from Dr. Pulitzer telling me about the situation and that when he told Dr. Greenberg that he couldn't cover, that he could not -- he could not take the time because he didn't have the coverage available. Then Dr. Greenberg told him that he was going to take the time and that he was going to do what he was going to do and that Dr. Pulitzer could do what he wanted to do.
Q This is what was reported to you by Dr. Pulitzer?
A Yes.
Q And when was this reported to you by Dr. Pulitzer?
A I don't recall exactly what time.
Q Well, was it on the same day that this issue arose, or was it some subsequent day?
A Same day.
Q What did doctor -- why was Dr. Pulitzer involving you? Was he asking you to do something, or was he asking whether he

Page 282

REEDE

should do something? Why did he involve you?
A Well, as the chairman of the department, I guess he was seeking my advice, "What do I do if I have an employee that's being outright insubordinate?"
Q I see. And is that how Dr. Pulitzer characterized Dr. Greenberg, as being outright insubordinate?
A No. But, I mean, based on what I'm told, that's how I would see it, as insubordination.
Q Did Dr. Pulitzer tell you why Dr. Greenberg wanted that time off?
A No.
Q Did you ask him that question?
A No.
Q Why not?
A Because if he had told me what it was for -- if it was anything other than, you know, a day off to -- you know just a routine day off, I would assume he would have mentioned it to me, but he did not.
Q Who, Dr. Pulitzer?
A Yes.

Page 283

REEDE

Q Okay. But what I'm saying is, did you have -- did you -- in this -- when doctor -- withdrawn.
  When Dr. Pulitzer informed you of this, did he do it by phone or face-to-face or some other way?
A Phone.
Q Okay. So he called you. Where were you, and where was he when he called you?
A I was in my office. I don't know where he was.
Q Was he working or was he on vacation or was he calling you from outside the hospital or --
A I don't recall.
Q Okay. And when you say he was seeking your advice, what did he ask you?
A "What should I do?"
Q And what did you tell him?
A I told him I would call HR and find out what they're going to recommend that you do in this case.
Q So you referred him to HR?
A Yes.

Page 284

REEDE

Q Okay. Did you ask him if he had asked Dr. Greenberg why he, meaning Dr. Greenberg, needed the time off?
A No.
Q Did you consider that to be relevant?
  MR. COULSTON: Object to the form.
A There are forms that we've asked people to fill out if they want time off. So if you fill out the forms and you indicate on the form why you need the time off, then there is no question at any date as to why you were asking for the time.
  No one said anything about it was needed for anything other than what I would call a routine day off. So if it was anything that was more than that, I would assume that somebody would have brought that to my attention.
Q Okay. Now, you say there was a form to fill out when you were requesting time off that provided for you to indicate the reason, correct?
A Yes.
Q Would you recognize that document if

Page 321

REEDE

Q Did you review any other documents when you weren't with Mr. Coulston or Mr. Versfelt?
A Not really.
Q What does "not really" mean?
A No. I mean, I wasn't -- you know, I may have looked at -- you know, I just -- I may have looked at -- may have looked at some of the things of the ACGME, like that. But, I mean, not really looking at anything of substance. I didn't go through all of these documents like this.
Q When you say "the ACGME," you mean the report of the ACGME?
A Yes.
Q So you believe you consulted that prior to your deposition here today?
A Yes. I mean, I have to look at it all the time because I always have another site visit coming, so...
Q Fair enough. But in your connection with your deposition here today, you also consulted it?
A I just reviewed it.

Page 322

REEDE

Q Is there any other document you recall looking at?
A No.
Q How about from Mr. Coulston or Mr. Versfelt, did they show you any documents?
A Basically the same ones I just discussed.
Q What does "basically" mean?
A Well, it means that those are the ones that I recall seeing that they showed me.
Q Do you recall seeing any others --
A No.
Q -- from them that you hadn't had yourself?
A No.
Q And it's your testimony that you have not reviewed the transcript of the interrogation that Mr. Arabian conducted of Dr. Greenberg?
A No, I have not. I didn't even know we were allowed to do that, so ...
Q Okay.
A Nobody has ever told me.
  MR. COULSTON: It's not a question.

