26

1

## STATEMENT OF ODED GREENBERG

2

### Taken on September 8, 2014

3

**Present: Michael Arabian - Senior Personnel Associate, Labor Relations (MA)**
**Oded Greenberg – Clinical Assistant Professor of Radiology (OG)**

4

5

MA:    Good afternoon.  Today is Monday, September 8, 2014.  This is the interrogation

6

7

of Dr. Oded Greenberg.  Interrogation is being recorded.  My name is Michael

8

Arabian, Senior Personnel Associate, Labor Relations.  Also in the room is?

OG:    Oded Greenberg, MD.

9

MA:    Okay.  And, Dr. Greenberg, have you ever been interrogated before?

10

OG:    No.

11

MA:    Okay.  I—I provide you the Statement of Rights Letter, Article 19 of the UUP

12

13

Contract.  You had the opportunity to review and read that?

OG:    Yes, I did.

14

MA:    Okay.  And you are electing to represent yourself, is that correct?

15

OG:    Yes, I am.

16

MA:    Okay.  So if at any time—as I mentioned before, you certainly have the right to

17

18

represent yourself, but at any time you decide you do want to have a

19

representative, just let me know, we'll stop the interrogation at that point and go

20

forward.

OG:    Okay.

21

MA:    You did read and sign the Statement of Rights Letter where you're electing to

22

23

represent yourself, correct?

OG:    I did.

24

25

**SUNY 001280    CONFIDENTIAL**

MA:   And your signature is there on September 8, 2014, today.                                        1

OG:   Correct.                                                                                         2

MA:   Okay.  I will be asking you a series of questions that you're required to respond                3

truthfully to.  Questions that I'll be asking you may subject you to disciplinary                      4

charges.    This is an investigation into absence—absences, failure to follow                          5

supervisors' directives, the outcome of those absences and the impact, et cetera.                      6

Again, your failure to cooperate with the investigation, meaning provide truthful                      7

responses, may result in your being charged with failing to cooperate with an                          8

administrative investigation with possible penalties ranging from a letter of                          9

reprimand to termination from state service.  That's separate from what we're here                     10

initially about.    Meaning, if you're asked a question, you need to respond                            11

truthfully.                                                                                             12

OG:   Okay.                                                                                             13

MA:   If—if you don't, then there's other charges that can be filed besides what the                   14

investigation is about with the absences.                                                              15

OG:   Okay.                                                                                             16

MA:   Okay.    So interrogations are done in question-answer; I will ask you the                       17

questions.  Provide the answers.  At times, if you feel that there's important part                    18

that question doesn't entail, raise it.  If we can stay on track, we will.                             19

OG:   Okay.                                                                                             20

MA:   If it gets off to a tangent, I'll try to focus on the questions that I have and then             21

you'll have the opportunity to say what you'd like at the end.                                          22

OG:   Okay.                                                                                             23

MA:   Okay.  So, just for the record, please give your name, title and department.                     24

OG:   My name is Oded Greenberg, MD.  I am a clinical assistant professor of                           25

| | | |
|---|---|---|
| | radiology. | 1 |
| MA: | Okay. How long have you been employed at Downstate? | 2 |
| OG: | With residency and— | 3 |
| MA: | Yeah. Your—your initial start date at Downstate. | 4 |
| OG: | Well, I went to medical school here, started in 1981. | 5 |
| MA: | Okay. And then you became an employee at Downstate? | 6 |
| OG: | I was a resident in both pathology and radiology for approximately 10 years. | 7 |
| MA: | Okay. | 8 |
| OG: | And then I came back here as an attending in 2001. | 9 |
| MA: | Okay. | 10 |
| OG: | And I've been an attending physician here for most of that time. I took a two-year | 11 |
| | hiatus— | 12 |
| MA: | Okay. | 13 |
| OG: | —and worked at teleradiology. | 14 |
| MA: | Okay. And how long have you worked in your department now? | 15 |
| OG: | At least 11 years now, I think. | 16 |
| MA: | Okay. Who is your immediate supervisor? | 17 |
| OG: | Currently, the acting director is Steven Pulitzer, MD. | 18 |
| MA: | Okay. And how long has he been your supervisor for? | 19 |
| OG: | He's only recently become the acting supervisor after Alan Kantor was fired. | 20 |
| MA: | Okay. And what is your schedule? | 21 |
| OG: | My schedule has varied over time. It's not been the same set of hours— | 22 |
| MA: | Okay. | 23 |
| OG: | —all the time. | 24 |
| MA: | What is it currently? | 25 |

**SUNY 001282**          **CONFIDENTIAL**

OG:   It's not been told to me actually.                                                    1

MA:   So your schedule has not been told to you.                                           2

OG:   I, originally, was supposed to have a schedule between 9:30 and 5:30—                 3

MA:   Okay.                                                                                 4

OG:   —but things have changed.  We have a new chairman, a new director and I'm not         5

      sure what the schedule is.  I think I'm on our schedule as 9 to 5.                    6

MA:   Okay.                                                                                 7

OG:   I occasionally have, to the benefit of the department, have come in later and        8

      stayed later, always working at least eight hours a day.                             9

MA:   Okay.                                                                                10

OG:   I've stayed later because the person who's on between 4 and 12 is being asked to     11

      read too many cases and I've stayed later to help him out.                           12

MA:   So is—                                                                              13

OG:   So, in recent weeks, over the summer, when my kids are at school—or my kids          14

      are not at school, I've been coming in somewheres around 10-10:30 and staying        15

      'til 6:30.                                                                           16

MA:   Okay.                                                                                17

OG:   Or 7 if I've come in a little bit later than that.                                   18

MA:   And your understanding is that you do not have a start time or an hours that you      19

      should—                                                                             20

OG:   It hasn't been discussed specifically with me.  I know that in the past they wanted  21

      me to come in later, specifically for this reason, and that's the schedule that I've 22

      adhered to.   Except during the school year when I have to leave earlier for my      23

      kids, so I come in earlier and leave by 5.                                           24

MA:   So, during the school year, you work—you leave at 5?                                 25

**SUNY 001283     CONFIDENTIAL**

OG:     Essentially, I leave at 5, yes.                                                                    1

MA:     Okay.  And the summer you change your—                                                            2

OG:     In the summer I have taken it upon myself to come in a little bit later because we                 3

         need help later on in the day.                                                                    4

MA:     Okay.  Has anyone authorized that or told you to do so?  You said you took it                      5

         upon yourself.                                                                                     6

OG:     Nobody told me to do so.  The department's covered otherwise, if I come in late it                 7

         really doesn't make any difference.  I stay a little bit later.  I've been keep—                  8

         adhering to a schedule between, say, 10 and 11 and 6 and 7 in the evening.                        9

