27

Page 45

**ARABIAN**

2 Q. There were no issues that were
3 prompting you to -- withdrawn.
4     You weren't, for example, told or it
5 wasn't suggested to you that it might be a good
6 idea if you resigned before you were fired?
7 A. No, no, there was a discussion about
8 my attendance previously, maybe two or three
9 months before. I ultimately left.
10 Q. What does that mean, a discussion
11 about your attendance?
12 A. Well, I had some -- I had surgery, I
13 asked to be on a vacation, I was granted the
14 time off. And then there was another issue
15 where I took time off because of an injury and
16 then I was told that I utilized too many of my
17 days off.
18 Q. Well, did you utilize too many of the
19 days off you had or did you utilize days off in
20 excess of what you had?
21 A. I did not use more days than I had.
22 So the organization gave, it was like 21 sick
23 days and 21 vacation days. And because of my
24 surgery, I was out of work about two weeks
25 during that time in April or May, I used the

Page 46

**ARABIAN**

2 majority of the sick days. And then I asked to
3 be on vacation at a certain point and I was
4 granted that vacation and I used the majority
5 of the vacation days.
6     But in my view I was granted the
7 vacation days and I was sick. It was, you
8 know, I had a gallbladder out and I was out of
9 work for two weeks so I didn't think I could do
10 anything regarding my time but I was told that
11 I'm using too much of my time.
12 Q. Okay. The trouble I'm having is
13 either the time was time you either had by
14 policy or had earned or accrued or wasn't. And
15 it seems to me that you're saying you had
16 accrued time. I'm trying, therefore, to
17 understand why it was an issue that you were
18 taking time that was indeed your entitlement?
19 A. I had the same view as you do.
20 Q. And who was it that raised this issue
21 with you?
22 A. It was the assistant vice president
23 of labor relations.
24 Q. Who is name is?
25 A. Leonzo Cuiman.

Page 47

**ARABIAN**

2 Q. And what did Mr. Cuiman say to you
3 and when?
4 A. It was, I guess it was around the end
5 of -- middle of August, the middle to the end
6 of August.
7 Q. 2014?
8 A. 2014.
9 Q. And what did he say to you at that
10 time?
11 A. They -- he said that there was, we
12 went over the time that I went out of work and
13 there was some -- I was -- I was granted time
14 and there was some misunderstanding that I was
15 granted the time. And then there was an injury
16 that I had that I brought in documentation that
17 dealt with -- I actually went to, I went to
18 work in the morning, my knee was hurt. I
19 actually told someone else that was in the
20 office that I need to leave because I have to
21 go to the doctor to take care of my knee.
22     And then I was out of work two or
23 three days because I literally couldn't walk.
24 And then when I returned I was told that I've
25 used too much of my time.

Page 48

**ARABIAN**

2     And then when I expressed that I had
3 the time, I utilized it, as you seem surprised
4 that they were questioning me on that time, I
5 was told different events that, you know, when
6 I come in, when I leave. You know, I was there
7 before nine and stayed until after 5:00, but
8 leaving at 5:20, 5:30, 6:00 o'clock, you know,
9 sometimes you needed to stay longer than that.
10     And there was time issues that got
11 morphed to other areas because I expressed my
12 views, as you seem surprised, I seemed
13 surprised when they spoke to me about that and,
14 you know, I certainly had a discussion with
15 Mr. Cuiman about that.
16 Q. And what did he say?
17 A. He said that I was taking too much
18 time off and they needed me. And they needed,
19 you know, the job needs to be done and when
20 somebody is not there, it impacts the
21 department and all of this, so.
22     It was a confusing point to me.
23 Q. And shortly thereafter you decided
24 that you would prefer to go work elsewhere; is
25 that right?

Page 49

ARABIAN

A. Yes, I preferred -- shortly thereafter I decided that it was actually better for me to work elsewhere. So I didn't go work elsewhere because I did not have that elsewhere position.

Q. How long was it between the time that you had this conversation with -- well let me ask, was it one conversation with Mr. Cuiman after you came back from that knee issue?

