38

```
 1    onboarding.  So physician recruitment is done as a joint
 2    effort between the chairman of radiology, the academic
 3    chairman of radiology, Dr. Reede, who sits at SUNY
 4    Downstate Medical Center, and the chairman of radiology at
 5    Kings County Hospital who is the director of service there.
 6         Q.    In 2014, who would that have been?
 7         A.    As of July 1, 2014, that would be me.
 8         Q.    As of July 1, 2014, would you identify yourself
 9    as an affiliate physician at Kings County Hospital?
10         A.    Yes.
11         Q.    At your prior deposition you testified that you
12    reported to the chief medical officer at Kings County
13    Hospital; do you recall that testimony?
14         A.    Yes, I do.
15         Q.    In 2014, who was the chief medical officer at
16    Kings County Hospital?
17         A.    Dr. Conswella (sic) Jamaleddine.
18         Q.    When you mentioned or testified that you reported
19    to Dr. Jamaleddine, what did you mean by that?
20         A.    So the structure if you were to make a table of
21    organization, okay, there would be the CEO of the hospital
22    and then on the next level there's the chief operating
23    officer, the chief financial officer, the chief nursing
24    officer, the chief medical officer.
25               Under the chief medical officer is all the
```

S. PULITZER

1  directors of service; the chairman of the hospital. So my
2  direct report in that chain of command is Dr. Jamaleddine.
3     Q.   What would you report to Dr. Jamaleddine?
4     A.   Everything that was going on in my department in
5  terms of physicians, technical staff, clerical staff;
6  regulatory issues, equipment purchase, equipment breaking
7  down; interruption in service due to equipment failure.
8  Any patient safety issues; any daily operation of the
9  department.
10    Q.   Specifically as it related to physicians and just
11 for clarity of the record, you were the director of
12 services for the radiology department in July 2014; is that
13 correct?
14    A.   That is correct.
15    Q.   For purposes of physicians, what would you report
16 to Dr. Jamaleddine with respect to physicians?
17    A.   With respect to physicians, my job required me to
18 do a couple of things. To make sure that all of my
19 physicians were credentialed, licensed, and able to
20 practice in the scope of their privilege. If there was a
21 new procedure that the physician needed to do or wanted to
22 do, it would first have to be cleared with Dr. Jamaleddine
23 so that the hospital would approve that physician and then
24 we would change their credentials. If there were any
25 performance problems with the physician we do bi-yearly

S. PULITZER

1  performance evaluations. If there was something in that
2  evaluation that was of concern, that would be reported to
3  Dr. Jamaleddine and if there was anything -- if there was a
4  problem with any of the physicians, time and attendance,
5  unruly behavior; doing a great job, whatever it was, was to
6  be reported to him.
7     Q.   Were you required to report these factors about
8  physicians within your department to Dr. Jamaleddine or was
9  it your practice to do so?
10    A.   I was required.
11    Q.   Who would you have to report to?
12    A.   Dr. Jamaleddine.
13    Q.   You also testified previously that Dr. Reede
14 handled the personnel or personnel matters as it related to
15 the attending physicians in the radiology department at
16 Kings County Hospital; what did you mean by that?
17         MR. NELSON:  Object to form.
18         MS. BLOCKER:  You can answer.  I'll
19      rephrase.
20    Q.   You testified at your prior deposition that Dr.
21 Reede managed the personnel matters of the physicians
22 within the radiology department at Kings County Hospital;
23 do you recall that?
24         MR. NELSON:  Object to the form.
25    A.   Yes, I do.

1  Q. What did you mean by that?

2  A. Because the physicians who are working at Kings
3  County Hospital were on an affiliate contract and employees
4  of SUNY Downstate Medical Center, she had jurisdiction over
5  their practices. She -- if there was a disciplinary issue,
6  if there were any schedule changes with the physicians,
7  anything that happened, approving vacation, signing sign-in
8  sheets, she was the final signature on those.

