47

Page 105

1   JAMALEDDINE
2   Q. Now, the issue with the residency program had
3   been brought to your attention by Dr. Reede; correct?
4   A. No, I knew it before Dr. Reede joined.
5   Q. And how long did you know about that?
6      What did you know and how did you know about
7   it?
8   A. So I meet with the designated institution
9   officer, the IO, who basically oversees the graduate
10  medical education for SUNY, and we discussed programs
11  that are on probation.
12  Q. And who was that person prior to Dr. Reede
13  becoming Chairman of the Radiology Department at
14  Downstate?
15  A. So that would be Steve --
16     Give me a moment. I'll remember the name.
17  I'll remember the name.
18     I cannot recall the last name right now.
19  Q. All right. If you remember it as we go along,
20  please say so.
21  A. Okay.
22  Q. So you were aware of issues with the residency
23  program before Dr. Reede joined; is that correct?
24  A. That's correct.
25  Q. And you were also aware of issues you say that

Page 106

1   JAMALEDDINE
2   occasionally got brought to your attention.
3      What type of issues are you referring to?
4   A. It could be some delay in readings or
5   reporting, or sometimes quality of reporting.
6   Q. Do you recall any particular attending
7   radiologist with respect to which such issues were
8   raised with you?
9   A. I cannot recall particular attendings.
10  Q. Do you recall Dr. Greenberg, there ever being
11  an issue with Dr. Greenberg, either the timeliness of
12  his reporting or any other issue in that regard?
13  A. I don't recall.
14  Q. And what was it that brought you to say that
15  Dr. Cantor was a weak leader?
16     MR. COULSTON: Objection.
17     You can answer.
18     THE WITNESS: There were things that were left
19  loose.
20     One of them was Dr. Mirchandani, who was
21  medically -- had medical problems and cognitive issues,
22  and he was kept on the staff.
23     Another one is the residency program going on
24  probation.
25     So these were like really major issues.

Page 107

1   JAMALEDDINE
2   BY MR. NELSON:
3   Q. Did you ever discuss those major issues with
4   Dr. Cantor himself?
5   A. I did.
6   Q. And on how many occasions did you do that?
7   A. I can't recall the exact number.
8   Q. Was it more or less than five?
9   A. Probably less than five.
10  Q. And what had you said to Dr. Cantor in that
11  regard?
12  A. With regard to the residency program, you
13  know, I told him he needs to have a plan assessing the
14  engagement of the attendings, the supervision of the
15  attendings, and with respect to Dr. Mirchandani I
16  recommended to have a really thorough evaluation of his
17  ability to read X-rays.
18     MR. NELSON: Okay. Carol, may I have the
19  witness' last answer read back, please.
20     (Record Read)
21     BY MR. NELSON:
22  Q. And did Dr. Cantor act on your
23  recommendations?
24  A. I don't remember what he did with respect to
25  the attendings and their supervisions of the resident

Page 108

1   JAMALEDDINE
2   and teaching, but I remember he acted on the request
3   with respect to Dr. Mirchandani.
4   Q. And what did he do in that regard?
5   A. He had a conversation with him and he
6   involved, I think, the Physician Health, and, third, Dr.
7   Mirchandani was given like known X-rays to read, and he
8   was assessed by a third party in terms of missing on his
9   readings.
10  Q. Okay. Was there any other physician in the
11  Radiology Service at Kings County that you made specific
12  comments about to Dr. Reede other than Dr. Cantor and,
13  of course, as you previously testified, Dr. Mirchandani?
14     MS. BLOCKER: Objection.
15     You can answer.
16     THE WITNESS: No.
17     BY MR. NELSON:
18  Q. And after Dr. Cantor did what it was you've
19  just recounted, what happened between you and Dr. Cantor
20  next?
21  A. Can you repeat this question, please.
22  Q. Let me withdraw that question and ask you, you
23  had made recommendations to Dr. Cantor, and he had acted
24  upon those.
25     Can you tell me in what regard you found his

**Page 109**

JAMALEDDINE
actions either lacking or otherwise indicating weak leadership?
MS. BLOCKER: Objection.
You can answer.
THE WITNESS: The fact that this has been going on for a long time indicated to me that I wanted to have a different leadership in the Department of Radiology.
BY MR. NELSON:
Q. I see.
So you were basically of the view that Dr. Cantor should no longer continue as Chief of Service, of Radiology?
A. That's correct.
Q. And what about him as a continuing attending radiologist in the department?
Did you have issues with his performance as a radiologist?
A. I did not have issues with his performance as a radiologist.
Q. So you simply wanted someone else to take over Chief of Service; is that correct?
A. That's correct.
MS. BLOCKER: Objection. You can answer.

**Page 110**

JAMALEDDINE
MR. NELSON: I'm sorry.
Say it again.
(Record read)
THE WITNESS: That's correct.
MS. BLOCKER: Note my objection.
BY MR. NELSON:
Q. And you so stated to Dr. Reede?
A. Yes, I did.
Q. Did you ever tell Dr. Reede that you wanted Dr. Cantor removed from Kings County Hospital?
A. Yes.
Q. And what did you tell her in that regard?
A. I told her that he cannot continue to be the Chief, my recommendation is to look into a different direction, and I would rather him not work as an attending.
Q. And why was it that you didn't want him to work as an attending?
A. I mean, as a principle I found it would be better for him to work in a different location after having been the Chief at Kings County.
Q. I thought you said a moment ago you didn't have any issues with him as an attending radiologist, as a practicing radiologist.

**Page 111**

JAMALEDDINE
Is that not correct?
A. That's correct.
Q. So, even though you found him to be a perfectly satisfactory attending radiologist, you still wanted him removed from the institution?
A. I preferred that he changes institutions.
Q. And when you say you preferred, is that something that you instructed or directed Dr. Reede to accomplish?
A. I suggested.
Q. Okay. And what was your understanding of the -- of how your suggestion would be taken?
A. I think it would be taken seriously.
Q. Well, I understand that.
But was it your expectation that, because you wanted Dr. Cantor removed, he would be removed, or was there -- was -- did you still leave the option open for Dr. Reede to keep him at Kings County?
A. As I stated, I recommended for him to be removed.
Q. I understand that, and I'm trying to understand the import of the suggestion or recommendation that he be removed.
Were you leaving the opportunity for Dr. Reede

**Page 112**

JAMALEDDINE
to keep him at Kings County notwithstanding your suggestion or were you essentially telling her that she did not have that discretion and she needed to remove him?
MS. BLOCKER: Objection. Asked and answered.
THE WITNESS: So I suggested for him to be removed.
I did not want to have the option to keep him working at Kings County, even though technically he had no issue as an attending.
BY MR. NELSON:
Q. So when you say you suggested or recommended that he be removed, you fully expected that that suggestion or recommendation would be honored; correct?
A. She can oppose it if she can, because the appointments and all labor issues, HR issues are handled by SUNY.
Q. What do you mean, "She can oppose it"?
A. Well, if she -- if she did not agree, she would tell me she wouldn't agree.
Q. But she didn't disagree; did she?
A. She did not disagree.
Q. How long after that was Dr. Cantor removed?
A. I cannot recall exact time.