UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ODED GREENBERG, M.D., | 15-cv-2343 (PKC/VMS) |
| Plaintiff, | |
| - against - | |
| SUNY DOWNSTATE ET AL., | |
| Defendants. | |


**REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF SUNY DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**


BARBARA D. UNDERWOOD
Attorney General of the State of New York
<u>Attorney for SUNY Defendants</u>
28 Liberty Street, 17th Floor
New York, New York 10005
(212) 416-8556
email: christopher.coulston@ag.ny.gov


CHRISTOPHER COULSTON
Assistant Attorney General
        <u>of Counsel</u>



Dated:  September 14, 2018

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii

Preliminary Statement ........................................................................................................1

Argument ...........................................................................................................................2

I.     PLAINTIFF CANNOT POINT TO FACTS FROM WHICH A REASONABLE
      JUROR COULD FIND THAT ANY ADVERSE ACTION WAS TAKEN
      AGAINST HIM BASED UPON DISCRIMNATORY ANIMUS ...........................................2

   A.  Plaintiff Asks the Court to Ignore the Evidence that in Light of the Accreditation
      Crisis, the Attendance and Performance of All Radiology Department Members,
      Not Just Him, Were Being Monitored.........................................................................2

   B.   Dr. Reede Renewed Plaintiff's Contract Knowing His Age and Race .......................4

   C.   The Record Establishes Plaintiff's Continuing Time and Attendance
      Noncompliance and Insubordination Which Were Serious Problems for
      the Hospital and the Radiology Department's Residency Accreditation....................4

   D.   Ms. Neiman's Declaration Consists of Stale and Stray Remarks that Fail to Show
      Discriminatory Animus Caused Any Adverse Action to Be Taken Against Plaintiff...............7

II    PLAINTIFF HAS NOT OVERCOME THE UNDIPUTED EVIDENCE
     OF DEFENDANTS' LEGITIMATE NON-DISCRIMINATORY REASONS
     FOR THE ALLEGED ADVERSE ACTIONS...................................................................8

   A.  Plaintiff Was Terminated After His Use of Unauthorized Attestations.....................9

   B.  Plaintiff Was Not Promoted Because Dr. Scott Had Better Academic
      Qualifications and Did Not Have Issues with Time and Attendance ........................10

   C.  Plaintiff's Voluntary Entry Into a Settlement Agreement Cannot Serve as the
      Basis for a Viable Claim............................................................................................15

III    PLAINTIFF'S FMLA CLAIMS FAIL BECAUSE BY HIS OWN ADMISSION HE
     FAILED TO TIMELY REQUEST LEAVE, TOLD SUNY HE MISSED WORK
     FOR A NON-FMLA PURPOSE, WAS TERMINATED FOR UNRELATED
     REASONS AND ASSERTS NO FACTS DEMONSTRATING DR. REEDE'S
     INVOLVEMENT.............................................................................................................16

# TABLE OF AUTHORITIES

C‌ASES                                                            **Page(s)**

Assue v. UPS, Inc.,
No. 16-CV-7629 (CS), 2018 WL 3849843 (S.D.N.Y. Aug. 13, 2018) ...................................5

Benedith v. Malverne Union Free Sch. Dist.,
38 F. Supp. 3d 286 (E.D.N.Y. 2014) ........................................................................... 10, 14

Bowman v. CSX Transp., Inc.,
22 F. Supp. 3d 181 (N.D.N.Y. 2014) ...................................................................................18

Brierly v. Deer Park Union Free Sch. Dist.,
359 F. Supp. 2d 275 (E.D.N.Y. 2005) ..................................................................................11

Brown v. The Pension Boards,
488 F. Supp. 2d 395 (S.D.N.Y. 2007) ........................................................................... 16, 18

Buckman v. Calyon Sec. (USA) Inc.,
817 F. Supp. 2d 322 (S.D.N.Y. 2011) ...................................................................................8

Byrnie v. Town of Cromwell,
243 F.3d 93 (2d Cir. 2001) ........................................................................................ 2, 11, 14

Costantin v. New York City Fire Dep't,
No. 06 CIV. 04631GBDTHK, 2009 WL 3053851 (S.D.N.Y. Sept. 22, 2009) ...................8

Coutard v. Municipal Credit Union,
848 F.3d 102 (2d Cir. 2017) ................................................................................................17

de la Cruz v. New York City Human Res. Admin. Dep't of Soc. Servs.,
884 F. Supp. 112 (S.D.N.Y. 1995), aff'd, 82 F.3d 16 (2d Cir. 1996) ..................................14

DeLuca v. Sirius XM Radio, Inc.,
No. 12-CV-8239 (CM), 2017 WL 3671038 (S.D.N.Y. Aug. 7, 2017) ..................................8

Edusei v. Adventist Healthcare, Inc.,
No. CIV.A. DKC 13-0157, 2014 WL 3345051 (D. Md. July 7, 2014) ...............................18

Eka v. Brookdale Hosp. Med. Ctr.,
247 F. Supp. 3d 250 (E.D.N.Y. 2017) ...................................................................................8

Fleming v. MaxMara USA, Inc.,
371 F. App'x 115 (2d Cir. 2010) ...........................................................................................9

Geromanos v. Columbia Univ.,
322 F. Supp. 2d 420 (S.D.N.Y. 2004) ..................................................................................18

Grady v. Affiliated Cent., Inc.,
    130 F.3d 553 (2d Cir. 1997) ........................................................................4

Graziadio v. Culinary Inst. of Am.,
    817 F.3d 415 (2d Cir. 2016) ......................................................................16

Harris v. Bd. of Educ. of the City Sch. Dist. of the City of New York,
    230 F. Supp. 3d 88 (E.D.N.Y. 2017) .........................................................15

Holcomb v. Iona College,
    521 F.3d 130 (2d Cir. 2008) ........................................................................2

Iverson v. Verizon Commc'ns,
    No. 08 CIV. 8873(SAS), 2009 WL 3334796 (S.D.N.Y. Oct. 13, 2009) .........10

Johnson v. New York City Dep't of Educ.,
    39 F. Supp. 3d 314 (E.D.N.Y. 2014), aff'd, 633 F. App'x 42 (2d Cir. 2016).....5

Mascetta v. Miranda,
    957 F. Supp. 1346, 1354 (S.D.N.Y. 1997) ...................................................2

McCullough v. Wyandanch Union Free Sch. Dist.,
    187 F.3d 272, 280 (2d Cir. 1999) ................................................................2

