UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

ODED GREENBERG, M.D.,

                Plaintiff,

        - against -

SUNY DOWNSTATE et al.,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

15 Civ. 2343 (PKC)(VMS)

**SUNY DEFENDANTS' COUNTER-RESPONSE TO PLAINTIFF'S RESPONSE TO DEFENDANTS' RULE 56.1 STATEMENT AND PLAINTIFF'S RULE 56.1 STATEMENT OF ADDITIONAL MATERIAL FACTS**

      Defendants Dr. Deborah Reede, Dr. Steven Pulitzer (the "Individual Defendants"), and The State University of New York ("SUNY") (together the "SUNY Defendants"), by their attorney BARBARA D. UNDERWOOD, the Attorney General of the State of New York, submit the following objections and counter-responses to Plaintiff's Response to their Rule 56.1 Statement and Plaintiff's Rule 56.1 Statement of Additional Material Facts.

## <u>Objections</u>

      The SUNY Defendants object to the Plaintiff's responses to the SUNY Defendants' 56.1 Statement, in its entirety, as improper. Plaintiff's responses to the SUNY Defendants' statements of undisputed facts are largely noncompliant with Rule 56.1(c) and (d) of the Local Civil Rules for the United States District Courts for the Southern and Eastern Districts of New York. Pursuant to Local Civil Rule 56.1(a), "[u]pon any motion for summary judgment … there shall be annexed to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."

Plaintiff's statement of Local Civil Rule 56.1(b) provides that "[t]he papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."

Local Civil Rule 56.1(c) provides that "[e]ach numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."

Accordingly, the Court's rules provide that the summary judgment movant must set forth a concise statement of facts as to which it is asserted that there is no dispute, and the failure to respond to such facts with admissible evidence demonstrating a material dispute will be deemed an admission by the opponent of the summary judgment motion. There is no provision under the rules for the service of such a 56.1(a) statement by the summary judgment opponent. Plaintiff was required to respond to the 56.1(a) statement by correspondingly numbered paragraphs, which specifically admit or dispute the contents of the paragraph, supported by a citation to admissible evidence.

Instead, Plaintiff served a voluminous and lengthy response that is noncompliant in that where Plaintiff controverts the facts asserted by the SUNY Defendants, he largely does not do so by citation to admissible facts, as he is required to do. Plaintiff repeatedly notes paragraphs as "disputed" but then refers only to argument, speculation, and citation to other, irrelevant and immaterial facts that he believes are true. Where Plaintiff does not contest the specific contents of a paragraph in the SUNY Defendant's 56.1(a) statement by citation to responsive, admissible evidence, the statement should be deemed admitted. Buckman v. Calyon Sec. (USA) Inc., 817 F. Supp. 2d 322, 328 (S.D.N.Y. 2011) ("56.1 statements not explicitly denied by plaintiff are

deemed admitted."); <u>Stepheny v. Brooklyn Hebrew Sch. for Special Children</u>, 356 F.Supp.2d 248, 255 n. 4 (E.D.N.Y.2005). Further, where Plaintiff's response consists of argument, it should be disregarded and the facts asserted by the SUNY Defendants deemed admitted. <u>Costello v. New York State Nurses Ass'n</u>, 783 F. Supp. 2d 656, 661 (S.D.N.Y. 2011)(disregarding 56.1(c) responses that did not specifically dispute Defendants' statements or which consisted of argument, conclusory allegations, speculation or conjecture, and deeming those paragraphs to be admitted), <u>citing</u> <u>Cifarelli v. Village of Babylon</u>, 93 F.3d 47, 51 (2d Cir. 1996).

To the extent that Plaintiff's counter statements and Plaintiff's Rule 56.1 Statement of Additional Material Facts in Opposition to Defendants' Motion For Summary Judgment contain new, irrelevant factual assertions and arguments, rather than alleged disputed issues of material facts supported by citations to admissible evidence, they should be disregarded. Plaintiff has not moved for summary judgment. The Court's Rules thus do not make provision for Plaintiff's inappropriate statements of fact and the SUNY Defendants' are thus not required to respond to the same under the Local Civil Rules. There is no rule that any failure to respond thereto constitutes an admission.

<b>SUNY Defendants' Responses to Plaintiff's Counter Statements</b>

**I.     The Parties**

1.    Plaintiff, who self-identifies as White (Caucasian) and of the Jewish faith, was at least 54 years of age at the time of his termination. Second Amended Complaint ("Compl."), ¶ 1. He began his employment at SUNY Downstate in or about April 2001, and he was assigned to the Kings County Hospital Center ("KCHC") emergency room ("ER") pursuant to an affiliation agreement. <u>Id.</u>, ¶¶ 4, 13. Besides a hiatus from 2008 to 2010, Plaintiff remained employed by SUNY Downstate until his termination in October 2014. Compl., ¶ 1; Greenberg Dep., p. 13:7-10.

**Response**: Disputed only to the time period to which Dr. Greenberg's hiatus occurred, which he believes was from 2009 to 2010.[1]

**Counter-Response:** The disputed fact is immaterial.

2. Defendant Dr. Reede self-identifies as African-American, not Jewish, and is 67 years old. Reede Decl., ¶ 2. She was appointed Chair of Radiology at SUNY Downstate Medical Center in 2013, a position she holds to this day. Id., ¶ 3.

**Response**: Undisputed.

**Counter-Response:** No response.

3. Defendant Dr. Stephen Pulitzer self identifies as White and Jewish and is 51 years old. Pulitzer Decl., ¶ 2. Dr. Pulitzer was a SUNY employee working at KCHC as part of an affiliation agreement at the time of the events described herein. Id. In July 2014, he became the Interim Chair of Radiology at KCHC, and eventually the full Chair in January 2015. Id. In November 2016, he was named the Chief Medical Officer at KCHC. Id.

**Response**: Disputed only to the extent that Dr. Pulitzer was also an employee of KCHC or NYCHHC operating through KCHC. See supra, n.2. Also, it is our understanding that Dr. Pulitzer's official title as to KCHC was first Interim then Chief of Service, Department of Radiology, as such is the nomenclature used in the relevant affiliation agreement between SUNY and NYCHHC referenced by the SUNY Defendants. Edgar Decl., Ex. 60 (HHC 0158 & 164).[2]

**Counter-Response:** The disputed facts are immaterial to the SUNY Defendants' motion.

---

[1] While Dr. Greenberg does not contest he was an employee at SUNY Downstate (hereafter, "SUNY"), he reserves the right to contend that both he and Dr. Steven Pulitzer were joint employees of SUNY and New York City Health and Hospitals Corporation (NYCHHC) (operating through KCHC) for the purpose of opposing defendant NYCHCC's motion for summary judgment. For the purposes of defending the claims that the SUNY Defendants seek to dismiss here, Dr. Greenberg does not need to press the material factual disputes regarding joint employment status.

[2] All subsequent references to exhibits will be those annexed to the Declaration of Chad L. Edgar dated July 6, 2018 submitted in opposition to SUNY Defendants' Motion for Summary Judgment.

4. Defendant SUNY is a legal entity constituted under N.Y. Educ. Law § 351 et seq. As subdivisions of SUNY, the Downstate Medical Center is not a legally-cognizable entity separate from SUNY. See N.Y. Educ. Law §§ 351 and 352.

**Response**: Undisputed.

**Counter-Response:** No response.

## II.    Facts Regarding ACGME Accreditation

5. The Accreditation Council for Graduate Medical Education (the "ACGME") is the body responsible for accrediting the majority of graduate medical training programs for physicians in the United States. Reede Decl., ¶ 6. The ACGME visited SUNY Downstate in 2013. Reede Dep., p. 96:2-11; Reede Decl., ¶ 6.

**Response**: Undisputed.

**Counter-Response:** No response.

6. Following its visit in 2013, the ACGME conferred the adverse designation of "Probationary Accreditation" on SUNY's Radiology Department. Ex A. The ACGME noted in its findings that "'some faculty' do not 'show up' for their scheduled supervision assignments and the program has not enforced adherence to the schedule." Id., SUNY000683. The Department was also criticized for not demonstrating that "an appropriate level of supervision is in place for all residents," and it was noted that "faculty do not demonstrate a strong interest in the education of the residents." Id., SUNY000684.

**Response**:     Undisputed as to what ACGME noted in its findings in the document referenced, as it speaks for itself. To expand upon what SUNY Defendants described as the content of that document, there were 10 areas cited for improvement: (1) inadequate resources of space and facilities; (2) insufficient time devoted by faculty to supervision of residents; (3) faculty showing insufficient interest in educating residents; (4) inadequate IT support; (5) inadequate clerical

support; (6) inadequate range of radiologic cases for residents; (7) inadequate procedures for residents and attending residents to communicate results to clinicians; (8) inadequate records to support that residents were learning to communicate in written or oral form the results of their studies; (9) untimely completion of evaluations of residents by faculty; (10) and no demonstrated incorporation of residents' reviews of program in order to improve it. Notably, of the 10 discrete areas for which the program was cited, only 3 of the areas could arguably be attributable to faculty shortcomings (areas (2), (3) & (9)).

**Counter-Response:** No response.

7. The SUNY Radiology Department was the only department in the country on probation in 2014 out of 201 radiology departments. Reede Decl., ¶ 7; Ex. B.

**Response**: Undisputed.

**Counter-Response:** No response.

8. Dr. Reede, along with Dr. Ross Clinchy, from the Dean's Office at SUNY, met with the KCHC Chief Medical Officer, Dr. Jamaleddine, on April 9, 2014 to discuss the ACGME review. Reede Decl., ¶ 9.

**Response**: Undisputed.

**Counter-Response:** No response.

9. During the meeting, Dr. Reede discussed changes that she believed were required to fix the issues in the department. Id. As part of the changes, Dr. Reede proposed replacing a number of faculty members, primarily based on teaching evaluations, and providing short term extensions for several others. Reede Dep., p. 67:15-69:8; Jamaleddine Dep., p. 101:11-17. She also emphasized the need for monitoring of faculty member performance, increased work performance for physicians, productivity monitoring, and monitoring of teaching and scholarly activity. Ex. B.

**Response**: Undisputed as to what Dr. Reede memorialized and then recalled at her deposition as to what was said during the aforesaid meeting.

**Counter-Response:** To the extent that Plaintiff has failed to support his response with citation to admissible contradictory evidence, this paragraph should be deemed admitted pursuant to Local Civil Rule 56.1(c) and (d).

10. Dr. Jamaleddine recommended that Dr. Kantor should also be nonrenewed, due to the unfavorable accreditation decision. Reede Dep., p. 31:18-25; Jamaleddine Dep., p. 109:6-110:17. Dr. Pulitzer replaced Dr. Kantor as Interim Chief in July 2014. Pulitzer Decl., ¶ 4.

**Response**: Disputed. According to Dr. Jamaleddine, his decision to replace Dr. Kantor was based on a perception that he was a weak leader and let problems linger. Edgar Decl., Ex. 47 (Jamaleddine Dep.) at 106-09. While one of the lingering problems that Dr. Jamaleddine identified as caused by Dr. Kantor's allegedly weak leadership was failure to assess the needs of the residency program, it was only one problem among others. He also cited ongoing issues with one of the radiologists whose competence was in question, delays in reading studies and the questionable quality of those readings. Id. at 107-08. Notably, Dr. Reede did not cite and/or recall that Dr. Jamaleddine removed Dr. Kantor because of the residency program being placed on probation. Edgar Decl., Ex. 10 (Reede Dep.) at 32.

**Counter-Response:** Dr. Jamaleddine referred to two "really major issues" in his testimony: the ongoing issues with one of the radiologists and the residency program going on probation, which he described as a "crisis situation." He further testified that the basis for his belief that Dr. Kantor was a weak leader who should be removed was "[t]he residency program going on probation and issues in performance sometimes escalated to me." Jamaleddine Dep., p. 106:18-25; 107:12-17; 184:12-20 (Reply Excerpts); 99:8-20; 104:17-24. It is immaterial that the ongoing issue with one radiologist was also considered by Dr. Jamaleddine in replacing Dr. Kantor. Dr.

Jamaleddine testified that the probation was a "really major issue" that led to Dr. Kantor's removal and the decision was made shortly after the accreditation decision.

### III. Facts Regarding Appointment of Dr. Jinell Scott-Moore

11. Dr. Jinel Scott-Moore was a radiologist at LICH, and therefore a SUNY Downstate employee as of 2014, following SUNY Downstate's merger with LICH, who had worked with Dr. Reede. Scott Dep., p. 73:23-74:8. She is also Black, younger than Plaintiff, and not Jewish. Compl., ¶ 25.

**Response**: Undisputed.

**Counter-Response:** No response.

12. Dr. Scott's resume showed more academic accomplishments than Plaintiff's. Ex YY, ZZ. Plaintiff's resume listed two publications without a date. Ex. YY. During his deposition, he admitted that one of them was never published, and the other was published in 1993 or 1994. Greenberg Dep., 10:23-12:4. Plaintiff had also let his membership lapse in the radiological professional societies. Id., 6:23-5. Dr. Scott on the other hand was a member of three professional societies in 2014, she had a number of recent scientific posters and education exhibits, and was actively engaged in research for publication. Ex. ZZ. Plaintiff had also submitted a summary of his scholarly activity in 2013-2104 [sic] to provide an update to the ACGME that showed zero hours spent engaging in "Research/scholarly activity with residents" and no scholarly activity in the prior year. Ex. BBB.

**Response**: Disputed. To be clear, Dr. Scott had no actual publications at the time of her appointment to the role of Director of ER Radiology. Ex. 48 (HHC 1787-88) (indicating only posters in the Bibliography section of her resume). In addition, in Dr. Scott's Faculty Self Assessment form for 2013 – 2014, in or around April of 2015, Dr. Reede handwrites on the evaluation that Dr. Scott needs to get published in addition to needing to "get on committees."

Edgar Decl., Ex. 49 (SUNY 003844-52) (handwriting on the final page of the assessment). As for Dr. Greenberg's summary of his scholarly activity submitted in or around July 2014, he admits that he indicated zero hours spent engaging in "Research/scholarly activity with residents," but states that he was in a hurry to submit the form where he indicated zero hours, and was unclear as to what was meant by this category. Oded Greenberg Decl., ¶ 14. In 2013, Dr. Greenberg, fellow radiologists and residents published two case reports. Id. Dr. Greenberg was also actively engaged in research projects with residents at the time of his termination. Id., ¶ 6.

      **Counter-Response:** Plainitff does not contradict any of the factual allegations in paragraph 12, which should therefore be deemed admitted. As to Plaintiff's alleged interest in academic research and scholarship, Plaintiff did not list these "case reports" or research projects on his resume, state that he ever told Dr. Reede about them, or provide citations to them in his declaration. Greenberg Decl., ¶ 14.

      13.    There is no evidence that Dr. Scott had any time and attendance issues.

      **Response**:    Undisputed but notably Dr. Scott did not have the long-term tenure at KCHC that Dr. Greenberg had and therefore the lack of evidence of any time and attendance issues is of little significance.

      **Counter-Response:** The factual assertion is undisputed, and Plaintiff's argument should be disregarded. In any event, Dr. Reede had supervised Dr. Scott at SUNY at Long Island College Hospital from 2011-2013, and she was therefore very familiar with Dr. Scott's time and attendance history. See Ex. ZZ; Reede Decl., ¶ 3.

## IV. Plaintiff's Problems with Time and Attendance

      14.    On May 5, 2014, following the ACGME report, Dr. Reede met with Plaintiff to discuss an incorrect time entry from April 21, 2014. Ex. I. Dr. Reede reminded Plaintiff that "his

job responsibilities require him to be present for consultations as well as resident supervision and education." Id. He was told to report his time correctly going forward. Id.

        **Response**:      Undisputed that a meeting occurred between Dr. Reede and Dr. Greenberg on this date. To the extent that SUNY Defendants hope to suggest that this was a disciplinary meeting, such is disputed as Dr. Reede testified it was not. Ex. 10 (Reede Dep.) at 143. This meeting marked the commencement of Dr. Reede's scrutiny of Dr. Greenberg with an eye to his termination. While she testified at her deposition that her assistant caught Dr. Greenberg's timesheet error, she, in fact, caught it. Id. at 143-44. In advance of Dr. Greenberg submitting his April timesheet, Dr. Reede apparently asked Dr. Pulitzer to review Dr. Greenberg's so-called Talk Station data in order to establish when he first completed a study and the time of his last completed study from April 14 to April 22, 2014. Ex. 8 (SUNY 003486). He obeyed her instruction and sent the information. Id. She is the one who must have spotted the timesheet entry error for April 21, 2014 but at her deposition she deflected responsibility for the catch to her assistant.

        **Counter-Response:** Paragraph 14 should be deemed admitted as Plaintiff does not contest the meeting occurred or the contents of the meeting. Buckman v. Calyon Sec. (USA) Inc., 817 F. Supp. 2d 322, 328 (S.D.N.Y. 2011) ("56.1 statements not explicitly denied by plaintiff are deemed admitted."); Stepheny v. Brooklyn Hebrew Sch. for Special Children, 356 F.Supp.2d 248, 255 n. 4 (E.D.N.Y.2005). The remainder of Plaintiff's response is improper argument which should be disregarded. Costello v. New York State Nurses Ass'n, 783 F. Supp. 2d 656, 661 (S.D.N.Y. 2011)(disregarding 56.1(c) responses that did not specifically dispute Defendants' statements or which consisted of argument, conclusory allegations, speculation or conjecture, and deeming those paragraphs to be admitted.), citing Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir.1996). Further, as to that argument, it is immaterial as to who located the time and attendance issue, but Plaintiff has offered only speculation, not admissible evidence, in support of his argument that Dr.