Page 323

REEDE

Just answer the question.
Q Did Mr. Arabian ever tell you anything that was recorded or appears in the transcript from that interview or interrogation?
A Not that I recall.
Q Did you -- have you subsequently learned that a reason was inquired of from Dr. Greenberg or offered by Dr. Greenberg as to why he had needed the leave on the 4th and 5th of September?
A I don't recall.
Q Okay. Sitting here today, are you aware of any such reason?
A No.
Q Is it your testimony that no one has ever shared a reason with you that Dr. Greenberg conveyed or that there may have been such a reason conveyed and you just don't recall?
A I don't recall any reason for why he wasn't there.
Q Do you know who Jayden Greenberg is?
A His son.

Page 324

REEDE

Q And you're aware that Dr. Greenberg has one child or more than one?
A I believe two.
Q And did you -- when did you learn that Dr. Greenberg had children?
A I think one day he was over in the office filling out time sheets and in passing he was saying he had two sons.
Q Okay. Have the two of you ever had occasion to discuss your children with each other?
A Not really.
Q You have children?
A I have one.
Q Okay. How old?
A Thirty something. It's not a child.
Q Well --
  MR. COULSTON: If he's living at home, he is.
  MR. NELSON: Off the record.
  (Discussion held off the record.)
Q Have you ever discussed with Dr. Greenberg either Jayden or his other child?
A I think once in passing he mentioned

Page 325

1  REEDE
2  that the one son had some special needs.
3  Q  Okay. And that's Jayden?
4  A  I believe, yes.
5  Q  And what were the nature of the
6  special needs, if you recall?
7  A  I did not inquire.
8  Q  Okay. This was while the two of you
9  were both working at Downstate?
10 A  No. He was -- he had come over one
11 day, and then we were just talking.
12 Q  Right. Right. But what I'm saying
13 is, this occasion when you learned that he
14 had -- that his son Jayden had special needs,
15 that is while you were both employed at
16 Downstate, correct? He was still working
17 there?
18 A  Yes.
19 Q  And what was the conversation between
20 the two of you as best you can recall?
21 A  No. He just mentioned it, and then
22 we moved on.
23 Q  Did he specify with you or say
24 anything about the nature of the special needs
25 that Jayden had?

Page 326

1  REEDE
2  A  No.
3  Q  How about his condition?
4  A  No.
5  Q  How about any diagnosed disorder that
6  he had?
7  A  No.
8  Q  Did you ever ask?
9  A  No.
10 Q  Did it later come to your attention
11 what the nature of Jayden's special needs were?
12 A  No.
13 Q  Did you ever inquire of anyone what
14 they were?
15 A  No.
16 Q  Now, after the letter, as you call
17 it, what's been marked as Exhibit 16, was
18 shared with you, what happened next in
19 connection with this matter --
20 A  Nothing.
21 Q  -- to your recollection?
22 A  Dr. Greenberg went back to work.
23 Q  And did everything proceed thereafter
24 without incident?
25    MR. COULSTON: Object to the form.

Page 327

1  REEDE
2  A  I believe there was -- as far as --
3  there was -- I don't know if there was anything
4  else between then and another issue with
5  signage on reports.
6  Q  Okay. What do you mean by an "issue
7  with signage on reports"?
8  A  The attestations affixed to the
9  reports.
10 Q  Okay. We were talking about cases,
11 the reading of cases?
12 A  No. It's when you sign off on a
13 report that was dictated by a resident.
14 Q  And that's something that
15 radiologists routinely do?
16 A  Yes.
17 Q  And what was the issue regarding
18 that?
19 A  The standard attestation that was
20 approved by the compliance department at Kings
21 County Hospital was not used.
22    MR. NELSON: All right. Before we
23 explore that further, let's make this
24 Exhibit 17.
25    (Reede Exhibit 17, Document Bates

Page 328

1  REEDE
2  stamped HHC 1529-1531, marked for
3  identification.)
4  Q  Dr. Reede, do you recognize -- well,
5  let me just say, for the record, what's been
6  presented to you by the reporter has been
7  marked as Exhibit 17 for identification?
8  A  Yes.
9  Q  This document bears HHC 1529 and
10 1531. Do you have that?
11 A  Yes.
12    MR. NELSON: And before you even ask,
13 I don't know why HHC 1530 is not also part
14 of this exhibit. But I'm only interested
15 in the E-mail on the first page of the
16 exhibit.
17 Q  Dr. Reede, is this a document you
18 received -- an E-mail that you received on or
19 about September the 15th, 2014, at
20 approximately 2:47 p.m.?
21 A  Let me read it, because, you know,
22 sometimes I don't even open all of the E-mail.
23 Q  Sure.
24 A  Okay.
25    MR. NELSON: Would you be kind enough