MA:     Okay.  Do you think that you have the authority to make that schedule or is there                  10

         any—                                                                                              11

OG:     Well, do I have the authority?  I don't believe I have the authority, but my primary               12

         responsibility is patient care and I feel that I have the moral authority to do so if I            13

         feel the department is failing to—to take care of their patients.                                 14

MA:     Have you expressed that concern to your supervisor or director?                                    15

OG:     I've discussed this with my director, yes.                                                         16

MA:     And who is that?                                                                                    17

OG:     Steven Pulitzer, MD.                                                                               18

MA:     Okay.  And what was his response?                                                                  19

OG:     Well, he's recently told me that the chairperson wants me to adhere to set hours.                  20

MA:     Okay.  And what are those set hours?                                                               21

OG:     And that is—again, they didn't specify, but I'm assuming it's 9 to 5 as written on                 22

         the schedule.                                                                                      23

MA:     Okay.  And you said he recently told you, when was that?                                           24

OG:     That the chairperson was concerned about my hours varying and coming in later.                     25

**SUNY 001284**        **CONFIDENTIAL**

|  | So I was told that I needed to come in at regular hours and keep to those hours. | 1 |
| MA: | And when did he tell you that? | 2 |
| OG: | That was about a week ago, I believe. | 3 |
| MA: | Okay. And, in the last week, did you adhere to those hours? | 4 |
| OG: | In the last week, I wrote back to the chairperson and to him telling him the reasons that I was doing that and there was only a couple of days in between after Labor Day. So, those two days, I did—I didn't come in earlier. I came in around 10:30 I think, or something like that, and I stayed a little bit later. | 5 6 7 8 |
| MA: | Okay. And you think Mister—or Dr. Pulitzer— | 9 |
| OG: | Mm-hm. | 10 |
| MA: | —told you the—this hour schedule when? You said a week or so— | 11 |
| OG: | It was about a week ago. So I think there may have been three or four days in between then. | 12 13 |
| MA: | Okay. | 14 |
| OG: | I—I promised him that I would return to a regular schedule as the school year started, which is this week. | 15 16 |
| MA: | And did he say that that was okay or did he give— | 17 |
| OG: | He never responded to my e-mail about it. I wrote him an e-mail. | 18 |
| MA: | Okay. So— | 19 |
| OG: | So— | 20 |
| MA: | —it was an e-mail that you sent. | 21 |
| OG: | Mm-hm. | 22 |
| MA: | And that was directly to him or was there anyone else on the— | 23 |
| OG: | To him and the chairperson was cc'd on that. | 24 |
| MA: | Okay. And neither party responded? | 25 |

       CONFIDENTIAL

| | | |
|---|---|---|
| OG: | No. | 1 |
| MA: | Okay. Now, confirm for the record your mailing address, please. | 2 |
| OG: | My mailing address is 150 Myrtle Avenue, Brooklyn, New York 11201. | 3 |
| MA: | And you did receive paperwork from Labor Relations? | 4 |
| OG: | I did not receive it 'cause I didn't— | 5 |
| MA: | Okay. | 6 |
| OG: | I—I didn't check the mail today. I wasn't notified that I had received any mail by our desk person, so I didn't—I received this from Steve Pulitzer today. | 7, 8 |
| MA: | Okay. So you received nothing in your—through the mail? | 9 |
| OG: | Not that I know of. | 10 |
| MA: | At your home? | 11 |
| OG: | It might be there, at home, but I didn't know anything about it. | 12 |
| MA: | Okay. But on that letter, that is the correct address? | 13 |
| OG: | It is the correct—yes, that is the correct address. | 14 |
| MA: | Okay. And your responsibilities here? | 15 |
| OG: | My responsibilities are primarily to read various X-rays, CTs, sonos, MRIs in the emergency room for emergent patients and occasionally cover other services such as body imaging. My secondary responsibility is to provide education to our residents. | 16, 17, 18, 19 |
| MA: | Okay. So when was the last day that you worked? | 20 |
| OG: | Last Wednesday. Well, I actually worked today, before I knew anything about this. I was actually at Kings County in the emergency room. | 21, 22 |
| MA: | Okay. | 23 |
| OG: | And then I was told by Steve Pulitzer that I wasn't supposed to and I signed off and I came over here. | 24, 25 |

**SUNY 001286**    **CONFIDENTIAL**

| | | |
|---|---|---|
| MA: | Okay. | 1 |
| OG: | Prior to that, it was last Wednesday. | 2 |
| MA: | Okay. So Dr. Pulitzer wrote a letter. It's dated—actually, he wrote two letters. | 3 |
| | I'll read the one that's dated September 5th first and then I'll read the one that's | 4 |
| | dated September 3rd. The one on September 5th says; "regarding Oded | 5 |
| | Greenberg, MD, to whom it may concern, Dr. Greenberg was scheduled for two | 6 |
| | weeks of vacation in August, August 11th-22nd 2014." Was that correct? | 7 |
| OG: | Yes. Originally, I was scheduled for that. | 8 |
| MA: | Okay. "Dr. Greenberg contacted me during the week of August 11, 2014 to | 9 |
| | request a change in his vacation schedule." | 10 |
| OG: | That's correct. | 11 |
| MA: | Okay. "He requested to return to work the week of August 18th-22nd and take | 12 |
| | the following week, August 25th-29th, for vacation." | 13 |
| OG: | Correct. | 14 |
| MA: | And Dr. Pulitzer said that "I agreed." So he agreed to that? | 15 |
| OG: | Yes. | 16 |
| MA: | Okay. "I instructed him to complete necessary paperwork for the change." That's | 17 |
| | what Dr. Pulitzer said. | 18 |
| OG: | He might have. I don't recall. | 19 |
| MA: | Okay. Then he's saying that he—"I was on vacation the week of August 25th- | 20 |
| | 29th. Dr. Hammill," H-A-M-M-I-L-L, "who was in charge of my absence, | 21 |
| | informed me that Dr. Greenberg was absent on Monday, August 25th." Were you | 22 |
| | absent on August 25th? | 23 |
| OG: | Was that the week that I had asked to take off? | 24 |
| MA: | Yes. | 25 |

**SUNY 001287**    **CONFIDENTIAL**

OG:    Yes, I was absent on that Monday and then I worked the rest of the week because    1

my vacation plans didn't work out.    2

MA:    Okay. But you requested to work the 25th. You requested to be off the 25th to    3