A. Yes.

Q. All right. And you say that was in August of 2014?

A. I believe so, yes.

Q. Okay. How long after that did you basically approach -- withdrawn.

How long after that did you approach Mr. Cuiman or somebody else at SUNY Downstate about the possibility of an agreeable separation?

A. I guess three weeks later.

Q. Had Mr. Cuiman in the conversation we're referring to in August suggested that it might be a good idea if you look for work elsewhere?

Page 50

ARABIAN

A. He expressed that he was upset with what was going on and he thought that, you know, my patterns needed to change.

Q. Sir, while you worked at SUNY Downstate, were you a member of a union?

A. No, I was not.

Q. Okay. So you were one of the few?

A. Yes, my position was what was called management confidential. I understood there was only about 80 people that were not union out of, like, 4,000.

Q. So you served essentially at the pleasure of your superiors?

MR. COULSTON: Object to the form.

A. To my knowledge, that is correct.

Q. And who was the person who had hired you?

A. Well, that's a good question. I assume it was Mr. Cuiman since he was the SVP when I got there. I actually met with three people when they -- when I was there for the interview, so...

Q. Now you've referred to him as I think as an AVP and SVP?

Page 51

ARABIAN

A. Yeah, I don't remember what he's -- he's some V, vice president. He may be AVP, he may be SVP.

Q. But as far as you knew, he was the head of labor relations function at Downstate?

A. Yes, he was.

Q. And he was one of the three people you interviewed with?

A. Yes.

Q. Who were the other two?

A. There was Sharon, I don't remember her last name. She moved to human resources, Sharon something. And then Adriana Conde-Billy.

Q. Okay. Now, did you, I've asked you about this meeting that you had with Mr. Cuiman and I've asked you what Mr. Cuiman said. I haven't asked you what you said to him. Did you point out that you had this accrued time and that you had only used the time that was within the limits of your accruals?

A. I did.

Q. And what was his response to that?

A. He was not really listening to, in my

Page 52

ARABIAN

view, he wasn't really listening to what I was saying.

Q. Sir, was this conversation a disciplinary conversation?

A. There was disciplinary, I did receive some letter about that.

Q. Tell me what you mean by, some letter about that?

A. It was written down somewhere, warning, I don't know what it was classified as.

Q. Before or after that conversation?

A. Oh, it was after the conversation.

Q. Okay. Before the conversation had you received any kind of discipline?

A. No.

Q. Had you received a written warning?

A. No.

Q. How about a -- do you understand what a notice of discipline is at SUNY Downstate?

A. No, what are you referring to?

Q. Let me not refer to it that way.

Were you informed at any point prior to this conversation with Mr. Cuiman that you

Page 53

ARABIAN

2 were either subject to discipline or being
3 disciplined or that there was some question
4 about whether or not you should be disciplined?
5 A. No. So prior to the conversation
6 with Mr. Cuiman I spoke with Miss Conde-Billy
7 and she's the one that spoke with me about
8 this. So in my conversation with her I was --
9 it was the first time I heard the conversation,
10 so I was actually shocked that somebody would
11 be talking to me about medical issues that I
12 had and, you know, they told me well, they need
13 me to go -- they need me to go through, improve
14 this.
15     And I said, well, I certainly hope
16 that it would improve because I don't expect to
17 have my gallbladder out next year because I
18 only had one and I was gone two weeks from
19 that. So I was perhaps a little sarcastic with
20 Ms. Conde-Billy.
21 Q. You were, you're saying?
22 A. I think perhaps I was because I was
23 shocked that somebody would call me in and talk
24 to me about something, as you seem to be, you
25 had the time, what seems to be the problem.