9  Q. At your prior deposition you also testified that
10 you reported to Dr. Reede who was the academic chairperson
11 at Kings County in July 2014; do you recall that testimony?

12 A. Yes, I do.

13 Q. What did you report to Dr. Reede?

14 A. I reported to Dr. Reede anything that happened
15 with the physicians in a similar manner. Anything I would
16 report to Dr. Jamaleddine I would report to Dr. Reede.
17 Other things that I would report to Dr. Reede about the
18 state of the department, if there were any issues; again,
19 interruptions in service; any regulatory issues; anything
20 that had to do with the physician staff and I did not
21 report to her about the technical or clerical staff who
22 were employees of New York City.

23 Q. You testified earlier that Dr. Reede had the
24 final signature on things related to the physicians within
25 the radiology department at Kings County Hospital; am I

1  of New York.

2  Q.  What do you mean you were paid by the City of New
3  York?

4  A.  So there's two campuses there. There's NYU Tisch
5  and there's Bellevue. My salary line came from Bellevue
6  from the City of New York.

7  Q.  Are you familiar with Long Island Medical College
8  Hospital?

9  A.  A little bit.

10 Q.  To your understanding or to your knowledge, does
11 Long Island College Hospital have an agreement with SUNY
12 Downstate?

13 A.  SUNY Downstate purchased Long Island College
14 Hospital or -- I don't know exactly who purchased it, if it
15 was UHB or SUNY or how that worked. What I do know was
16 that the physicians who were there in the radiology
17 department and this is all that I know became an affiliate
18 through the same contract that I have through an
19 affiliation contract so they were working at Long Island
20 College Hospital but they were employees of SUNY Downstate.

21 Q.  Is that similar to the relationship between SUNY
22 Downstate and Kings County Hospital as you understand it?

23          MR. NELSON: Object to the form.

24 A.  Yes.

25 Q.  You mention in or about 2014 July you managed the

S. PULITZER

```
 1   schedules for the attending physicians at Kings County
 2   Hospital in the radiology department; is that correct?
 3        A.   Yes.
 4        Q.   Did the schedules need to be reviewed by anyone?
 5        A.   Just me.
 6        Q.   The type of schedule, the hours that were worked,
 7   who made that determination?
 8        A.   That was a joint determination between Dr. Reede
 9   and myself.
10        Q.   Was Dr. Jamaleddine involved in that scheduling
11   or the determination of that scheduling?
12        A.   No, he was not.
13        Q.   Did you assign tasks to physicians in the
14   radiology department when you were the chief of service for
15   radiology?
16        A.   Yes.
17        Q.   What task would you assign to the physicians in
18   that department?
19        A.   There was a wide range that I would assign.  They
20   had their daily duty which was reading films.  Most of
21   those physicians were in a subspecialty department so
22   within our department we have nine or ten subspecialty
23   areas.  Within those areas there are quality assurance
24   tasks that need to be performed.  So I would assign not
25   only their daily work but also quality assurance stuff, you
```

S. PULITZER

1 know, whatever -- I guess tasks.
2  Q.  Where do these tasks arrive?
3  A.  There are regulations that come from the Joint
4 Commission which is a, you know, a body that inspects your
5 hospital; has codes that you have to meet in order for the
6 inspection to be -- in order to pass the inspection. There
7 is the center for Medicare and Medicaid services that have
8 guidelines and regulations and there's hospital by-laws so
9 between the three of those bodies generally.
10  Q.  You are familiar with Dr. Greenberg, yes?
11  A.  Yes.
12  Q.  Did there come a time in which Dr. Greenberg
13 requested family medical leave from you?
14  A.  No.
15  Q.  Did there come a time in which Dr. Greenberg
16 requested time off on or about September 2014 for family
17 issues?
18  A.  He requested time off. I did not know the nature
19 of his request.
20  Q.  When he requested time off during that time, to
21 whom did you report that request to, if anyone?
22  A.  Dr. Reede.
23  Q.  Did you ever report that request for his time off
24 to Dr. Jamaleddine?
25  A.  Not at that time, no.