Moore v. Kingsbrook Jewish Med. Ctr.,
    No. 11-CV-3625 MKB, 2013 WL 3968748 (E.D.N.Y. July 30, 2013).........4, 15

Moy v. Perez,
    712 F. App'x 38 (2d Cir. 2017).....................................................................2

Pearson v. Unification Theological Seminary,
    785 F. Supp. 2d 141 (S.D.N.Y. 2011).........................................................18

Phipps v. Comprehensive Cmty. Dev. Corp.,
    No. 00 CIV. 6063RJHKNF, 2005 WL 287413 (S.D.N.Y. Feb. 4, 2005).........8

Rinaldi v. Quality King Dist., Inc.,
    29 F. Supp. 3d 218 (E.D.N.Y. 2014)..........................................................17

Serby v. New York City Dep't of Educ.,
    526 F. App'x 132 (2d Cir. 2013) ................................................................16

Sethi v. Narod,
    12 F. Supp. 3d 505 (E.D.N.Y. 2014)............................................................8

Shaw v. McHugh,
    No. 12-CV-6834 CS, 2015 WL 1400069 (S.D.N.Y. Mar. 26, 2015), aff'd, 641 F.
    App'x 95 (2d Cir. 2016).............................................................................10

Terry v. Ashcroft,
  336 F. 3d 128 (2d Cir. 2003) ...................................................................................8

Van Zant v. KLM Royal Dutch Airlines,
  80 F.3d 708 (2d Cir. 1996) ......................................................................................8

Weinstock v. Columbia Univ.,
  224 F.3d 33 (2d Cir. 2000) ................................................................................. 8-9

Whethers v. Nassau Health Care Corp.,
  956 F. Supp. 2d 364 (E.D.N.Y. 2013), aff'd, 578 F. App'x 34 (2d Cir. 2014)............9, 11

Ya–Chen Chen v. City Univ. of New York,
  805 F.3d 59 (2d Cir. 2015) .....................................................................................2

**FEDERAL STATUTES**

Family Medical Leave Act (FMLA)..............................................................2, 16-19

Title VII....................................................................................................... 2, 8, 11

**FEDERAL REGULATIONS**

29 C.F.R.
  § 825.303(c) ........................................................................................................17

**RULES**

Fed. R. Civ. P. 37(e)................................................................................................2

Federal Rules of Civil Procedure
  Rule 56 ...................................................................................................................1

Local Rule 56.1.........................................................................................................1

Defendants Dr. Deborah Reede, Dr. Steven Pulitzer and The State University of New York submit this reply memorandum of law in further support of their motion for summary judgment dismissing the claims in this action pursuant to Rule 56 of the Federal Rules of Civil Procedure. Also submitted in support are the SUNY Defendants' Counter-Response to Plaintiff's Response to Defendants' Rule 56.1 Statement; and the declarations of Christopher Coulston ("Coulston Reply Decl."), Dr. Deborah Reede ("Reede Reply Decl.") and Dr. Steven Pulitzer (Pulitzer Reply Decl.").[1]

## Preliminary Statement

Not once in Plaintiff's Opposition papers does he mention the Accreditation Council for Graduate Medical Education ("ACGME") placing the Radiology Residency Program at SUNY Downstate on probation in April 2014. This omission is striking, as the probationary status explains the heightened scrutiny of the radiologists in the Department, the concern about attending physicians disappearing during the day, and the renewed focus on academics in the Department beginning in Spring 2014. See SJ Memo, p. 4-6. It is no coincidence that Plaintiff's long and uncontested history of time and attendance issues finally came to a head shortly after the Department was placed on probation. Instead of reforming his behavior, Plaintiff continued his pattern of time and attendance abuse – stunningly, Plaintiff does not even assert that after repeated warnings about his time and attendance he actually complied and worked the hours he was supposed to work – and ultimately lashed out by authoring the sarcastic attestations, which led to his own termination. He cannot contest the undisputed fact that his insubordination relating to attestations caused the Chief Medical Officer of KCHC, Dr. Ghassan Jamaleddine, to refuse to let him continue to practice at KCHC. Instead of addressing this factual context of his claims, Plaintiff resorts to mischaracterizing the record and portraying standard managerial actions – like ensuring employees show up to work – as a vague

---

[1] The SUNY Defendants incorporate and rely on their moving brief to respond to any of Plaintiff's arguments not addressed herein.

conspiracy with Dr. Deborah Reede as the puppet master.  Opp., p. 23, fn. 13.

In the end, Plaintiff cannot rebut the SUNY Defendants' showing of a legitimate and non-discriminatory reason for each of the three alleged adverse actions he asserts and his discrimination claims fail for this and other reasons.  Further, Plaintiff's FMLA claims fail because Plaintiff's own opposition and the undisputed facts show that Plaintiff did not timely ask for leave, told SUNY it was for a non-FMLA purpose, took the time off, and was fired shortly thereafter as a result of his insubordination relating to the attestations.  Accordingly, as set forth below, it is respectfully submitted that the SUNY Defendants are entitled to summary judgment.

## Argument

### I.   PLAINTIFF CANNOT POINT TO FACTS FROM WHICH A REASONABLE JUROR COULD FIND THAT ANY ADVERSE ACTION WAS TAKEN AGAINST HIM BASED UPON DISCRIMNATORY ANIMUS.

Plaintiff has failed to proffer sufficient facts so that it can plausibly be inferred that any of the alleged adverse actions were caused by discriminatory animus.  See Holcomb v. Iona College, 521 F.3d 130, 138 (2d Cir. 2008); Moy v. Perez, 712 F. App'x 38, 41–42 (2d Cir. 2017); Byrnie v. Town of Cromwell, 243 F.3d 93, 103 (2d Cir. 2001), superseded in part by Fed. R. Civ. P. 37(e).  Instead of admissible evidence, Plaintiff offers allusions to a conspiracy orchestrated by Dr. Reede, who had retained Dr. Greenberg in June 2014, and irrelevant statements by her from 2013.[2]  Because Plaintiff has not met his burden, and "Title VII is not an invitation for courts to sit as a super-personnel Department that reexamines employers' judgment," Ya–Chen Chen v. City Univ. of New York, 805 F.3d 59, 73 (2d Cir. 2015), Plaintiff's claims should be dismissed.

### A.  Plaintiff Asks the Court to Ignore the Evidence that in Light of the Accreditation Crisis, the Attendance and Performance of All Radiology Department Members, Not Just Him, Were Being Monitored.