Reede found the timesheet error, as opposed to the timekeeper Linda McMurren. Reede Dep., p. 147:24-148:10 (Reply excerpts); Reede Reply Decl., ¶ 2. Plaintiff has not contested that his time and attendance problems were brought to his attention, in a meeting that Dr. Reede described as "formal," and that he had made misrepresentations on his timesheets and improperly reported that he was present at the hospital when he was not. Reede Dep., p. 150:6-8 (Reply Excerpts). The SUNY Defendants do not dispute that there was increased scrutiny on time and attendance after the ACGME report.

15.     On May 8, 2014, Dr. Reede reminded all of the attending radiologists in the department that "everyone documents accurate information on their timesheets." Ex. L. This was repeated during the KCHC Department Meeting on June 26, 2014 led by Dr. Pulitzer, who noted that time and attendance will be monitored and that time sheets should reflect the actual time a physician was in the hospital. Ex. M, SUNY002458.

> **Response**:     Undisputed.

> **Counter-Response:** No response.

16.     Dr. Pulitzer, who oversaw the schedule at KCHC, testified that, beginning in late July or August 2014, Plaintiff was "coming in late, he was on occasion leaving early. I ... often didn't know what time he was going to be in that day .... I couldn't reliably plan the schedule." Pulitzer Dep., p. 305:23-306:9. Dr. Reede testified that she received reports that Plaintiff was sometimes not in the emergency room when "residents would be looking for him." Reede Dep., p. 142:22-143:9. Plaintiff's Talk Station data from the time showed that he was often not reading his first case until 10:30 or later. Ex. R.

> **Response**:     Disputed. Notably, in her memo to the file dated July 23, 2014 about a meeting with Dr. Greenberg as to why he was not going to be made Director of ER Radiology at KCHC, Dr. Reede did not cite as a reason for not getting the promotion that he had attendance

issues. Ex. 4 (SUNY 000498). During this period when Dr. Greenberg was allegedly working erratic hours, on July 31, 2014, Dr. Pulitzer stated at a Departmental meeting that radiologists were expected to arrive at KCHC by 9 a.m. Ex. 42 (HHC 1335 & 1349). It was not until August 22, 2014, however, that Dr. Pulitzer allegedly approached Dr. Greenberg and requested that he arrive at KCHC at 9 or 9:30 a.m. Ex. 17 (HHC_ESI_001091-92; HHC_ESI_001062-63). This delay in applying the requirement to Dr. Greenberg suggests that the set, earlier schedule did not apply to him, which it did not historically. Greenberg Decl., ¶ 7; Ex. 3 ("Hi Steve, following up on our discussion, I just want to reiterate that prior to recent changes in the schedule I was asked by Alan to change my hours to 10 to 6 to help cover Vin during the early evening"). According to Dr. Greenberg, Alan Kantor, the previous Chief of Service, always pushed him to come in later in order to stay later to assist with the crush of cases that came into ER Radiology between 4 p.m. and 8 p.m. Greenberg Decl., ¶ 7. According to Dr. Greenberg's account of his discussion with Dr. Pulitzer about a set schedule in late August, Dr. Pulitzer knew that Dr. Kantor historically wanted Dr. Greenberg to come in later but Dr. Reede was insisting that he come in earlier. Greenberg Decl., ¶ 7. Thus, the notion that Dr. Greenberg was working erratic hours in July and August by coming in late does not accord with Dr. Greenberg's account that Dr. Pulitzer knew that in the past he was asked to work a later schedule and his work hours continued to reflect it.

　　　　**Counter-Response:** Paragraph 16 should be deemed admitted, as Plaintiff does not contest the specific contents thereof by citation to admissible evidence. Buckman v. Calyon Sec. (USA) Inc., 817 F. Supp. 2d 322, 328 (S.D.N.Y. 2011) ("56.1 statements not explicitly denied by plaintiff are deemed admitted."); Stepheny v. Brooklyn Hebrew Sch. for Special Children, 356 F.Supp.2d 248, 255 n. 4 (E.D.N.Y.2005). Plaintiff's response is improper argument, which should be disregarded. Costello v. New York State Nurses Ass'n, 783 F. Supp. 2d 656, 661 (S.D.N.Y. 2011)(disregarding 56.1(c) responses that did not specifically dispute Defendants' statements or

which consisted of argument, conclusory allegations, speculation or conjecture, and deeming those paragraphs to be admitted.), citing Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir.1996).

On those grounds alone, Plaintiff's response should be disregarded. But as to his arguments, they are either irrelevant, not supported by admissible evidence, or both. Whether or not a specific memo stated that Plaintiff's time and attendance was a problem is irrelevant to this motion. But in any event, Dr. Reede's July 23, 2014 memo, to which Plaintiff refers, *did* include information about Plaintiff's time and attendance problems in that it cited resident evaluations of Plaintiff which complained of Plaintiff's lack of availability, noting that Plaintiff "would disappear for hours at a time" to "go[] home to eat dinner with his family" during his shift.. Exs. AAA, DDD, SUNY000475. Another resident suggested that Plaintiff "be more available," and Plaintiff received poor feedback in response to whether he provided feedback to residents during his rotation (SUNY000468), whether he was available to assist residents with academic work (SUNY000473), and whether provided a high-quality teaching experience (SUNY000465). Id. Plaintiff's alleged arrangements with his previous supervisor, Dr. Kantor, are irrelevant. But even so, the evidence shows that Dr. Kantor had problems with Plaintiff and, in regard to Dr. Kantor's issues with Plaintiff's time and attendance, Plaintiff actual avers in his own declaration that he "compromised" with Dr. Kantor on a schedule to which Plaintiff only "tended to adhere." Greenberg Decl. ¶ 7; Exs. F, G, H. The SUNY Defendants do not dispute that Plaintiff acted as if the "schedule did not apply to him," but the admissible evidence shows that he knew he was supposed to be present during his scheduled hours based upon his long history of escalating time and attendance problems that had been brought to his attention and ultimately led to his referral to Labor Relations in September 2014.[3] Further, whether characterized as "formal" or informal, a counseling or a

---

[3] Plaintiff carefully parses his statements in his 56.1(c) response to make it sound like he was unaware of his longterm and escalating time and attendance problems, but does not actually state that he did not have time and attendance problems or that he was unaware of time and attendance problems. This he could not do in light of the incontestable

discussion, Plaintiff cannot contest the record showing that he was spoken to by Dr. Kantor, Dr. Reede, Dr. Pulitzer and Labor Relations about his time and attendance. See, e.g., Ex. R; Reede Dep., p. 150; Pls. Exs. 9 (noting the May 2014 meeting with Dr. Reede and the discussion of time and attendance requirements at Grand Rounds the previous October) and 17.   In fact, when confronted, Plaintiff disregarded a resident's criticism that Plaintiff was not around to supervise the residents, claiming the "inmates are running the asylum." Pls. Ex. 11.

17.     The general expectation at KCHC is that radiologists spent most of their workday reading films. Pulitzer Decl., ¶ 6.  Time spent reading film gets reflected, if only approximately, in "talk station" data.  Id.  Talk Station data comprises information about a particular film, including which radiologist read the film, and when the film was opened and signed for by a

---

admissible evidence here.  There had "been time and attendance issues with Dr. Greenberg for many years." Pulitzer Dep., 111:24-25; Ex. E.  In August 2013, Dr. Kantor noted that Plaintiff failed to follow his scheduled work time and "unilaterally decided to leave early every day." Ex. F.  On September 25, 2013, Plaintiff emailed Dr. Kantor and complained that "it pisses me off that there is so much attention being paid to data analysis as to when I read my first and last cases (an inaccurate measure of the time I arrive and leave)…" Ex. G. Plaintiff's time and attendance problems continued and worsened.  On October 9, 2013, Plaintiff was informed about another doctor's complaint that there "is routinely no one in the ER reading room between 4 and 5 pm" (Plaintiff's then-scheduled shift), and responded that he thought this was "bullshit" and saying that he "no longer give[s] a fuck." Ex. H.  In his resident evaluations for 2013, one resident noted that Plaintiff "would disappear for hours at a time" to "go[] home to eat dinner with his family." Ex. DDD, SUNY000475.  On May 5, 2014, following the ACGME report, Dr. Reede met with Plaintiff to discuss an incorrect time entry from April 21, 2014 which Plaintiff admitted; he incorrectly entered his time on other occasions as well. Exs. I, J, K; Greenberg Dep., p. 157:11-159:9.  During this period, Dr. Reede received reports that Plaintiff was sometimes not in the emergency room when "residents would be looking for him." Reede Dep., p. 142:22-143:9. Plaintiff scheduled a day off on July 9, only to appear for work that day, state that he had to leave by 2:15 pm, and state he would take July 10 off instead. Ex. N.  Dr. Pulitzer testified that  beginning in late July or August, Plaintiff was "coming in late, he was on occasion leaving early. I…often didn't know what time he was going to be in that day…. I couldn't reliably plan the schedule." Pulitzer Dep., p. 305:23-306:9. Dr. Scott, who worked in the same room as Plaintiff, saw firsthand that "[Plaintiff] was sometimes very erratic about his hours." Scott Dep., p. 137:19-25. She noted that Plaintiff "would often come late to work.  It could vary from like half an hour late to an hour to an hour and a half, to two." Id., p. 153:21-25.  In August 2014, Plaintiff originally requested vacation for August 11-August 22. Ex. O.  On August 13, 2014, Plaintiff emailed Dr. Pulitzer while on vacation, and asked if he could return the following week, and then instead take off the week of August 25th. Ex. P.  During the week of August 18, Plaintiff maintained erratic hours, only working from 10 am to 1:30 pm on Thursday, August 21. Ex. Q.  On August 22, 2014, Dr. Pulitzer confronted Plaintiff in person on issues of time and attendance. Ex. R.  Dr. Pulitzer addressed specific time entries with Plaintiff during this meeting that appeared to be inaccurate based on Plaintiff's Talk Station dictation system.  Id.  Dr. Pulitzer reminded him of the need to be at the hospital for his set hours of 9:30-5:30.  Id.  These hours were decided upon after Dr. Pulitzer asked Plaintiff what hours would be most convenient for him, and made it clear that he would try to accommodate his schedule. Pulitzer Dep., p. 310:21-311:14.  Despite his scheduled vacation the week of August 25th, Plaintiff returned to work on August 26, again working erratic hours "at his choosing." Ex. S; Pulitzer Dep., p. 334:8-21.

radiologist. Id. By reviewing the data for one day, an approximation of when a radiologist started reading film and when he or she stopped can be discerned. Id.

      **Response**:     Disputed. According to Dr. Greenberg, Talk Station data is a poor proxy for the hours that he worked. See Greenberg Decl., ¶ 5. Talk Station data does not capture when film is first opened for review by a radiologist but when he or she closes out of the study, usually after completion of review. Id. Thus, the time first captured by Talk Station on any given day is when the radiologist completes his or her first study. Id. During the time that Dr. Reede threatened closer scrutiny of each radiologist's productivity by examining Talk Station data, around the spring of 2014, many of Dr. Greenberg's colleagues "gamed" the system by choosing a very easy study to review when they first arrived at work thereby memorializing the earliest possible time for a so-called "clock in." Id. Dr. Greenberg refused to play that game. Id. Rather, he always read whatever film he viewed in his professional opinion as the most pressing after consulting with his ER colleagues, even if it was complicated and meant that he would have a later "clock in" time than would otherwise be indicated. Id. Also, with respect to Dr. Greenberg, when he came into the reading room at or around 9 or 9:30 a.m., his colleague had usually been reviewing film for three hours ahead of him and therefore there might not be any cases to read immediately. Id. Further, the computer he used was frequently turned off and could take as long as 20 minutes to boot up and be available to start reading cases. Id. Also, it was Dr. Greenberg's habit upon arriving at work to take a tour of ER to see if there were any pending issues that needed to be addressed and to confer with multiple colleagues, if necessary. Id. All of these factors and circumstances made the time of the completion of his first study upon arriving at work a poor proxy as to what time exactly he arrived there. Id.

      **Counter-Response:**   Irrelevant. Plaintiff fails to raise a disputed issue of material fact. Plaintiff's subjective view of Talk Station data is immaterial as it was used to monitor time and

attendance of all radiologists, and it was within the business judgment of the SUNY Defendants to rely on it. Further, Plaintiff does not assert that he adhered to his scheduled time (see Response to ¶ 16). Plaintiff did not arrive in the "reading room at or around 9 or 9:30 a.m." in July and August 2014 even according to his own timesheets. Ex. T.

18.    Dr. Scott, who worked in the same room as Plaintiff, testified that "[Plaintiff] was sometimes very erratic about his hours." Scott Dep., p. 137:19-25. She noted that Plaintiff "would often come late to work. It could vary from like half an hour late to an hour to an hour and a half, to two." Id., p. 153:21-25.

**Response**:    Disputed. Dr. Scott initially testified that she did not really know to which shift exactly Dr. Greenberg was assigned when she first began working at KCHC, which she characterizes as in August of 2014. Ex. 6 (Scott Dep.) at 127. Therefore, since she did not know the hours of his shift, her testimony that he would arrive late is lacking in credibility. Further, Dr. Scott's sample size of Dr. Greenberg's allegedly erratic hours is limited to the month of August since by September he was being closely monitored for time and attendance by Dr. Reede and Dr. Pulitzer and he had only one alleged misstep. Ex. 37 (HHC_ESI_001274) (example of the close monitoring by Dr. Reede and Dr. Pulitzer). The only time and attendance issue that they caught was an alleged unauthorized absence from the building for approximately two hours in the afternoon of September 23, 2014. Ex. 39 (SUNY 000863-64). It is likely that Dr. Scott is referring to Dr. Greenberg's erratic hours during the week that he was supposed to be on vacation and volunteered to pitch in.

**Counter-Response:** The cited testimony does not contradict paragraph 18. Paragraph 18 should be deemed admitted, as Plaintiff does not contest the specific contents thereof by citation to admissible evidence. Buckman v. Calyon Sec. (USA) Inc., 817 F. Supp. 2d 322, 328 (S.D.N.Y. 2011) ("56.1 statements not explicitly denied by plaintiff are deemed admitted");

Stepheny v. Brooklyn Hebrew Sch. for Special Children, 356 F.Supp.2d 248, 255 n. 4 (E.D.N.Y.2005). Plaintiff's response is improper argument, which should be disregarded. Costello v. New York State Nurses Ass'n, 783 F. Supp. 2d 656, 661 (S.D.N.Y. 2011) (disregarding 56.1(c) responses that did not specifically dispute Defendants' statements or which consisted of argument, conclusory allegations, speculation or conjecture, and deeming those paragraphs to be admitted.), citing Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir.1996). Whatever his scheduled hours, showing up "like half an hour late to an hour to an hour and a half, to two" is not showing up in accordance with a schedule. Plaintiff does not even allege, let alone provide admissible evidence demonstrating, that Dr. Scott is wrong and that he worked in accordance with his schedule. SUNY Defendants do not dispute that Plaintiff worked erratic hours during the week of August 25, 2014.

19.     In August 2014, Plaintiff originally requested vacation for August 11-August 22. Ex. O. On August 13, 2014, Plaintiff emailed Dr. Pulitzer while on vacation, and asked if he could return the following week, and then instead take off the week of August 25th. Ex. P.

    **Response**:     Undisputed.

    **Counter-Response:**  No response.

20.     On August 22, 2014, Dr. Pulitzer counseled Plaintiff in person on issues of time and attendance. Ex. R. Dr. Pulitzer addressed specific time entries with Plaintiff during this meeting that appeared to be inaccurate based on his Talk Station dictation system entries. Id. Dr. Pulitzer reminded him of the need to be at the hospital for set hours of 9:30-5:30. Id.

     **Response**:     Disputed. Dr. Pulitzer testified that this discussion with Dr. Greenberg was not a "disciplinary counseling." Ex. 5 (Pulitzer Dep.) at 310. Rather it was an attempt to find what schedule would work for Dr. Greenberg, given his personal circumstances. Id. at 311. Pulitzer testified that his intent in going into this discussion was to work with whatever

schedule was manageable for Dr. Greenberg.  Id.  It is only Dr. Pulitzer's memos regarding this meeting, which were written after Dr. Greenberg's request for family leave on September 2, 2014, that characterize or suggest that this discussion had a counseling component to it.[4]  Ex. 17 (HHC_ESI_001062-63 & 001091-92).  In Dr. Greenberg's version of the discussion, Dr. Pulitzer approached him in a "Don't shoot the messenger" fashion and shared that Dr. Reede wanted Dr. Greenberg to work an earlier set shift of 9 to 5.  Greenberg Decl. ¶ 7.  To which Dr. Greenberg questioned why since Dr. Kantor always wanted him to start work later to help out with the high volume of cases in the late afternoon.  Id.  According to Dr. Greenberg, Dr. Pulitzer replied that Dr. Reede was like a cop and wanted to catch Dr. Greenberg in order to get rid of him.  Id.