29th.    4

OG:    Right.    5

MA:    So you—    6

OG:    I took off the one day and then I worked the rest of the week.    7

MA:    Okay. And why did you report to work—you—from what I'm reading, you were    8

scheduled on vacation that week?    9

OG:    Right. I was scheduled on the vacation that week.    10

MA:    Okay.    11

OG:    But, my vacation plans didn't work out, so there was no point to me taking the    12

time off and just sitting at home. So I came back to work.    13

MA:    Okay. Did you contact anyone or get approval to come back to work or—'cause,    14

again, what most—most—I can speak for myself; if you're scheduled off, they're    15

not expecting you in—    16

OG:    Mm-hm.    17

MA:    —and then if you come in there's—in essence, should be someone there that was    18

going to do the job that you were going to do 'cause you weren't going to be there.    19

So it actually can make two people there or can—it's a possibility of that and just,    20

if they're not thinking that you're to be there, to come to work on a day that is    21

supposed to be a day off for your vacation.    22

OG:    I informed Dr. Hammill—was informed that I was there so that he can tell the    23

person coming in later from 4-12 not to come in early. In other words, that person    24

was supposed to come in early 'cause I wasn't around.    25

**SUNY 001288**      **CONFIDENTIAL**

MA:     Mm-hm.

1

OG:     And so I had him inform this person to not come in early, to come in at his regular

2

time.

3

MA:     Okay. But the—again, "he reported to work on Tuesday to Friday, August 26th-

4

29th," and you agree that that occurred?

5

OG:     Yes.

6

MA:     You reported the 26th to the 29th?

7

OG:     Yeah, I did.

8

MA:     "His hours were not his standard hours of 9AM-5PM." So I guess Dr. Pulitzer is

9

under the impression those are your standard hours?

10

OG:     I guess those are the standard hours on the schedule, yes, and I probably worked

11

those—the hours that I told you earlier.

12

MA:     Okay.

13

OG:     10:30-6:30, or something like that.

14

MA:     He also said "he did not"—this is Dr. Pulitzer, "he did not discuss the schedule

15

change with me at any time. At no time did I give permission to Dr. Greenberg to

16

create his own schedule during that week."

17

OG:     That's probably true.

18

MA:     Okay.

19

OG:     I might have e-mailed him about it. I don't recall right now.

20

MA:     Okay.

21

OG:     I didn't think that that was disruptive in any way to the department for me to work

22

a week that I was supposed to take off, but I realize that, you know, perhaps I

23

probably should have been more communicative about it.

24

MA:     Okay.    Then, still the same letter, "on Tuesday September 2nd 2014, Dr.

25

**SUNY 001289**        **CONFIDENTIAL**

|     |                                                                                      |     |
|-----|--------------------------------------------------------------------------------------|-----|
|     | Greenberg came to my office and requested time off, September 3rd to the 5th          | 1   |
|     | 2014. Due to the operational needs of the department, I denied his request."          | 2   |
| OG: | That's true.                                                                         | 3   |
| MA: | Okay. "And then on Wednesday September 3rd 2014, Dr. Greenberg came to my             | 4   |
|     | neuroradiology reading room and informed me that he would not be reporting for        | 5   |
|     | duty on Thursday and Friday, September 4th and 5th 2014." Did you do that?            | 6   |
| OG: | That is true.                                                                         | 7   |
| MA: | Okay.                                                                                | 8   |
| OG: | I had to choose my family over the hospital. I have a child with special needs and   | 9   |
|     | he was kicked out of his school and he was to attend a new school and I had to       | 10  |
|     | spend time with him.                                                                 | 11  |
| MA: | Okay. He—this is what, again—"he stated out of respect for me, he wanted to let      | 12  |
|     | me know that he could not be in so that I could arrange coverage in his absence."    | 13  |
|     | And then Dr. Pulitzer said "I informed him that I cannot authorize his time off.     | 14  |
|     | He acknowledged stating that he will take full responsibility for his actions."      | 15  |
| OG: | That's absolutely true.                                                              | 16  |
| MA: | Okay.                                                                                | 17  |
| OG: | I could well have just called in sick the next day. I chose to think of the          | 18  |
|     | department and the patients before my own needs and I wanted to inform him in        | 19  |
|     | advance that I wouldn't be there. And so that he could make preparations ahead       | 20  |
|     | of time so the department could be covered.                                          | 21  |
| MA: | Okay. And then "on Wednesday September 3rd, shortly after his discussion, he         | 22  |
|     | informed the department chair and then they prepared a letter."                      | 23  |
| OG: | Mm-hm.                                                                               | 24  |
| MA: | For you?                                                                             | 25  |

**SUNY 001290          CONFIDENTIAL**

| | | |
|---|---|---|
| OG: | Yes. | 1 |
| MA: | And you did receive a letter? | 2 |
| OG: | Yes, I did. | 3 |
| MA: | Okay. And you did not report to work on September 4th and 5th. | 4 |
| OG: | I did not, however, circumstances had changed that—that morning. My mother-in-law came from out of town to be with my son and I had initially planned to take the day off, but I—I—I was gonna come in, I rolled out of bed and I—and I stretched my back out and I've been in pain and not able to be mobile since then. I—it did get better over this weekend and I thought I could come in today and as I was heading into to work I hurt it again and I went to urgent care and I subsequently came to work at around 12:30. | 5 6 7 8 9 10 11 |
| MA: | Okay. So you said your mother-in-law came? | 12 |
| OG: | My mother-in-law came to town to help support my son. | 13 |
| MA: | Okay. | 14 |
| OG: | My son has special needs. | 15 |
| MA: | Mm-hm. | 16 |
| OG: | He has an autism spectrum diagnosis, in the past. And she came into town to help him out and I didn't anticipate that she would. And so, at that point, I felt like I could go to work, but in the process of getting ready to go to work I threw out my back. | 17 18 19 20 |
| MA: | Mm-hm. | 21 |
| OG: | I know how that sounds, but it really did happen that way. | 22 |
| MA: | Okay. Did you contact your employer on Thursday to say that— | 23 |
| OG: | I—I initially contacted my employer to say that I wasn't coming in, but then I wrote a subsequent e-mail saying that I had intended to come in, but actually | 24 25 |

injured my back so I couldn't come in. 1

MA:    And this was on Thursday? 2

OG:    I believe that was on Thursday. Yeah, that e-mail was Thursday morning. The— 3

both of those e-mails were on Thursday, I believe. 4

MA:    Okay. And, again, what time did you plan on coming in on Thursday? 5

OG:    I was gonna come in around 10 o'clock probably I would've been in. I had to take 6

care of some things at home and then I was gonna come in around 10. 7

MA:    Okay. And then your mother-in-law came at what time? 8

OG:    She was on her way over. My wife was still at home, but I knew that my son 9