Page 54

ARABIAN

2     There was a problem, obviously, and I
3 guess Miss Conde-Billy reported to Mr. Cuiman
4 that in her mind I might have been
5 disrespectful to her, so all of that came about
6 in this meeting with Mr. Cuiman.
7 Q. Okay. And when was the conversation,
8 was there only one conversation with
9 Miss Conde-Billy about this?
10 A. I believe so, yes.
11 Q. By the way, it's C O N D E-B I L L Y.
12     And how -- when was the conversation
13 with Miss Conde-Billy?
14 A. The day before the conversation with
15 Mr. Cuiman.
16 Q. So this was after both your operation
17 and your vacation; is that correct?
18 A. Yes, the operation was in May and the
19 vacation ended in August.
20 Q. Okay. And the operation in May, you
21 say you were gone for two weeks?
22 A. Yes.
23 Q. And the vacation was for how long?
24 A. It was a one week in July and two
25 weeks in August.

Page 55

ARABIAN

2 Q. And I believe you testified to this
3 but just forgive me if I ask again. When you
4 went out on this -- for this operation that
5 was, you had given notice and let them know
6 that you were going out or was this an
7 emergency situation?
8 A. It was an emergency. It was on
9 Easter of what year, I was eating dinner. No
10 previous problems with the gallbladder. I
11 don't know if anyone ever had their gallbladder
12 removed, but supposedly you have a lot of pain
13 before. I was eating dinner, went to hospital,
14 the next day they did an operation.
15 Q. And it took two weeks essentially to
16 get out of the hospital and be cleared to go
17 back to work?
18 A. Yes, I was in the hospital for five
19 days and then I had another week off the doctor
20 gave me to...
21 Q. Okay. And so you're having Easter
22 dinner on a Sunday?
23 A. Uh-huh.
24 Q. And you went to the hospital that
25 evening?

Page 56

ARABIAN

2 A. Yes.
3 Q. And when was it that you or someone
4 on your behalf informed Downstate that you were
5 in the hospital and were having this operation?
6 A. Sunday night -- well, Sunday night
7 they were informed I was in the hospital.
8 Q. Okay.
9 A. And Monday they were informed that I
10 was going for the operation. And I kept in
11 touch with them or my wife kept in touch with
12 them.
13 Q. Was it your wife who basically made
14 the notifications on your behalf?
15 A. Early on, yes.
16 Q. Okay. And after the operation you
17 basically told them your doctor had said you
18 needed a week or however long to recuperate?
19 A. Yes.
20 Q. And then you went back to work, this
21 was still in May or was this June?
22 A. No, it was -- so I think April 20th
23 was the actual day or the 19th -- or the 20th
24 was Easter that year so two weeks from then, I
25 guess is what, the beginning of May?

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

MICHAEL ARABIAN
November 16, 2016

Page 73

1    ARABIAN
2    Q. Okay. All right, so have you now
3    told me about the conversation with Mr. Cuiman
4    in full or was there additional things said by
5    you or by him in that conversation that you
6    haven't already said?
7    A. Again, there was -- there was some
8    discussion about my performance, which again,
9    surprised me since I got a review a month
10   before. So I tend to be honest to a fault, so
11   when something surprises me I tend to voice
12   that. And I guess he was unappreciative that I
13   was voicing my objections.
14   Q. Anything else about that conversation
15   now beyond what you've already testified that
16   you recall saying or having said to you?
17   A. I'm sure there was other things. It
18   was two years ago, it was, you know.
19   Q. I'm only asking what you remember?
20   A. No, that's the way I remember it.
21   Q. Okay. Now say, the day before this
22   conversation you had the conversation you were
23   referring to earlier with Miss Conde-Billy,
24   correct?
25   A. Yes.

Page 74

1    ARABIAN
2    Q. And now tell me, what was said by her
3    to you and by you to her in that conversation?
4    A. She told me that I was, again, my
5    remembrance of it, she told me that I was using
6    too much of my time and it was starting to be a
7    problem.
8    Q. By the way, was there anyone else in
9    these conversations with you and Mr. Cuiman or
10   you and Miss Conde-Billy at the time or was it
11   just the two of you in each of those?
12   A. I believe it was just the two of us
13   in each of them.
14   Q. Okay. So Miss Conde-Billy says,
15   you're using too much of your time. What do
16   you recall what you said to her in that
17   conversation?
18   A. Yes. I was -- I mentioned it a
19   little bit before, I certainly was sarcastic
20   when it was first approached to me and I told
21   her, I remember telling her, well, I can
22   guarantee I won't be using some time for having
23   a gallbladder removed because I already had
24   that removed and --
25   Q. Did she specifically reference your