S. PULITZER

1  Q. When, if at all, did you report it to Dr.
2  Jamaleddine?
3  A. Only after there was an issue where he did not
4  show up for work.
5  Q. Why did you report it to Dr. Jamaleddine after
6  there was an issue?
7  A. It's, as I stated earlier, one of the
8  requirements of the job descriptions of the chief of
9  service is to inform the chief medical officer of any
10 problems with staff that you are having and so it was one
11 of my duties to keep him abreast of what was happening.
12 Q. You were reporting to him what was going on in
13 the department with respect to Dr. Greenberg?
14 A. Correct.
15 Q. You said when there were problems with -- when
16 Dr. Greenberg didn't show up to work during that period of
17 time you reported it to Dr. Reede; correct?
18 A. Yes, I did.
19 Q. What, if anything, occurred as a result of Dr.
20 Greenberg not showing up to work?
21 A. Dr. Greenberg was referred to the Labor Relations
22 department.
23 Q. Who referred him to Labor Relations?
24 A. Myself and Dr. Reede.
25 Q. At whose direction did you refer him to Labor

S. PULITZER

1           MR. NELSON:  Object to the form.
2      A.   So that was depending on where -- how much of an
3   affiliate, how much the affiliation contract was paying
4   their salary.  If a hundred percent of their salary was
5   coming from the affiliation contract, a hundred percent of
6   their effort equals 1 FTE would be at Kings County
7   Hospital.
8      Q.   Who set the salary, if you know, for the
9   affiliates within the radiology department at Kings County
10  Hospital?
11     A.   I don't know.
12     Q.   Do you know who would know who set the salary for
13  those affiliates?
14     A.   Yes.  The chief financial officer, Anthony Saul.
15     Q.   Anthony Saul is at SUNY?
16     A.   Kings County.
17     Q.   Is it your understanding that Saul would set the
18  specific salary for physicians or allocate a certain amount
19  of money to pay for physician salaries?
20          MR. NELSON:  Object to the form.
21     Q.   Pursuant to the affiliate agreement?
22          MR. NELSON:  Object to the form.
23     A.   So the operating budget for physicians is a
24  yearly budget and that number, the total yearly number is
25  set by the chief financial officer's office.

```
 1            How you divide that number up is left to the
 2   discretion of Dr. Reede and myself.  So if we wanted to
 3   adjust someone's salary or bring somebody in who was new,
 4   if there was money in the affiliation and it was cost
 5   neutral and it did not require any influx of funds that
 6   money is within reason, no -- you can do that.  As long as
 7   the salary was in line with what other physicians of the
 8   same specialty at other similar institutions were making
 9   you can do that.
10       Q.   As you testified you and Dr. Reede would make the
11   determination what specific salaries physicians from the
12   radiology department would receive?
13            MR. NELSON:  Objection to the form.
14       A.   Yes.  We would do that and then that has to be
15   approved by a number of people so we can make a
16   recommendation but the final approval was not us.
17       Q.   Who was the final approval?
18       A.   The final approval was Dr. Jamaleddine as the
19   chief medical officer, Mr. Saul as the chief financial
20   officer and the - I don't know if it's the dean or the
21   president, somebody at SUNY who's a dean, or the president
22   who is in charge of their affiliate contracts.
23       Q.   When you say final approval, this is pursuant to
24   the affiliate agreement?
25       A.   Correct.
```