---

[2]  Plaintiff has also failed to allege any conduct that is not "objectively reasonable," and Dr. Reede and Dr. Pulitzer are therefore entitled to qualified immunity for claims brought pursuant to §1983 against them in their individual capacities.  Mascetta v. Miranda, 957 F. Supp. 1346, 1354 (S.D.N.Y. 1997); see also McCullough v. Wyandanch Union Free Sch. Dist., 187 F.3d 272, 280 (2d Cir. 1999).

Plaintiff's portrayal of a conspiracy (see Pl. Opp., p. 22-27) between Drs. Pulitzer and Reede is based on speculation and contrary to both admissible evidence and common sense. Plaintiff alleges that he was "singl[ed] out" in an "illicit campaign" that culminated in his termination. Id., p. 25-27. As discussed in Defendants' moving brief, though, the ACGME probationary status created a "crisis" in the Radiology Department. Id.; Jamaleddine Dep., p. 99:8-20. Following the ACGME report, Dr. Reede instituted a number of measures to monitor the attendance and performance of **all** of the physicians in the Department. Reede Reply Decl., ¶ 2; Ex. B; Reede Dep., p. 149:10-25 (Reply Excerpts). As Chair, Dr. Pulitzer reviewed productivity details for every physician, not just Dr. Greenberg, and looked for any attendance irregularities. Pulitzer Decl. ¶ 6. This close monitoring was essential to correct the deficiencies identified by the ACGME, which had specifically found "that 'some faculty' do not 'show up' for their scheduled supervision assignments and the program has not enforced adherence to the schedule." Ex. A, SUNY000683. Dr. Pulitzer and Dr. Reede did not "conspire"; they worked collaboratively to save the residency program at KCHC. Dr. Reede admits that this monitoring continues today, ensuring that physicians are complying with the schedule, spending their days reading film and available to consult with residents. Reede Reply Decl., ¶ 2.

In support of Plaintiff's conspiracy narrative, he downplays his time and attendance issues and goes so far as to call Dr. Pulitzer "suspicious" and portrays him as "mendacious and furtive." Opp., p. 26, 27. *Ad hominem* attacks aside, Plaintiff's first encounter with Dr. Reede or Dr. Pulitzer regarding his time and attendance occurred in early May 2014.[3] This was a few weeks **after** the ACGME decision, and Plaintiff does not allege a single act of monitoring or "conspiring" against him that

---

[3] Plaintiff alleges that it was Dr. Reede who caught the error in his timesheet, not her assistant Ms. McMurren. See Opp., p. 3. Plaintiff ignores Dr. Reede's unambiguous testimony that Ms. McMurren "brought it to [her] attention." Reede Dep., p. 147:24-148:10 (Reply Excerpts). Ms. McMurren reviewed **all** timesheets during this period, not just Plaintiff's, for irregularities, and brought them to the attention of Dr. Reede. Reede Reply Decl., ¶ 2. Further, Plaintiff calls this incident a "trap." Plaintiff's mischaracterizations are irrelevant red herrings: he admits that his time and attendance problems were brought to his attention and that Dr. Reede was correct that he had improperly reported that he was present at the hospital when he was not. Opp., p. 3.

preceded the ACGME report. In the first email identified by Plaintiff that he claims was part of the "illicit alliance" to eventually terminate him, Dr. Reede reviewed Plaintiff's *and* Dr. Qi Chen's timesheet. See Opp., p. 3; Ex. 8. Dr. Chen, who is not White or Jewish and was 39 years old at the time of the ACGME probation, was also a notorious time and attendance abuser and ultimately resigned as a result. Reede Reply Decl., ¶ 3. Plaintiff was hardly "singl[ed] out." Opp., p. 25.

**B. Dr. Reede Renewed Plaintiff's Contract knowing His Age and Race.**

There were five physicians non-renewed immediately after the ACGME report. SJ Memo, p. 4-5. At that time, due to financial uncertainty following the financial crisis, all physicians in the Radiology Department were on one-year renewable contracts, and Plaintiff could have been terminated without cause. See Reede Decl., ¶ 9, fn 2. Dr. Reede renewed Plaintiff in June 2014. At that time, she knew Plaintiff's age and race. Reede Reply Dec., ¶ 4. Plaintiff's conspiracy story makes no sense if Plaintiff could have simply been terminated without cause as of June 2014. Courts are rightly skeptical of claims of discrimination that are preceded closely in time by a decision to hire an employee by the same supervisor, and the same logic applies here. See Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997); Moore v. Kingsbrook Jewish Med. Ctr., No. 11-CV-3625 MKB, 2013 WL 3968748, at *11 (E.D.N.Y. July 30, 2013).

**C. The Record Establishes Plaintiff's Continuing Time and Attendance Noncompliance and Insubordination Which Were Serious Problems for the Hospital and the Radiology Department's Residency Accreditation.**

The undisputed evidence establishes that Plaintiff's time and attendance were problems, and he was insubordinate. Dr. Jinel Scott, who worked in the same room as Plaintiff, saw firsthand that "[Plaintiff] was sometimes very erratic about his hours" and that Plaintiff "would often come late to work. It could vary from like half an hour late to an hour to an hour and a half, to two." Id., p. 137:19-25; 153:21-25. The Talk Station data, which Plaintiff attempts to discredit, is used to monitor all members of the Department and showed Plaintiff's pattern of erratic attendance between July 1

and August 31.  Pl. Ex. 15.  When Plaintiff was supposed to be working 9 to 5, Talk Station data shows that he logged his first case at 12:11 pm on August 18; 12:22 pm on August 19; 3:14 pm on August 20; 10:00 am on August 21 (although he read his last case at 1:17 pm that day); and 10:54 am on August 22, the day of his meeting regarding time and attendance with Dr. Pulitzer.  Id.  This pattern continued the following week when he was supposed to be on vacation, when Plaintiff claimed to have arrived at 10 or 11 am on his timesheet (3:33 pm on August 26; 12:29 on August 27; 3:31 pm on August 28; 11:59 am on August 29),[4] and the week after Labor Day before he was sent to Labor Relations (11:09 am on September 2; 1:57 pm on September 3).  Exs. T, Pl. Ex. 15.