   **Counter-Response:**  The cited evidence does not contradict paragraph 20. Paragraph 20 should be deemed admitted, as Plaintiff does not contest the specific contents thereof by citation to admissible evidence.  Buckman v. Calyon Sec. (USA) Inc., 817 F. Supp. 2d 322, 328 (S.D.N.Y. 2011) ("56.1 statements not explicitly denied by plaintiff are deemed admitted."); Stepheny v. Brooklyn Hebrew Sch. for Special Children, 356 F.Supp.2d 248, 255 n. 4 (E.D.N.Y.2005).  Plaintiff's response is improper argument, which should be disregarded.  Costello v. New York State Nurses Ass'n, 783 F. Supp. 2d 656, 661 (S.D.N.Y. 2011) (disregarding 56.1(c) responses that did not specifically dispute Defendants' statements or which consisted of argument, conclusory allegations, speculation or conjecture, and deeming those paragraphs to be admitted.),

---

[4] The first mention Dr. Pulitzer makes of a meeting or discussion with Dr. Greenberg in late August in personnel paperwork or email traffic is on September 2, 2014 when he wrote a brief memo to the file dated that day without using KCHC letterhead memorializing his conversation with Dr. Greenberg about the additional leave that he sought on September 2, 2014.  Edgar Decl., Ex. 17 (HHC_ESI_1062-63).  In this memo, Dr. Pulitzer references an earlier conversation with Dr. Greenberg that he erroneously dates as August 23, 2014.  Id.  he states that "Oded was counseled in person on time and attendance."  Dr. Pulitzer's habit after writing a memo dealing with a personnel issue was to send it immediately to his assistant; he did so with respect to the memo without letterhead dated September 2, 2014.  Id.  On September 5, 2014, Dr. Pulitzer sent to his assistant and Dr. Reede a more formal memo of his encounter with Dr. Greenberg on August 22, 2014 bearing a date of August 22, 2014.  Edgar Decl., Ex. 17 (HHC_ESI_001092).  There is no evidence via a cover email that this memo was sent to his assistant on August 22, 2014.  Therefore, it is a safe assumption that this memo dated August 22, 2014 was actually written after that date, which means Dr. Pulitzer pre-dated a memo dealing with what he believed was a serious personnel issue.

citing Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir.1996).  It is also immaterial whether Plaintiff's August 22 meeting is characterized as "disciplinary" or not and when the notes from the meeting were drafted with formal letterhead, but the SUNY Defendants note that Plaintiff's theory regarding the drafting of the memos is improper speculation.

        21.      Despite his scheduled vacation the week of August 25th, Plaintiff returned to work on August 26.  Ex. S; Pulitzer Dep., p:334:8-21.  Dr. Pulitzer received reports that Plaintiff was working "erratic" hours.  Pulitzer Dep., p. 334:8-21.  Plaintiff's time sheet indicates that, instead of 9:30 am to 5:30 pm, he claimed to have worked from 11 am to 7 pm on three days that week and 10 am to 6 pm on the other day he was in the office.  Ex. T.

        **Response**:     Disputed.  As Dr. Greenberg was scheduled to be off the week of August 25th but instead decided to work both because his vacation plans fell through and the Department appeared to need the assistance, we strain to understand how his schedule could be criticized as erratic since he was not supposed to be working in the first instance.  In any event, if Dr. Greenberg's account is to be credited, he worked the week of August 25, 2014 because the Radiology department appeared short-staffed and he wanted to help out.  Greenberg Decl., ¶ 8. Further, it appears undisputed that the busiest time in ER Radiology was between 4 p.m. and 8 p.m. Ex. 6 (Scott Dep.) at 128.  Dr. Greenberg's schedule in encompassing those busiest hours was in conformity with the department's most acute need.  Further, during the week of August 25, 2015, Dr. Greenberg received no complaints from Dr. Hammil about erratic hours he was working; rather, Dr. Hammil appeared to be appreciative of Dr. Greenberg's willingness to help when they were short of staff.  Greenberg Decl., ¶ 8.

        **Counter-Response:**    Plaintiff's response does not contradict paragraph 21.  To the extent that Plaintiff wanted to cancel his scheduled time off and work, he was not working during his scheduled times.  Talk Station data from the time confirms that Plaintiff was not working the

shift assigned to him on the revised schedule, and his timesheets, which show him arriving at 10 or

11 am each day he was there, were also likely incorrect (first case read at 3:33 pm on August 26;

12:29 on August 27; 3:31 pm on August 28; 11:59 am on August 29).  Ex. T; Pl. Exs. 9, 15, 19.

Plaintiff's response also includes argument and unrelated references to evidence that are improper

and should be disregarded.  Hengjin Sun v. China 1221, Inc., No. 12-CV-7135, 2015 WL 5542919, at

*3 (S.D.N.Y. Aug. 12, 2015).

V.      **Facts Regarding the September 4th and 5th Absences**

        22.     On August 29, 2014, the Friday before Labor Day weekend, Plaintiff emailed

Linda McMurren asking how he could get approval for days off the following week "on an

emergent basis."  Ex. U, SUNYESI000994.  Ms. McMurren was not authorized to approve

vacation requests; the site director - Dr. Pulitzer - was the appropriate person to contact.  Reede

Dep., p. 290:9-15.

        **Response**:      Disputed.  This account does not tell the entire story of Dr.

Greenberg's attempts to notify his various employers of his need for an unexpected leave of

absence.  While it is true that Dr. Greenberg emailed Linda McMurren on August 29, 2014

requesting guidance as to how to seek approval for days off the following week for an emergency, he

first attempted to notify Dr. Reede via telephone but her voicemail was too full to accept another

message because she was on vacation.  Greenberg Decl., ¶ 9.  Dr. Pulitzer could not be notified

because he too was on vacation.  Id.  Dr. Greenberg then resorted to emailing Linda McMurren in

order to get guidance about how he best should proceed in taking the leave of absence.  Notably,

according to relevant policy at SUNY, the protocol for notifying management when an employee

had to take an unexpected leave was to notify the Department Chair, which would be Dr. Reede.

Ex. 59 (SUNY 000677).  That is exactly what Dr. Greenberg attempted to do.  Dr. Greenberg made

his request to the first available manager on September 2, 2014, which was the date that Dr. Pulitzer finally returned from his vacation the previous week.

**Counter-Response:** Plaintiff's response does not contradict paragraph 22. Paragraph 22 should be deemed admitted, as Plaintiff does not contest the specific contents thereof by citation to admissible evidence. Buckman v. Calyon Sec. (USA) Inc., 817 F. Supp. 2d 322, 328 (S.D.N.Y. 2011) ("56.1 statements not explicitly denied by plaintiff are deemed admitted."); Stepheny v. Brooklyn Hebrew Sch. for Special Children, 356 F.Supp.2d 248, 255 n. 4 (E.D.N.Y.2005). Plaintiff's response is improper argument, which should be disregarded. Costello v. New York State Nurses Ass'n, 783 F. Supp. 2d 656, 661 (S.D.N.Y. 2011) (disregarding 56.1(c) responses that did not specifically dispute Defendants' statements or which consisted of argument, conclusory allegations, speculation or conjecture, and deeming those paragraphs to be admitted.), citing Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir.1996). Plaintiff's response also includes argument and unrelated references to evidence that are improper and should be disregarded. Hengjin Sun v. China 1221, Inc., No. 12-CV-7135, 2015 WL 5542919, at *3 (S.D.N.Y. Aug. 12, 2015).

And, addressing Plaintiff's argument, even if Plaintiff did call Dr. Reede, and this is the first time he has made such a claim, he did not email Dr. Pulitzer or Dr. Reede to give them notice, nor did he reach out to them on their cell phones, although their numbers had been given to all physicians in the Department. Reede Reply Decl. ¶ 7; Pulitzer Reply Decl. ¶ 1.

23.     Plaintiff requested this "emergent" leave five days before he intended to take it, and he did not submit the approved form, which he had received on a number of occasions, to Dr. Pulitzer indicating who would provide coverage, the reason for the leave, and how much time he intended to take off. Ex. V, SUNYESI000805-6; Pulitzer Decl. ¶ 9.

**Response**: Disputed. Dr. Greenberg contends that his request constituted an "Unexpected Absence" for which he followed governing policy by immediately attempting to direct his request to the Department Chair. Ex. 59 (SUNY 000677). Even if for the sake of argument, Dr. Greenberg's request was not an "Unexpected Absence," and he was required to submit an approved leave form to Dr. Pulitzer as SUNY Defendants appear to contend, Dr. Pulitzer was on vacation at the time Dr. Greenberg became aware of the need on August 29, 2014. Ex. 5 (Pulitzer Dep.) at 333. Immediately upon Dr. Pulitzer's return from vacation, Dr. Greenberg posed to him his request, which was immediately denied. Id. Once Dr. Pulitzer immediately denied Dr. Greenberg's request for an emergency family leave, it would have been futile for Dr. Greenberg to present Dr. Pulitzer with the proper paperwork for the leave request.

**Counter-Response:** Plaintiff's response does not contradict paragraph 23. Paragraph 23 should be deemed admitted, as Plaintiff does not contest the specific contents thereof by citation to admissible evidence. Buckman v. Calyon Sec. (USA) Inc., 817 F. Supp. 2d 322, 328 (S.D.N.Y. 2011) ("56.1 statements not explicitly denied by plaintiff are deemed admitted."); Stepheny v. Brooklyn Hebrew Sch. for Special Children, 356 F.Supp.2d 248, 255 n. 4 (E.D.N.Y.2005). Plaintiff's response is improper argument, which should be disregarded. Costello v. New York State Nurses Ass'n, 783 F. Supp. 2d 656, 661 (S.D.N.Y. 2011) (disregarding 56.1(c) responses that did not specifically dispute Defendants' statements or which consisted of argument, conclusory allegations, speculation or conjecture, and deeming those paragraphs to be admitted.), citing Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir.1996). Plaintiff's response also includes argument and unrelated references to evidence that are improper and should be disregarded. Hengjin Sun v. China 1221, Inc., No. 12-CV-7135, 2015 WL 5542919, at *3 (S.D.N.Y. Aug. 12, 2015).

And, addressing Plaintiff's argument, Plaintiff has now provided evidence, which he himself does not cite here, that he was also aware of the need for leave as early as August 18, 2014, and no later than August 25, 2014. Ex. FFF. In any event, he cannot and does not contest the contents of the paragraph.

24. The following Tuesday, September 2, 2014, Plaintiff asked Dr. Pulitzer to take the remainder of the week off. Ex. W, SUNY 827. This was the first time Dr. Pulitzer had heard of this request. Pulitzer Dep. 349:23-350:3.

**Response**: Disputed to the extent that Dr. Greenberg does not remember whether he asked for the rest of the week off or just September 4 and 5, 2014. Ex. 1 (Greenberg Dep.) at 227-28.

**Counter-Response:** No response. This dispute is not material.

25. Dr. Pulitzer denied his request, due to the operational needs of the department, since Dr. Patrick Hammil, the only other body imager, was scheduled to be off that same week. Ex. S; Ex. X, SUNY001289-1290; Reede Dep., p. 303:25-304:12.

**Response**: Undisputed that Dr. Pulitzer denied the request and that he stated that the reasons for the denial was because the only other radiologist who could read body images, Dr. Hammil, was scheduled to be on vacation the week for which Dr. Greenberg sought an absence. Disputed as to whether his statement that Dr. Hammil was the only other body imager in the Department is accurate, as there were many other radiologists available that week and who worked on the days at issue who could read body images. Greenberg Decl., ¶ 9.

**Counter-Response:** Plaintiff's response does not contradict paragraph 25. The Department was severely understaffed the week of September 1, 2014, and there were not enough radiologists available to adequately cover the work. Pulitzer Reply Decl., ¶ 2. Dr. Pulitzer set the schedule for that week with the expectation that Plaintiff would cover for Dr. Patrick Hammil, who

is a specialist in complex Body Imaging cases.  Id.  Dr. Scott testified that the department was "really understaffed" on those two days and Plaintiff's absence created "even more stress in the department."  Scott Dep., p. 149:17-150:14 (Reply Excerpts).

26.     Dr. Pulitzer testified that he does not recall Plaintiff specifying the reason he wanted to take the leave.  Pulitzer Dep., 344:5-9; 345:16-346:12; 359:16-22.  Dr. Pulitzer did not tell Dr. Reede that there was a specific reason for the request, and Plaintiff did not speak to her at all regarding his request.  Reede Dep., 282:13-23.  There is no written evidence of Plaintiff specifying the reason for his request prior to taking leave.

**Response**:     Undisputed that Dr. Pulitzer testified that he does not recall Dr. Greenberg's stated reason for needing the leave.  Disputed that his testimony is credible.  See, infra, Plaintiff's Statement of Material Facts That Preclude Summary Judgment, ¶¶ 17, 19 & 21. Undisputed that Dr. Reede did not ask Dr. Pulitzer why Dr. Greenberg was being so obstinate about taking the leave nor did she request that he inquire of Dr. Greenberg the reason for the leave. Edgar Ex. 10 (Reede Dep.) at 282-84.

**Counter-Response:**   See responses to Plaintiff's Statement of Material Facts That Preclude Summary Judgment, ¶¶ 17, 19 & 21.  Plaintiff's response also includes argument and unrelated references to evidence, i.e., Plaintiff's assertion that Dr. Reede should have but did not ask why Plaintiff was being obstinate, that are improper and should be disregarded.  Hengjin Sun v. China 1221, Inc., No. 12-CV-7135, 2015 WL 5542919, at *3 (S.D.N.Y. Aug. 12, 2015).

27.     On September 3, Plaintiff returned to Dr. Pulitzer and informed him that he would be absent on September 4 and September 5.  Pulitzer Dep., p. 351:9-24.  After consulting with Dr. Reede, Dr. Pulitzer drafted a letter to Plaintiff that specifically denied his request for time off on September 4th and 5th, and Plaintiff was directed to report for duty or the matter would be referred to the Labor Relations Department.  Ex. Y; Pulitzer Dep. 355:18-356:7.

**Response**:       Undisputed to the extent that Dr. Pulitzer and Dr. Greenberg spoke on September 3, 2014 about the September 4th and 5th absences but note that they spoke twice about those absences.  According to Dr. Pulitzer, their first discussion was initiated by Dr. Greenberg who related to Dr. Pulitzer that he still intended to take those days off. Ex. 5 (Pulitzer Dep. at 351-52.  To which Dr. Pulitzer responded that he did not want Dr. Greenberg to take those days off.  Id. at 352.  Dr. Pulitzer admitted that at this point he did not warn Dr. Greenberg that there would be consequences if he proceeded to take those days off.  Id.  After relating to Dr. Reede what just took place, Dr. Reede "advised" Dr. Pulitzer to write a letter denying Dr. Greenberg's request and state therein that if he proceeded to take the days off in any event he would be referred to Labor Relations.  Id. at 356.  Again, according to Dr. Pulitzer's own account, the second discussion about the leave on September 3, 2014 occurred when Dr. Pulitzer hand-delivered this letter to Dr. Greenberg himself and read its contents aloud to him.  Id. at 358.  To which Dr. Greenberg responded according to Dr. Pulitzer's paraphrase, "Well, you're making me choose between my job and my family."  Id. at 360.  To which Dr. Pulitzer replied, according to his own testimony, "I'm not making that choice."  Id.  Dr. Pulitzer admitted that he did not ask Dr. Greenberg any follow-up questions as to why Dr. Greenberg stated to him that he was making him decide between his job and his family.  Id. at 360-61.  In an email that he wrote to Mr. Arabian, the representative of Labor Relations who investigated Dr. Greenberg's case once it was referred there when Dr. Greenberg did not show up for work on September 4, 2014, Dr. Pulitzer stated that he and Dr. Greenberg talked a few minutes about each other's family towards the end of their third discussion about the leave (or the second discussion on September 3, 2014).  Ex. 50 (HHC_ESI_1087).

**Counter-Response:**   Plaintiff's response does not contradict paragraph 27 and to the extent that Plaintiff is representing Dr. Pulitzer's testimony about their conversations on

September 2nd, Dr. Pulitzer testified that Plaintiff did not tell him he needed the time to care for his son. Ex. 5, Pulitzer Dep. p. 361. Plaintiff's response also includes argument and unrelated references to evidence that are improper and should be disregarded. Hengjin Sun v. China 1221, Inc., No. 12-CV-7135, 2015 WL 5542919, at *3 (S.D.N.Y. Aug. 12, 2015).

28. On September 4, 2014, Plaintiff e-mailed Linda McMurren to confirm that he was not coming in "due to important family issues," the nature of which he did not specify. Ex. Z. Short on staff, Dr. Pulitzer arranged for multiple radiologists to cover Plaintiff's shifts those days. Pulitzer Dep., p. 354:3-23.

**Response**: Undisputed that Dr. Greenberg emailed Linda McMurren on September 4, 2014. Disputed that the Radiology Department at KCH was short on staff, as there were multiple radiologists that were available on these days to cover for Dr. Hammil who was on vacation and the so-called body imager. Greenberg Decl., ¶ 9.

**Counter-Response:** Plaintiff fails to cite to relevant admissible evidence supporting his counter-statement of fact. The Department was severely understaffed the week of September 1, 2014, and there were not enough radiologists available to adequately cover the work. Pulitzer Reply Decl., ¶ 2. Dr. Pulitzer set the schedule for that week with the expectation that Plainitff would cover for Dr. Patrick Hammil, who is a specialist in complex Body Imaging cases. Id. Dr. Scott testified that the department was "really understaffed" on those two days and Plaintiff's absence created "even more stress in the department." Scott Dep., p. 149:17-150:14 (Reply Excerpts). Plaintiff's cited evidence, Greenberg Decl., ¶ 9, does not provide admissible evidence that the Department was not short-staffed on that day. It merely references that three of the four radiologists who had been laid off had been replaced. Plaintiff's response also includes argument that should be disregarded. Hengjin Sun v. China 1221, Inc., No. 12-CV-7135, 2015 WL 5542919, at *3 (S.D.N.Y. Aug. 12, 2015).