would have appropriate support and I thought I could just come into work at that 10

point. 11

MA:    Okay. And you said you sent an e-mail to your employer that you weren't coming 12

in Thursday. 13

OG:    Initially, yeah, before I knew this information. 14

MA:    And what time was—did you send the e-mail? 15

OG:    I think probably around 8 o'clock, something like that. I—I don't remember the 16

exact time. 17

MA:    So between 8 and 10, that's when you—all the information came about your 18

mother-in-law coming— 19

OG:    Yep. 20

MA:    You getting injured? 21

OG:    Yes. Believe it or not, that's what happened. 22

MA:    Okay. 23

OG:    As strange as it seems, I initially wanted to take that time off for one reason and it 24

turned out I had to take the time off for another. 25

    **CONFIDENTIAL**

MA:   Okay.  And you believe you contacted your employer Thursday—so, again, we're   1

trying to—   2

OG:   This is an e-mail.  It's—it's on the record.   3

MA:   Okay.   4

OG:   Yeah   5

MA:   About both situations, your—   6

OG:   The initial—yeah.  The initial e-mail was that I was going to take off—   7

MA:   Okay.   8

OG:   —due to personal reasons, family reasons.  And the subsequent e-mail was that I   9

had hurt myself and that I was gonna come in and now I couldn't come in.  So   10

that's exactly the way it happened, strange as it seems.   11

MA:   Okay.  So I do have an e-mail, somewhere in here, that, I guess, it's—it was a   12

lean—Linda—is that—   13

OG:   Linda McMurren.   14

MA:   Yes.  So give me a moment.  Okay.  So we have at, I guess, 9—9—where are we?   15

9/4/2014, which is Thursday—   16

OG:   Mm-hm.   17

MA:   —at 8:24AM.   18

OG:   Mm-hm.   19

MA:   It says—the subject sick days.  "Hi Linda.  I unfortunately must take today and   20

tomorrow off due to important family issues.  Dr. Pulitzer is away, just making it   21

official."   22

OG:   Is that—that's my e-mail.   23

MA:   Okay.   24

OG:   Mm-hm.   25

    CONFIDENTIAL

MA:   And then there's another email that says—again this is at—on 9/5/2014 at 12:21PM.

OG:   Okay. So it was the next—

MA:   So this is the following day.

OG:   Yeah.

MA:   And, again, it's from—from you to Linda and, I guess, Steven Pulitzer.

OG:   Mm-hm.

MA:   It says "as it turns out, I was going to come in regardless of my last e-mail Thursday. The family issues have been resolved Thursday morning. I then managed to throw my back out. My mobility has been severely limited since. Please forgive the confusion."

OG:   Yes.

MA:   Okay. So that was on Friday?

OG:   Okay.

MA:   At 12—

OG:   Yeah. I forgot—yeah, that makes sense. Maybe I did do it the next day.

MA:   Okay. So is—again, from the situation, you smiled and laughed and thought it didn't sound right when we first talked between 8 and 10 where you were gonna take off and then your mother-in-law came and then you said you hurt your back.

OG:   Right.

MA:   Is there any reason why you didn't contact your employer that day?

OG:   I didn't really think at the time that it made that much difference because they already knew that I wasn't coming in. And I just didn't think it made any difference at that point. They knew I wasn't gonna be there anyway. And I—you know, I didn't think to write them, but the next day I thought better of it and I

wrote, you know?

1

MA: Right, 'cause they knew from your e-mail that you weren't coming in the following day as well.

2

3

OG: Right.

4

MA: But you thought that you should write something on Friday? Okay. And, again, just rethinking it or—what—why—what was the change?

5

6

OG: There was a lot going on, on Thursday and I didn't get around to writing another e-mail and then I thought about it the next day and I thought that I should elaborate further and let them know exactly what happened, just for the record.

7

8

9

MA: Okay. Now, Dr. Reede has—I spoke with Dr. Reede and she said that she had a meeting with you regarding time and attendance. She said it was back in May?

10

11

OG: Yes.

12

MA: Do you remember meeting with Dr. Reede?

13

OG: Mm-hm. Yes, I did.

14

MA: Okay. And, again, this is what she wrote; "meeting with Dr. Greenberg, May 5th 2014, time and attendance, incorrect reporting of time and attendance. I requested a meeting to discuss an incorrect entry on his timesheet. The administrative assistant responsible for monitoring timesheets reported a discrepancy in his April timesheet, the time worked on April 21st 2014. Dr. Greenberg reported that he worked from 9AM to 5PM. On the day in question, he sent an e-mail to the timekeeper stating that he would be arriving around 11AM and had notified the resident on-call at KCHC at 6AM that he would be late. A review of the case dictation log showed that he did not take"—"dictate a case 'til 12:07PM. Dr. Greenberg said he did not see what the problem was because he" read all the films." For—"I informed him that his job responsibilities require him to be

15

16

17

18

19

20

21

22

23

24

25

present for consultations as well as resident supervision and education. I also | 1

reminded him that we had grand rounds on time and attendance from DMCHR on | 2

October 15, 2013, and although that he works at KCHC, he is paid by DMC and, | 3

therefore, subject to our rules and regulations. He was informed that after | 4

discussion with Leo Johnson and"—"and a review of his records it was | 5

determined that he could leave the time as reported because there were several | 6

days where he worked more than eight hours. In the future, however, he should | 7

report his time correctly. The meeting ended with a reminder that random audits | 8

can be performed to monitor attendance." Okay. | 9

OG: Mm-hm. | 10

MA: So, again, since that time, how have you been reporting your hours? | 11

OG: Well, up until recently, nobody's been monitoring my time to the exact minute. | 12

Now, when I start reading a case is not necessarily the time I arrive. I sometimes | 13

come in and there're consultations, there's teaching moments, there's times I have | 14

to speak to clinicians. So it's not an accurate measure of when I'm in or when I | 15

leave. | 16

MA: Okay. | 17

OG: Having said that, in the past when I filled out timesheets, I didn't keep track of my | 18

exact times. So I always wrote 9 o'clock because I was there for eight hours every | 19

day and I didn't realize that it was that important for me to, you know, punch a | 20

clock as a professional. | 21

MA: Well, again, the department, again, is—it's not punching a clock, it's—you know, | 22

documenting the hours that you were working. | 23

OG: Okay. | 24

MA: So if you are supposed to work from 9-5 or, that is, your hours and, again, if you | 25

worked from 11-7 and that's approved or whatever on the paperwork—                    1

OG:    Mm-hm.                                                                          2

MA:    —in my view, it should show 11-7.                                              3

OG:    Okay.                                                                          4