Page 75

1    ARABIAN
2    medical leave or your medical reason for being
3    out back in April and May?
4    A. She didn't -- I referred to it, she
5    didn't refer to it.
6    Q. Okay. Did she refer to any medical
7    issues you had had?
8    A. No, not that I --
9    Q. So she spoke about time in general?
10   A. Yes, and I went in to the details of
11   why I was taking off.
12   Q. So did she tell you this was a formal
13   counseling or some kind of formal early step in
14   a disciplinary process?
15   A. Don't recall that.
16   Q. Did you have that as an understanding
17   that you were being counseled as part of a,
18   essentially a disciplinary matter?
19   A. I had the understanding when somebody
20   calls me into their office to talk about
21   something that they need corrected, that it's
22   a, I call counseling, in my word, it's a, this
23   needs to change, heads up, this can't continue,
24   things like that.
25   Q. Okay.

Page 76

1    ARABIAN
2    A. There's different levels of
3    discipline in my world so usually there's, you
4    know, usually after the counseling would come
5    some kind of more additional, depending on what
6    the offense is it might be a next step. It
7    could be other steps that go along.
8    Q. That's what I'm getting at, did you
9    have an understanding that Miss Conde-Billy's
10   conversation with you was the first step in
11   some disciplinary process?
12   A. Yes. I believe it was putting me --
13   making me aware, putting me on notice that my
14   attendance needs to correct --
15   Q. Okay.
16   A. -- be corrected.
17   Q. And did Miss Conde-Billy tell you
18   that you were going to meet with Mr. Cuiman the
19   next day?
20   A. No.
21   Q. So was that meeting also a surprise,
22   the next day meeting?
23   A. Yes, yes.
24   Q. And did you understand that to be
25   another step in the disciplinary process?

Page 77

1  ARABIAN
2  A. I believe that meeting took place
3  because of how I responded to Miss Conde-Billy.
4  Q. Okay. And so you -- did you
5  understand that meeting to be disciplinary in
6  nature?
7  A. Yes.
8  Q. And was it disciplinary because of
9  the leave, disciplinary because what you had
10 said to Miss Conde-Billy or both?
11 A. It's a very good question. I don't
12 know because at that meeting many things got
13 brought up, as I mentioned. My performance got
14 brought up, which was another surprise to me
15 after receiving that performance review that I
16 mentioned.
17     So everything kind of got thrown at
18 me. Attendance, how I interacted with her, my
19 performance and all of it seemed surprising to
20 me. When it was presented to me in that manner
21 and, I guess, I defended myself or I don't
22 know, the right -- responded, not saying yes, I
23 will do better, this will not happen again.
24 Which is, I guess, what they wanted me to say.
25 But I didn't say that.

Page 78

1  ARABIAN
2  Q. Why not?
3  A. Because in my mind, that I do not
4  take sick time when there's not a reason to
5  take sick time and I do not take vacation time.
6  In fact, now that you mentioned it, I did tell
7  Mr. Cuiman if you didn't want me to take
8  vacation, you shouldn't have approved it.
9      And I was -- and he was -- he told
10 me, be careful what I wish for meaning, to me
11 it made it sound like if I put in for a
12 request, I'm going to get denied now all of the
13 time. So my view is, and I guess my response
14 was, well, you gave me the time, why did you
15 give me the time if it was a problem. And he
16 was like, well, you shouldn't ask for it. And
17 I'm like, yes, shouldn't ask.
18     So with the -- the gist again, this
19 is my view of the events and obviously I'm very
20 close to it. The gist was, well, you took two
21 weeks for your gallbladder and you asked for a
22 week of vacation in July that you were approved
23 for, why would you ask for the two weeks in the
24 end of July. And I actually put on the E-mail,
25 I remember, opportunity of a lifetime or