S. PULITZER

1   was. I remember informing Dr. Reede, you know, as this was
2   happening and informing labor relations at SUNY.
3           MS. BLOCKER: Can you read back his last
4       answer.
5           (Whereupon, the referred-to answer was read
6       back by the Reporter.)
7   Q.  What was Dr. Jamaleddine's response to the
8   information that you were providing him?
9   A.  He was aghast. He could not believe there were
10  so many reports with this on it. He did not want this
11  employee at his institution, essentially. We had discussed
12  referring to, if this was something offering to OPMC and
13  decided that we -- when you do that, that provider can lose
14  their license and we thought that while there might be a
15  case there we didn't want to take it to that level but we
16  preferred to handle it internally.
17  Q.  Do you know what the process is for if a
18  physician within the radiology department at Kings County
19  Hospital who is an affiliate physician were to be
20  terminated?
21  A.  I'm sorry, can you repeat that.
22  Q.  What is the process, if you know, for termination
23  of an affiliate doctor?
24  A.  So it depends. It depends on -- it can range
25  from voluntary separation to termination for cause. So

S. PULITZER

1   did but they then asked me and Dr. Reede and Dr.
2   Jamaleddine what we recommend in terms of this, you know,
3   employee, and the recommendation was for termination.
4       Q.   When you say they, who are you referring to?
5       A.   Labor relations. The labor relations. I
6   remember speaking with Stephanie Bernadel.
7       Q.   Labor relations at SUNY; yes?
8       A.   Yes.
9       Q.   And you said that they asked you, Dr. Reede and
10  Dr. Jamaleddine?
11      A.   Yes.
12      Q.   How do you know they asked Dr. Jamaleddine?
13      A.   I don't remember if I heard it from Dr.
14  Jamaleddine or if I heard it from labor relations that they
15  wanted to know but that was my understanding.
16      Q.   You say you spoke with?
17      A.   Stephanie Bernadel.
18      Q.   What was the conversation that you had with
19  Stephanie Bernadel?
20      A.   I just remember her saying that Dr. Greenberg had
21  been interviewed again and there was a case pending because
22  of the unscheduled absences and the attestations and that
23  did they want -- there was time between particular --
24  there were two. He went one day and came back another day.
25  There was time between the two things.

S. PULITZER

1  I don't know if he requested the time so I don't
2  know who did it. Around that time they said what is your
3  recommendation; how do you want to pursue these and then we
4  had recommended termination.
5  Q. Did Stephanie Bernadel mention that she spoke
6  with Dr. Jamaleddine?
7  A. I don't know if she said it to me or if it came
8  through Dr. Reede or if I talked to him myself. I don't
9  remember.
10         MS. BLOCKER: We'll take a break.
11         (Whereupon, a short recess was taken.)
12  Q. Dr. Pulitzer, to your knowledge, could Dr.
13  Jamaleddine override any decision made by SUNY's labor
14  relations department?
15  A. Yes, he could.
16  Q. How so?
17  A. For instance, with the attestations he was firm
18  that he did not want Dr. Greenberg to be employed at Kings
19  County Hospital. He did not want somebody who was going to
20  mock the medical record to the degree that he mocked it.
21  If labor relations at SUNY had decided that Dr. Greenberg
22  would continue in the employment, he can continue to be an
23  employee of Downstate but Dr. Jamaleddine could say that he
24  cannot work at Kings County Hospital.
25  Q. You testified he could say -- he could still be

43

S. PULITZER

1  an employee at SUNY Downstate but not be assigned to Kings
2  County Hospital?
3      A.   Correct.
4      Q.   To the extent that Dr. Jamaleddine wanted Dr.
5  Greenberg's employment terminated --
6      A.   Yes.
7      Q.   -- from SUNY, could Dr. Jamaleddine override any
8  recommendation from SUNY's labor relations in connection
9  with the termination?
10     A.   All I know is that he has jurisdiction over his
11 own hospital and his own employees. The affiliates are not
12 employees of the City, of that hospital, but he can say who
13 is given privileges and who is not. So his privileges
14 could be revoked.
15     Q.   And privileges within the hospital at Kings
16 County?
17     A.   Yes.
18          MS. BLOCKER:  I have no further questions.
19          MR. COULSTON:  Off the record.
20          (Whereupon, an off-the-record discussion was
21      held.)
22 EXAMINATION BY
23 MR. NELSON:
24     Q.   Good morning.
25     A.   Good morning.