Most astoundingly, Plaintiff does not even claim that he adhered to his schedule and tacitly admits, and in some exhibits expressly admits, that he refused to follow the coverage schedule, even when it was built around his preferences.  He admits that he had to be pushed to work certain hours by his previous supervisor, finally "compromised" on the hours he was willing to work and, even then, only "tended to adhere" to such hours.  Greenberg Decl.¶ 7.  During his September 8, 2014 Interrogation, he stated that although he was on the schedule as "9 to 5," he would occasionally "come in later and stay[] later."[5]  56.1 Response, ¶ 32.  He also showed contempt for the schedule stating that "it didn't make a difference" when he came in, and he had the "moral authority" to change the schedule.  Id.  But Dr. Kantor was gone, and new supervisors may set new standards, such as asking an employee to actually adhere to a set schedule.  Greenberg Decl., ¶ 7; Assue v. UPS, Inc., No. 16-CV-7629 (CS), 2018 WL 3849843, at *15 (S.D.N.Y. Aug. 13, 2018); Johnson v. New York City Dep't

---

[4] The revised schedule, which was set after Plaintiff unilaterally decided to change his plans, showed that Plaintiff was scheduled to work from 9 am – 5pm on August 26-28 and 6 am to 5 pm on August 29.  Pl. Ex. 19.
[5] Plaintiff's failure to be present and available during his scheduled hours was a serious problem.  Not only was the lack of availability of attendings a primary reason for the ACGME probation, but Plaintiff's job was not just reading films.  It included teaching and supervising residents, being present to consult with other doctors, attending scheduled meetings, and providing the Hospital with coverage by a radiologist.  See Pl. Exs. 9 and 11; Reede Dep., p. 149:18-25 (Reply Excerpts).  The department could also be audited for time and attendance by KCHC, which could lead to problems with the affiliation agreement. Ex. I; Reede Dep., p. 150:13-20 (Reply Excerpts).  These concerns were communicated to Plaintiff.  Id.

of Educ., 39 F. Supp. 3d 314, 324 (E.D.N.Y. 2014), aff'd, 633 F. App'x 42 (2d Cir. 2016).

Plaintiff attempts to make a factual issue as to whether he was formally "counseled" for his admitted failure to follow his work hours. See Opp. at 3-6. He does not accurately represent the record on this issue, but it is, in any event, irrelevant. Whether characterized as "formal" or informal, a counseling or a discussion, he cannot contest the record showing that he was spoken to by Dr. Kantor, Dr. Reede, Dr. Pulitzer and Labor Relations about his time and attendance. See Exs. F, G, H; Pulitzer Dep., 311-324; Reede Dep., p. 150; Pls. Exs. 9 (noting the May 2014 meeting with Dr. Reede and the discussion of time and attendance requirements at Grand Rounds the previous October) and 17. In fact, when confronted, Plaintiff disregarded a resident's criticism that Plaintiff was not around to supervise the residents, claiming the "inmates are running the asylum" and he need not be present when expected. Pls. Ex. 11. At the end of his Interrogation, Plaintiff finally agreed that he would adhere "to the schedule they want me to" going forward. Ex. X, SUNY001314.

It is worth recalling that the ACGME specifically criticized the Department because "'some faculty' do not 'show up' for their scheduled supervision assignments and the ***program has not enforced adherence to the schedule***." Ex. A, SUNY000683. The ACGME report in 2015, which reinstated the Department's accreditation, commended the administration "for a quick turnaround and implementing significant changes that have greatly improved the educational program." Ex. SS, SUNY00697.

Finally, and most damaging to Plaintiff's conspiracy theory, Plaintiff admits that he drafted an unapproved, sarcastic attestation and affixed it to approximately 180 patient files, and that it was this action that precipitated his termination. See Opp., p. 25-27. The Chief Medical Officer of KCHC, Dr. Ghassan Jamaleddine, stated, and Plaintiff admits, that he "would not allow Dr. Greenberg to practice anymore at KCHC" after his use of the unapproved attestations. Opp., p. 14. This had nothing to do with Plaintiff's age, race or religion.

### D. Ms. Neiman's Declaration Consists of Stale and Stray Remarks that Fail to Show Discriminatory Animus Caused Any adverse Action to Be Taken Against Plaintiff.

In a desperate bid to save his discrimination claims, Plaintiff submits the declaration of Esther Neiman, a former employee of University Physicians of Brooklyn, who was terminated in 2013, to prove Dr. Reede's racial animus. Reede Reply Decl., ¶ 5. But Ms. Neiman's statements cannot rescue Plaintiff's claims. The declaration includes alleged comments by Dr. Reede that primarily concern her reaction to daily midday prayers taking place in the office of the Chair of the Radiology Department at SUNY Downstate. Neiman Decl., ¶¶ 4-5. When Dr. Reede began at SUNY Downstate, the office traditionally used by the Chair of the Department of Radiology was used by another radiologist, Dr. Hyman Schwarzberg, and Orthodox Jewish physicians from throughout the hospital met there for daily prayers. Reede Dep., p. 387:2-20 (Reply Excerpts). Not surprisingly, when Dr. Reede assumed the position of Department Chair, she wanted to use the office traditionally used by the Chair. Id. Dr. Schwarzberg's office was moved two doors down, and physicians continue to pray there. Id.

Dr. Reede specifically denies ever asking Ms. Neiman "what are your people doing here at this time of day," and that she ever said "she wished she were Jewish because then she would get lots of holidays from work too." Reede Reply Decl., ¶ 5. The latter statement does not even make sense, since physicians must use leave time for Jewish holidays. Id. But even assuming the truth of Ms. Neiman's allegations for the purpose of this motion, they do not support Plaintiff's claims. The alleged statements were not directed at Dr. Greenberg, who is not an Orthodox Jew and does not allege that he participated in the prayer gatherings. They allegedly took place at an unspecified time in 2013, after Dr. Reede was appointed as the Chair of the Department in July 2013 and before Ms. Neiman left. Reede Decl., ¶ 3; Neiman Decl. ¶¶ 2, 3, and 6.

Even taken as true for the purposes of this motion, the alleged statements are clearly "stray remarks" since there is no causal nexus to connect them to any of the alleged adverse actions here. In

fact, not only are they not linked to any of the alleged adverse actions, they predate Dr. Reede's decision to retain Plaintiff and therefore do not give rise to an inference of discrimination.  See <u>Sethi v. Narod</u>, 12 F. Supp. 3d 505, 539 (E.D.N.Y. 2014); <u>DeLuca v. Sirius XM Radio, Inc.</u>, No. 12-CV-8239 (CM), 2017 WL 3671038, at *18 (S.D.N.Y. Aug. 7, 2017); <u>Costantin v. New York City Fire Dep't</u>, No. 06 CIV. 04631GBDTHK, 2009 WL 3053851, at *15 (S.D.N.Y. Sept. 22, 2009); <u>Phipps v. Comprehensive Cmty. Dev. Corp.</u>, No. 00 CIV. 6063RJHKNF, 2005 WL 287413, at *18 (S.D.N.Y. Feb. 4, 2005).  The alleged statements took place at least 6 months before the promotion of Dr. Scott and 10 months before Plaintiff's termination, and more likely more than a year before both events. <u>Buckman v. Calyon Sec. (USA) Inc.</u>, 817 F. Supp. 2d 322, 336 (S.D.N.Y. 2011) (remarks made five months before discharge deemed "too remote in time and context").  As such, they do not establish discriminatory animus.