29.     On September 5, 2014, however, Plaintiff e-mailed Ms. McMurren again and cc'd Dr. Pulitzer, writing that he "was going to come in regardless of my last email Thursday, the family issues having been resolved Thursday morning, I then managed to throw my back out." Ex. U.  Plaintiff was absent from work on Thursday, September 4 and Friday, September 5.  Ex. FF, SUNYESI001401.

**Response:**     Undisputed that Dr. Greenberg wrote the above-referenced email but disputed as to its purport.  According to Dr. Greenberg, he never intended to come in on September 4th but stated otherwise in the email in order to protect his job, which he thought was in jeopardy.  Ex. 1 (Greenberg Dep. at 242, 246-47).

**Counter-Response:**   Plaintiff's response does not contradict paragraph 29.

30.     Plaintiff called Ms. McMurren the following Monday, September 8, at 10:40 a.m. (nearly two hours after his shift began) to inform her that he would be in late because he had to go to Urgent Care for his back.  Ex. AA.  Plaintiff arrived for work at about 12:30 p.m. and provided documentation from Premier Care of Park Slope, indicating that he received treatment for back pain that morning.  Exs. BB; X, SUNY001291.

**Response:**     Undisputed.

**Counter-Response:** No response.

## VI.     Facts Regarding Plaintiff's First Interrogation

31.     Upon his arrival on September 8, Plaintiff was directed to Labor Relations, where he met with Michael Arabian.  Ex. X.  After reading the Statement of Rights Letter regarding his rights to representation by a union attorney or counsel of his choice during the hearing, Plaintiff elected to represent himself.  Id., SUNY001280.  Plaintiff was also advised by Mr. Arabian that he must respond truthfully to the questions asked during the interrogation or he could be subject to

further discipline.  Id., SUNY001281.  The investigation was into Plaintiff's absences and failure to follow supervisors' directives regarding time and attendance.  Id.

**Response**:     Undisputed as to Dr. Greenberg being directed to Labor Relations by Dr. Pulitzer and what occurred at the interrogation as the transcript thereof speaks for itself. Disputed as to the merits of the claim that Dr. Greenberg had any issues with time, attendance and absences other than his insistence that he be allowed to take a leave covered by the Family Medical Leave Act.

**Counter-Response:** Plaintiff does not cite any admissible evidence to contradict paragraph 31, which should be deemed admitted in its entirety.

32.     During the interrogation, Plaintiff stated that he was "on the [department's] schedule as 9 to 5," but he would occasionally "come in later and stayed later," sometimes arriving at 10-10:30 or even "a little bit later."  Id., SUNY001283.  Plaintiff further stated that "if I come in late it doesn't make a difference.  I stay a little bit later.  I've been keep - adhering to a schedule between, say, 10 and 11 and 6 and 7 in the evening."  Id., SUNY001284.  When Plaintiff was asked whether he had the authority to make his own schedule, he replied that he felt he had the "moral authority to do so if I feel the department is failing to -- to take care of their patients."  Id., SUNY001284. Plaintiff admitted that he had recently been told by Dr. Pulitzer to adhere to set hours, which he assumed were "9 to 5 as written on the schedule."  Id., SUNY001284.

**Response**:     Undisputed to the extent that such was said at the interrogation, which otherwise speaks for itself.

**Counter-Response:** No response.

33.     When discussing the September 4 and 5 absences, Plaintiff stated that "I have a child with special needs and he was kicked out of his school and he was to attend a new school and I had to spend time with him," but he said that was not the reason he did not appear for

work on September 4 and 5. Id., SUNY001290-1291. Plaintiff's mother-in-law came from out of town to help with his son, and while Plaintiff "had initially planned to take the day off, but I-I-I was gonna come in, I rolled out of bed and I - and I stretched my back out and I've been in pain and not able to be mobile since then." Id., SUNY001291. Plaintiff stated that he knew "that [his] son would have appropriate support" after his mother-in-law arrived. Id., SUNY001292.

> **Response**: Undisputed as to what Dr. Greenberg stated at his interrogation, as the transcript thereof speaks for itself.

> **Counter-Response:** No response.

34. Following the interrogation, Mr. Arabian consulted with Leonzo Cuiman, the Assistant Vice President for Labor Relations, and prepared a Settlement Agreement, which Plaintiff signed. Cuiman Dep., p. 237:22-238:6; Ex. CC. Dr. Reede and Dr. Pulitzer had no role in preparing the agreement, nor were they informed that Mr. Arabian was preparing such a document. Reede Dep., 314:12-25; Pulitzer Decl., ¶ 11.

> **Response**: Disputed. While Mr. Arabian had no specific recollection of the interrogation of Dr. Greenberg and entering into the settlement agreement with him, he said it was standard operating procedure to confer with department heads that supervised the employee referred to Labor Relations about the terms of a settlement agreement before presenting it to an employee. Ex. 27 (Arabian Dep.) at 224-25. Therefore, it is likely that Dr. Reede and Dr. Pulitzer weighed in on or ratified the terms of the settlement agreement.

> **Counter-Response:** The cited testimony does not contradict paragraph 34. Because Plaintiff has failed to cite admissible evidence disputing the facts alleged, Paragraph 34 should be deemed admitted in its entirety. Mr. Arabian did not testify that it was "standard operating procedure to confer with department heads that supervised the employee referred to Labor Relations about the terms of a settlement agreement before presenting it to an employee." Mr.

Arabian testified that "sometimes my superiors had conversations or at least a heads-up to certain departments of what was happening" (Ex. 27, 223:2-5), but he had no recollection of that happening on September 8, 2014 (Id., p. 222:12-7). Dr. Pulitzer and Dr. Reede have stated that they were not consulted regarding the terms of the agreement (Reede Dep., 314:12-25; Pulitzer Decl., ¶ 11), and there is no admissible evidence to contradict these statements.

35.    The Settlement Agreement, covered Plaintiff's September 4 and 5 absences as well as his time and attendance issues in July and August. Ex. CC. The Settlement Agreement stated that in lieu of a Notice of Discipline for: "(1) unscheduled absences, (2) tardiness, (3) interfering with the operations of the department, (4) insubordination and (5) misrepresenting hours worked on time sheets, as a result of absences and tardiness, [and] switching schedule without authorization of his supervisor" a penalty ranging from a letter of reprimand to termination would be held in abeyance for one year provided Plaintiff could abide by its terms. Id.

**Response**:    Undisputed as to the terms of the Settlement Agreement and what it sought to address in terms of disciplinary issues, as the document speaks for itself. Disputed as to whether Dr. Greenberg had time and attendance issues in July and August.

**Counter-Response:** Plaintiff has not cited admissible evidence to dispute that he had time and attendance issues in July and August. Paragraph 35 should be deemed admitted in its entirety.

36.    The language included was standard for a settlement agreement from Labor Relations Department. Ex. CC; Arabian Dep., p. 209:7-21. It called for Plaintiff to work his scheduled shift of 9:00 a.m. to 5:00 p.m., accurately list the hours he works, seek approval for any leave, and adhere to all Departmental policies and procedures. Id. The Agreement provided that if Plaintiff failed to abide by its terms, he could be punished with discipline ranging from a letter of reprimand to termination. Id. This language was subject to negotiation when it was presented to

Plaintiff, who, having turned down assistance of counsel from his union, did not request for any of the terms to be changed; subsequently stating that he did not even read the agreement. Cuiman Dep., p. 255-257:4; Ex. DD, SUNY001353; Greenberg Dep., 274:12-275:18. The agreement also waived any claims Plaintiff had related to any incidents occurring up to and including September 8, 2014. Ex. CC.

> **Response**: Undisputed as to the terms of the Settlement Agreement, which document speaks for itself. Disputed as to the "language" being "standard" for a "settlement agreement," to the extent that the terms of probation meted out to Dr. Greenberg were more onerous than the terms of probation of Radiology Department employees referred to Labor Relations around the same time. Ex. 30 (SUNY 6601-03, 6582-83, 6625, 6652-53, 6621-22, 6654-57). Undisputed that during the course of his interrogation and executing the Settlement Agreement, Dr. Greenberg waived the right to counsel, did not negotiate the terms of the Settlement Agreement and signed it without reviewing it carefully. Notably, Dr. Greenberg was in acute pain from back spasms during the time that he sat through the Interrogation, awaited the presentation of the Settlement Agreement and signed same - a time period spanning approximately 4-5 hours. Ex. 1 (Greenberg Dep. at 268-71); Greenberg Decl., ¶ 10.

> **Counter-Response**: Plaintiff does not dispute that he waived representation, the terms of the agreement, that he signed the agreement, and other allegations, which should be deemed admitted. To the extent that he contests the nature of the agreement, he chose to sign it and Plaintiff's Settlement Agreement is similar to the one cited agreement that was signed by another unrepresented employee. See Ex. 30, SUNY006625. The rest of the response does not contradict paragraph 36. SUNY Defendants further note that the recording of the Interrogation is 55 minutes long, and at no point in the recording does Plaintiff complain of his back pain. Ex. X. Coulston Decl., ¶ 7.

**VII.    Plaintiff's Use of Unapproved Attestations**

37.  An attestation is a written statement made by an attending physician to certify that he or she had reviewed a patient's report and that the report is now final.  Pulitzer Decl., ¶ 12.  Attestations are legal documents that are vital to hospital billing, and non-conforming ones could trigger an investigation by the Centers for Medicare & Medicaid Services ("CMS"), as well as potential financial liability.  Id.  Risk Management approved the use of three attestations and, beginning in July 2014, staff were informed at numerous meetings on how to use them.  GG, SUNY001270.

**Response**:       Undisputed as to what an attestation is.  Disputed as to its significance in terms of triggering investigations and any financial liability other than the hospital not being paid for the service performed if a non-conforming attestation is submitted.  See, e.g., Ex. 42 (HHC 1367) ("Attestations ..... Must be on ALL exams or we will not get paid") see also Ex. 51 (SUNY 2537) ("Missing Attestations ..... We need to be compliant so we can show we are a revenue generating department").  Disputed as to the status of the acceptable form of different attestations during the summer and fall of 2014 as it appears that they were a work in progress as evidenced by the statement of Dr. Rhonda Osborne, one of Dr. Greenberg's colleagues and a radiologist at KCHC, who stated that even after the September 22, 2014 departmental meeting where the attestations were once again discussed the form of same was not yet finalized.  Ex. 41 (SUNY 1252) ("However, I believe that they were still working on it because there was major and a minor, meaning if you had a major disagreement versus a minor disagreement").  Disputed as to whether Dr. Greenberg was fully informed as to the form of the attestation to be used.  With respect to the September 22, 2014 Departmental meeting where the form of attestations was discussed by Dr. Pulitzer and the other radiologists in the department, Dr. Greenberg was late in arriving to the meeting.  Ex. 1 (Greenberg Dep. at 276-77); Greenberg Decl. ¶ 11.  In addition, Dr. Greenberg

missed the departmental meeting where KCHC's billing vendor explained the attestations. See Greenberg Decl., ¶ 11.

**Counter-Response:** The cited evidence does not contradict paragraph 37. Dr. Osborne stated that they were "told to use these specific [attestations]" and "it was important for us to use these specific attestations for either billing or legal purposes." Ex. 41, SUNY001252. Dr. James Walsh provided a statement saying that "two attestations that we should use" were identified during the meeting. Id., SUNY000449. Dr. Scott was even more clear: "We were told to use those exact words because that had been cleared by legal. We were supposed to use those attestations and none other." Ex. HH, SUNY001251. Although it is not a plausible excuse, Plaintiff's knowledge of the form of the attestation is also immaterial, as he was terminated not for simply departing from the approved language, but for using sarcastic language that was completely unacceptable in a patient's file.

Further, Plaintiff's dispute as to how important the attestations were is immaterial. He admits that they were necessary for the hospital to receive payment and presents no admissible evidence that non-conforming attestations could not trigger an investigation by the Centers for Medicare & Medicaid Services or potential financial liability.

38.     Phycare, which handles the billing for the department, gave a presentation on September 15, 2014 on the attestations. Id.

**Response**:     Undisputed. Notably, Dr. Greenberg was not able to attend this presentation because he had to cover the ER on that day. Greenberg Decl., ¶ 11.

**Counter-Response:** The cited evidence does not contradict paragraph 38. The cited evidence also does not state that Plaintiff missed the meeting on September 15 "because he had to cover the ER."

39.     All Radiology Department staff, including Plaintiff, were personally instructed by Dr. Pulitzer to use the approved attestations during a staff meeting on September 22, 2014. Pulitzer Decl., ¶ 1; Ex. HH. The approved language was as follows:

> "I, _____, MD, have personally reviewed the images and concur with the preliminary report and the interpretation as stated and signed by the resident. This report now represents the FINAL REPORT for this patient." Ex. GG.

**Response**:     Disputed. First, Dr. Osborne's statement referenced above clarifies that she at least believed that even after the September 22, 2014 meeting the issue surrounding the form of attestations to be used by herself and her colleagues was still evolving. Ex. 41 (SUNY 1252). Second, Dr. Greenberg arrived late to the meeting and missed portions of the discussion regarding the form and use of attestations. Ex. 1 (Greenberg Dep. at 276-77); Greenberg Decl., ¶ 11. Dr. Greenberg left the meeting believing that the attestations that Dr. Pulitzer presented were examples from which he had to tailor his own attestations rather than available to him as a macro that he could easily copy and incorporate into his studies with a simple click. Greenberg Decl., ¶ 11.

**Counter-Response:**     The cited evidence does not contradict paragraph 39. Dr. Osborne stated that they were "told to use these specific [attestations]" and "it was important for us to use these specific attestations for either billing or legal purposes." Ex. 41, SUNY001252. Dr. James Walsh provided a statement saying that "two attestations that we should use" were identified during the meeting. Id., SUNY000449. Dr. Scott was even more clear: "We were told to use those exact words because they had been cleared by legal. We were supposed to use those attestations and none other." Ex. HH, SUNY001251. Although it is not a plausible excuse, it is also immaterial whether Plaintiff was late to a scheduled meeting or his understanding of what was required. Plaintiff did not simply depart from the approved language, but he used sarcastic language that was completely unacceptable in a patient's file.

40.     Shortly after the meeting, Plaintiff attached to patients' records approximately 180 unapproved attestations that were filled with sarcastic language, stating the following:

> "I, Oded Greenberg M.D., Board Certified Diagnostic attending Radiologist and Board Certified Pathologist, have personally, painstakingly reviewed each and every one of the provided images and reviewed the available clinical information. The above report, based on my own extensive knowledge and skill as well as meticulous observation and careful interpretation now represents the final report."

Ex. LL, SUNY00506-659.

**Response**:     Undisputed only to the extent that Dr. Greenberg attached the attestation above to the records of patients around September 22, 2014.

**Counter-Response:**  No response.

41.     Dr. Pulitzer was informed that Plaintiff subsequently had asked Jayan Kurian, an employee in the IT Department, to "take off" or "erase" the incorrect attestations, which would have been tampering with a legal medical file.  Pulitzer Dep., p. 143:13-144:11.  Dr. Pulitzer was extremely concerned by the number of reports, which he believed indicated a more severe "malicious" act, as well as posing problems for managing the data for all of the cases with the unauthorized language, which would need to be tracked.  Id., p. 147:7-148:4.

**Response**:     Disputed as to what Plaintiff asked Jayan Kurian.  Dr. Greenberg merely asked Mr. Kurian whether it was possible to modify or change these attestations.  Ex. 1 (Greenberg Dep. at 292-93).  When Mr. Kurian related to Dr. Greenberg that he could but that it would not be appropriate for him to do so, Dr. Greenberg reassured him that he did not want to get him into any trouble.  Id. at 293.

**Counter-Response:**  Plaintiff's dispute is not material; he inquired about changing the attestations.  The remainder of the facts alleged in paragraph 41 should be deemed admitted.

42.     After collecting and reviewing the attestations, Dr. Pulitzer then escalated the issue to Dr. Jamaleddine at KCHC, and scheduled a meeting with Risk Management at KCHC at his recommendation.  Pulitzer Dep., p. 155:3-156:11.  Risk Management believed the conduct was at least insubordinate, and told Dr. Pulitzer to consider a Medical Board Hearing.  Ex. MM, HHC_ESI_001344; Pulitzer Decl., ¶ 16.  Risk Management also told Dr. Pulitzer to have a "second reader" add a new, proper attestation to each file, and they were concerned that "if any of these cases became a medical legal case that there could be potential exposure to the hospital."  Pulitzer Dep., p. 287:8-20; Pulitzer Dep. II, p. 108:23-109:3.

**Response**:     Undisputed as to what Dr. Pulitzer did and the recommendations of Risk Management with respect to the attestations.

**Counter-Response:**   No response.

43.     Dr. Pulitzer again conferred with Dr. Jamaleddine and they agreed that Plaintiff should be referred to Labor Relations, as well as a possible referral to the Office of Professional Medical Conduct, which investigates complaints against physicians.  Pulitzer Dep., p. 289:8-23; 290:20-291:17.  Dr. Reede was consulted and agreed with referring the matter to Labor Relations at SUNY Downstate.  Pulitzer Decl., ¶ 16; Reede Decl., ¶ 15.