MA:    It's shouldn't show 9-5 because there could be reasons that, again, for audit  5

purposes or for other issues, Dr. Greenberg says he's here at 9:30, but he's not      6

here 'till 11—                                                                       7

OG:    Right.                                                                         8

MA:    —that could be—                                                               9

OG:    So I got the memo.   I understood that and from that time on, I started        10

documenting my exact time in a book.                                                 11

MA:    Okay.                                                                          12

OG:    And, so, when the time comes at the end of the month to do the timesheet, I put 13

the exact time that I was there.                                                     14

MA:    Okay.                                                                          15

OG:    But, prior to that, I hadn't been doing that.                                 16

MA:    So since May—so, June-July all the times are what you—                        17

OG:    I have a booklet. I write every time down, when I come in and when I leave.    18

MA:    Okay.                                                                          19

OG:    And I've been trying to be more accurate.  Prior to that time, I certainly wasn't. 20

MA:    So on these timesheets, is—there was a timesheet that I have.  I don't have the 21

most recent one.  I did have—they provided it.  Is this something that gets filled   22

out—this is the month of April.  I guess that was the day in question, April 21st.   23

As you see—                                                                         24

OG:    And as you see, I always wrote 9-5.                                           25

SUNY 001297          CONFIDENTIAL

| | | |
|---|---|---|
| MA: | Right. | 1 |
| OG: | Because I just didn't think, you know, I did—I felt like I was doing my job and, | 2 |
| | you know, but I understand. | 3 |
| MA: | Does that sheet get filled out—did you fill out— | 4 |
| OG: | Every— | 5 |
| MA: | So June, July— | 6 |
| OG: | Correct. | 7 |
| MA: | Every month it's filled out. | 8 |
| OG: | Yeah. | 9 |
| MA: | And what you're saying is, in June-July, it will show the exact times that you | 10 |
| | worked? | 11 |
| OG: | It should, yes. | 12 |
| MA: | It won't show 9-5, like this? | 13 |
| OG: | I think after my meeting I started to change that. Now, I don't know exactly—I | 14 |
| | mean, I—I don't know. I would have to look at the next— | 15 |
| MA: | 'Cause I only have April, so it's the same— | 16 |
| OG: | Okay. | 17 |
| MA: | I don't have— | 18 |
| OG: | I think from May on I probably did, like, the exact time— | 19 |
| MA: | Okay. | 20 |
| OG: | —that I was there, because that's what we discussed. | 21 |
| MA: | Okay. And will you—are you sure of that? Do you—or do you think you did | 22 |
| | or— | 23 |
| OG: | I think I did. I don't know, like—like I said, I don't know exactly when I started, | 24 |
| | but if we had the meeting then, I'm pretty sure the next month— | 25 |

MA:    Okay.    1

OG:    —I put the accurate times in.    2

MA:    Okay. And those times, did any supervisor or anyone discuss that you—you were    3

supposed to work from 9-5 and you came in 11-7. Did anyone discuss that with    4

you during that time period?    5

OG:    My times during that time period up until the summer were pretty regular. There    6

may have been a day here and there where I came in a little bit later, for whatever    7

reason, but I tried to keep it reasonably between 9 and 5 or around then.    8

MA:    Okay.    9

OG:    During the—it was only recently, during the summer, that I started to come in late    10

for a couple weeks to help out in the evening.    11

MA:    Okay. And there's also some questions on filling out—I know that, I guess, Linda    12

McMurrin—    13

OG:    Mm-hm.    14

MA:    —I guess, requests for timesheets—time off. She has sent you the forms that    15

need to be filled out.    16

OG:    Mm-hm. Yes.    17

MA:    Do you fill them out when you take days off?    18

OG:    Yes, yes, we have to.    19

MA:    Okay. Okay. And—'cause it's my understanding that when you ask for time off,    20

they constantly send you the form. Like, you ask for a time and then they'll say    21

the form needs to be filled out.    22

OG:    Right. Well, there's a form that they told us a while back, and this is a new policy    23

this past year. There are forms that are available online that I can print out and    24

then fill out and I have to have my supervisor sign—sign them and then they go to    25

**SUNY 001299    CONFIDENTIAL**

|  |  |  |
|---|---|---|
|  | the chairperson. | 1 |
| MA: | Okay. So do you understand that the department is expecting you to work from 9-5? | 2<br>3 |
| OG: | Okay. Yeah, I do. | 4 |
| MA: | Okay. | 5 |
| OG: | And I know that they're serious about it. | 6 |
| MA: | Okay. | 7 |
| OG: | So I'm gonna adhere to those hours come hell or high water. | 8 |
| MA: | Okay. Well, again, someone's schedule is—you know, when you say you'll adhere to that—in my—my belief is if you're scheduled between 9-5, that's the time. Now, if an event comes up or you're running late, you should send an e-mail that I'm running late 'cause the belief is that you will be here at 9. | 9<br>10<br>11<br>12 |
| OG: | Mm-hm. Okay. | 13 |
| MA: | And then, you know, the belief is that you're gonna leave at 5. Obviously, if you're in the middle of something I don't think you're gonna say it's 4:59 I gotta leave, but, you know, you're probably not gonna get assigned work at 7 if you're supposed to be leaving at 5. | 14<br>15<br>16<br>17 |
| OG: | Okay. | 18 |
| MA: | Hopefully. I mean, I don't—I don't know how the department works, I would assume that the person that's there at the—that scheduled time will receive the work at the time. | 19<br>20<br>21 |
| OG: | Mm-hm. | 22 |
| MA: | Correct? | 23 |
| OG: | Well, it's a constant flow of work. It's not like it's chopped up— | 24 |
| MA: | Right. | 25 |

    CONFIDENTIAL

OG:    —in any way, but yeah.                                                                    1

MA:    Okay. And then the—that, again, the concern and the issue of the—the first, the          2

       switching of the vacation from—so you were scheduled for two weeks—                      3

OG:    Mm-hm.                                                                                    4

MA:    —and then you asked for a change—                                                        5

OG:    Right.                                                                                    6

MA:    —and then you didn't adhere to that schedule.                                            7

OG:    Yeah.                                                                                     8

MA:    And then came in one—took off one day, which would make people believe                   9

       you're gonna take off the whole week 'cause they didn't expect you there Monday          10

       'cause that was the week you were on vacation.                                            11

OG:    Correct.                                                                                  12

MA:    And then you came Tuesday to Friday.                                                      13

OG:    Mm-hm.                                                                                    14

MA:    At hours that the department didn't believe was your schedule.                           15

OG:    Right. I didn't do a good job of communicating there. And I will, in the future,         16

       do a much better job of doing that 'cause it clearly created problems.                   17