Page 79

1  ARABIAN
2  something because I don't plan on going to
3  Europe any time soon.
4      And it was -- it really was something
5  that I wanted to be at. But if it was told no,
6  I wouldn't have gone because I had to buy
7  tickets and I had to do a lot of things, so
8  they said yes and then everything was good
9  until now I've taken off too much time and you
10 shouldn't have asked to be off was almost the
11 answer.
12 Q. Sir, you say that Mr. Cuiman
13 mentioned your performance?
14 A. Yes.
15 Q. Did Miss Conde-Billy mention your
16 performance in the day before meeting?
17 A. I don't believe so.
18 Q. All right. What did Mr. Cuiman say
19 about your performance?
20 A. He was mentioning that he would have
21 hoped that I would have moved along faster with
22 different things that were going on. So he
23 thought I should be more advanced, perhaps some
24 medical knowledge because I was new to the
25 hospital scene and there would be some

Page 80

1  ARABIAN
2  disciplines that would deal with medical
3  terminology. Which again, I have -- in another
4  hospital and still have limited knowledge on
5  medical procedures and so forth. So that was
6  there.
7      There was also, I don't remember. It
8  was things that seemed like it was, I thought
9  they were stretching for items in my view.
10 Q. In other words, he was looking for
11 something to make an issue of is what you're
12 saying?
13 A. Well, I think I believe that he
14 didn't like the way I responded to a staff --
15 one of the staff, which was Adriana and he
16 wanted to make sure that he -- I understand
17 that he is in charge and there's been other
18 issues that they might have let go. And then
19 they just threw -- they seem like they threw
20 everything at me at a that point.
21 Q. When you had the evaluation a month
22 or so earlier, who administered that
23 evaluation? Did you have a face-to-face
24 meeting with someone about that?
25 A. Yes.

Page 221

ARABIAN

Q. Okay. So sitting here today, you can't tell me whether or not he was given an opportunity to take the agreement and consider it for a period of time, I understand that. But that's not my question.

My question is: Did the department have a custom and practice of having the document either signed or rejected at the time it was presented, okay, or permitting employees time to consider and come back at some later time to say whether they were prepared to sign and/or reject?

A. Again, my recollection is they wanted it signed as soon as possible and it wasn't, come back in three days or whatever. So that was not the opportunities that I was providing to other people that I remember. So it wasn't, here it is, come back in a week, let me know what you think about it.

Q. Okay. But what about come back in a day?

A. I do -- as I mentioned before, I do remember a long time, someone wasn't feeling well or it was they had the opportunity to go

Page 222

ARABIAN

home and come back the next day, yes.

Q. Okay. How many occasions like that do you recall?

A. Not many.

Q. More than one?

A. I don't know. I don't even know if it was more than one. I -- it wasn't many, it was -- it would have to be some sort of special circumstance or issue that would dictate that.

Q. I see.

Sir, do you know whether or not this document and its terms were discussed with either Dr. Reede or Dr. Pulitzer before being presented to Dr. Greenberg?

A. I don't have any recollection of that.

Q. Okay. In your experience, have you had occasion where you've done these agreements, presented them to Ms. Conde-Billy or to Mr. Cuiman and they have said, come back later and perhaps in the interim discuss them with whoever the department chair or supervisor was?

A. I don't remember any of that, as I

Page 223

ARABIAN

stated earlier. I do know that sometimes my superiors had conversations or at least a heads-up to certain departments of what was happening, but I don't recall doing that directly myself.

Q. Okay. But do you know -- but I'm asking whether or not if there were heads-up to the departments, whether that was done before the agreement was presented to the employee for signature or was that after?

A. I don't -- so I don't know. What I would say answering is that before anything is presented to the department and if there was going to be a heads-up they would explain what was going on.

So if they were looking -- as an example, if they were looking to terminate the employee, he's terminated tomorrow, we don't want him back, the settlement agreement would bring the employee back to work, right, if he was going to be terminated.