## II. PLAINTIFF HAS NOT OVERCOME THE UNDIPUTED EVIDENCE OF DEFENDANTS' LEGITIMATE NON-DISCRIMINATORY REASONS FOR THE ALLEGED ADVERSE ACTIONS.

Under the <u>McDonnell Douglas</u> burden-shifting framework, if a Title VII plaintiff makes the <u>prima facie</u> showing, the burden shifts to the defendant to articulate legitimate, non-discriminatory reasons for its actions.  <u>Terry v. Ashcroft</u>, 336 F. 3d 128, 140 (2d Cir. 2003).  If defendants makes such a showing, the final and ultimate burden is on the plaintiff to offer evidence that the defendant's reason is a mere pretext for intentional discrimination. <u>Eka v. Brookdale Hosp. Med. Ctr.</u>, 247 F. Supp. 3d 250, 263 (E.D.N.Y. 2017).  At this last stage, the "plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false[.]" <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 42 (2d Cir. 2000) (<u>citing</u> <u>Van Zant v. KLM Royal Dutch Airlines</u>, 80 F.3d 708, 714 (2d Cir. 1996) (internal quotations omitted).

### A. Plaintiff Was Terminated After His Use of Unauthorized Attestations.

Plaintiff's use of unapproved, sarcastic attestations on 180 patient files easily satisfies Defendants' burden to establish a legitimate non-discriminatory reason for his termination. "The employer's burden of showing a legitimate non-discriminatory reason for its actions is not a particularly steep hurdle." Whethers v. Nassau Health Care Corp., 956 F. Supp. 2d 364, 375 (E.D.N.Y. 2013), aff'd, 578 F. App'x 34 (2d Cir. 2014). The decision to terminate Plaintiff was not simply plausible, but inevitable following his brazen act of insubordination. As Plaintiff admits, Dr. Jamaleddine, KCHC's Chief Medical Officer, believed that Plaintiff should be terminated following the incident, and Dr. Jamaleddine *would not allow him to practice at KCHC* after the incident. Opp., p. 14. There are no allegations of discriminatory animus against Dr. Jamaleddine, and his view on this subject as the Chief Medical Officer of KCHC is powerful, undisputed evidence that Plaintiff's behavior was outrageous and resulted in his immediate termination. Greenberg Dep., p. 463:22-25.

Plaintiff admits that he was alerted that his attestations "were causing a stir in the hallways," Opp., p. 13, and that he went to IT to try and change the records. Id. Plaintiff admits that Risk Management at KCHC told Dr. Pulitzer that Plaintiff's conduct was at least insubordinate, and told Dr. Pulitzer to consider a Medical Board Hearing, which could lead to revocation of his license. Pl. Counter Statement, ¶ 42; Ex. MM. Accordingly, Plaintiff's own opposition admits there was a legitimate non-discriminatory reason to terminate Plaintiff. Fleming v. MaxMara USA, Inc., 371 F. App'x 115, 118 (2d Cir. 2010). Finally, it was not just Dr. Jamaleddine, Dr. Reede and Dr. Pulitzer, but Labor Relations that decided to implement the penalty of termination after Plaintiff's Interrogation. Cuiman Dep., p. 220:9-221:12.

The burden then shifts back to Plaintiff who must show that Defendants' reason was pretextual. In this final step, Plaintiff must establish that "the evidence, taken as a whole, supports a sufficient rational inference of discrimination." Weinstock, 224 F.3d at 42. To believe that Plaintiff was terminated because of his race, age or religion, this Court must disregard the undisputed evidence

that Dr. Jamaleddine stated that Plaintiff would no longer be allowed to work at KCHC. Further, as Plaintiff concedes, Dr. Pulitzer was the primary actor on behalf of the SUNY Defendants in responding to the attestations. Opp., pp. 25-7. Dr. Pulitzer is white, Jewish and approximately the same age as Plaintiff. Courts "draw an inference against discrimination where the person taking the adverse action is in the same protected class as the affected employee," further undermining any theory of pretext. Benedith v. Malverne Union Free Sch. Dist., 38 F. Supp. 3d 286, 319 (E.D.N.Y. 2014)(collecting cases)(internal citation omitted).

Plaintiff's theory of pretext is also unpersuasive. Plaintiff argues that the attestations were only important for reimbursement from insurers. Id. But "[m]erely disagreeing with a supervisor's assessment of work performance...is insufficient to raise a triable issue of fact regarding pretext." Iverson v. Verizon Commc'ns, No. 08 CIV. 8873(SAS), 2009 WL 3334796, at *5 (S.D.N.Y. Oct. 13, 2009); also see Shaw v. McHugh, No. 12-CV-6834 CS, 2015 WL 1400069, at *12 (S.D.N.Y. Mar. 26, 2015), aff'd, 641 F. App'x 95 (2d Cir. 2016). Further, reimbursement is critical to the functioning of the hospital, which Plaintiff admitted during his Interrogation. Ex. QQ, p. 15. Plaintiff's act was also plainly insubordinate, as it was contrary to direct instructions from Dr. Pulitzer. Pulitzer Decl., ¶ 12. Plaintiff argues that he was late to the meeting, and this somehow excuses his conduct. Opp. p., 12-3. But Plaintiff was not terminated for simply departing from the approved language. He was terminated for using sarcastic language that was unprofessional and unacceptable in a patient's file.

For these reasons, Plaintiff's termination was the inevitable result of his own conduct. There is no evidence of discrimination, and Plaintiff's discriminatory discharge claims should be dismissed.

**B. Plaintiff Was Not Promoted Because Dr. Scott Had Better Academic Qualifications and Did Not Have Issues with Time and Attendance.**

Plaintiff alleges that the choice of Dr. Jinel Scott over him as Director of ER Radiology in July 2014 is also a discriminatory adverse action. The SUNY Defendants are not required to prove that

Dr. Scott was the superior candidate to Plaintiff, but only "to offer non-discriminatory explanations for how and why they chose her over [Plaintiff]." Brierly v. Deer Park Union Free Sch. Dist., 359 F. Supp. 2d 275, 296 (E.D.N.Y. 2005). When, as here,

> "a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications … that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to mask unlawful discrimination. **In effect, the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question."**

Byrnie, 243 F.3d at 103 (internal quotes and citations omitted). Plaintiff's credentials cannot meet this weighty burden.