**Response**:     Disputed.  Dr. Pulitzer's testimony was that Dr. Jamaleddine told him rather than merely agreeing with him to refer Dr. Greenberg to Labor Relations.  Ex. 5 (Pulitzer Dep. at 291).  ("Dr. Jameladdine told me to find out what the legal implications were of this, if this needs to be reported to the Office of Professional Conduct - Medical Conduct, and to refer this to Labor Relations ....").

**Counter-Response:**   No response.  Plaintiff's dispute as to whether Dr. Jamaleddine agreed to or ordered Dr. Pulitzer to go to Labor Relations is not a material issue of fact.

and, if anything, assuming his version as true, it demonstrates the seriousness of Plaintiff's admitted conduct.

**VIII.  Facts Regarding Plaintiff's September 23 Absence**

44. After taking off part of the morning of September 23, 2014, Plaintiff asked for two hours of additional leave that afternoon. Pulitzer Dep., p. 389:22-390:6; Ex. GG. Defendant Pulitzer denied this request, because there was no one available to adequately cover for Plaintiff. Id.

**Response**:    Undisputed that Dr. Greenberg asked for two hours of additional leave the afternoon of September 23, 2014 and that Dr. Pulitzer denied the request and cited as the reason that there was no one to cover Dr. Greenberg. Notably, Dr. Greenberg asked for the additional leave in order to attend further meetings related to the funding for the education of his special needs son, Jayden. Ex. 44 (HHC 1526).

**Counter-Response:**  The cited evidence does not contradict paragraph 44, and it should be admitted in its entirety. The email cited only refers to Plaintiff's request for leave during the morning of September 23, 2014, which Dr. Pulitzer granted.

45. That afternoon, Dr. Pulitzer learned that, in spite of the denied request for leave, Plaintiff "had left the building," and Dr. Pulitzer was unable to locate him for a number of hours. Pulitzer Dep., p. 402:20-403:6; 413:15-20. According to Talk Station data there was a gap of approximately two hours from 2:50 to 4:52. Ex. QQ, SUNY001326. Dr. Pulitzer learned that Dr. Greenberg had asked Dr. Amiram Samin to cover for him during that period, but Dr. Samin was not able to read neuroradiology cases, leaving the ER inadequately covered. Id. p. 401:24-403:6; 413:15-20. This issue was referred to Labor Relations as well. Ex. GG.

**Response**: Disputed. Dr. Greenberg did not leave the hospital in the afternoon of September 23, 2014 in any sort of unauthorized fashion. Dr. Greenberg testified that in the

afternoon on that day, he left the reading room either to confer with clinicians in the Emergency Room about patients or to take a lunch break (which he was allowed to do across the street at SUNY Downstate Hospital). Ex. 1 (Greenberg Dep. at 300-05; 308-09). Dr. Greenberg had a cell phone and pager that his colleagues could use in the event that he was needed and it is not disputed that neither Dr. Pulitzer nor any of Dr. Greenberg's colleagues attempted to locate him by calling or paging him during the afternoon of September 23, 2014. Greenberg Decl., ¶ 13.

**Counter-Response:** The cited evidence does not contradict paragraph 45, specifically that Dr. Pulitzer was told that Plaintiff had left the building and could not find him in the Department, that Plaintiff had asked a colleague to cover for him, and that there was a two hour gap in Plaintiff's Talk Station data shortly after a request for him to leave the hospital for two hours was denied.

## IX.    Facts Regarding Plaintiff's Second Visit to Labor Relation

46.    On October 3, 2014, Plaintiff was notified that he was to report to Labor Relations "to discuss allegations of insubordination, leaving the worksite without authorization and related matters." Ex. RR.    This new case was handled by Stephanie Bernadel. Bernadel Dep., 11:22-12:6. After a delay so Plaintiff could attempt to locate an outside attorney, an interrogation was held on October 10, 2014. Ex. QQ. Plaintiff was accompanied by his wife who is an attorney, and again waived his right to union representation. Ex. SS.

**Response**:    Undisputed.

**Counter-Response:**   No response.

47.    During the interrogation, Plaintiff was asked about the two hour gap in his Talk Station data on September 23. Ex. QQ, SUNY001323-1328. Plaintiff admitted that he left his desk during this period, and claimed it was only to talk to colleagues, his wife and eat lunch across the street at SUNY Downstate. Id., SUNY001326.

**Response**: Disputed. Dr. Greenberg's testimony at the interrogation with respect to the two-hour gap was that he went to lunch for an hour, during which time he spoke with his wife about the day's events concerning his special-needs son, and the rest of the time was spent conferring with clinical staff in the ER to discuss several patients' cases from earlier in the day. Ex. 52 (SUNY 001326).

**Counter-Response:** The cited evidence does not contradict paragraph 47.

48. During the interrogation, Plaintiff described the attestations as "a Medicare and insurance hoop to jump through." Id., SUNY001329. He admitted the purpose of the attestations was explained to him, and that it was important to the hospital. Id. But he also admitted that he "thought it was ridiculous." Id., SUNY001329-30. He admitted that he complained about the forms during the meeting, and he continued to complain about the attestations during the interrogation, stating "I don't see why signing the document isn't attesting to me checking his work." Id., SUNY001330, 1340, 1337-8. Plaintiff admitted that he wrote the unapproved attestations, and he admitted that he thought the language was "playful." Id., SUNY001339.

**Response**: Undisputed as to what Dr. Greenberg said at his interrogation, as the transcript speaks for itself.

**Counter-Response:** No response.

49. At the interrogation, Plaintiff mentioned possible allegations of discrimination for the first time. Ex. QQ, SUNY001335. In response, Ms. Bernadel sent Plaintiff a letter directing him to contact The Office of Diversity & Inclusion regarding any complaints of discrimination. Ex. TT.

**Response**: Undisputed only to the extent that Dr. Greenberg alleged a formal complaint of discrimination to Labor Relations for the first time in the context of the interrogation

on October 10, 2014.  Undisputed that Ms. Bernadel sent the above-referenced letter subsequent to the interrogation on October 10, 2014.

> **Counter-Response:** No response.

50. Shortly after the interrogation, it was reported to Labor Relations that Plaintiff "harassed" employees outside of KCHC.  Ex. UU, SUNYESI000101.  As a result, Plaintiff was informed that he was not allowed to be on the hospital premises pending the outcome of the disciplinary action.  Id.

> **Response**: Undisputed that Labor Relations alleged that Dr. Greenberg "harassed" employees outside of KCHC shortly after the interrogation but dispute that such actually occurred.  Rather, Dr. Greenberg merely chatted with a KCHC employee with whom he thought he was friendly about the fact that he was frustrated with his employer and it looked like he was going to be terminated.  Ex. 1 (Greenberg Dep. at 346).

> **Counter-Response:** The cited evidence does not contradict paragraph 50.

51. On October 20, 2014, Ms. Bernadel and Mr. Cuiman met with Plaintiff again, who this time was accompanied by counsel from the New York State Unified Teachers, as well as his wife.  Ex. DD, SUNY001345.  Plaintiff continued to complain about the use of the required attestations during this meeting, repeating his view that the "purpose of the attestation" was "so that insurance companies make you jump through another hoop before they pay you" or, he added, "so that you can get sued better … there's no real good reason for it."  Id., SUNY001364.  He went on to say that "[i]t just adds more work to my day."  Id., SUNY001365.  Despite admitting he did not use the approved attestations, Plaintiff blamed Dr. Reede for his situation, and stated that her character was "really piss-poor."  Id., SUNY001393.  Plaintiff concluded the meeting by stating that "I expect to get my job back.  I expect an apology from [Dr. Reede] and I expect a raise."  Id., SUNY001394.

**Response**:     Disputed to the extent that the statement indicates that Mr. Cuiman met with Dr. Greenberg for a second time, as he was not present at either the initial interrogation with Mr. Arabian nor the second interrogation with Stephanie Bernadel.  Undisputed as to what Dr. Greenberg said at the interrogation, as the transcript thereof speaks for itself.

**Counter-Response:**   Undisputed that Mr. Cuiman was only present for the October 20, 2014 meeting with Plaintiff but this dispute is not material.

52.     As part of her investigation, Stephanie Bernadel interviewed a number of employees regarding Plaintiff's use of the unapproved attestations.  Dr. Scott told Ms. Bernadel that Plaintiff complained during that meeting about the use of the attestations, telling her that "this is the beginning of the end of medicine, this is the corporatization of medicine."  Ex. HH.

**Response**:     Undisputed as to what Dr. Scott's witness statement says.

**Counter-Response:**   No response.

53.     Dr. James Walsh told Ms. Bernadel that Plaintiff told him after the meeting that "I can't believe I have to write an attestation."  Ex. II.

**Response**:     Undisputed.  Notably, this statement attributed to Dr. Greenberg supports the contention that he misunderstood the mandate - that he had to write an attestation to every report rather than merely adopt a macro and with one click add it to a patient's report.

**Counter-Response:**   Plaintiff mischaracterizes the use of attestations.  He did not "write an attestation to every report."  He wrote one sarcastic version and attached the same attestation to approximately 180 patient files.

**X.      Facts Regarding Other Statements Made by Plaintiff**

54.     On September 30, Plaintiff sent a letter to Dr. Pulitzer complaining that "[t]he hyper-vigilance and micromanagement is often insulting and I no longer look forward to coming to works [sic] as a result of the corporatization of medicine."  Ex. JJ.  Plaintiff repeated this

concern about the "corporatization" of medicine in an email following his termination, saying that "the new administrations [sic] polices have negatively affected morale and patient care in the name of corporatization." Ex. KK. Plaintiff believed this "corporatization of medicine" began at SUNY Downstate when Dr. Reede became chairwoman. Greenberg Dep., p. 42:9-13.

      **Response**:     Undisputed to the extent of noting that the emails referenced above speak for themselves. Undisputed to the extent that it is a fair characterization that Dr. Greenberg's concern has always been primarily focused on the delivery of quality patient care above all else.

      **Counter-Response:** No response.

## XI.    <u>Facts Regarding Plaintiff's Termination</u>

      55.     On October 22, 2014, Plaintiff was terminated for violations of the September 8 disciplinary settlement by the Labor Relations Department, in consultation with Drs. Pulitzer and Reede, following "allegations of insubordination, leaving the worksite without authorization and related matters." Ex. VV; Bernadel Dep., p. 5:12-18; Pulitzer Dep., p. 420:23-421:2. Dr. Pulitzer also conferred with Dr. Jamaleddine prior to Plaintiff's termination, and he agreed with the decision. Pulitzer Dep., p. 439:12-24.

      **Response**:     Disputed. It was Dr. Reede and Dr. Pulitzer who decided to terminate Dr. Greenberg. Ex. 28 (Bernadel Dep. at 9). According to Ms. Bernadel, after interrogating Dr. Greenberg about the allegations that prompted his referral in October of 2014 and investigating the allegations by interviewing other witnesses to his conduct, Ms. Bernadel and Mr. Cuiman presented their findings to Dr. Reede and Dr. Pulitzer and together and separately it was his two supervisors who decided that Dr. Greenberg should be terminated. <u>Id.</u>; Ex. 5 (Pulitzer Dep., 420-21). Ms. Bernadel and Mr. Cuiman apparently were in agreement with that decision. Ex. 28 (Bernadel Dep. at 9). According to Dr. Pulitzer, Dr. Jamaleddine made it known that he would not

allow Dr. Greenberg to continue to practice at KCHC and therefore, in effect, he was saying that Dr. Greenberg had to be terminated.  Ex. 38 (Pulitzer Dep. (2d)) at 42.

   **Counter-Response:** The cited testimony does not contradict the factual statements in paragraph 55 regarding who terminated Plaintiff.  Dr. Reede and Dr. Pulitzer both were consulted and stated that they believed he should be terminated, as stated in paragraph 55, but Labor Relations was in agreement (see Ex. 28, 9:15-19) and issued the termination letter.  Ex. VV; Cuiman Dep., p. 220:9-221:12. Plaintiff's  Opp., p. 14.  Defendants do not dispute that Dr. Jamaleddine would not allow Plaintiff to continue to practice at KCHC.

   56.  Dr. Pulitzer himself ultimately had to correct the approximately 180 attestations by re-reading each study, confirming that he agreed or disagreed, and affixing a new counter-attestation.  Ex. WW; Pulitzer Dep., 207:19-208:15.

   **Response**:  Uncontested that Dr. Pulitzer decided, along with Risk Management, that he would re-read each study and after confirming or disagreeing with the report, affix an appropriate attestation to the report.

   **Counter-Response:** No response.

**XII.**  **Facts Regarding the ACGME Reassessment**

   57.  Following the changes in personnel and the new standards put in place for all physicians in the department, the ACGME restored the Radiology Department's "Continued Accreditation" in August 2015.  Ex. XX.  The department was taken off probation at that time, and it remains accredited today.  Reede Decl., ¶ 17.  The ACGME report in 2015 commended the department "for a quick turnaround and implementing significant changes that have greatly improved the educational program."  Ex. SS, SUNY00697.

   **Response**:  Undisputed.

   **Counter-Response:** No response.

**Plaintiff's Rule 56.1 Statement of Additional Material Facts
In Opposition to Defendants' Motion For Summary Judgment**

**Dr. Greenberg's Qualifications as a Competent and Caring Professional**

1.      Throughout his employment at SUNY and KCHC, Dr. Greenberg was a fierce advocate for quality assurance and patient care.  When he first arrived at KCHC, he wrote to David Stark, then Chief of Radiology and his supervisor, to draw attention to deficiencies both in patient care, especially during after hours, and resident teaching.  Ex. 2 (SUNY 003388-90). Notably, Dr. Greenberg offered to take over supervision of emergent cases during off hours.  Id. During the period in which Dr. Greenberg was supposedly "acting out" as the SUNY Defendants would have it, the summer of 2014, he took on the daunting administrative task of researching the causes for lapses in care attributable to the Radiology Department at KCHC as his contribution to a multi-departmental longitudinal study on quality assurance with participants from various departments in the hospital, even going so far as to attend one of the study's meetings during his scheduled vacation.  Ex. 3 (HHC_ESI_001006).

        **Response:**      Plaintiff's statement of material facts in paragraph 1 relies on improper argument and conclusory allegations.  Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998); Watson v. Grady, No. 09-CV-3055 NSR, 2015 WL 2168189, at *17 (S.D.N.Y. May 7, 2015), aff'd sub nom. Watson v. Sims, 648 F. App'x 49 (2d Cir. 2016).  The alleged facts are also immaterial and are insufficient to create a genuinely disputed fact. Plaintiff's Statement of Additional Material Facts in Opposition to Defendants' Motion For Summary Judgment is additionally not in compliance with Local Civil Rule 56.1(b).

2.      According to his colleagues, even those who played a pivotal role in terminating his employment, Dr. Greenberg was a highly competent radiologist.  Ex. 4 (SUNY000498); Ex. 5 (Pulitzer Dep.) at 426 ("Dr. Greenberg was a very well respected radiologist in our department.  I mean, he was one of the best radiologists we've ever had and people look up

to him"); Ex. 6 (Scott Dep.) at 90.  During 2013, according to departmental metrics that counted all

studies completed by radiologists and then weighted those studies according to their complexity, out

of 24 radiologists, Dr. Greenberg was the fifth highest in terms of productivity.  Ex. 7 (SUNY

002439) (14,954 studies completed and weighted at 10,160.1).  According to other colleagues, Dr.

Greenberg was not only a highly capable radiologist but he was also a "good teacher."  Ex. 6 (Scott

Dep. at 90).

> **Response:** The alleged facts are immaterial and are insufficient to create a genuinely
>
> disputed fact for trial.  Further, Plaintiff's Statement of Additional Material Facts In Opposition to
>
> Defendants' Motion For Summary Judgment is additionally not in compliance with Local Civil Rule
>
> 56.1(b).  The SUNY Defendants dispute Plaintiff's reputation as a teacher; although Dr. Scott said
>
> she thought he was a "good teacher" during her residency (but qualified that by saying it was a hard
>
> year for everyone at the Hospital), Plaintiff had received unfavorable evaluations from the residents
>
> in the program in 2014.  Pl. Ex. 4; Ex. DDD.  Further, he was criticized by residents in relation to
>
> his attendance and academic preparation; problems cited by the ACGME.  Id.

### Evidence Of Dr. Reede and Dr. Pulitzer's Surreptitious Scrutiny Of Dr. Greenberg And Fabricating Issues In His Personnel File

3.      On May 5, 2014, Dr. Greenberg and Dr. Reede met.  Ex. 54 (SUNY 3469).

In anticipation of that meeting, Dr. Reede had a pre-printed agenda with bullet points.  Id.  She also

had carefully prepared data to confront Dr. Greenberg with the fact that while on his timesheet he

had written that he worked 9 to 5 p.m. on April 21, 2014, in fact an email that he had written on

April 21, 2014 to Linda McMurren indicated that he was running late and Talk Station data indicated

that he did not start work until about noon.  Ex. 55 (SUNY 003485-86 & 88).  Notably, it was Dr.

Pulitzer who provided Dr. Reede with an analysis of Talk Station data about Dr. Greenberg on the

day in question.  Id. (SUNY 003486).  At this point, Dr. Pulitzer had not yet been appointed Interim

Section Chief of Radiology - that role still belonged to Dr. Kantor.  Ex. 5 (Pulitzer Dep.) at 13.