MA:    Okay. And then the—the, I don't know—what Dr. Pulitzer said, which certainly             18

       when, you know, I read it. It didn't sound good when I heard it. That you were           19

       aware and they can—you know, you'll take whatever consequences there are or              20

       something—                                                                               21

OG:    Well, sometimes you have to make decisions for your family that go against the           22

       grain. I have made many, many sacrifices for—for Kings County. In fact, my              23

       wife was nine-months pregnant with the flu and I had to come back here from             24

       Pennsylvania to do a shift Friday and a call—                                           25

    CONFIDENTIAL

MA:    Mm-hm.                                                                                        1

OG:    —and I missed the birth of my son because I was being responsible.  And I've                   2

done that many times before, much to the consternation of my wife.                               3

MA:    Okay.  And I have the letter that we talked about, just to let you see, September             4

3rd.  I mentioned there was two letters.  Is there September 3rd there?                           5

OG:    Yes, I have this.  I have a copy of this.                                                      6

MA:    Okay.  And Dr. Pulitzer gave you that letter?                                                 7

OG:    Yes, he did.                                                                                   8

MA:    Okay.  Was there any conversation when he handed you that letter or do you                    9

remember the conversation?                                                                       10

OG:    He said that, after our conversation, he had to present this to the chairman,                11

chairperson, and that he wrote up that letter and that's it.  I don't think that there          12

was any further discussion about it.  I said—                                                    13

MA:    Okay.  I—                                                                                      14

OG:    —I understand and I accept that.                                                               15

MA:    Okay.  So he—Dr. Pulitzer wrote an e-mail as I ask more questions about the                  16

letter.                                                                                          17

OG:    Mm-hm.                                                                                         18

MA:    So this is what Dr. Pulitzer said; "I handed him the letter on Wednesday                      19

September 13, 2014, at approximately 4PM while he was at his workstation in the                  20

S Building at KCHC."                                                                             21

OG:    Mm-hm.                                                                                         22

MA:    That's—you remember that?                                                                      23

OG:    Yeah.                                                                                          24

MA:    Okay.  "I informed him that I had given him a written denial of his requested time           25

**SUNY 001302    CONFIDENTIAL**

|     |                                                                                                    |     |
| --- | -------------------------------------------------------------------------------------------------- | --- |
|     | off" and I—that I—"and that I sent him an electronic copy in addition to the                        | 1   |
|     | physical copy I was hand delivering.  He read the letter."  You read the letter in                 | 2   |
|     | front of Dr. Pulitzer?                                                                              | 3   |
| OG: | Mm-hm.  Yeah.                                                                                       | 4   |
| MA: | Dr. Pulitzer said "I advised him to show up for work on September 4th and to                        | 5   |
|     | revise his pans or this matter would be referred to Labor Relations."  Remember                    | 6   |
|     | him—                                                                                                | 7   |
| OG: | Yeah.  I'm pretty sure he said that, yeah.                                                          | 8   |
| MA: | "He thanked me for my recommendation and said that he intended to continue                         | 9   |
|     | with his original plan."                                                                            | 10  |
| OG: | Yes.                                                                                                | 11  |
| MA: | Okay.  And then he said he stayed an additional five minutes and had some small                    | 12  |
|     | talk about family and I" left—"then left his reading room."                                         | 13  |
| OG: | That sounds about right.                                                                            | 14  |
| MA: | Okay.   So, again, the—reading it on paper and, again, you mentioned family                         | 15  |
|     | issues, personal issues and so forth, the—on paper how it sounds; "I'm staying                     | 16  |
|     | with my original plan" and "I'm going to take off."                                                 | 17  |
| OG: | I know how that sounds.                                                                             | 18  |
| MA: | Okay.                                                                                               | 19  |
| OG: | But if you had a child with special needs who's starting a new school and had a lot                | 20  |
|     | of trouble with transitions, you probably would've done the same.                                  | 21  |
| MA: | Well, I don't know what I would've done.  I don't have a child with special needs.                 | 22  |
| OG: | I understand.                                                                                       | 23  |
| MA: | And, again, you know, the situation, ultimately, was handled, from what you're                     | 24  |
|     | saying, by your mother-in-law anyways.  So—                                                         | 25  |

      CONFIDENTIAL

OG: Well, I didn't know that that was gonna happen. I didn't know that I was gonna    1
have additional support that day. That sort of transpired and, at the same time, I    2
threw out my back.    3

MA: Right.    4

OG: So it's interesting the way things turned out. I had, I guess, what you might    5
consider a more legitimate reason to be out, but that's just the way it happened.    6

MA: So, again, you mentioned you have a child that has special needs and there's a    7
balance of work responsibilities and family responsibilities.    8

OG: And most of the time—most of the time stuff like this has come up, I've—I've    9
gone to work and I've done what I had to do professionally, despite my wife being    10
upset with me about it. So this is really, perhaps, the first time that I've actually,    11
you know, supported my family over—over work. So this is actually an unusual    12
circumstance for me. I usually don't do this, but I felt it was important.    13

MA: Well, from what you said on the recording, and please correct me if I'm wrong,    14
July and August you changed your schedule because of your family.    15

OG: July and August, you mean the vacation schedule?    16

MA: No, I mean the hours that you come to work.    17

OG: Oh, no. Those—I didn't change those hours because of my family. I changed    18
those hours because the patients in—in the ER required my services. In other    19
words, there's a person who comes in later in the evening who's being overworked    20
and I feared that he was gonna start missing things. He was reading far too many    21
cases and in the past we've had a 12-8 shift and, for some reason, that shift    22
disappeared. So he didn't have that support anymore. That's now been reinstated.    23
Now, there's a 12-8 shift. All of a sudden, it just started again. So I felt that the    24
department needed me to do this. Now, should I have communicated it better to    25

others?  Yeah.  I didn't feel like it made any difference to anybody, but clearly it 1

does, so— 2

MA:  Did you—'cause, again, we have, and again you certainly, you know, can have a 3

copy of the tape, it's your right to have. 4

OG:  Mm-hm. 5

MA:  I recall you saying in—during the—your change of the hours during the summer 6

for your— 7

OG:  Oh.  No, no, no.  What I meant was that I was able to work those hours during the 8

summer to help out the department because my kids were not at school.  During 9

the year, I wouldn't be able to do that because I need to be at home at 5 or 5:30— 10