So if there was, there would be some conversation if that would take place meaning, they would refer or consult with that

Page 224

ARABIAN

department, so. It all is happening at the same time.

So I can't present something to the person and they're going to sign off and then if there's going to be an issue with the department, then what happens. So either there is an accepted approval of labor relations, we'll deal with the issue. Which has been my vast majority, that was the case, except for the, you know, I said those political events that I'm not aware of. But it wouldn't be -- I don't know if that answers your question.

Q. Well, let me ask you this: Did you recall any occasion with regard to any employee where either Mr. Cuiman or Miss Conde-Billy said to you, upon you presenting an agreement like this to them for approval, let me talk to so and so or the department and get back to you?

A. I do recall people talking to the department but they would talk directly, it would be while I'm there.

Q. I see. So in other words, you go in with the agreement you've prepared, they are

Page 225

1  ARABIAN
2  looking at the agreement, they call up the
3  department chair, whoever, on the phone while
4  you're there, tell them what's happening, get a
5  consensus that it's agreed to and then give you
6  the approval and then you go back to the
7  employee; is that how you remember it?
8  A. Yes.
9      MR. COULSTON: Object to the form.
10 Q. Now, I think you said a little
11 earlier that Dr. Greenberg waived the
12 opportunity to have union representation with
13 him for this interrogation; is that correct?
14 A. That's what the document says, yes.
15 Q. After that point did you -- did you
16 tell him anything about any union related
17 rights he may have with regard to this
18 agreement?
19 A. I don't understand the question.
20 Q. Okay. Dr. Greenberg had the right to
21 have a union representative with him at the
22 interrogation, correct?
23 A. Yes.
24 Q. And you had him sign something
25 acknowledging that he had waived that

Page 226

1  ARABIAN
2  opportunity, correct?
3  A. Correct.
4  Q. So you and he proceeded in the
5  absence of any union representative, correct?
6  A. Yes.
7  Q. Okay. But he was still covered under
8  a collective bargaining agreement as an
9  employee physician in his department, correct?
10 A. Correct.
11 Q. And he continued to have whatever
12 rights the contract -- the collective
13 bargaining agreement provided to him, correct?
14     MR. COULSTON: Object to the form.
15 A. He, as a member of the union he had
16 rights that are in the union, yes.
17 Q. Okay. Did you at any point after he
18 waived union representation inform him that he
19 had any particular rights with respect to this
20 agreement say, under the contract or otherwise
21 that you were aware of?
22 A. So specifically I don't remember with
23 Dr. Greenberg. What I can tell you that what I
24 do is I discussed the settlement agreement and
25 explain the events, what each language -- as

Page 227

1  ARABIAN
2  you're asking me questions I answer the
3  questions that are requested. And if there's
4  any questions that they have like, you know,
5  what does adhering to the policies, what is
6  time and attendance watch, I would explain
7  those issues to Dr. Greenberg.
8  Q. Okay. Is there any point in the
9  process once he waived union representation
10 that you asked him again whether or not he
11 wanted an opportunity to review say, the
12 agreement with his union rep before signing?
13 A. I don't remember. I don't know.
14 Q. Okay. When he signed the waiver
15 acknowledging that he was going forward in the
16 interrogation without a union rep, did you
17 understand that agreement to also mean -- well,
18 did you understand that agreement to mean that
19 he was proceeding in the interrogation without
20 a union rep or that he was proceeding for all
21 purposes from that point forward without union
22 representation?
23     MR. COULSTON: Object to the form.
24 A. So I guess the interrogation he was
25 proceeding without a union rep. The -- after

Page 228

1  ARABIAN
2  the interrogation he signed an agreement,
3  right, there is an agreement here that dictates
4  what is contained, he agreed to what's in this
5  settlement and the organization agreed to
6  what's in the settlement of the matter.
7      So the language of the settlement is
8  important so, I mean, I don't understand your
9  question because there are things that are
10 contained in the settlement that specify that.
11 And it's states that he voluntarily waived his
12 right and again, Dr. Greenberg represented
13 himself in this matter.
14     So it explains what's there and
15 there's again, it's a form where the UUP
16 representative is listed there and obviously
17 there's no representative so nobody signed it
18 next to that spot.
19 Q. Right. But what I'm asking is: You
20 had him sign a document that he was proceeding
21 in the interrogation without a union rep?
22 A. Correct.
23 Q. Once the interrogation is over --
24 A. Uh-huh.
25 Q. And you go draft this document, get