Dr. Scott was chosen because of her qualifications, including her well-documented interest in academics and Plaintiff's history of time and attendance issues. Exs. I, YY, ZZ, BBB. In light of the ACGME probation report, which directly criticized the faculty for their perceived lack of "interest in the education of residents," and that this perception was the "primary" reason for the probation, there were certainly legitimate business reasons to use such criteria, (See Ex. A, SUNY000683-4; Reede Dep., p. 67:25-69:8), and it is not the place of this Court to question the business judgment of the defendants. Whethers, 956 F. Supp. 2d at 375.

Plaintiff's effort to establish that Dr. Scott's promotion was discriminatory and the justification pretextual is unsupported and self-defeating. Plaintiff does not dispute that Dr. Scott had superior academic qualifications; instead, he points to his lengthy experience at SUNY Downstate. Opp., p. 19-20. But Plaintiff's subjective view that he was more qualified is not relevant, Brierly, 359 F. Supp. 2d at 296, and there is ample evidence demonstrating that the SUNY Defendants' business decision to appoint Dr. Scott was legitimate and not pretextual.

While Plaintiff now states in a conclusory fashion that he is "interested in scholarly activity and academics," Greenberg Decl. ¶ 6, he had failed to evidence this interest during his tenure at

KCHC.  Plaintiff's CV, which was provided to Dr. Reede at the time of the decision to appoint Dr. Scott, listed two papers, both undated and without the name of a journal.  Ex. YY.  During his deposition, Plaintiff admitted that one of the papers, which he wrote in 1988 or 1989, was never published.  Greenberg Dep., p. 10:23-11:18.  Plaintiff was not a member of any radiological societies and did not list any academic accomplishments beyond the two articles.  Ex. YY.  Plaintiff had also submitted a summary of his scholarly activity to update the ACGME that showed zero hours spent on "Research/scholarly activity with residents" and no scholarly activity in the prior year.  Ex. BBB.

Even before the position of Director of ER Radiology became available, Dr. Reede had made clear that scholarly activity was connected to promotion, and that without such activity, Plaintiff should not expect a promotion.  During Plaintiff's annual review in February 2014, well before the decision was made to promote Dr. Scott in July, Plaintiff was asked to fill out a form indicating his accomplishments during the prior year.  Ex. CCC; Greenberg Dep., p. 138:9-18 (Reply Excerpts).  Plaintiff left two boxes completely blank: "scholarly distinction and accomplishment" and "mutual expectations regarding promotion."  Id.  In the blank box for "mutual expectations regarding promotion," Dr. Reede wrote: "No scholarly activity to support promotion."  Id.  As Dr. Reede summarized in her notes regarding her meeting with him in July 2014, Plaintiff had "[n]o significant scholarly activity" and primarily for that reason, Dr. Scott was selected.[6]  Ex. AAA.

Plaintiff argues that Dr. Reede's interest in hiring someone with achievements in academics and scholarly activity is pretextual based on the deposition testimony of Jinel Scott, who testified that at first she worked on "get[ting] the E.D. section functioning appropriately."  Pl. Opp., p. 20; Scott Dep., p. 272:3-4.  But Dr. Scott went on to testify that she still "did scholarly activity" when she

---

[6] Plaintiff claims that he told Dr. Reede he was working on academic papers at the time of their meeting, but he also said that he "wanted to have academic time to do so."  Greenberg Dep. 131:24-132:11.  Academic time is paid time during regular work hours and no one in the Radiology Department at SUNY Downstate has received academic time during Dr. Reede's tenure.  Reede Reply Decl., ¶ 8.  Plaintiff had not produced any academic posters at any point during his career, derisively stating that such work "wasn't my forte."  Greenberg Dep., p. 128:17-22.

started, and in fact she had published two papers in her first two years, planned to publish two more, and put together several academic posters. Scott Dep., p. 264:2-7. In her first two years as Director of ER Radiology, Dr. Scott had more academic accomplishments than Dr. Greenberg had in his entire career. See Exs. YY, ZZ. Dr. Reede also testified that Dr. Scott "expressed a strong interest in academics" to her prior to the decision, and she had already volunteered to work on teaching module projects. Reede Dep., p. 124:10-18. Even Plaintiff acknowledged at the time that a key part of the position was to "provide[] the best academic experience for our residents" and that "academics" had "been somewhat stunted" in the Department. Pl. Opp., Ex. 12. Most damning of all, Plaintiff's claim that the requirement of academic achievement was pretext is belied by his own words. In his email applying for the promotion, Plaintiff acknowledged that the Program was "recalibrating" its academic goals and tried to explain away his lack of scholarship by saying it had been a "tough year," without explaining the absence of scholarship in his previous years. Pls. Ex. 12.

Plaintiff also argues that it is evidence of pretext that Dr. Reede mentioned for the "first time" during her deposition that "residents sometimes could not find him," and this was not in her July 23, 2014 memo regarding her reasons for not selecting Plaintiff. Pl. Opp., p. 21-2; Ex. AAA. But the memo *does address this issue*. Dr. Reede wrote that Dr. Greenberg's "resident evaluations showed deficiencies in several areas." Ex. AAA. The resident evaluations from 2014 addressed Plaintiff's time and attendance issues, among other things. One resident wrote a particularly scathing critique of Plaintiff, commenting that he "would disappear for hours at a time" to "go[] home to eat dinner with his family." Ex. DDD, SUNY000475. The resident also stated Plaintiff was "extremely disinterested in teaching" and his lectures were "embarrassing and very insulting to the residents." Id. Residents walked out of a particular lecture that Plaintiff was not prepared to give. Id. Another resident suggested that Plaintiff "be more available," and Plaintiff received poor ratings as to whether he provided feedback to residents during his rotation (SUNY000468), whether he was available to assist

13

residents with academic work (SUNY000473), and whether he provided a high-quality teaching experience (SUNY000465). Id. The ACGME raised these very issues in its report. Ex. A ("[T]here was consensus that 'some faculty' do not 'show up' for their scheduled supervision assignments" (SUNY000683); residents complained of "inconsistent faculty supervision" (Id.); and "faculty do not demonstrate a strong interest in the education of the residents" (SUNY000684)).