While she handwrote notes of the meeting, there is no indication in those notes that the meeting was disciplinary or involved counseling about performance issues or anything of grave concern. Ex 54 (SUNY 3469). Dr. Reede did type a memo to the file about this meeting and stated in that memo that the occasion of the meeting was "incorrect reporting of time and attendance." Ex. 9 (SUNY 003511). In this memo, she focused on the issue of time and attendance and added nuggets like her summary of Dr. Greenberg's response to arriving late for work: "he did not see what the problem was because he read all the films. See id. In a follow-up email to this meeting, Dr. Greenberg wrote to Dr. Reede about the issue that he believed was the focus of their meeting - a negative resident evaluation. Ex. 11 (SUNY 000477). In this email, Dr. Greenberg does not even mention the time and attendance issue, which Dr. Reede suggests was the focus of their meeting. See id. At her deposition and in contrast to the negative tone of her typed memo to the file about this meeting, Dr. Reede characterized it as informal and almost friendly. Ex. 10 (Reede Dep. at 148-151).

   **Response:**  Plaintiff's statement of material facts in paragraph 3 relies on improper argument and conclusory allegations. Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998); Watson v. Grady, No. 09-CV-3055 NSR, 2015 WL 2168189, at *17 (S.D.N.Y. May 7, 2015), aff'd sub nom. Watson v. Sims, 648 F. App'x 49 (2d Cir. 2016). SUNY Defendants dispute Plaintiff's characterization of the alleged facts in this paragraph, but do not dispute that Dr. Reede and Dr. Pulitzer were monitoring the attendance and availability of the physicians within the Department, or that Plaintiff met with Dr. Reede on April 21, 2014 to discuss his time and attendance. Reede Reply Decl., ¶ 2; Ex. B, I; Reede Dep., p. 149:10-25 (Reply Excerpts)

   4.  In a memo that Dr. Pulitzer authored, apparently on September 2, 2014, he stated that he had "counseled in person [Dr. Greenberg] on time and attendance" on August 23, 2014. Ex. 17 (HHC_ESI_1063). In another memo, one that was more formalized by being placed on KCHC letterhead and dated August 22, 2014, Dr. Pulitzer stated that the "counseling" took place

on August 22, 2014.  Ex. 17 (HHC_ESI_001092).  Dr. Pulitzer's first memo to the file about the

alleged counseling of Dr. Greenberg on August 22, 2014, which he inaccurately dates as August 23,

2014, was likely generated on September 2, 2014, as that is the date of the cover email to his

administrative assistant instructing her to file the memo in Dr. Greenberg's personnel file.  Ex. 17

(HHC_ESI_001062).  The second, more formal memo was likely "pre-dated" as the date it bears is

August 22, 2014, yet there is no evidence that he instructed his assistant to file any memos on that

date, which was his usual habit.  Notably, it was on September 2, 2014 that Dr. Greenberg

approached Dr. Pulitzer about taking two days off under the Family Medical Leave Act.  Ex. 5

(Pulitzer Dep.) at 337.  At his deposition, Dr. Pulitzer characterized his August 22, 2014 meeting

with Dr. Greenberg as a friendly attempt to get Dr. Greenberg to commit to a shift that he could

reliably maintain, given his constraints.  Id. at 311.  Dr. Greenberg recalls a far different

conversation in which Dr. Pulitzer told him that Dr. Reede was the person who wanted Dr.

Greenberg to work an early, set shift, that he knew that historically Dr. Greenberg was asked to

come in later and work later and that, finally, Dr. Reede was out to get rid of him.  Greenberg Decl.,

¶ 7.

      **Response:**     Plaintiff's statement of material facts in paragraph 4 relies on

improper argument and conclusory allegations.  Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d

Cir.1998); Watson v. Grady, No. 09-CV-3055 NSR, 2015 WL 2168189, at *17 (S.D.N.Y. May 7,

2015), aff'd sub nom. Watson v. Sims, 648 F. App'x 49 (2d Cir. 2016).  Most of the allegations,

especially those relating to the alleged "pre-dating" are speculative and not supported by admissible

evidence.  SUNY Defendants dispute Plaintiff's characterization of the alleged facts in this

paragraph and dispute Plaintiff's recounting of the conversation with Dr. Pulitzer.  Ex. R.  The

parties agree that Plaintiff's time and attendance were monitored, that Dr. Pulitzer identified

problems with the same, that Dr. Reede had identified problems with the same, and that both raised

the issue with Plaintiff. Any additional alleged facts are immaterial and insufficient to create a genuinely disputed fact.

**Dr. Reede and Dr. Pulitzer's Continued Surveillance Of Dr. Greenberg**

5.      On August 20, 2014, Jayan Kurian, an IT administrator at KCHC, sent to Dr. Pulitzer a daily log indicating when Dr. Greenberg completed review of films while at work from July 1, 2014 to August 8, 2014. Ex. 15 (HHC_ESI_000777-872). Later that same day, Dr. Pulitzer forwarded this log to Dr. Reede without a cover email, implying that they were in an ongoing conversation about Dr. Greenberg's time and attendance and/or productivity. Ex. 16 (HHC_ESI_873). Discovery has indicated that no other radiologist was singled out for scrutiny in this manner at this point in time.

**Response:**      Plaintiff's statement of material facts in paragraph 5 relies on speculation, improper argument and conclusory allegations. Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998); Watson v. Grady, No. 09-CV-3055 NSR, 2015 WL 2168189, at *17 (S.D.N.Y. May 7, 2015), aff'd sub nom. Watson v. Sims, 648 F. App'x 49 (2d Cir. 2016). SUNY Defendants dispute Plaintiff's characterization of the alleged facts in this paragraph. The SUNY Defendants do not dispute that Dr. Pulitzer monitored this data for all of the radiologists in the department at the time he was appointed Director of Radiology in part due to time and attendance abuse by physicians. Pulitzer Decl., ¶¶ 4, 6; Pulitzer Dep. II, p. 160:17-161:3. Dr. Qi Chen ultimately resigned as a result of time and attendance problems, when he was threatened with termination. Reede Reply Decl., ¶ 3. The alleged facts are also immaterial and insufficient to create a genuinely disputed fact.

6.      At her deposition, Dr. Scott admitted that Dr. Pulitzer would reach out to her in July and August of 2014 to get details about Dr. Greenberg's work hours. Ex. 6 (Scott Dep. at 136-39, 141-43 & 187).

**Response:**     SUNY Defendants dispute Plaintiff's characterization of the alleged facts in this paragraph.  The cited testimony does not state that Dr. Pulitzer reached out to Dr. Scott to get details about Plaintiff's work hours.  It does state that Dr. Scott and Dr. Pulitzer discussed Plaintiff's absences when they created coverage problems.  Ex. 6, Scott Dep., p. 137-139.  The alleged facts are also immaterial and insufficient to create a genuinely disputed fact.

### The Promotion Of Dr. Scott Rather Than Dr. Greenberg To The Directorship

7.     The position of Director of ER was never officially posted.  Greenberg Decl., ¶ 6.  By the time Dr. Greenberg requested to be considered for the position and he attended a meeting to discuss his request with Dr. Reede, she had already decided he would not get the position and apparently already offered it to Dr. Scott.  Ex. 6 (Scott Dep. at 68-73).

**Response:**     Not disputed for the purposes of the motion that the position was not officially posted or that Dr. Greenberg asked to be considered for the position.   The alleged facts are immaterial and insufficient to create a genuinely disputed fact.  Even before the position of Director of ER Radiology became available, Dr. Reede had made clear that scholarly activity was connected to promotion, and that without such activity, Plaintiff should not expect a promotion.  During Plaintiff's annual review in February 2014, well before the decision was made to promote Dr. Scott in July, Dr. Reede made clear that promotion should not be expected without academic accomplishments.  Plaintiff was asked to fill out a form indicating his accomplishments during the prior year.  Ex. CCC; Greenberg Dep., p. 138:9-18.  Plaintiff left two boxes completely blank: "scholarly distinction and accomplishment" and "mutual expectations regarding promotion."  Id.  In the blank box for "mutual expectations regarding promotion," Dr. Reede wrote "No scholarly activity to support promotion."  Id.  As Dr. Reede summarized in her notes regarding her meeting with him in July 2014, Plaintiff had "[n]o significant scholarly activity" and primarily for that reason, Dr. Scott was selected.  Ex. AAA.  Plaintiff acknowledged at the time that a key part of the position

49

was to "provide[] the best academic experience for our residents" and that "academics" had "been somewhat stunted" in the Department. Pl. Opp., Ex. 12. In his email applying for the promotion, Plaintiff acknowledged that the Program was "recalibrating" its academic goals and tried to explain away his lack of scholarship by saying it had been a "tough year," without explaining the absence of scholarship in his previous years. Pls. Ex. 12. Plaintiff's CV, which was provided to Dr. Reede at the time of the decision to hire Dr. Scott, listed two publications, both undated and without the name of any journal where they were published. Ex. YY. During his deposition, Plaintiff admitted that one of the listed articles, which he wrote in 1988 or 1989, was never published. Greenberg Dep., p. 10:23-11:18. Plaintiff was not a member of any radiological societies and did not list any academic accomplishments beyond the two articles. Ex. YY. Plaintiff had also submitted a summary of his scholarly activity to provide an update to the ACGME that showed zero hours spent engaging in "Research/scholarly activity with residents" and no scholarly activity in the prior year. Ex. BBB. Dr. Reede's July 23, 2014 memo regarding Plaintiff's request for a promotion reflected the numerous reasons she did not think Plaintiff should be promoted, including information about Plaintiff's time and attendance problems, in that it cited resident evaluations of Plaintiff which complained of Plaintiff's lack of availability, noting that Plaintiff "would disappear for hours at a time" to "go[] home to eat dinner with his family" during his shift. Ex. AAA Ex. DDD, SUNY000475. Another resident suggested that Plaintiff "be more available," and Plaintiff received poor feedback in response to whether he provided feedback to residents during his rotation (SUNY000468), whether he was available to assist residents with academic work (SUNY000473), and whether he provided a high-quality teaching experience (SUNY000465). Id.

       8.     Dr. Scott testified that her mission as Director of ER as far as she understood it (and which must have been conveyed by Dr. Reede who hired her for the position) was to get the department running more smoothly rather than focus on her own research and

publications. Ex. 6 (Scott Dep. at 272-73). At the time that Dr. Scott was appointed Director of

ER, she had no peer-reviewed journal publications listed in the bibliography section of her resume.

Ex. 48 (HHC 1787).

**Response:** Plaintiff's statement of material facts in paragraph 8 relies on improper

speculation, argument and conclusory allegations. Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d

Cir.1998); Watson v. Grady, No. 09-CV-3055 NSR, 2015 WL 2168189, at *17 (S.D.N.Y. May 7,

2015), aff'd sub nom. Watson v. Sims, 648 F. App'x 49 (2d Cir. 2016). SUNY Defendants also

dispute Plaintiff's characterization of the alleged facts in this paragraph. Dr. Scott went on to testify

that she still "did scholarly activity" when she started, and in fact she had published two papers in

her first two years, planned to publish two more, and put together several academic posters. Scott

Dep., p. 264:2-7. Undisputed that Dr. Scott did not have any publications as of July 2014, but she

was a member of three professional societies, she had a number of recent scientific posters and

education exhibits, and was actively engaged in research for publication. Ex. ZZ. Dr. Reede also

testified that Dr. Scott "expressed a strong interest in academics" to her prior to the decision, and

she had already volunteered to work on some teaching module projects. Reede Dep., p. 124:10-18.

9.      As previous Director of ER Radiology at KCHC, Dr. Greenberg had run a

service in a department that was not placed on probation by ACGME. Also, at the time that Dr.

Greenberg sought to become the Director of ER Radiology he had twice as much clinical experience

as Dr. Scott with the majority of it at an institution categorized as a Level One trauma ER, as

opposed to Dr. Scott's experience which was not at a Level One trauma ER. Greenberg Decl., at ¶

6. Dr. Greenberg was also board certified in both anatomic pathology and diagnostic radiology,

which is unusual and not the case with Dr. Scott. Complaint ¶ 1. He also completed an ACGME-

approved fellowship in radiology while Dr. Scott had not. Id.

**Response:** The alleged facts pertain to Plaintiff's subjective belief as to why he was better qualified for the position than Dr. Scott and are immaterial and insufficient to create a genuinely disputed fact. Further, none of the alleged facts concern Dr. Reede's reason for choosing Dr. Scott instead of Dr. Greenberg. Ex. AAA. Plaintiff was an attending physician in the Program when it was placed on probation. He had time and attendance problems, which raised particular concern given the ACGME report. See Response to ¶ 16, supra.

10. At the meeting on July 23, 2014, where Dr. Reede and Dr. Greenberg discussed the latter's request to be made Director of ER Radiology, Dr. Reede said in sum and substance that she believed Dr. Scott was the better candidate because she was closer to her residency and therefore would be a more effective mentor to residents. See Greenberg Decl., ¶ 6. Dr. Greenberg understood this comment to mean that he would be a less effective teacher of residents because he was older. Id.

**Response:** Plaintiff does not identify what Dr. Reede is alleged to have said. The allegation that she stated that she sought someone closer to residency, which Dr. Reede denies making, is nevertheless neutral as to age, and instead refers to the experience of having been a resident. It is therefore immaterial and insufficient to create a genuinely disputed fact.

11. According to Dr. Reede's memo to the file of the July 23, 2014 meeting between Dr. Greenberg and herself to discuss why he would not become Director of ER Radiology under her watch, (Ex. 13 (SUNY 000498)), Dr. Greenberg (1) lacked participation in administrative functions in the department; (2) his resident evaluations showed deficiencies; (3) he had no significant scholarly activity; and (4) he did not demonstrate an interest in academic pursuits. Id. None of these reasons was credible. First, Dr. Greenberg's day-time schedule and duties required that he remain in the ER at all times so attending administrative meetings posed tremendous challenges. Ex. 56 (HHC_ESI_000144-45). Second, Dr. Greenberg's resident evaluations were well

above average, except for one resident who had an ax to grind, which Dr. Greenberg had explained to Dr. Reede in great detail previously. Ex. 11 (SUNY 000477). Third, Dr. Reede never gave Dr. Greenberg a chance to explain that he had been engaged in academic research during the past year and remained interested in pursuing such. Greenberg Aff., ¶ 6. Notably, at her deposition, Dr. Scott made clear that her mission as the new Director of ER Radiology, as must have been explained to her by Dr. Reede, was not to focus on academic and scholarly activity but to render more efficient clinical processes and staffing so that films of patients would be read more quickly and in a timely fashion, an issue that had been Dr. Greenberg's hobbyhorse during his entire tenure at KCHC.[5] Ex. 6 (Scott Dep. 272-73). Finally, at the meeting and not memorialized in the memo to the file, Dr. Reede told Dr. Greenberg that one of the reasons she had chosen Dr. Scott rather than he to be Director was that she was closer to her residency and therefore would be a more effective mentor to them, which Dr. Greenberg understood her to mean that Dr. Scott was younger than he was and therefore more able to relate to them. Greenberg Aff., ¶ 6.

     **Response:**     Plaintiff's statement of material facts in paragraph 11 relies on speculation, improper argument and conclusory allegations. <u>Kerzer v. Kingly Mfg.</u>, 156 F.3d 396, 400 (2d Cir.1998); <u>Watson v. Grady</u>, No. 09-CV-3055 NSR, 2015 WL 2168189, at *17 (S.D.N.Y. May 7, 2015), <u>aff'd sub nom. Watson v. Sims</u>, 648 F. App'x 49 (2d Cir. 2016). The alleged facts are not supported by admissible evidence. Plaintiff's evaluations were not "well above average" and noted significant issues with his availability and his interest in teaching. Ex. DDD, compare with Dr. Scott's evaluations from the following year, Ex. EEE. Plaintiff had a number of opportunities to inform Dr. Reede of his interest in scholarly work. He submitted a resume to Dr. Reede that

---

[5] In Dr. Reede's memo of the July 23, 2014 meeting with Dr. Greenberg, she noted that she was seeking a Director with an academic predisposition because "we want to explore the possibility of starting an ER Fellowship." Ex. 4 (SUNY 000498) This note is pretextual to the extent that we can believe Dr. Scott's testimony that Dr. Reede told her to focus on administrative tasks; furthermore, the Department of Radiology has yet to implement any such ER Fellowship.

showed two undated articles, one of which was never published; he filled out a February 2014 form

that asked him to list any "scholarly distinction and accomplishment," which he left blank (Ex. CCC;

Greenberg Dep., p. 138:9-18); and he submitted a summary of his scholarly activity to provide an

update to the ACGME that showed zero hours spent engaging in "Research/scholarly activity with

residents" and no scholarly activity in the prior year.  Ex. BBB.  Plaintiff mischaracterizes Dr. Scott's

testimony.  Dr. Scott went on to testify that she still "did scholarly activity" when she started, and in

fact she had published two papers in her first two years, planned to publish two more, and put

together several academic posters.  Scott Dep., p. 264:2-7.  Plaintiff does not identify what Dr.

Reede is alleged to have said.  The allegation that she stated that she sought someone closer to

residency, which Dr. Reede denies making, is neutral as to age, and instead refers to the experience

of having been a resident  It is therefore immaterial and insufficient to create a genuinely disputed

fact.

        12.      Dr. Scott testified that as a resident supervised by Dr. Greenberg she could

state that he was "a good teacher ... an excellent radiologist." Ex. 6 (Scott Dep.) at 90.  Even Dr.