5:30. 11

MA:  Mm-hm. 12

OG:  So during the summer, my kids are off, school isn't an issue.  They're off doing 13

whatever vacations stuff their doing.  So my hours are more flexible and I felt that 14

the patients at Kings County deserve my—my—my work and my strong work 15

ethic. 16

MA:  Now, the other members of your department; do they adhere to a schedule or are 17

they—did—so you use—you made it—you know, you stated you didn't really 18

know your schedule or things change. 19

OG:  There wasn't a defined schedule.  There's been lots of changes in our department. 20

I wasn't told to come a specific hour.  I guess it was assumed that I'd be working 21

9-5.  And, you know, the schedule does say 9-5 on it, but, in the past, that's been 22

modified to—to cover the needs of the hospital. 23

MA:  So there's—there is a schedule posted that says 9— 24

OG:  There is a schedule posted that says 9-5, however, in the past, when we—we had 25

a different director then, he wanted me to come in later. So, despite the schedule 1

saying 9-5, I had slightly different hours. So I—you know, my priorities are 2

patient care and I feel like I do what is necessary to take care of the patients at 3

Kings County. And that's a higher purpose and I'm sorry it doesn't fit in with the 4

cookie cutter hours that they require, but, you know, that's okay. I'll do the hours 5

that they want, you know, and that's from now on. 6

MA: Well, I think—again, I think the key that I'm hearing is communication. So if 7

you—if the other director, whoever that was. I mean, you mentioned his name, I 8

forgot. 9

OG: Alan Kantor 10

MA: Okay. If Dr. Kantor agreed to a modification of the hours, that was a 11

conversation that was had with Dr. Kantor. Now the new director comes in, I 12

don't know if—I mean, he—my understanding is he expected you from Point A to 13

Point B, as I would. If it says on the schedule, people see that, that's what they 14

would expect. Now, if you have reasons why you think it's best that you would 15

be there from a different schedule, you know, I think, to me, the key is to raise 16

that issue with your director and get a—get authority to change the hours if that 17

so—if he agrees or she agrees. Then, that's—that's a different conversation, 18

which, again, you may be 100 percent right, I don't know the needs of the 19

department. What—what I do know is that the directors really have the authority 20

to make the decision of what time they expect the workers to come in, the, you 21

know, the employees to come in. 22

OG: Right. Well, I was informed of that through the chairperson that she was 23

concerned that my hours varied or fluctuated between say 10 and 10:30 to 6 and 24

6:30 and that she had an issue with that. 25

MA:   Right.                                                                                        1

OG:   I had that conversation with Steve Pulitzer and I forget now, a week or two ago.              2

MA:   Right.                                                                                        3

OG:   Subsequent to that conversation I e-mailed him and I said look, the reason I'm              4
      doing this is to help Vin out. Vin is the person who works from 4-12. He needed             5
      some support during that time and I took it upon myself to—to do that. Now, that            6
      clearly doesn't—nobody responded to that e-mail and that was—and the                        7
      chairperson was also cc'd. So I never heard otherwise after that point, but I did           8
      say that, look, the school year is right around the corner, I'm gonna be working 9-         9
      5, you know? So, in the future, I'll make it clear what I'm doing.                          10

MA:   Yeah. I mean, to me, from dealing—in the labor relations field, making it clear            11
      and getting authority to do it is—is really an important factor. And, again, I'm not       12
      saying—'cause a lot of times, the person on the direct line might really have the          13
      best input to make a decision, but that decision really needs to be approved or           14
      done by the director, the supervisor, whatever and not the employee, or the—I call         15
      the worker making that decision. Even though it might make 100 percent sense to           16
      that person, but the ultimate decision is made—you know, the scheduling, the             17
      director and so forth. So I'm not saying not to have that conversation because that       18
      conversation might really warrant—be warranted and might need to be, you              19
      know, looked at and evaluated—                                                             20

OG:   Mm-hm.                                                                                      21

MA:   —but, when you said you sent an e-mail and no one really responded differently,            22
      so that means I can come in, and now I'm paraphrasing; so I just came in when—            23
      when I thought was the most appropriate can be—                                            24

OG:   I had—I had intended to correct that. I was just explaining my—my purpose in           25

the past. And yes, there were a couple of days after that where I did—there was only maybe another three or four days since that. But I did come in a little bit later on those days. So yes, I didn't adhere to it right then and I should've made that clearer and I understand and I'll, you know, I'll—I'll keep to whatever hours they want me to keep to. By the way, I do have a—I did go to urgent care today.

MA:    Okay.

OG:    I don't know if this is important or not. If you want to see this document, I have prescriptions as well.

MA:    Okay.

OG:    And I was just diagnosed with—with back spasms on my (inaudible) side.

MA:    Now, did they release you to come to work?

OG:    Yes. Well, they gave me a prescription for muscle relaxers.

MA:    Okay. And this is September 8th? That was—

OG:    That was today. That was this morning.

MA:    You were in today. Yes. I will make a copy and give you your original back.

OG:    Right. Do you want the prescriptions as well or does that make any—

MA:    Sure, sure, I might as well take everything. So I will—I will do that. Is there anything else that you wanna say on the record or anything that I didn't bring up? 'Cause, again, I asked the questions, you gave the answers. Is there anything that is relative to what we were talking about that you feel is important to be included?

OG:    I think we covered it, but just to summarize, I—it's a—it's a—it's a careful balance to do what's best for your family and best for your career. It's not always possible for me to fulfill every detail of my schedule when there are serious issues at home. For the most part, I have erred on the side of my professional career in lieu of my family. In this instance, I really didn't feel like I could do that.

MA:    Okay. And, going forward, you know, there are going—there are going to be    1

       issues that—    2

(Phone ringing)    3

MA:    Hang on one second.    4

OG:    Okay.    5

MA:    Michael Arabian. I'm meeting with Dr. Greenberg right now. Yes, hang on one    6

       second. We're going to go off the record right now. It is 3:34PM.    7

OG:    Okay.    8

MA:    Okay.    9

                              OFF THE RECORD    10

MA:    Okay. We are back on the record. It is now 3:36PM. I apologize I had to take    11

       that phone call. You were saying—well, actually, I was—    12

OG:    You were actually asking, yes.    13

MA:    Right. In the future, there may be this type of situation that happens again where    14

       you're expected at work and there's a, what you believe, a pressing family issue    15

       and you can't be in two places at once, et cetera. How would you handle it    16

       differently, if at all?    17

OG:    I, perhaps, should do a better job of communicating and presenting issues to the    18

       department. However, if there is a serious issue with my family, I will have to    19

       choose my family over my work if—if I deem it important enough. I'm gonna try    20

       not to do that, obviously, but I'd be lying if I said that I wouldn't choose my    21

       family.    22

MA:    When—so, your—you said your—your child needed—started a new school or    23

       something?    24

       25

    CONFIDENTIAL

OG: Yes. He's—it's very difficult for him to handle transitions. He needs a lot of emotional support— 1,2