Page 269

1 ARABIAN
2 certification was done in by, I think 2015 so I
3 had to have 60 hours of credit by that 2015.
4 Q. And did SRHM have its own requirement
5 by then or was that just to get the SPHR
6 certification updated?
7 A. That was to get the SPHR
8 certification updated.
9 Q. Okay. And so sometime prior to that
10 2015 deadline, you got 60 hours of continuing
11 education?
12 A. Correct.
13 Q. Was any of that related to the Family
14 Medical Leave Act?
15 A. I don't remember.
16 Q. Do you recall any -- at any time
17 during your employment with SUNY Downstate that
18 related to the Family Medical Leave Act?
19 A. No. No training, nothing like that.
20 Q. Okay. Do you recall any training you
21 received in the FMLA at any time prior to going
22 to work for SUNY Downstate?
23 A. I've had experience with FMLA, yes.
24 So I don't know where the training came. I am
25 aware of the laws, et cetera.

Page 270

1 ARABIAN
2 Q. No, I'm not asking what you know or
3 what you're aware of.
4 A. Okay.
5 Q. I'm asking whether or not you got any
6 specific training, seminars, conferences,
7 courses, in FMLA at any time prior to joining
8 SUNY Downstate?
9 A. I don't remember.
10 Q. Okay. Sitting here now are you able
11 to identify any?
12 A. I couldn't tell you what any of
13 the -- usually they were geared toward the
14 labor side because that's where my interest is,
15 but there was classes that, you know, certain,
16 had to be in different areas, so...
17 Q. When you say, geared toward the labor
18 side because there's where your interest is,
19 are you saying the courses that you took, you
20 took regarding unionized -- workers unionized
21 employees?
22 A. Uh-huh.
23 Q. Collective bargaining agreements,
24 that type of thing?
25 A. Yes.

Page 271

1 ARABIAN
2 Q. And that's your interest?
3 A. Yes.
4 Q. Okay. Sir, did you receive any
5 seminar or course or conference training at
6 Downstate itself while employed concerning the
7 FMLA?
8 A. I don't remember, no.
9 Q. Okay. Did you handle FMLA matters in
10 or labor relations at Downstate or was that
11 handled by somebody else?
12 A. Handled in the human resource
13 department.
14 Q. I see. To your knowledge, was there
15 any FMLA related matters that were handled in
16 labor relations while you were employed?
17 A. I don't recall.
18 Q. Do you recall ever referring any
19 matter that had come to you to human resources
20 because it concerned FMLA?
21 A. I do not think any matters came up.
22 I don't recall referring it so it's possible I
23 did, it's possible I didn't.
24 Q. Okay. Did any FMLA issue ever come
25 up in the course of your handling of

Page 272

1 ARABIAN
2 Dr. Greenberg's matter?
3 A. I don't recall. I see the transcript
4 but I don't recall.
5 Q. What do you mean when you say, you
6 see the transcript? What do you see in the
7 transcript?
8 A. I see the writings that are there. I
9 mean, what's listed.
10 Q. Yeah, I understand but what are you
11 saying that raised an FMLA issue in the
12 transcript?
13 A. In my view, nothing.
14 Q. Okay. And sir, are you familiar with
15 any published policy at Downstate regarding
16 FMLA?
17 A. No, I am not.
18 Q. Okay. Can we mark as exhibit 16 that
19 document.
20    (Arabian Exhibit 16, US Department of
21 Labor form, marked for identification.)
22 Q. Sir, the reporter has placed in front
23 of you what has been marked as Exhibit 16 to
24 your deposition. Can you tell me if you
25 recognize that document?