Dr. Scott's resident evaluations following her first year at SUNY Downstate are, as with her resume, in stark contrast to Plaintiff's. The vast majority of residents believed Dr. Scott "always" performed her responsibilities and one resident wrote that she "seems to genuinely care about resident education." Ex. EEE; SUNY003853-67. There are also no facts to suggest that there were issues with Dr. Scott's time and attendance. Dr. Reede testified that she is regarded as "an excellent teacher by the orthopedic residents, by podiatry, by surgery, and radiology." Reede Dep., p. 124:20-22. Despite Plaintiff's subjective view that he was more qualified, he was less qualified with respect to his interest in academics and teaching, and his unreliability made him a problematic employee. In short, Plaintiff has not carried his burden to show that his credentials were so superior to Dr. Scott's that no reasonable person could have chosen Dr. Scott for the position. Byrnie, 243 F.3d at 103.

Plaintiff's allegation that Dr. Reede stated to him during the July 23, 2014 meeting that she wanted someone "close to residency," Pl. Opp., p. 21, even if it were true, is neutral as to age, and instead refers to the experience of having been a resident, which one can do at any age. Reede Reply Decl., ¶ 6. Such statements are not direct evidence of discriminatory animus. See de la Cruz v. New York City Human Res. Admin. Dep't of Soc. Servs., 884 F. Supp. 112, 116 (S.D.N.Y. 1995), aff'd, 82 F.3d 16 (2d Cir. 1996). Dr. Reede was also 64 years old at the time of her meeting with Plaintiff, a decade older than Plaintiff, and there is an inference against discriminatory animus for members of the same protected class. Benedith, 38 F. Supp. 3d at 319 (collecting cases). In addition, Dr. Reede has a well-documented history of appointing older (and Jewish) physicians to senior positions. Dr.

Pulitzer is 51 years old, and he was appointed the Chief of Radiology at KCHC in 2015.  Pulitzer Decl., ¶ 2.  Dr. Reede promoted Dr. Linden (57 years old) to the Chief of Neuroradiology position and ultimately to Vice President of Academic Affairs.  Reede Decl., ¶ 9.  This further undermines claims of discrimination by Plaintiff.  Moore, No. 11-CV-3625 MKB, 2013 WL 3968748, at *12. Plaintiff cannot meet his burden to show that the reasons for Dr. Scott's promotion were pretextual.

### C. Plaintiff's Voluntary Entry Into a Settlement Agreement Cannot Serve as the Basis for a Viable Claim.

Without citing authority, Plaintiff argues that the signing of the Settlement Agreement was an adverse action and an independent basis for Plaintiff's discrimination claims.  Opp., p. 23-5. However, "[a]ccepted charges through a settlement cannot be considered as adverse employment actions."  Harris v. Bd. of Educ. of the City Sch. Dist. of the City of New York, 230 F. Supp. 3d 88, 107 (E.D.N.Y. 2017).  This makes sense since Plaintiff accepted the terms of the agreement.

Even if the Court were to find that the signing of the Agreement was an adverse action, there is no basis to infer discriminatory motives, since the Agreement was negotiated by Michael Arabian about whom there are no allegations of discrimination.  There is no evidence that Mr. Arabian consulted with Dr. Pulitzer or Dr. Reede regarding the terms or language in the Settlement Agreement, and both Dr. Reede and Dr. Pulitzer testified that they never saw its terms until after it was signed. Reede Dep., 314:12-25; Pulitzer Decl., ¶ 11.  There is also no denying that there were legitimate reasons to refer Plaintiff to Labor Relations.  Plaintiff's failure to appear for work affected the coverage in the Radiology Department, the supervision of the residents, and the Program's ACGME accreditation. Plaintiff had been counseled by Dr. Reede and Dr. Pulitzer regarding time and attendance, his time and attendance was erratic in August 2014, and he denied a direct instruction to appear for work on September 4 and 5, 2014.  All of these issues were discussed during the Interrogation.  See Ex. X.

Plaintiff argues that the Settlement Agreement he signed (allegedly without reading) was uniquely onerous, and this indicates discriminatory intent.  Opp., p. 11, fn. 9.  Plaintiff cites nine

settlement agreements and notes that only one includes a waiver of protection for termination for cause as was the case with Plaintiff's settlement. Opp., p. 11, fn. 9. But that agreement, like Plaintiff's, was the only one of the nine that was negotiated without a union or legal representative present. See Ex. 30, SUNY006625. Plaintiff himself declined the offer of representation. Ex. X, SUNY001281.[7] That cannot constitute discrimination by Defendants.

### III. PLAINTIFF'S FMLA CLAIMS FAIL BECAUSE BY HIS OWN ADMISSION HE FAILED TO TIMELY REQUEST LEAVE, TOLD SUNY HE MISSED WORK FOR A NON-FMLA PURPOSE, WAS TERMINATED FOR UNRELATED REASONS AND ASSERTS NO FACTS DEMONSTRATING DR. REEDE'S INVOLVEMENT.

In order to state a retaliation or interference claim under the FMLA, Plaintiff must provide evidence that he "exercised rights protected under the FMLA" (retaliation) or he was "entitled to take leave under the FMLA." Serby v. New York City Dep't of Educ., 526 F. App'x 132, 134 (2d Cir. 2013)(retaliation); Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 424 (2d Cir. 2016)(interference). Both causes of action also require that the employee provide notice to the employer. Id. An employer "is not required to be clairvoyant," and the SUNY Defendants were entitled to rely on Plaintiff's statements as the actual reasons for his absence. See Brown v. The Pension Boards, 488 F. Supp. 2d 395, 409 (S.D.N.Y. 2007).

Plaintiff argues now that what he said to Dr. Pulitzer on September 2nd about his need to take leave on September 4th and 5th is a material issue of fact that prevents summary judgment on his FMLA claim. Pls. Opp. p. 8. But this is not true. Whatever was allegedly said or not said to Dr. Pulitzer before Plaintiff took unauthorized time off is not a material fact. First, notice on September 2nd was untimely.[8] Additionally, Plaintiff took the time off knowing it was not authorized, and he would have

---

[7] As Leonzo Cuiman, the head of Labor Relations at the time, testified, the terms of a settlement agreement were always negotiable, and Plaintiff's agreement could have been better if he had sought representation. Cuiman Dep., p. 137:12-18 (Reply Excerpts). Plaintiff testified that he did not even read the agreement, let alone attempt to negotiate better terms at the time or afterwards. Ex. DD, SUNY01353.