Reede admitted at her deposition that Dr. Greenberg had a reputation as a highly productive and

accurate radiologist and good teacher.  Ex. 10 (Reede Dep) at 264; Ex. 57 (Reede (Second) Dep.) at

118.

**Response:**     Defendants do not dispute that Plaintiff is a good radiologist and that Dr.,

Scott testified that he was a good teacher and excellent radiologist during her residency. Scott Dep.

p. 90. The alleged facts are immaterial and insufficient to create a genuinely disputed fact.  SUNY

Defendants do not assert that any action was taken against Plaintiff because of his skills or lack

thereof as a radiologist.  As to his teaching, resident evaluations of Plaintiff in 2014 complained of

Plaintiff's lack of availability, noting that Plaintiff "would disappear for hours at a time" to "go[]

home to eat dinner with his family" during his shift..  Ex. AAA, Ex. DDD.  Another resident

suggested that Plaintiff "be more available," and Plaintiff received poor feedback in response to whether he provided feedback to residents during his rotation (SUNY000468), whether he was available to assist residents with academic work (SUNY000473), and whether he provided a high-quality teaching experience (SUNY000465).

13.     Dr. Pulitzer admitted that Dr. Greenberg was an admired ER radiologist: "[he] was a very well respected radiologist in our department. I mean, he was one of the best radiologists we've ever had and people look up to him. People looked to him to model what he's doing, just like a Michael Jordan or whomever." Ex. 5 (Pulitzer Dep. at 426-27).

**Response:**     Undisputed. The alleged facts are immaterial and insufficient to create a genuinely disputed fact.

### The Shifts For ER Radiologists At KCHC

14.     Dr. Scott testified that when she began working at KCH the 9 to 5 shift was for non-ER radiologists "upstairs." Ex. 6 (Scott Dep. at 127). She believed that Dr. Greenberg worked the 9 to 5 shift but she was unsure. Id. After he left, the 9-5 shift in ER Radiology was eradicated. Id. Dr. Scott testified that the 9-5 shift assigned to Dr. Greenberg did not conform well to the needs of the ER since the volume of film from 9 to 2 did not justify two people being there. Id. at 128.

**Response:**     The alleged facts are immaterial and insufficient to create a genuinely disputed fact. Plaintiff has not alleged or provided admissible evidence showing that whatever his shift hours were, he complied with them. So whether Dr. Scott knew his hours and the best way to arrange shifts is immaterial. Plaintiff also mischaracterizes Dr. Scott's testimony, which does not state that "she was unsure" Dr. Greenberg worked 9:00 to 5:00, but rather that she believed he worked the 9:00 to 5:00 shift.

15.     In fact, in the past, what shift Dr. Greenberg worked was a topic of continued discussion when he was supervised by Dr. Alan Kantor, Chief of Service in the Radiology at KCHC before Dr. Pulitzer.  Dr. Kantor wanted Dr. Greenberg routinely to work from noon to 8 p.m.  Ex. 5 (Pulitzer Dep. at 255-56); Greenberg Decl, ¶ 7.  Dr. Greenberg found the noon to 8 p.m. shift very difficult to balance with his family obligations, which included care of a special needs son.  Ex. 58 (HHC_ESI_00068).  Eventually, Dr. Greenberg accepted a compromise position with Dr. Kantor - he would come in between 10 and 11 a.m. and work 8 hours from his start time - until approximately 6 or 7 p.m.  Greenberg Decl., ¶ 7.  Dr. Greenberg worked the modified 12 to 8 p.m. shift up to the point that Dr. Pulitzer conveyed to him that Dr. Reede was demanding that Dr. Greenberg work a 9 to 5 p.m. schedule in or around August 22, 2014.  Greenberg Decl., ¶ 7.  Dr. Greenberg agreed to work the 9 to 5 p.m. schedule commencing in September of 2014 when his children were established in their school routines.  Id.

**Response:**     Plaintiff's allegation that he reached a "compromise position" with a former supervisor in regard to his hours, which Plaintiff alleges he "tended to adhere" (Greenberg Decl. ¶ 7), is immaterial even if true.  At all times relevant to this action, Plaintiff had an assigned shift and he was told his hours were being monitored.  Dr, Kantor also had problems with Plaintiff's time and attendance.  Exs. F, G, H.  The remaining alleged facts are immaterial and insufficient to create a genuinely disputed fact.  Also see Counter Response, ¶ 16, fn. 3 supra.

### Dr. Greenberg's Request for FMLA Leave

16.     On August 29, 2014, Dr. Greenberg and his wife received an email from a representative of the school where their special needs son, Jayden, had been matriculated notifying them that it was likely that their son would have to be transferred to another school.  Ex. 20 (G212); Ex. 1 (Greenberg Dep. at 224-26).  Jayden has a serious condition (i.e., has been diagnosed as on the autism spectrum) and throughout his lifetime has received extensive support from health and

mental-health professionals and during the relevant period attended school with the assistance of an Individualized Education Plan (IEP). Greenberg Decl., ¶ 4; Ex. 1 (Greenberg Dep.) at 225-26; Ex. 21 (SUNY 007281-7302). At the time relevant to this case, he was unable to perform regular life activities, unless he received assistance from his parents. Greenberg Decl., ¶ 4. In light of the news about Jayden, Dr. Greenberg wanted to take a leave of a few days to assist in the necessary arrangements for Jayden's transfer and to provide him with love, support and care during what was likely to be a difficult period for Jayden, which was likely to lead to depression, anxiety and incapacitation. Greenberg Decl., ¶ 9. In light of his son's situation, on August 29, 2014, Dr. Greenberg attempted to call Dr. Reede at her office because he understood that what he was requesting was on short notice. Greenberg Decl., ¶ 9. Dr. Reede's voicemail was full because she was on vacation and therefore he was unable to leave a message. See id. Knowing that Dr. Pulitzer was on vacation too, Dr. Greenberg reached out to the only other person that might be able to guide him as to how to proceed - Linda McMurren who was Dr. Reede's administrative assistant. Ex. 22 (HHC_ESI_001090). Dr. Greenberg did not realize that Ms. McMurren was also on vacation, as she did not reply to his email until September 4, 2014. Id. (HHC_ESI_001089). In contacting Dr. Reede immediately upon learning of his need to take time off for an emergency family matter that related to the care of his son who has a serious condition, Dr. Greenberg followed relevant policy regarding unexpected absences. Ex. 59 (SUNY 000677).

    **Response:**    The alleged facts regarding Plaintiff's son's condition are undisputed but immaterial and are insufficient to create a genuinely disputed fact. Plaintiff's allegations about trying to reach Drs. Reede and Pulitzer do not create a triable issue of material fact. Plaintiff does not in fact point to admissible evidence indicating that he "immediately contacted Dr. Reede upon learning" of the need to take time off. Plaintiff has submitted uncontroverted evidence that a letter was sent to him during the week of August 18, 2014, and an email on August 25, 2014 indicating

that Plaintiff's son would not be able to return to his school, the alleged reason for his original need for leave. Ex. FFF. Plaintiff now claims, for the first time, that he called Dr. Reede on August 29th to ask for time to care for his son, but was unable to leave a message because her voice mail was full. He did not "reach" her or make any real attempt to do so. Plaintiff further alleges that he could not reach Dr. Pulitzer because he was on vacation. But these allegations are immaterial because both doctors regularly checked their emails and their cell phone numbers were circulated to all physicians. Reede Reply Decl., ¶ 7; Pulitzer Reply Decl. ¶ 1. Plaintiff could have and should have used either method. The admissible evidence demonstrates that he did not immediately reach out to any of his supervisors upon learning, by August 25th at the latest, of his alleged need for leave. SUNY Defendants have no knowledge of Plaintiff's attempt to call Dr. Reede on August 29, 2014, at least four days after receiving notice that he may need leave time, but he did not email either doctor or include the alleged reason for his leave in any written communication with Linda McMurren, Dr. Pulitzer or Dr. Reede at any time. Plaintiff does not even allege that he notified Dr. Pulitzer of his need for leave until September 2, 2014. Further, Plaintiff's alleged notice to SUNY Downstate of an FMLA qualifying condition is immaterial since Plaintiff actually took leave on September 4 and ,5 and in any event repeatedly told SUNY, and stated on the record during his Interrogation, that he did not actually have to take that time off for his son (as his mother-in-law and wife could provide "appropriate support"), but missed work due to a non-qualifying back injury. Ex. X, SUNY001292.

   17. Not hearing back from Linda McMurren, on September 2, 2014, Dr. Greenberg approached Dr. Pulitzer about taking off September 4th and 5th later that week. Ex. 1 (Greenberg Dep. at 228); Ex. 5 (Pulitzer Dep. at 337). Dr. Greenberg provided the reason why he needed the leave: "I told him that I had to care for my son, that he had to transition to a new school, and that I needed the time off to be with him." Ex. 1 (Greenberg Dep.) at 228). Dr. Pulitzer knew that Dr. Greenberg had a special-needs son. Ex. 5 (Pulitzer Dep.) at 341-42. He denied that Dr.

Greenberg mentioned that he needed the time off to take care of Jayden during any of their conversations about the leave. Id. at 341 & 345. He admitted that he never asked Dr. Greenberg why he needed the time off in spite of three conversations about the request, including one conversation in which he admitted that Dr. Greenberg told him in sum and substance that you are making me choose between my job and my family. Id. at 360. To all of Dr. Greenberg's requests for a leave, Dr. Pulitzer responded verbally and finally in writing that he could not allow Dr. Greenberg to take the days off because of staffing deficiencies and departmental operational needs. Ex. 1 (Greenberg Dep. at 232); Ex. 5 (Pulitzer Dep. at 337-38); Ex 58 (SUNY 000482).

**Response:** The SUNY Defendants do not dispute that Plaintiff's leave request was denied due to staffing deficiencies and departmental operational needs. SUNY Defendants dispute Plaintiff's characterization of what he said to Dr. Pulitzer regarding his need for leave. Pulitzer Dep., 344:5-9; 345:16-346:12; 359:16-22. However, the allegations regarding Plaintiff's alleged notice to SUNY Downstate of an FMLA qualifying condition are immaterial, since the admissible evidence demonstrates that Plaintiff did not in fact notify his supervisors of the need for leave as soon as he knew he may need it, see Ex. FFF and the SUNY Defendants' response to Plaintiff's ¶ 16, supra; took leave on September 4 and 5 anyway; testified that his mother-in-law and wife were available to take care of his son, and stated in an email to SUNY and during his interrogation that he missed work due to a back injury, rather than for any family purpose. Ex. X, SUNY001292.

18. At his deposition, Dr. Pulitzer stated that he could not grant Dr. Greenberg leave on September 4 and 5, 2014 because he was down four radiologists from recent non-renewals and other radiologists were on vacation. Ex. 5 (Pulitzer Dep. at 338-39). In fact, at the time, the department had replaced three of the four of the radiologists that had been let go. Greenberg Decl., ¶ 9. Dr. Greenberg also remembers Dr. Pulitzer stating as another reason he could not permit his leave is that the department lacked someone who could do body imaging, if Dr. Greenberg was not

around.  Id.  As for the lack of body imagers on the days in question, according to Dr. Greenberg, any radiologist who did weekend call, such as Drs. Scott, Chen, Samin, Zinn, Pulitzer and Waite, could have done body imaging and each of whom was working the days in question.  Id.

**Response:**      The alleged facts do not contradict Dr. Pulitzer's reason for denying leave based on the operational needs of the department.  Plaintiff mischaracterizes Dr. Pulitzer's cited testimony.  Dr. Pulitzer testified that because of the lay offs *and vacation schedules*, the Radiology Department was working on a "skeleton crew." Pl. Ex. 5, Pulitzer Dep. at 338-39.  The Radiology Department was severely understaffed the week of September 1, 2014, and there were not enough radiologists available to adequately cover the work.  Pulitzer Reply Decl., ¶ 2.  Plaintiff has cited no admissible evidence otherwise.  Dr. Pulitzer set the schedule for that week with the expectation that Plaintiff would cover for Dr. Patrick Hammil, who is a specialist in complex Body Imaging cases.  Id.  Plaintiff does not cite any evidence showing that any of the doctors he names have such a specialization or that moving them to cover Dr. Hammil would not create additional coverage problems in the department.  Dr. Scott testified that the department was "really understaffed" on those two days and Plaintiff's absence created "even more stress in the department." Scott Dep., p. 149:17-150:14.

19.      On September 3, 2014, Dr. Greenberg approached Dr. Pulitzer once again about the two days that he needed to take off in order to care for his special needs son.  Ex. 5 (Pulitzer Dep. at 351); Ex. 1 (Greenberg Dep. at 231-32).  According to Dr. Greenberg, he said to Pulitzer amongst other statements about his need for the leave to take care of his son: "I must have this time off to care for my son.  This is a difficult transition for him." Id., Ex. 1 (Greenberg Dep. at 232).  Again, Dr. Pulitzer denied the request in sum and substance by stating: "due to the operational needs of the department, I can't let you have the time off." Id.

**Response:**      SUNY Defendants dispute Plaintiff's characterization of what he said to Dr. Pultizer regarding his need for leave.  Pulitzer Dep., 344:5-9; 345:16-346:12; 359:16-22.  But even if true, the alleged facts regarding Plaintiff's claimed notice to SUNY Downstate of an FMLA qualifying condition are immaterial, since Plaintiff delayed in seeking the leave, see Ex. FFF and the SUNY Defendants' response to Plaintiff's ¶ 16, supra; took leave on September 4 and 5 anyway; testified that his mother-in-law and wife were available to take care of his son obviating the need for his leave; and stated in an email to SUNY and during his interrogation that he missed work due to a back injury, rather than for any family purpose.  Ex. X, SUNY001292.

20.      After Dr. Greenberg approached Dr. Pulitzer the second time to request two days off to take care of his special-needs son, Dr. Pulitzer sought Dr. Reede's assistance as to how to handle the situation.  Ex. 5 (Pulitzer Dep. at 355-56).  She advised him to write a letter to Dr. Greenberg officially denying the time off, ordering him to report for work and warning him that if he were to disobey the command he would be referred to Labor Relations.  Id. at 356.  Dr. Pulitzer followed Dr. Reede's recommendation and generated the letter described above.

**Response:**      SUNY Defendants dispute Plaintiff's characterization of what he said to Dr. Pultizer regarding his need for leave.  Pulitzer Dep., 344:5-9; 345:16-346:12; 359:16-22.  But even if true, the alleged facts regarding Plaintiff's alleged notice to SUNY Downstate of an FMLA qualifying condition are immaterial since Plaintiff delayed in seeking the leave, see Ex. FFF and the SUNY Defendants' response to Plaintiff's ¶ 16, supra; took leave on September 4 and 5 anyway; testified that his mother-in-law and wife were available to take care of his son obviating the need for his leave; and stated in an email to SUNY and during his interrogation that he missed work due to a back injury, rather than for any family purpose.  Ex. X, SUNY001292.  The remaining alleged facts are immaterial and insufficient to create a genuinely disputed fact.

21.     Dr. Pulitzer delivered the letter recommended by Dr. Reede to Dr. Greenberg within 30 minutes of discussing the matter with Dr. Reede. Ex. 5 (Pulitzer Dep. at 358). He went to the reading room where Dr. Greenberg was working and said: "Oded, I have to give you this letter. I can't approve your time off." Id. He then read the contents of the letter to Dr. Greenberg and after doing so told him not to take the time off. Id. Dr. Pulitzer admitted that Dr. Greenberg said to him at this juncture, "Well, you're making me choose between my job and my family," to which he responded "I'm not making that choice." Id. at 360. Dr. Pulitzer admitted that he did not inquire as to what Dr. Greenberg meant by stating that he was making Dr. Greenberg choose between his job and family. Id. at 360-61. In an email that Dr. Pulitzer wrote to Michael Arabian, the Labor Relations representative who was assigned to Dr. Greenberg's case after the "insubordination" of September 4, 2014, he stated that during the third discussion, after he had read the official letter that he wrote to Dr. Greenberg officially denying his request for leave and warning him that he would be referred to Labor Relations if he did not show up (and presumably after he had heard Dr. Greenberg state, "you're making me choose between my job and my family"), he and Dr. Greenberg talked for a few minutes about each other's mutual families. Ex. 50 (HHC_ESI_1087). At his deposition, Dr. Pulitzer testified that if he had known that the leave of absence was to take care of Dr. Greenberg's special-needs son Jayden he would have made every attempt to accommodate the request. Id. at 361.

**Response:**     SUNY Defendants dispute Plaintiff's characterization of what he said to Dr. Pultizer regarding his need for leave. Pulitzer Dep., 344:5-9; 345:16-346:12; 359:16-22. Nevertheless, the alleged facts are immaterial and insufficient to create a genuinely disputed fact, since Plaintiff delayed in seeking the leave, see Ex. FFF and the SUNY Defendants' response to Plaintiff's ¶ 16, supra; took leave on September 4 and 5 anyway; testified that his mother-in-law and wife were available to take care of his son obviating the need for his leave; and stated in an email to

SUNY and during his interrogation that he missed work due to a back injury, rather than for any family purpose. Ex. X, SUNY001292. SUNY Defendants dispute Plaintiff's characterization of what he said to Dr. Pulitzer regarding his need for leave. Pulitzer Dep., 344:5-9; 345:16-346:12; 359:16-22. The remaining alleged facts are immaterial and insufficient to create a genuinely disputed fact.