MA: Mm-hm. 3

OG: —and I am the most important person in his life. 4

MA: And, I guess, the—the—the next question is when were you aware that your child was starting this new school? 5,6

OG: This all transpired recently. We were—he was sort of forced out of his previous school. We were trying to keep him in there— 7,8

MA: Mm-hm. 9

OG: —and we had to make a decision over the last week or so as to where he was gonna go. So it was—the decision was just made for him to go to that school this past week. 10,11,12

MA: Okay. 13

OG: So it was only very recently. 14

MA: Okay. And he—does he go to school from September to—the regular school year? 15,16

OG: It's a regular school year. It's a special school where he now goes to Mary McDowell and today—well, Friday he was there for an hour. Today he was there for a half a day. Tomorrow is his first full day. 17,18,19

MA: So I guess, you know, what makes sense to me, and again not having—as I mentioned, I don't have a special needs child, but if the school issue might have been a problem or an issue and you did request for vacation August 11th to the 22nd—and one of the things I would take away is well maybe I will plan better to maybe be off the week initially because I don't know if you requested the week of Labor Day and you were denied it initially or if it was that— 20,21,22,23,24,25

| | | |
|---|---|---|
| OG: | No, no, no that's not what happened. I requested those original two weeks— | 1 |
| MA: | Right. | 2 |
| OG: | —thinking that that was the time we were gonna take off and things had changed. It had nothing to do with his school year per se. The stuff that happened at the end was different. | 3<br>4<br>5 |
| MA: | Mm-hm. | 6 |
| OG: | We just found out that he had to go to a new school and I had to spend time with him. | 7<br>8 |
| MA: | So I didn't get your full answer or I interrupted. I don't know how you want to phrase it. So if the situation comes up again, which it probably will— | 9<br>10 |
| OG: | Oh, I—I will— | 11 |
| MA: | I mean— | 12 |
| OG: | I will—I will do my best to plan it differently and to—to communicate better and to let everybody know what's going on as soon as I know it. | 13<br>14 |
| MA: | Okay. | 15 |
| OG: | Yeah.  I—I, you know, I admit that I didn't do the best job I could with communication this time around. | 16<br>17 |
| MA: | Okay.  And so that we clarify so everyone understands on the record, so you understand your work hours are 9AM-5PM? | 18<br>19 |
| OG: | I sure do now, yup. | 20 |
| MA: | Okay.  And that's Monday-Friday? | 21 |
| OG: | Monday-Friday.  And I do call as well and we're occasionally requested now to do 12-8, but that's part of the schedule. | 22<br>23 |
| MA: | Okay.  Now, did you— | 24 |
| (Knocking) | | 25 |

**SUNY 001311**          **CONFIDENTIAL**

| MA: | Yes? Thank you, Carol. Were you on call Saturday? | 1 |
|---|---|---|
| OG: | Which Saturday? | 2 |
| MA: | Saturday the 6th? | 3 |
| OG: | I was scheduled to be on call and I switched with somebody, which is something we routinely do. | 4 5 |
| MA: | Okay. | 6 |
| OG: | So somebody else covered that call and I'm gonna cover that person's call. | 7 |
| MA: | So you were scheduled to be on call September 6th? | 8 |
| OG: | Correct. | 9 |
| MA: | So how far in advance does that come out? | 10 |
| OG: | On the schedule? | 11 |
| MA: | Like, does it—yes. | 12 |
| OG: | It just came out last week. I didn't know I was on call September 6th until September 1st, maybe. | 13 14 |
| MA: | Okay. And when did you ask to switch? | 15 |
| OG: | During the course of this week, early—early last week? I e-mailed somebody who was on call two Saturdays hence— | 16 17 |
| MA: | Mm-hm. | 18 |
| OG: | —and she agreed to switch with me and I made it official by, you know, by cc'ing Linda McMurren or writing her an e-mail about it. | 19 20 |
| MA: | Okay. | 21 |
| OG: | I think I cc'd her on it. | 22 |
| MA: | Okay. And, again, the perception, and I don't know the reason why you couldn't—you said it's common that people switch, but the perception was I want Wednesday, Thursday and Friday off. You came in Wednesday and you said I'm | 23 24 25 |

|  | not coming in Thursday and Friday. They said you need to come in Thursday and | 1 |
|  | Friday. | 2 |
| OG: | Mm-hm. | 3 |
| MA: | And you had Saturday scheduled and switched Saturday. | 4 |
| OG: | Yeah. I don't see the problem with that. That happens all the time. People switch | 5 |
|  | their calls all the time. | 6 |
| MA: | Okay. And you're saying— | 7 |
| OG: | You're saying that the perception of that is that I'm taking a bunch of days off | 8 |
|  | or— | 9 |
| MA: | Well, again, I'm asking questions 'cause I didn't realize that the schedule came | 10 |
|  | out, you're saying,—initially so there wasn't— | 11 |
| OG: | Yeah. | 12 |
| MA: | I mean, I think if it was a month in advance, maybe it looks different than a week | 13 |
|  | in advance. | 14 |
| OG: | Well, the schedule comes at—at—either at the very end of the month before at | 15 |
|  | the—or at the very beginning of the new month. | 16 |
| MA: | Okay. | 17 |
| OG: | So the first week or so you—you know, you have very short notice. Yeah, I know | 18 |
|  | the schedule for the end of the month now. | 19 |
| MA: | Right. | 20 |
| OG: | Four weeks in advance, essentially. | 21 |
| MA: | Okay. | 22 |
| OG: | But I didn't have much notice for that day. | 23 |
| MA: | And that schedule just dictates the Saturday cover or is that every— | 24 |
|  |  | 25 |

    CONFIDENTIAL

OG: It is the whole schedule, yeah. The whole schedule, all the hours, all the different, you know, parts of the department and what their hours are, yeah.

MA: Okay. And that's where 9-5 would be listed? That's the schedule we're—we're talking about?

OG: Yes.

MA: Okay. Anything else that you would do differently? Anything comes to mind?

OG: Well, like I said, I have to do a better job of communicating. And, you know, and adhering to the schedule that they want me to—you know, to adhere to and if I feel that it requires some changes to benefit the department, I should have a discussion with the director about that before I choose to do it on my own.

MA: Okay. All right. So what I'd like to say is that this will end the interrogation for now. We always have the—the opportunity to reopen it and ask you additional questions if we—

OG: Okay.

MA: —so desire. Gonna go off the record now. It is now 3:44PM.

OFF THE RECORD

    CONFIDENTIAL