[8] As a matter of law, such alleged notice would not be sufficient. Plaintiff was required to request FMLA "as soon as practicable" after learning of an unforeseen need for leave. 29 C.F.R. § 825.303(c). This is especially important in a

to explain it to Labor Relations. He did not tell Labor Relations he was absent to care for his son. To the contrary, when Labor Relations interrogated him, Plaintiff stated that he did not need to care for his son because his mother-in-law and wife could provide "appropriate support" and that he did not appear for work on September 4 and 5, 2014 because of a back injury. 56.1 Response, ¶ 33; Ex. X, SUNY001290-1292; SUNY001295. This should end the Court's inquiry as to whether the SUNY Defendants interfered with Plaintiff's FMLA rights or retaliated against him, because Plaintiff was not entitled to protection under the FMLA and, if he were, the SUNY Defendants are immune from suit. See SJ Memo, p. 20; Rinaldi v. Quality King Dist., Inc., 29 F. Supp. 3d 218, 232 (E.D.N.Y. 2014)(finding no serious medical condition for two days of absences due to a "pain in one's side").

Plaintiff knew SUNY would rely on his responses to questions during his Interrogation, and he was explicitly told that he must respond truthfully or he could be "charged with failing to cooperate with an administrative investigation with possible penalties ranging from a letter of reprimand to termination from state service." Ex. X, SUNY001281. Yet Plaintiff now argues that the back injury was just an "excuse to which [he] resorted in an attempt to save his job and later recanted." Opp., p. 30. This is completely implausible and calls on SUNY Downstate to be "clairvoyant." Brown, 488 F. Supp. 2d at 409. Plaintiff submitted medical documentation regarding his back injury, complains in his Opposition that he was suffering from such an injury at the time, and did not recant the back injury

---

hospital setting, during a week following a holiday, where coverage is needed. Plaintiff produced evidence on July 18, 2018 (after discovery had concluded and the SUNY Defendants' motion was served) that a letter was sent to him during the week of August 18, 2014 and an email on August 25, 2014 indicating that Plaintiff's son would not be able to return to his school, the alleged reason for the leave. Ex. FFF, G02000-2001. Plaintiff therefore knew that his son could not attend his prior school no later than August 25, 2014, more than a week before he claims he asked Dr. Pulitzer for such leave on September 2nd. By waiting at least a full week before requesting leave, Plaintiff failed to comply with 29 C.F.R. § 825.303(c) and for this reason, denial of his leave request would have been appropriate even if he had communicated an FMLA-qualifying reason. Coutard v. Municipal Credit Union, 848 F.3d 102, 109 (2d Cir. 2017). Further, Plaintiff's inaction on August 29th is inexcusable. Plaintiff now claims, *for the first time*, that he called Dr. Reede's office phone to ask for time to care for his son but was unable to leave a message because her voice mail was full. This does not excuse his failure to contact Dr. Reede or Dr. Pulitzer by other means on August 29th. Both doctors regularly checked their email and their cell phone numbers were circulated to all physicians. Reede Reply Decl., ¶ 7; Pulitzer Reply Decl., ¶ 1. Plaintiff does not argue that his August 29th email to Ms. McMurren asking how he could get approval for days off the following week "on an emergent basis," Ex. U, SUNYESI000994, provided sufficient notice that the FMLA may apply.

as the reason for his absence until his deposition more than two years after his termination. Exs. BB; X, SUNY001291; 56.1 Response, ¶ 36. The SUNY Defendants were entitled to rely upon Plaintiff's official statement and submitted records.

Finally, Plaintiff was not terminated for the September 4 and 5 absences. Plaintiff was fired for the attestations, and the uncontested evidence shows that he would have been fired for this offense regardless of his absence on September 4 and 5. "[I]t is well-settled that an employer is not liable for 'interfering' with an employee's leave when the employee would have been terminated regardless of the leave." Pearson v. Unification Theological Seminary, 785 F. Supp. 2d 141, 162 (S.D.N.Y. 2011); also see Geromanos v. Columbia Univ., 322 F. Supp. 2d 420, 429 (S.D.N.Y. 2004)("FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave."); Bowman v. CSX Transp., Inc., 22 F. Supp. 3d 181, 191 (N.D.N.Y. 2014)(No interference where "the overwhelming evidence shows that Bowman was terminated for his well-documented poor performance and insubordinate behavior.").[9] Plaintiff admits that Dr. Jamaleddine, who had no involvement with the alleged FMLA request, would not allow Plaintiff to continue to practice at KCHC after the incident. Pl. Counter Statement, ¶ 55.[10]

Finally, Plaintiff admits that Dr. Reede did not know of the reason for his leave request. Pl. 56.1 Response, ¶ 26. The claim can therefore not go forward against Dr. Reede, even assuming the Court finds that she is an employer under the FMLA (see SJ Memo, p. 34).

---

[9] Plaintiff has located a single case – an unpublished decision in the District of Maryland – to argue that his termination was an FMLA interference violation. Opp., p. 29; Edusei v. Adventist Healthcare, Inc., No. CIV.A. DKC 13-0157, 2014 WL 3345051 (D. Md. July 7, 2014). Edusei is distinguishable. Edusei was fired for extending a pre-approved FMLA leave without authorization. Here, unlike in that case, Plaintiff told SUNY that the reason for his absences on September 4 and 5, 2014 was a back injury, which does not qualify for FMLA leave. 56.1 Response, ¶ 33. Further, the cases differ in the "prejudice" suffered by the plaintiffs. Edusei was fired because of the unauthorized extension of her FMLA leave. Id. at *4. Here, Plaintiff was terminated for the independent reason of drafting the unprofessional attestations.

[10] Plaintiff's termination letter cites his violation of the Settlement Agreement because it allowed termination without the protections of the collective bargaining agreement. He was not terminated due to the September 4 and 5 leave.

Dated: New York, New York
      September 14, 2018

BARBARA D. UNDERWOOD
Attorney General of the State of New York
*Attorney for SUNY Defendants*

BY: */s/ Christopher Coulston*
CHRISTOPHER COULSTON
Assistant Attorney General
28 Liberty Street
New York, New York 10005
(212) 416-8556
email: christopher.coulston@ag.ny.gov

TO:    *(via ECF)*
      Chad L. Edgar
      Cardi & Edgar LLP
      99 Madison Avenue, 8th Floor
      New York, NY 10016
      212.481.7770 (tel.)

      Ryan Shaffer
      Senior Counsel
      New York City Law Department
      100 Church St.
      New York, New York 10007
      (212) 356-5037