22. Dr. Greenberg did not go to work on September 4 and 5 of 2014. In fact, on the schedule for this week were sufficient radiologists to cover for Dr. Greenberg's absence on these two days. Greenberg Decl., ¶ 9. The services that Dr. Greenberg would have covered were covered on these two days. Ex. 5 (Pulitzer Dep. at 354). Dr. Greenberg never filled out forms to request his FMLA leave because his supervisor, Dr. Pulitzer, made it clear through discussion and the September 3, 2014 letter ordering him to work that he would not approve the request.

**Response:** SUNY Defendants do not dispute that multiple people covered for Plaintiff during those two days. Ex. 5, p. 354:17-23. The alleged facts do not contradict Dr. Pulitzer's reason for denying leave based on the operational needs of the department. The Radiology Department was severely understaffed the week of September 1, 2014, Pulitzer Reply Decl., ¶ 2, but had no option except to continue to operate. Dr. Scott testified that the department was "really understaffed" on those two days and Plaintiff's absence created "even more stress in the department." Scott Dep., p. 149:17-150:14. The SUNY Defendants do not contest that Plaintiff did not complete FMLA request forms, state that Plaintiff has failed to identify admissible evidence showing that Dr. Pulitzer made it clear that such request would be futile, and state that the other facts alleged are immaterial.

23. On September 4, 2014 at 2:48 p.m., Dr. Reede notified Labor Relations that Dr. Greenberg did not come into work as ordered; therefore, a case regarding him that was already "opened" at Labor Relations and assigned to Michael Arabian was set to be pursued. Ex. 23

(SUNYESI0000278).  Later that day, Arabian reached out to Dr. Pulitzer by email and asked for the details as to what occurred when he hand-delivered the letter dated September 3, 2014 that denied Dr. Greenberg's request for two days off.  At 10:57 a.m. the next morning, Dr. Pulitzer emailed Arabian an attachment that described his interactions with Dr. Greenberg in detail.  Ex. 24 (SUNY 000494); Ex. 25 (HHC 1135-36) (the memo that Dr. Pulitzer sent to Mr. Arabian).  In his memo to Labor Relations, Dr. Pulitzer described Dr. Greenberg's conduct the week of August 25th, coming into work rather than staying out on vacation, in a manner to suggest that it was a problem, even though Dr. Hammil, according to Dr. Greenberg, welcomed Dr. Greenberg's help.  Ex. 25 (HHC 1135); Greenberg Decl., ¶ 8.  Arabian responded to this memo about 10 minutes later by asking for more details as to what happened when Dr. Pulitzer handed to Dr. Greenberg the September 3, 2014 letter denying his request.  Ex. 24 (SUNY 000493).  Dr. Pulitzer responded 20 minutes later and stated in pertinent part: "I advised him to show up for work on September 4 and to revise his plans or this matter would be referred to labor relation.  He thanked me for my recommendation and said that he intended to continue with his original plan.  I stayed an additional five minutes and had small talk about his family."  Ex. 24 (SUNY 000493).  Later this same day, Dr. Pulitzer sent to Dr. Reede the "pre-dated" memo discussed above.  Ex. 17 (HHC_ESI_001091-92).

    **Response:**    Plaintiff's statement of material facts in paragraph 23 relies on speculation, improper argument and conclusory allegations.  Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998); Watson v. Grady, No. 09-CV-3055 NSR, 2015 WL 2168189, at *17 (S.D.N.Y. May 7, 2015), aff'd sub nom. Watson v. Sims, 648 F. App'x 49 (2d Cir. 2016).  The SUNY Defendants dispute Plaintiff's characterization of the facts in paragraph 23, but the alleged facts are immaterial and insufficient to create a genuinely disputed fact.

    24.    On September 5, 2015, Dr. Reede, Dr. Pulitzer and Michael Arabian from SUNY Labor Relations met to talk about what would happen, i.e., the process now that Dr.

Greenberg had been referred to Labor Relations. Ex. 5 (Pulitzer Dep. 363-72). Dr. Pulitzer noted that the meeting was arranged through Dr. Reede's office because she was familiar with Labor Relations and he was "a very, very new administrator." Id. at 364.

**Response:** The alleged facts are immaterial and insufficient to create a genuinely disputed fact.

25. On September 5, 2014, Dr. Greenberg wrote an email to Linda McMurren and cc'd Dr. Pulitzer to provide an explanation of his absence. Ex. 22 (HHC_ESI_001089). Therein, he wrote, "[a]s it turns out I was going to come in regardless of my last email Thursday, the family issues having been resolved Thursday morning. I then managed to throw my back out. My mobility has been severely limited since. Please forgive the confusion." Id. At his deposition, Dr. Greenberg made clear that this email was an attempt to save his job by misrepresenting that he had intended to come to work on the two days that he missed but he threw his back out on the morning of the 4th; he always intended to take his leave in order to be available for Jayden and assist in his transfer from one school to another. Ex. 1 (Greenberg Dep. at 246-47).

**Response:** The SUNY Defendants do not dispute that Plaintiff notified Ms. McMurren and Dr. Pulitzer that he was out as a result of his back, and he did not state that the reason for his leave was to care for his son until his deposition, almost two years later. The alleged facts regarding Plaintiff's intent are immaterial and insufficient to create a genuinely disputed fact.

The Settlement Agreement that Dr. Greenberg Signed Under Duress

26. When Dr. Greenberg returned to work on his next scheduled work day, September 8, 2014, he went to the reading room where he began reading cases. Edgar Decl., Ex. 5 (Pulitzer Dep. at 373). Shortly after arriving, Dr. Pulitzer approached him and instructed him to cease working immediately and report to Labor Relations. Id. After being interrogated for a few hours and having to wait another few hours for Labor Relations to draft and present to him a

Settlement Agreement, all the while suffering from back spasms, Dr. Greenberg signed a draconian Settlement Agreement. Ex. 29 (SUNY 006626-27). By its terms, in lieu of any immediate discipline, the Settlement Agreement provided that Dr. Greenberg would be on probation for a year and any subsequent infraction posed the real possibility that he could be terminated immediately. Id. (¶ 4). This settlement agreement, the terms of which were likely discussed between Mr. Arabian and Dr. Reede and Dr. Pulitzer because that was the standard operating procedure, was especially severe in light of the fact that of the nine other settlement agreements presented to employees during this time period by SUNY Labor Relations only one other stripped the employee of his or her job security. Ex. 27 (Arabian Dep. at 224-25) (conferring with those supervisors affected by the agreement would routinely occur); Ex. 30 (nine other settlement agreements). In the cover email to the Settlement Agreement, Mr. Arabian instructed Dr. Pulitzer to keep a close eye on Dr. Greenberg to confirm that he did not stray from its strict terms.

**Response:** Plaintiff's response relies on speculation, improper argument and conclusory allegations. Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998); Watson v. Grady, No. 09-CV-3055 NSR, 2015 WL 2168189, at *17 (S.D.N.Y. May 7, 2015), aff'd sub nom. Watson v. Sims, 648 F. App'x 49 (2d Cir. 2016). Plaintiff's interrogation was 55 minutes long. Ex. GGG; Coulston Decl., ¶ 7. There is no admissible evidence that Mr. Arabian conferred with Dr. Pulitzer or Dr. Reede regarding the terms of the settlement agreement. Mr. Arabian testified that "sometimes my superiors had conversations or at least a heads-up to certain departments of what was happening" (Ex. 27, 223:2-5), but he had no recollection of that happening on September 8, 2014 (Id., p. 222:12-7). Dr. Pulitzer and Dr. Reede have stated that they were not consulted (Reede Dep., 314:12-25; Pulitzer Decl., ¶ 11). Plaintiff chose to decline representation, and received the same agreement as the other unrepresented individual in the agreements cited by Plaintiff. See Ex. 30, SUNY006625. Plaintiff admits he did not read the agreement, let alone try to negotiate better terms. Ex. DD,

SUNY01353; 56.1 Response, ¶ 36. The remaining alleged facts are unsupported, immaterial and insufficient to create a genuinely disputed fact.

### The Heightened Surveillance of Dr. Greenberg and His Alleged Violations of the Settlement Agreement

27.     Dr. Greenberg was subject to unremitting scrutiny by Dr. Reede and Dr. Pulitzer upon his return to work after signing the Settlement Agreement.  On September 9, 2014, Dr. Greenberg wrote an email to Dr. Pulitzer wherein he complained about the slow speed in which archived images were made accessible due to computer issues. Ex. 32 (HHC_ESI_001238).  In response to this email, Dr. Pulitzer sent it to his assistant to file in his personnel folder. Id.  On September 12, 2014, Dr. Pulitzer wrote an email to Dr. Reede with the subject line of "week in review September 12, 2013." Ex. 33 (HHC_ESI_001243-44).  The first item addressed is Dr. Greenberg and in relation to him, Dr. Pulitzer wrote: "Will monitor time and attendance and number of cases read per day." Id.  On September 15, 2014 at 8:52 a.m., Dr. Reede emailed Dr. Pulitzer and posed the question: "is Dr. Greenberg reading films?" Ex. 34 (HHC_ESI_1259).  Dr. Pulitzer responded within 35 minutes with the answer, "Yes. He is." Ex. 35 (HHC_ESI_1262).

**Response:**     Plaintiff's response relies on speculation, improper argument and conclusory allegations. Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998); Watson v. Grady, No. 09-CV-3055 NSR, 2015 WL 2168189, at *17 (S.D.N.Y. May 7, 2015), aff'd sub nom. Watson v. Sims, 648 F. App'x 49 (2d Cir. 2016).  The alleged facts are also immaterial and are insufficient to create a genuinely disputed fact.

28.     On September 15, 2014 at around 2:47 p.m., Dr. Greenberg wrote to Dr. Pulitzer while carbon copying Dr. Reede in which he gave his account of what occurred leading up to his absences on September 4 and 5, 2014, emphasizing the fact that he emailed Dr. Pulitzer and Dr. Reede about coming in the week of August 25th and emailed Linda McMurren about the need to take off days the following week. Ex. 36 (HHC 1529 & 1531).  In response to this email, Dr.

Reede wrote to Dr. Pulitzer: "Dr. Greenberg is trying to cover his tracts [sic]." Ex. 37

(HHC_ESI_001274). To which Dr. Pulitzer responded, "Yes I have filed his email in his file. he is

really all over the map." Id.

    **Response:**    The SUNY Defendants do not dispute that the writings referred to were sent

and speak for themselves. The alleged facts are immaterial and are insufficient to create a genuinely

disputed fact.

    29.    On September 22, 2014, Dr. Greenberg attended a departmental meeting but

arrived late. Greenberg Decl., ¶ 11. During the departmental meeting, the use of attestation clauses

was discussed but because he arrived late Dr. Greenberg was not there for the whole discussion.

According to Dr. Greenberg, he left the meeting thinking that he had to draft an attestation clause

that met the criteria discussed at the meeting. Greenberg Decl., ¶ 11. He had no idea that the

clauses were available as macro templates from a colleague and they could therefore be easily placed

onto reports. Id. Out of frustration and in a fit of pique about this additional bureaucratic hurdle

that would slow down reading times and be an impediment to timely turnaround of radiological

studies for patient care and not realizing that what was required of him was simply copying a macro

template from a colleague, Dr. Greenberg wrote an attestation clause that was playful or sarcastic at

worse. Id. Soon after his studies started circulating with the attestation, colleagues in the ER were

talking about them. One of Dr. Greenberg's colleagues approached him, told him about the stir that

the attestations were creating and advised him to modify or revise them. Id., ¶ 12. Dr. Greenberg

approached an employee in the IT department and asked whether it was possible to change the

attestations that he had included in his studies. Ex. 1 (Greenberg Dep. at 291-93). When the

employee expressed discomfort in involving himself in such, Dr. Greenberg immediately clarified

that he was not asking that the attestations be changed or to do anything wrongful. Id. at 293.

**Response:** It is undisputed that Plaintiff authored unapproved attestations, and he inquired about improperly modifying them. Although it is not a plausible excuse, Plaintiff's knowledge of the form of the attestation is also immaterial, as he was terminated not for simply departing from the approved language, but for using unprofessional sarcastic language that was completely unacceptable in a patient's file. Pulitzer Decl., ¶ 13; Exs. HH, GG, II, LL, MM; Pulitzer Dep., 143:13-144:11; 138:21-139:25; 147:7-148:4; 155:3-156:11; 265:23-266:2; 287:8-20; 289:8-23; 290:20-291:17; Pulitzer Dep. II, p. 108:23-109:3. The remaining alleged facts are immaterial and insufficient to create a genuinely disputed fact.

30. On September 23, 2014, Dr. Greenberg took off time in the morning in order to attend a meeting related to his special-needs son's IEP. Ex. 1 (Greenberg Dep. at 297-98). After returning to work, Dr. Greenberg asked Dr. Pulitzer for additional time off in the afternoon in order to attend another such meeting. Id. at 298. His request was denied. Id. That afternoon, he left the reading room from 2:50 to 4:30 p.m. Part of that time was spent consulting with colleagues in ER and another part was spent taking lunch at the SUNY campus across the street from KCHC, which he was allowed to do, and he used part of the lunch break to talk to his wife about the IEP meeting that he missed. Id. at 302-03.

**Response:** SUNY Defendants admit that Plaintiff requested two hours off that afternoon and that Dr. Pulitzer denied this request, because there was no one available to adequately cover for Plaintiff. Pulitzer Dep., p. 389:22-390:6; Ex. GG. According to Talk Station data there was a gap of approximately two hours from 2:50 to 4:52. Ex. QQ, SUNY001326. It is uncontested that Dr. Pulitzer became alarmed by this because he was unable to locate Plaintiff, and he was concerned that the ER was not adequately covered. Id., p. 402:20-403:6; 413:15-20. It is uncontested that Dr. Pulitzer learned that Dr. Greenberg had asked Dr. Amiram Samin to cover for him during that period, but Dr. Samin was not able to read neuroradiology cases. Id. p. 401:24-

69

403:6; 413:15-20.  This issue was referred to Labor Relations as well.  Ex. GG.  The remaining

alleged facts are contested but immaterial and insufficient to create a genuinely disputed fact.

31.     On October 3, 2014, Labor Relations sent a letter to Dr. Greenberg

instructing him to report to Labor Relations to be interrogated as to alleged violations of the

Settlement Agreement.  Ex. 40 (SUNY 000014).  Dr. Greenberg was eventually terminated from

employment in or around October 22, 2014.

**Response:**     Undisputed.

### Dr. Reede's Anti-Semitic Remarks

32.     During the relevant period, in 2013, Esther Neiman sat in a room adjacent to

Dr. Reede.  Declaration of Esther Neiman dated June 27, 2018, ¶ 3.  She also frequently interacted

with Dr. Reede.  Id.  She testified that when Dr. Reede first arrived at SUNY to assume the position

of Department Chair of Radiology she was taken aback and showed evident disapproval that

observant Jews from all over the hospital were coming to the Radiology Department to participate

in midday prayers.  In this context, she asked Ms. Neiman, "What are your people doing here at this

time of day?"  Id., ¶ 4.  To which Ms. Neiman responded, after being shocked that Dr. Reede would

use the phrase "your people" something to the effect of I believe they are doing their daily prayers.

Id.  Ms. Neiman also heard Dr. Reede state to other administrative staff that she was going to put an

end to the midday prayers because it was disruptive to her department's operations.  Id. ¶ 5.  Ms.

Neiman also heard Dr. Reede state sarcastically that she wished she were Jewish because then she

too could have a lot of holidays from work and express frustration with observant Jews who she

could not reach or find on Friday afternoons because they left work early to observe Shabbat.  Id. ¶

6.

**Response:**     SUNY Defendants dispute the alleged facts in paragraph 32, state

that some of the allegations are not supported by admissible evidence, and aver that the disputed

facts are, nevertheless, immaterial and insufficient to create a triable issue of fact. When Dr. Reede began at SUNY Downstate, the office traditionally used by the Department Chair of the Department of Radiology was used by another radiologist, Dr. Hyman Schwarzberg and Orthodox Jewish physicians from throughout the hospital met there for daily prayers. Reede Dep., p. 387:2-20 (Reply Excerpts). When Dr. Reede assumed the position of Department Chair, she wanted to use the office traditionally used by the Department Chair. Id. Dr. Schwarzberg's office was moved two doors down, and Orthodox Jewish physicians continue to meet there. Id.

Dr. Reede specifically denies ever asking Ms. Neiman "what are your people doing here at this time of day," and that she ever said "she wished she were Jewish because then she would get lots of holidays from work too." Reede Reply Decl., ¶ 5. Even assuming their truth for the purposes of the motion, the alleged facts are also immaterial and insufficient to create a genuinely disputed fact, as the alleged statements are not directed at Plaintiff or connected to any of the alleged adverse acts at issue in this litigation and predated SUNY Defendants' renewal of Plaintiff's contract and the adverse actions.

Dated: New York, New York
      September 14, 2018

                                        BARBARA D. UNDERWOOD
                                        Attorney General of the State of New York
                                        *Attorney for SUNY Defendants*

                                        BY: */s/ Christopher Coulston*
                                        CHRISTOPHER COULSTON
                                        Assistant Attorney General
                                        28 Liberty Street
                                        New York, New York 10005
                                        (212) 416-8556
                                        email: christopher.coulston@ag.ny.gov

TO:     *(via ECF)*
         Chad L. Edgar
         Cardi & Edgar LLP
         99 Madison Avenue, 8th Floor
         New York, NY 10016
         212.481.7770 (tel.)

Ryan Shaffer
Senior Counsel
New York City Law Department
100 Church St.
New York, New York 10007
(212) 356-5037